**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

| | | |
|---|---|---|
| **CHRISTINA MITCHELL, IN HER OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY FOR THE 38TH JUDICIAL DISTRICT OF TEXAS,** | § § § § § | **CIVIL ACTION NO. 2:25-cv-00033** |
| *Plaintiff*, | § § | **COMPLAINT PURSUANT TO THE ADMINISTRATIVE PROCEDURE ACT,** |
| **V.** | § § | **5 U.S.C. § 551,** *et seq.* |
| **UNITED STATES CUSTOMS AND BORDER PROTECTION,** | § § | |
| *Defendant.* | § | |

---

## COMPLAINT

---

CHRISTINA MITCHELL, in her official capacity as the District Attorney for the 38th Judicial District of Texas, files this action against United States Customs and Border Protection ("CBP") pursuant to the Administrative Procedure Act.

## I.    INTRODUCTION

***Core Issue.***  This is an action for declaratory judgment and relief from a final agency decision under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*  Specifically, Mitchell seeks judicial review of CBP's administrative decision not to authorize United States Border Patrol ("U.S. Border Patrol") Agents A, B, and C to provide testimony in a Texas criminal law matter.[1]

---

[1]    Counsel for CBP and Mitchell have corresponded in advance of the filing of this complaint and have reached an agreement as to the letter assignments for each U.S. Border Patrol agent at issue to be used in publicly-filed documents in this litigation.

At its core, the question before this Court is this: With agents of the United States Border Patrol: (1) having come to Robb Elementary School in Uvalde, Texas on May 22, 2022, apparently at the request of the Uvalde Police Department and perhaps with jurisdiction to enforce the federal Gun-Free School Zones Act of 1990;[2] (2) having taken tactical control of the officers amassed in the school's hallway to formulate a plan to make entry into the suite of classrooms where a gunman was holding children and teachers hostage;[3] and (3) having participated in that plan and eliminated the threat, **how can the agents' employing agency – United States Customs and Border Protection – then interpret its own administrative regulations to find: (a) these agents need not cooperate with a state law criminal prosecution regarding the circumstances giving rise to the deaths of nineteen children and two adults; and (b) these agents have *no unique information to provide in the case*?**

---

[2]     The question of the CBP agents' authority to participate in the Robb Elementary incident was addressed in the Report of Investigation prepared by CBP's Office of Professional Responsibility ("OPR"):

> Absent specific statutory authority or any formal agreement, CBP law enforcement officers lacked explicit authority to respond to the incident at Robb Elementary School to assist state and local authorities. …. However, BPA [redacted], UVA, who was assigned to work in the radio room at UVA, told OPR investigators he received a call from UPD requesting USBP assistance at Robb Elementary School at approximately 11:45:00 AM.

The OPR report found that the agents had authority because "the incident at Robb Elementary School on May 24, 2022, fell within the scope of the Gun-Free School Zones Act of 1990."

[3]     According to OPR's Report of Investigation (emphasis added):

> Additionally, the written statement TXDPS Ranger [redacted] provided to TXDPS investigators following the incident at Robb Elementary School stated that upon his arrival, he coordinated with the BORTAC agent on scene and *requested he [the BORTAC agent] assume tactical control of the officers inside the hallway*. The only BORTAC agent on scene when TXDPS Ranger [redacted] arrived at Robb Elementary School was SBPA [redacted].

Under any reasonable interpretation of the CBP's *Touhy* regulations, the only possible conclusion is that the three border patrol agents whose cooperation is now being sought by District Attorney Mitchell – *two of whom participated in the actual killing of the gunman and the third who was present in the hallway during most of the incident* – are essential to the pending Texas criminal prosecution.[4]

**Facts.** The criminal law matter giving rise to this proceeding is the mass shooting incident at Robb Elementary School in Uvalde, Texas, on May 24, 2022, in which a man named Salvador Ramos entered Robb Elementary School and killed nineteen children and two adults and injured eighteen others before being killed by law enforcement officers at the scene ("Robb Elementary incident").

In the aftermath of the Robb Elementary incident, the Texas Department of Public Safety ("TDPS") conducted an extensive investigation of the law enforcement response to the incident. The TDPS investigation discovered that, after Ramos had entered a suite of two classrooms, closed the classroom door, and began discharging his assault rifle, the responding law enforcement officers amassed in a west wing hallway adjacent to the classrooms. The hallway officers included several U.S. Border Patrol agents.

---

[4]    To be clear, this request for cooperation from three CBP witnesses is the culmination of District Attorney Mitchell's good faith efforts to reasonably accommodate the CBP. According to OPR's report, *188* U.S. Border Patrol employees were involved in the response to the Robb Elementary incident. District Attorney Mitchell pared down her request for cooperation initially to eighteen CBP employees, and then ultimately to just the essential three employees who were directly involved in the response to the shooter.

The TDPS investigation established that, upon arrival, the hallway officers did not enter the classrooms to engage Ramos until one hour and seventeen minutes had elapsed, during which time Ramos sporadically fired shots from within the classrooms. The initial TDPS investigation primarily centered on discovering the reasons for the hallway officers' delay. Central to this investigation were written statements, interviews, and grand jury testimony from the law enforcement officers at the scene of the Robb Elementary incident, as well as hallway and body camera video recordings.

All but one agency cooperated with the TDPS investigation and a subsequent Uvalde County grand jury investigation. Although the U.S. Border Patrol agents at the scene of the Robb Elementary incident had provided written statements to the Texas Rangers, the Chief Counsel for United States Customs and Border Protection ("CBP")[5] declined to authorize the U.S. Border Patrol agents to be further interviewed by the TDPS or to testify before the Uvalde County grand jury.[6]

---

[5]     The U.S. Border Patrol is an agency under the umbrella of the CBP, which is itself an agency within the United States Department of Homeland Security.

[6]     CBP did eventually make available to the State of Texas a redacted copy of its publicly released OPR Report of Investigation into the Robb Elementary incident and allowed the State to review, but not obtain, the statements made to their investigators by the three agents at issue.

As will be discussed in more detail below, 38th Judicial Assistant District Attorney Bill Turner closely adhered to the administrative regulations promulgated by the CBP in requesting the U.S. Border Patrol agents at the Robb Elementary incident to appear before the Uvalde County grand jury. Despite Turner's good faith communications, negotiations, and narrowing of the requests for information, the CBP's Chief Counsel persisted in declining to authorize the testimony of the U.S. Border Patrol agents.

On June 27, 2024, the Uvalde County grand jury returned indictments against Pedro Arredondo and Adrian Gonzales for multiple counts of felony child endangerment based on their conduct, which can encompass both acts and omissions, as law enforcement officers responding to the Robb Elementary incident. The indictments against Arredondo and Gonzales are currently pending in the 38th District Court of Uvalde County, Texas.

After the indictments were presented, the prosecutors for the State of Texas again requested the testimony of three of the U.S. Border Patrol agents at the scene of the Robb Elementary incident, this time contending that the first-hand testimony of the U.S. Border Patrol agents would be essential for both the prosecution and defense of Arrendondo.[7] The CBP Chief Counsel has continued to decline authorization for the U.S. Border Patrol agents' cooperation and testimony.

---

[7] Adrian Gonzales was indicted for alleged criminal conduct that preceded the arrival of the U.S. Border Patrol agents. District Attorney Mitchell has not sought CBP assistance in the investigation and prosecution of Gonzales and does not seek relief from this Court related to the prosecution of his cases.

5

***Summary of Argument.***  The CBP's administrative declination of the State of Texas's most recent request for testimony from three U.S. Border Patrol agents at the scene of the Robb Elementary incident was arbitrary, capricious, an abuse of discretion, and not in accordance with the applicable law.  The information sought from the U.S. Border Patrol agents is not confidential, will not disclose or compromise investigative techniques, and will not unreasonably interfere with the missions of the CBP and the U.S. Border Patrol.[8]

The information sought from the three U.S. Border Patrol agents is extraordinarily significant.  As will be discussed below, these agents are uniquely situated to clarify how Arredondo's actions, omissions, and orders as incident commander influenced their actions.  Moreover, CBP reports and witness statements are no substitute for the testimony of these three witnesses because such reports and witness statements would be inadmissible hearsay in any evidentiary proceeding in state court.  *See, e.g., Ceroni v. 4Front Engineered Solutions, Inc.*, 793 F. Supp.2d 1268 (D. Colorado 2011) (holding that "suggestion that the evidence is available through some other source is unsupported and obviously incorrect" because "witness testimony can only be obtained at a deposition or trial through a subpoena").

This information may also be significant to Arrendondo's defense.  If the U.S. Border Patrol agents' testimony establishes that they were not influenced by the acts, omissions, or

---

[8]     In fact, to assuage any concerns about potential criminal liability, District Attorney Mitchell has offered to seek a court order granting the testifying U.S. Border Patrol agents "use" immunity for their cooperation and testimony in the Texas criminal proceedings.

orders of Arredondo, such testimony could be exculpatory or mitigating in his criminal case. If the agents' testimony establishes that (a) they had been trained as federal officers to intervene in a mass shooting even when told not to by a state authority; and (b) despite this training, did not do so, such testimony could likewise be exculpatory or mitigating. As such, access to the U.S. Border Patrol employees also implicates Arrendondo's Sixth Amendment and Fourteenth Amendment constitutional rights.

For these reasons, District Attorney Mitchell seeks an order from this Court mandating that the designated U.S. Border Patrol agents be made available as reasonably necessary to assist the prosecution and defense counsel for Arredondo's criminal trial in the 38th Judicial District Court of Uvalde County, Texas.

## II.    PARTIES

1.    38th Judicial District Attorney Christina Mitchell, represented by Special Assistant District Attorneys Bill Turner and Scott Durfee.[9]

2.    United States Customs and Border Protection is a law enforcement agency of the United States Department of Homeland Security. The CBP may be served through the Office of Chief Counsel, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue, Suite 4.4-B, Washington, D.C. 20229, and by email to cbpserviceintake@cbp.dhs.gov.

---

[9]    Durfee will file a motion to appear *pro hac vice* in this District when this complaint is docketed.

### III.    JURISDICTION AND VENUE

3.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, which authorizes this Court to review a final administrative decision or action of the CBP and determine whether such decision or action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the applicable law, including the CBP's *Touhy* Regulations set forth at 19 C.F.R., Part 103.

4.    This Court has jurisdiction to grant declaratory or other relief in this action pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

5.    An actual, justiciable controversy now exists between Mitchell and the CBP and the requested relief herein is proper pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

6.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim asserted herein occurred in the Western District of Texas.  The U.S. Border Patrol agents' participation in the Robb Elementary incident, the subsequent investigation of the law enforcement response to the Robb Elementary incident, the indictment of Arredondo, and the CBP's declination of Mitchell's *Touhy* request all occurred in the Western District of Texas.

7.    The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## IV.    *TOUHY* REVIEW STANDARDS

8.    District Attorney Mitchell acknowledges that the U.S. Border Patrol officials cannot be compelled by a state court to appear for state court proceedings, including grand jury proceedings, depositions, or trial proceedings, to testify about matters that relate to their official duties.

9.    The existence of sovereign immunity does not make the testimony of the U.S. Border Patrol agents impossible to obtain, however.  Federal law and regulations allow U.S. Border Patrol officials to testify in state court proceedings if the requestor utilizes certain administrative procedures detailed in the Code of Federal Regulations and designated federal officials authorize the U.S. Border Patrol officials to provide testimony in the state court proceedings.  For purposes of this Complaint, the administrative process for requesting and obtaining authorization for such testimony will be referred to as "*Touhy* proceedings."[10]

10.    U.S. Border Patrol employees are within the jurisdiction of U.S. Customs and Border Protection.  As such, *Touhy* proceedings for U.S. Border Patrol employees are dictated by 19 C.F.R., Part 103.

11.    Under CBP's *Touhy* regulations, CBP employees may only "furnish CBP documents or testimony as to any material contained in CBP files, any information relating to or based upon material contained in CBP files, or any information or material acquired as

---

[10]    The shorthand term "*Touhy* proceedings" refers to *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the seminal case establishing a federal agency's authority to restrict the production of information by the agency's employees.

part of the performance of that person's official duties (or because of that person's official status)" if authorized by the CBP Chief Counsel.  19 C.F.R. § 103.22(a).

12.     To acquire the CBP's authorization, a party seeking CBP information must serve on the appropriate CBP employee three things: (1) a demand for information; (2) a copy of the Summons and Complaint; and (3) an affidavit or statement that sets forth a summary of the documents or testimony sought and its relevance to the proceeding.  19 C.F.R. § 103.22(c).

13.     When evaluating a request for information pursuant to a demand, the Chief Counsel for the CBP is required to consider the following factors:

(1)     Whether the disclosure would be appropriate under the relevant substantive law concerning privilege;

(2)     Whether the disclosure would be appropriate under the rules of procedure governing the case or matter in which the demand arose; and,

(3)     Whether the requesting party has demonstrated that the information requested is:

(i)     Relevant and material to the action pending, based on copies of the summons and complaint that are required to be attached to the subpoena duces tecum or other demand;

(ii)     Genuinely necessary to the proceeding, *i.e.*, a showing of substantial need has been made;

(iii)     Unavailable from other sources; and,

(iv)     Reasonable in its scope, *i.e.*, the documents, information, or testimony sought are described with particularity.

(4)     Whether consultation with the originating component requires that the Chief Counsel make a separate determination as to the disclosure of the information requested.

19 CFR 103.23(a).

14.     There are eleven specific circumstances under which the Chief Counsel may not authorize the release of information.  *See* 19 CFR 103.23(b).   Of these eleven circumstances, the Chief Counsel has identified the following four circumstances as relevant to the State's request for information:

- Disclosure would reveal classified or confidential information.

- Disclosure would reveal a confidential source or informant.

- Disclosure would reveal investigatory records compiled for law enforcement purposes, interfere with enforcement proceedings, or disclose investigative techniques and procedures.

- Disclosure would unduly interfere with the orderly conduct of CBP business.

15.     The proper method to seek judicial review of a federal agency's final *Touhy* decision pursuant to its regulations is through a direct action brought under the Administrative Procedure Act.  *See, e.g., Hasie v. Office of Comptroller of Currency*, 633 F.3d 361, 365 (5th Cir. 2011); *CF Industries, Inc. v. Dep't of Justice BATF*, 692 F.App'x 177, 182 n.3 (5th Cir. 2017).

16.     A federal agency's denial of a *Touhy* request will be overturned only if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded "an important aspect of the problem, offered an explanation that runs counter to the evidence," or when a reasonable explanation for the agency's decision cannot be discerned.  *Motor Vehicle Ass'n v. State Farm Mut.*

*Auto. Ins.,* 463 U.S. 29, 43, (1983); *Judulang v. Holder*, 565 U.S. 42, 64 (2011); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 105 (1983).

17.    The "arbitrary and capricious" standard is not an impossible standard.  In several cases, federal courts have found agencies to have made *Touhy* determinations that were arbitrary and capricious.  *See, e.g., Schroeder v. U.S. Department of Veterans Affairs*, 673 F. Supp.3d 1204 (D. Kansas 2023); *In re Subpoena to National Science Foundation, Office of Inspector General*, 2018 WL 5017612 (E.D. Virginia, Oct. 16, 2018) (construing Administrative Procedure Act's "arbitrary and capricious" standard to find that agency misapplied *Touhy* regulations and to require disclosure of interview transcripts because transcripts were "crucial for the trial court to adjudicated fairly the rights of the parties in the underlying action"); *Rhoads v. U.S. Department of Veterans Affairs,* 242 F.Supp. 985 (E.D. Cal. 2017); *Ceroni v. 4Front Engineered Solutions, Inc.*, 793 F. Supp.2d 1268 (D. Colorado 2011).  One district judge fairly summarized the necessity for an agency to have a "good reason" to withhold evidence in a *Touhy* analysis:

> The Supreme Court has reminded us that,
>
>> "'For more than three centuries it has now been recognized as a fundamental maxim that the public ... has a right to every man's evidence. When we come to examine the various claims of exemption, *we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.*'"
>
> While the decision in *Touhy* recognized the authority of the heads of government agencies to enact regulations to provide an orderly process for handling requests for information and evidence addressed to them, neither

*Touhy* nor the Federal Housekeeping Act stands for the proposition that the government is broadly exempt from providing evidence. Indeed, the Federal Housekeeping Act – the current legal authority under which Touhy regulations are promulgated – explicitly rejects the notion that the government is exempt from providing evidence, saying "This section does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301. *There must be a good reason for an agency to withhold its evidence, and absent such a good reason, doing so is arbitrary, capricious, and an abuse of discretion.* Courts certainly are required to give great deference to the determinations made by agencies concerning reasons for withholding evidence, but *those reasons must make sense within the general context of the broad obligation to comply with the public's entitlement to "every man's evidence."*

*Brown v. U.S. Department of Veterans Affairs*, 2017 WL 3620253 (N.D. Ala., Aug. 23.

2017) (citations omitted and emphasis added).

## V.    FACTUAL BACKGROUND

### A.    The Incident

18.    On May 24, 2022, Salvador Ramos entered Robb Elementary School in Uvalde, Texas, with an assault rifle while school was in session.  He entered interconnected Classrooms 111 and 112 and discharged his assault rifle.

19.    Law enforcement officers thereafter responded, gathering in a hallway adjacent to the classrooms in the west wing of Robb Elementary School.  They did not attempt to enter the classrooms until one hour and seventeen minutes after Ramos's entry.  Instead, they called for the U.S. Border Patrol's Border Patrol Tactical Unit (BORTAC) to handle the incident.  Two of the officers who testimony is now requested were members of that BORTAC team.  One was the tactical commander who directed and participated in the entry.

20.     BORTAC members arrived approximately 35 to 40 minutes after the incident began and led the group that entered the room and eliminated the threat. Eventually, the officers procured a master key to open the door to the classroom suite, several officers, including U.S. Border Patrol employees, entered the classrooms.  After Ramos fired at them from a closet in the classroom, the officers returned fire and killed Ramos.  Approximately 25 minutes passed from the time they arrived until they entered the room.

**B.      The Immediate Aftermath**

21.     In the immediate aftermath of the Robb Elementary shooting, investigators from the FBI and Texas Rangers obtained statements from all of the U.S. Border Patrol officers present at the scene.

22.     When TDPS investigators turned over their investigation to the Uvalde County District Attorney and she initiated a grand jury investigation to gather additional information, the Chief Counsel for the U.S. Border Patrol declined her request to make the responding U.S. Border Patrol officers available.

**C.      Compliance with *Touhy* Procedures**

**1.      First Request**

23.     On February 21, 2023, Assistant District Attorney Bill Turner, who had been appointed by District Attorney Mitchell to assist her office's review of the Robb Elementary incident, sent the following documents to U.S. Border Patrol Chief Patrol Agent Jason Owens, each titled "19 CFR § 103.21-26 Demand for Testimony from Customs and Border Protection Employees":

a.    A request seeking grand jury testimony from eighteen U.S. Border Patrol employees.  This document included a preliminary statement, an affidavit detailing the specific need for the testimony of these witnesses, a list of the witnesses, the specific questions to be asked of each witness before the grand jury, and a summary of their previous statements to the Uvalde Police Department.

b.    A request seeking grand jury testimony from a specified U.S. Border Patrol agent.  This document included a preliminary statement, an affidavit detailing the specific need for the agent's testimony, and the specific questions to be asked of the agent before the grand jury.

24.    On March 9, 2023, Raul Ortiz, Chief of the U.S. Border Patrol, and Scott Falk, Chief Counsel for the CBP, sent Turner a letter declining to authorize access to the requested U.S. Border Patrol witnesses.  The letter detailed their consideration of four factors under the CBP's *Touhy* regulations:

a.    ***No showing that CBP is the only source for the information.***  Citing 19 C.F.R. § 103.23(a)(3)(iii), Ortiz and Falk noted that other non-CBP officers were in the hallway, stating "it is not clear that your office has exhausted attempts to obtain the information from the Texas state and local law enforcement officers who were present at the scene."

b.    ***Request unreasonable in scope and not described with sufficient particularity.***  Citing 19 C.F.R. § 103.23(a)(3)(iv), Ortiz and Falk took exception to the request seeking "general topics including CBP practices and procedures."

c. ***Unclear whether "all of the information sought is relevant and material to your case or generally necessary to the proceedings."*** Citing 19 C.F.R. § 103.23(a)(3)(i) & (ii), Ortiz and Falk argued that the request sought "general information regarding CBP's authorities, policies, training, and procedures without a clear explanation of why such information is relevant to these proceedings."

### 2. Second Request

25.     On April 2, 2024, Turner sent U.S. Border Patrol Chief Patrol Agent Jason Owens a document titled "19 CFR § 103.21-26 Second Demand for Testimony from Customs and Border Protection Employees," narrowing the request to seeking grand jury testimony from only three U.S. Border Patrol Agents: A, B, and C. This document included a preliminary statement, an affidavit detailing the need for their testimony, and the specific questions to be asked of these three witnesses before the grand jury.

26.     On May 21, 2024, CBP Chief Counsel Frederick B. Smith sent Turner a letter declining to produce the requested U.S. Border Patrol witnesses. The letter detailed their consideration of four factors under the CBP's *Touhy* regulations:

a. ***No showing that CBP has relevant information beyond original statements already disclosed.*** Citing 19 C.F.R. § 103.23(a)(3)(iii), Smith repeated the observations from Ortiz and Falk's letter and additionally pointed out that "you have already reviewed statements from [Agents A, B, and C] concerning their response to the mass shooting at the school" and that Turner's second request "fails to identify additional information that is

needed beyond the prior statements, and how that information relates to the individuals and issues under investigation."

      b.    ***Request "may" seek confidential law enforcement techniques and procedures not appropriate for disclosure.*** Smith cited 19 C.F.R. § 103.23(b)(5) but provided no additional explanation.

      c.    ***Demand for testimony remains unreasonable in scope and fails to describe need for information with any particularity; no nexus established between CBP officers' training, equipment or actions and any potential criminal acts or omissions of state and local officers at Robb Elementary.*** Citing 19 C.F.R. § 103.23(a)(3)(i) & (ii), Smith contended that "it is still not clear how this information is essential to your investigation and material and relevant to the case." Smith objected to requests for "the federal agents' training and experience in active shooter incidents, the gear they typically carry in response to such incidents and as Border Patrol Agents, the communication devices they use and other CBP practices and procedures," stating that the information being sought "seems not to be clearly relevant and material to the question of whether state and local law enforcement officers, operating under their own policies and procedures, violated Texas Penal Code Sec. 22.041 through their own acts and omissions."

      d.    ***Testimony intended to corroborate evidence from state officials.*** According to Smith, Turner did not have a need for the CBP officers' testimony beyond "corroborating information about the acts or omissions of state and local officials at Robb Elementary."

27.     On June 7, 2024, Turner sent Assistant United States Attorney Michael Clendenen a letter further explaining the specific need for the testimony of Agents A, B and C.  Turner received no written response to this letter.

### 3.    Third Request

28.     On October 24, 2024, Turner sent Smith a document titled "19 CFR § 103.21-26 Third Demand for Testimony from Customs and Border Protection Employees," seeking cooperation and testimony from U.S. Border Patrol Agents A, B, and C.  In his letter and accompanying affidavit, Turner responded in detail to the concerns expressed by Smith in his previous two letters and clarified the need for cooperation and testimony from the three witnesses regarding: (a) whether they had been trained on active shooter scenarios to exercise their own judgment independent of any state scene supervisor; (b) the extent to which the responding officers were provisioned with equipment necessary to respond to the active shooter; (c) the manner and content of Arredondo's communications with them during the incident; and (d) their knowledge of any evidence that would be exculpatory, impeaching or mitigating in Arredondo's favor.

29.     In a letter dated December 16, 2024, Smith declined Turner's request for the following reasons:

a.     ***Lack of clarity on relevance of CBP active shooter training.***  Citing 19 C.F.R. § 103.23(a)(3)(ii), Smith asserted that "it is unclear how information concerning how CBP agents are trained in active shooter scenarios and their prospective responses to an incident

commander's directives are relevant to the question of whether Mr. Arredondo violated Texas

Penal Code Sec. 20.041 through his own acts or omissions."

      b.    ***CBP OPR report sufficiently addresses equipment question.***  According to

Smith, the OPR report "makes it clear that CBP employees did not respond to Robb

Elementary School with the equipment necessary to breach the classroom door nor did any

of them possess a key to the school and/or any classroom."

      c.    ***Equipment list irrelevant.***  Smith conclusorily adds that "an inventory list of

the equipment BORTAC or other CBP employees had or wished they had on May 24, 2022

at the time of their arrival to Robb Elementary School is irrelevant to your prosecution of Mr.

Arredondo."

      d.    ***Equipment inventory available from non-CBP sources.***  Smith concludes that

an inventory of the available equipment "may be obtained from the state and local law

enforcement responders of which there were many. These individuals can testify about the

equipment they possessed and whether anyone, including Mr. Arredondo, supplied them with

the necessary equipment they lacked upon arrival."

      e.    ***Arredondo communications available from non-CBP sources.***  In response to

Turner's request for clarity from the CBP witnesses on how and what Arredondo

communicated with them during the Robb Elementary incident, Smith argued that the "CBP

OPR report indicates that the school hallway was littered with state and local law enforcement

officers. Your office can obtain this information from the state and/or local law enforcement

officers present in the hallway and at the shooting scene."

f.    ***CBP has no Brady or Giglio obligations.***    Regarding the request for exculpatory, impeaching or mitigating evidence known to CBP, Smith contended that the duty to seek and disclose such evidence belongs to the State of Texas, and that, as a non-party to the Texas criminal case, CBP has "no official interest or information regarding" the matter.

g.    ***Brady and Giglio request too broad.***    Finally, Smith objected to the request as not described "precisely enough" and that it would be "unduly burdensome to produce and speculative for a non-party federal agency to determine what is responsive."

## VI.    *TOUHY* AUTHORIZATION INCORRECTLY WITHHELD

30.    A careful review of Turner's third request shows that, in his affidavit, Turner specifically addressed each concern detailed in the CBP's declination letters of March 9, 2023, May 21, 2024, and December 14, 2024.

## A.    Conflicts Between Federal Training and State Incident Command Orders

31.    In his third *Touhy* request, Turner asked Smith for permission to make the following inquiries of Agents A, B, and C:

- Were the CBP employees trained as federal law enforcement officers on how to respond when they hear a driving force such as gunfire in an active shooting incident?

- What is that training?

- What does their training tell them to do when a state or local law enforcement incident commander at the scene orders them to respond to the driving force in a manner inconsistent with their federal training?

- Did they face that concern on May 24, 2022, during the Robb Elementary incident?  If so, how did they resolve that inconsistency?

32.    Turner then explained the need for the answers to these questions:

We have learned that state and local law enforcement officers are trained to go toward a driving force, such as gunfire, in an active shooter incident. In addition, local and state law enforcement have been trained to follow orders from an incident commander.

The unresolved question is: What do CBP agents do when shots are fired but the incident commander tells responding law enforcement officers to wait?

Local law enforcement has not been trained to override an incident commander. ALERRT officials, who train local and state officials on active shooter incidents, have said that federal officials do their own training and are not trained by ALERRT. They have told us that federal active shooter training is similar, but they could not say specifically how it differs. Therefore, the only source to tell us how federal officials would resolve this issue are the federal officials.

The answer to that question is essential to determine the degree of criminal responsibility an incident commander has when he gives responding law enforcement officers the order to stand down immediately after shots are fired. If each officer is responsible to act on their own initiative, the incident commander is necessarily less responsible for any delay in the law enforcement response to the active shooter. If, on the other hand, the CBP officers were trained to respect and obey the incident commander or considered their role as assisting the local commander, responsibility for the delay in the response falls much more directly upon the incident commander.

In this case, [Agent B] expressed frustration with the incident commander, Pedro Arredondo, for taking so long. However, his prior statement does not explain if he was frustrated because of a general feeling, or because he was trained to respond expeditiously to the active shooter and could not so respond due to Arredondo's order.

In addition, [Agent A] was the leader of the BORTAC squad that made entry. He was on the scene for approximately 25 minutes before entry was made. His prior statement does not address whether he heard Arredondo say that he should stand down after shots were fired and if he was trained to follow a local incident commander's orders. His response to how he was trained and how he may have responded to Arredondo is essential to understanding if Arredondo delayed his entry and is responsible for that delay.

21

Finally, other evidence indicates that there may have been a number of reasons for [Agent A]'s delay outside of a command to wait.  Some evidence indicates [Agent A]'s delay was due in part to a lack of quality information about the room and whether children had been injured. Nor could he determine from the people on the ground if the room was locked.  In addition, keys and breaching tools were not available when he arrived. As incident commander, Arredondo was responsible for setting up a command post to gather this vital information and provide assets to efficiently address the shooter.

**B.    CBP Equipment at the Scene**

33.    In his third *Touhy* request, Turner asked Smith for permission to make the following inquiries of Agents A, B, and C:

- When they arrived, what equipment did the BORTAC team have?  Specifically, did they have (a) weapons; (b) a breaching tool; (c) a sledgehammer; (d) gas canisters; (e) gas masks; (f) flash bangs; (g) keys to the classroom door?  If they did not, when did Pedro Arredondo supply them to the BORTAC team, if at all?

- Did the unavailability of flash bangs the BORTAC team's entry into the classroom? If so, why?

- Did the initial unavailability of a master key to the classroom door delay the BORTAC team's entry into the classroom?  If so, why?

- If there were gas canisters and gas masks available at the scene, why were they not used by the BORTAC team?

34.    Turner then explained the need for the answers to these questions:

The evidence developed to date indicates that Arredondo, in the face of gunfire, asked for additional rifles. Other officers have testified that they could not enter because they did not have proper equipment. Some officers have said that their protective gear was not rated to stop rifle fire.  Some officers have said their shields were not rated to stop rifle fire. Some officers have said they only had a handgun. Local and state officers have testified that they were not trained in breaching a door and that lack of training prohibited them from entering.  Other officers have said they called for breaching equipment.

It is my understanding that an incident commander has an obligation to provide the equipment to accomplish the mission. The outstanding question is what equipment the BORTAC team had when they arrived. It is true that some agents described the rifles they brought. There is some indication that [Agent A] went to his vehicle to get a breaching tool. A sledgehammer appeared on the scene at some time. However, without asking these agents for an inventory of the BORTAC team's equipment, a fact finder would be unable to determine how much of the incident commander's lack of providing equipment contributed to the delay.

At some point, gas canisters and gas masks arrived on the scene. However, they were never used. I have questioned the state and local law enforcement officers in the hallway why the gas was not used and have not been provided an answer. [Agent A], at one point, is heard on a body camera recording asking about the gas. There is some evidence that because there were injured children in the classrooms, the decision was made to not use gas. Therefore, I believe he knows why gas was not used. The reason gas was not used may be attributable to Arredondo or someone else. The answer is essential in establishing Arredondo's degree of responsibility.

Officers on body camera footage discussed the use of flash bangs. Video recordings indicate that local officers did not bring flash bangs to the scene but mistakenly brought a crate of explosives that fire rubber projectiles. It is unclear, after questioning state and local law enforcement officers, if CBP agents had flash bangs readily available, or if the unavailability of such equipment led to delays.

Most importantly, a decision was made to wait on keys to breach the classroom door. There has been testimony that officers were looking for keys. Other testimony indicates that the school officers, including the incident commander, were issued keys. However, when [Agent A] entered the school, 25 minutes lapsed before the BORTAC team he commanded made entry into the classroom. [Agent A] would know how much of that delay was based on waiting for a master key that would open the classroom door. There is some information that he believed that breaching tools would unnecessarily expose his men to danger, but it is unclear when he decided a key was necessary or if the lack of the key was a contributing factor to the delayed entry. I believe it was, but [Agent A] was the decision maker on entry and the answer to that question is very important to this prosecution.

23

### C.    Communications

35.    In his third *Touhy* request, Turner asked Smith for permission to make the following inquiry of Agents A, B, and C:

- To what degree were Pedro Arredondo's communications received and comprehended by the CBP personnel at the scene of the Robb Elementary incident?

36.    Turner then explained the need for the answers to these questions:

There has been considerable conflict in testimony as to how effective radios were in the hallway.  Arredondo did not bring his radio but communicated by cell phone.  Other officers gathered information from Arredondo and broadcast it to others.  One of the victims called the Uvalde Police Department's dispatch and that employee relayed that there were victims in the room.

The effectiveness of those communications is questionable.  The purpose in asking the CBP employees what communications they used is to establish what communications they were capable of hearing and what communications they heard.  The answers to these open questions are not apparent from the written statements of the CBP employees. Arredondo gave commands to officers on the south end of the wing where the shooter was.  What communications were received by these three CBP employees, who I believe were on the north end, is dependent to some degree on the communication devices they had or direction from others on the north end.

As established by the questions provided, the reception of these communications and actions taken are tied to the issue of whether Arredondo controlled their actions and if the communications impacted the responding agents' decision making.  The answers would assist a fact finder in deciding how much delay was due to Arredondo.

The CBP employees are the only source for the information I am requesting. We have exhausted our attempts to obtain the information from the state and local law enforcement officers who were present at the scene with the CBP employees.

### D.    Exculpatory, Impeaching or Mitigating Information

37.    In his third *Touhy* request, Turner asked Smith for permission to make the following inquiry of the CBP agents:

- Are you aware of any information, admissible as evidence or not, that would tend to negate the guilt of Pedro Arredondo, impeach the testimony of any witness for the State of Texas, or tend to reduce the punishment for the charges against Arredondo?

38.    Turner then explained the need for the answers to these questions:

> The primary duty of a prosecutor is not to convict, but to see that justice is done. If CBP has any exculpatory, impeaching or mitigating information related to the pending indictments, it is my obligation under federal and state law to obtain that information and either disclose it or present it to the trial court under seal for *in camera* review. If CBP has no such information, it is important to know that fact as well.

## VI.    REBUTTING CBP JUSTIFICATIONS

39.    As noted above, this Court has the authority under the Administrative Procedure Act to determine whether the CBP's decision to deny Turner's requests were arbitrary and capricious.

As a threshold matter, a close review of the CBP's various responses show that much of them are comprised solely of boilerplate objections, devoid of any individualized factual analysis. *Cf. Ceroni v. 4Front Engineered Solutions, Inc.*, 793 F. Supp.2d 1268, 1278 (D. Colorado 2011) (rejecting such conclusory analysis).

Setting aside the common-sense conclusion that Agents A, B, and C, by inserting themselves into the center of the Robb Elementary incident, cannot now abdicate their duty as material witnesses to provide clarity on what was an extraordinarily chaotic scene, here

are rebuttals to each of the CBP's administrative justifications for withholding the three agents' cooperation in the Texas criminal proceeding.[11]

40.      ***No showing that CBP is the only source for the information (March 9, 2023 letter).***  Contrary to the conclusory statements in Ortiz and Falk's March 9, 2023 letter, Turner specifically explains the necessity for knowing what Agents A, B, and C themselves heard, thought, and did during the Robb Elementary incident.  The uniqueness of the knowledge held by the CBP agents is self-evident, but the affidavit accompanying Turner's third *Touhy* request specifically states, "We have exhausted our attempts to obtain the information from the state and local law enforcement officers who were present at the scene with the CBP employees."  CBP has not stated a factual basis for concluding otherwise.

41.      ***Request unreasonable in scope and not described with sufficient particularity (March 9, 2023 letter).***  Contrary to the conclusory statements in Ortiz and Falk's March 9, 2023 letter, Turner did not seek information on "general topics including CBP practices and procedures" in his third request.  He narrowed the scope of the request to seeking the cooperation of three CBP agents and went into great detail about the necessity for their testimony.  This justification is no longer valid in light of Turner's most recent affidavit.

---

[11]      Rebuttals to the justifications expressed in the CBP's letters of March 9, 2023, and May 21, 2024, are necessary because the CBP Chief Counsel specifically incorporated the justifications from those letters into his December 14, 2024, letter.

42.    ***Unclear whether "all of the information sought is relevant and material to your case or generally necessary to the proceedings" (March 9, 2023 letter).***  Ortiz and Falk argued that the request sought "general information regarding CBP's authorities, policies, training, and procedures without a clear explanation of why such information is relevant to these proceedings."  This justification is no longer valid in light of Turner's most recent affidavit.

43.    ***No showing that CBP has relevant information beyond original statements already disclosed (May 21, 2024 letter).***  Smith stated that Turner had failed to identify additional information that is needed beyond the prior statements given by the three CBP agents, and how that information relates to the individuals and issues under investigation.  As noted above, Turner's third affidavit specifically addresses the need for additional information beyond the statements.  It also goes without saying that the prior statements would be inadmissible hearsay in the Texas criminal proceedings.  The sworn in-person testimony of the CBP agents is essential to the Texas proceedings.

44.    ***Request "may" seek confidential law enforcement techniques and procedures not appropriate for disclosure (May 21, 2024 letter)***.  Smith provided no explanation for this conclusion in his May 21, 2024 letter.[12]  In the affidavit accompanying his third *Touhy* request, Turner then clarified that he was not seeking confidential information

---

[12]    *See, e.g., OhioHealth Corp. v. U.S. Dep't of Veteran Affs.,* No. 2:14-cv-292, 2014 WL 4660092, at *6 (S.D. Ohio, Sept. 17, 2014) (finding VA's denial of *Touhy* requests was arbitrary and capricious where the VA "offered no connections, just conclusions" for the basis of its denial).

and pointed out that "the specific way that the BORTAC team entered the room and carried out its mission has been thoroughly discussed in statements by your agents and other officers" and had been captured on video.

45.      ***Demand for testimony remains unreasonable in scope and fails to describe need for information with any particularity; no nexus established between CBP officers' training, equipment or actions and any potential criminal acts or omissions of state and local officers at Robb Elementary (May 21, 2024 letter).*** In his May 21, 2024 letter, Smith objected to requests for "the federal agents' training and experience in active shooter incidents, the gear they typically carry in response to such incidents and as Border Patrol Agents, the communication devices they use and other CBP practices and procedures," stating that the information being sought "seems" not to be clearly relevant and material to the question of whether state and local law enforcement officers, operating under their own policies and procedures, violated Texas Penal Code Sec. 22.041 through their own acts and omissions. In the affidavit accompanying his third *Touhy* request, Turner detailed his theory of the Texas criminal prosecution, which contends that Arredondo failed to properly supervise, outfit, and communicate with the officers on the scene of the Robb Elementary incident. This prosecution turns, in part, on establishing that Arredondo's conduct was a primary cause for the delays in responding to and neutralizing the gunman at Robb Elementary. Establishing what the CBP agents brought with them, whether they were trained to defer to the incident commander (and in fact did defer), and what communications, if any,

they received from Arredondo, is essential to proving the absence of any intervening cause for the delayed response to the gunman.

46.     ***Testimony intended to corroborate evidence from state officials (May 21, 2024 letter).***  Smith concluded his May 21, 2024 letter by speculating that the testimony of the three CBP agents was simply being sought for "corroborating information about the acts or omissions of state and local officials at Robb Elementary."  In Turner's affidavit accompanying his third *Touhy* request, he established the unique non-corroborative information held by the CBP agents.  This conclusory justification is no longer valid in light of Turner's affidavit.

47.     ***Lack of clarity on relevance of CBP active shooter training (December 14, 2024 letter).***  In his December 14, 2024 letter, Smith states that it was "unclear" to him why active shooter training was relevant to the Texas criminal prosecution against Arredondo.  As noted above, in Turner's affidavit accompanying his third *Touhy* request, he specifically addressed the need for establishing whether the CBP's active shooter training required the CBP agents to act independently from the incident commander or whether they were required to be deferential to the incident commander.  The answer to that question is essential in establishing whether Arredondo was the primary cause of the delayed response to the gunman.

48.     ***CBP Office of Professional Responsibility report sufficiently addresses equipment question (December 14, 2024 letter).***  According to Smith, the OPR report "makes

it clear that CBP employees did not respond to Robb Elementary School with the equipment necessary to breach the classroom door nor did any of them possess a key to the school and/or any classroom." As noted above, this report is a hearsay document, inadmissible in the Texas criminal proceeding. The testimony of the CBP agents is essential to establish that Arredondo's failure to equip the responding officers was a direct cause of the delay in responding to the gunman. *See Ceroni v. 4Front Engineered Solutions, Inc.*, 793 F. Supp.2d 1268, 1279 (D. Colorado 2011) (holding that "suggestion that the evidence is available through some other source is unsupported and obviously incorrect" because "witness testimony can only be obtained at a deposition or trial through a subpoena").

49.     ***Equipment list irrelevant (December 14, 2024 letter).*** Smith conclusorily adds that "an inventory list of the equipment BORTAC or other CBP employees had or wished they had on May 24, 2022 at the time of their arrival to Robb Elementary School is irrelevant to your prosecution of Mr. Arredondo." This is untrue – establishing the *absence* of equipment from CBP forecloses any claim by Arredondo that CBP could have provided, but did not, equipment that could have expedited the law enforcement response to the gunman. And establishing what CBP believed it *needed* to enter the classroom suite is directly relevant to what Arredondo should have made available but did not.

50.     ***Equipment inventory available from non-CBP sources (December 14, 2024 letter).*** Smith concludes that an inventory of the available equipment "may be obtained from the state and local law enforcement responders of which there were many. These individuals

can testify about the equipment they possessed and whether anyone, including Mr. Arredondo, supplied them with the necessary equipment they lacked upon arrival." As noted above, Turner's affidavit established that all non-CBP sources were exhausted prior to the third *Touhy* request. Moreover, non-CBP sources cannot speak to what CBP brought to the scene – only the CBP agents can address that issue.

51.     ***Arredondo communications available from non-CBP sources (December 14, 2024 letter).*** In response to Turner's request for clarity from the CBP witnesses on how and what Arredondo communicated with them during the Robb Elementary incident, Smith argued that the "CBP OPR report indicates that the school hallway was littered with state and local law enforcement officers. Your office can obtain this information from the state and/or local law enforcement officers present in the hallway and at the shooting scene." As noted above, however, Turner's affidavit established that all non-CBP sources were exhausted prior to the third *Touhy* request. Moreover, non-CBP sources cannot speak to what Arredondo may have said directly to the CBP agents, particularly with respect to the issues related to the entry into the classroom suite – only the CBP agents can address that issue.

52.     ***CBP has no Brady or Giglio obligations; Brady and Giglio request too broad (December 14, 2024 letter).*** Finally, Smith has declined to cooperate with a search for information held by CBP that could exonerate or mitigate Arredondo's guilt, or impeach other inculpatory witnesses. This is a remarkable abstention from bedrock constitutional due process principles. CBP *regularly* conducts such searches in its own criminal law matters.

This request asks nothing more than what they already do in other federal court proceedings arising out of their participation in criminal law matters.

## VII.   COUNT I - APPEAL UNDER THE ADMINISTRATIVE PROCEDURE ACT OF THE CBP'S DENIAL OF DISTRICT ATTORNEY MITCHELL'S OCTOBER 24, 2024 REQUEST FOR TESTIMONY FROM AGENTS A, B, AND C.

53.     District Attorney Mitchell incorporates all previous paragraphs as if fully set forth herein.

54.     On October 24, 2024, on behalf of the State of Texas and District Attorney Mitchell, Assistant District Attorney Bill Turner submitted a written request for the testimony of Agents A, B and C in the pending state court prosecution of Pedro Arredondo.

55.     On December 14, 2024, CBP responded to Turner denying his request.

56.     District Attorney Mitchell has satisfied all regulatory requirements, and exhausted all administrative remedies, in her office's pursuit of testimony from Agents A, B, and C.  CBP has failed to provide any valid reason why the testimony of Agents A, B, and C would be improper pursuant to its *Touhy* regulations or otherwise. The CBP's alleged privileges and concerns do not apply to the topics to be inquired upon in the *Arrendondo* trial.

57.     CBP's suggestion that District Attorney Mitchell could obtain this information elsewhere is not an appropriate basis to deny the testimony because the avenues suggested by CBP are potentially inadmissible.

58.     CBP's denial precluding District Attorney Mitchell from obtaining relevant and admissible testimony from Agents A, B, and C is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act.

59.    District Attorney Mitchell and the State of Texas have been, and will continue to be, damaged by CBP's improper denials, as their ability to mount a complete prosecution in the *Arrendondo* state court case will be impaired without the requested testimony.

## VIII.  REQUEST FOR RELIEF

60.    District Attorney Mitchell requests that this Court issue an order:

(a)    setting aside CBP's December 14, 2024 denial of District Attorney Mitchell's request for testimony from Agents A, B, and C;

(b)    requiring Agents A, B, and C to testify in the state court proceedings pending against Pedro Arredondo in the 38th District Court of Uvalde County, Texas; and

(c)    granting all other appropriate, equitable, or remedial relief that the Court considers appropriate.

Respectfully submitted,

*/s/  Bill R. Turner*

State Bar No. 20335200
Assistant District Attorney
38th Judicial District Attorney's Office
524 E. Nopal Street
Uvalde, Texas 78801
(830) 278-2916 (telephone)
bill.turner@38thda.org

33

*/s/ Scott A. Durfee*

State Bar No. 20335200
Assistant District Attorney
38th Judicial District Attorney's Office
524 E. Nopal Street
Uvalde, Texas 78801
(830) 278-2916 (telephone)
scott.durfee@38thda.org
***Appearing Pro Hac Vice***

34