



# CHRISTINA MITCHELL
## 38TH JUDICIAL DISTRICT ATTORNEY
### UVALDE AND REAL COUNTIES

**THIRD REQUEST FOR TESTIMONY FROM
UNITED STATES CUSTOMS AND BORDER PROTECTION
EMPLOYEES**

October 24, 2024

Mr. Frederick B. Smith
Chief Counsel
United States Customs and Border Protection
1300 Pennsylvania Avenue, NW
Washington, DC 20229

Greetings:

I am a special assistant district attorney employed by 38th Judicial District Attorney Christina Mitchell, who prosecutes criminal law matters in Uvalde County, Texas. I have been retained by District Attorney Mitchell to assist her in the investigation and prosecution of state criminal law violations arising out of a mass shooting on May 24, 2022, at Robb Elementary School in Uvalde, Texas, that resulted in the deaths of nineteen children and two adults.

As you know, when Salvador Ramos entered the elementary school, hundreds of law enforcement officers surrounded the school, and a number of the officers made entry into a hallway adjacent to the classroom that Ramos occupied. Among the officers present at the scene were 188 employees of United States Customs and Border Protection (CBP), including many United States Border Patrol employees in the hallway outside the classroom. Some of the hallway Border Patrol officers were ultimately instrumental in making entry into the classroom and neutralizing the murderer. For that, I have gratitude for their public service.

**524 EAST NOPAL STREET, UVALDE, TEXAS 78801**
**TELEPHONE: (830) 278-2916**
**FACSIMILE: (830) 278-4731**
**38THDA.ORG**

AR00001

Mr. Frederick B. Smith
October 24, 2024
Page 2.

In the immediate aftermath of the mass shooting, the CBP employees gave statements to the Texas Rangers. Again, I am grateful for the willingness of these CBP employees to provide information at the time when they could have declined to cooperate under the CBP's *Touhy* regulations.

The Texas Department of Public Safety (TDPS) thereafter began a comprehensive investigation of the mass shooting. During the course of this investigation, it became apparent that the law enforcement response to the reports of an active shooter at Robb Elementary had been deeply flawed. The focus of the investigation shifted from a determination of whether the use of force was justified to whether the law enforcement response had been so poorly executed that it could have been a contributing cause to the endangerment of the children in the elementary school.

When I first met with Border Patrol investigators, I was advised that they were going to do an internal investigation and that they wanted to coordinate with me to reduce the amount of stress we put on the employees. It was their belief that having their employees repeatedly recount the details of the event was not emotionally healthy for them. At that meeting, I was assured that Border Patrol employees would be available to discuss the case with me. Therefore, I placed the rest of the investigation on hold to address CBP's concerns and prepare for interviews with Border Patrol employees. That process took approximately six months. After I concluded my preparation, I contacted CBP and was then told that I could not have access to the CBP employees.

On February 21, 2023, I requested access to nineteen CBP employees who had significant information regarding the Robb Elementary School incident. I adhered to the dictates of 19 C.F.R. § 103.22(c), providing an affidavit summarizing the testimony sought, including the questions to be asked, and an explanation of its relevance to the grand jury proceedings. In short, I explained that the grand jury was investigating whether any of the officers located in the west wing of Robb Elementary School during the mass shooting violated the Texas child endangerment statute, Section 22.041(c) of the Texas Penal Code. I further explained that the grand jury was considering the following:

Mr. Frederick B. Smith
October 24, 2024
Page 3.

- Whether the CBP employees at the scene had received inaccurate communications from others in law enforcement.

- Whether a lack of equipment at the scene may have impacted the CBP employees' response.

- Who, if anyone, directed the CBP employees at the scene to engage in the tasks that they performed.

- Whether the CBP employees received and heard communications from other law enforcement officers at the scene to stand down or delay their response to the gunman, and if so, the degree to which those communications influenced the CBP employees' response.

On March 9, 2023, Raul Ortiz, Chief of the U.S. Border Patrol, and Scott Falk, Chief Counsel for the CBP, sent me a letter declining to authorize the requested CBP witnesses. The letter detailed their consideration of four factors under the CBP's *Touhy* regulations:

- *[T]here has been no showing that CBP is the only source for the information.* Citing 19 C.F.R. § 103.23(a)(3)(iii), Ortiz and Falk pointed out that there were other non-CBP officers in the hallway and stated that "it is not clear that your office has exhausted attempts to obtain the information from the Texas state and local law enforcement officers who were present at the scene."

- *[T]he request is unreasonable in scope, and the requested information was not described with sufficient particularity."* Citing 19 C.F.R. § 103.23(a)(3)(iv), Ortiz and Falk took exception to the request seeking "general topics including CBP practices and procedures."

- *Nor is it clear that all of the information sought is relevant and material to your case or generally necessary to the proceedings.* Citing 19 C.F.R. § 103.23(a)(3)(i) & (ii), Ortiz and Falk argued that the request sought "general information regarding CBP's authorities, policies, training, and procedures without a clear explanation of why such information is relevant to these proceedings."

Mr. Frederick B. Smith
October 24, 2024
Page 4.

On April 2, 2024, I sent a second request for information, this time seeking grand jury testimony solely from CBP employees ████████ ████████, and ████████████. My explanatory affidavit, with minor style changes, remained the same.

On May 21, 2024, CPB Chief Counsel Frederick B. Smith sent me a letter declining to produce the requested CBP employees. The letter detailed his agency's consideration of four factors under the CBP's *Touhy* regulations:

- *[T]here has been no showing that CBP is the only source for the information.* Citing 19 C.F.R. § 103.23(a)(3)(iii), Smith repeated the observations from Ortiz and Falk's letter and additionally pointed out that "you have already reviewed statements from Agents ████ ████, and ████████ concerning their response to the mass shooting at the school" and that my second request "fails to identify additional information that is needed beyond the prior statements, and how that information relates to the individuals and issues under investigation."

- *[T]he request may also seek confidential law enforcement techniques and procedures which are not appropriate for disclosure.* Smith cited 19 C.F.R. § 103.23(b)(5), but provided no additional explanation.

- *[Y]our second demand for testimony remains unreasonable in scope and fails to describe your need for information with any particularity.* Citing 19 C.F.R. § 103.23(a)(3)(i) & (ii), Smith contended that "it is still not clear how this information is essential to your investigation and material and relevant to the case." Smith objected to requests for "the federal agents' training and experience in active shooter incidents, the gear they typically carry in response to such incidents and as Border Patrol Agents, the communication devices they use and other CBP practices and procedures," stating that the information being sought "seems not to be clearly relevant and material to the question of whether state and local law enforcement officers, operating under their own policies and procedures, violated Texas Penal Code Sec. 22.041 through their own acts and omissions."

Mr. Frederick B. Smith
October 24, 2024
Page 5.

- *[Y]ou fail to provide a nexus between the CBP officers' training, equipment or actions and any potential criminal acts or omissions of state and local officers at Robb Elementary.*

- *[Y]ou intend to use the CBP employees' response to the mass shooting to corroborate information about the acts or omissions of state and local officials at Robb Elementary.*

Based on the lack of cooperation from CPB, I was forced to delete from the criminal charge against Chief Pete Arredondo all references to actions by CBP employees. These deletions significantly damage the prosecution of Chief Arredondo.

On June 27, 2024, a Uvalde County grand jury indicted Uvalde Independent School District Police Department (UISDPD) Chief Pedro Arredondo and UISDPD Officer Adrian Gonzales on multiple counts of child endangerment.  The indictments have been docketed in the 38th District Court of Uvalde County, Texas, and are currently pending trial.

On July 22, 2024, Assistant U.S. Attorney Michael Clendenen notified me that my request for testimony from ████, ████ and ████ had become moot in the aftermath of the grand jury indictments.  In an email on July 23, 2024, Clendenen clarified that his notification "does not preclude your office from submitting (whether as part of your *Brady* obligation or otherwise) a *Touhy* request in connection with a subsequent legal proceeding, submitting a FOIA request, or participating in another information-sharing arrangement that may have been discussed during your office's July 12 phone call with OPR, in which the attorneys representing CBP and I did not participate."

Thereafter, I met with CBP investigators who provided brief summaries of the three employees I sought to interview during the grand jury investigation.  The summaries confirmed my belief that their information is critical to the prosecution of Chief Arredondo. Likewise, some of the information they provided may qualify as information helpful to Arredondo.  I am now preparing for trial and trying to fulfill my discovery obligation to turn over all information helpful to the defense.

Because the circumstances of the case have changed since my previous *Touhy* request, I am now submitting a third request for the testimony of CBP employees ████ ████ ████, and ████.  In the attached affidavit, I detail

Mr. Frederick B. Smith
October 24, 2024
Page 6.

the reasons why their testimony is relevant to the pending cases and specifically address the concerns expressed by CBP in the previous two responses to my *Touhy* requests.

Please note that this request seeks: (1) availability for pretrial preparatory interviews with the three CBP employees; and (2) availability for pretrial hearings and trial, as necessary. To minimize the time required for this process, I am willing to conduct the pretrial preparatory interviews at a location convenient to the employees.

Further, to address any concerns CBP may have about the employees' exposure to prosecution under Texas law, District Attorney Mitchell and I are thoroughly familiar with the facts of this case and have concluded that prosecution of CBP employees is not warranted. To this end, if necessary, District Attorney Mitchell agrees to request an order of "use immunity" from the presiding judge of the 38th District Court for any information provided by the three CBP employees in response to the State's subpoenas.

If you believe that any part of this request is beyond the scope of your authority to grant, I would very much appreciate an opportunity to discuss the matter with you. I am willing to meet with you in person.

I look forward to hearing from you soon.

Thank you for your consideration of this request for testimony.

Sincerely,

**Bill Turner**

Bill Turner
Assistant District Attorney
38th Judicial District Attorney's Office

**COUNTY OF HAYS**                                  §
                                                   §
**STATE OF TEXAS**                                 §

### AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared William R. Turner who, upon being duly sworn, deposed and stated as follows:

My name is William R. Turner. I am over eighteen years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated, which are true and correct.

I am an Assistant District Attorney employed by 38th Judicial District Attorney Christina Mitchell to investigate and prosecute any criminal matters arising out of the mass shooting incident that occurred at Robb Elementary School in Uvalde, Texas, on May 24, 2022.

The essential facts of the mass shooting are as follows: Salvador Ramos entered Robb Elementary School with an assault rifle and thereafter entered two interconnected classrooms. Inside the classroom area, he discharged his firearm. Hundreds of law enforcement officers, including many employees of United States Customs and Border Protection (CBP), responded to the shooting. Many of the responding officers entered the west wing of the school and took a position in a hallway outside the classroom area that Ramos occupied.

Seventy-seven minutes after law enforcement officers entered Robb Elementary School, members of CBP's Border Patrol Tactical Unit (BORTAC) and Border Patrol Search, Trauma, and Rescue Unit (BORSTAR) opened the door to the classroom area and, after a brief exchange of gunfire, killed Ramos. Nineteen children and two adults had been killed by Ramos, and several other individuals had been injured.

In the aftermath of the mass shooting incident, the Texas Department of Public Safety (TDPS) and District Attorney Mitchell initiated a criminal investigation of the law enforcement response to the incident. They determined that, during the seventy-seven minutes preceding law enforcement's entry through the closed classroom door,

Affidavit of William R. Turner
October 21, 2024
Page 2.

Ramos sporadically fired shots from inside. 911 recordings established that a child inside the classroom area called for help and described the injured and dead in her classroom, but that law enforcement did not act on this information for approximately 30 minutes.

After a lengthy TDPS investigation and a presentation of the available facts to a Uvalde County grand jury, the grand jury indicted Uvalde Independent School District Police Department Chief Pedro "Pete" Arredondo on ten counts of child endangerment.[1]

The indictment alleges that Arredondo endangered the children who survived the shooting by delaying law enforcement's response to the active shooter by:

1.  Calling for SWAT assistance after hearing active shooting.

2.  Calling for SWAT assistance after being advised a teacher had been shot.

3.  Directing law enforcement to evacuate the wing before entering the classroom.

4.  Failing to follow an active shooter policy developed by the school district to stop the shooter before evacuating students.

5.  Negotiating with an active shooter.

6.  Failing to determine if the classroom door was locked.

7.  Failing to timely provide keys and breaching tools.

8.  Failing to establish a command center or direct others to establish a command center.

9.  Failing to establish an immediate action plan or direct others to establish an immediate action plan.

---

[1]  The Uvalde County grand jury also indicted Adrian Gonzales on ten counts of child endangerment. To my knowledge, there were no CBP interactions with Gonzales. As such, I am not seeking CBP cooperation in the prosecution of Gonzales at this time.

Affidavit of William R. Turner
October 21, 2024
Page 3.

There are three CBP employees who are essential to the prosecution (and defense) of the allegations against Arredondo: ▮▮▮ ▮▮▮▮ ▮▮▮▮ , and ▮▮▮▮ .

▮▮▮▮ was the acting commander of the U.S. Border Patrol Tactical Unit (BORTAC) at the time of the Robb Elementary incident. According to his statement to the Texas Rangers, he arrived around 12:15 p.m. and was briefed on the situation. ▮▮▮ determined that, if locked, prying the classroom door open would expose the officers at the door to gunfire, so he waited for delivery of a master key to the hallway. When the key arrived and was verified to work, ▮▮▮ opened the classroom door and was part of the team that entered the classroom and killed Ramos.

▮▮▮▮ is a supervisor for the U.S. Border Patrol who was teaching a class on use of force at the time of the incident. He arrived at Robb Elementary School before the BORTAC team arrived. He personally observed Arredondo's conduct.

▮▮▮▮ is an employee of the U.S. Border Patrol who was assigned to Uvalde at the time of the incident. He personally observed the early response to the incident and the dynamics of Arredondo's interactions (or lack thereof) with the responding law enforcement officers. When ▮▮▮ arrived, he worked closely with ▮▮▮ in planning and executing the entry into the classroom area.

What a fact finder must know that cannot be determined from state and local law enforcement at the scene are the following questions:

Conflicts Between Federal Training and State Incident Command Orders

- Were the CBP employees trained as federal law enforcement officers on how to respond when they hear a driving force such as gunfire in an active shooting incident?

- What is that training?

Affidavit of William R. Turner
October 21, 2024
Page 4.

- What does their training tell them to do when a state or local law enforcement incident commander at the scene orders them to respond to the driving force in a manner inconsistent with their federal training?

- Did they face that concern on May 24, 2022, during the Robb Elementary incident? If so, how did they resolve that inconsistency?

*Explanation of necessity and relevancy.* We have learned that state and local law enforcement officers are trained to go toward a driving force, such as gunfire, in an active shooter incident. In addition, local and state law enforcement have been trained to follow orders from an incident commander.

The unresolved question is: What do CBP agents do when shots are fired but the incident commander tells responding law enforcement officers to wait?

Local law enforcement has not been trained to override an incident commander. ALERRT officials, who train local and state officials on active shooter incidents, have said that federal officials do their own training and are not trained by ALERRT. They have told us that federal active shooter training is similar, but they could not say specifically how it differs. Therefore, the only source to tell us how federal officials would resolve this issue are the federal officials.

The answer to that question is essential to determine the degree of criminal responsibility an incident commander has when he gives responding law enforcement officers the order to stand down immediately after shots are fired. If each officer is responsible to act on their own initiative, the incident commander is necessarily less responsible for any delay in the law enforcement response to the active shooter. If, on the other hand, the CBP officers were trained to respect and obey the incident commander or considered their role as assisting the local commander, responsibility for the delay in the response falls much more directly upon the incident commander.

Affidavit of William R. Turner
October 21, 2024
Page 5.

In this case, ███████ expressed frustration with the incident commander, Pedro Arredondo, for taking so long. However, his prior statement does not explain if he was frustrated because of a general feeling, or because he was trained to respond expeditiously to the active shooter and could not so respond due to Arredondo's order.

In addition, ███████ was the leader of the BORTAC squad that made entry. He was on the scene for approximately 25 minutes before entry was made. His prior statement does not address whether he heard Arredondo say that he should stand down after shots were fired and if he was trained to follow a local incident commander's orders. His response to how he was trained and how he may have responded to Arredondo is essential to understanding if Arredondo delayed his entry and is responsible for that delay.

Finally, other evidence indicates that there may have been a number of reasons for ███████ delay outside of a command to wait. Some evidence indicates ███████ delay was due in part to a lack of quality information about the room and whether children had been injured. Nor could he determine from the people on the ground if the room was locked. In addition, keys and breaching tools were not available when he arrived. As incident commander, Arredondo was responsible for setting up a command post to gather this vital information and provide assets to efficiently address the shooter.

I have no intent to seek confidential information that could jeopardize CPB's work in the future. The specific way that the BORTAC team entered the room and carried out its mission has been thoroughly discussed in statements by your agents and other officers. It has also been captured on video. I am not seeking confidential information in this *Touhy* request.

CBP Equipment at the Scene

- When they arrived, what equipment did the BORTAC team have? Specifically, did they have (a) weapons; (b) a breaching tool; (c) a sledgehammer; (d) gas canisters; (e) gas masks; (f) flash bangs; (g) keys to the classroom door? If they did not, when did Pedro Arredondo supply them to the BORTAC team, if at all?

Affidavit of William R. Turner
October 21, 2024
Page 6.

- Did the unavailability of flash bangs the BORTAC team's entry into the classroom? If so, why?

- Did the initial unavailability of a master key to the classroom door delay the BORTAC team's entry into the classroom? If so, why?

- If there were gas canisters and gas masks available at the scene, why were they not used by the BORTAC team?

*Explanation of necessity and relevancy.* The evidence developed to date indicates that Arredondo, in the face of gunfire, asked for additional rifles. Other officers have testified that they could not enter because they did not have proper equipment. Some officers have said that their protective gear was not rated to stop rifle fire. Some officers have said their shields were not rated to stop rifle fire. Some officers have said they only had a handgun. Local and state officers have testified that they were not trained in breaching a door and that lack of training prohibited them from entering. Other officers have said they called for breaching equipment.

It is my understanding that an incident commander has an obligation to provide the equipment to accomplish the mission. The outstanding question is what equipment the BORTAC team had when they arrived. It is true that some agents described the rifles they brought. There is some indication that ███████ went to his vehicle to get a breaching tool. A sledgehammer appeared on the scene at some time. However, without asking these agents for an inventory of the BORTAC team's equipment, a fact finder would be unable to determine how much of the incident commander's lack of providing equipment contributed to the delay.

At some point, gas canisters and gas masks arrived on the scene. However, they were never used. I have questioned the state and local law enforcement officers in the hallway why the gas was not used and have not been provided an answer. ███████ at one point, is heard on a body camera recording asking about the gas. There is some evidence that because there were injured children in the classrooms, the decision was made to not use gas. Therefore, I believe he knows why gas was not used.

Affidavit of William R. Turner
October 21, 2024
Page 7.

The reason gas was not used may be attributable to Arredondo or someone else. The answer is essential in establishing Arredondo's degree of responsibility.

Officers on body camera footage discussed the use of flash bangs. Video recordings indicate that local officers did not bring flash bangs to the scene but mistakenly brought a crate of explosives that fire rubber projectiles.    It is unclear, after questioning state and local law enforcement officers, if CPB agents had flash bangs readily available, or if the unavailability of such equipment led to delays.

Most importantly, a decision was made to wait on keys to breach the classroom door. There has been testimony that officers were looking for keys. Other testimony indicates that the school officers, including the incident commander, were issued keys.   However, when [redacted] entered the school, 25 minutes lapsed before the BORTAC team he commanded made entry into the classroom. [redacted] would know how much of that delay was based on waiting for a master key that would open the classroom door. There is some information that he believed that breaching tools would unnecessarily expose his men to danger, but it is unclear when he decided a key was necessary or if the lack of the key was a contributing factor to the delayed entry. I believe it was, but [redacted] was the decision maker on entry and the answer to that question is very important to this prosecution.

Communications

- To what degree were Pedro Arredondo's communications received and comprehended by the CBP personnel at the scene of the Robb Elementary incident?

   *Explanation of necessity and relevancy.*    There has been considerable conflict in testimony as to how effective radios were in the hallway. Arredondo did not bring his radio but communicated by cell phone.   Other officers gathered information from Arredondo and broadcast it to others. One of the victims called the Uvalde Police Department's dispatch and that employee relayed that there were victims in the room.

Affidavit of William R. Turner
October 21, 2024
Page 8.

The effectiveness of those communications is questionable. The purpose in asking the CPB employees what communications they used is to establish what communications they were capable of hearing and what communications they heard. The answers to these open questions are not apparent from the written statements of the CPB employees. Arredondo gave commands to officers on the south end of the wing where the shooter was. What communications were received by these three CPB employees, who I believe were on the north end, is dependent to some degree on the communication devices they had or direction from others on the north end.

As established by the questions provided, the reception of these communications and actions taken are tied to the issue of whether Arredondo controlled their actions and if the communications impacted the responding agents' decision making. The answers would assist a fact finder in deciding how much delay was due to Arredondo.

The CBP employees are the only source for the information I am requesting. We have exhausted our attempts to obtain the information from the state and local law enforcement officers who were present at the scene with the CBP employees.

Exculpatory, Impeaching or Mitigating Information

- Are you aware of any information, admissible as evidence or not, that would tend to negate the guilt of Pedro Arredondo, impeach the testimony of any witness for the State of Texas, or tend to reduce the punishment for the charges against Arredondo?

***Explanation of necessity and relevancy.*** The primary duty of a prosecutor is not to convict, but to see that justice is done. If CBP has any exculpatory, impeaching or mitigating information related to the pending indictments, it is my obligation under federal and state law to obtain that information and either disclose it or present it to the trial court under seal for *in camera* review. If CBP has no such information, it is important to know that fact as well.

Affidavit of William R. Turner
October 21, 2024
Page 9.

       I respectfully request that this request for testimony as well as trial preparation be approved.


_WILLIAM R. TURNER_

SWORN TO AND SUBSCRIBED before me on this the 21st day of October, 2024.


NOTARY PUBLIC,
in and for Hays County, Texas

CRISTIAN CADENA
Notary Public, State of Texas
Comm. Expires 09-16-2026
Notary ID 13396522-6

AR00015



1300 Pennsylvania Avenue, NW

**U.S. Customs and Border Protection**

December 16, 2024

William R. Turner
Assistant District Attorney
38th Judicial District Attorney's Office
524 E. Nopal Street
Uvalde, Texas 78801

Re: Request for testimony from CBP employees related to the shooting at Robb Elementary School

Dear ADA Turner,

We are in receipt of your third request for trial testimony from U.S. Customs and Border Protection (CBP) employees, dated October 24, 2024. This request is substantially similar to your prior requests, dated February 21, 2023 and April 2, 2024, respectively, as it relates to your office's investigation into law enforcement's response to the mass shooting at Robb Elementary School on May 24, 2022, and the prosecution of former Uvalde School District Police Chief Pete Arredondo. We have reviewed your request, affidavit, and the questions you intend to ask the CBP employees. Pursuant to the applicable CBP regulations and the reasons set forth below, CBP respectfully declines to authorize these employees' testimony in this litigation.

As with your prior requests, we reviewed this request pursuant to CBP's regulations which govern production or disclosure in federal, state, local, and foreign proceedings. Federal law controls the disclosure of information by CBP. *See* 5 U.S.C. § 301 (authorizing federal agency heads to prescribe regulations for the conduct of employees and the custody, use, and preservation of agency records). The Department of Homeland Security has promulgated regulations applicable to the disclosure of information by CBP. *See* 6 C.F.R. Part 5; 19 C.F.R. Part 103. These regulations have the force and effect of federal law, and the U.S. Supreme Court has expressly recognized the authority of a federal agency to restrict the production of information by its subordinates. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951) (approving federal agencies' use of regulations to govern administrative requests for production of agency documents and testimony). No CBP employee may provide official information or testimony without advance authorization granted pursuant to the agency's disclosure regulations. *See* 6 C.F.R. § 5.44(a); 19 C.F.R. § 103.22(a). The agency's disclosure regulations set forth the requirements for service of subpoenas, as well as a specific description of and justification for release of official information or testimony. *See* 6 C.F.R. §§ 5.43-5.45; 19 C.F.R. § 103.22. The agency's disclosure regulations require that at least ten working days prior to the scheduled date of production of documents or taking of testimony, the requesting party must provide an affidavit or, if that is not feasible, a statement that sets forth a summary of the

documents or testimony sought and its relevance to the proceeding. *See* 6 C.F.R. § 5.45(a); 19 C.F.R. §§ 103.22(c), (d).

Moreover, a state court lacks jurisdiction to enforce a subpoena seeking testimony or documents from a federal employee or federal agency. *See, e.g., Louisiana v. Sparks*, 978 F.2d 226 (5th Cir. 1992) (state court subpoena issued to federal parole officer quashed on sovereign immunity grounds); *see also United States v. McLeod*, 385 F.2d 734, 752 (5th Cir. 1967) (state court may not enforce subpoena directing federal officers to testify before state grand jury).

After careful consideration of the applicable factors listed in 19 C.F.R. § 103.23, CBP has determined that several of the listed factors weigh against providing the requested testimony. We incorporate by reference each of the factors that weigh against providing the requested testimony from our previous responses, dated March 9, 2023 and May 21, 2024, and include additional considerations based on your updated demand for testimony.

In your affidavit, you identify four areas in which you seek information from the identified CBP employees or the agency more generally. First, you request information about potential conflicts between federal and state incident command training. Specifically, you seek information about (1) how CBP employees respond to a driving force in an active shooter situation; (2) CBP law enforcement officer active shooter training; (3) what CBP employees would do when a local law enforcement incident commander orders them to respond to a driving force in a manner inconsistent with their federal training; and (4) whether they faced that concern on May 24, 2022, during the Robb Elementary School shooting, and if so, how they resolved it. As stated in our previous response, it is unclear how information concerning how CBP agents are trained in active shooter scenarios and their prospective responses to an incident commander's directives are relevant to the question of whether Mr. Arredondo violated Texas Penal Code Sec. 20.041 through his own acts or omissions. *See* 19 C.F.R. § 103.23(a)(3)(ii).

Next, you have requested information about the equipment CBP may or may not have possessed at the shooting scene, including the U.S. Border Patrol Tactical Unit's (BORTAC) equipment, weaponry, breaching tools, sledgehammer, gas cannister, gas masks, flash bangs, or keys to the classroom. You also asked who supplied any equipment to the CBP officials who responded to the shooting, the reasons they used certain equipment over others, and/or the possible effect not having specific equipment had on their actions. Based on your affidavit, it appears you are attempting to confirm whether Mr. Arredondo provided any equipment to any CBP employee and whether a lack of that equipment contributed to law enforcement's delayed response to the shooting. The CBP Office of Professional Responsibility (OPR) report makes it clear that CBP employees did not respond to Robb Elementary School with the equipment necessary to breach the classroom door nor did any of them possess a key to the school and/or any classroom. Additionally, an inventory list of the equipment BORTAC or other CBP employees had or wished they had on May 24, 2022 at the time of their arrival to Robb Elementary School is irrelevant to your prosecution of Mr. Arredondo. Moreover, this information may be obtained from the state and local law enforcement responders of which there were many. These individuals can testify about the equipment they possessed and whether anyone, including Mr. Arredondo, supplied them with the necessary equipment they lacked upon arrival.

Further, you seek testimony from the CBP employees about the degree to which they received and understood Mr. Arredondo's communications, if any. Specifically, you request information about the communications between Mr. Arredondo at the south end of the hallway and the law enforcement officers at the north end. The CBP OPR report indicates that the school hallway was littered with state and local law enforcement officers. Your office can obtain this information from the state and/or local law enforcement officers present in the hallway and at the shooting scene. Accordingly, CBP is not the only source of this information.

The final area of requested testimony concerns whether CBP is aware of any information, admissible as evidence or not, that would tend to negate Mr. Arredondo's guilt, impeach the testimony of any witness for the State of Texas, or tend to reduce the punishment for the charges against him. The obligation to comply with *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) belongs to the State. Additionally, we object on grounds that the requested information is not described precisely enough and therefore would be unduly burdensome to produce and speculative for a non-party federal agency to determine what is responsive. Lastly, CBP is not a party to this litigation and has no official interest or information regarding this matter and efforts toward complying with this request would significantly interfere with the orderly conduct of CBP's business. *See* 19 C.F.R. § 103.23(b).

Considering the foregoing factors, taken together with other considerations, CBP declines to authorize the requested information. This letter is not intended to contain a complete recitation of CBP's basis for denial of this request, and CBP reserves the right to object to the request on any additional grounds which may be applicable.

Should you have any questions regarding this response, you may contact Department of Justice Trial Attorney Michael Clendenen at Michael.P.Clendenen@usdoj.gov.

Sincerely,

Frederick B. Smith
Chief Counsel

Cc:    Michael Clendenen, Trial Attorney
       U.S. Department of Justice, Civil Division



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

March 9, 2023

William R. Turner
Assistant District Attorney
Office of the 38th Judicial District Attorney
524 E. Nopal Street
Uvalde, Texas 78801

      Re:  Request for Grand Jury Testimony

Dear Mr. Turner,

Thank you for your correspondence, dated February 21, 2023, requesting information relating to the investigation into law enforcement's response to the mass shooting at Robb Elementary on May 24, 2022.  As you know, U.S. Customs and Border Protection (CBP) is also conducting an investigation into those events.  CBP has considered your request, and for the reasons outlined below, CBP respectfully declines to supply the grand jury testimony that your office has requested.

Your request was considered pursuant to CBP's regulations for production or disclosure in federal, state, local, and foreign proceedings.  Federal law controls the disclosure of information by CBP.  *See* 5 U.S.C. § 301 (authorizing federal agency heads to prescribe regulations for the conduct of employees and the custody, use, and preservation of agency records).  The Department of Homeland Security has promulgated regulations applicable to disclosure of information by CBP.  *See* 6 C.F.R. Part 5; 19 C.F.R. Part 103.  These regulations have the force and effect of federal law, and the U.S. Supreme Court has expressly recognized the authority of a federal agency to restrict the production of information by its subordinates.  *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951) (approving federal agencies' use of regulations to govern administrative requests for production of agency documents and testimony).  No CBP employee may provide official information or testimony without advance authorization granted pursuant to the agency's disclosure regulations.  *See* 6 C.F.R. § 5.44(a); 19 C.F.R. § 103.22(a).  The agency's disclosure regulations set forth the requirements for service of subpoenas, as well as a specific description of and justification for release of official information or testimony.  *See* 6 C.F.R. §§ 5.43-5.45; 19 C.F.R. § 103.22.  The agency's disclosure regulations require that, at least ten working days prior to the scheduled date of production of documents or taking of testimony, the requesting party must provide an affidavit or specific written summary setting forth the nature of the official information sought and its relevance to the proceeding.  *See* 6 C.F.R. § 5.45(a); 19 C.F.R. §§ 103.22(c), (d).  Moreover, a state court lacks jurisdiction to enforce a subpoena seeking testimony or documents from a federal employee or federal agency.

AR00019

- 2 -

*See, e.g., Louisiana v. Sparks*, 978 F.2d 226 (5th Cir. 1992) (state court subpoena issued to federal parole officer quashed on sovereign immunity grounds); *United States v. McLeod*, 385 F.2d 734, 752 (5th Cir. 1967) (state court may not enforce subpoena directing federal officers to testify before state grand jury).

After careful consideration of the applicable factors listed in 19 C.F.R. § 103.23, CBP has determined that several of the listed factors weigh against providing the requested testimony. At the outset, there has been no showing that CBP is the only source for the information. *See* 19 C.F.R. § 103.23(a)(3)(iii). Texas state and local law enforcement officers were located at the school and in the hallway with the requested CBP employees, and it is not clear that your office has exhausted attempts to obtain the information from the Texas state and local law enforcement officers who were present on the scene. In addition, the request is unreasonable in scope, and the requested information was not described with sufficient particularity. *See* 19 C.F.R. § 103.23(a)(3)(iv). Rather than focus on what each witness did and/or observed on the day in question, the scope of the request extends to general topics including CBP practices and procedures. Nor is it clear that all of the information sought is relevant and material to your case or generally necessary to the proceedings. *See* 19 C.F.R. §§ 103.23(a)(3)(i), (ii). For example, you requested general information regarding CBP's authorities, policies, training, and procedures without a clear explanation of why such information is relevant to these proceedings. In light of the foregoing factors, taken together with other considerations, CBP is unable to supply the requested information.

This letter is not intended to contain a complete recitation of CBP's basis for denial of this request, and CBP reserves the right to object to the request on any additional grounds which may be applicable.

Sincerely,

Raul L. Ortiz
Chief, U.S. Border Patrol

Scott K. Falk
Chief Counsel

cc:    United States Attorney's Office, W.D. Texas



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

May 21, 2024

William R. Turner
Assistant District Attorney
Office of the 38th Judicial District Attorney
524 E. Nopal Street
Uvalde, Texas 78801

Re:  Request for Grand Jury Testimony

Dear ADA Turner,

We are in receipt of your second demand for grand jury testimony from U.S. Customs and
Border Protection (CBP) employees dated April 2, 2024, and the subsequent subpoenas
requesting testimony on May 29, 2024.  We understand that the reason for this supplemental
request remains the same as your initial February 21, 2023, demand in that it relates to your
office's investigation into law enforcement's response to the mass shooting at Robb Elementary
on May 24, 2022.  We have also reviewed your statement of need for relevant and material
testimony affidavit as well as the list of proposed questions you intend to ask the CBP
employees.  We understand you have narrowed your request to question only three CBP
employees instead of 19 employees.  Specifically, you have indicated that you would like to
question U.S. Border Patrol (USBP) Agents ███████, ███████, and ███████
███████.  For the reasons outlined below, CBP respectfully continues to decline to authorize
these employees' disclosure of CBP information in this proceeding.

As with your request from last year, your second request was considered pursuant to CBP's
regulations that govern production or disclosure in federal, state, local, and foreign proceedings.
Federal law controls the disclosure of information by CBP.  *See* 5 U.S.C. § 301 (authorizing
federal agency heads to prescribe regulations for the conduct of employees and the custody, use,
and preservation of agency records).  The Department of Homeland Security has promulgated
regulations applicable to disclosure of information by CBP.  *See* 6 C.F.R. Part 5; 19 C.F.R. Part
103.  These regulations have the force and effect of federal law, and the U.S. Supreme Court has
expressly recognized the authority of a federal agency to restrict the production of information
by its subordinates.  *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951)
(approving federal agencies' use of regulations to govern administrative requests for production
of agency documents and testimony).  No CBP employee may provide official information or
testimony without advance authorization granted pursuant to the agency's disclosure regulations.
*See* 6 C.F.R. § 5.44(a); 19 C.F.R. § 103.22(a).  The agency's disclosure regulations set forth the
requirements for service of subpoenas, as well as a specific description of and justification for
release of official information or testimony.  *See* 6 C.F.R. §§ 5.43-5.45; 19 C.F.R. § 103.22.  The
agency's disclosure regulations require that at least ten working days prior to the scheduled date

of production of documents or taking of testimony, the requesting party must provide an affidavit or specific written summary setting forth the nature of the official information sought and its relevance to the proceeding. *See* 6 C.F.R. § 5.45(a); 19 C.F.R. §§ 103.22(c), (d). Moreover, a state court lacks jurisdiction to enforce a subpoena seeking testimony or documents from a federal employee or federal agency. *See, e.g., Louisiana v. Sparks*, 978 F.2d 226 (5th Cir. 1992) (state court subpoena issued to federal parole officer quashed on sovereign immunity grounds); *United States v. McLeod*, 385 F.2d 734, 752 (5th Cir. 1967) (state court may not enforce subpoena directing federal officers to testify before state grand jury).

After careful consideration of the applicable factors listed in 19 C.F.R. § 103.23, CBP has determined that several of the listed factors weigh against providing the requested testimony. We incorporate by reference each of the factors that weighed against providing the requested testimony from our March 9, 2023, response in this correspondence and include additional considerations based on your second demand for testimony. It remains the case that there has been no showing that CBP is the only source for the information. *See* 19 C.F.R. § 103.23(a)(3)(iii). Texas state and local law enforcement officers were located at Robb Elementary and in the hallway with the requested CBP employees, and it is not clear that your office has exhausted attempts to obtain the information you seek about the communication between the incident commander and responding law enforcement officers from the Texas state and local responders who were present on the scene. Additionally, you acknowledge in your second demand for testimony that you have already reviewed statements from Agents ▮▮▮, ▮▮▮, and ▮▮▮ concerning their response to the mass shooting at the school. The request for testimony fails to identify additional information that is needed beyond the prior statements, and how that information relates to the individuals and issues under investigation. Further, the request may also seek confidential law enforcement techniques and procedures which are not appropriate for disclosure. *See* 19 C.F.R. § 103.23(b)(5). In addition, your second demand for testimony remains unreasonable in scope and fails to describe your need for this information with any particularity. Even though you have provided us with a list of questions and/or topics you intend to address with the CBP employees, it is still not clear how this information is essential to your investigation and material and relevant to the case. *See* 19 C.F.R. §§ 103.23(a)(3)(i),(ii). You continue to describe the information you seek as relevant and material to your investigation as to whether any individual, through act or omission endangered a child by allowing a gunman that was attacking children to remain in a classroom, but you requested a broad scope of information regarding the federal agents' training and experience in active shooter incidents, the gear they typically carry in response to such incidents and as Border Patrol Agents, the communication devices they use, and other CBP practices and procedures. This type of information seems not to be clearly relevant and material to the question of whether state and local law enforcement officers, operating under their own policies and procedures, violated Texas Penal Code Sec. 22.041 through their own acts or omissions. Additionally, your second demand for testimony indicates that the focus of your investigation is not any CBP employee, but rests with the actions and/or omissions of state and local officers while on scene at Robb Elementary; yet, you fail to provide a nexus between the CBP employees' training, equipment or actions and any potential criminal acts or omissions of other law enforcement officers. More so, it appears that you intend to use the CBP employees' response to the mass shooting to corroborate information about the acts or omissions of state and local officers at Robb Elementary. This harkens back to our initial primary reason for declining to authorize

- 3 -

these witnesses' testimony – you can obtain information from the Texas state and local witnesses on scene.

Lastly, while not part of CBP's bases for denial of this request, it is our position that were the Government to remove this issue to federal court, it would likely succeed on its motion to quash the instant subpoenas since no state court has jurisdiction to compel a nonparty federal official to testify or produce documents absent a waiver of sovereign immunity. See *Louisiana v. Sparks*, 978 F.2d 226, 235-36 (5th Cir. 1992); see also *Giza v. Secretary of Health, Education & Welfare*, 628 F.2d 748, 752 (1st Cir. 1980) ("[W]e are aware of no authority ... plac[ing] an affirmative obligation on, and vest[ing] jurisdiction in, a federal court to enforce a state court subpoena.... [T]he prerogative of a federal court to enforce state process absent specific authorization remains doubtful."). We are aware of no such waiver of sovereign immunity by the Government related to this matter.

Considering the foregoing factors, taken together, with other considerations, CBP is unable to supply the requested information. This letter is not intended to contain a complete recitation of CBP's basis for denial of this request, and CBP reserves the right to object to the request on any additional grounds which may be applicable.

Should you have any questions regarding this response, you may contact Assistant United States Attorney Michael Clendenen at Michael.P.Clendenen@usdoj.gov.

Sincerely,

Frederick B. Smith
Chief Counsel

cc:    Michael Clendenen, Assistant United States Attorney
       United States Attorney's Office, W.D. Texas

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL INFORMATION

# DEPARTMENT OF HOMELAND SECURITY
# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY

## REPORT OF INVESTIGATION

**Office of Professional Responsibility**

**IOD Headquarters**

**Case #    UF2022586**



THIS REPORT CONTAINS SENSITIVE LAW ENFORCMENT MATERIAL.  IT MAY NOT BE
LOANED OUTSIDE YOUR AGENCY AND, EXCEPT IN CONNECTION WITH OFFICIAL
AGENCY ACTION, NO PORTION OF THE REPORT MAY BE COPIED OR DISTRIBUTED
WITHOUT THE KNOWELDGE AND CONSENT OF U.S. CUSTOMS AND BORDER PROTECTION

AR00024



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



# CASE CLOSING REPORT

| | | | |
|---|---|---|---|
| **CASE NUMBER:** | UF2022586 | **FIELD OFFICE:** | IOD Headquarters |
| **CASE AGENT:** | SA ▮▮▮▮▮▮ | | |
| **CASE TITLE:** | Uvalde Texas School Shooting w/ Fatalities | | |
| **DATE OF INCIDENT:** | May 24, 2022 | | |
| **SECURITY CLEARANCE:** | | | |

**INCIDENT**

On May 24, 2022, U.S. Customs and Border Protection (CBP), Office of Professional Responsibility (OPR), Del Rio, Texas, received information concerning the CBP response to the shooting at Robb Elementary School in Uvalde, Texas, which included a use of force by CBP personnel. The shooting resulted in the deaths of 21 individuals and the injury of 17 others.

The purpose of this review is to examine the facts and circumstances surrounding this incident (including use of force by CBP personnel); evaluate whether all CBP personnel complied with relevant rules, regulations, and laws; and determine whether any actions can be taken to improve CBP's performance in similar situations in the future.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| | | | |
|---|---|---|---|
| Prepared by: | ▮▮▮▮▮▮ | Digitally signed by ▮▮▮▮▮▮ Date: 2024.04.23 16:54:07 -04'00' | Date: |
| Reviewed by: | ▮▮▮▮▮▮ | Digitally signed by ▮▮▮▮▮▮ Date: 2024.04.24 00:04:05 -04'00' | Date: |
| Approved by: | DANIEL P ALTMAN | Digitally signed by DANIEL P ALTMAN Date: 2024.04.26 09:34:52 -04'00' | Date: |

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR00025



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



## EXECUTIVE SUMMARY

CBP OPR's Investigative Operations Directorate (IOD) conducts thorough, impartial, and timely investigations into CBP use of force incidents involving death or serious bodily injury and other critical incidents. This review sought to examine the facts and circumstances surrounding this incident (including use of force by CBP personnel); evaluate whether all personnel complied with relevant rules, regulations, and laws; and determine whether any actions could be taken to improve CBP's performance in similar situations in the future.

On May 24, 2022, at 11:33:02 AM (CDT), a lone assailant, ███████████████, entered Robb Elementary School through an unsecured exterior side door. Upon entering the school, the assailant quickly moved down the hallway and pulled open one of the doors to adjoining Classrooms 111 and 112, both fourth-grade classrooms full of students and their teachers. An internal doorway connected Classroom 111 and Classroom 112. By entering through either classroom door, the assailant had access to both classrooms. Upon entering the classroom, the assailant began firing a semi-automatic rifle at the children and their teachers in both classrooms. Approximately 77 minutes after the assailant entered the classroom, CBP personnel consisting of Border Patrol Agents (BPAs) assigned to the Border Patrol Tactical Unit (BORTAC), along with state and local law enforcement officials, entered the classroom and, after an exchange of gunfire, shot and killed the assailant. By the time the incident at Robb Elementary was over, the assailant had killed 19 children and 2 teachers. An additional 16 students, teachers, and law enforcement officers were wounded.

A total of 188 CBP personnel, along with law enforcement officers from more than 20 other federal, state, and local agencies, responded or provided support during or following the incident. The incident created immense logistical and tactical challenges that severely tested the resources and capabilities of responding officers and agencies.

OPR reached the following conclusions based on this review:

- Involved CBP personnel at all levels had an inconsistent understanding of their authority to respond to non-federal incidents including active shooter situations. None of the responders whom OPR interviewed could cite a specific authority for being at Robb Elementary School on May 24, 2022.

- The failure of arriving law enforcement personnel to establish identifiable incident management or command and control protocols led to a disorganized response to the Robb Elementary School shooting. No law enforcement official ever clearly established command at the school during the incident, leading to delays, inaction, and potentially further loss of life.

- CBP personnel responding to the incident did not establish a command and control framework for their own responding personnel, which resulted in responders taking on tasks on an ad-hoc basis as requested by local law enforcement or at their own initiative.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



- OPR determined existing CBP training on active shooter response procedures did not adequately prepare responding personnel to deal with this situation. The current training and curriculum did not include the proper application of National Incident Management System (NIMS) or Incident Command System (ICS) protocols and did not prepare them for a number of factors, including the need to address an active shooter behind a locked door.

- None of the first responders from state, local, or federal law enforcement agencies in a position to take action against the assailant had access to an accurate school layout or knew how to obtain the correct keys to gain access to critical areas of the school. Additionally, none of the first responders from law enforcement agencies had the necessary tools to adequately breach the outwardly opening metal doors to Classrooms 111 and 112. Only one CBP law enforcement officer who arrived on scene had access to a Halligan tool (used for forcibly opening a locked door).

- CBP personnel established a medical triage area in the hallway of the west building and provided lifesaving care for multiple victims. However, the overall chaotic response caused by the lack of command and control led to the breakdown of adherence to established medical protocols for a mass-casualty incident. This led to some victims with gunshot wounds being inadvertently placed on a school bus without receiving immediate medical treatment.

- In the immediate aftermath of this incident, numerous investigative agencies, including the Texas Rangers and the Federal Bureau of Investigation (FBI), began to independently interview personnel and recover evidence, leading to fragmented crime scene processing and evidence collection. Text messages and other records from cellular devices used by CBP personnel during the incident were not obtained until OPR identified this deficiency and collected most of these materials months following the incident. Coordination with other investigative entities could prevent this oversight in the future.

- CBP lacked procedures for establishing a centralized point from which to disseminate all information pertaining to the incident. A centralized point of dissemination would have helped to ensure accurate and timely distribution of information while preserving the integrity of ongoing investigations.

OPR made the following recommendations based on its review:

- CBP must ensure its officers, agents, and managers understand and properly work within the confines of their authority. To the extent CBP intends for its personnel to continue to respond to mass violence incidents in a non-federal setting, policy or law must be generated to ensure they have proper authority to do so.

- All CBP personnel tasked with responding to incidents such as the one at Robb Elementary School should be familiar with NIMS or ICS protocols. CBP should make NIMS or ICS protocols a facet of CBP's response protocols.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



- CBP's active shooter training and doctrine should be revised to align with continuously emerging best practices, including lessons learned from this incident. Once the training is revised, all first responders within CBP should receive comprehensive training and the tools necessary to deal with the management of and response to active shooter events.

- CBP should establish procedures for following medical best practices during critical events and ensure that all CBP personnel are trained to properly assess people requiring medical care, especially because CBP personnel might arrive on scene before emergency medical technicians (EMTs) and paramedics.

- Responding to critical incidents can overwhelm both an organization's and individuals' ability to cope. The mental health needs of first responders must be addressed through comprehensive and universally established protocols. CBP should continue to invest in best practices for responding to critical incidents of all types, including mass violence events, focusing on the healing involved.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00028



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



## SUMMARY OF SCOPE AND METHODOLOGIES

CBP OPR self-initiated this review immediately after receiving notification of a use of force incident involving CBP personnel at Robb Elementary School in Uvalde, Texas, on May 24, 2022. In accordance with Department of Homeland Security (DHS) policy, OPR notified the DHS Office of Inspector General (OIG) about this incident on May 24, 2022.[1] DHS OIG ultimately declined interest in the matter.

This investigative report focuses on OPR's review of the events of May 24, 2022, and aims to provide transparency and accountability. The report contains additional specific information about the actions taken by CBP personnel and describes the actions of CBP personnel and applicable CBP policies and procedures.

In furtherance of this review, OPR assembled a team of investigative, operational, technical, analytical, and legal experts. In total, 62 OPR investigators, analysts, and other personnel contributed to this review and investigative report. Using the material obtained from various sources, OPR analyzed and synthesized the information to develop an investigative plan. This process formed the basis for formulating an interview strategy and culminated in the development of a consolidated timeline of events from dozens of sources, including radio communications, body worn cameras (BWC), static cameras, and interviews. From May 2022 until September 2023, the investigative team reviewed available video evidence, interviewed CBP personnel, examined publicly available materials, researched commonly accepted practices for critical incident planning, preparation, and training, and analyzed other findings from prior active shooter events.[2] OPR's investigative process included obtaining records, videos, and other evidence from the FBI, Texas Department of Public Safety (TXDPS) Ranger Division, and other law enforcement agencies.[3] In reaching the findings contained in this report, OPR carefully considered the overall circumstances under which the incident took place.

OPR investigators who interviewed those who went inside Robb Elementary School completed specialized interview training focused on trauma-informed cognitive interview techniques. In March 2023, during the interview process, representatives from the U.S. Department of Justice (DOJ), Office of Community Oriented Policing Services (COPS) observed select interviews of CBP personnel.

As OPR conducted its investigation, other federal, state, and local law enforcement agencies conducted their own investigations into this incident. The FBI coordinated with the United

---

[1] Notification regarding certain incidents, including the discharge of firearms in deadly force situations, is required by DHS Management Directive 0810.1 (June 10, 2004).

[2] Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022; ALERRT, Robb Elementary School Attack Response Assessment and Recommendations, June 2022; U.S. Department of Justice, Office of Community Oriented Policing Services, Rescue, Response, and Resilience: A Critical Incident Review of the Orlando Public Safety Response to the Attack on the Pulse Nightclub, 2017; U.S. Department of Justice, Office of Community Oriented Policing Services, Critical Incident Review: Active Shooter at Robb Elementary School, 2024.

[3] CBP began a targeted deployment of BWC technology in August 2021 as part of its Incident-Driven Video Recording Systems Program. Although 7,000 BWCs had been issued to CBP employees nationwide as of May 23, 2023, only one CBP BWC was present and activated at Robb Elementary School on May 24, 2022.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



States Attorney's Office for the Western District of Texas throughout its investigation; however, the United States Attorney's Office did not seek to open a criminal case into the use of force by federal agents.

On January 18, 2024, DOJ COPS released the findings of its critical incident review in a report titled, "Critical Incident Review: Active Shooter at Robb Elementary School." On March 7, 2024, the City of Uvalde released the findings of its internal investigation into the Uvalde Police Department. Because of the differences in scope and materials relied upon in each inquiry, the DOJ COPS's and City of Uvalde's reports vary in comprehensiveness and specificity.

***INTERVIEWS OF CBP PERSONNEL***

The formal process to interview all CBP personnel who responded to the incident and other CBP personnel who supported them on that day commenced in February 2023 and concluded in August 2023. OPR conducted a total of 193 interviews of CBP employees, including BPAs, Customs and Border Protection Officers (CBPOs), Air and Marine Agents, and other CBP personnel, including those responsible for training. In addition to the 188 personnel who responded to or supported the response to the incident at Robb Elementary School, OPR interviewed two CBP subject matter experts in the fields of NIMS/ICS protocols and active shooter training and three CBP employees who did not participate in the incident or its response but were mentioned as potentially being a part of the incident response. OPR's interview strategy identified the individual level of involvement of CBP personnel and grouped them into categories based on if and when they arrived at Robb Elementary School and the actions they took on that day. Below is a breakdown of the distribution of categories:



Breakdown of Interviews

- BORTAC - Member or Directly Involved (18, 9%)
- Medical Responders (24, 12%)
- Inside School/Assist with Evac - Pre-Breach (18, 9%)
- Perimeter of School - Pre-Breach (28, 15%)
- Arrived Post-Breach/Redirected (71, 37%)
- Supported Response (29, 15%))
- Subject Matter Expert (2, 1%)
- Not Involved (3, 2%)

**Figure 1. Breakdown of Interviews**

For a summary of the interviews of the CBP personnel who responded to the incident and other CBP personnel who supported them, see Appendix I.

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00030



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



## LIMITATIONS

In an effort to better understand the events of May 24, 2022, CBP requested to interview the following key personnel; however, each of these individuals declined OPR's interview requests:

- Uvalde Consolidated Independent School District Police Department (UCISDPD) Chief Pedro "Pete" Arredondo
- Uvalde County Sheriff Ruben Nolasco
- TXDPS Ranger ███████
- Uvalde Police Department (UPD) Acting Chief Mariano Pargas
- UPD Lieutenant ███████
- Uvalde County Precinct 1 Constable Johnny Field
- UPD Staff Sergeant ███████
- UPD Sergeant ███████
- Zavala County Sheriff's Office (ZCSO) Deputy ███████

OPR did not interview any law enforcement officers from any federal, state, or local agencies outside of CBP as part of this review. Although OPR was unable to interview personnel from other law enforcement agencies, the scope of OPR's review included primary source documents and hundreds of hours of video and interviews of involved personnel. OPR reviewed the real-time actions of law enforcement personnel captured by dozens of body worn cameras and reviewed and analyzed written summaries and videos of interviews of those personnel by the FBI and TXDPS Ranger Division. Summaries of those interviews may be included in further reports issued by TXDPS.[4] Additionally, OPR requested, but was unable to obtain, finalized autopsy reports of the deceased.

As part of the investigative process, OPR examined and evaluated previously published reports on this incident. Specifically, OPR assessed the "Robb Elementary School Attack Response Assessment and Recommendations" published by Advanced Law Enforcement Rapid Response Training (ALERRT). That report was issued shortly after the incident and contained limited information "based on an incident briefing…held for approximately 1 hour."[5]

OPR also reviewed the report from the Texas House of Representatives Investigative Committee on the Robb Elementary Shooting. The Committee held a series of closed-door hearings on this incident and OPR sought copies of the videos of those hearings to review primary source data and testimonial evidence. Citing parliamentary privilege, the Committee declined to provide OPR access to the video testimony. Consequently, OPR relied on the Committee's final report and direct quotes of individuals extracted from the report to provide insight into the actions and

---

[4] Records belonging to third-party agencies can only be released by the owning agency.
[5] ALERRT, Robb Elementary School Attack Response Assessment and Recommendations, June 2022, p. 1.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



perspectives of non-CBP personnel who were on scene but declined to be interviewed by OPR as part of this review.[6]

## OVERVIEW OF AREA

Positioned in south Texas between San Antonio, Texas, and the United States/Mexico border, the city of Uvalde has a population of over 15,000 people.[7] Uvalde regularly sees USBP personnel engage in federal border enforcement operations in and around the city. Because of its proximity to US-83, a major throughfare in Uvalde, border enforcement-related operations by USBP, TXDPS, and other agencies reportedly led to Uvalde school lockdowns in the past. From January 1, 2020, to May 24, 2022, there were four documented instances of bailouts within a one-mile radius of Robb Elementary School.[8]

Uvalde is in the U.S. Border Patrol (USBP) Del Rio Sector (DRT) area of responsibility. Within DRT, there are two specialty units that are assigned directly to DRT's Special Operations Division (SOD) – BORTAC and the Border Patrol Search, Trauma, and Rescue Unit (BORSTAR). BORTAC provides an immediate response capability to emergent and high-risk incidents requiring specialized skills and tactics, similar to a traditional SWAT team. BORSTAR provides specialized law enforcement search and rescue response capabilities, including emergency and tactical medicine. Both units are based in Del Rio, Texas, approximately 70 miles from Uvalde, though CBP personnel may live or work throughout the area.

CBP is a major part of the Uvalde community. In addition to the agents assigned to the USBP Uvalde Station (UVA), many CBP families from across DRT call the city home. Children and grandchildren of CBP personnel were attending school at Robb Elementary School on May 24, 2022, while children enrolled in other area schools were already done with school for the year.[9] One CBP employee recalled how one of the victims he encountered at Robb Elementary School was friends with ▮▮▮▮▮▮▮ and had been at his house playing just days prior to the incident.[10] The incident at Robb Elementary School was more than just another law enforcement operation for the CBP personnel who responded – many had a direct, personal connection to the community.

---

[6] OPR adheres to the Council of the Inspectors General on Integrity and Efficiency (CIGIE) Quality Standards for Investigations to provide a framework for conducting high-quality investigations. The standards call for "the validity of information and evidence obtained during an investigation" to be verified.
[7] U.S. Census Bureau, 2020 Census (April 1, 2020)
[8] "Bailouts" are instances where suspects pursued by law enforcement in a vehicle and evade apprehension by exiting the vehicle and fleeing on foot. Data retrieved from CBP data systems and may not include enforcement actions carried out by other agencies.
[9] OPR interview of SBPA ▮▮▮▮▮▮▮, February 14, 2023, timestamp 00:16:55; OPR interview of BPA ▮▮▮▮▮▮▮, March 2, 2023, timestamp 00:12:51; OPR interview of SBPA ▮▮▮▮▮▮▮, March 16, 2022, timestamp 00:41:18.
[10] OPR interview of BPA ▮▮▮▮▮▮▮, dated March 6, 2023, timestamp 05:46:36

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00032



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



On May 24, 2022, approximately ▮▮▮ CBP personnel were assigned to DRT, with ▮▮▮ scheduled to work on that day as follows:

- USBP Del Rio Sector (DRT) Staff:
- DRT Sector Intelligence Unit (SIU):
- DRT Special Operations Division (SOD):
  - DRT BORTAC:
  - DRT BORSTAR:
  - DRT SOD Detailed In:
  - DRT SOD Staff:
- USBP Abilene Station (ABT):
- USBP Brackettville Station (BRA):
- USBP Carrizo Springs Station (CAR):
- USBP Comstock Station (COM):
- USBP Del Rio Station (DRS):
- USBP Eagle Pass Station (EGT):
- USBP Eagle Pass South Station (EGS):
- USBP Rocksprings Station (RKS):
- USBP San Angelo Station (SAT):
- USBP Uvalde Station (UVA):



Map Source: USBP GIS

**Figure 2. USBP Sectors and select USBP Stations**




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Map Source: USBP GIS

**Figure 3. Uvalde – Points of Interest**



**Figure 4. Area around Robb Elementary School**

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00034



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**





**Figure 5. Layout of West Building at Robb Elementary School**



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



## TIMELINE OF EVENTS – MAY 24, 2022

OPR created the following timeline of events based on information, documents, and video provided by the TXDPS, FBI, CBP, and employee interviews. All times are Central Daylight Time.

This timeline is intended to be an overview of the chronology of events. Additional information supporting this timeline is contained in the *Incident Overview* section.

| <u>TIME</u> | <u>DESCRIPTION</u> |
|---|---|
| 11:28:25 AM | The assailant crashed his truck into a culvert at the intersection of Grove and Geraldine Streets. |
| 11:31:36 AM | The assailant fired multiple shots outside Robb Elementary School toward windows on the west side of the school. |
| 11:33:02 AM | The assailant entered Robb Elementary School through the west entrance. |
| 11:33:24 AM | The assailant began firing at the doors of Classrooms 111 and 112, then entered the classrooms and continued firing. |
| 11:36:02 AM | Law enforcement officers from the UPD and UCISDPD entered Robb Elementary School through the west entrance. |
| 11:36:10 AM | UPD Acting Chief Pargas entered Robb Elementary School through the west entrance. |
| 11:36:11 AM | UCISDPD Chief Arredondo entered Robb Elementary School through the south entrance and approached Classrooms 111 and 112 from the opposite side of the building as the law enforcement officers who entered through the west entrance. |



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| **TIME** | **DESCRIPTION** |
|---|---|
| 11:37:03 AM | The assailant shot through the metal doors of Classrooms 111 and 112 as law enforcement officers approached, striking two officers with shrapnel. The law enforcement officers withdrew from their position near the doors of Classrooms 111 and 112 to a nearby position at the north end of the hallway, approximately 70 feet from the doors of Classrooms 111 and 112. UCISDPD Chief Arredondo and other officers took a position at the south end of the hallway opposite the law enforcement officers, approximately 30 feet from the doors of Classrooms 111 and 112. The assailant stopped shooting. |
| 11:38:35 AM | The first CBP employee, Border Patrol Agent – Intelligence (BPA-I) ███████████, USBP DRT, Sector Intelligence Unit (SIU), entered Robb Elementary School through the west entrance. |
| 11:40:00 AM (approx.) | Aviation Interdiction Agent (AIA) ███████, flying a CBP helicopter near Eagle Pass, TX, learned of a "possible shooting" in Uvalde and began to fly in that direction. |
| 11:44:02 AM | The assailant fired a single shot. |
| 11:51:15 AM | Additional CBP employees, BPA ███████ (UVA), BPA ███████████ (UVA), and BPA ███████ (UVA), entered Robb Elementary School through the west entrance. |
| 11:52:15 AM | At the west entrance, an unknown law enforcement officer handed BPA ███████ (UVA) a ballistic shield with the word "SHERIFF" on it. The shield was not rifle rated. |
| 11:56:54 AM | In the hallway near the west entrance, UCISDPD Officer ███████ told Precinct 1 Constable Johnny Field that his [Officer ████'s] wife was in Classroom 112 and had been shot. |



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| **TIME** | **DESCRIPTION** |
|---|---|
| 11:58:33 AM | Classroom evacuations began.  Law enforcement officers, including BPAs ████ (UVA), ████ (CAR), ████ ████ (UVA), ████ (UVA), ████ (Marfa Station (MRS)), ████ (UVA), ████ (UVA), ████ (UVA), ████ (UVA); BPA-I ████ (DRT SIU); SBPA ████ (UVA); and Special Operations Supervisor (SOS) ████ (UVA), evacuated nine classrooms in the west building through doors and windows. |
| 12:00:00 PM (approx.) | AIA ████, flying a CBP helicopter, arrived in the air above Robb Elementary School. |
| 12:03:59 PM | UPD Officer ████ entered Robb Elementary School through the west entrance carrying a ballistic shield with the word "POLICE" on it and handed it to BPA ████.  The shield was not rifle rated. |
| 12:04:48 PM | UPD Officer ████ entered Robb Elementary School through the west entrance with another ballistic shield with the word "POLICE" on it and handed it to BPA ████.  The shield was not rifle rated. |
| 12:05:00 PM (approx.) | Uvalde County Sheriff Ruben Nolasco arrived at Robb Elementary School. |
| 12:05:00 PM | Acting Patrol Agent in Charge ((A)PAIC) ████ (UVA) arrived at Robb Elementary School. |
| 12:08:35 PM | UCISDPD Chief Arredondo, standing in the south hallway, asked UPD Investigator ████, standing outside the south entrance, to get a master key to the classrooms from a school official. |
| 12:09:08 PM | UCISDPD Chief Arredondo, standing in the south hallway, said, "As soon as I clear this room, I'm gonna verify what's been vacated guys before we do any kind of breaching but time is on our side right now." |
| 12:11:45 PM | UPD Officer ████ was seen standing outside the south hallway holding a red lanyard with multiple keys, later determined to be the incorrect keys to the classrooms. |



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| **TIME** | **DESCRIPTION** |
|---|---|
| 12:12:52 PM | UPD Acting Chief Pargas stood next to UPD Detective ███ ███████ outside the west building as radio traffic stated, "Child is advising he is in a room full of victims. Full of victims at this moment." UPD Acting Chief Pargas took UPD Detective ████████'s radio and walked through the west entrance. |
| 12:13:12 PM | Supervisory Border Patrol Agent (SBPA) ████████ (DRT SOD), Acting BORTAC Commander, entered Robb Elementary School through the west entrance. |
| 12:13:58 PM | UPD Officer ████████████ entered Robb Elementary School through the west entrance with a box of 2-chlorobenzalmalononitrile (CS) gas. |
| 12:15:50 PM | Uvalde County Precinct 6 Constable Emmanuel Zamora took the keys with the red lanyard from UPD Officer ███████ outside the west entrance. UCISDPD Lieutenant ███████████ took some of the keys from the red lanyard and gave them to Constable Zamora, identifying them as likely master keys. None of the keys unlocked the classroom doors. |
| 12:16:24 PM | UPD Officer ██████████ was seen inside Robb Elementary School near the south entrance holding a non-rifle rated ballistic shield with the word "POLICE" on it. This shield came from the west entrance. |
| 12:16:47 PM | Upon hearing from TXDPS Sergeant ██████████ that a BORTAC team was possibly about to "go in" to Classrooms 111 and 112, UCISDPD Chief Arredondo said, "Tell them to fucking wait…no one comes in," as he tried to enter Classroom 109 to ensure it was empty. |
| 12:18:23 PM | BPA ██████████ (UVA), a USBP EMT, entered Robb Elementary School through the west entrance. |
| 12:18:57 PM | TXDPS Ranger █████ encountered SBPA █████ near the T-intersection. |
| 12:19:35 PM | SBPA ██████, while on the phone with an unknown person, discussed the status of the doors to Classroom 111 and 112 with UPD Staff Sergeant ██████████. |




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

| **TIME** | **DESCRIPTION** |
|---|---|
| 12:20:55 PM | An unidentified Deputy U.S. Marshal entered Robb Elementary School through the west entrance carrying a rifle-rated ballistic shield with the words "U.S. MARSHAL" on it. |
| 12:21:05 PM | The assailant fired four shots from inside the classroom. A group of approximately 17 law enforcement officers positioned at the north end of the hallway, including BPA ████, SBPA ████, BPA ████, BPA ████, an unidentified BPA wearing a gas mask, BPA ████, and BPA ████, advanced toward the doors of Classrooms 111 and 112, but took no further action. |
| 12:23:09 PM | UPD Lieutenant ████ transmitted over the radio that the SSgt. Willie de Leon Civic Center would be the reunification point. |
| 12:23:28 PM | BORSTAR Paramedics BPA ████ and SBPA ████ ████ entered Robb Elementary School through the west entrance. |
| 12:24:25 PM | BPA ████ and SBPA ████ began setting up a medical triage area near the restrooms at the north end of the west building. |
| 12:24:43 PM | SBPA ████ attempted to open a locked janitor's closet with a set of keys, but the keys did not work on the locked door. |
| 12:24:51 PM | "Hot Mic" (a situation where someone unknowingly activates the microphone on their radio, thereby disabling others' ability to communicate) began intermittently hindering radio communications. |
| 12:26:08 PM | BPA ████ climbed through the window of Classroom 109 to assist with evacuating teacher ████, who was shot in the abdomen. ████ was the last student or teacher in the west building besides those in Classrooms 111 and 112. |
| 12:26:22 PM | Classroom evacuations completed. |
| 12:26:29 PM | UCISDPD Chief Arredondo, standing in the south hallway speaking to an unknown person on the phone, said, "People are going to ask why we are taking so long, OK? So that's what we're trying to preserve the rest of the lives first." |



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



| TIME | DESCRIPTION |
|------|-------------|
| 12:26:59 PM | SBPA ▓▓▓▓ discussed with UPD Officers ▓▓▓▓ and ▓▓▓▓ the possibility of Classrooms 111 and 112 being connected. During the conversation, Texas Parks and Wildlife Department (TPWD) Game Warden ▓▓▓▓ brought a rough map of the building, which showed that the classrooms were not connected. |
| 12:28:39 PM | Sheriff Nolasco entered Robb Elementary School through the west entrance and told law enforcement officers that only one person in the building should be communicating. |
| 12:30:16 PM | An unidentified Deputy U.S. Marshal entered Robb Elementary School through the south entrance carrying a rifle-rated ballistic shield with the word "POLICE" on it. |
| 12:30:31 PM | TXDPS Sergeant ▓▓▓▓, who was assisting ▓▓▓▓ (the teacher from Classroom 109 who was wounded), contacted TXDPS dispatch and said she did not see any EMS on scene. |
| 12:32:27 PM | UPD Officer ▓▓▓▓ entered Robb Elementary School through the west entrance and told law enforcement officers that vehicles were blocking the roadway for ambulances to arrive. Law enforcement officers gave UPD Officer ▓▓▓▓ their car keys to have him move their vehicles. |
| 12:33:08 PM | "Hot Mic" situation resolved, allowing unimpeded radio communications to resume. |
| 12:32:32 PM | SBPA ▓▓▓▓ exited Robb Elementary School to retrieve a Halligan tool from his vehicle. |
| 12:35:00 PM (approx.) | CBP AIA ▓▓▓▓ (AMO Del Rio, Texas) and AIA ▓▓▓▓ (AMO Del Rio, Texas), both part of the Air Crew Rifle Program, met at the Uvalde County Fairplex and traveled to the airspace above Robb Elementary School via helicopter. |
| 12:35:44 PM | SBPA ▓▓▓▓ reentered Robb Elementary School through the west entrance, carrying a Halligan tool. |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00041



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| **TIME** | **DESCRIPTION** |
|---|---|
| 12:36:16 PM | TXDPS Ranger ██████ handed SBPA ██████ the correct master key for the classrooms. |
| 12:36:57 PM | SBPA ██████ successfully tested the master key on the door to Classrooms 131 and 132. |
| 12:37:08 PM | BPAs ██████ (DRT SOD) and ██████ (DRT SOD), the second and third BORTAC operators to arrive, entered the west building of Robb Elementary School. |
| 12:38:22 PM | BPA ████, a BORTAC sniper, exited the east entrance to find a vantage point that would allow him to see into Classrooms 111 and 112. |
| 12:43:05 PM | An unidentified Deputy U.S. Marshal entered Robb Elementary School though the west entrance, carrying a rifle-rated ballistic shield with the words "U.S. MARSHAL" on it. |
| 12:46:49 PM | Law enforcement officers in the north end of the hallway near Classrooms 111 and 112 formed into lines in preparation to make entry. |
| 12:47:03 PM | BPA ██████ (DRT SOD) entered Robb Elementary School through the west entrance. |
| 12:49:09 PM | SBPA ██████ and BPA ████ opened the door to Classroom 111 and visually assessed the classroom. |
| 12:50:02 PM | SBPA ██████ gave indication for the team to enter Classroom 111. SBPA ████, BPA ████, BORSTAR BPA ████ (DRT SOD), and ZCSO Deputy ████ entered the classroom and were shot at by the assailant. BPA ████, who was in the hallway outside Classroom 111 waiting to enter the classroom, was struck by gunfire or shrapnel. SBPA ████, BPAs ████ and ████, and ZCSO Deputy ████ returned fire, killing the assailant. |
| 12:50:08 PM | Shooting stopped, medics began to triage and evaluate victims inside Classrooms 111 and 112. |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00042



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| <u>TIME</u> | <u>DESCRIPTION</u> |
|---|---|
| 12:52:52 PM | ████████, the final victim initially removed from the classrooms, was carried out of Classroom 112 and taken outside the west entrance for treatment. |
| 2:00:00 PM (approx.) | A possible second threat against other Uvalde-area schools was identified.  Law enforcement officers were sent to area schools to assist with the safe, orderly dismissal of students. |
| 5:00:00 PM (approx.) | Uvalde-area schools completely dismissed. |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00043




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

## INCIDENT OVERVIEW

This report is divided into six sections that correspond with six distinct segments of activity that comprise the shooting at Robb Elementary School.  The first section, *Preliminary Events*, describes the events that preceded the shooting.  This report focuses on the actions and events after the shooting because CBP personnel were not involved in any related actions prior to responding to the school.  The second section, *Phase I: 11:33 AM – 12:21 PM*, focuses on the actions and events between the time the assailant entered Robb Elementary School and the time the assailant fired four gunshots from inside the classrooms.  The third section, *Phase II: 12:21 PM – 12:50 PM,* details the events that occurred between the time the assailant fired the four gunshots and the time the group of law enforcement officers engaged the assailant.

Because the assailant fired rounds through the classroom door and injured some of the first responding law enforcement officers, responding personnel avoided the area immediately in front of the classroom doors.  Consequently, the actions of the personnel north of the classrooms were not well coordinated or communicated with the responding personnel in the same hallway south of the classrooms.  To provide clarity, *Phase I: 11:33 AM – 12:21 PM* and *Phase II: 12:21 PM – 12:50 PM* are split between the two groups of law enforcement officers at the north and south ends of the hallway.  The sections describe each group's actions separately.

The fourth section, *Phase III: Rendering Aid*, describes the actions taken to triage and treat the victims following the breach of Classrooms 111 and 112.  The fifth section, *Phase IV: Post Incident Response,* details the potential of a second threat and the law enforcement response at Uvalde-area schools and other points of interest including the Civic Center and hospital.  Finally, the sixth section, *Air and Marine Operations Activities*, details the actions related to the three CBP helicopters involved in the incident.

Based on OPR's review of the information available, the following is a summary of what occurred:

### *PRELIMINARY EVENTS*

The incident at Robb Elementary School began at **11:28:25 AM** when the assailant approached the intersection of Grove and Geraldine Streets at the northwest boundary of the school property and crashed the truck he was driving into a culvert.[11] Two employees from the Hillcrest Memorial Funeral Home, located at the same intersection, saw the crash and approached the vehicle to render aid; however, they were met with gunfire from the assailant (**11:29:28 AM**). Both individuals were able to safely retreat. Video from the funeral home showed the assailant emerge from the culvert and toss a dark-colored backpack over the chain link fence at the outer edge of the schoolgrounds and then climb over the fence and walk toward the school (**11:30:14 AM**).[12] As the assailant approached the west side of the western-most building, he began firing

---

[11] Video footage captured by static camera located at Hillcrest Memorial Funeral Home, May 24, 2022.
[12] *Id.*

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00044



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



at the exterior of the school. The assailant left the dark-colored backpack on the ground on the west side of the school.

The campus of Robb Elementary School is located at the intersection of Old Carrizo Road and Geraldine Street in Uvalde, Texas, and consists of several buildings connected by a series of covered walkways. The fourth-grade classes were in the western-most building (adjacent to Geraldine Street), along with the school's library. The western-most building has three metal doors leading to the outside: one located on the west side of the building, one located at the opposite end of the hallway on the east side of the building, and one located on the south side of the building. Each classroom has an outward opening metal door that opens into a hall. According to school policy, the doors are supposed to always remain locked. A camera was mounted to the ceiling at the T-intersection of the east/west and north/south hallways.

OPR obtained the video from the camera at the T-intersection from the FBI approximately one week following the incident. Although the audio throughout much of the video is inaudible, the video showed ███████, the teacher from Classroom 132 (closest to the entrance where the assailant entered), exit the school at the time of the crash and then immediately reenter the school, closing the door behind her, while placing a phone call reporting the car crash and the gunshots fired (**11:29:40 AM**). ███████ then moved back and forth in the main hallway closest to the door where the assailant would enter, warning the teacher in Classroom 116 (which is also adjacent to the entrance) and screaming, "He's shooting!" (**11:31:40 AM**).[13] According to ███████'s interview with TXDPS investigators, she exited the building with her cell phone to call 911 regarding the vehicle crash.[14] As she moved toward the crash, she observed other witnesses begin to retreat toward the funeral home yelling that the driver had a gun.[15] She then observed that the driver of the vehicle had a gun and was advancing toward the school. She saw the driver fire shots in the direction of children who were on the playground at the south end of the building. Multiple interviews by TXPDS investigators and footage from the static camera substantiated ███████'s account.[16]

### PHASE I: 11:33 AM – 12:21 PM

The assailant entered Robb Elementary School by pulling open the door at the west end of the western-most building at **11:33:02 AM**. Visible in the assailant's hands as he entered the school was an AR-style rifle. The assailant walked inside the building and turned right down the north/south hallway, stopping at the doors of Classrooms 111 and 112, which are recessed in the hallway next to each other. Twenty-two seconds after entering the building, while facing the doors of Classrooms 111 and 112, the assailant began firing dozens of rounds. The assailant

---

[13] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.
[14] TXDPS interview of ███████, May 27, 2022.
[15] *Id.*
[16] TXDPS interview of ███████, June 3, 2022; TXDPS interview of ███████, June 11, 2022; Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00045




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

stepped in and out of the classrooms, firing at, from, and within the classrooms, for the next 2 minutes and 39 seconds.[17]

### *North End of Building (11:33 AM – 12:21 PM)*

The first law enforcement officers to respond included UPD Lieutenant ███████, UPD Staff Sergeant ███████, UPD Officer ███████, and UPD Officer ███████. The four officers entered the building through the same door as the assailant on the west end of the building at **11:36:00 AM** and approached Classrooms 111 and 112. At **11:36:10 AM**, UPD Acting Chief Pargas entered the building through door at the west end of the building. The static camera inside the school showed the initial team of law enforcement officers reacting to and moving toward the assailant's gunfire near Classrooms 111 and 112. At nearly the same time, the static camera inside the school and UPD Staff Sergeant ███████'s BWC showed UCISDPD Chief Arredondo, UCISDPD Officer ███████, UPD Investigator ███████, and UPD Sergeant ███████ approach Classrooms 111 and 112 from the south end of the hallway while communicating with UPD Lieutenant ███████ and UPD Staff Sergeant ███████.[18] As UPD Lieutenant ███████ and UPD Staff Sergeant ███████ approached the doors to Classrooms 111 and 112, the assailant, from inside one of the classrooms, shot toward the door of Classroom 111. The assailant's shots turned fragments of the metal door into projectiles, injuring both officers and causing all law enforcement officers on site to withdraw from their positions and abandon efforts to breach the classroom door. From this point forward, the police presence within the west wing of the school was split between personnel at the T-intersection at the north end of the hallway and personnel staged in the entranceways along the hallway south of Classrooms 111 and 112, with approximately 95 feet separating the two groups.

The first CBP law enforcement officer to arrive (BPA-I ███████, DRT SIU) entered Robb Elementary School at **11:38:35 AM** through the door at the west end of the building while the assailant was still intermittently firing gunshots. Immediately upon entering the building, BPA-I ███████ took cover just inside the west door.[19] At least six other law enforcement officers were inside the building when BPA-I ███████ arrived.[20] BPA-I ███████ stated he received information about the assailant's location inside in the building from UPD Lieutenant ███████, who had approached the door of Classroom 111 and was struck by shrapnel prior to BPA-I ███████'s arrival.

For the next nine minutes, additional law enforcement officers from state and local agencies arrived and entered the building, all taking defensive positions at the north end of the building in the T-intersection. BPA-I ███████ exited the building at **11:47:41 AM** and went toward the south entrance with UPD Officer ███████ and Uvalde County Sheriff's Office (UCSO) Deputies ███████ and ███████, where they met UPD Sergeant ███████ at **11:48:32 AM**. No other CBP personnel were in the school until **11:51:15 AM** when BPAs ███████

---

[17] Based on OPR's review of all available video footage, it cannot be determined definitively which classroom door the assailant entered.
[18] The actions of law enforcement officers at the south end of the hallway will be discussed in later portions of this report.
[19] OPR interview of SA ███████, March 18, 2023, timestamp 00:36:22.
[20] *Id.*



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



███████ (UVA), ███████████ (UVA), and ███████████ (UVA), entered through the west door.

Several minutes passed as multiple law enforcement officers from various agencies, including CBP, entered the school. UCISDPD Officer ████ entered the building through the west door at **11:56:54 AM** and was stopped by Uvalde County Precinct 1 Constable Johnny Field. UCISDPD Officer ████ told Constable Field in front of BPAs ████████, █████████, and ████████ while motioning toward Classroom 112, "She says she's shot, Johnny."[21] UCISDPD Officer ████ was referring to his wife, ████████, who was a teacher inside Classroom 112.[22]

Between **11:58:33 AM** and **12:26:22 PM**, law enforcement officers, including CBP personnel, evacuated students and teachers from some of the classrooms in the building.[23] Individuals in Classrooms 116 and 108 evacuated through the classroom door, with law enforcement officers providing cover while the occupants fled. Individuals from Classrooms 102, 103, 104, 105, 106, and 109 evacuated by climbing out windows to safety. Classroom 110 was already empty because the class was out on the playground. Dozens of law enforcement officers, including BPAs ████████████, █████████, ████████, ████████, █████████, █████████; BPA-I ████████; SBPA ████████; and SOS ████████ opened locked and obstructed windows and led students and teachers to safety. Classroom 109 (closest to the assailant's location) was the last to be cleared. During the evacuation of Classroom 109, BPA ████ observed that a teacher was shot in the classroom and was unable to move herself. BPA ████ climbed through the window into the classroom and lifted the injured teacher through the window to safety.[24] The average time for classroom evacuations was 56.25 seconds per classroom. The following table details the evacuations of Classrooms 102–106, 108–109, and 116:

---

[21] BWC footage from UPD Officer ████████.
[22] TXDPS interview of UCISD Lieutenant ████████, May 25, 2022.
[23] BWC footage from TXDPS Troopers ████████ and ████████, UPD Officers ████████ and ████████, UCSO Deputy ████████, and Constable Zamora. Cell phone video footage from ████████.
[24] OPR interview of BPA ████████, March 6, 2023, timestamp between 01:06:57 and 01:29:45; cell phone video footage from ████████.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00047



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| Classroom | Start Time | Stop Time | Total Time | Means of Escape |
|-----------|-----------|-----------|-----------|-----------------|
| 102 | 11:58:33 AM | 11:59:03 AM | 30 seconds | Window |
| 116 | 11:59:18 AM | 11:59:44 AM | 26 seconds | Door |
| 103 | 12:02:26 PM | 12:03:03 PM | 37 seconds | Window |
| 104 | 12:05:25 PM | 12:06:10 PM | 45 seconds | Window |
| 106 | 12:06:27 PM | 12:08:33 PM | 126 seconds | Window |
| 108 | 12:07:22 PM | 12:07:28 PM | 6 seconds | Door |
| 105 | 12:07:48 PM | 12:08:15 PM | 27 seconds | Window |
| 109 | 12:23:49 PM | 12:26:22 PM | 153 seconds | Window |

**Table 1. Estimated Evacuation Times for West Wing of Robb Elementary School**



**Figure 6. Evacuation of West Wing of Robb Elementary School**

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00048



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



According to interview statements, UCSO Sheriff Ruben Nolasco arrived at Robb Elementary School at approximately **12:05:00 PM**, and Acting USBP Patrol Agent in Charge ((A)PAIC) ████████ (UVA) arrived at **12:05:00 PM**.[25]  Outside the west door, UPD Officer ████████'s BWC captured UPD Officer ████████ telling UPD Acting Chief Pargas, "I've got BORTAC on the way.  I need an [Officer in Charge] out here and I need someone to make calls." (**12:10:47 PM**).[26]  Sheriff Nolasco was first seen on TPWD Game Warden ████████'s BWC at **12:11:46 PM** giving direction to move the parents congregating near the school farther back.  (A)PAIC ████████ stated that he walked over to UCSO Sheriff Nolasco, who was standing by a patrol vehicle near the funeral home, to get an update, believing he [Sheriff Nolasco] was the highest-ranking law enforcement officer on scene.[27]

SBPA ████████ (DRT SOD), who was the Acting BORTAC Commander, was on approved annual leave on May 24, 2022, when he learned about the incident at Robb Elementary School from BPA ████████ (UVA) at approximately **11:45:00 AM**.  After notifying BORTAC team members about the incident through a group chat and telling them to respond, SBPA ████████ drove to Robb Elementary School and entered the building at **12:13:12 PM**.  Upon entering the building, UPD Officer ████████ informed SBPA ████████ there was a child on the phone stating there were victims in the classroom.[28]  Although SBPA ████████ responded to confirm this information, SBPA ████████ later said it did not make sense to him because his own children enrolled in Uvalde-area schools were already out of school for the summer (**12:13:43 PM**).[29]  SBPA ████████ spent the next few minutes obtaining conflicting details about the situation, including information on the extent of the injuries of those in Classrooms 111 and 112 (**12:16:19 PM**).[30]  At the time of SBPA ████████'s arrival, no shots had been fired for 29 minutes.

UPD Officer ████████ reentered the west door at **12:17:32 PM** with a duffle bag full of gas masks, to be used by law enforcement officers if CS gas was deployed.[31]  TXDPS Ranger ████████ spoke to UPD Acting Chief Pargas and said the situation was becoming chaotic and unmanageable (**12:17:56 PM**).[32]  TXDPS Ranger ████████ told UPD Acting Chief Pargas, "We need to get everybody back, all the heads get together, whoever's in charge of each agency so we know what's coming and what's not coming and then have somebody relay the information back

---

[25] OPR interview of XO ████████, March 15, 2023, timestamp 08:41:30; OPR interview of Assistant Chief Patrol Agent (ACPA) ████████, March 1, 2023, timestamp 00:36:17; OPR interview of PAIC ████████, March 23, 2023, timestamp 00:58:25; OPR interview of SOS ████████, March 1, 2023, timestamp 12:12:22; OPR interview of WC ████████, March 1, 2023, timestamp between 01:04:10 and 01:13:00; OPR interview of WC ████████, March 2, 2023, timestamp 08:28:00; OPR interview of BPA ████████, March 21, 2023, timestamp 01:07:16.
[26] BWC footage from UPD Officer ████████.
[27] Follow-up email to OPR investigators from (A)PAIC ████████, March 10, 2023.
[28] BWC footage from UPD Officer ████████.
[29] OPR interview of SBPA ████████, March 16, 2022, timestamp 00:41:18
[30] *Id.*
[31] 2-chlorobenzalmalononitrile gas, commonly called CS gas, is used as a riot control agent.  Exposure to CS gas reacts with moisture on the skin and eyes, causing a temporary burning sensation that lasts between several minutes and several hours.
[32] BWC footage from TPWD Game Warden ████████.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



cuz it's starting to get to that to that point."[33]  TXDPS Ranger ████ then went back inside the building and spoke to SBPA ████.  According to SBPA ████'s statement, TXDPS Ranger ████ told SBPA ████ he would help SBPA ████ as much as possible and told SBPA ████ to do whatever was needed to resolve the situation.[34]  SBPA ████ explained that TXDPS Ranger ████ said, "You've got my support…whatever you need, I'm here."[35]

After SBPA ████ spoke with TXDPS Ranger ████, BWC footage from UCSO Deputy ████ sh████d SBPA ████ on the phone providing an update to an unknown person based on his understanding of the situation.  In his update, SBPA ████ said, "I'm here with everyone else, we just gotta know if the door is opened, is it closed, is it locked?"  After a pause, SBPA ████ asked, "How many inside?  They said I gotta breach the door?"  He asked the other law enforcement officers around him, "Who saw the door?  Does the door need to be breached?"  UPD Staff Sergeant ████ responded by saying, "Yeah.  I don't know if it's locked, but when we got close…it's dark…he shot toward us, so we had to come back" (**12:19:35 PM**).  At that time, there were at least 19 law enforcement officers in the north end of the hallway.

### South End of Building (11:33 AM – 12:21 PM)

The law enforcement response continued to be split between the north and south ends of the building.  The static camera at the T-intersection provided continuous coverage of the hallway facing south for the entirety of the incident.  Various BWCs of other law enforcement personnel passing through the area captured additional perspectives of the activities taking place at the T-intersection.  Although there is no static camera at the south end of the hallway, several BWCs, including those worn by UPD Staff Sergeant ████, Uvalde County Precinct 6 Constable Emmanuel Zamora, UPD Sergeant ████, and UCSO Deputy ████, captured portions of the incident from the south.  At various times during the incident, one or more law enforcement officers were standing near UCISDPD Chief Arredondo and captured some of his words and actions on their BWC.  Despite this coverage, there are significant gaps in the footage from the south end of the hallway.

UPD Staff Sergeant ████ and UPD Officer ████'s BWCs captured the seconds before the assailant opened fire on the initial team at **11:37:00 AM**.  UPD Investigator ████, UPD Sergeant ████, UCISDPD Chief Arredondo, and UCISDPD Officer ████ approached Classrooms 111 and 112 from the south end of the hallway at **11:36:11 AM**.  Once the assailant opened fire, UCISDPD Chief Arredondo, UCISDPD Officer ████, and UPD Investigator ████ retreated southward toward the door but remained inside the building, while UPD Sergeant ████ exited through the south door to make a radio transmission.  UPD Sergeant ████'s BWC captured his actions and those of UCISDPD Officer ████, who exited the building less than two minutes after UPD Sergeant ████.  UPD Sergeant ████ and UCISDPD Officer ████ remained outside the south door for the next ten

---

[33] *Id.*
[34] OPR interview of SBPA ████, March 16, 2023, timestamp 00:35:58.
[35] *Id.* at timestamp 00:36:25.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00050




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

minutes, while UPD Sergeant ███ tried to communicate over the radio. No BWC or interview captured the activities in south hallway during this time.

UPD Sergeant ███'s BWC showed UPD Officer ███, UCSO Deputies ███ and ███, and BPA-I ███ arrive at the south entrance and meet with UPD Sergeant ███ at **11:48:32 AM**. There were no further recordings capturing law enforcement's actions inside the south end of the building until UCSO Deputy ███'s BWC recorded him entering through the south door of the building at **11:54:24 AM**. UCSO Deputy ███ took up a prone defensive position near Classroom 102 and checked the room for occupants at **11:57:07 AM**, finding people inside the classroom. He directed the students there to try to exit the room through the window on the west side of the building, away from the assailant's position. UPD Investigator ███ also entered Classroom 102 and asked if anyone was injured (**11:57:46 AM**). UCSO Deputy ███'s BWC next captured UCISDPD Chief Arredondo attempting to make contact with the assailant by calling out to him from the south hallway (**11:59:02 AM**).

At **12:01:54 PM**, UPD Lieutenant ███ entered the south end of the building, where UCSO Deputy ███ asked him to check for occupants in Classroom 108. UPD Lieutenant ███ looked inside the classroom through the window in the door but did not attempt to open the door. After being told by UCSO Deputy ███ that he was in a dangerous potential crossfire situation, UPD Lieutenant ███ crossed the hallway and joined UCSO Deputy ███ near Classroom 102.[36] UCISDPD Chief Arredondo called out to UPD Lieutenant ███ and asked if he could get a sniper on the rooftop, then continued to try to contact the assailant by calling out to him from the hallway (**12:02:40 PM**).

At **12:06:56 PM**, UCSO Deputy ███ crossed the hall and opened the door to Classroom 108, where he encountered a teacher and children inside the room. UCSO Deputy ███ called out to UCISDPD Chief Arredondo and another officer and requested cover, saying he "has got kids in the classroom."[37] UCSO Deputy ███'s BWC showed UPD Officer ███ taking a defensive position near the door of Classroom 102 to provide cover for the students' evacuation. Once Classroom 108 was cleared, UCSO Deputy ███ moved down the hall toward UCISDPD Chief Arredondo near Classroom 104. UCSO Deputy ███'s BWC captured UCISDPD Chief Arredondo giving direction to other nearby law enforcement officers in and around the south end of the hallway.

In the south end of the hallway, UCSO Deputy ███'s BWC recorded an unknown person asking UCISDPD Chief Arredondo, who was then standing across from UCSO Deputy ███ near Classrooms 109 and 110, whether BORTAC had arrived. UCISDPD Chief Arredondo responded to the unknown person, saying, "We're gonna clear out before we do any breaching." (**12:08:18 PM**). UCISDPD Chief Arredondo then asked a different unknown person near the south hallway door to find one of the school officials and get a master key for the classrooms (**12:08:33 PM**). Shortly thereafter, UCISDPD Chief Arredondo said to UCSO Deputy ███, "I'm going to verify what's been vacated before we do any kind of breaching, but time is on our

---

[36] BWC footage from UCSO Deputy ███.
[37] *Id.* at timestamp 00:29:32.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00051



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



side right now." (**12:09:05 PM**). At **12:09:13 PM**, Constable Zamora entered through the south door with UPD Sergeant ███████, and both cleared Classroom 108.[38] UCSO Deputy ███'s and Constable Zamora's BWCs captured UCISDPD Chief Arredondo telling people near the south door that the helicopter flying overhead needs to "go out" because it was too loud (**12:09:45 PM**). Constable Zamora exited through the south door and relayed UCISDPD Chief Arredondo's direction to the officers waiting outside; however, there is no indication this information was ever relayed to the pilots overhead.

UPD Sergeant ███████ focused on trying to enter the locked door to Classroom 109 to evacuate the teacher and students and offered to break the small, reinforced window inset of the metal door to access the interior door latch. UCISDPD Chief Arredondo told UPD Sergeant ███████ not to because it was too small to be useful, and UCISDPD Chief Arredondo didn't want to draw attention toward the area (**12:10:16 PM**).[39]

At **12:10:38 PM**, UCSO Deputy ███'s BWC captured UCISDPD Chief Arredondo making a phone call and saying, "Johnny, Johnny, I'm getting a master key and we're gonna check one room that we can't open. It's dark. I need to verify the west wing is completely empty." Footage from the static camera at the T-intersection and TPWD Game Warden ███████'s BWC showed Constable Johnny Field receiving a call at the same time at the north end of the hallway. At the conclusion of the call, Constable Zamora's BWC captured UCISDPD Chief Arredondo moving south down the hall at **12:12:10 PM**, where he gave instructions and a situation report to the nearby officers, stating, "Hey guys. Hey guys. Hold on. We're going to clear the building first…and then we'll tackle him…but we're going to empty out these classrooms." (**12:12:23 PM**).

Once UCISDPD Chief Arredondo finished speaking, Constable Zamora moved toward the south door. Visible inside the south hallway near the door was BPA ███████ (UVA), along with four other law enforcement officers. Outside the south door were approximately nine law enforcement officers, including BPA-I ███████, BPA ███████ (UVA), and BPA ███ ███ (MRS, detailed to UVA). Constable Zamora's BWC captured Constable Zamora telling the group, "No entry until the Chief of Police gives you permission then." (**12:13:33 PM**). There is no indication that UCISDPD Chief Arredondo's directions were relayed beyond the law enforcement officers standing immediately outside the south door.

Constable Zamora then asked UPD Investigator ███ about a master key, and UPD Investigator ███ told Constable Zamora there was a key on "the other side" and nodded toward the west door (**12:13:48 PM**).[40] Constable Zamora ran around to the west side of the building and asked UPD Lieutenant ███████ if he knew where to find a master key. While on the west side of the building, Constable Zamora learned of a dark-colored backpack found outside containing

---

[38] BWC footage from Constable Zamora.
[39] BWC footage from UPD Sergeant ███████.
[40] BWC footage from Constable Zamora.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



approximately 30 loaded rifle magazines and broadcasted this information over the radio
(**12:14:18 PM**).

Constable Zamora next asked UCISDPD Officer ▮▮▮▮▮ about a master key.
UCISDPD Officer ▮▮▮▮ called out to UCISDPD Lieutenant ▮▮▮▮ to ask about
the key and heard that UPD Officer ▮▮▮▮ had them (**12:14:43 PM**). Constable
Zamora ran to UPD Officer ▮▮▮▮ and received a keyring on a red lanyard from UPD
Officer ▮▮▮▮.  UCISDPD Lieutenant ▮▮▮▮ then took the keys from Constable Zamora
and removed part of them, handing Constable Zamora what he believed were the correct keys.
Constable Zamora then ran back to the south door of the building.

At **12:16:33 PM**, TXDPS Sergeant ▮▮▮▮ approached and stopped at the south door
and told UCISDPD Chief Arredondo, "They say BORTAC unit is going in."[41] USCISPD Chief
Arredondo replied, "Okay…let me secure that room first," [referring to Classroom 109].[42]  At
**12:16:47 PM**, UCISDPD Chief Arredondo went to the doors to Classrooms 109 and 110 with
UPD Sergeant ▮▮▮▮ and Constable Zamora and attempted to open the door to Classroom
109 with the keys obtained by Constable Zamora.  Prior to trying the door, Constable Zamora
told the law enforcement officers in the hallway to "Get ready for friendlies," referring to the
potential for teachers and students to come out of the classroom.[43]  UCISDPD Chief Arredondo
immediately stepped into the hall and faced south toward the law enforcement officers down the
hallway and said, "Tell them to fucking wait," (**12:16:53 PM**).[44]  TXDPS Sergeant ▮▮▮▮
turned around and relayed UCISDPD Chief Arredondo's direction to wait to the officers outside
the south door, saying, "Sir, sir, sir…don't send them…we need to clear the classroom first."[45]

UCSO Deputy ▮▮▮▮'s BWC showed SBPA ▮▮▮▮ (UVA) outside the south hallway
holding a cell phone to his ear.  In his statement to OPR, SBPA ▮▮ stated that he made multiple
calls on his personal cell phone, lasting 10-15 seconds each, to SBPA ▮▮▮▮ throughout the
incident, discussing UCISDPD Chief Arredondo's search for a master key and the location of
CBP personnel at the school.[46]  However, besides UCISDPD Chief Arredondo attempting to
negotiate with the assailant and discussing the need to find a master key, SBPA ▮▮ stated that he
never heard or relayed a command from UCISDPD Chief Arredondo or anyone else for an entry
team to wait.[47]  SBPA ▮▮▮▮ could also be seen receiving two calls from unknown people.[48]
In the first call, which lasted 23 seconds, SBPA ▮▮▮▮ said toward the end of the call, "these

---

[41] BWC footage from UPD Sergeant ▮▮▮▮.
[42] *Id.*
[43] BWC footage from UPD Sergeant ▮▮▮▮.
[44] BWC footage from Constable Zamora.
[45] BWC footage from TXDPS Trooper ▮▮▮▮.
[46] OPR interview of SBPA ▮▮▮▮ March 7, 2023, timestamp 00:38:10.
[47] *Id.* at timestamp 02:01:15.
[48] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



guys are about to make entry on this side bro… Alright…10-4…We'll standby."[49]  No audio was captured from the second call, which lasted 10 seconds.[50]

After UCISDPD Chief Arredondo was unsuccessful in opening the door to Classroom 109 with the keys, Constable Zamora tried to open the door by releasing the latch with a knife (**12:18:15 PM**).  Constable Zamora asked an unknown law enforcement officer to call UCISDPD Lieutenant ▢ to bring the rest of the keys (**12:19:29 PM**).  UCISDPD Chief Arredondo told TXDPS Trooper ▢, "Want to get [victims] out before we go in, we already have victims in there [referring to Classrooms 111 and 112], don't want to have any more in here, you know what I'm saying?" (**12:20:28 PM**).[51]  At that time, there were at least 15 law enforcement officers in the south end of the hallway.



**Figure 7. Approximate location of law enforcement officers inside Robb Elementary School at 12:21 PM**

---

[49] BWC footage from UPD Officer ▢ ; Video footage captured by static camera located in Robb Elementary School, May 24, 2022.
[50] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.
[51] BWC footage from TXDPS Trooper ▢ .

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00054



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



*PHASE II: 12:21 PM – 12:50 PM*

*North End of Building (12:21 PM – 12:50 PM)*

At **12:21:05 PM**, multiple videos and BWCs captured the sound of four gunshots coming from the direction of Classrooms 111 and 112. This was 37 minutes and 3 seconds after the assailant's last shot at **11:44:02 AM**. Video footage from BWCs and the static camera at the T-intersection showed approximately 17 law enforcement officers, including 8 CBP personnel, present inside the north end of the building when the shots were fired. At that time, the only USBP BORTAC member on scene was SBPA ███████. The static camera at the T-intersection showed ZCSO Deputy ███████, BPA ███████, SBPA ███████, BPA ███████, BPA ███████ (UVA), an unidentified Deputy U.S. Marshal an unidentified BPA wearing a gas mask, BPA ███████, Constable Field, UPD Staff Sergeant ███████, BPA ███████ (UVA), UPD Officer ███████, and an unidentified UCSO Deputy respond to the gunshots by lining up and advancing down the hallway toward Classrooms 111 and 112, fifteen seconds after the four shots were fired. At least eight other law enforcement officers remained at the T-intersection.

Shortly after the group began approaching the doors to Classrooms 111 and 112, it halted between the door of the janitor's closet and the doors to Classrooms 111 and 112. Two BPAs who were in the group that approached the classrooms from the T-intersection after hearing shots fired stated that no one told the group to stop their advance; instead, they did not proceed further because they believed the doors to the classrooms were locked and they had no means to open them (**12:22:06 PM**).[52] An unknown law enforcement officer in the stalled group that made its way toward the doors to Classroom 111 and 112 transmitted over the radio, "We need breaching equipment and a rifle shield, suspect still shooting in the school, I'm in with the team, got a shield." (**12:22:11 PM**).[53] Other officers in the hallway who approached Classrooms 111 and 112 following the shots asked if the doors to the classrooms were locked, while others discussed whether the priority should be using CS gas or finding breaching tools.

BPA ███████ (DRT SOD) and SBPA ███████ (DRT SOD), both BORSTAR paramedics, entered the building at **12:23:28 PM** and briefly spoke to SBPA ███████ at the T-intersection to assess the situation. During their discussion, BPA ███████, who was in the north hallway, reached into his pocket and pulled out a key lanyard that he had received earlier from an unknown person, and shouted, "Who needs a key?" SBPA ███████ responded, and BPA ███████ tossed the key lanyard; however, they quickly realized the keys did not work on the doors in the building. Meanwhile, BPA ███████ and SBPA ███████ established a medical triage area by setting up medical equipment near the restrooms in the hallway east of the T-intersection (**12:24:25 PM**). Other BPAs, including BPAs ███████ and ███████, assisted in setting up the triage area. In a brief conversation with TXDPS Ranger ███████ and

---

[52] OPR interview of BPA ███████, March 20, 2023, timestamp 02:57:30; OPR interview of BPA ███████, March 17, 2023, timestamp 00:56:26.
[53] BWC footage from UPD Staff Sergeant ███████.

AR00055



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



TPWD Game Warden ▮▮▮▮ near the T-intersection, SBPA ▮▮▮▮ told them, "If he keeps firing, we gotta go." (**12:25:45 PM**).



**Figure 8. Location of Medical Triage Area**

Between **12:24:51 PM** and **12:33:08 PM**, radio communications were hindered by an unidentified person unknowingly activating the microphone on their radio, a situation known as a "hot mic," which prevented others from using their radios. During that time, conversations between law enforcement officers with their microphones depressed could intermittently be heard over the radio frequency while the dispatcher broadcasted that a microphone was activated. Previously, the UPD radio system had been connected with the USBP radio system through what is known as a "patch," leading to additional radios on the network, which further complicated resolution of the hot mic issue. The hot mic issue intermittently affected all radio communications on the patched radio network.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00056



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



At **12:26:59 PM**, UPD Officer ▮▮▮▮ asked UPD Officer ▮▮▮▮ whether Classrooms 111 and 112 were connected to each other.[54] As the two discussed the issue, SBPA ▮▮▮▮ interjected and asked, "He could be in the other one?" referring to Classroom 112. UPD Officer ▮▮▮▮ stated he believed the two classrooms might be connected, to which SBPA ▮▮▮▮ responded, "So there's a giant room he could be in? OK." Seconds later, SBPA ▮▮▮▮ met with TPWD Game Warden ▮▮▮▮, who was looking at a rough map of the school, which did not show any connecting doors between Classrooms 111 and 112.[55] SBPA ▮▮▮▮ then sent a text message sharing his understanding of the situation to other BORTAC members at approximately **12:28:12 PM** saying, "Guy is taking shots at the door. He has multiple children in there. Door is locked."[56]

At **12:28:39 PM**, UCSO Sheriff Nolasco entered the school through the west door, stopped at the T-intersection, pointed at TPWD Game Warden ▮▮▮▮, and said, "Get one guy, from in here only making phone calls or radio communications. We got too many…" TPWD Game Warden ▮▮▮▮ replied, "Yeah. Nah. Everyone in here is quiet. We are all focused." UCSO Sheriff Nolasco responded, "Ok. But we just need one person communicating out of this building, okay? Please." (**12:28:46 PM**). UCSO Sheriff Nolasco exited the building at **12:29:52 PM**.

At **12:29:01 PM**, BORSTAR SBPA ▮▮▮▮ (DRT SOD) entered the building and walked toward SBPA ▮▮▮▮, who was talking to BPA ▮▮▮▮ and SBPA ▮▮▮▮ at the T-intersection.[57] UCSO Deputy ▮▮▮▮'s BWC captured SBPA ▮▮▮▮ explaining his understanding of the situation at that moment:

| | |
|---|---|
| SBPA ▮▮▮▮: | *"On each window and deploy gas."* (**12:29:08 PM**) |
| SBPA ▮▮▮▮: | *"I don't have gas…it's in my truck…"* (**12:29:09 PM**) |
| SBPA ▮▮▮▮: | *"There's a crate full of gas right there. I just need breachers…"* (**12:29:11 PM**) |
| SBPA ▮▮▮▮: | *"Do we have keys for the room?"* (**12:29:17 PM**) |
| SBPA ▮▮▮▮: | *"There are master keys here, but they aren't opening none of these other doors. So, they say it's a master key but it's not opening the doors, so we don't know if it works or not. He is shooting at the door every time someone gets close to it."* (**12:29:18 PM**) |
| SBPA ▮▮▮▮: | *"What's he shooting with?"* (**12:27:27 PM**) |
| SBPA ▮▮▮▮: | *"A rifle. They said he has a rifle and some magazines. They already found rifles and magazines. The rounds are going through the walls."* (**12:29:28 PM**) |
| SBPA ▮▮▮▮: | *"OK."* (**12:29:34 PM**) |
| SBPA ▮▮▮▮: | *"We just need…I need my guys to breach that window and get some gas in there."* (**12:29:35 PM**) |

---

[54] BWC footage from UPD Officer ▮▮▮▮.
[55] BWC footage from TPWD Game Warden ▮▮▮▮; Video footage captured by static camera located in Robb Elementary School, May 24, 2022.
[56] See Appendix II for detailed information about the BORTAC members' internal communications and locations.
[57] BWC footage from UCSO Deputy ▮▮▮▮.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA-Programs (BPA-P) ███████████ (DRT) entered the building through the west door at **12:29:18 PM** and identified himself as an EMT.  BPA ████ and SBPA ████ broke away from their conversation with SBPA ████████ and began to explain the preliminary triage plan to BPA-P ████.  For the next several minutes, BPA-P ████ and BPA ███████████ prepared medical equipment while SBPAs ████ and ████ and BPA ████ stayed near the group of law enforcement officers gathered outside Classrooms 111 and 112.  BORSTAR BPA ████████████ (DRT SOD) arrived with additional medical supplies, dropped them off with BPA-P ████ and BPA ████, and joined SBPAs ████ and ████ and BPA ████ (**12:30:39 PM**).  At that time, one member of BORTAC (SBPA ████████) and four members of BORSTAR (SBPAs ████ and ████ and BPAs ████ and ████) were on scene.

BPA ████████ (BRA), an EMT, entered through the west door at **12:31:41 PM** with multiple bags of medical equipment and a backboard, which he took to the restrooms on the east side of the T-intersection where the triage area was being set up.  SBPA ████ handed SBPA ████ a canister of CS gas in preparation for an eventual breach (**12:32:27 PM**).  At **12:32:32 PM**, SBPA ████ exited the building through the west door and went to his vehicle to retrieve a Halligan tool (a tool used for forcible entry).  As SBPA ████ exited the building, UPD Officer ████ entered the building and told people, "Hey guys, there's somebody parked in the roadway, if you can move so they can egress. Give me your keys if you want." (**12:32:27 PM**).  Multiple law enforcement officers in the T-intersection handed UPD Officer ████ their car keys or let him know where their keys were located.

Beginning at **12:33:04 PM**, BPA-P ████ informed other law enforcement officers in the T-intersection about the medical triage plan.  He told an unknown BPA the plan for integrating the awaiting civilian ambulance crews with the medical response efforts inside the building, saying, "They can stage outside, we are going to triage here; what needs to go we are going to go."  As he said this, BPA-P ████ pointed to the west door, motioning for the ambulance crews to be staged just outside the door.  As BPA ████ repeated information previously told to him to SBPAs ████ and ████, BPA-P ████, and BPA ████, an unknown Deputy U.S. Marshal said, "A student called 911. That they are locked in there, multiple casualties," (**12:33:12 PM**).[58]  The static camera at the T-intersection and several BWCs captured the triage preparations for the next several minutes.

At **12:35:44 PM**, SBPA ████ reentered the building through the west door, carrying a Halligan tool, and walked toward the janitor's door near Classrooms 111 and 112 to test the viability of using the tool.  SBPA ████ told investigators during an interview that he determined that using the Halligan tool alone, without a ram or sledgehammer, would be ineffective because it would take too long to open the door.[59]  SBPA ████ asked if anyone around him had access to a sledgehammer, but none was



**Figure 9. Halligan Tool**

---

[58] BWC footage from UCSO Deputy ████.
[59] OPR interview of SBPA ████████, March 16, 2023, timestamp 02:44:09.

AR00058



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



available. SBPA ███████ believed if he had tried to open the door with just the Halligan tool and the assailant shot through the door again, it could have resulted in a situation where he or another law enforcement officer could be injured without making any progress stopping the assailant.[60]

At **12:36:16 PM**, TXDPS Ranger ███████ entered the building through the west door with a set of keys on a black lanyard. He handed them to SBPA ███████, who took them and successfully tested them on the janitor's door and Classrooms 131 and 132 (**12:36:57 PM**). At **12:37:08 PM**, BPA ███████ (DRT SOD) and BPA ███████ (DRT SOD), both members of BORTAC arrived at the T-intersection and received a quick briefing from SBPA ███████. SBPA ███████ motioned for everyone in the T-intersection to quiet down at **12:37:56 PM**. BPA ███████, a BORTAC sniper, exited through the east door to find a vantage point that would allow him to see into the classroom. Over the course of 13 minutes, BPA ███████ attempted to see inside Classrooms 111 and 112 from three different vantage points. BPA ███████ told investigators he was able to see a bullet hole in the window of Classroom 111 but was unable to see inside the classroom because the closed window blinds obstructed his view.[61]

Preparation for the medical response continued in the T-intersection. Multiple BWCs captured BPA-P ███████ explaining the response plan for casualties. At **12:42:07 PM**, BPA-P ███████ told at least eight law enforcement officers in the T-intersection, "We gotta, we're gonna send out, wounded, wounded this way. Non wounded, we're going to take them straight over there, outside, ok? Anybody wounded, we want to go here so our EMTs can work on them, OK?" BPA ███████ asked BPA ███████ if his medical equipment was still packed up and said to take his equipment to the "other side" as he pointed to the south end of the hallway "in case they take people to the other side." (**12:42:31 PM**).

An unidentified Deputy U.S. Marshal entered the west end of the building with a rifle-rated ballistic shield and handed it to BPAs ███████ and ███████ near the T-intersection (**12:43:05 PM**).[62] Together, BPAs ███████ and ███████ brought the shield toward the doors to Classrooms 111 and 112, where law enforcement officers were gathered in preparation to enter the classrooms. Afterward, BPA ███████ gathered BPA-P ███████, BPA ███████, and TXDPS Trooper ███████ (all EMTs) to review the medical plan, saying, "Serious trauma. Straight to the ambulance. Once they are overwhelmed, we do it here." (**12:43:49 PM**). BPA-P ███████ further clarified where wounded and non-wounded victims were to be treated. At **12:45:45 PM**, footage from UCSO Deputy ███████'s BWC showed BPA ███████ and BPA-P ███████ briefing a civilian ambulance crew staged immediately outside the west door because the situation inside the west building still active and posed an immediate danger to life and health. BPA ███████

---

[60] OPR interview of SBPA ███████, March 16, 2023, timestamp 02:47:28.
[61] OPR interview of BPA ███████, March 9, 2023, timestamp 00:34:20.
[62] Five other ballistic shields were brough into Robb Elementary School before an unidentified Deputy U.S. Marshal brought a rifle-rated shield. Three shields were brought into Robb Elementary School at 11:52:15 AM, 12:03:59 PM, and 12:04:48 PM, but none of them were rifle-rated. Two additional shields, both rifle-rated, were brought into Robb Elementary School at 12:20:55 PM and 12:30:16 PM before the final rifle-rated shield arrived at 12:43:05 PM.

AR00059



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



(BRA) arrived during this briefing, and BPA ███████ directed him to assist BPA ███████ on the south end of the hallway (**12:46:33 PM**).

After driving more than 70 miles from Del Rio, Texas, BPA ███████████ (DRT SOD and member of BORTAC) arrived and parked near the funeral home at approximately **12:47:00 PM**.[63]  Although no one specifically requested he do so, as a Level II Breacher trained in explosive breaching techniques, BPA ████████ brought supplies to prepare an explosive omni-bottle charge.  Unaware that SBPA ████████ had identified and possessed the correct key to Classrooms 111 and 112, BPA ████████ began preparing an explosive omni-bottle charge at his vehicle upon his arrival, but abandoned his efforts when he realized law enforcement officers had entered the classroom.[64]  BPA ████████████ (DRT SOD and a member of BORTAC) arrived at the school, entered through the west door at **12:47:03 PM**, and joined the line of law enforcement officers preparing to enter the classrooms.  At **12:48:03 PM**, an unidentified person brought a sledgehammer and handed it to BPA-P ████████ and the law enforcement officers preparing to make entry, although it was no longer needed because the master key had been located.

Officers in view of the static camera at the T-intersection repositioned in anticipation of the breach.  BPA-P ████████ instructed the ten law enforcement officers in the T-intersection to separate, with medics going toward the triage area set up near the restrooms and all other officers toward the opposite side near the west door (**12:48:22 PM**).

A group of law enforcement officers, consisting of BPA ████████, SBPA ████████, ZCSO Deputy ████████, and BPA ████████, advanced to the door to Classroom 111.  BPA ████████ and SBPA ████████ approached the door to open it, with BPA ████████ holding a rifle-rated ballistic shield to protect SBPA ████████ while SBPA ████████ inserted the key on the black lanyard he received from TXDPS Ranger ████████ into the door of Classroom 111 and turned it.  After the door was opened, it kept automatically closing, so SBPA ████████ asked someone to put a chair in front of it.[65]  As the law enforcement officer in front, BPA ████████ called out to SBPA ████████ what he saw inside Classroom 111.  BPA ████████ and SBPA ████████ waited outside the open door of Classroom 111 for approximately 90 seconds, while SBPA ████████ assessed what could be seen inside the classroom because the group did not have the element of surprise.  While the door was open, SBPA ████████ recognized BPA ████████ as another member of his team and motioned for him to come toward the group to make entry.

---

[63] OPR interview of BPA ████████, March 9, 2023, timestamp 00:47:00.
[64] *Id.* at timestamp 00:34:36.
[65] OPR interview of SBPA ████████, March 16, 2023, timestamp 03:01:45.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00060




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



Figure 10. Approximate Location of Law Enforcement Officers at North End of Building at 12:50 PM



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Once positioned, SBPA [redacted] gave the indication for the team to advance into the classroom at approximately **12:50:00 PM**. Video footage from BWCs and the static camera at the T-intersection showed approximately 27 law enforcement officers lined up and prepared to enter Classrooms 111 and 112, while approximately 19 law enforcement officers remained at the T-intersection, for a total of approximately 46 law enforcement officers inside the north end of the building when the team entered Classroom 111.

BPA [redacted] entered the classroom and moved straight, stopping at the open doors that joined Classroom 111 to Classroom 112. SBPA [redacted] entered the room behind BPA [redacted] and immediately turned right to ensure there were no threats in the corner of the room not initially visible from the doorway.[66] While visually clearing the blind corner, SBPA [redacted] saw a pile of what appeared to be deceased people in the corner of the room.[67]

ZCSO Deputy [redacted] entered the room next, followed by BPA [redacted], who also turned right toward the blind corner before turning left to address "a loud bang."[68] As SBPA [redacted] turned toward BPA [redacted] to proceed with clearing Classroom 112, he heard a sound and saw muzzle flashes from the assailant's rifle in the corner of the room.[69] BPA [redacted] stated his attention was focused on the open doors leading to the next classroom, so he was caught off-guard when he saw a closet door kicked open from the inside.[70] Almost instantaneously, BPA [redacted] took a step back, slipped, and observed the assailant's black hair and muzzle flashes from the assailant's rifle.[71] BPA [redacted] felt his shield receiving impacts from the assailant's gunfire and returned fire with four rounds from his pistol before it malfunctioned.[72]

---

[66] OPR interview of SBPA [redacted], March 16, 2023, timestamp 05:46:25.
[67] Id.
[68] OPR interview of BPA [redacted], March 21, 2023, timestamp 02:14:00.
[69] OPR interview of SBPA [redacted], March 16, 2023, timestamp 05:46:54.
[70] OPR interview of BPA [redacted], March 15, 2023, timestamp 04:05:20.
[71] Id.
[72] Id.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00062



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**





**Figure 11. Approximate Movement and Locations of Entry Team**

SBPA ████████ aimed his rifle at the assailant and returned fire, passing BPA ████████, who was also returning fire, and continuing to fire until the assailant was down on the floor.[73] ZCSO Deputy ████████ recognized the threat and fired two to four rounds from his rifle before it jammed.[74] BPA ████████ also heard the gunfire and saw the muzzle flashes. He aimed his rifle at the muzzle flashes and fired 12 rounds at the assailant.[75] As the assailant fell to the floor, his rifle dropped away from him. Once the assailant was down, SBPA ████████ stood over his body to protect the scene and visually assess the assailant's condition.[76] Seeing no movement and significant trauma to the assailant's torso, SBPA ████████ concluded the assailant was deceased and did not feel the need to handcuff him.[77]

### South End of Building (12:21 PM – 12:50 PM)

Interaction between the law enforcement officers on the north end of the building near the T-intersection and south end of the hallway was minimal. Between **12:21:00 PM** and **12:50:00 PM**, there was no BWC or static camera footage of phone calls or conversations between the two

---

[73] *Id.*
[74] TXDPS Interview with ZCSO ████████, May 26, 2022.
[75] OPR interview of BPA ████████████, March 21, 2023, timestamp 03:44:00.
[76] OPR interview of SBPA ████████████, March 16, 2023, timestamp 03:39:04.
[77] *Id.*

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00063



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



groups. Law enforcement officers at the north end of the building were congregated outside Classrooms 111 and 112 and near the T-intersection, while law enforcement officers at the south end of the building, including UCISDPD Chief Arredondo, were lined up along the hallway. The gap between the groups was to prevent a crossfire situation because of the position of Classrooms 111 and 112. While UCISDPD Chief Arredondo was in the south hallway, three other law enforcement leaders, UPD Acting Chief Pargas, UCSO Sheriff Nolasco, and (A)PAIC ███████, were on-site at Robb Elementary School but were not present inside the school, nor did they give any direction to responding officers. Outside of these four individuals, no other law enforcement leaders arrived until right before or immediately after law enforcement entered Classrooms 111 and 112.

The BWCs of Constable Zamora, TXDPS Troopers ███████ and ███████, UPD Sergeant ███████, and UCSO Deputy ███ captured the four shots fired by the assailant at **12:21:05 PM** from the south end of the hallway. After repositioning along the south hallway following the four shots from inside the classroom, the attention of the law enforcement officers in the hallway, including UCISDPD Chief Arredondo, appeared to be focused on evacuating the children in the classrooms around Classrooms 111 and 112. The assailant was believed to be in Classroom 111 or 112, and all other classrooms besides Classroom 109 had been cleared prior to the four shots.

Unknown to the officers in the south hallway, a teacher, ███████, and a student, ███████, had been shot in Classroom 109, as bullets from the assailant's weapon penetrated through multiple layers of drywall into adjoining classrooms. Outside, BPAs ███████ and ███████ assisted with lifting students out the window of Classroom 109 while other law enforcement officers guided the students to safety. Once the students were evacuated from Classroom 109, BPA ███ climbed through the window into the classroom at **12:25:43 PM** and lifted ███████ through the window to safety.[78] BPA ███ climbed out of the classroom window at **12:26:08 PM**.[79]

UPD Sergent ███████'s BWC captured UCISDPD Chief Arredondo talking during a phone conversation with an unknown person, saying, "trying to…so we are trying to…people are going to ask why we are taking so long…okay?…So that's what we're trying to preserve the rest of the lives first" (**12:26:29 PM**). During UCISDPD Chief Arredondo's phone conversation, UPD Sergeant ███████ relayed a message from Constable Zamora to UCISDPD Chief Arredondo that the final classroom, Classroom 109, was clear of students and teachers (**12:26:37 PM**). UCISDPD Chief Arredondo then said, "We have a team ready to go? Have at it." (**12:26:57 PM**). However, OPR's review did not find evidence that this message was ever relayed to law enforcement officers beyond those in UCISDPD Chief Arredondo's immediate vicinity. While talking on the phone, UCISDPD Chief Arredondo said, "so there is a window over there obviously…so the door is going to probably be locked…probably is locked…that's the nature of…Let me try to find some more keys but man…I'm going to get more keys to test some of

---

[78] OPR interview of BPA ███████, March 6, 2023, timestamp between 01:06:57 and 01:29:45; cell phone video footage from ███████.
[79] Cell phone video footage from ███████.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



these doors…I'll call you back." (**12:27:32 PM**).  After ending the call, UCISDPD Chief Arredondo told Constable Zamora to find a man named "████," who possibly had a master key.[80]  At **12:29:08 PM**, UCISDPD Chief Arredondo repeated his description of "████" to Constable Zamora, who had been unable to locate him.

At **12:29:22 PM**, UPD Officer ████'s BWC captured UCISDPD Chief Arredondo explaining his understanding of the situation at that moment to an unknown TXDPS Sergeant and TXDPS Criminal Investigations Division (CID) Special Agent (SA) ████:

> UCISDPD Chief Arredondo: *"We've cleared out…we've cleared out everything except for that room…we do have some people down."* (**12:29:24 PM**)
> TXDPS CID SA ████: *"The one with the flag door?"* (**12:29:30 PM**)
> UCISDPD Chief Arredondo: *"Uh…Just past the flag to the right…it's probably going to be the south…there's two doors on the right…it's going to be the south door but…we were ready to breach but that door's locked."* (**12:29:49 PM**)

At the conclusion of that conversation, approximately 20 law enforcement officers were standing in the south hallway, including SBPA ████ (UVA) and BPA ████.  Outside the south door, UCSO Deputy ████ said, "There's a lot of people in there…you see those guys on the other end?  It's just way too much…way too much gun firepower in there." (**12:31:15 PM**).

As ████, the teacher in Classroom 109, was making her way away from the building and seeking medical treatment with the assistance of law enforcement officers, TXDPS communications captured a phone call between their dispatch and TXDPS Sergeant ████ (**12:30:31 PM**).  During the phone call, TXDPS Sergeant ████ was looking for EMS to provide care for ████ and said on the call, "I don't see any EMS on scene."

At **12:32:07 PM**, UPD Sergeant ████'s BWC captured UCISDPD Chief Arredondo talking on the phone and saying, "Yes sir…yes sir…We need a master key bro…None of these we got are working bro. None of these we just got. Okay. Okay…Keys are coming with ████…okay…I'm waiting for keys…Your BORTAC team…they're ready to go right…so if they've got flashbangs…I hope…I mean are they taking care of that? …'cause we need a distraction for sure…if we get a key going to take a second to open that god damn door, so…yeah…I say we breach those windows…you know what I mean? …offer that to them…because going in through the door is going to be hard…[unintelligible]…would they consider popping in through that window? …[unintelligible]…something to think about…"  The static camera at the T-intersection at that time showed that SBPA ████, the only member of BORTAC on scene, was not talking on his phone.  Additionally, SBPA ████ confirmed in his interview with OPR investigators that he never spoke to or received any

---

[80] UCISD Maintenance and Operations Supervisor ████.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



messages directly or indirectly from UCISDPD Chief Arredondo or any other law enforcement leader on scene.[81]

While discussing tactical options with other law enforcement officers in the south hallway, an unknown law enforcement officer asked if the assailant had anyone in the room with him.[82] UCISDPD Chief Arredondo replied, "I think he does…there's probably some casualties." (**12:34:07 PM**).[83]  Farther down the hall, the BWCs of TXDPS ███████ and UCSO Deputy ███ recorded a conversation between unidentified individuals stating that BORTAC was on its way (**12:34:40 PM**).  Near the south door, UPD Investigator ███ and Constable Zamora discussed their awareness of a student on the phone inside the classroom with the assailant (**12:34:55 PM**).

At **12:35:22 PM**, Constable Zamora's BWC captured him explaining his understanding of the situation at that moment to TXDPS Lieutenant ██████████ outside the south door:

| | | |
|---|---|---|
| TXDPS Lieutenant ███████ | : | *"So, so how many law do we have in there? How many law?"* (**12:35:24 PM**) |
| Constable Zamora: | | *"Officers?"* (**12:35:25 PM**) |
| TXDPS Lieutenant ███████ | : | *"Yes sir, do you know how many?"* (**12:35:26 PM**) |
| Constable Zamora: | | *"Approximately 20."* (**12:35:27 PM**) |
| TXDPS Lieutenant ███████ | : | *"Okay, so."* (**12:35:28 PM**) |
| Constable Zamora: | | *"They have two stacks on each side of the door."* (**12:35:29 PM**) |
| TXDPS Lieutenant ███████ | : | *"But they are good on manpower."* (**12:35:30 PM**) |
| Constable Zamora: | | *"Oh, yes sir, they are good on manpower."* (**12:35:32 PM**) |
| TXPDS Lieutenant ███████ | | *"So they're just clearing the way to the backside?"* (**12:35:33 PM**) |
| Constable Zamora: | | *"They are making sure that all kids have exited so, and the crossfire because uh they shot already through two uh two walls…"* (**12:35:35 PM**) |
| TXPDS Lieutenant ███████ | : | *"Right."* (**12:35:42 PM**) |
| Constable Zamora: | | *"…and hit a teacher, so and the teacher was in a in a room closer to us."* (**12:35:42 PM**) |
| TXPDS Lieutenant ███████ | : | *"Where is she at, she already…"* (**12:35:45 PM**) |
| Constable Zamora: | | *"She's over here with the EMTs and stuff, yes sir."* (**12:35:46 PM**) |
| TXPDS Lieutenant ███████ | : | *"Okay, so she was only one person."* (**12:35:47 PM**) |
| UPD Investigator ███ | : | *"She was transported to UMH already."* (**12:35:48 PM**) |
| Constable Zamora: | | *"To the hospital."* (**12:35:51 PM**) |

---

[81] OPR interview of SBPA ██████████, March 16, 2023, timestamp 02:33:55.  Additionally, the Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report found, "Chief Arredondo did not actually exercise tactical incident command over the BORTAC team, nor did the BORTAC team seek instruction from Chief Arredondo" (p. 76).
[82] BWC footage from TXDPS Trooper ███████, BWC footage from UCSO Deputy ████.
[83] BWC footage from UPD Sergeant ██████.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00066



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



TXPDS Lieutenant ████ : *"Okay, she's already enroute."* (**12:35:52 PM**)
Constable Zamora: *"Yes, sir."* (**12:35:53 PM**)
TXPDS Lieutenant ████ : *"Only one injury that we know about?"* (**12:35:54 PM**)
UPD Investigator ████ : *"Two."* (**12:35:55 PM**)
TXPDS Lieutenant ████ : *"Two injuries."* (**12:35:55 PM**)
Unknown: *"Teacher and a child."* (**12:35:56 PM**)
UPD Investigator ████ : *"And another adult that's at UMH that I know about for sure. Two adults and one child from my understanding."* (**12:35:58 PM**)[84]

Constable Zamora's BWC captured him providing UCISDPD Chief Arredondo the assailant's name and showing a picture of the assailant on his cell phone to the other law enforcement officers outside the south door (**12:36:54 PM**). UPD Officer ████ 's BWC captured UCISDPD Chief Arredondo talking on the phone and saying, "test it on other doors first," but at that time SBPA ████ , who was in possession of the correct master key, was not talking on the phone (**12:37:25 PM**). SBPA ████ was speaking to BPAs ████ and ████ , who had just arrived.

Beginning at **12:37:42 PM**, UCISDPD Chief Arredondo attempted to communicate with the assailant for several minutes in English and Spanish, calling out to him by name after Constable Zamora relayed that information. UCISDPD Chief Arredondo asked the assailant to not hurt anyone and to put his firearm down. Constable Zamora said to UCISDPD Chief Arredondo, "Ranger. Ranger has the keys, Chief; Ranger on that side," as Constable Zamora pointed toward the north side of the building (**12:38:05 PM**). Talking to UPD Officer ████ , UCISDPD Chief Arredondo said, "We're gonna test the door…and he's gonna shoot as soon as they put the key in the hole." (**12:39:47 PM**). Later, on the phone, UCISDPD Chief Arredondo said, "We understand there are some injuries in there…uh and and so what we did was clear out the rest of the building so we wouldn't have any more besides what's in there obviously but having a problem getting into the fucking room because it's locked." (**12:41:31 PM**). Constable Zamora notified UCISDPD Chief Arredondo that he had a possible phone number for the assailant and was going to call it to try to contact the assailant (**12:42:11 PM**).

At **12:42:53 PM**, UCISDPD Chief Arredondo was heard on the phone talking about the continued need to locate the correct master key. However, unbeknownst to him, SBPA ████ had already received and successfully tested a master key, having had it in his possession since **12:36:57 PM**. Closer to Classrooms 111 and 112 in the south hallway, UCSO Deputy ████ 's BWC captured similar discussions among various law enforcement officers regarding the need to locate the correct key (**12:43:11 PM**). At **12:43:26 PM**, UPD Officer ████ 's BWC captured UCISDPD Chief Arredondo saying, "That door, I bet you it's unlocked. I bet you it's unlocked. We tell 'em, we tell 'em, we tell 'em." Simultaneously, UPD Investigator ████ , who

---

[84] BWC footage from UCSO Deputy ████ .



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



was outside the south door, was heard on Constable Zamora's BWC reiterating the belief the door was locked and there was no way into the classroom (**12:44:49 PM**).

UCISDPD Chief Arredondo was still on the phone at **12:45:01 PM** and UPD Officer ███'s BWC captured UCISDPD Chief Arredondo saying law enforcement officers still needed keys. UPD Lieutenant ███ then told UCISDPD Chief Arredondo that the keys were on the other side of the hall at the north end. At **12:45:45 PM**, the person on the phone with UCISDPD Chief Arredondo told him that the key was working. UCISDPD Chief Arredondo told the person on the phone, "If y'all are ready to do it, you do it, but someone should distract him out the window," (**12:45:51 PM**). UCISDPD Chief Arredondo later told the group of law enforcement officers closer to Classrooms 111 and 112 in the south hallway that a working key was found (**12:46:04 PM**). The BWC of TXDPS Trooper ███, who was part of the group closer to Classrooms 111 and 112 in the south hallway, captured the notification that a key was located.

At **12:47:17 PM**, Constable Zamora's BWC captured him telling the law enforcement officers outside the south entrance that a team was about to make entry. Most of the conversations captured by BWCs in the south hallway prior the team entering the classroom centered around the need for officers to be out of the way of a possible crossfire situation. UPD Officer ███ briefly exited the south hallway to transmit over the radio, "Keep an eye on top of the roof. He might have climbed on top of the ceiling." (**12:48:25 PM**). UPD Officer ███'s BWC captured UCISDPD Chief Arredondo saying, "Complete surround. I don't know what's going on. The door is open." (**12:49:09 PM**). At **12:50:00 PM**, UCISDPD Chief Arredondo said, "They're going in." Gunshots were heard at **12:50:02 PM**.

### *PHASE III: RENDERING AID*

When the team entered Classrooms 111 and 112 at **12:50:00 PM**, approximately 79 law enforcement officers were inside the building or immediately outside the south door. Approximately 27 law enforcement officers were lined up on the north side of the hallway, prepared to enter Classrooms 111 and 112, while approximately 19 law enforcement officers remained at the T-intersection, for a total of approximately 46 law enforcement officers inside the north side of the building. Of these 46 law enforcement officers, at least six were either EMTs or paramedics. Outside the south doorway, various BWCs recorded 16 law enforcement officers, including two EMTs. An additional 17 law enforcement officers were dispersed along the south hallway between Classrooms 111 and 112 and the south door, bringing the total number of law enforcement officers at the south end of the building to 33. Of the 33 law enforcement officers at the south end, at least two were EMTs.

OPR determined that the medical response plan was not effectively communicated to everyone inside the west building. Seconds prior to officers breaching Classroom 111, multiple law enforcement officers entered the north hallway from the west door, some for the first time. None of these officers were briefed on the medical response plan. OPR investigators did not identify any evidence indicating that the law enforcement officers who lined up to enter the room were made aware of the medical response plan. BPA-P ███ and BPAs ███ and ███ communicated the plan only to the officers at the T-intersection, away from the officers lined up



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



to make entry. No senior law enforcement officials were briefed on the medical response plan prior to the breach; however, in at least one instance, a senior law enforcement leader, unaware of a medical response plan taking shape at the north end of the hall, gave directions contrary to the plan to responding officers and created confusion. After the shooting stopped and the classrooms were declared clear of active threats, dozens of officers flooded into Classrooms 111 and 112 to assess the situation and assist the victims. Most of these officers were not aware of the medical response plan. TXDPS Trooper ███████'s BWC captured UCISDPD Chief Arredondo yelling, "Bring me the children!" (**12:50:44 PM**) following the breach.

Based on video footage and interviews with the law enforcement officers who entered Classrooms 111 and 112, the scene can only be described as horrific. In Classroom 111, officers saw a pile of children in the southwest corner of the classroom. A similar scene existed in Classroom 112, where teachers had lain on top of children trying to protect them. Many law enforcement officers stated that upon seeing such a horrific sight, they simply grabbed the closest victim they could find and tried to bring them to medical attention.

The following summarizes the known actions taken following the breach for each victim at Robb Elementary School in the order they exited Classrooms 111 and 112:[85]



███████████ (Student, Classroom 111, Deceased): SBPA ███, BPA-Trainee (BPA-T) ███████ (BRA), and an unknown BPA carried ███ outside through the west entrance. No treatment was provided because ███ had obvious signs of death.

███████████ (Student, Classroom 111, Deceased): BPA-I ███████, BPA ███████, and other law enforcement officers carried ███████ down the hallway toward the south entrance. BPA ██████ assessed her at the south entrance of the building and determined she was deceased.

███████████ (Student, Classroom 111, Deceased): BPA ██████████ and two other law enforcement officers initially carried ██████ north to place him down at the west doorway; however, they immediately relocated him to the medical triage area and placed him on a backboard. SBPA ██████ checked for a pulse. Finding none, law enforcement medics moved on to other patients while an unknown law enforcement officer remained with ███. Approximately two and a half minutes later, BPA ██████ reassessed ██████ and found what he believed was a pulse. BPA ██████ reassessed ███ and, with BPAs ██████ and ██████, began lifesaving measures. ███ was transferred onto a gurney and BPA ████████, other law enforcement officers, and civilian medical personnel rolled him to the parking lot near the southwest corner of the school for a helicopter transport. While awaiting the helicopter transport, medical personnel continued to treat ██████ until he was taken to an awaiting ambulance, where he succumbed to his injuries.

---

[85] The assailant's grandmother, ███████████████, has been widely reported as the seventeenth injured victim in this incident. However, CBP personnel were not involved in any facet of the response at the assailant's residence, so actions at the assailant's residence were not considered during OPR's review.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



███████████ (Student, Classroom 111, Deceased):  Constable Field and BPA ███████ (DRT SOD) carried ███████ toward the T-intersection and handed her off to civilian medical personnel, who took her to the east side of the hallway.  BPA ███████ assessed her and left her with the civilian medical personnel.  Later, an unidentified Deputy U.S. Marshal, SBPA ███████ (UVA), and BPA-I ███████ carried her to Classroom 131, where other deceased victims were taken.

███████████ (Student, Classroom 111, Deceased):  BPA ███████ and UCSO Deputy ███████ carried ███████ to the T-intersection.  An unidentified TXDPS Trooper moved her to the east side of the hallway.  SBPA ███████, civilian medical personnel, and BPA ███████ all checked on ███████ over the course of several minutes.  BPA ███████ and BPA ███████ eventually applied bandages and performed chest compressions on her.  An unknown TXDPS Trooper and SBPA ███████ carried ███████ out on a backboard to awaiting ambulances.

███████████ (Student, Classroom 111, Deceased):  BPA ███████ and an unidentified Deputy U.S. Marshal carried ███████ to the T-intersection near Classroom 131.  BPAs ███████ and ███████ (BRA) assessed him near the door to Classroom 131 and determined he was deceased.  BPA ███████ moved ███████ into Classroom 131, where other deceased victims were taken.

███████████ (Teacher, Classroom 111, Injured):  An unidentified TXDPS Trooper, TXDPS CID SA ███████, and an unidentified law enforcement officer carried ███████ toward the T-intersection and stopped at the east side of the hallway just past the triage area.  Later, an unidentified BPA, an unidentified law enforcement officer, and civilian medical personnel treated ███████ there.  After hearing calls for assistance, BPA ███████ and three other unidentified law enforcement officers carried ███████ out the east door toward the school's half-circle driveway on Old Carrizo Road, where an unoccupied ambulance was parked.  BPA ███████ and an unidentified firefighter transported ███████ to Uvalde Memorial Hospital in the unoccupied ambulance.

███████████ (Student, Classroom 112, Injured):  ███████ ran out of the classroom and was escorted by an unidentified law enforcement officer before being handed off to TXDPS Trooper ███████ near the T-intersection.  TXDPS Trooper ███████ and an unidentified Deputy U.S. Marshal took ███████ to the east side of the hallway just past the triage area.  The unidentified Deputy U.S. Marshal assessed ███████ and stabilized his gunshot wound while TXDPS Trooper ███████ remained with him to comfort him.  Once stabilized, an unidentified TXDPS Trooper and BPA ███████ (BRA) took ███████ out of the building through the west door to an ambulance.

███████████ (Student, Classroom 112, Injured):  ███████ ran out of the classroom and was received by Constable Field.  Constable Field assessed ███████ and took him to Classroom 132.  Shortly afterward, Constable Field asked for an EMT, and an unknown BPA entered the classroom.  Later, Constable Field, the unknown BPA, and ███████ exited Classroom 132 and went out through the west door to an ambulance.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00070



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



██████████ (Student, Classroom 112, Injured): ██████ ran out of the classroom and was escorted by SBPA ██████ out the west door to a school bus.

██████████ (Student, Classroom 112, Injured): ██████ ran out of the classroom and was received by BPA ██████ and Special Operations Supervisor (SOS) ██████ (UVA). Along with others, ██████ was taken out the west door to a school bus.

██████████ (Student, Classroom 112, Injured): ██████ ran out of the classroom and was received by BPA ██████ and SOS ████. Along with others, ██████ was taken out the west door to a school bus.

██████████ (Student, Classroom 112, Injured): ██████ ran out of the classroom and was escorted by TXDPS Ranger ████ out the west door to a school bus.

██████████ (Student, Classroom 112, Injured): BPA ██████ carried ██████ out of the classroom, assisted by BPA-T ████ and BPA ████. BPA ██████ and SBPA ██████ assessed ██████ and stabilized her gunshot wounds before carrying her to an ambulance with BPA ████'s assistance.

██████████ (Student, Classroom 111, Deceased): BPA ██████████ (DRT SOD) carried ██████ from Classroom 111 and handed her off to SBPA ██████████ (DRT SOD). SBPA ██████ carried ██████ to Classroom 131, where other deceased victims were taken.

██████████ (Student, Classroom 111, Deceased): An unknown TXDPS CID SA carried ██████ and met BPA ████ at the T-intersection. BPAs ██████ and ██████ assessed ██████ in the hallway near the west door. BPA ████ removed his shirt and handed it to SBPA ██████ to cover ████. ██████ was carried to Classroom 132, where some deceased victims were taken.

██████████ (Student, Classroom 111, Deceased): TXDPS Trooper ██████ and two other unidentified law enforcement officers carried ████ to Classroom 131, where other deceased victims were taken.

██████████ (Student, Classroom 112, Injured): ████ ran out of the classroom and was escorted by TXDPS Trooper ██████ and an unidentified TXDPS Trooper to the T-intersection. SOS ████ received ██████, along with others, and took them out the west door to a school bus. While on the school bus, ████ complained of injury to TXDPS Trooper ██████, who triaged and treated his gunshot wounds until the bus arrived at Uvalde Memorial Hospital, where he received higher-level medical care.

██████████ (Student, Classroom 112, Injured): ██████ ran out of the classroom and was escorted by TXDPS Trooper ████ and an unidentified TXDPS Trooper to the T-intersection. SOS ██████ received ██████, along with others, and took them out the west door to a school bus.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00071



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



███████████ (Student, Classroom 112, Injured): ██████ ran out of the classroom and was escorted by TXDPS Trooper ██████ and an unidentified TXDPS Trooper to the T-intersection. BPA ██████ received ██████, along with others, and took them out the west door to a school bus. While on the school bus, ██████ complained of injury to TXDPS Trooper ████████████, who triaged and treated her gunshot wounds until the bus arrived at Uvalde Memorial Hospital, where she received higher-level medical care.

███████████ (Student, Classroom 111, Deceased):  BPA-I██████ and BPA ██████ carried ██████ to Classroom 132, where some deceased victims were taken.

███████████ (Student, Classroom 111, Deceased):  BPA ████████ (CAR) and TPWD Game Warden ████████ carried ██████ to Classroom 132, where some deceased victims were taken.

███████████ (Student, Classroom 112, Deceased):  BPA ████████ and an unidentified BPA carried ██████ to the T-intersection.  An unknown Deputy U.S. Marshal assessed ██████ and determined she was deceased.  BPA-T██████ and BPA ██████ moved ██████ to Classroom 132, where some deceased victims were taken.

███████████ (Student, Classroom 112, Deceased):  An unknown Deputy U.S. Marshal and an unknown BPA moved ██████ to the T-intersection.  TXDPS Trooper ██████ assessed ██████ and determined she was deceased.  BPA ██████ and BPA ████████ (BRA) moved ██████ to Classroom 132, where some deceased victims were taken.

███████████ (Teacher, Classroom 112, Deceased):  BPAs ████████ and ██████, along with other unidentified law enforcement officers, carried ████████ from Classroom 112 to an area just outside the west door.  TXDPS ████████'s BWC captured BPA ████████ helping to treat ██████.  ████████ was taken to an ambulance.

The following victims remained in Classroom 112:[86]

███████████ (Student, Classroom 112, Deceased): BPA-P██████ assessed ██████ in Classroom 112, determined she was deceased, and did not transport her.

███████████ (Student, Classroom 112, Deceased): BPA-P██████ assessed ██████ in Classroom 112, determined she was deceased, and did not transport her.

███████████ (Teacher, Classroom 112, Deceased):  BPA-P██████ assessed ██████ in Classroom 112, determined she was deceased, and did not transport her.

███████████ (Student, Classroom 112, Deceased):  BPA-P██████ assessed ██████ in Classroom 112, determined she was deceased, and did not transport her.

---

[86] OPR interview of BPA-P██████████, March 8, 2023, timestamp 0:54:25; BWC footage from BPA ████████.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00072



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



███████ (Student, Classroom 112, Deceased): BPA-P███ assessed ███ in Classroom 112, determined she was deceased, and did not transport her.

███████████ (Student, Classroom 112, Deceased): BPA-P███ assessed ███ in Classroom 112, determined she was deceased, and did not transport her.

███████████ (Student, Classroom 112, Deceased): BPA-P███ assessed ███ in Classroom 112, determined she was deceased, and did not transport her.

The following victims were injured during other parts of the incident:

████████ (Student, Classroom 109, Injured): As the assailant fired rounds in and around Classrooms 111 and 112, stray bullet fragments went through the walls of Classroom 110 and struck ████ in Classroom 109. ██████ escaped from Classroom 109 through the window with the assistance of law enforcement officers.

████████ (Teacher, Classroom 109, Injured): As the assailant fired rounds in and around Classrooms 111 and 112, stray bullet fragments went through the walls of Classroom 110 and struck ██████ in Classroom 109. ██████ escaped from Classroom 109 through the window with the assistance of law enforcement officers.

**BPA** ██████ (Law Enforcement Officer, Injured): During the shots fired at **12:50:00 PM**, BPA ██████, who was in the hallway near the door to Classroom 111, was injured by stray bullet fragments that likely came through the wall when the assailant opened fire. BPA ██████ was assisted out the south entrance of the building and taken to the hospital by BPA ██████ ████ (UVA) in a USBP vehicle.

**UPD Lieutenant** ██████ (Law Enforcement Officer, Injured): UPD Lieutenant ██████ was one of the first law enforcement officers on scene. As he approached the doors to Classrooms 111 and 112, the assailant, from inside one of the classrooms, shot toward the door of Classroom 111 at **11:37:00 AM**. The assailant's shots turned fragments of the metal door into projectiles, injuring UPD Lieutenant ██████. UPD Lieutenant ██████ remained on scene for the duration of the incident.

**UPD Staff Sergeant** ██████ (Law Enforcement Officer, Injured): UPD Staff Sergeant ██████ was one of the first law enforcement officers on scene. As he approached the doors to Classrooms 111 and 112, the assailant, from inside one of the classrooms, shot toward the door of Classroom 111 at **11:37:00 AM**. The assailant's shots turned fragments of the metal door into projectiles, injuring UPD Staff Sergeant ████. UPD Staff Sergeant ██████ remained on scene for the duration of the incident.

*PHASE IV: POST-INCIDENT RESPONSE*

As the events at Robb Elementary School unfolded, law enforcement officers, including CBP personnel, continued to respond to the Uvalde area to provide assistance. Responding from other activities on duty, as well as off duty, CBP personnel worked at the request of local law

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00073



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



enforcement to mitigate the safety and logistical concerns arising from the incident and to fill operational gaps. This included keeping the public at a safe distance from the Robb Elementary School, assisting other Uvalde-area schools to dismiss students in a safe and orderly manner, and helping parents reunite with their children at the SSgt. Willie de Leon Civic Center in Uvalde.

Anxious parents and other concerned citizens gathered at the Hillcrest Memorial Funeral Home across the street from Robb Elementary School. At times, the crowd became angry and ignored law enforcement commands to stay back. During one such instance, a woman ran into BPA-T ███████ (BRA) in an effort to get past him to reach a child she believed was her ██████ Believing she might fall, BPA-T ███ wrapped his arms around the woman to avoid her being injured.[87] BPA-T ███ stated he did not believe the woman meant him any harm, so he chose to absorb the impact and prevent injury to the woman.[88] An unknown TXDPS Trooper took the woman aside and spoke with her as she sat on the ground. OPR's review did not identify any other instances where CBP personnel came into physical contact with the public.

Following the events at Robb Elementary School, a possible second threat was identified at approximately **2:00:00 PM**. This threat, identified through social media, alleged that the assailant's suspected girlfriend was going to "finish the job" and prompted law enforcement officials from multiple agencies to send all available law enforcement officers to various schools to provide security in support of the orderly dismissal of students. In all, 71 CBP personnel responded to schools in the Uvalde area.

When CBP personnel arrived at the various schools, some were on lockdown, while others had students congregated in gymnasiums or cafeterias. Not knowing the specifics of the threat, some CBP personnel, along with other law enforcement officers, entered the schools and proceeded through the hallways and rooms to ensure no threats were active at the schools. Once law enforcement officers established that the schools were safe, they assisted with the orderly dismissal of students to their parents. All schools were completely dismissed by **5:00:00 PM.**

---

[87] OPR interview of BPA ██████, March 2, 2023, timestamp 01:33:33.
[88] *Id.*



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**





Map Source: USBP GIS

**Figure 12. Uvalde Area Schools Where Law Enforcement Responded**

In an effort to keep families away from Robb Elementary School, which was still an active crime scene, the Civic Center was utilized as a reunification site. At **12:23:09 PM**, UPD Lieutenant ▬▬▬▬ transmitted over his radio, "Advise the parents, all children are going to be bused to the Civic Center and released there." As students were evacuated from Robb Elementary School, they were loaded onto buses and taken to the Civic Center, where they were to be picked up by their parents or guardians. Because large crowds began to gather at the Civic Center, law enforcement officers, including CBP personnel, provided security around the building and allowed only students' parents or guardians into the building.

May 24, 2022, was also the day of a primary run-off election and the Civic Center was one of the polling locations. At some time during the day, voting ceased in response to the shooting, but some members of the public, unaware of the shooting, attempted to enter the Civic Center to vote. Law enforcement officers, including CBP personnel, denied these people entry into the Civic Center.

As victims were transported to Uvalde Memorial Hospital, crowds began to gather there with anxious family members arriving and searching for loved ones when they could not be found at

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00075



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



the Civic Center. Law enforcement officers, including CBP personnel, provided security and traffic control at the hospital to keep the area safe and accessible to emergency vehicles. Inside the hospital, hospital staff asked BPAs to assist with escorting family members to a room to identify deceased children. BPAs ██████████ (DRT SOD) and ██████████ (DRT SOD), who were at the hospital to check on BPA ██████ 's condition, assisted hospital staff with this request; however, after escorting a few families, they notified hospital staff they were not comfortable continuing with this duty.

### *AIR AND MARINE OPERATIONS ACTIVITIES*

On May 24, 2022, three CBP Air and Marine Operations (AMO) helicopters supported the response at Robb Elementary School. All three helicopters were Airbus A-Star AS-350 Light Enforcement Helicopters, with a maximum speed of 156 miles per hour, maximum range of 414 miles, and maximum endurance of three hours. Although these specifications provided by the manufacturer represent maximum performance, multiple factors affect an aircraft's performance, such as winds, payload, and the age of the aircraft. Typically, a crew consisting of one or two people operate the aircraft, with room for no more than four passengers. Because of the additional sensors and equipment onboard, CBP variants of the AS-350 helicopter typically only have room for no more than three passengers. As a matter of practice, chemicals such as oleoresin capsicum (OC) spray and explosives are not flown on CBP aircraft for safety reasons.

The first helicopter (Helo 1) in service that responded to the incident at Robb Elementary School was flown by AIA ██████████ (AMO Del Rio, Texas). AIA ██████ was flying alone 46 miles from Robb Elementary School near ██████████ in Maverick County, Texas, in support of BORTAC agents apprehending a group of suspected migrants.[89] AIA ██████ had just refueled his aircraft and was above the BORTAC agents at approximately **11:40:00 AM** when he heard a call over the radio regarding a possible shooting in Uvalde. AIA ██████ did not know the exact location or severity of the incident. Because his was the closest helicopter at the time, he was directed by an unknown person from Del Rio Sector Communications to leave the BORTAC agents and fly toward Uvalde. AIA ██████ stated that had he known the severity and nature of the incident, he would have immediately landed, picked up two or three BORTAC agents, and brought them with him to Uvalde.[90]

Flying at top speed, AIA ██████ 's flight time from ██████████ to Uvalde took approximately 20 minutes. Upon entering the Uvalde area at approximately **12:00:00 PM**, an unidentified BPA directed AIA ██████ to the vicinity of Robb Elementary School over the radio. As AIA ██████ got closer to the school, he began to understand the severity of the incident as an active shooter situation. AIA ██████ decided not to fly back to ██████████ to pick up BORTAC agents because doing so would take approximately 40 minutes round trip and his was the only helicopter on scene when he arrived.[91] AIA ██████ flew over the school, providing aerial observation of the scene at an altitude of approximately 150 feet. After flying on scene for approximately 20

---

[89] OPR interview of AIA ██████████, August 2, 2023, timestamp 00:29:30.
[90] *Id.* at timestamp 00:27:40.
[91] *Id.* at timestamp 00:29:04.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



minutes, a TXDPS helicopter flown by two crew members and equipped with a camera contacted AIA ████. Because two helicopters operating in the same airspace is dangerous and the TXDPS helicopter was more capable, AIA ████ flew his helicopter to the CBP Air Branch at Uvalde Airport. By that time, AIA ████ was aware that a certified CBP Aircrew Rifleman (ACR) and ACR pilot were headed to Uvalde.[92]  He remained at the airport for a few hours awaiting direction before returning to Del Rio at approximately **4:00:00 PM**.[93]

The second CBP helicopter (Helo 2) in service was flown by AIA ████████ (AMO Del Rio, Texas). At approximately **11:45:00 AM**, AIA ████ was flying 46 miles from Robb Elementary School near Carrizo Springs, Texas, in support of BPAs tracking a group of suspected migrants.[94]  Aviation Enforcement Agent (AEA) ████████ (AMO Del Rio, Texas) was also onboard. AEA ████ was outside the aircraft assisting BPAs with a group of suspected migrants when AIA ████, who was hovering overhead, heard on the aircraft radio about a shooting in Uvalde. AIA ████ told AEA ████ he was landing the aircraft for AEA ████ to reboard.

Because of the amount of time the helicopter had been assisting the BPAs in Carrizo Springs, it needed to be refueled. Based on AIA ████'s experience, he determined it would be quicker to refuel at CAR than in Uvalde.[95]  AIA ████ and AEA ████ flew to CAR to refuel, then continued to Uvalde. They arrived at the Uvalde County Fairplex at approximately **12:35:00 PM** to bring onboard AEA ████████ (AMO Del Rio, Texas) because AEA ████ was a certified ACR and AIA ████ was a certified ACR pilot. The distance between CAR and the Uvalde County Fairplex was 46 miles, so flying at top speed, it would have taken approximately 18.5 minutes to fly between the two places.

Upon arriving in the airspace above Robb Elementary School, AEA ████ attempted to use his 6x magnification rifle scope to look inside Classroom 111 through a window, but the room was too dark to see anything inside. After seeing injured victims being carried from the building and hearing the scene was safe over the radio, AIA ████ decided to fly to the CBP Uvalde Air Branch to clear the airspace for emergency medical service air units, if they were needed. The AS-350 is not equipped to carry stretchers and does not have any medical equipment onboard, so any decision to transport injured victims must consider the fact that the helicopter lacks the capabilities regularly found in an ambulance. At the CBP Uvalde Air Branch, AIA ████ refueled the aircraft and learned through social media about a potential threat at another Uvalde area school.[96]  Learning of this threat and knowing that law enforcement officers were responding, AIA ████ took off and orbited around Uvalde schools to provide overwatch for law enforcement officers deployed to the schools.[97]

---

[92] CBP's Air and Marine Operations employs an Aircrew Rifle (ACR) program, which provides specialized training to pilots and aircrew in the use of precision marksmanship to shoot from CBP aircraft.
[93] OPR interview of AIA ████████, August 2, 2023, timestamp 00:30:24.
[94] OPR interview of AIA ████████, March 15, 2023, timestamp 00:09:30.
[95] *Id.* at timestamp 00:11:45.
[96] *Id.* at timestamp 00:49:45.
[97] *Id.* at timestamp 00:51:15.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00077



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



The third helicopter (Helo 3) in service that responded to the incident at Robb Elementary School was flown by AIA ██████████ (AMO Del Rio, Texas). AIA █████ was at his office in Del Rio when his supervisor, Supervisory Air Enforcement Agent (SAEA) ██████████ (AMO Del Rio, Texas) informed him of a shooting in Uvalde at around **12:00:00 PM**. SAEA ████████ was attempting to figure out how to pair AIA █████, who was flying near CAR, with AEA █████, who was in Del Rio. Recognizing it would save time, AIA █████ offered to fly AEA ██████ to Uvalde to join AIA █████. SAEA █████ agreed and told AIA █████ to prepare the helicopter while AEA █████ gathered his ACR equipment. The distance between DRT and the Uvalde County Fairplex was 68 miles, so flying at top speed, it would have taken approximately 27.2 minutes to fly between the two places. AIA █████ and AEA █████ arrived at the Uvalde County Fairplex at approximately **12:35:00 PM**, where AEA ████████ joined AIA ████ 's aircraft. AIA █████ remained with his aircraft at the Uvalde County Fairplex on stand-by for approximately 45 minutes in case AIA █████ 's aircraft needed to refuel.

Following the breach of the classrooms, all CBP aircraft cleared the airspace above Robb Elementary School to allow for emergency medical service air units, if necessary. One helicopter remained at the Uvalde Fairplex and two helicopters were at the CBP Uvalde Air Branch. Only one helicopter, flown by AIA █████, took off again to fly in support of law enforcement officers responding to other Uvalde-area schools.



Map Source: USBP GIS

**Figure 13. CBP Helicopter Position, Distance, and Flight Time**



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



## STANDARDS AND ANALYSIS

OPR reviewed the laws, policies, and agency training applicable to CBP personnel in effect on May 24, 2022. Additionally, OPR evaluated the actions of CBP personnel in accordance with applicable laws, policies, and agency training. OPR considered multiple facets of the response, including the legal authority to take law enforcement action in such a situation, the agency's expectations for the conduct of its employees, and the training CBP provides its employees for situations such as the one at Robb Elementary School.

### *AUTHORITY*

### *Statutes & Policies*

There is no authoritative statute that governs all scenarios involving federal law enforcement and the enforcement of state law. Pursuant to 19 U.S.C. § 1589a and 8 U.S.C. § 1357, CBP officers/agents have the authority to make arrests for federal crimes committed in the officer/agent's presence and for federal felonies if the officer/agent has reasonable grounds to believe that the person to be arrested has committed such felony.[98] These authorities are only applicable for the enforcement of federal laws.

CBP, like all federal law enforcement agencies, does not possess statutory authority to enforce state or local law. Any state law enforcement authority is contingent on whether the state has conveyed peace officer status on the federal officers/agents or otherwise provided authority to enforce state law via some other legal mechanism, including, but not limited to, deputation and citizen arrest authority. Generally, when peace officer status is conveyed, peace officers can make arrests for state felonies based on probable cause and for state misdemeanors committed in the peace officer's presence.

Texas has not conveyed peace officer status on CBP officers/agents. Narrow authority exists in the Texas Code of Criminal Procedure for a CBP officer/agent to detain a person suspected of public intoxication, driving while intoxicated, intoxication assault, or intoxication manslaughter only while physically at a port of entry. Title 1, Chapter 2, Article 2.112(c) of the Texas Code of Criminal Procedure states:

> Art. 2.122. SPECIAL INVESTIGATORS. (c) A Customs and Border Protection Officer or Border Patrol Agent of the United States Customs and Border Protection or an immigration enforcement agent or deportation officer of the Department of Homeland Security is not a peace officer under the laws of this state but, on the premises of a port facility designated by the commissioner of the United States Customs and Border Protection as a port of entry for arrival in the United States by land transportation from the United Mexican States into the State of Texas or at a permanent established border patrol traffic check point, has the authority to detain

---

[98] 8 U.S.C. § 1357 may be utilized only if the officer is performing duties related to immigration enforcement at the time of the arrest, and if there is no time for the officer/agent to obtain a warrant.




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

> a person pending transfer without unnecessary delay to a peace officer if the agent or officer has probable cause to believe that the person has engaged in conduct that is a violation of Section 49.02, 49.04, 49.07, or 49.08, Penal Code, regardless of whether the violation may be disposed of in a criminal proceeding or a juvenile justice proceeding.

Absent any peace officer status, Texas law allows any person, including members of the general public, to arrest an offender if the offense is classified as a felony. Title 1, Chapter 14, Article 14.01(a) of the Texas Code of Criminal Procedure states:

> Art. 14.01. OFFENSE WITHIN VIEW. (a) A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace.

Additionally, Title 1, Chapter 2, Article 2.14 of the Texas Code of Criminal Procedure states:

> Art. 2.14. MAY SUMMON AID. Whenever a peace officer meets with resistance in discharging any duty imposed upon him by law, he shall summon a sufficient number of citizens of his county to overcome the resistance; and all persons summoned are bound to obey.

Under Texas Code of Criminal Procedure Article 2.14, a Texas peace officer may request assistance from the public in relation to discharging the Texas peace officer's duties imposed by law.

Federal law enforcement agencies may have authority to enforce state law through a Memorandum of Understanding (MOU) with state or local law enforcement, when permissible under state law, or when a "law enforcement emergency" exists and federal assistance is permitted and needed. "Actual need" is defined generally as "when state and local resources are inadequate to protect lives or to enforce criminal law."[99] Both of these examples require advance planning or authorization, which did not exist on May 24, 2022.

The USBP's *Law of Arrest, Search & Seizure Manual M-69* (M-69) is a 40-year-old document issued by the former Immigration and Naturalization Service (INS). M-69 outlines the administration and enforcement of laws relating to "the immigration and naturalization of

---

[99] Under the *Emergency Federal Law Enforcement Assistance Act (EFLEA),* the Attorney General of the United States may aid state and local units of government in case of a "law enforcement emergency." A law enforcement emergency is defined as "an uncommon situation which requires law enforcement, which is or threatens to become of serious or epidemic proportions, and with respect to which State and local resources are inadequate to protect the lives and property of citizens or to enforce the criminal law." The Department of Justice has promulgated regulations under the EFLEA governing the process to be followed by a state governor or chief state executive when requesting federal assistance. The regulations require, among other things, the requesting state to identify the specific federal resources required to respond to the emergency.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



aliens."[100]  Despite referencing an agency that no longer exists, M-69 has never been formally retracted.  USBP still references M-69 as a manual articulating its authorities.

M-69 also addresses the fact that some states offer peace officer status to "INS officers stationed in that state."[101]  It goes on to address the intersection of federal and state law, specifically the expectation that INS officers are to cooperate with local and state officers.  Such cooperation includes "enforcing local law where the matter is serious and the need to act is imperative."[102]

When the local matter is a felony or violent misdemeanor cognizable under state law, M-69 directs "that the agent will take reasonable action as a law enforcement officer to prevent the crime and/or arrest the violator."[103]  Importantly, M-69 correctly articulates that such action in the absence of specific peace officer authority is simply that of an "ordinary citizen."[104]  Therefore, M-69 requires that federal law enforcement officials be thoroughly familiar with applicable state laws in their jurisdiction.[105] M-69 states that INS "will fully support an agent's reasonable actions," and that agents will be regarded as having acted within the course and scope of their employment.[106]

When federal law enforcement officers desire representation in a criminal and/or civil proceedings related to actions purportedly taken within the scope of their employment, they must first submit a written request for representation by the U.S. Department of Justice (DOJ) to the agency official designated to review such requests.[107]  Unless it is "clearly unwarranted," the designated agency official submits to the DOJ a statement of its findings regarding whether the agency believes the employee was acting within the scope of employment and its recommendation for or against providing representation.  The DOJ then reviews the request and determines whether the employee's actions appear to be within their scope of employment and whether it is in the interest of the United States to provide representation to the employee.

CBP lacks the authority to make assurances of federal support or determinations of scope of employment.  Scope of employment determinations are solely the responsibility of the DOJ.[108]  Legally, CBP officers/agents acting to enforce a state or local law do so as private citizens without any guarantee of federal representation, regardless of the assertions made in M-69.  A supervisor's order or directive to act does not absolve individual CBP officers/agents from

---

[100] *The Law of Search Manual: The Law of Arrest, Search & Seizure Manual M-69*, Immigration and Naturalization Service, Office of the General Counsel, p. 4 (January 1983).
[101] *Id.* at p. 6.
[102] *Id.* at p. 36.
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] See 28 C.F.R. § 50.15, Representation of federal officials and employees by Department of Justice attorneys or by private counsel furnished by the DOJ in civil, criminal, and congressional proceedings in which Federal employees are sued, subpoenaed, or charged in their individual capacities.
[108] *Id.*

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



responsibility for their actions or guarantee that the DOJ will provide them with legal representation in any criminal or civil proceedings stemming from the officer's action.

Even in a situation where:

1) A supervisor orders and employee to act, and
2) Agency officials validate and affirm to the DOJ the supervisor gave the employee an order to act,

The DOJ is not guaranteed to find the act was within the scope of employment and provide legal representation.

Whether a CBP law enforcement officer self-deploys or is ordered to respond to an incident, either on or off duty, each request for legal representation will be reviewed the same way, by an independent third party at the DOJ. When deciding whether to take action to enforce a state or local law, each CBP officer/agent must individually decide whether to act with the knowledge that their actions may not be considered within the scope of their employment, thereby potentially denying them legal representation by the DOJ.

In the weeks and months following the incident at Robb Elementary School, 45 CBP personnel submitted a request for legal representation by the DOJ. At the time of this writing, the DOJ has not granted any of the requests for a scope of employment determination regarding the actions of CBP personnel on May 24, 2022.

### *Response*

A bedrock principal of constitutional policing is ensuring that actions taken by law enforcement officers are within their statutory authority and in accordance with the principles set forth in the U.S. Constitution. Basic training provided to CBP law enforcement officers begins like training at most police agencies, with a clear explanation of the agents'/officers' statutory authority and jurisdiction. Because of the criticality of swiftly responding to active shooter incidents, it is important that all responding personnel have a clear understanding of their authority and of how their agency would engage in an incident outside their jurisdiction. To the extent CBP intends to continue to direct its personnel to respond to active shooter situations that lack a clear federal nexus, CBP must ensure a framework exists that formally authorizes its personnel to engage in such situations and seek assurances that they will be protected from civil and criminal liability for acting within the scope of their employment. This will likely require either a legislative solution or modification of DOJ's procedures for scope of employment determinations.

Over 100 CBP law enforcement officials responded to the school in a variety of capacities, and none of them were able to explain to OPR under what authority they were acting on May 24, 2022. CBP personnel's articulation of their authority to respond to an active shooter incident off federal property varied widely. Responses included the authority to take action against a felony occurring in the agent's presence, a moral imperative to preserve life, and a belief that they had the authority to support state and local law enforcement efforts. Several OPR interviewees spoke



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



of the informal nature of interagency cooperation between USBP and local law enforcement agencies in USBP DRT. In Uvalde, it was common practice to assist local law enforcement, despite the lack of a formal written MOU between USBP and local law enforcement agencies.[109] In fact, at both the USBP station and sector levels, agreements were never reduced to writing according to USBP Del Rio Sector managers interviewed.[110] OPR concluded that CBP personnel do not have a clear understanding of their authority to respond to an active shooter incident in a non-federal setting because there is no clear statutory or regulatory framework that supports a federal law enforcement response to active shooter incidents outside of those that occur on federal property.



Responding CBP Personnel's Understanding of USBP's Authority to Respond

- Assisting Local Law Enforcment (105, 42%)
- Duty to Response / Moral Imperative (94, 37%)
- Did Not Know / Unsure (40, 16%)
- Felony in Officer's/Agent's Presence (10, 4%)
- Gun-Free School Zone (2, 1%)

**Figure 14. Responding CBP Personnel's Understanding of USBP's Authority to Respond (NOTE: Some CBP personnel provided more than one response)**

Absent specific statutory authority or any formal agreement, CBP law enforcement officers lacked explicit authority to respond to the incident at Robb Elementary School to assist state and local authorities. OPR's review of radio communications did not reveal a specific request for CBP assistance over the radio. However, BPA ▮▮▮▮▮▮, UVA, who was assigned to work in the radio room at UVA, told OPR investigators he received a call from UPD requesting USBP assistance at Robb Elementary School at approximately **11:45:00 AM**.[111] Additionally, the written statement TXDPS Ranger ▮▮▮▮ provided to TXDPS investigators following the incident at Robb Elementary School stated that upon his arrival, he coordinated with the BORTAC agent on scene and requested he [the BORTAC agent] assume tactical control of the officers inside the hallway.[112] The only BORTAC agent on scene when TXDPS Ranger ▮▮▮▮ arrived at Robb Elementary School was SBPA ▮▮▮▮. Irrespective of the Texas Code of

---

[109] OPR interview of WC ▮▮▮▮▮, March 2, 2023, timestamp 08:56:50.
[110] OPR interview of DCPA ▮▮▮▮, March 17, 2023, timestamp 03:11:03. Email from CPA Jason Owens, March 16, 2023.
[111] OPR interview of BPA ▮▮▮▮, February 28, 2023, timestamp 00:31:20.
[112] TXDPS interview of TXDPS Ranger ▮▮▮▮, June 7, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00083



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



Criminal Procedure, state and local law enforcement lack the legal authority "to summon" a federal law enforcement officer, including CBP personnel.[113]

OPR considered the assertion that the Gun-Free School Zones Act of 1990 provided CBP personnel the authority to respond to the incident at Robb Elementary School on May 24, 2022. The Act makes it a federal crime to knowingly possess a firearm in a school zone.[114]  The penalty for violating the Gun-Free School Zones Act involves a fine of not more than $5,000, imprisonment for up to 5 years, or both.[115]  The Act specifically defines a school as a public, parochial, or private school providing elementary or secondary education.[116]  Although the incident at Robb Elementary School on May 24, 2022, fell within the scope of the Gun-Free School Zones Act of 1990, relying on the Act for statutory authority is insufficient moving forward.  The narrow scope of the Act applies to incidents involving firearms at schools.  It does not address the larger threat of mass violence using weapons other than firearms, such as knives or improvised explosive devices, or occurring at locations other than schools, such as preschools or shopping malls.

## *USE OF FORCE*

### *Policy*

The CBP Use of Force Policy (UOF Policy) dated January 2021 is the authoritative reference for firearms procedures and use of force-related issues.[117]  It provides guidance and parameters under which force may be used, as well as the levels of oversight when force is used, and the ongoing training and demonstration of decision-making and skills surrounding the use of force.  By conforming to standard use of force policies, procedures, training, and equipment, authorized CBP officers/agents can more effectively protect themselves and the public they serve.

The CBP UOF Policy states:

> A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties.  In all instances, covered in the UOF Policy, of note, Authorized Officers/Agents shall only use objectively reasonable and necessary force to effectively bring an incident under control, while minimizing the risk of injury for all involved parties.  The use of excessive force by CBP law enforcement personnel is strictly prohibited.  This Policy establishes the minimum CBP policy standards regarding the use of force.  CBP offices may establish additional policy guidance where they deem necessary, in accordance with the

---

[113] U.S. Const. art. 6, cl. 2.
[114] 18 U.S.C. § 922(q).
[115] 18 U.S.C. § 924(a)(4).
[116] 18 U.S.C. § 921(a)(26).
[117] CBP Use of Force Policy, Law Enforcement Safety and Compliance Directorate, Operations Support, 4500-002A (January 2021).

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00084




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

minimum standards articulated in this Policy.  …  Violation of the UOF Policy may constitute grounds for disciplinary action.[118]

*Response*

This critical incident review is not intended to definitively determine the appropriateness of the force used by CBP personnel during the incident.  Under CBP policy, uses of force by CBP personnel resulting in serious bodily injury or death and those involving the discharge of a firearm will be presented to a CBP National Use of Force Review Board to independently determine if the use of force was consistent with CBP policy.  That body will determine whether this use of force was within policy.  National Use of Force Review Board results are shared with the public on CBP's public webpage.

## INCIDENT COMMAND SYSTEM

### Training

OPR reviewed incident command policy and training documents, including:

- IS-100.C: Introduction to the Incident Command System, ICS 100.
- IS-200.C: Basic Incident Command System for Initial Response, ICS 200.
- IS-700.B: An Introduction to the National Incident Management System.
- IS-800.D: National Response Framework, An Introduction.[119]
- CBP Lead Field Coordinator Course Presentation.

Because of the absence of instruction regarding working with other local, state, or federal law enforcement agencies during an incident or command and control during active shooter situations in CBP's Active Shooter Instructor Training Program (ASITP), OPR personnel discussed CBP's implementation of the National Incident Management System (NIMS) under Homeland Security Presidential Directive 5 (HSPD-5) with the CBP program manager responsible for the program, Branch Chief (BC) ███████, in August 2023.  NIMS is the framework by which coordination occurs during an incident involving multiple agencies.  One component of NIMS is the ICS, which is a standardized approach to the command, control, and coordination of emergency responses that provides a common hierarchy within which responders from multiple agencies can be effectively managed.

BC ███ stated that CBP implements NIMS at the local level where the incident occurs.  Training for the implementation of NIMS and ICS consists of four classes offered virtually through CBP's distance learning platform, Acadis Training Management System.  The classes are:

---

[118] *Id.*
[119] IS-100.C., IS-200.C, IS-700.B., and IS-800.D. are Independent Study (IS) courses offered by the Federal Emergency Management Agency (FEMA), Emergency Management Institute (EMI).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



- DHS Web-Based Training - IS-100.c: Introduction to the Incident Command System, ICS 100 (Online, 1 hour).
- DHS Web-Based Training - IS-0200.c: Basic Incident Command System for Initial Response, ICS 200 (Online, 4 hours).
- DHS Web-Based Training - IS-0700.b: An Introduction to the National Incident Management System (Online, 3.5 hours).
- DHS Web-Based Training - IS-0800.d: National Response Framework, An Introduction (Online, 3 hours).[120]

CBP's Office of Training and Development offers the following:

- Advanced Operations Training Branch (AOTB) Incident Command System Training Program-300 - ICS-300-2310 (Advanced Training Center (ATC), 24 hours, 40 minutes).
- AOTB Incident Command System Training Program-400 - ICS-400-2310 (Advanced Training Center (ATC), 24 hours).
- Local Field Coordinator course (only for senior GS-15 employees and members of the Senior Executive Service).[121]

OPR reviewed the training records of the 78 CBP personnel who were at Robb Elementary School before **12:50:00 PM** to identify which personnel may have completed NIMS/ICS training:[122]

| CLASS | # ATTENDED |
|---|---|
| IS-100.C (online) | 8/78 (10.3%) |
| IS-200.C (online) | 0/78 (0.0%) |
| IS-700.B (online) | 13/78 (16.7%) |
| IS-800.D (online) | 0/78 (0.0%) |
| ICS-300 (in-person) | 6/78 (7.7%) |
| ICS-400 (in-person) | 4/78 (5.1%) |
| Local Field Coordinator (in-person) | 0/78 (0.0%) |
| No NIMS/ICS Training | 59/78 (75.6%) |

**Table 2. NIMS/ICS Training of CBP Personnel**

All NIMS and ICS courses offered by CBP are voluntary, with no formal, mandatory instruction provided to CBP personnel on how to recognize or handle multi-agency incidents. There is no training on NIMS or ICS protocols in CBP's mandatory three-week training class for new supervisory personnel, nor has there been any coordination with CBP's Law Enforcement Safety and Compliance (LESC) to implement NIMS or ICS protocols in their training programs. BC ▮ stated that more training is needed across CBP in both NIMS and ICS protocols.[123]

---

[120] OPR interview of Branch Chief ▮, August 7, 2023, timestamp 01:07:57.
[121] *Id.*
[122] Some CBP employees attended more than one class, therefore total percentage will be greater than 100%.
[123] *Id.* at timestamp 00:48:02.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00086



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



ICS protocols stipulate the initial first responder on scene "need[s] to explicitly establish incident or unified command and clearly state and record when command is transferred."[124]  This makes the first responder on scene the Incident Commander.  As more people arrive on scene, a more-qualified individual may assume command according to agency guidelines, maintain command as it is and monitor command activity and effectiveness, or request a more-qualified Incident Commander from the agency with a higher level of jurisdictional responsibility.[125]  Applying ICS protocols to the incident at Robb Elementary School, every law enforcement officer had an obligation to establish, maintain, and, if necessary, transfer command and control.  None of the senior law enforcement officials on scene, including USBP leadership, established command and control.  A review of CBP training records showed that 75.6% of the CBP personnel at Robb Elementary School at the time the entry team breached the door of Classroom 111 had no training in NIMS and ICS protocols.

*Response*

The lack of command and control on May 24, 2022, led to a disjointed and chaotic response by all personnel at Robb Elementary School, including CBP personnel.  Adding to the dysfunction, the integration of CBP personnel and local personnel in a mass casualty incident such as the incident at Robb Elementary School was never practiced prior to May 24, 2022.  At no time between when USBP BORTAC personnel began to arrive at Robb Elementary School at **12:13:12 PM** and when they breached the room and killed the assailant did they receive any guidance, direction, or instruction from any senior law enforcement leaders at the school or elsewhere.  This is clear from the testimony of the senior law enforcement official inside the school, UCISDPD Chief Arredondo.  He testified before the Texas House of Representatives Investigative Committee on the Robb Elementary Shooting on June 21, 2022, that he did not consider himself to have assumed incident command.[126]

According to the Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, "[UCISDPD's] active shooter policy called for [UCISDPD] Chief Arredondo to be the incident commander in any active shooter response."[127]  Following proper NIMS and ICS protocols, an incident commander should not be present in an area near the active threat but should instead establish a single command post and unified command among all responding agencies from a remote location.  UCISDPD Chief Arredondo said:

> [W]hile you're in there, you don't title yourself ... I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as ... I'm talking about the command part ... the people that went in,

---

[124] IS-0200.c Student Manual.
[125] *Id.*
[126] Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, *Interim Report*, p. 63 (July 17, 2022).
[127] *Id.* at p. 74.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



> *there was a big group of them outside that door. I have no idea who they were and how*
> *they walked in or anything. I kind of – I wasn't given that direction.*[128]

Formal command and control was also never established for CBP personnel on site, including those inside the west building, those outside on the campus of Robb Elementary School, and those who arrived at the school immediately following the breach of Classrooms 111 and 112. Additionally, the state and local law enforcement officials on site failed to establish incident command. The lack of a unified command structure led to the impromptu tasking or autonomous decision-making of CBP personnel until the situation transitioned to a more formal structure well after the assailant was killed. For example, SBPA ▇▇▇▇▇ indicated there was never any question that he had the autonomy to "act however [he] saw fit" to bring the incident to a resolution."[129] He was the one who instructed BORTAC agents to respond to Robb Elementary School and authorized the breach of Classroom 111.[130] Beyond the level of command and control exerted by SBPA ▇▇▇▇▇ as he attempted to enter Classrooms 111 and 112, CBP never established an incident command structure for its responding personnel to support an established unified command.

One of the benefits of establishing unified command is managing the flow of communication to and from the area of the threat. OPR heard multiple people who were at the scene describe the difficulties experienced with the radio system on May 24, 2022. In the absence of radio communications, NIMS and ICS training encourages the use of runners – people whose sole purpose is to go to and from the established command post delivering information. Based on the lack of an established command post, there was nowhere for information to flow to or from, leading to mass confusion regarding who was in charge of the situation.

CBP personnel at the school, including some who had received standard training in NIMS or ICS protocols, did not establish command and control during the incident. Had CBP leadership established an incident command post for its own personnel, it could have had an impact on the overall command and control structure, even though CBP lacked the authority to assume control of the incident from state and local law enforcement officers. Although various videos showed some instances of leadership at intermittent moments, no specific plan of action ever came together in a cohesive manner. OPR's review identified that many of the responding CBP officers/agents were unsure of who was in charge or who was providing direction at the school, with some believing UPD was in charge, others believing TXDPS was in charge, and others simply believing no one was in charge.

---

[128] *Id.* at p. 63.
[129] OPR interview of SBPA ▇▇▇▇▇, March 16, 2023, timestamp 07:03:05.
[130] *Id.* at timestamp 07:03:20.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00088




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**





**Figure 15. Perception of Command and Control (CBP Personnel at Robb Elementary School before 12:50:00 PM)**

After the breach of the doors to Classrooms 111 and 112, the disjointed response continued. Without any specific guidance, CBP personnel responded to multiple schools in the Uvalde area to address a potential second threat.  No single person was in charge of this response, leading to some law enforcement officers, including some CBP personnel, taking charge of the school dismissal process while others yielded to school administrators.  CBP personnel also responded to the Civic Center to assist with providing security during the student/family reunification process.  Based on the circumstances of the day and requests from local law enforcement for assistance, CBP personnel focused on facilitating a safe and orderly reunification of students with their families.  CBP personnel also provided security at Uvalde Memorial Hospital, and even assisted with notifications to the families of the deceased at the request of medical personnel at the hospital, without the ability or benefit of reaching back to a command post to receive direction under a unified command.

The lack of incident command also negatively impacted media messaging regarding the incident. NIMS/ICS protocols, as part of the IS-100.C: Introduction to the Incident Command System, ICS 100 curriculum, state a Joint Information Center (JIC) is a facility at which personnel coordinate incident-related public information activities.[131]  The JIC serves as the central point of contact for all information disseminated.  However, on May 24, 2022, USBP officials tweeted

---

[131] IS-100.C: Introduction to the Incident Command System, ICS 100



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



three messages about the incident on social media without verifying the accuracy of the statements.[132]  These messages were neither coordinated through the JIC nor accurate.[133]

## *ACTIVE SHOOTER INCIDENTS*

### *Training*

OPR reviewed CBP's active shooter policy and other external training documents, including:

- Advanced Law Enforcement Rapid Response Training (ALERRT) Train-the-Trainer Active Shooter Response Level 1 (v. 7.2).
- Active Shooter Instructor Training Program (ASITP) Instructor Guidebook.

ALERRT at Texas State University was created in 2002 to address the need for active shooter response training for first responders.  In 2013, the FBI named ALERRT at Texas State the National Standard in Active Shooter Training.[134]  The two-day, 16-hour course is designed to provide basic, tactically-sound, standardized active shooter response training across the country, enabling law enforcement responders from different agencies to work together safely and effectively on active shooter responses.[135]  Although OPR personnel did not audit ALERRT training, four LESC instructors tasked with teaching ASITP have attended ALERRT training since 2021.[136]

CBP initially developed the ASITP in 2009 and taught it exclusively at the USBP Academy.  Presently, ASITP is a one-week training program for CBP-certified firearms and less-lethal instructors, taught by a cadre from LESC.  ASITP focuses on room entry and clearing tactics during an active shooter situation, utilizing interactive role players and inert training rounds.  In April 2023, OPR personnel audited CBP's ASITP at Summit Point, West Virginia.

OPR personnel noted that ASITP students are told on the first day of training that they will not receive instruction on breaching a locked door.  Instead, students are told to find another way into the room.  Students did not receive any training on the use of ballistic shields during active shooter situations.  The ASITP curriculum did not address the legal authorities for CBP personnel to respond to active shooter situations and did not discuss jurisdiction, leadership roles or responsibilities, or how to work with other local, state, or federal law enforcement agencies at the same scene or incident.  There was no discussion or emphasis on command and control during active shooter situations at the ASITP.

---

[132] U.S. Border Patrol Chief Raul Ortiz tweeted on May 24, 2022, at 11:04:00 PM, "Risking their own lives, these Agents and other officers put themselves between the shooter and children, to draw the shooter's attention away from potential victims and save lives.  At least one Agent was wounded by the shooter during the exchange of gunfire." U.S. Department of Justice, Office of Community Oriented Policing Services, Critical Incident Review: Active Shooter at Robb Elementary School, 2024, pp. 213-214.
[133] *Id.*  While not within the scope of this report, the DOJ COPS report also found the accuracy of the overall public communications coming from the JIC was questionable on May 24, 2022.
[134] ALERRT at Texas State University, *About ALERRT,* https://alerrt.org/about, 2023.
[135] ALERRT curriculum
[136] OPR interview of ACPA ████████████, August 10, 2023, timestamp 00:22:26.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



The course is a train-the-trainer program and did not require participants to receive a formal pass/fail for certification. All standards of success were based on safety and students' safe weapon handling skills. At the end of the course, any student without major safety infractions was authorized to teach Active Shooter at their respective Field Operations ports and Border Patrol stations and sectors. If a student received multiple major safety infractions, they were granted an end-user completion certificate, but not authorized to provide Active Shooter instruction. Overall, OPR personnel found ASITP to be more of an advanced tactics and firearms movement course, rather than an active shooter course.

OPR reviewed the training records of the 78 CBP personnel who were at Robb Elementary School before **12:50:00 PM** to identify which personnel attended active shooter training beyond instruction provided at the USBP Academy:

| CLASS | # ATTENDED |
|---|---|
| **Active Shooter (3-Day)** | 30/78 (38.5%) |
| **ASITP** | 10/78 (12.8%) |
| **ALERRT Level 1** | 1/78 (1.2%) |
| **No Additional Training** | 37/78 (47.4%) |

*Table 3. Active Shooter Training of CBP Personnel*

To discuss the development and implementation of the ASITP curriculum, OPR interviewed ACPA█████, former Director of the Pre-Deployment Branch of LESC, which is responsible for conducting ASITP classes.[137] ACPA███ explained that he believed the ASITP curriculum was designed and focused specifically on responding to a call for service related to gunshots being fired, approaching a building, entering the building, and clearing the building to eliminate the threat.[138] ACPA███ stated the ASITP curriculum is loosely based on ALERRT's training doctrine with an emphasis on additional tactics for team movement. He acknowledged that the two curricula are different, with ASITP not including instruction on medical treatment of victims or NIMS/ICS protocols.[139] ACPA███ also acknowledged that ASITP's definition of an "active shooter" does not mirror that of ALERRT's definition and stated that when the ASITP curriculum was created in 2009, ALERRT was one of many vendors providing active shooter training.[140]

Law enforcement training involves repetition to improve an officer's ability to make split-second decisions faster and clearer. A comparison of ALERRT and ASITP revealed multiple differences between the two curricula, which may have been pertinent to the law enforcement response at Robb Elementary School. Many state and local law enforcement officers responding to Robb Elementary School were trained using the ALERRT curriculum, while CBP personnel

---

[137] Although ACPA████ was not the current Director of the Pre-Deployment Branch of LESC, it was appropriate to interview him since he was the former Director responsible for developing and implementing the ASITP curriculum prior to May 24, 2022. The transition to his new role occurred after May 24, 2022.
[138] OPR interview of ACPA████, August 10, 2023, timestamp 00:56:45.
[139] *Id.* at timestamp 00:54:15; ALERRT curriculum.
[140] *Id.*



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



were trained using the ASITP curriculum. The extent of the differences between the two could have led to issues with interoperability.

First, the two programs have different definitions of an "active shooter" situation. ALERRT teaches that an active shooter situation is one where "there is reliable evidence that an attacker is actively killing people or that his or her actions are preventing medical attention from reaching critically injured victims."[141] Conversely, ASITP teaches that an active shooter situation is "an armed person who has used deadly, physical force on other people and continues to do so, while having unrestricted access to additional victims."[142] These minor differences in verbiage can have a significant impact on the actions law enforcement officers take during an active shooter response. Additionally, ASITP incorporates the use of rifles in active shooter training scenarios, whereas ALERRT does not because, according to ALERRT, not all law enforcement agencies and officers have access to rifles. Instruction on medical response and incident command is provided in ALERRT but only briefly mentioned in ASITP.

Neither training program includes instruction on actions to take when encountering a locked door; however, this does not unburden officers/agents from finding other means of getting into a locked room. The training does instruct students to do whatever is necessary to find alternate means of entry. Without the benefit of adequate training, law enforcement officers were left unequipped to handle the demands of the situation at Robb Elementary School. There is also a potential missed opportunity in training programs to include scenarios with difficult circumstances to teach officers/agents better decision-making skills.

### *Response*

USBP is the largest and best equipped law enforcement unit in many rural border communities and has multiple units with specialized capabilities, making it an attractive partner. USBP has more law enforcement officers assigned to Uvalde than all other law enforcement agencies in the Uvalde area combined. Compared to the more than ■■■ BPAs assigned to UVA, UPD has 39 police officers, UCSO has 15 sheriffs' deputies, and UCISDPD has only 6 police officers.[143] Considering USBP's size and specialized capabilities, area law enforcement agencies often look to partner with USBP when necessary.

Dispersed throughout the USBP Del Rio Sector area of responsibility are members of BORTAC and BORSTAR units. BORTAC members receive training in advanced tactics, high-risk warrant service, and precision marksmanship, among other skills. BORSTAR members are trained in tactical medicine, technical rescue, and operations management and planning. In addition to these specialized units, dozens of other DRT BPAs completed EMT training. OPR learned that BPAs in the USBP Del Rio Sector previously provided training to state and local law

---

[141] ALERRT curriculum.
[142] ASITP curriculum.
[143] City of Uvalde, *Public Safety*, https://www.uvaldetx.gov/residents/public_safety/index.php; Police1 by Lexipol, *Uvalde County Sheriff's Department*, https://www.police1.com/law-enforcement-directory/sheriffs-departments/uvalde-county-sheriffs-department-uvalde-tx-ZDhEPsOIAVAkB9UF/; Uvalde Leader-News, *UCISD adds two police officers for total of six*, https://www.uvaldeleadernews.com/articles/ucisd-adds-two-police-officers-for-total-of-six/.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



enforcement agencies on topics including active shooter training and tactical combat casualty care.

Additionally, interviewed BPAs recalled their radios being "patched" during the Robb Elementary School incident, meaning that two separate radio systems were combined to allow interoperability to facilitate faster information sharing. The patch in place on May 24, 2022, was not the first time the USBP and UPD radio systems had been merged.

Many of OPR's interviews pointed to informal relationships previously established to provide assistance to area law enforcement agencies when necessary. Although none of these relationships were formalized through a memorandum of understanding, the BPAs interviewed by OPR investigators expected that they would render assistance to state and local law enforcement officers when circumstances necessitated it, based on past practice. The absence of an executed memorandum of understanding likely contributed to the lack of clarity about CBP's role and under whose authority CBP was operating.

Because of the lack of a unified command at Robb Elementary School, CBP personnel were left to make decisions and take actions on their own, drawing on their individual training, experiences, and moral imperatives. CBP personnel, including the individuals who ultimately brought the situation to a close, made autonomous decisions at almost every juncture of the incident, from deploying to the scene to returning to their assigned USBP duty station.

CBP personnel responded to the incident based on a variety of prompts, including both self-deployment and direction to respond from a supervisor. Some employees received phone calls, others heard about the situation over the radio, and still others learned about the event from social media. Some CBP personnel who responded were on duty while others came from off-duty to assist.

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00093



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**





**Figure 16. How CBP Personnel Initially Learned of the Incident**

As CBP personnel arrived on scene at Robb Elementary School, many inquired about the location of a command post with other law enforcement officers; however, its absence led CBP employees to independently find a way to be useful in the situation. Recognizing the still-active nature of the situation, some CBP personnel entered the west building and joined other law enforcement officers as they gathered near the classrooms. Other employees helped other law enforcement officers keep onlookers at a safe distance for their own protection and to prevent the efforts of first responders from being impeded. Still other CBP personnel, seeing the actions of nearby law enforcement officers, assisted with the evacuation of children from classrooms, even placing themselves in harm's way to evacuate a wounded student and teacher from the room next to the classroom where the assailant was known to be located.

At the time of the incident on May 24, 2022, members of Del Rio Sector's BORTAC team were operating in a remote location to apprehend undocumented migrants.[144] The remoteness of the location not only delayed their response to Robb Elementary School, but also hindered the team's regular method of communication – cell phone text messages. The following table lists each member of SBPA ████████'s BORTAC team, the approximate time they acknowledged being notified about the incident, and approximate time and location they arrived on scene:[145]

[144] OPR interview of SBPA ████████████, March 6, 2023, timestamp 00:49:31; OPR interview of PAIC███, March 13, 2023.
[145] See Appendix II for detailed information about the BORTAC members' internal communications and locations.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| Last Name | Acknowledge Time | Arrival Time | Arrival Location |
|---|---|---|---|
| ▓▓▓ | Sent message at 11:45:00 AM | 12:13:12 PM* | Robb Elementary School – West Building |
| ▓▓▓ | 11:50:00 AM | 12:10:00 PM | Robb Elementary School – East Side Near Admin Bldg. |
| ▓▓▓ | 11:48:00 PM | 12:37:08 PM* | Robb Elementary School – West Building |
| ▓▓▓ | 11:48:00 AM | 12:37:08 PM* | Robb Elementary School – West Building |
| ▓▓▓ | 11:51:00 AM | 12:47:03 PM* | Robb Elementary School – West Building |
| ▓▓▓ | 11:45:00 AM | 12:45:00 PM | Hillcrest Memorial Funeral Home – Parking Lot |
| ▓▓▓ | 11:47:00 AM | 12:50:00 PM | Hillcrest Memorial Funeral Home – Parking Lot |
| ▓▓▓ | 11:47:00 AM | 12:50:00 PM | Hillcrest Memorial Funeral Home – Parking Lot |
| ▓▓▓ | 11:47:00 AM | 12:50:00 PM | Hillcrest Memorial Funeral Home – Parking Lot |

**\* Denotes exact time**

**Table 4. BORTAC Team Timeline**

SBPA ▓▓▓ entered Robb Elementary School at **12:13:12 PM**. Usually, a specially trained law enforcement officer responding to a dynamic situation is tactically supported by an established incident command structure that provides the foundation for any actions taken. SBPA ▓▓▓ did not have the benefit of such a structure. Further impeding SBPA ▓▓▓'s ability to respond and adding to the challenges he faced during the situation was the lack of action or command by UCISDPD, UPD, UCSO, or USBP leadership. SBPA ▓▓▓ was left to handle issues of containment, breaching, situational awareness, and communication on his own. According to SBPA ▓▓▓, he was flooded with multiple, conflicting pieces of information and was left to independently assess and validate all of them.[146]

To manage the situation, SBPA ▓▓▓ told OPR investigators he solved one problem at a time until the situation was resolved. SBPA ▓▓▓ spoke with PAIC ▓▓▓ on the phone as SBPA ▓▓▓ was preparing to leave his house to respond and was told he had "top cover," a phrase used to suggest approval from higher levels of management.[147] Although SBPA ▓▓▓ spoke with PAIC ▓▓▓ and (A)PAIC ▓▓▓ on the phone prior to making entry at **12:50:00 PM**, he was unaware of the notifications made and approvals sought and granted from the Chief, U.S. Border Patrol, to take any action needed to resolve the situation. SBPA ▓▓▓ received no on-site guidance or instructions from senior law enforcement leaders at the school or elsewhere and instead acted on his own. Because of the organizational culture within the U.S. Border Patrol,

---

[146] OPR interview of SBPA ▓▓▓, March 16, 2023, timestamp 00:35:12.
[147] *Id.* at timestamp 02:25:50.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00095



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



SBPA ███████ and other responding CBP personnel felt empowered to bring the incident to a conclusion without the need to repeatedly seek permission for various courses of action.[148]

SBPA ███████ was only one of many officers/agents challenged by the lack of command and control. Aside from concerns relating to authority or command and control, CBP personnel faced specific and immediate issues needing to be addressed. The law enforcement officers who responded to Robb Elementary School spent significant time trying to determine the best way breach the door of Classroom 111. None of the law enforcement officers in the hallway were aware of the adjoining door between Classrooms 111 and 112. OPR's review did not find any evidence to suggest anyone physically turned the handle of the door to Classroom 111 to see if it was locked prior to the breach. Instead, a combination of factors, including overhearing conversation coupled with the knowledge that other doors were actually locked led officers to assume the door to Classroom 111 was locked.[149]

Alternative means of gaining access to Classroom 111 were explored and dismissed for a variety of reasons. Within seconds of SBPA ███████'s arrival in the west building at **12:13:12 PM**, UPD Officer ███████ brought canisters of CS gas into the hallway at **12:13:58 PM**. However, as law enforcement officers were readying themselves for the use of gas, they learned that a child was calling from inside the classroom and spoke of injured victims.[150] The presence of casualties led SBPA ███████ to eliminate the use of CS gas as a viable option.[151] Other CBP law enforcement officers who responded to the incident considered using an explosive breach; however, the potential use of an explosive breach was not communicated to SBPA ███████.[152] If anyone had established an incident command post, the use of explosive breaching techniques could have been communicated to the incident commander in a timely manner for consideration. The incident commander could then have evaluated the logistical challenges of obtaining the necessary materials, since they were not on site and needed to be transported from Del Rio.

Although transporting explosives by helicopter from Del Rio would have been faster, explosives are not flown on CBP helicopters because CBP has not evaluated the effects of altitude and static electricity on the materials.[153] Given this standard practice, CBP law enforcement officers who responded to the incident did not consider transporting the explosive supplies needed for a dynamic breach via helicopter. Furthermore, all available helicopters were already tasked and out of the Del Rio area by the time the need for explosive breaching materials was realized. Explosive breaching materials were eventually driven up to Uvalde from Del Rio, but arrived at **12:47:00 PM**, minutes before the entry team breached Classroom 111.[154] The officers also

---

[148] *Id.* at timestamp 07:02:40
[149] Additionally, the U.S. Department of Justice, Office of Community Oriented Policing Services, Critical Incident Review: Active Shooter at Robb Elementary School found, "Though the entry team puts the key in the door, turns the key, and opens it, pulling the door toward them, the CIR Team concludes that the door is likely already unlocked, as the shooter gained entry through the door and it is unlikely that he locked it thereafter" (p. 15).
[150] OPR interview of BPA ███████, March 13, 2023, timestamp 00:39:45.
[151] OPR interview of SBPA ███████, March 16, 2023, timestamp 02:59:33.
[152] OPR interview of SBPA ███████, March 6, 2023, timestamp 03:22:07. OPR interview of BPA ███████, March 9, 2023, timestamp 00:36:20.
[153] OPR interview of AIA ███████, August 2, 2023, timestamp 00:48:20.
[154] OPR interview of BPA ███████, March 9, 2023, timestamp 00:34:20

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00096



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



considered the use of breaching tools, such as a Halligan tool and sledgehammer. SBPA ▮▮▮▮▮ entered the building through the west door with a Halligan tool at **12:35:44 PM**; however, after testing its effectiveness without a ram or sledgehammer on a door similar to that of Classroom 111, SBPA ▮▮▮▮▮ decided using the tool could result in a situation where he would "not get in [to the classroom] and get everybody shot up and still be locked out."[155] Seconds later, the use of the Halligan tool became moot when TXDPS Ranger ▮▮▮▮ handed SBPA ▮▮▮▮ the correct master key at **12:36:34 PM**.

During the 14 minutes that passed between the time SBPA ▮▮▮▮ was given the correct master key and when the team entered Classroom 111, SBPA ▮▮▮▮ made sure the medical triage area was staged and ready. He also used the time to try to gain a better understanding of the situation. He instructed BPA ▮▮▮, a BORTAC sniper, to attempt to find a position that would allow him visibility into the classroom. After making three unsuccessful attempts by climbing onto different adjacent rooftops, BPA ▮▮▮ was unable to see inside the classroom. Simultaneously, TXDPS deployed a drone to try to gain visibility inside the classroom but was also unable to see inside. Had any of those attempts succeeded, it would have provided law enforcement officers invaluable information regarding the situation inside the classroom. Recognizing the futility of waiting any longer, SBPA ▮▮▮ formed a team and entered the classroom.[156]

### MEDICAL

#### Training and Licensure

The level of medical training of the CBP personnel who responded to Robb Elementary School on May 24, 2022, varied greatly. While some responding CBP personnel had advanced medical certifications, such as EMT or Paramedic, other CBP personnel had only basic medical instruction provided at the USBP Academy.[157] OPR reviewed the level and recency of medical training of CBP personnel who responded to Robb Elementary School on May 24, 2022. OPR also conducted a licensure review for those who were deemed medical providers (EMTs and higher).

While medical training is included in the USBP Academy curriculum, there is little structure to ensure personnel remain proficient in their skills following graduation. OPR's interviews revealed that training on the use of Individual First Aid Kits (IFAKs) and performing CPR does not occur on an annual or routine basis because of increased operational demands.[158]

Each CBP component establishes and operates its own emergency medical response program. CBP's Office of Field Operations (OFO) supports the training and equipping of Customs and Border Protection Officers as medical providers. Similarly, AMO supports the training and

---

[155] OPR interview of SBPA ▮▮▮▮▮▮, March 16, 2023, timestamp 02:47:28.
[156] *Id.* at timestamp 03:00:45.
[157] Program Syllabus for U.S. Border Patrol Integrated Training Program, July 2020, p. 112.
[158] OPR interview of BPA ▮▮▮▮▮▮, March 8, 2023, timestamp 01:56:43. OPR interview of BPA ▮▮▮▮▮▮, March 8, 2023, timestamp 1:28:38.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



equipping of their personnel.  OPR, with the support of OFO's EMS program, also trains and equips medical providers.  OFO, AMO, and OPR medical providers are required to be certified by the National Registry of Emergency Medical Technicians (NREMT) and licensed in DHS's eLicensing Portal, in accordance with best practices and industry standards.

OPR's review identified that USBP medical providers, certified by the NREMT at both the EMT and paramedic levels, who responded to Robb Elementary School on May 24, 2022, were not licensed in DHS's eLicensing Portal, nor were they licensed by the State of Texas.  Some USBP medics have provided EMT training to outside state and local agencies.  From the NREMT website:

> Certification is the process by which a non-governmental organization grants recognition to an individual who has met predetermined qualifications specified by that organization.  Licensure, on the other hand, is the state's grant of legal authority, pursuant to the state's police powers, to practice a profession within a designated scope of practice.[159]

On October 14, 2022, ███████████, former Director of Emergency Medical Services at the DHS Office of Health Security, sent Assistant Chief ███████████, then-National USBP EMT Program Manager, a memorandum outlining the proper medical provider credentialing requirements for operational medical programs such as USBP's.[160]  The DHS Office of Health Security's memorandum states:

> The [DHS credentialing] system provides for a medical oversight process ensuring the competencies and qualifications of those with medical care responsibilities. The system establishes quality assurance requirements for the improvement of EMS services through monitoring, review, and assessment of medical data. Evidenced-based practice guidelines are developed and distributed as standard medical protocols for use throughout DHS, providing continuity of care and interoperability standards for all EMS programs. The credentialing system reduces the liability exposure of DHS where the Federal Tort Claims Act does not apply by ensuring that trained, qualified, and vetted EMS professionals who meet national standards operate within an approved system of protocols and oversight.[161]

OPR discussed the conflicting definitions of licensure, certification, and credentialing with representatives from the DHS Office of Health Security, CBP Office of Chief Medical Officer, and USBP National EMT Program Manager.  Absent the memorandum sent by the former Director of Emergency Medical Services at the DHS Office of Health Security mentioned previously, there is no definitive policy on the requirements for medical provider licensing within the Department of Homeland Security.  USBP does not interpret the DHS Office of

---

[159] National Registry of Emergency Medical Technicians, *The Nation's EMS Certification*, https://www.nremt.org/, version 2023.2, (2023).
[160] Memorandum from DHS Office of Health Security, Director of Emergency Medical Services to USBP National EMT Program Manager, dated October 14, 2022.
[161] *Id.*



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



Health Security memorandum to mean licensing is required.  However, it is the intent of the DHS Office of Health Security, based on industry standards and best practices, to have all DHS medical providers, including those in USBP, registered in the DHS eLicensing Portal.  This is to ensure continuity of the standards for patient care throughout DHS and ensure adequate oversight over DHS-component emergency medical systems.

*Response*

OPR evaluated the May 24, 2022, medical response by CBP personnel at Robb Elementary School.  The review did not focus on individual patient care provided to specific victims, but instead focused on the actions of CBP personnel in the context of the incident.

Civilian medical crews were present at Robb Elementary School; however, they remained outside.  Standard practice dictated they remain outside the school while there still existed a direct and immediate threat.[162]  Additionally, roads leading to Robb Elementary School were clogged with police vehicles, leaving some ambulances unable to get to the school prior to **12:50:00 PM**.[163]  With civilian medical crews unable to fully respond and establish medical command and control of the situation, this task fell on law enforcement personnel inside the west building.  CBP personnel took the lead for this task by establishing a triage area near the T-intersection.

Because of the separation between personnel at the north and south ends of the hallway, individuals at the south end of the hallway were unaware of the medical response plan in place at the north end.  The chaotic nature of the situation, coupled with the lack of guidance, led to a void in leadership that was filled on an ad-hoc basis.  OPR's review revealed that BPA-P ▮▮▮▮▮▮▮▮▮, an EMT, recognized the need for triage to be established and took the initiative to lead that effort.  He directed other law enforcement EMTs inside the west building to establish a medical triage area at the north end of the hallway.  Despite BPA-P ▮▮▮▮'s efforts in establishing a triage area, there was no chance for the medical response plan to be implemented, because the lack of communication between the groups at the north and south ends of the hallway ultimately led to chaos and disorganization once additional personnel flooded into the hallways following the breach of Classrooms 111 and 112.

BPA-P ▮▮▮▮'s plan involved following triage protocols for a mass casualty incident, i.e., once an incident scene is safe, victims are triaged in place and assigned one of four color codes pertaining to the severity of their injuries as follows:

---

[162] Goldstein, Scott, LeeAnne M. Martin Lee, and Joseph Roarty. *EMS Zones of Care*. Treasure Island, FL: StatPearls Publishing, 2023. https://www.ncbi.nlm.nih.gov/books/NBK436017.  U.S. Department of Justice, Office of Community Oriented Policing Services, Critical Incident Review: Active Shooter at Robb Elementary School, 2024; OPR interview of BPA-P ▮▮▮▮▮▮▮▮, March 8, 2023, timestamp 01:38:30.
[163] OPR interview of SBPA ▮▮▮▮▮▮▮▮, March 8, 2023, timestamp 00:50:53; OPR interview of BPA ▮▮▮▮▮▮, March 10, 2023, timestamp 01:38:30; OPR interview of ASAC ▮▮▮▮▮▮▮, February 28, 2023, timestamp 00:22:50, Call to 911 made by TXDPS Sergeant ▮▮▮▮▮▮ at 12:34:00 PM.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



- Green is given to victims who can safely walk to a different location.
- Yellow is given to victims who need medical treatment on site.
- Red is given to victims who need to be immediately transported to a higher level of care.
- Black is given to victims who are deceased or have no chance of survival.[164]

Once the scene is safe, the person on site with the highest level of medical training provides direction to other medically trained personnel in accordance with ICS protocols, which are a part of the National Emergency Medical Services Education Standards.[165]

In the specific instance of the Robb Elementary School shooting, protocols for a mass casualty incident were not followed.  Realizing that the medical response plan was not being followed by the scores of law enforcement officers flooding into the classrooms, BPA-P ████ worked his way into Classroom 112 and personally triaged seven victims, taking charge of the medical response inside the room.  Other higher-level medically trained personnel inside the west building were initially overwhelmed by the scene and focused on patient care instead of coordinating the medical response.[166]

Ultimately, all occupants of Classrooms 111 and 112 were attended to in 2 minutes and 44 seconds.  However, because mass casualty protocols were not followed, some victims were not properly triaged and were instead unnecessarily taken out of the classrooms.  Some of the victims who were unnecessarily removed from the classroom were deceased and should have been left in place. The lack of command and control over the medical response following the breach also led to six victims being taken out of the building and to a school bus without being properly triaged.  Two of the six victims taken to the school bus had gunshot injuries that should have been identified during triage.  Although neither of those injured victims succumbed to their injuries, they were not provided immediate care.

---

[164] U.S. Department of Transportation, National Highway Traffic Safety Administration, *Model Uniform Core Criteria for Mass Casualty Incident Triage*, December 2017.
[165] U.S. Department of Transportation, National Highway Traffic Safety Administration, *National Emergency Medical Services Education Standards*, December 2021.
[166] OPR interview of SBPA ████████, March 8, 2023, timestamp 01:33:50; OPR interview of BPA ████████, March 21, 2023, timestamp 00:49:04.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00100



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



## FINDINGS AND RECOMMENDATIONS

Based on a comprehensive review of the May 24, 2022, incident at Robb Elementary School, the following are OPR's findings and recommendations:

- **VAGUE, MISUNDERSTOOD AUTHORITY**. Effective multiagency coordination allows all levels of government to work together more efficiently and effectively. In many communities throughout the United States, CBP personnel constitute the largest group of law enforcement personnel in the area. While there is recognition of the threat posed by active shooter incidents in the communities in which they work and live, CBP first responders do not have the statutory authority to intervene in incidents that lack a clear, federal nexus. CBP officers, agents, and their managers at all levels have an inconsistent understanding of their actual authority to respond to non-federal incidents including active shooter situations.

  **Recommendation:** CBP must ensure its officers, agents, and managers understand and properly work within the confines of their authority. To the extent that CBP intends to continue to direct its personnel to respond to active shooter situations that lack a clear federal nexus, CBP must ensure a framework exists that formally authorizes its personnel to do so and guarantee that they will be protected from civil and criminal liability by ensuring these actions are within the scope of their employment. Because of the strong societal interest in preventing the loss of life, CBP officials should work with the U.S. Department of Justice and/or Congress to provide more expansive authorities that allow federal officers/agents to respond to acts of mass violence regardless of a nexus to a clear violation of federal law. Such responses must be found within the scope of their duties for purposes of legal representation.

- **THE ABSENCE OF UNIFIED COMMAND**. Over three hundred law enforcement personnel responded to the scene of the Robb Elementary School shooting. The failure of law enforcement personnel to establish identifiable incident management or command and control protocols led to a confused overresponse to the Robb Elementary School shooting. No law enforcement official ever clearly established they were in charge of the efforts inside the school. None of the law enforcement personnel involved, including CBP law enforcement personnel, executed NIMS protocols designed for the effective management of critical events.

  More importantly, there was a failure to establish an incident command post by anyone at the scene, including CBP senior management officials. This failure left responding officers and agents to act on their own and persisted throughout the duration of the event and into the post-event medical care. A few first responders attempted to contain the assailant while simultaneously addressing some scene management or command and control responsibilities independently. This led to a disjointed and fractured response and caused undue delays, led to wasted initiatives, clogged roads with emergency vehicles, prevented access by other needed critical personnel, and created a chaotic medical triage response for victims in need of advanced medical support.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00101



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Although OPR's review showed that some of the law enforcement personnel assumed a BORTAC supervisor would take tactical command of the scene once he arrived, the BORTAC supervisor was never explicitly asked to take charge of the situation. Instead, seeing the absence of command and control, the BORTAC supervisor took the initiative to understand and resolve the situation, one problem at a time. The event did not end until the BORTAC supervisor, along with a small group of CBP personnel and a local deputy sheriff, entered the classroom and killed the assailant.

**Recommendation:** If CBP assets will be tasked to assist state and local law enforcement agencies with similar responses because of CBP's size and capabilities, or if CBP leadership proactively decides to offer CBP assistance, the Incident Command System must be a facet of CBP's response protocols. All CBP supervisors should complete training on NIMS and ICS protocols. Doing so will provide them with knowledge of how an incident should be managed and how to interact with other federal, state, and local partners who are trained in ICS and NIMS protocols. The training would also provide CBP supervisors with the skills necessary to identify when a lack of command is present and how to establish incident command in a complex interagency environment, when needed. This training is especially pertinent because of the complexities of responding to incidents that lack clarity regarding CBP's statutory authority to respond.

- **UTILIZATION OF CBP AIRCRAFT.** CBP AMO used helicopters to provide overhead observation of the incident scene. However, the noise generated by the low flying helicopters inadvertently contributed to an already chaotic situation. Furthermore, no one ever told the helicopter crews there was an issue. Although there is no indication that the outcome of this incident would have been materially impacted if CBP's helicopters were used differently, the possibility of using CBP helicopters in a different manner was never considered because CBP did not establish its own command post for this incident.

  **Recommendation:** All CBP personnel tasked with responding to incidents such as the one at Robb Elementary School should be familiar with NIMS or ICS protocols. It is vital to recognize when an incident command post is necessary and take action. Implementing such protocols would allow the coordination of all CBP assets, including CBP aircraft. Additionally, CBP personnel should understand the capabilities of CBP aircraft and consider incorporating them in incidents, as appropriate. Establishing a command and control structure, even if solely to coordinate CBP assets, may serve as a catalyst to other responding agencies to set up an incident command structure of their own.

- **INSUFFICIENT ACTIVE SHOOTER TRAINING.** Existing CBP training on active shooter response protocols was inadequate and did not consider a tactical response to an active shooter incident utilizing ballistic shields, medical triage response, or the presence of a shooter behind a locked door. The training did not address complex questions of CBP's statutory authority or how CBP personnel fit into a response involving a state and local



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



incident without a clear federal nexus.  The CBP active shooter training did not align with the standards other law enforcement agencies were trained on, including instruction on medical response and the proper application of NIMS or ICS protocols.  It was also unclear under what authority CBP personnel are providing active shooter training to external partners around the country, particularly since CBP's training does not align with the standards by which many other agencies train or operate.

**Recommendation:**  CBP should align its training and doctrine on active shooter response protocols with continuously emerging best practices, including lessons learned from this incident, before providing additional training to CBP personnel or anyone else.  Once revised, all CBP first responders should receive comprehensive training on managing and responding to active shooter events.

- **SCARCE AVAILABILITY OF NECESSARY TOOLS**.  None of the CBP personnel at Robb Elementary School had access to effective breaching equipment, such as a breaching shotgun, a sledgehammer or ram, or breaching explosives.  This issue was exacerbated by the lack of unified command.  Even if such equipment had been available, the lack of command and control left dozens of officers trying to resolve the situation with only the tools they had on hand and no coordination of assets.

  **Recommendation:**  CBP should assess which breaching tools are available to its personnel.  CBP personnel should be equipped with the necessary tools and training to breach commonly encountered obstacles like locked doors.  Those tools must be issued and positioned to make them more widely available.

- **AGENT APPEARANCE**.  BORSTAR personnel, who are medically trained at the EMT and paramedic level, wore the same uniform as BORTAC personnel.  This created confusion about the number of tactically trained personnel on scene and may have contributed to the lack of command and control during the medical response.

  **Recommendation:**  CBP should clearly distinguish medics from other personnel.  CBP should develop a way to easily distinguish BORTAC and BORSTAR uniforms.  This will allow law enforcement officers to know who to turn to for guidance and direction during a situation similar to that encountered at Robb Elementary School.

- **REINFORCE PROPER MEDICAL PROCEDURES AND TRAINING**.  The absence of unified command led to a chaotic medical response following the breach of Classrooms 111 and 112.  The lack of command and control led to six victims being taken out of the building and to a school bus without being properly triaged.  Best practices dictate that medical triage should be conducted at the physical location of the event.  Once triaged, victims should be moved to dedicated areas for stabilization, or immediately taken to awaiting medical vehicles for transport to hospitals.  Failure to follow such established medical practices can lead to the inability to provide prompt and necessary care to those with catastrophic injuries.  The Robb Elementary School incident also highlighted the importance of personnel receiving and



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



maintaining medical response training to the maximum extent possible. Many of the CBP personnel interviewed stated they did not receive proficiency training in CPR and the use of IFAKs and AEDs.

**Recommendation**: CBP should establish procedures for following medical best practices during critical events and ensure that all CBP personnel are trained to properly assess people requiring medical care, especially since CBP personnel may arrive on scene before EMTs and paramedics. To operate seamlessly in various locations, CBP should implement standardized protocols throughout the nation by registering all CBP medical providers in DHS's eLicensing Portal to ensure adherence to the standards for patient care. Additionally, CBP should provide all CBP medical personnel with opportunities to refresh and further their medical response training.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



## APPENDIX I:  CBP PERSONNEL INTERVIEW SUMMARIES

The formal process to interview all CBP personnel who responded to the incident, as well as other CBP personnel who supported CBP personnel on May 24, 2022, commenced in February 2023 and concluded in August 2023.  OPR conducted a total of 193 interviews of CBP employees, including Border Patrol Agents, Customs and Border Protection Officers, Air and Marine Agents, and other CBP personnel, including those responsible for training CBP personnel.  In addition to the 188 CBP personnel who responded to or supported the response to the incident at Robb Elementary School, OPR interviewed two CBP subject matter experts in the fields of NIMS/ICS protocols and active shooter training and three CBP employees who did not participate in the incident or its response but were mentioned as potentially being a part of the incident response.

OPR's interview strategy identified the individual level of involvement of CBP personnel and grouped them into categories based on if and when they arrived at Robb Elementary School and the actions they took on that day.  OPR investigators who interviewed those who went inside Robb Elementary School completed specialized interview training focused on trauma informed cognitive interview techniques.  All interviews of CBP personnel who responded to the incident and the CBP personnel who supported them on that day included questions about incident command, active shooter training, and the interviewee's understanding of their authority and responsibility to respond to an incident such as the one at Robb Elementary School.  At the conclusion of each interview day, OPR investigators and analysts met together to discuss salient pieces of information collected from that day's interviews and to identify knowledge gaps to help shape future interviews.

Below are summaries of the interviews.  OPR confirmed all times reflected in the interview summaries through video footage and other verifiable means.  Any times not validated are noted as approximate.

### BORTAC

BORTAC personnel played a prominent role in the CBP response to the incident.  The following is a summary of the interviews provided by BORTAC members, as well as those involved in the deployment of BORTAC personnel:

***BPA*** ▮▮▮▮▮▮▮▮▮▮▮ ***(DRT SOD), interviewed on March 13, 2023. (Exhibit 171)***



On May 24, 2022, BPA ▮▮▮▮▮▮ was off duty and on his way to celebrate ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ in Concan, Texas.  As he was about to depart his home in Uvalde, he received a group text message from SBPA ▮▮▮▮▮ stating that there was an active shooter at Robb Elementary School and asking who was available to respond.  BPA ▮▮▮▮▮▮ put on his multi-camouflage uniform, body armor plates, gun belt, pistol, two pistol magazines, M4 rifle, and individual first aid kit.  He traveled to Robb Elementary School in an unmarked USBP vehicle without activating the emergency equipment, believing the incident would be resolved by the time he



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



arrived. He attempted to communicate via text messages using his personal phone without success.

He arrived at Robb Elementary School at approximately **12:10:00 PM**, parked on West Cargile Street, and walked toward the southeast side of the school. He saw a group of students running away from the school east toward Old Carrizo Road and guided them to safety. BPA ██████ next saw a group of law enforcement officers running toward the school and decided to join them. They stopped near the southeast side of the school and one of the law enforcement officers told BPA ██████ the subject was barricaded in the west building, located in the room that was the seventh window from the left side of the west building. BPA ██████ relayed information to BORTAC team members via text message because radio communication was lacking; however, his text messages did not appear to go through. BPA ██████ remained on the southeast side of the school, attempting to relay information to BORTAC team members, until he heard a volley of gunshots at approximately **12:50:00 PM**. After hearing the gunshots, he ran toward the south entrance of the school. He entered the building and froze when he saw a pile of deceased children and heard one of the law enforcement officers say all the children were deceased.

He met with other BORTAC BPAs by a tree in front of the school and was directed to go to the Uvalde hospital to check on BPA ██████. At the hospital, he was requested by hospital staff to escort parents to help identify deceased children. After escorting several sets of parents, BPA ██████ suggested the hospital find assistance from experienced personnel trained to assist parents in that kind of situation. After BPA ██████ stopped escorting parents, he stayed with BPA ██████ until BPA ██████ was discharged, then BPA ██████ went home.

BPA ██████ stated there was no incident command or sense of direction and the scene was the most chaotic he had ever experienced. He stated the situation was announced multiple times as a barricaded subject. BPA ██████ believed USBP's role was to provide support if there was no nexus to an immigration matter or the border. He stated there is an obligation to respond to an active shooter situation as a law enforcement officer.

***SBPA ██████ (DRT SOD), interviewed on March 16, 2023. (Exhibit 189)***

On May 24, 2022, SBPA ██████ was the acting BORTAC Commander, off-duty on approved leave, when he received a phone call from BPA ██████ informing him about a shooting or a shooter at Robb Elementary School. BPA ██████ asked SBPA ██████ if he was responding and said all UVA BPAs were instructed to respond. SBPA ██████ sent a text to the BORTAC supervisors notifying them to respond and to the BORTAC text group ordering them to respond. He then decided to come back on duty and respond, and informed (A)PAIC ██████ that BORTAC was heading to the school.

SBPA ██████ drove in an unmarked GOV to the school and approached from the south. He asked an unknown officer where the incident command post was located but the officer had no information. SBPA ██████ parked in front of the west entrance of the school and entered the building through the west entrance at **12:13:12 PM**, then returned to his vehicle to get additional




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

equipment before going back inside.[167]  Inside the west building, SBPA ████ spoke to TXDPS Ranger ████, who briefed him on the situation.

Based on the information he obtained from TXDPS Ranger ████ and other law enforcement officers in the west building, SBPA ████ believed resolving the situation was contingent on getting through the locked doors of Classrooms 111 and 112.  While still gathering information, SBPA ████ was given a ring of keys and approached the door to Classroom 111, but another officer suggested testing the key on a different door beforehand.  SBPA ████ tested the keys on a nearby janitor's closet and realized none of the keys worked.  After the keys failed, SBPA ████ started considering alternatives methods of breaching the door.  BORSTAR BPAs then arrived and SBPA ████ told them to act in their capacity as medics and develop a triage plan.  SBPA ████ retrieved his Halligan tool from his vehicle and tested it on the door of the janitor's closet.  He determined he would need a ram or a hammer to successfully use the Halligan tool and requested one, but none was available.

Shortly after returning with the Halligan tool, SBPA ████ received a second set of keys and tested it on the janitor closet, which opened.  At the same time, a BPA sniper arrived.  SBPA ████ told the sniper to set up on the east side of the building to gain a tactical advantage. After the sniper and a TXDPS drone operator reported they could not see into Classroom 111, SBPA ████ decided to breach the classroom.  SBPA ████ received a rifle-rated ballistic shield and ████ it to BPA ████, who lined up first.  SBPA ████ inserted the key and opened the door to Classroom 111.  The door kept closing, so they tried to use a chair to hold it open.  SBPA ████ assessed the room and confirmed that Classroom 111 was connected to 112.  Seeing BPA ████, SBPA ████ called him to join the group, then squeezed BPA ████'s shoulder to initiate movement into the classroom.

As they moved into the room, the assailant kicked open the door to a closet in the classroom from inside the closet and SBPA ████ saw muzzle flashes as the assailant fired.  SBPA ████ returned fire and moved toward the assailant, passing BPA ████.  SBPA ████ continued to fire at the assailant until the assailant fell to the floor.  SBPA ████ held position over the assailant to protect the scene until TXDPS arrived and ordered all non-medics to exit the building.  SBPA ████ left through the west door and met outside with PAIC ████, who directed SBPA ████ to gather with his team by a tree north of the building.

The team checked each other for injuries, then met at UVA, where they learned about a potential second shooter in the area and deployed to provide security.  While at Uvalde High School providing security, TXDPS requested SBPA ████ and BPA ████ return to UVA take pictures for evidence.  SBPA ████ returned to UVA and went home around **8:00:00 PM**.

SBPA ████ stated he knew he needed to respond because the situation involved a weapon at a school, and other agents were responding.  He stated the patched radio traffic was chaotic, but the priorities when he arrived at Robb Elementary School were to determine who was in command and identify how he could help.  SBPA ████ observed a low sense of urgency

---

[167] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



outside the building; each group of officers redirected him to a different group, and no one had any information. SBPA ▮▮▮ did not know who was in charge or what their plan was. He stated it was unclear if it was an active shooter or barricaded subject. He explained that BORTAC is the highest trained tactical team in the Del Rio area and all law enforcement agencies know "BORTAC solves the problems that regular law enforcement can't."[168]

SBPA ▮▮▮ stated that in situations that are not border related, BORTAC provides assistance, but there was no indication of a chain of command or anyone in charge at Robb Elementary School. SBPA ▮▮▮ felt that TXDPS Ranger ▮▮▮ told him to take care of the situation because TXDPS Ranger ▮▮▮ told SBPA ▮▮▮ to let him know what was needed. SBPA ▮▮▮ identified that BORSTAR's role was to establish medical triage and provide medical aid to the wounded. He stated that it was not a USBP-led incident and despite there being many other agencies, none were in communication with one another, which caused confusion and lack of information.

SBPA ▮▮▮ assumed his primary focus was to get the door open and that other law enforcement officers looked to him to take charge when he was handed the first set of keys. SBPA ▮▮▮ did not expect to see children at the school because his children also attend school in Uvalde, but their schools were already dismissed for the summer. SBPA ▮▮▮ believed there is a moral obligation for law enforcement officers to respond and assist in situations such as the one at Robb Elementary School.

*BPA ▮▮▮ (DRT SOD), interviewed on March 15, 2023. (Exhibit 185)*

On May 24, 2022, BPA ▮▮▮ was working at the Casey Ranch with other BORTAC BPAs and an AMO helicopter when he received a radio transmission from the AMO pilot stating that the pilot was leaving the area because of a shooting in Uvalde. BPA ▮▮▮ did not know any details about the shooting but got into BPA ▮▮▮'s GOV and started toward Uvalde. BPA ▮▮▮ rode to Uvalde with BPA ▮▮▮ in an unmarked GOV with emergency equipment activated. BPA ▮▮▮ provided navigation assistance and read aloud the text messages that were coming in. While enroute, BPA ▮▮▮ received a text from SBPA ▮▮▮ directing everyone to go to the active shooter scene at Robb Elementary School. BPA ▮▮▮, who was in the car with BPA ▮▮▮, also received a text from his wife, who ▮▮▮ at the school, saying, "▮▮▮, please save us."

They parked a few blocks away and ran toward the school, arriving at **12:37:08 PM**.[169] They entered Robb Elementary School through the west entrance and saw about 25 law enforcement officers in tactical gear. SBPA ▮▮▮ tasked BPA ▮▮▮ with identifying the shooter's location and tasked BPA ▮▮▮ with locating a sniper position outside to see inside through the windows of Classroom 111. BPA ▮▮▮ observed bullet holes throughout the hallway and

---

[168] OPR interview of SBPA ▮▮▮, March 16, 2023, timestamp 01:05:00.
[169] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

AR00108



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



recalled discussions with SBPA ████ and other law enforcement officers about obtaining master keys and the assailant's alleged location.

Based on the lack of new information and lack of success by BPA ████ to see inside Classroom 111, BPA ████ and SBPA ████ decided to enter Classroom 111. As he moved closer to Classrooms 111 and 112 with SBPA ████, BPA ████ received a U.S. Marshal Service rifle-rated shield, which he held as he moved into a position to provide cover for SBPA ████ as SBPA ████ inserted the key into the door to Classroom 111.

BPA ████ opened the door to Classroom 111 at **12:49:09 PM**, held the door open, and called out his observation of the inside of the classroom. He unholstered his CBP-issued firearm and activated the pistol-mounted light, then entered the classroom and moved left along the wall with the door connecting to Classroom 112. As he entered Classroom 111, his tactical priority was on the open doors. He approached a closet and was approximately 10 feet away from it when the closet door was kicked open from the inside. BPA ████ saw the assailant emerge, and BPA ████ stepped back and fell as he felt his shield receiving bullet impacts. He returned fire with four rounds from his pistol before it malfunctioned and became inoperable. He threw down the pistol and transitioned to a borrowed rifle but did not fire any rounds from the rifle.

After the shooting ceased, he entered Classroom 112 and observed two boys with their arms raised under a sheet. He pulled out the boys and sent them out of the classroom and yelled at other law enforcement officers to regain their composure. BPA ████ announced they needed EMS in the room, discarded his shield, and helped another law enforcement officer carry ████ out of the classroom and put pressure on her gunshot wounds. He went back inside the building after other EMTs arrived to work on ████.

After reentering the building, BPA ████ heard an unknown law enforcement officer claim the assailant had a pistol and showed him a picture of it. Recognizing it as his pistol that had malfunctioned, he walked toward Classroom 111 and retrieved his pistol from an unknown BPA. The unknown BPA told him to holster the pistol in its malfunctioned state and join law enforcement officers with clearing some of the classrooms using the borrowed rifle.

BPA ████ met with other BPAs at a tree outside, received water, and was told to go to UVA. On the way to his vehicle, BPA ████ (whom he did not know at the time) questioned him, but BPA ████ did not provide any information. At UVA, BPA ████ had photos taken in his gear, then learned the assailant's girlfriend had threatened to shoot up another school, so he and other BPAs deployed to the high school and junior high school. He cleared the pistol malfunction in case he needed to use his pistol at the high school. Later, the Texas Rangers requested BPA ████ and SBPA ████ go to the Uvalde Police Department to have photos taken in their uniforms because the previous photos were insufficient, but CPA Owens instead directed them to UVA to have the pictures taken by the Uvalde Police Department at Uvalde Border Patrol Station. BPA ████ (DRT SOD) drove BPA ████ back to his vehicle at the ranch, then BPA ████ drove home.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA ████ understood the situation at Robb Elementary was a shooter at the school and the assailant was a barricaded subject. He described the information on the service radio as contradictory, confusing, and chaotic, with a long period of a "hot mic." BPA ████ felt like other law enforcement officers looked to BPAs to solve the situation. He did not see anyone in command or control of the scene.

***BPA* ████** ***(DRT SOD), interviewed on March 9, 2023. (Exhibit 157)***

On May 24, 2022, BPA ████ was working with other BORTAC agents and an AMO helicopter near the ████ gas line when the AMO pilot notified them over the radio of a shooting in Uvalde. Almost immediately after the helicopter departed, BPA ████ received a text message from ████ saying, "████, shooting at Robb" and "████, it's me, shooting at Robb." He also received a text message from SBPA ████ notifying him to respond to Robb Elementary School because of a shooting. BPA ████ drove with BPA ████ in an unmarked GOV to the school, arriving at **12:37:08 PM**.[170] He parked north of Geraldine Street and ran to the school with BPA ████, entering via the west entrance door. He grabbed his sniper rifle and gave BPA ████ his M4 rifle and ballistic vest because BPA ████'s equipment was in his GOV, which was still back near ████.

BPA ████ entered the west building and immediately looked for SBPA ████. He asked SBPA ████ what he could do to assist, and SBPA ████ instructed him to "go outside, find him, and shoot him," referring to the assailant.[171] BPA ████ exited the school via the east entrance and positioned himself near a tree north of Classroom 32, then moved to the northwest corner of Classroom 34 but could not see into the classroom where the assailant was located because the blinds were down. After the breach, he reentered the school through the east entrance, but TXDPS told him he could not enter Classroom 111, so he and BPA ████ began clearing Classrooms 102-106. BPA ████ also assisted with moving deceased victims into Classroom 132.

He met with other BPAs outside for a muster, where they were directed to report to UVA. While at UVA, he was informed of a possible second shooter, so he and BPA ████ reported to Morales Junior High School. He provided security from the roof with his sniper rifle until all students were released, then returned to UVA.

BPA ████ stated he went to SBPA ████ upon his arrival at Robb Elementary School because SBPA ████ was in his chain of command, not because he believed SBPA ████ was in charge of the overall incident at the school. BPA ████ did not know who was in command or control of the incident. He did not know if it was an active shooter or barricaded subject. He believed it was his duty to act and "stop bad people doing bad things to other people."[172]

---

[170] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.
[171] OPR interview of BPA ████, March 9, 2023, timestamp 00:35:50.
[172] *Id.* at timestamp 01:07:45.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00110



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**





*BPA* ███████████ *(DRT SOD), interviewed on March 9, 2023. (Exhibit 156)*

On May 24, 2022, BPA ████ was working as a BORTAC Operator conducting a plain clothes surveillance operation in Del Rio, Texas, when he learned about the shooting at Robb Elementary School through the stash house operation group chat text shared with other agents and officers from other agencies. BPA ████ confirmed the information through UVA, then returned to DRT to obtain his breaching tools, explosive breaching charges, and other equipment before proceeding to Uvalde. He received instruction to deploy while already enroute to DRT in his unmarked GOV with lights and sirens activated.

BPA ████ called another breacher he had previously trained with to discuss different scenarios and breaching options. He arrived at the Hillcrest Memorial Funeral Home at approximately **12:47:00 PM**, where he parked and prepared explosive breaching charges, then ran to the west entrance of the school. He entered the building and saw people treating children and carrying children out and was informed the assailant had already been stopped. He was requested to assist with clearing the other classrooms, then exited the building after an announcement that everyone who was not actively working on treating a victim needed to depart. He met with other BPAs at a tree near the front of the school to take accountability of the personnel onsite, then met at UVA for a debrief. At UVA, a secondary threat was announced. BPA ████ deployed to the Uvalde High School with other BPAs and assisted with perimeter security and the release of students to their parents. He then went back to UVA before returning to Del Rio.

BPA ████ did not know who was in command and control at Robb Elementary School. He observed multiple law enforcement agencies on site. BPA ████ stated USBP's authority to respond is related to any law enforcement entity responding to an active shooter or felony being committed. He believed he was expected to react as a first responder.

*BPA* ███████████ *(DRT SOD), interviewed on March 20, 2023. (Exhibit 201)*

On May 24, 2022, BPA ████ was scheduled to begin work at ████████. He was having lunch with his father in Leakey, Texas, when BPA ████'s wife called to notify him of a shooting at Robb Elementary School. BPA ████ concluded his lunch and prepared to leave, then received a group text from SBPA ████ asking all BORTAC members to report to the school. BPA ████ drove home to get his PIV card, then drove to UVA to get his GOV and issued gear.

He arrived at Robb Elementary School at **12:47:03 PM**, parked approximately 50 yards from the school in a resident's yard, and was approached by a frantic parent who couldn't find her child.[173] He told the parent he was not sure exactly what was going on and departed toward the school. He encountered WC ████, who directed him to the west door, where he entered. SBPA ████ motioned for him to approach, and BPA ████ ran to the group of law enforcement officers near the classroom doorway. There was an exchange of gunfire at about the time he passed in front of Classroom 111, and he spun hard to his left behind drywall and felt

---

[173] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00111



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



an impact to his head.  He leaned against the hallway wall, then walked toward daylight shining through the exterior door at the south end of the hallway and exited the building, where he met BPA ███████████ .

BPA ██████ took off his own hat to observe BPA ███████'s reaction to determine how badly he was injured.  The lack of BPA ███████'s reaction comforted him, and he told BPA ███████ to go back into the school and assist.  BPA ███████ noticed pain in his foot and leg and checked the wounds.  Medical personnel approached him to provide aid, but he rerouted them to the school to support the medical needs inside the classrooms.  BPA ██████ walked toward his GOV through the same gate he had used earlier to enter the school and received a ride to the hospital from an unknown BPA.  He instructed the other BPA to take his GOV and gear to UVA, saying he would retrieve it later.

BPA ██████ received x-rays of his head, leg, and foot, which identified shrapnel.  Doctors removed the shrapnel from his head but left it in his leg because removing it would cause more damage.  After BPA ██████ was discharged from the hospital, PAIC ██████ planned to drive him to UVA, but BPA ██████ learned ██████ was nearby, so he joined her instead, and she took him to UVA.  From there, he drove his personal truck home.

BPA ██████ believed the situation at Robb Elementary School was a possible barricaded shooter.  He stated that radio traffic was unintelligible and conflicting.  He was unsure of who was in charge of the scene, but it was apparent that if BORTAC didn't handle the situation, no one else would.  BPA ███████ observed a very relaxed posture by the other law enforcement officers in the school hallway when he entered, as if they were waiting for instruction from someone.  He indicated the number of law enforcement personnel present was confusing for what he believed was a contained subject.  BPA ██████ stated there is a moral responsibility to respond to incidents like the one at Robb Elementary School.

***PAIC ████████████ (USBP Tucson Sector, Nogales Station, Arizona), interviewed on March 13, 2023. (Exhibit 166)***

On May 24, 2022, PAIC ██████ was PAIC of BORTAC at DRT headquarters.  While eating lunch in his GOV, he received a phone call or notification via service radio that there was a shooting in Uvalde.  He notified (A)PAIC ████ that he was going to respond to Uvalde to assist, then traveled in the unmarked GOV with emergency equipment activated, following directly behind a TXDPS trooper.  PAIC ██████ called SBPA ████████ and told him he had authorization to make all tactical decisions necessary and do whatever was needed.  PAIC ██████ received a phone call from (A)DCPA ██████ that BORTAC was heading to the scene and had authorization to do whatever was needed.

PAIC █████ arrived at Robb Elementary School at approximately **12:50:00 PM**, parked his GOV, donned his body armor, and moved toward the northwest gate of the school with the goal of locating SBPA ██████ .  After entering the school grounds, he approached the west entrance and observed BPAs exiting the west entrance with wounded victims.  He learned from an unknown source that the threat was over.  PAIC █████ then attended a meeting with all BPAs

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



who were not actively involved in something at that moment and was instructed to return to UVA. While at UVA, he received notification of a potential second shooter, so he deployed the BORTAC and BORSTAR teams to local schools to provide security. He drove his GOV to Uvalde Junior High School and Uvalde High School to help with perimeter security and ensure all BORSTAR and BORTAC BPAs were okay. He left the high school and returned to UVA, then traveled to the Uvalde Regional Medical Center to visit BPA ▓▓▓▓, who was wounded. He stayed until BPA ▓▓▓▓ was discharged, then drove BPA ▓▓▓▓ to ▓▓▓▓, who took BPA ▓▓▓ home. PAIC ▓▓▓ drove back to DRT before going home.

PAIC ▓▓▓ stated he received a lot of conflicting and inaccurate information during the incident. He observed a lot of chaos at Robb Elementary School but did not feel a sense of urgency among the responders present. He was unsure if the situation had changed from an active shooter to a barricaded subject, but based on the actions of the other law enforcement officers he observed as he arrived on-scene just prior to the breach, it did not appear to be an active shooter.

***SBPA ▓▓▓▓▓▓▓ (USBP Tucson SOD, AZ), interviewed on March 6, 2023. (Exhibit 133)***

On May 24, 2022, SBPA ▓▓▓▓▓ was conducting line watch operations as a member of BORTAC in the USBP Del Rio Sector. He was working at a remote location on ▓▓▓▓▓, north of Eagle Pass, Texas, when he received notification from an AMO pilot on a tactical radio channel saying there was a school shooting, and the pilot was leaving the area to assist. SBPA ▓▓▓▓▓ wondered why the AMO pilot didn't help transport other BPAs to the school, but SBPA ▓▓▓▓▓ notified the other team members and said they needed to start getting ready to leave in case they were deployed to the school. Shortly after the AMO pilot left the area, SBPA ▓▓▓▓▓ received a phone call from SBPA ▓▓▓▓ telling him to get the BORTAC team to the school.

BORTAC BPAs split into two teams and drove in two GOVs with emergency equipment activated. SBPA ▓▓▓▓ maintained communication with SBPA ▓▓▓▓ via text messages during the trip. He arrived at Robb Elementary School at approximately **12:50:00 PM**, parked approximately two blocks away and went to the funeral home after encountering BPA ▓▓▓ preparing breaching charges. SBPA ▓▓▓▓ heard gunfire and ran to the west entrance of the school with the goal of entering, finding SBPA ▓▓▓▓ and other team members, and providing medical assistance. He entered Classroom 112 and was told everyone was deceased. He entered Classroom 111 and spoke to SBPA ▓▓▓▓, then told the BORTAC BPAs to clear the classrooms in the west building.

SBPA ▓▓▓▓ exited through the south entrance to gather the rest of the BORTAC BPAs outside. He provided a situation report to his PAIC, (A)DCPA, and CPA. They instructed him to have BORTAC and BORSTAR members not actively involved in something rally in front of the school, so he walked around the building and notified everyone he could find to report there. After learning a medical helicopter was enroute and needed to land, he established a landing zone, but a few minutes later he was told the helicopter was not coming. SBPA ▓▓▓▓ reported to the rally point in front of the school, where everyone was requested to report to UVA



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



at **2:00:00 PM**.  They received information about a secondary threat and SBPA ▮▮▮▮ responded to Uvalde Middle School, where he assisted with evacuating children to the gymnasium and ultimately to their parents.  He returned to UVA before returning to ▮▮▮▮, then went home.

SBPA ▮▮▮▮ understood the incident was an active shooter situation with a barricaded subject and the subject probably had hostages.  SBPA ▮▮▮▮ believed everyone on scene was trying to be helpful, but there were too many law enforcement officers on scene.  He observed the responses seemed separated.  He stated BORSTAR and paramedics maintained command and control regarding patient triage and treatment and observed that BPAs outnumbered state and local law enforcement officers throughout the scene.  SBPA ▮▮▮▮ stated he never located an incident command post anywhere.  He believed that PAIC ▮▮▮▮ had overall control outside the school until transferring control to (A)DCPA ▮▮▮▮ and CPA Owens, then to TXDPS after the children were evacuated because TXDPS started processing the crime scene.

SBPA ▮▮▮▮ stated that communication could have been a lot better, especially between the north and south groups in the hallway.  He believed Uvalde was not prepared for a mass casualty event, stating there was no formal organization at the scene, and it was total chaos.  SBPA ▮▮▮▮ believed USBP's authority to respond was based on a federal law banning guns on school property and that an active threat to life requires a response from all law enforcement.

***BPA ▮▮▮▮ (DRT SOD), interviewed on March 9, 2023. (Exhibit 155)***

On May 24, 2022, BPA ▮▮▮▮ was working at a ranch in Eagle Pass, Texas, with other BORTAC BPAs when SBPA ▮▮▮▮ told him to get his stuff because they had to go.  The BORTAC agents consolidated into GOVs and drove to Uvalde.  They heard radio transmissions indicating there was an active shooter at Robb Elementary School.  They arrived at the corner of Nicolas Street and Geraldine Street at approximately **12:50:00 PM** and ran toward the school.  They entered the west entrance and walked down the hallway to Classroom 112, where a Texas Ranger informed them that the classroom was now considered a crime scene, and everyone had to leave.

SBPA ▮▮▮▮ directed BPA ▮▮▮▮ to go and find BPA ▮▮▮▮.  BPA ▮▮▮▮ and other agents cleared Classrooms 103, 104, and 109, then were instructed via radio to exit the school and meet at the tree by the north end of the school.  There, they were ordered to report to UVA.  At UVA, they were informed of a threat by a potential second shooter, so BPA ▮▮▮▮ went to Morales Junior High School to assist with security and crowd control.

BPA ▮▮▮▮ stated that when local law enforcement agencies see BORTAC agents, it is assumed that BORTAC will handle the situation, although he did not feel that BORTAC was in charge.  He stated USBP has the authority to respond when a felony is being committed and as first responders it is the right thing to do.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ███████████████ *(DRT SOD), interviewed on March 14, 2023. (Exhibit 170)*

On May 24, 2022, BPA ███████ was working field operations with BORTAC agents near Eagle Pass North Station's area of responsibility when the helicopter pilot who was assisting them called over the radio that there was an active shooter in Uvalde. After freeing his vehicle from being stuck in the mud, BPA ███████ picked up two other BPAs and proceeded to Uvalde. He arrived at Robb Elementary School at approximately **12:50:00 PM**, where the streets were very congested with first responder and civilian vehicles. He parked a few blocks away and ran toward the school, where he then learned the assailant had been "neutralized." He entered the building, cleared the rest of the building for potential threats, then exited through the south door. He met with other agents and supervisors on the north side of the building, where they were instructed to head to UVA for debriefing. During the debrief, they were informed there was another possible threat at a nearby school, so they responded to the Uvalde High School area. They cleared the area after determining there was no threat to the school.

*SBPA* ███████████████ *(DRT SOD), interviewed on March 9, 2023. (Exhibit 151)*

On May 24, 2022, SBPA ███████ was at DRT on day shift as administrative supervisor. During a meeting with WC ███████, another BPA informed them about an active shooter in Uvalde. SBPA ███████ left the office, ran to his vehicle, and began to put on his gear. He told BPA ███████ to drive the USBP BearCat to Uvalde as soon as possible. SBPA ███████ drove to Robb Elementary School in a GOV with the emergency lights on and arrived at approximately **12:50:00 PM**. He parked and approached the school on foot. While enroute, he and encountered BPA ███████ and asked if he was good.

SBPA ███████ entered the school and moved through the hall, then entered Classroom 112, where an EMT told him there was nothing they could do for the children and that everyone was deceased. SBPA ███████ then entered Classroom 111 and asked SBPA ███████ where he needed him. SBPA ███████ said he didn't know. SBPA ███████ exited the school after Texas Rangers told everyone to exit so they could secure the crime scene. He went back to his vehicle to drop off his gear and get medical gear, then returned to the school but was not permitted to enter.

He gathered with other USBP personnel at a tree in front of the school and checked on his teammates, then went to the hospital to check on BPA ███████. SBPA ███████ advised BORTAC command staff that BPA ███████ was doing well. While at the hospital, hospital staff requested SBPA ███████ and BPA ███████ help escort parents to identify children, so he went to the hospital lobby to do that. He told BPA ███████ that they could not keep escorting families because "it was not their job."[174] He reunited family members who had broken through the access doors with the parents who had been escorted through, then left and got BPA ███████'s wife and brought her to BPA ███████'s room. SBPA ███████ stayed at the hospital until approximately **7:00:00 PM**, then went home.

---

[174] OPR interview of SBPA ███████, March 9, 2023, timestamp 00:48:40.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00115


**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**


Initially, SBPA ▮▮▮ felt they would receive a stand down order because an active shooter situation usually ends quickly. He thought it might be a barricaded subject since it was taking so long to resolve, although he didn't hear anyone say that. He observed there was an open mic for a prolonged period, during which he heard information that caused him to feel the personnel at Robb Elementary School did not know the location of the suspect. He observed the scene at the school was chaotic and it did not appear that anyone was in command. He observed parents screaming and law enforcement officers standing around looking away from the school.

*SBPA ▮▮▮▮▮▮ (DRT), interviewed on February 14, 2023. (Exhibit 75)*

On May 24, 2022, SBPA ▮▮▮ was on the DRT Sector Intelligence Unit, covering Uvalde and Carrizo Springs, working out of EGT when he received a phone call from a BPA at CAR advising there was an active shooter at Robb Elementary School in Uvalde. SBPA ▮▮▮ reported the active shooter situation via group text message to local supervisors and called the Border Intelligence Center (BIC) in Del Rio and advised them to deploy the USBP Special Operations Detachment and Emergency Medical Services assets to the school. Although he did not recall the time he called the BIC, SBPA ▮▮▮ believed he relayed the information about the incident at Robb Elementary School before anyone at the BIC was aware of the situation.[175] He attempted to call BPA ▮▮▮, who was on approved leave to attend his ▮▮▮ award presentation at Robb Elementary School, but BPA ▮▮▮ did not answer.

SBPA ▮▮▮ decided to go to Uvalde to account for his personnel and see if he could help. He drove in an unmarked GOV with emergency equipment activated. When he arrived at the Hillcrest Memorial Funeral Home approximately between **12:55:00 PM** and **1:05:00 PM**, a BPA advised him that the threat had been eliminated. SBPA ▮▮▮ parked five blocks away from Robb Elementary School and attended a briefing near a tree in front of the school. He later walked over to the funeral home, then attended a **2:00:00 PM** muster at UVA, where he learned of a potential threat to the Uvalde High School. He drove to the high school and parked 150 yards away to monitor the scene from inside his vehicle. SBPA ▮▮▮ believed USBP had the authority to protect and serve and was there to secure the scene and assist other law enforcement personnel.

*SBPA ▮▮▮▮▮▮ (DRT SOD), interviewed on February 28, 2023. (Exhibit 103)*

On May 24, 2022, SBPA ▮▮▮ was working in the field near Eagle Pass, Texas, apprehending a group of migrants. While tending to a USBP vehicle that was stuck in the mud, he received texts on his personal phone about an active shooter at Robb Elementary School. He directed BORTAC BPAs ▮▮▮ and ▮▮▮ to gather their gear and respond to the school while he stayed behind with a USBP canine to coordinate the movement and transfer of the migrants. After transport and transfer of custody, SBPA ▮▮▮ dropped off the canine at ▮▮▮ and traveled to Uvalde, arriving at Robb Elementary School between **1:05:00 PM** and **1:10:00 PM**.

---

[175] OPR interview of SBPA ▮▮▮, February 14, 2023, timestamp 00:13:52.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00116



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He parked several blocks away and approached the funeral home.  He called someone from his group, who told him the incident was over and to report to the Uvalde Border Patrol Station.  When he got to UVA, he saw the BORTAC team exiting, so he caravanned with them to Uvalde High School, where the principal asked him to help maintain perimeter security.  He informed parents that students would be released one by one and remained at the high school until **5:30:00 PM** or **6:00:00 PM**, then went to UVA for a short debrief.

SBPA ▇▇▇▇ stated that initially the information he received via text was that there was an active shooter.  However, while enroute to Uvalde, he heard the incident turned into a barricaded subject.  He thought the incident would be quickly resolved but felt it was necessary to respond because USBP had been called to assist.  He stated it did not seem there was any command and control in place upon his arrival at Robb Elementary School, and the funeral home appeared to be a consolidation point for student reunification with parents.

*BPA ▇▇▇▇▇▇▇ (DRT SOD), interviewed on March 3, 2023. (Exhibit 127)*

On May 24, 2022, BPA ▇▇▇▇▇▇ was with other BORTAC agents detaining a group of undocumented migrants on Burr Ranch when the pilot of the AMO helicopter that was assisting them stated over the radio that he had to leave because he got a call about a school shooting in Uvalde.  Five minutes later, the BORTAC agents received texts on their personal phones about the shooting at an Uvalde school.

BPA ▇▇▇▇▇▇ took BPA ▇▇▇▇ to his vehicle and used a tow strap to get the vehicle out of the mud.  BPA ▇▇▇▇▇▇ stayed behind to transport the detained group while other BORTAC agents departed.  After the detained group was picked up, BPA ▇▇▇▇▇ headed to Uvalde in a GOV.  At the checkpoint on Highway 90, he instructed BPA ▇▇▇▇ to follow him to the school with the BearCat armored vehicle.

BPA ▇▇▇▇▇▇ arrived at Robb Elementary School at approximately **1:20:00 PM**.  He parked and was walking toward the school when he received a message to meet at the tree in front of the school.  There, he was directed to go to UVA, so he left the school and went to UVA.  While at UVA, everyone started talking about the girlfriend of the assailant who was allegedly going to shoot up the high school and everyone in the muster room was directed to head to the high school.  BPA ▇▇▇▇▇▇ arrived at the high school and stood guard on the southwest side for approximately 1.5 hours before all the students were evacuated.  He went back to UVA with the BORTAC and BORSTAR agents, then left after about 30 minutes.  He returned to the morning's location to retrieve the remaining vehicles, then went home.

BPA ▇▇▇▇▇▇ did not know who was in command of the scene and was unsure what agencies were at Robb Elementary School.  He did not know who was in charge at the high school and stated there is an understanding in the community that BORTAC will respond to school shootings because they have the best training.  BPA ▇▇▇▇▇▇ stated that if someone is in danger, it is USBP's responsibility to do something.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ██████████ *(DRT SOD), interviewed on March 20, 2023. (Exhibit 199)*

On May 24, 2022, BPA ██████ arrived at DRT and noticed BPAs running in the parking lot. They told him there was an active shooter in Uvalde.  (A)PAIC ████ told BPA ███████ to get the BearCat and respond to Uvalde.  BPA ████████ transferred his issued gear to the BearCat and drove to Robb Elementary School using lights and sirens.  He arrived at approximately **1:20:00 PM**, parked near Geraldine Street and Farm to Market 1435, then ran with another BPA to the school.  They were informed the door had been breached and there was not anything for them to do.  BPA ████████ joined other USBP personnel under a tree, where they learned of a secondary threat and were directed to respond to the high school.  He drove the BearCat to the high school and parked at the student pickup point to provide security for students being dismissed to their parents, then returned to Del Rio.

BPA ████████ stated he was unsure of who was in charge at Robb Elementary School.  He indicated USBP has a responsibility to respond, and their role was to provide support to local law enforcement agencies.

*BPA* ████████████ *(DRT SOD), interviewed on March 2, 2023. (Exhibit 123)*

On May 24, 2022, BPA ████████ was off duty at home in Del Rio, Texas.  He received a text from SBPA ████████ that there was a barricaded subject at a school in Uvalde.  BPA ████████ put on his BORTAC uniform, left his residence, and traveled in a GOV to Uvalde with the emergency lights activated.  He arrived at Robb Elementary School at approximately **1:30:00 PM**, parked, and walked toward the school to join his teammates.  He encountered PAIC ████, who advised him to go to UVA for a muster, so he returned to his GOV and drove to UVA.

While at UVA, he learned of another possible threat, so he and his teammates went to Morales Junior High School and provided perimeter security for approximately one hour.  BPA ████████ then returned to UVA and met with other BORTAC and BORSTAR agents in an informal muster.  He left UVA and assisted other BORTAC agents to retrieve GOVs that were stuck in the desert.

BPA ██████ stated he responded because it was his duty as a law enforcement officer, and he is always on call.  He believed the incident to be a barricaded subject and believed local police departments were in command of the incident because when BORTAC responds it is always to assist other agencies.  He stated USBP's role was to assist local and state police departments and that USBP has authority to respond to any incident if requested.

*BPA* ████████████ *(DRT SOD), interviewed on February 28, 2023. (Exhibit 94)*

On May 24, 2022, BPA ████████ was conducting line watch operations north of Eagle Pass, Texas, when he received a text message on his personal cell phone from SBPA ██████ telling BORTAC BPAs to immediately respond to Robb Elementary School for a shooting and that a person was barricaded.  BPA ████████ took a screenshot of the text and waited until another BPA finished transporting migrants to the highway, then rode with that BPA to BPA ████████'s

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



GOV. BPA ▮▮▮▮▮ drove his GOV toward Uvalde with emergency equipment activated. He received a text to report to UVA and arrived there after **2:00:00 PM**, where he was immediately instructed to report to the Uvalde High School and provide security because there were other possible shooters. BPA ▮▮▮▮▮'s ▮▮▮▮▮ was an employee at Uvalde High School, so he went to ▮▮▮▮▮ location first to make sure she was okay, then started working with her and helping at the school. He helped with traffic and to maintain some type of order as parents arrived to retrieve their children. He returned to UVA for an out-briefing, traveled to the ranch area to retrieve another GOV that was stuck in the mud, then went home at approximately midnight. BPA ▮▮▮▮▮ observed that as other law enforcement agencies arrived, they were under their own chain of command and were occupied with their own responsibilities.

***Deputy Patrol Agent in Charge (DPAIC)*** ▮▮▮▮▮ ***(COM), interviewed on February 28, 2023. (Exhibit 97)***

On May 24, 2022, DPAIC ▮▮▮ was acting PAIC ((A)PAIC) of the Special Operations Detachment (SOD) for DRT overseeing operations and administration of BORSTAR and BORTAC teams. Although PAIC ▮▮▮▮▮ (USBP Tucson Sector, Nogales Station, Nogales, Arizona) was permanently assigned over the DRT Special Operations Detachment, PAIC ▮▮▮ was temporarily detailed to TXDPS.

(A)PAIC ▮▮▮ received a phone call from an unknown person at the DRT Border Intelligence Center (BIC) that there was a shooting incident at Robb Elementary School in Uvalde. Approximately 15-20 minutes later, he received additional information that it was a male with a rifle inside the school. Upon learning this additional information, (A)PAIC ▮▮▮ called SBPA ▮▮▮▮▮ and SBPA ▮▮▮▮▮ on the phone and informed them about the preliminary information and initiated the process of deploying SOD personnel to the scene. (A)PAIC ▮▮▮ remained in Del Rio and did not respond to Uvalde. As information about personnel and resource deployments came into the DRT SOD office, he kept track of them by listing the names of responding SOD personnel on a whiteboard in the office. Additionally, he authorized BPA ▮▮▮▮▮ to use the response truck to take EMTs to respond.

Due to the gravity of the situation, PAIC ▮▮▮ directed (A)PAIC ▮▮▮ to remain at DRT to coordinate SOD efforts while PAIC ▮▮▮ responded to Uvalde. (A)PAIC ▮▮▮ relocated from the SOD office to the radio room at the BIC to maintain clear lines of communication among all DRT assets responding to the incident. (A)PAIC ▮▮▮ helped coordinate various facets of the SOD response, including tactical considerations and medical response considerations. He also prepared to conduct an after-action plan and ensured DRT staff were apprised of SOD plans. (A)PAIC ▮▮▮ stated he backed off direct communication with the SOD commanders once PAIC ▮▮▮ responded, but he continued to listen to radio communications and identify field requirements, including a landing zone for air evacuations. As (A)PAIC ▮▮▮ received information in the BIC, he attempted to disseminate it to the SOD BPAs in the field via PAIC ▮▮▮.

Beyond his initial contact with SBPAs ▮▮▮▮▮ and ▮▮▮▮▮, (A)PAIC ▮▮▮ did not give any directions or guidance to personnel in the field, nor did he receive any guidance from more



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



senior USBP officials. (A)PAIC ⬛ understood the situation was a barricaded shooter until the team made entry, at which time he understood it was an active shooter situation. He stated that USBP standard practice would be for the SOD commanders to report to the highest ranking USBP official on site. He believed there was a clear lack of guidance at the scene and at no time did he ever know of any one person or entity that was in command or control at Robb Elementary School. DPAIC ⬛ stated that any USBP response is a support role and SOD would not typically deploy without being requested to do so by another agency. He mentioned that radio communications were disrupted by an open mic for one to three minutes.

*MEDICAL RESPONDERS*

Several medically trained CBP personnel, including members of BORSTAR, responded to the incident at Robb Elementary School on May 24, 2022. These medically trained personnel set up a medical triage area inside the west building, established a medical response plan, and provided medical care to victims. Other CBP personnel not having received advanced medical training also provided care to victims. The following is a summary of the interviews provided by medically trained CBP personnel and other CBP personnel who provided medical treatment:

*SA ⬛ (Homeland Security Investigations (HSI)), interviewed on March 18, 2023.*
*(Exhibit 194)*

On May 24, 2022, SA ⬛ was serving as a BPA-I at UVA when he observed a TXDPS vehicle drive past him near Uvalde High School at a high rate of speed with its emergency equipment activated. He recognized the trooper as being best friends with a UCISDPD officer. BPA-I ⬛ followed the TXDPS vehicle in his unmarked GOV to the intersection of Grove Street and Geraldine Street, arriving at **11:38:35 AM**.[176] BPA-I ⬛ exited his vehicle and spoke with a TXDPS trooper. The trooper stated that there was a shooter in the school and asked BPA-I ⬛ to call for assistance.

BPA-I ⬛ called UVA and told the station about the presence of a shooter at Robb Elementary School and requested all units respond. He put on his vest and Glock 26 handgun, then ran toward the school. He entered the west door of the west wing, where officers in the hallway had just taken fire from the assailant. He asked where the assailant was and stated he "was with them to go in."[177] They were moving toward the classroom when someone in the hallway told everyone to hold up and make a plan prior to making entry.

BPA-I ⬛ left the hallway with two UCSO deputies and moved to the south doorway of the school to provide coverage and ensure the assailant did not exit. Upon receiving notification that children were going to be evacuated through exterior windows, he went to the window of Classroom 102 and assisted, then moved to the next room to the north, broke out the windows, and assisted with the evacuation of children and teachers. He received an alert of an injured person in the parking lot area, so he retrieved his EMT bag and placed it near the parking lot so others could use it.

---

[176] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.
[177] OPR interview of SA ⬛, March 18, 2023, timestamp 00:30:38.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00120




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

He moved back to the south side of the building, then moved to assist other law enforcement officers evacuating people from Classrooms 19–23. He then moved to the next building with Classrooms 13–18 and assisted with evacuations. He went to the cafeteria and assisted with evacuations from there, then moved back toward the south doorway of the west building when he heard gunshots, which he assumed to be the breach of the classroom. He then entered the hallway of the west wing through the south door and moved toward Classroom 111.

BPA-I ▮▮▮▮▮ entered the classroom, saw that the assailant was deceased, and observed that no one in the classroom was directing anyone about which victims to prioritize or where to place them for treatment. He assisted with getting children out of the classroom and carried three children to the medical triage area, then someone yelled for all non-EMTs to get out of the classroom. He went to the hallway, where he was requested to assist in moving deceased children from the hallway to Classrooms 130 and 131. He exited the west doorway and took over CPR on ▮▮▮▮▮ from another BPA who appeared tired. BPA-I ▮▮▮▮▮ checked in with other BPAs, retrieved his EMT bag from the parking lot, and met with USBP personnel at a tree on the north side of the building. He then returned to his vehicle and departed for UVA by himself.

While enroute, he heard about another possible shooter at the high school, where his wife and oldest child were, so he responded to the high school with another BPA and assisted with evacuating children until **5:30:00 PM**. He rendered aid to a dehydrated UPD officer until an ambulance arrived, then returned to UVA, retrieved his vehicle, and went home.

BPA-I ▮▮▮▮▮ could not identify who was in command and control at any time. He stated UCISDPD Chief Arredondo was the only person who could have been in charge, but there was no active command and control initiated. BPA-I ▮▮▮▮▮ identified that USBP's role was in a backup capacity.

***BPA ▮▮▮▮▮ (UVA), interviewed on March 6, 2023. (Exhibit 136)***

On May 24, 2022, BPA ▮▮▮ was on day shift assigned to camera and sensor duties changing batteries. While working at a ranch 10 miles west of Uvalde, he heard over the radio that all agents should report to Robb Elementary School. Immediately, he drove toward the school and arrived in less than 20 minutes, at approximately **11:50:00 AM**. There, he used his vehicle to block traffic down one of the streets near the school. He went to the west entrance of the school and asked every law enforcement officer he encountered if they had any information, but no one did. An unknown UPD officer told him the school police chief was in the classroom negotiating with the assailant. BPA ▮▮▮ began assisting with the evacuation of children from Classrooms 102–106, then went to the south entrance and began evacuating children from Classrooms 108–110. He broke classroom windows and climbed into Classroom 109 through the window to assist the injured teacher, who was shot and could not move without assistance.

Prior to the breach, he staged near the south entrance. Immediately after the breach, he entered the south entrance and went toward the classroom. He carried a girl from the floor just outside the classroom to an EMT at the south entrance. He found a blanket and covered the girl, who



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



was deceased, then entered Classroom 112 and was told to leave the classroom if he was not a medic. He exited the school through the south entrance and gathered at the front of the school for a muster, where he was directed back to UVA. Shortly after arriving at UVA, he left and assisted with securing and evacuating several local schools.

BPA ▮▮▮ identified that SBPA ▮▮▮▮▮ took charge in the school hallway. BPA ▮▮▮ stated the entire incident was chaotic and that USBP responded to the incident to assist the local police departments. He identified that BPAs took control of the situation because no one else was doing anything. BPA ▮▮▮ stated USBP did not have the authority to handle situations like the Robb Elementary School shooting.

***BPA*** ▮▮▮▮▮▮▮▮▮▮ ***(UVA), interviewed on March 17, 2023. (Exhibit 192)***

On May 24, 2022, BPA ▮▮▮▮▮ was scheduled for a use of force training day. During a training break, he heard over a radio that there was an active shooter at Robb Elementary School and local law enforcement officers were requesting assistance. He immediately went to the UVA armory and got a rifle and hard plate body armor, then responded to the school with other BPAs in a marked GOV. He communicated with USBP dispatch while enroute to confirm the correct school.

When he arrived at Robb Elementary School at approximately **11:50:00 AM**, he entered the west entrance and inquired with local law enforcement officers about the situation, but they did not seem to know what was going on or what to do. He inquired if there were students or teachers in the surrounding classrooms but did not receive a definitive answer. Along with other BPAs, he began evacuating classrooms near the west entrance, including Classrooms 131 and 132, where there were two teachers but no students. The BPAs relieved a local law enforcement officer who was aimed in at the classroom with the barricaded subject and discussed that if the assailant began firing, they would go in.

BPA ▮▮▮▮ briefed SBPA ▮▮▮▮ when SBPA ▮▮▮▮ arrived. Shortly after SBPA ▮▮▮▮ arrived, they heard four gunshots and advanced toward the classroom. In the hallway, the law enforcement officers focused on finding the correct set of keys to open the doors to Classrooms 111 and 112. Initially, the plan was to unlock the doors to Classrooms 111 and 112 and simultaneously enter both classrooms. However, after SBPA ▮▮▮▮ opened the door to Classroom 111, the decision was made to only enter through Classroom 111. Following SBPA ▮▮▮▮ and others entering Classroom 111, BPA ▮▮▮▮▮ heard a barrage of gunfire and dropped to the floor in the hallway. Once the shooting was over, BPA ▮▮▮▮ got up and entered the classroom to assist with the victims.

He took victims to the medical triage area and assisted an EMT with a victim. He took the victim to an ambulance outside, then reentered the school and assisted with clearing the rest of the building. He exited through the south door, then ran back to the triage area to gather medical supplies and deliver them outside. He returned again to the triage area, but no additional assistance was needed, and he was informed that the school was a crime scene, and no one was allowed to enter.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He then mustered at a large tree on the north side of the school, where he was instructed to report to UVA. At UVA, he changed out of his bloody uniform, sent texts to family and friends to let them know he was okay, and overheard a report of additional threats at other schools. He remained at UVA, then went home.

BPA ██████ believed local law enforcement officers were in command of the scene because they were sending a hostage negotiator. They informed him that the assailant had fired upon them and that it was a barricaded subject situation. BPA ██████ believed it was his duty as a BPA to respond and assist and identified that BPAs responded in a support role to assist local law enforcement officers.

***BPA*** ████████ ***(UVA), interviewed on March 22, 2023. (Exhibit 213)***

On May 24, 2022, BPA ██████ was at the UVA processing area when he heard a call over the radio regarding a possible school shooting at Robb Elementary School. He left the processing area, went to the armory, checked out an M4 rifle, then rode with another BPA to Robb Elementary School, following another BPA they saw enroute.

He walked toward the school and entered the school through the west entrance at **11:51:15 AM**, where he observed a mixture of law enforcement personnel from UPD, UCSO, and TXDPS.[178] He and another BPA cleared the classrooms behind the law enforcement officers in the hallway. During that time, he observed law enforcement officers going in and out of the school and a uniformed police officer calling out to the shooter and telling him to give himself up.

After BORTAC and BORSTAR team members arrived in the hallway, BPA ██████ heard three to four gunshots from within the classroom. A team of law enforcement officers lined up in two columns along the hallway and moved toward the doors to Classrooms 111 and 112. BPA ████████ saw BPA ██████ (DRT) test keys on other doors to identify a master key, although he did not know where the keys went afterward. While in the hallway, BPA ██████ recalled hearing that a child had called 9-1-1 from inside the classroom.

BPA ██████ saw a BPA with a shield enter Classroom 111, followed by other officers lined up. As BPA ██████ was about to enter the classroom, he heard a door at the back of the classroom swing open, followed by gunfire, and saw the assailant come out of a cabinet firing. BPA ██████ did not have a clear shot but could tell the assailant was getting shot because his body was flailing as he went down to the ground. After the breach, he cleared the adjacent classroom, then went back to the first classroom to see if there were any survivors.

He assisted a boy who stood up from the pile of children and escorted the boy out the door to another law enforcement officer. BPA ██████ carried children out of the classroom to the medical triage area, then cleared the other classrooms across the hall with other law enforcement officers and did not find anyone. He went outside because there were so many other people in the hall and helped BPA ██████ wash the blood off his arms. BPA ██████ met with CPA

---

[178] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

AR00123



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Owens and other BPAs for a briefing, then gave another BPA a ride back to UVA and returned his rifle to the armory.

While enroute to Robb Elementary School, he believed he was responding to a school shooter situation. Upon arriving at the school, he thought it was a barricaded subject based on information from another law enforcement officer. He observed that radio traffic was chaotic and at one point there was a "hot mic" that prevented anyone else from transmitting. He stated it was difficult to understand what was being broadcast. When BPA _____ arrived at Robb Elementary School, it did not appear there was any command and control outside the school. He was not aware if an incident command was established, and he believed UPD was in charge. BPA _____ did not see that anyone from USBP was in command and control, but identified that when SBPA _____ arrived, SBPA _____ took control.

BPA _____ identified that the situation in the school was chaotic with law enforcement officers going in and out. BPA _____ identified that his role at the incident was to provide backup to UPD and stated it has been USBP's past practice to assist other law enforcement agencies when they request assistance.

***BPA _____ (DRT SOD), interviewed on March 13, 2023. (Exhibit 168)***

On May 24, 2022, BPA _____ was on day shift performing line watch with another BORSTAR BPA northwest of Eagle Pass, Texas, when he received a group text from SBPA _____ stating there was an active shooter at an elementary school in Uvalde and a subsequent message ordering everyone in the group text to respond to Uvalde. BPA _____ deployed toward Uvalde in his unmarked GOV. While enroute he overheard a prolonged hot mic moment.

He arrived at Robb Elementary School at approximately **12:25:00 PM**, parked, put on his gear, and ran toward the school. He dropped his radio while running and had to run back to get it, then returned to the school and entered through the west entrance. After the breach, he took a deceased child from another BPA and helped carry the body to the medical triage area. He entered Classroom 111 and carried a child out to the medical triage area. He confirmed children were deceased by checking for carotid pulses. He exited the school through the west entrance after TXDPS ordered everyone out to preserve the crime scene. He reported to the tree north of the building for a muster, where he was instructed to meet at UVA in 30 minutes. When he arrived at UVA, he was informed about a second threat and decided to respond along with other DRT SOD members to Morales Junior High School to provide security around the school. He remained there until everyone was evacuated, then returned to UVA, where he changed out of his uniform and went home.

BPA _____ believed TXDPS was in charge based on the number of officers outside the school perimeter. He did not feel USBP was in charge but observed SBPA _____ lead the group of law enforcement officers who entered Classroom 111. BPA _____ stated that in an active shooter event, his role was to stop the threat and support his team and other agencies.

---



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ███████████ *(CAR), interviewed on March 21, 2023. (Exhibit 205)*

On May 24, 2022, BPA ██████ was at CAR assigned to day shift on field duties near Texas Highway 57 when, either via text or radio, he heard that there was an active shooter inside Robb Elementary School.  BPA ██████ decided, along with another BPA, to respond to the scene. They drove straight to the school, arriving at approximately **12:25:00 PM**, and parked several blocks away.  He put on his ballistic vest and helmet, took his M4 rifle and medical bag, and walked to the school.

BPA ██████ encountered PAIC ██████ and asked if PAIC ██████ was okay; PAIC ██████ said no because his child was inside the school.  BPA ██████ entered the school through the west entrance and spoke with BPA █████, then assisted with setting up a triage area.  They decided BPA ██████ would assist with breaching the classroom.

He approached the classroom after hearing gunshots and someone yell "shooter down."  BPA ██████ identified a male teacher being dragged from the classroom as a potential patient.  He assisted another BPA with looking for signs of life in the pile of children in Classroom 112.  He checked four or five and determined none had signs of life.  He determined all the children in Classroom 112 were deceased.  He took over performing lifesaving efforts on a boy from BPA ██████ and took the boy to a nearby ambulance, but the boy did not show signs of life.

He attempted to reenter the school through the west entrance but was denied entry by a TXDPS trooper.  BPA ██████ met with other BPAs around a tree near the front of the school, where all BPAs were instructed to report back to UVA.  He walked alone to his vehicle.  At UVA, he was instructed to report to any local Uvalde school to assist with security upon being informed of the possibility of another shooter.  He arrived at Dalton Middle School and provided security on the back side of the school.  He remained in his vehicle for several hours before receiving instructions to report back to UVA.

*BPA* ███████████ *(USBP International Falls Station, Minnesota), interviewed on March 10, 2023. (Exhibit 164)*

On May 24, 2022, BPA ██████ worked at UVA providing less lethal instruction to BPAs from UVA.  During a training break, SBPA ██████ notified BPA ██████ that there was a shooting at a local school.  BPA ██████ went to the armory, retrieved his rifle and keys to a marked USBP vehicle, put on his duty belt, handgun, body armor, and retrieved his EMT bag.  He saw SBPA ██████ driving a USBP vehicle with emergency equipment activated and decided to follow SBPA █.  He parked at the intersection of South Grove Street and Geraldine Street at approximately **12:10:00 PM** and ran toward Robb Elementary School with his rifle.  Near the school, BPA ██████ saw the assailant's truck in a ditch, and spoke to BPA ██████, who was guarding the truck and weapons found near it.  BPA ██████ returned to his truck to retrieve his EMT bag from his vehicle and walked back toward the school.  He left the EMT bag near a Dodge Charger and approached a group of law enforcement officers north of the west entrance to the school.

---

AR00125



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He assisted with evacuating students and teachers from classrooms, then went to the south entrance of the building, where he observed a UPD officer with a ballistic shield and told the officer he should be inside.  BPA ███████ told a TXDPS trooper to accompany him into the school, and the three of them entered through the south entrance.  BPA ███████ heard four shots fired and pushed the officer with the shield forward into the hallway.  The three of them positioned near a classroom door on the west side of the south hallway.  BPA ███████ asked UCISDPD Chief Arredondo if a sniper was available; the chief said no.  BPA ███████ asked about using a BearCat to enter the classroom and someone said they didn't have one.  BPA ███████ asked if students were in the classroom with the assailant and no one responded.

After the BORTAC breach, BPA ███████ entered the classroom and assisted with evacuating a student and attempted CPR on her before realizing she was deceased.  He reentered the school without his rifle and assessed eight or nine students.  He asked if the classroom was a crime scene and BPA-P ███████ said yes, so BPA ███████ left the classroom.  He checked students who did not have clearly fatal wounds for a pulse and breathing before determining they were deceased.  He advised another EMT to start chest compressions on a child, then asked the BPA working on the child if he needed to be switched out and the BPA said yes.  BPA ███████ continued trying to provide air to the child but was unsuccessful and began moving the child toward an ambulance.

After the child departed in the ambulance, BPA ███████ decided to assist at the Uvalde Memorial Hospital.  He went to the emergency room and asked a nurse where he could assist.  The nurse pointed him to follow a doctor and the doctor directed him to handle the initial assessments of children yet to arrive with minor injuries.  BPA ███████ left the emergency room upon hearing radio communications regarding a social media threat from the girlfriend of the assailant and drove to Uvalde High School.  He parked near the front of the school and encountered other law enforcement officers and agreed to search the school together with them.

The security guard let them in, and BPA ███████ announced that everyone should get into a room.  He moved down the hallway, searching bathrooms and classrooms.  He heard a radio communication about shots in Classroom 606, but he was near Classroom 606 and did not hear anything.  He exited the school when BORTAC arrived and returned to his vehicle, then drove to UVA, where he unloaded and secured his equipment.  He obtained a clean uniform, changed into it, and took photos of his dirty uniform pants and boots, then went home.

BPA ███████ stated he did not know if anyone was in charge of medical treatment prior to the breach.  After the breach, BPA ███████ explained that medical treatment involved dynamic leadership with the most knowledgeable individual making decisions.  He stated he responded to Robb Elementary School because it was a violent felony that required numerous agencies to respond and explained that BPAs are expected to respond with firearms and body armor.  BPA ███████ believed UCISDPD Chief Arredondo should have been in command and control but could not identify who was in command and control at any time.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00126



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ▮▮▮▮▮ *(BRA), interviewed on March 10, 2023. (Exhibit 159)*

On May 24, 2022, BPA ▮▮▮▮ was assigned to BPA field training and was interdicting a group of migrants in the ▮▮▮▮▮ area along with a CBP helicopter when the pilot informed them that he had received an urgent request for assistance and was departing the area.  Another BPA received information about a shooting happening in Uvalde involving a school, and the BPAs decided to return to BRA to verify the situation.  There, they were informed that there was a shooting at Robb Elementary School and they needed to respond.  BPA ▮▮▮▮ drove with another BPA toward the school in a USBP-marked GOV with lights and sirens activated.  They arrived at the school at approximately **12:15:00 PM** and were stopped at the entrance by unknown law enforcement officers who informed them that only EMTs and paramedics were needed inside.  BPA ▮▮▮▮ stated he was previously a medic and was then allowed to enter through the west entrance door.

He assisted with setting up the medical triage area by the bathrooms and water fountain.  After the breach, he attempted to stop an officer who was carrying a deceased child outside to prevent onlookers from seeing the child, but the officer took the child outside, so BPA ▮▮▮▮ covered the child with a blanket and asked another law enforcement officer for assistance moving the child back inside the school.  He applied a tourniquet to the arm of a male teacher who had a gunshot wound to the arm and asked two law enforcement officers to take the teacher to an ambulance.  BPA ▮▮▮▮ moved deceased children into Classroom 132.  He entered Classroom 111 and observed the scene, then went outside and assisted with chest compressions until EMS took over.  He assisted with chest compressions on another teacher on a stretcher being carried to an ambulance before meeting with other BPAs by a tree.  He then left to report to UVA for a briefing, then returned home.

Upon arriving at the school, BPA ▮▮▮▮ assumed the assailant was deceased or in custody.  He did not know the scene was still active and did not know who was in command.  He believed CBP had authority to respond because there was a threat to human life.

*BPA* ▮▮▮▮▮ *(BRA), interviewed on March 6, 2023. (Exhibit 139)*

On May 24, 2022, BPA ▮▮▮ was tracking a group of migrants with the assistance of a CBP helicopter when the pilot relayed that he had to break off and respond to a possible active shooter call.  Around the same time, BPA ▮▮▮'s wife inquired with him if he knew ▮▮▮▮▮▮▮ ▮▮▮ Robb Elementary School, was on lockdown; he responded that he had read about it on social media but thought it was probably locked down related to a bailout.  A few minutes later ▮▮▮▮ called back and was upset because ▮▮ had been informed there was a shooting at the school.  BPA ▮▮▮ decided to respond to the school along with two other BPA trainees because he is an EMT and because ▮▮▮▮▮ was there.

He drove to Robb Elementary School with two BPA trainees in a marked GOV with emergency lights activated and activated the sirens when encountering traffic.  When they arrived near Robb Elementary School at approximately **12:15:00 PM**, BPA ▮▮▮ observed the streets were backed up and there were many parked vehicles blocking the streets and people pacing back and forth in



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



the streets and on the sidewalks. He asked another BPA to clear traffic so he could park, then all the BPAs ran toward the school. BPA ▇▇▇ inquired where the EMS triage was going to be set up and where they could help. A TXDPS trooper said they needed to secure the area around the funeral home and help with getting the crowd back. BPA ▇▇▇ told the crowd to move back. He told BPA-T ▇▇▇ to write down all the names of all the BRA BPAs who were on site. He asked a father in the crowd to help get the crowd back, then went to the school upon hearing a radio transmission that law enforcement officers were going to breach the classroom.

BPA ▇▇▇ advised a TXDPS medic he would provide support. After the breach, he waited to hear "all clear" but never did. BPA ▇▇▇ entered Classroom 111 or 112 to look for any live children. He helped carry out one child and applied a tourniquet and chest seal. He stayed in the hallway and looked for work, then assessed and assisted another injured victim, instructing that they be taken to the ambulance. BPA ▇▇▇ stayed with ▇▇▇▇▇▇'s husband to provide support.

BPA ▇▇▇ stated it appeared that TXDPS had command and control. He thought he was responding to either an active shooter or barricaded subject. He knew deceased people should not be moved because it was a crime scene and there were not many victims with signs of life. BPA ▇▇▇ stated USBP responded in a support role to provide both medical and tactical assistance.

***BPA ▇▇▇▇▇▇▇▇▇ (UVA), interviewed on March 2, 2023. (Exhibit 147)***

On May 24, 2022, BPA ▇▇▇▇▇▇ was assigned to firearms qualifications at the firing range in Uvalde when he heard over the radio about a subject with a weapon and then heard about an active shooter at Robb Elementary School. He packed his medical equipment and drove to Robb Elementary School using lights and sirens. He parked 100–150 yards from the school in a residential yard at approximately **12:18:00 PM**, then ran with his medical bag toward the school. He entered the school via the west entrance, where he observed mass confusion and saw many people in the hallway.[179] After hearing four to five shots, the law enforcement officers in the hallway lined up outside Classrooms 111 and 112. BPA ▇▇▇▇▇▇ lined up behind them in the hallway with two tourniquets in his hand in case a law enforcement officer was injured. After the breach, he yelled at law enforcement officers to prevent them from entering Classroom 111 until it was declared clear, then entered the classroom. There, he found a girl with a pulse and carried her to the medical triage area, where he instructed she be taken outside. He attempted to return to Classrooms 111 and 112 but was denied entry.

He went outside and relieved a TXDPS trooper performing CPR on a girl, then attempted to reenter the school, but was prevented from doing so. He joined BPAs at the tree on the north side of the school and washed his hands with water he kept in his vehicle, then returned to UVA to clean up some more and went home.

---

[179] OPR interview of BPA ▇▇▇▇▇▇▇, timestamp 00:31:04.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00128



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA ▮▮▮▮ stated that the scene at the school was mass confusion and no one person was giving orders. He observed that what people inside the school knew and were thinking was different from what people outside the school knew and were thinking. He was surprised by the number of people who responded to the incident and was unsure about who was in charge. He stated that USBP had a duty to respond and act on their law enforcement training.

***BPA*** ▮▮▮▮ ***(DRT SOD), interviewed on March 21, 2023. (Exhibit 202)***

On May 24, 2022, BPA ▮▮▮ was assigned to the day shift performing roving patrol on a ranch with other BPAs. He heard a CBP pilot transmitting over the radio that there had been an active shooter in Uvalde and saw a text message thread on his government cell phone stating there was an active shooter at an elementary school in Uvalde. BPA ▮▮▮ left the ranch and started driving toward Uvalde, then received a text from an SBPA telling the group to start rolling. BPA ▮▮▮ arrived at Robb Elementary School at **12:23:28 PM**, parked at the intersection of Geraldine Street and Nicolas Street, grabbed his gear, and ran toward the school.[180]

He set up a medical triage area, prepared equipment, and guided other EMTs and officers to establish the medical plan. When Classroom 111 was declared "clear," BPA ▮▮▮ entered the classroom and removed a boy from a pile of children on one side of the classroom. He brought the boy to the triage area and began assessing the three other children who had also been brought out. The fourth child did not have any visible gunshot wounds, so BPA ▮▮▮ placed that child on a gurney and took him outside with another officer. He returned inside the school to get his medical equipment, then continued working on the child outside. He returned inside and received permission from a TXDPS Ranger to confirm whether the casualties inside the classroom were deceased.

All BPAs were instructed to rally by a tree and report to UVA. BPA ▮▮▮ rode with another BPA to UVA, where they learned of a second threat. BPA ▮▮▮ responded to Dalton Elementary School because ▮▮▮▮ attended school there. He aided at the pickup location to ensure the safe handoff of children to their parents, then returned to UVA and went home.

BPA ▮▮▮ stated there did not appear to be a sense of urgency outside, but inside the Robb Elementary School building was more tense. He stated he had a responsibility to respond as a matter of morality and as a BPA under the oath to serve and protect. BPA ▮▮▮ did not believe anyone was in command at Robb Elementary School.

***SBPA*** ▮▮▮▮▮▮ ***(DRT SOD), interviewed on March 8, 2023. (Exhibit 149)***

On May 24, 2022, SBPA ▮▮▮ was conducting operations on a ranch between Uvalde and Eagle Pass, Texas, when he received a text message from SBPA ▮▮▮ advising of radio traffic of a shooting at Robb Elementary School. SBPA ▮▮▮ spoke with SBPA ▮▮▮ and decided to self-deploy to the school. He messaged the BORSTAR team and requested everyone who was free to respond to the school and for those not free to respond when available. SBPA ▮▮▮

---

[180] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



requested someone drop a pin for the school on the Android Team Awareness Kit (ATAK) phone application, then drove there with the vehicle emergency equipment activated. He messaged the team that he was parked approximately two blocks away and on foot due to the law enforcement and civilian vehicles blocking the street. He advised his team that it was an active shooter and to bring hand-thrown gas and medical equipment and for them to be medically prepared for people with multiple gunshot wounds.

SBPA ▇▇▇ asked two local law enforcement officers where the incident command was located but they were confused by his question. He entered the school through the west entrance at **12:23:28 PM**, then upon instruction from SBPA ▇▇▇▇, returned to his vehicle and got hand-thrown gas and medical equipment.[181] SBPA ▇▇▇ discussed setting up a medical triage area with BPA ▇▇▇ and other USBP paramedics, then began stripping down and staging the medical gear.

After the breach, he helped carry children outside. He assessed five or six children and stabilized a girl inside, then took her outside to EMS. He attempted to assist with CPR on a teacher, then met with other USBP personnel on the north side of the school, where they were directed to report to UVA. Upon learning about another possible threat concerning the assailant's girlfriend, SBPA ▇▇▇ deployed to Dalton Elementary School with another BPA. He patrolled the school perimeter and assisted with taking children from classrooms to their parents. He messaged his team at approximately **6:30:00 PM** to depart from Dalton Elementary School.

SBPA ▇▇▇ stated he did not have a clear understanding of the situation. He believed that by the time he arrived, he would be assisting with perimeter security. He identified that radio communications were bad, with people relaying misinformation and transmitting simultaneously, causing communications to be incomprehensible. Based on the officers' demeanors inside the school, SBPA ▇▇▇ observed that the situation did not seem urgent. He was under the impression that the subject was barricaded and law enforcement officers in the building were looking to SBPA ▇▇▇ to take over. SBPA ▇▇▇ did not feel that any of the other law enforcement agencies on scene were in control of the situation. He identified USBP's role as first responders and observed that USBP had the largest law enforcement presence at the scene. SBPA ▇▇▇ was not aware of written legal authority to respond to an active shooter incident but felt that if there was an existing threat to the public, USBP had a responsibility to respond as law enforcement officers to prevent members of the public from being injured.

***SBPA ▇▇▇▇ (DRT SOD), interviewed on March 14, 2023. (Exhibit 196)***

On May 24, 2022, SBPA ▇▇▇ was the field supervisor with DRT BORSTAR working near Eagle Pass, Texas, when he heard radio transmissions of a school shooting or active shooter at Robb Elementary School. He called SBPA ▇▇▇ and informed him of the situation and confirmed with SBPA ▇▇▇ to deploy BORSTAR personnel to Robb Elementary School. SBPA ▇▇▇ drove in an unmarked GOV with lights and sirens activated and parked on the southeast side of the school. An unknown civilian approached him and wanted to know what

---

[181] *Id.*



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



was going on. SBPA ████ replied that he did not know and asked the civilian if he could help clear the roads to allow emergency vehicles in.

SBPA ████ then ran toward the school with his tactical medical bag, M4 rifle, and two fully loaded magazines. He entered the building through the west entrance at **12:29:05 PM** and asked SBPA ████ where the assailant was, why he had not been killed, and if someone was attempting to negotiate with the assailant.[182] SBPA ████ explained the situation with the door and an unknown UPD officer informed SBPA ████ that UCISDPD Chief Arredondo was trying to negotiate. SBPA ████ asked SBPA ████ why they would deploy gas if UCISDPD Chief Arredondo was trying to negotiate.

SBPA ████ assisted BPA ████ with setting up BPA ████'s sniper rifle and tripod outside the building. SBPA ████ advised BPA ████ that they were getting ready to breach inside the school. While outside, an unknown DEA Special Agent brought a layout of the school and SBPA ████ instructed him to take it inside the building to assist with the situation. SBPA ████ reentered the school and formed in a group in the hallway near the classroom with other law enforcement officers. After the breach, he set his rifle down in the hallway so he could provide medical treatment. He waited in the hallway as children were taken out and instructed a boy who could walk to continue down the hallway. SBPA ████ asked two girls who exited if they were okay; they said yes and continued down the hallway. He assisted another law enforcement officer with carrying a boy and tried to stop the law enforcement officer from taking the boy outside but was unsuccessful. SBPA ████ staged the boy inside the ambulance, out of view of onlookers, then ran back inside the school.

SBPA ████ found a BPA carrying a boy, and instructed the BPA to set the boy down so he could begin medical treatment, but the boy had no signs of life. SBPA ████ asked an unknown law enforcement officer to put the boy inside one of the classrooms, then assisted SBPA ████ with carrying an adult female. Medics began working on her outside and SBPA ████ asked why they were working on her there and said to get her to the hospital. He provided a tourniquet but then saw where on the body they were trying to apply it and said they couldn't put it there. Instead, he instructed BPA ████████ (DRT SOD) to pack the wound with gauze and provided rescue breaths to the woman until a paramedic took over.

SBPA ████ recognized that no other victims were being evacuated from the school, so he went to a tree in front of the school and met with CPA Owens (DRT) and other BORSTAR personnel. From there, he was instructed to go to UVA. While at UVA, SBPA ████ heard rumors of a second threat, so he deployed to Dalton Elementary School. There, he met off-duty BPA ████ and instructed him to secure the front of the school while SBPA ████ secured the back of the school. After an hour or two, the school began releasing children. Once the school was completely evacuated, SBPA ████ returned to UVA.

---

[182] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00131



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



During the incident, SBPA ████ heard via radio, "they've got him in a classroom, in an office, and he's a barricaded subject."[183] Someone asked via radio where incident command was located; another person said there was no incident command. SBPA ████ believed no one was in command of the scene but assumed the school police would be in command because UCISDPD Chief Arredondo was negotiating. SBPA ████ believed SBPA ████ was the most experienced, tactically trained person on the scene but did not feel that he was in charge. SBPA ████ believed BPAs had a responsibility to respond to an active shooter situation and help. He stated that if USBP was called to assist state and local law enforcement agencies, USBP would be in a support role. Due to the active shooter situation, SBPA ████ considered the BORSTAR deployment as a law enforcement deployment.

***BPA ████████████ (DRT SOD), interviewed on March 21, 2023. (Exhibit 207)***

On May 24, 2022, BPA ████ was working with another BORSTAR Agent near Pierce Ranch, when he heard via radio that someone was shot at Robb Elementary School. He drove to Uvalde and found his way to the school using his ATAK device, then parked 150–200 yards from the entrance. He ran toward the school with his Kevlar helmet, rifle, Camelbak, and two individual first aid kits. Enroute, he saw a young girl run across the road in front of him. He saw blood on her face and asked her if she was hurt. She continued running toward the Hillcrest Memorial Funeral Home and BPA ████ proceeded to the west entrance of the school, arriving at **12:30:39 PM.**[184]

After speaking with BPA ████, BPA ████ returned to his vehicle and retrieved both his medical bags, then ran back to the school and entered the building. He lined up with other law enforcement officers outside Classroom 111, then retrieved a rifle-rated shield from an unknown law enforcement officer and provided the shield to BPA ████. BPA ████ was fourth in line in the group of law enforcement officers at Classroom 111. Upon entering Classroom 111, BPA ████ immediately turned right to ensure there were no threats in that corner of the room. Hearing gunfire, BPA ████ turned and fired his rifle at the muzzle flashes coming from the assailant.

After the shooting ceased, he attempted to get a child out from under a table but slipped in the blood on the floor and fell. He went with BPA ████ to Classroom 112 to help clear that classroom. He carried a girl out to the triage area, then went back in and took a boy from BPA ████ to an ambulance, then went back in and looked for other victims to help. He carried the bottle of oxygen for a female teacher on a gurney, then met other BPAs at a tree and was told to meet at UVA.

After mustering at UVA, he went to Uvalde High School with another BPA and provided security near the entrance at the high school for approximately one hour. Later, he provided his name, identifying information, and round count to SBPA ████.

---

[183] OPR interview of SBPA ████, March 14, 2023, timestamp 02:24:19.
[184] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00132



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA ▮▮▮ did not know who was in charge of the incident. When he saw the young girl running outside, he knew law enforcement officers had to get there fast. BPA ▮▮▮ stated SBPA ▮▮▮ and SBPA ▮▮▮ oversaw the medical triage pre-breach but did not know who was in charge of the medical triage post-breach. He understood the doors of Classrooms 111 and 112 were locked.

***BPA-P*** ▮▮▮ ***(DRT), interviewed on March 20, 2023. (Exhibit 197)***

On May 24, 2022, BPA-P ▮▮▮ was transporting equipment around the Del Rio area of operations with another BPA. He was driving into Uvalde from the west when he noticed two UPD vehicles passing them with lights and sirens, headed toward Robb Elementary School. He saw additional law enforcement vehicles, one being a USBP vehicle, passing them with lights and sirens activated. He turned on the service radio and heard about a shooter entering Robb Elementary School.

BPA-P ▮▮▮ parked along Geraldine Street and walked to the school, arriving at **12:31:41 PM**.[185] He assisted with perimeter security, keeping numerous parents who were present and armed with pistols and rifles out of the school. He directed parents to the nearby funeral home, where they would reunite with their children. He asked BORSTAR BPAs about the situation and they directed him to come with them and assist with establishing a medical triage area in the hallway. There, he met civilian medical personnel as they arrived and explained the triage plan. He directed deceased victims brought out of the classrooms to be placed in the hallway and covered with blankets.

Following the breach, he entered Classroom 111 and assessed vital signs, checking each victim four or five times, but observed multiple gunshots on each and found no vital signs. He told everyone in the room that all the victims were deceased, then exited the classroom after a Texas Ranger told everyone to leave. He exited the school via the south entrance, then attempted to reenter the school but was denied entry. He pushed his way in and waited in case any signs of life were discovered, but there were none.

He exited the school again and met with other BPAs at a tree on the north side of the school, where they were instructed to return to UVA. He returned to UVA with BPA-P ▮▮▮, where they heard about a second threat, but he was discouraged from responding because he was covered in blood. BPA-P ▮▮▮ and BPA-P ▮▮▮ departed UVA and drove to complete their work from the morning, then returned to Del Rio.

***BPA*** ▮▮▮ ***(BRA), interviewed on March 14, 2023. (Exhibit 175)***

On May 24, 2022, BPA ▮▮▮ received a call from WC ▮▮▮ to go toward Ranch Road 334 because of shots being fired. While enroute, BPA ▮▮▮ received a call from SBPA ▮▮▮ redirecting him toward Uvalde because of a need for EMTs. BPA ▮▮▮ received a text

---

[185] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00133




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

message indicating the destination was Robb Elementary School, so he called SBPA ███ for more details and learned there was a shooting at the school.

BPA ███ arrived near the school at approximately **12:30:00 PM** and asked a TXDPS trooper what was going on, but the Trooper did not know. BPA ███ explained he was responding as an EMT, parked in the Hillcrest Memorial Funeral Home parking lot, and ran toward the school. He entered the west entrance and recognized BPA ███, who said they were still figuring out the situation. BPA ███ returned to his vehicle and collected medical supplies, then set up the triage area in the hallway near the restrooms. He moved to the south entrance with another BPA in case children were evacuated somewhere other than where the triage area was, then joined other law enforcement officers in the hallway south of Classrooms 111 and 112.

After the breach, he entered the classroom through the same door as the entry team, picked up a child, brought her to the south entrance, and began CPR. He terminated patient care upon determining the extent of her injuries, then returned to the classroom to assist with other victims. He ended up assisting with the treatment of another child in the triage area of the hallway before determining that child was also deceased. He returned to the classroom and was informed that all the victims in the classroom were already deceased. He exited the building through the west door and assisted with one cycle of CPR on a patient after transporting the patient to an ambulance. He reentered the building one final time to check for signs of life before joining other BPAs near a tree outside the building. There, he informed CPA Owens that several of the BPAs onsite would need Peer Support. He went to UVA, where he heard about a second threat that was quickly dismissed. He then drove to BRA, changed clothes, threw away his bloody clothes, and went home.

BPA ███ stated it did not seem like anyone was in charge of the overall incident, beginning with when he arrived at Robb Elementary School and the TXDPS trooper not knowing what was going on. BPA ███ believed BPA ███ and BPA-P ███ oversaw the medical response inside the school.

***BPA ███ (BRA), interviewed on March 14, 2023. (Exhibit 176)***

On May 24, 2022, BPA ███ was assigned to ranch liaison detail and was having lunch in Brackettville, Texas, with another BPA when BPA ███'s wife texted him that there was an active shooter at Robb Elementary School. BPA ███ drove with the other BPA to BRA and advised SBPA ███ about the possible active shooter and that they were going to respond. He arrived at Robb Elementary School at approximately **12:40:00 PM**, parked, and ran west toward the school. Just as he entered the school through the west door, BPA ███ heard gunshots. Following the gunshots, he encountered a girl who did not appear injured, asked if she was hurt, took her to a school bus, then ran back into the school. He helped another BPA move deceased children from the hallway to Classrooms 131 and 132 until TXDPS told them to clear out of the school due to it being a crime scene.

BPA ███ handed medical supplies to law enforcement officers providing medical care to a teacher, then was told to meet at UVA for a muster. He was at UVA for an hour, then drove



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



back to BRA, where ▮▮▮▮ drove him home. BPA ▮▮▮▮ stated he never knew who was in command of the incident and that USBP's role in a situation such as the Robb Elementary School shooting would be to assist in any way possible. He stated the first person on scene would be the person or agency in charge.

***BPA*** ▮▮▮▮▮▮▮▮▮▮ ***(DRT SOD), interviewed on March 21, 2023. (Exhibit 206)***

On May 24, 2022, BPA ▮▮▮▮ was assigned to the day shift working on Paloma Ranch near Eagle Pass, Texas, when he received a text message notifying him of a shooting in Uvalde. SBPA ▮▮▮ directed BORSTAR agents to respond to Uvalde if they were not waiting for a detainee transport, so BPA ▮▮▮▮ responded using the ATAK map location of Robb Elementary School. He arrived at Robb Elementary School at approximately **12:40:00 PM** and parked two blocks away in the shade for his canine, who was a search and rescue canine, not a patrol canine.

BPA ▮▮▮▮ entered the school through the west entrance and joined the group of law enforcement officers on the left side of the hall preparing to enter a room. When gunfire started during the breach, he dropped to the floor for a moment, then rejoined the other law enforcement officers. After someone said, "all clear," he and the other officers entered Classroom 111. BPA ▮▮▮▮ carried children to the triage area until a law enforcement officer told him to stop removing bodies because they had been declared dead and the room was now a crime scene.

BPA ▮▮▮▮ then exited the classroom and assisted with clearing two classrooms across from Classrooms 111 and 112. He exited the school and met with other BPAs at the tree in front of the school, then was instructed to report to UVA. At UVA, they learned of another threat against other schools and redeployed to Dalton Elementary School, where he assisted with reuniting students with their parents. BPA ▮▮▮▮ returned to UVA for another debrief, then went home.

Prior to arriving at the school, he expected to encounter an active shooter situation but upon arriving, he observed it was very quiet. He did not know who was in charge at the scene, but believed SBPA ▮▮▮▮ was in command of the school hallway and BPA ▮▮▮ was in command of the triage area. BPA ▮▮▮▮ believed USBP had the responsibility to respond and assist.

***BPA*** ▮▮▮▮▮▮ ***(BRA), interviewed on March 22, 2023. (Exhibit 208)***

On May 24, 2022, BPA ▮▮ was assigned to detention and care at BRA. While on his lunch break, he learned about a shooting in Uvalde and was directed to respond because he was an EMT. While departing, he informed another BPA EMT about the shooting and called a third EMT while enroute. He arrived near Robb Elementary School and parked some distance away. Some nearby parents suggested he drive to the other side of the school, so he tried to get closer and finally parked and ran with his medical equipment toward the school. He arrived at the west



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



entrance at **12:46:33 PM**, where he was informed that the scene was still active and was directed to the south entrance.[186]

After the breach, he observed BPA ▮▮▮▮ was injured and stopped to evaluate him. BPA ▮▮▮▮ insisted BPA ▮▮ stop treating him and assist the other victims. BPA ▮▮ approached Classroom 111 and assisted with carrying an adult woman. He yelled to the occupants of Classroom 112 to leave if they were not an EMT, then exited Classroom 112 to help with medical treatment in the hallway. He helped three unknown law enforcement officers move a male teacher onto a backboard and carried the teacher out the east entrance. BPA ▮▮ loaded the teacher into an unoccupied ambulance and rode in the ambulance, holding the teacher to secure him, while an unidentified firefighter drove to the hospital.

When BPA ▮▮ returned to the school, he was denied entry. He met with a group of BPAs near a tree on the north side of the school, where they were instructed to return to UVA. He arrived at UVA, changed his clothes, and had a BPA-T drive his vehicle back to BRA.

Prior to the breach, BPA ▮▮ believed BORTAC oversaw USBP personnel, and it appeared that the other agencies did not seem to care who was in charge. He did not observe an incident command or medical command. He believed it was his duty to act and assist local law enforcement.

***SBPA ▮▮▮▮▮▮ (DRT SOD), interviewed on March 13, 2023. (Exhibit 167)***

On May 24, 2022, SBPA ▮▮▮▮ was Acting Commander for DRT BORSTAR and received a call from SBPA ▮▮▮▮ advising of an active shooter in Uvalde. SBPA ▮▮▮▮ concurred with SBPA ▮▮▮▮'s intention to deploy and directed him to do so. SBPA ▮▮▮▮ advised (A)PAI ▮▮ and others about the report of an active shooter, then gathered his gear and deployed to Uvalde. While enroute, he heard mixed reports of whether the assailant was stopped or not stopped. He arrived at Robb Elementary School at approximately **12:50:00 PM** and was approximately 150 yards away from the school when he heard on the radio that they were breaching. He entered the school grounds and began to help render aid to a female teacher who was carried out. He rallied at a tree with other BPAs for a debrief and was directed to meet at UVA for further debriefing. While at UVA, they learned of another threat, so he responded to a junior high school and provided perimeter security while students were released to their families. He returned to UVA for further debriefing, then went home. SBPA ▮▮▮▮ stated he did not know who had command and control of the scene.

***AEA ▮▮▮▮ (AMO Uvalde), interviewed on March 16, 2023. (Exhibit 186)***

On May 24, 2022, AEA ▮▮▮▮ was at home in Uvalde when his wife received a notification about an active shooter at Robb Elementary School. He grabbed the gear he had at home and went to the office to get his radio, medic kit, and rifle. He drove to the school in a CBP vehicle without lights or sirens. While enroute, he heard on the radio that law enforcement officers were

---

[186] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



making entry and then he heard the "shooter was down." AEA ███ parked down the street because of the traffic, then ran toward the school and asked TXDPS troopers where he was needed. They directed him to the entrance of the school. He arrived at approximately **12:55:00 PM** and was at the front fence when someone handed him a child on a backboard. He helped load the child into an ambulance, then saw BORSTAR EMTs and asked what they needed help with. They told him to just find something to do, so he entered the school through the west entrance, then exited through the south door to get out of the way. He assisted other personnel with a child outside and told everyone there were ambulances by the front of the school. He helped get another child on a gurney and moved to the ambulance.

A TXDPS officer prevented him from getting back into the school, but a UPD officer informed him there were still children inside classrooms, so he followed the UPD officer to the portable classrooms and helped evacuate the children to a collection point on the far east side of the school. He was told help was needed with security at the Civic Center, so he went there. He returned to Robb Elementary School with the UPD officer, then realized he was no longer needed, so he went to the office to drop off his gear and went home between **5:30:00 PM** and **6:00:00 PM**.

AEA ███ initially thought the incident was a bailout. A few minutes after his initial notification, while still at home, ███ received an additional notification, at which time he believed it was a legitimate incident. While at the office, he learned it was a barricaded subject at the school. He stated that it appeared TXDPS was in charge at the Civic Center.

### SBPA ███████ (CBP LESC), interviewed on March 10, 2023. (Exhibit 160)

On May 24, 2022, SBPA ███████ was observing low-light qualifications at DRT as part of an LESC policy review when another BPA told him he heard about a possible bailout in Uvalde. When they heard there were shots fired, they grabbed M4 rifles from the DRT armory and traveled to Uvalde to assist. They attempted to obtain information enroute via handheld radio and text messages and believed they heard gunshots over the radio as they parked.

SBPA ███████ parked at approximately **1:00:00 PM**, ran toward Robb Elementary School, and captured a video of the vehicle congestion using a cell phone. As an EMT, he went to the busiest area he could find, which was the west building, and attempted to enter the school to assist with medical treatment. Although he could see victims being treated by law enforcement officers in the hallway, a TXDPS ranger denied him entry into the west building.

After being turned away by the TXDPS Ranger, he noticed a loaded, unattended CS gas weapon near the entryway and decided to unload it. After unloading it, he noticed an EMT remove a tourniquet on a woman being transported on a gurney and went over to assist the EMT with applying a second tourniquet. Afterward, SBPA ███████ helped transfer a male child from one gurney to another, then noticed BPAs were distraught and began providing comfort and support to them.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He gathered with all BPAs around a tree on the north side of the building, where they were instructed to gather at UVA. At UVA, they learned of an alleged second threat, so he went to the UVA armory to get a rifle, then went to Uvalde High School. He told the school security guard to lock the school and only allow law enforcement officers to enter, then began clearing the school. He exited the school and informed TXDPS that the high school was cleared and that the junior high school still needed to be cleared.

After clearing Flores Elementary School, he returned to Uvalde High School to assist with the reunification of children with their parents, then returned to UVA. Afterward, he returned his rifle to the DRT armory, returned to the Del Rio firing range to pick up his personal gear, and went to his hotel room for the night.

SBPA ████ stated there was conflicting radio traffic at both Robb Elementary School and at the Uvalde High School about the nature and details of the incident. SBPA ████ did not believe anyone was in charge at the scene at Robb Elementary School and there was a lack of command and control throughout the entire situation. He stated USBP has a responsibility to respond to the incident and stop children from dying. He further explained that USBP has authority to use deadly force to prevent the loss of life and it is law enforcement's responsibility to stop the killing and stop the dying.

***BPA*** ████████ ***(DRT SOD), interviewed on March 20, 2023. (Exhibit 195)***

On May 24, 2022, BPA ████ was assigned to administrative functions when he was advised either verbally or via text of a possible active shooter at Robb Elementary School. He traveled to the school in a GOV with lights and sirens activated, arriving at approximately **1:00:00 PM**. He received permission from a resident a couple hundred yards from the school to park in the resident's yard, then gathered his gas mask, M4 rifle, two 30-round magazines, three pistol magazines, ballistic plates, and tactical medical bag, and approached the west entrance door. There, he assisted with treatment of ████████, then walked to the side yard where BORSTAR agents were congregating.

Next, he responded to Uvalde High School upon receiving a message that the girlfriend of the assailant made a threat there. He provided care to a student who was not injured but was emotionally upset and stayed at the high school for a couple hours assisting the principal with the release of the students.

BPA ████ stated the scene at Robb Elementary School was very chaotic, with officers and agents walking both toward and away from the school. He believed USBP's role was to respond and address the assailant. He stated that in active shooter situations, the priority is to stop the killing and stop the dying. He did not know who was in command of the scene or if anyone from USBP was in command and control of its personnel at the scene.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*SBPA* ▮▮▮▮▮ *(USBP Fort Brown Station, Brownsville, Texas), interviewed on March 15, 2023. (Exhibit 181)*

On May 24, 2022, SBPA ▮▮▮ was working at the DRT range providing active shooter training when he heard someone say there was an active shooter situation in Uvalde.  He asked his training partner, SBPA ▮▮▮▮▮, if he wanted to respond; SBPA ▮▮▮▮ said yes, so they grabbed equipment and headed toward Uvalde.  While enroute, SBPA ▮▮▮ explained to SBPA ▮▮ what to expect when arriving at the scene and told SBPA ▮▮ to check in with incident command for direction.  SBPA ▮▮▮ arrived at Robb Elementary School at approximately **1:00:00 PM**, parked a few blocks away, and approached the school on foot.  He observed no incident command, so he approached the west entrance of the school.  He took a few steps into the school and assisted with moving at least one patient to an ambulance.  He attempted to reenter the school but was denied entry by a Texas Ranger, so he talked to and consoled other BPAs outside the school.

SBPA ▮▮▮ gathered with other BPAs around a tree, where they were instructed to go to UVA.  He coordinated with other BPAs to find rides for everyone because some people were not in a condition to drive.  When law enforcement officers from Homeland Security Investigations (HSI) arrived, he told them there was nothing left to do at the school and directed them to the hospital to assist with security.

At UVA, he learned about a possible threat at Uvalde High School and went there with SBPA ▮▮▮▮▮ to assist.  SBPA ▮▮▮ began clearing the school and assisting with the reunification of parents and students at other schools, including Morales Junior High School, Flores Elementary School, and Dalton Elementary School.  He returned to UVA, ate dinner, then drove back to Del Rio.

During the incident, SBPA ▮▮▮ heard talk about hostage negotiation over the radio and thought too much time had passed since the original call about an active shooter.  He observed there was no incident command and he did not know who was in charge of the situation at Robb Elementary School.  SBPA ▮▮▮ observed that no one was yelling commands or seemed like they were in charge.  He stated USBP is not supposed to be the lead agency onsite but will respond.

### CBP PERSONNEL INSIDE ROBB ELEMENTARY SCHOOL OR ASSISTING WITH CLASSROOM EVACUATIONS PRIOR TO BREACH

Dozens of CBP personnel arrived at Robb Elementary School prior to **12:50:00 PM** and entered the west building to address the threat posed by the assailant or assist with evacuating students and teachers from nearby classrooms.  The following is a summary of the interviews provided by these employees:



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**





*BPA* ▮▮▮▮▮▮ *(UVA), interviewed on March 7, 2023. (Exhibit 144)*

On May 24, 2022, BPA ▮▮▮▮ had just completed transporting migrants to Eagle Pass, Texas, when he heard a radio transmission requesting all available agents respond to an active shooter or shots fired at Robb Elementary School. He was already driving, so he activated the emergency lights on his GOV and responded to the school. He parked and ran to the school with two other BPAs, arriving between approximately **11:45:00 AM** and **12:00:00 PM**. They were advised it was a hostage situation and a hostage negotiator was responding. He then entered the school through the west entrance and assisted with evacuating a female teacher and escorted her out of the school.

Outside the school, he assisted with breaking exterior windows to Classroom 105 or 106 to evacuate everyone, then went to the south entrance of the school, where he was informed a TXDPS helicopter was flying too low. He used his handheld radio to request the TXDPS air unit to fly higher. He went outside the west building and broke the exterior windows on the east side of the building to evacuate everyone from that classroom. As he reentered the school through the south entrance, he heard gunshots as law enforcement officers breached the classroom. After the breach, he entered Classroom 111, and after a short time, everyone but EMTs was told to leave. He exited through the south entrance and met with other BPAs at a tree in front of the school, where everyone was instructed to report to UVA. He remained at UVA for 30–45 minutes before being released for the day.

BPA ▮▮▮▮ stated he did not feel anyone had command and control of the incident. He stated there was no rally point or command post, and there was an open mic that disrupted radio communications.

*SBPA* ▮▮▮▮▮▮ *(UVA), interviewed on March 15, 2023. (Exhibit 183)*

On May 24, 2022, SBPA ▮▮▮▮ was conducting use of force training at UVA when he received a phone call that there was an active shooter at Robb Elementary School. He went to the armory and began handing out M4 rifles, magazines, and vehicle keys to the agents who were in the training. He drove to the school with another BPA, dropped off the BPA, then parked near the cafeteria on the east side of the school at approximately **11:50:00 AM**. He jumped the fence because the gate was locked and asked a UCISDPD officer what was going on, but the officer said he didn't know.

SBPA ▮▮▮▮ walked between the two southern-most classroom buildings and moved west at the end of the Classroom 18 building, making sure the classroom doors were locked and the students were safe. He did not know where the assailant was located. SBPA ▮▮▮▮ entered the cafeteria and told the workers there to go to the kitchen until he returned. He observed a teacher and students hiding behind the auditorium curtain and told them to stay there. He returned to the cafeteria and evacuated the workers, children, and teachers east toward Old Carrizo Road, then went outside to the northern two classroom buildings and attempted to clear Classrooms 7–12 but they were already empty. He went to the building containing Classrooms 1–6 and stood at the southwest corner of Classroom 6 to provide security while TXDPS troopers



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



cleared the classrooms. He then went south and entered the east door of the school and took up a position at the T-intersection facing south.

After he heard the breaching gunfire, he assisted with carrying deceased children into Classrooms 131 and 132. He escorted a boy outside the west door and directed him to medical personnel on the sidewalk. SBPA ███ assisted with carrying deceased children and then exited the building upon an announcement from a Texas Ranger that the building was a crime scene.

SBPA ███ met with other USBP personnel at a large tree at the north end of the school. He returned to his vehicle, where he swapped vehicles with (A)PAIC ███ because (A)PAIC ███'s vehicle was blocked by other vehicles. SBPA ███ d (A)PAIC ███'s vehicle to the Civic Center, stayed there for about an hour, then swapped vehicles with (A)PAIC ███ again. Upon hearing of a possible second threat, SBPA ███ stayed at the Civic Center and instructed the people outside to move inside for safety. He then returned to UVA.

SBPA ███ believed UCISDPD Chief Arredondo was the overall incident commander and thought he was possibly negotiating with the assailant. SBPA ███ believed USBP was going to secure the perimeter around the school and assist local law enforcement officers.

***BPA*** ███████ ***(UVA), interviewed on March 6, 2023. (Exhibit 135)***

On May 24, 2022, BPA ███ was assigned as a Vehicle Maintenance Officer at UVA and was completing his duties in the GOV parking lot when he saw BPAs running toward vehicles. One of the BPAs informed him there was an active shooter at Robb Elementary School. BPA ███ volunteered to accompany SBPA ███ and returned to the office to get his vest, extra magazines, and handheld radio before departing UVA with SBPA ███. They arrived at the back side of the school near the playground at approximately **11:50:00 AM** as the third unit to arrive on scene. BPA ███ told parents approaching from surrounding homes to stay back, then learned the threat was on the other side of the school. The other BPAs went to that side while BPA ███ stayed on the south side of the school, followed the sidewalk to the southwest corner of Classroom 23, and took cover.

BPA ███ helped get the attention of a teacher in Classroom 23 by giving his USBP ballcap to another BPA to wave in the window to identify themselves. When the teacher opened the door, the BPAs directed the children to the playground and evacuated Classrooms 19–23. It took some extra time to convince some children who locked themselves in interior restrooms to come out. BPA ███ then held his position and listened to the patched radio communications until he heard an announcement about the breach over the radio and gunfire.

Following the breach of Classrooms 111 and 112, BPA ███ entered the building from the south entrance to see how he could assist. He had difficulty walking because there was so much blood in the hallway it caused him to slip and slide. By the time he made it to the classrooms, many of the victims had already been brought out. Seeing BPAs emotionally distraught, he began to focus on consoling them until he was ordered to meet at a tree near the front of the




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

school. Following this meeting, he was told to muster at UVA. After the muster, he went to his office with other BPAs and listened for updates, then departed UVA with other BPAs in his carpool group.

Before the breach, BPA ▓▓▓▓ kept thinking about what was taking so long. He stated that whichever agency is first on scene is in charge and his role was to provide backup. He explained that USBP's role would have been to take down the active shooter, but they did not because they were not the first on scene. He believed the local law enforcement officers were first on scene and were therefore in command and control. BPA ▓▓▓▓ observed a shift in command when BORTAC arrived. He believed USBP's authority to respond was related to the oath and a responsibility to help whoever needs help.

*BPA* ▓▓▓▓▓▓▓ *(UVA), interviewed on March 3, 2023. (Exhibit 131)*

On May 24, 2022, BPA ▓▓▓▓ was assigned to the evening shift but went early to work on paperwork. He was working near the station dispatch room and overheard a radio transmission in which someone stated shots were fired. He went into the dispatch room to gather information, then went to the station armory, checked out a rifle, and drove to Robb Elementary School with another BPA, arriving at approximately **11:50:00 AM**. As they approached the school, they witnessed numerous law enforcement agencies, including TXDPS, UPD, and UCSO. BPA ▓▓▓▓ entered the school via the west entrance and noticed no one seemed to be in charge of the situation. An unknown law enforcement officer told BPA ▓▓▓▓ that all the classrooms were locked, and keys were needed. BPA ▓▓▓▓ checked the doors to Classrooms 131 and 132 and verified they were locked.

While waiting for keys to arrive, BPA ▓▓▓▓ assisted several BPAs with evacuating children from Classrooms 102–106. At some point near the times the classrooms were being evacuated, BPA ▓▓▓▓ recalled hearing four gunshots. Following the gunshots, he moved to the east side of the building to evacuate Classrooms 108–110. After the classrooms were empty, he waited near the south entrance of the building until he heard multiple gunshots. He entered the school through the south entrance, proceeded to Classroom 111, saw the deceased assailant, and was instructed to leave because it was a crime scene. He exited through the west entrance and provided security in the field next to the school to establish a helicopter landing zone. He attended a muster near the front of the school, where all BPAs were instructed to report back to UVA. BPA ▓▓▓▓ stated the scene at the school when he arrived was quiet and no one appeared to be in charge.

*BPA* ▓▓▓▓▓▓▓ *(DRT), interviewed on March 8, 2023. (Exhibit 150)*

On May 24, 2022, BPA ▓▓▓▓ was on duty near an area called 19-Mile Crossing when he heard over the radio, "active shooter, Robb Elementary." He drove to Robb Elementary School and parked in front of the funeral home at approximately **11:50:00 AM**, then went to the west door of the west building, near Classroom 132. While there, he observed that the gate through which he had entered was the only unlocked gate, so he decided to open the vehicle gate on the north side of the school for first responders. He discovered it was locked and he was

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00142



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



unsuccessful in breaking it open.  Someone produced bolt cutters and he then opened the gate.
He went back toward the west hallway, gaining access through a pedestrian gate with the keys he
had been given (which did not work on the vehicle gate) and returned to the west building.
There, he assisted with the evacuation of students and faculty through the windows of
Classrooms 102–106.  He took a student with blood on their clothes to an ambulance, then
returned to the west hallway and gathered medical supplies and brought them to the triage area.
He began staging ambulances along Geraldine Street and provided the keys he had to SBPA
███████, although they were not the correct master key.

After the breach, BPA ███████ gathered with other BPAs near a tree on the north side of the
school, where they were instructed to return to UVA.  He returned to UVA and provided Peer
Support to other BPAs, then returned home.

Upon receiving the initial call, BPA ███████ assumed the incident was a failure to yield that
caused the school to go into lockdown.  He assumed UCSO Chief Deputy ███████ was in
command of the scene based on him wearing a dress shirt and tie and walking around talking on
a cell phone and radio.  BPA ███████ stated that the hallway was chaos, but BORSTAR and
BPA EMTs took charge of the triage area.

***BPA*** ███████ ***(UVA), interviewed on February 10, 2023. (Exhibit 57)***

On May 24, 2022, BPA ███ was in training at the Uvalde Border Patrol Station.  During a break
in training, he heard the UPD request assistance over the radio.  BPA ███ checked out a rifle
from the UVA armory and drove to Robb Elementary School with BPA ███████ (UVA).
They parked on the northeast side on Geraldine Street, approximately 50–60 yards from the
school and approached the school from the north at approximately **11:50:00 AM**.  As BPA ███
came around to the west side of the building, he observed law enforcement officers helping
children out of the classroom windows.  BPA ███ noticed there was no information being
provided to law enforcement officers regarding the assailant, so he provided cover for the
evacuation of the children.  Afterward, BPA ███ went to the southeast corner of the school and
remained there to cover the perimeter.  At one point during the incident, BPA ███ assisted an
injured teacher to an area where children were running.

OPR re-interviewed BPA ███ on **March 23, 2023**, after learning that he had entered Robb
Elementary School.  BPA ███ entered the school through the south entrance after law
enforcement officers confronted and killed the assailant.  He entered a dark classroom and
assisted another BPA with carrying a child victim to the medical triage area, then rendezvoused
with other agents at a tree and received instruction to report to UVA for a debrief.  BPA ███
indicated he knew he was responding to a shooter at a school when he first learned of the
incident but was unaware there were children in the classroom with the assailant until after he
entered the classroom following the assailant's final confrontation with law enforcement.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ████████████ *(UVA), interviewed on March 21, 2023. (Exhibit 140)*

On May 24, 2022, BPA ████████ was working at UVA as a canine handler performing checkpoint duties and when he learned of a possible active shooter at Robb Elementary School via an announcement over the USBP radio that there were shots fired at the school. BPA ████████ responded to the school, along with another USBP canine handler assigned to the checkpoint. They drove in a USBP vehicle and parked near the funeral home at approximately **11:50:00 AM**. An unidentified civilian pointed him to the assailant's wrecked vehicle, which BPA ████████ approached and took photos of, then remained at the vehicle providing scene security until relieved by BPA ████.

BPA ████████ then ran toward the school to aid with evacuating children and directed the children toward officers down the street. He moved to the other side of the school and assisted other BPAs with evacuating children. Following the classroom breach, BPA ████████ entered the school through the south entrance, where he assisted BPA ████████ out of the school and to an EMT for medical assistance. He reentered the school and went into Classroom 112 but left after being told that only EMTs were permitted in the room.

BPA ████████ gathered with other BPAs near a tree at the front of the school and received instructions to report to UVA. Upon arriving at UVA, he received information about another potential threat, so he responded to the Uvalde Theater of Arts School and provided security for several hours.

BPA ████████ could not determine who was in command and control of the situation. During the incident, he wondered why it was taking so long for someone to enter the classroom and take out the assailant. He described the scene inside Classroom 112 after the breach as chaos.

*BPA* ████████████ *(UVA), interviewed on March 20, 2023. (Exhibit 200)*

On May 24, 2022, BPA ████████ was a firearms instructor at UVA. When he returned to UVA from the range, SBPA ████████ informed him that there was a person with a gun at a school. BPA ████████ went to the armory and obtained a weapon, then drove with another BPA in an unmarked USBP firearms truck to Robb Elementary School. He parked near the intersection of Old Carrizo Road and Geraldine Street and met with other BPAs, then followed other law enforcement officers toward the west entrance of west building.

He entered the building at **11:51:15 AM** and approached the group of law enforcement officers facing the south hallway. He offered to relieve them because he knew their shoulders would be fatigued from holding their rifles.[187] He asked if Classroom 131 had been cleared and did not receive a response, so he and two other BPAs entered that classroom and found a teacher hiding under a table and escorted the teacher from the classroom. BPA ████████ also inquired about the adjacent classroom where another teacher was hiding.

---

[187] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00144



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



After the two classrooms were cleared, BPA ▮▮▮▮ relieved law enforcement officers in the group facing south, then saw another group of law enforcement officers in the south end of the hallway. BPA ▮▮▮▮ then heard three gunshots and moved down the hallway toward the gunshots with other law enforcement officers. The group stopped when officers realized they had no way to enter the locked classroom. BPA ▮▮▮▮ remained near the classroom door, ready to enter, while other officers discussed how to gain entry.

After SBPA ▮▮▮▮ opened the door to Classroom 111, gunfire erupted. Following the gunfire, BPA ▮▮▮▮ entered Classroom 111 and began taking victims to the triage area at the north end of the hallway. He checked on the assailant, then a law enforcement officer came into the classroom, declared the area a crime scene, and instructed everyone to leave. BPA ▮▮▮▮ exited the classroom and cleared other classrooms in the building. Afterward, he met some other BPAs and gathered at a tree near the front of the school, where they were instructed to report to UVA for a muster. At UVA, he changed clothes and then left for the day at approximately **4:00:00 PM**.

BPA ▮▮▮▮ observed there was talk at the onset of the incident that it was related to a bailout or pursuit. After arriving at Robb Elementary School, while standing in the school hallway, he heard someone call out, "barricaded suspect." BPA ▮▮▮▮ thought it was a teacher workday but later saw children at the school and realized it was not. He believed the incident changed from a barricaded subject to an active shooter when he heard the three shots near the time of his arrival. BPA ▮▮▮▮ did not know anyone who was in charge at the school and did not know who was in command and control of USBP. He stated USBP's role was to supplement where needed and identified that local law enforcement agencies had authority over the situation. BPA ▮▮▮▮ believed USBP's authority to respond is their sworn duty to safeguard lives.

***BPA ▮▮▮▮▮▮ (UVA), interviewed on March 17, 2023. (Exhibit 191)***

On May 24, 2022, BPA ▮▮▮▮ was assigned to the UVA Planning Team. As he was preparing his lunch, he heard a call broadcast over the radio regarding an active shooter at Robb Elementary School. Immediately upon hearing the radio transmission, he ran to the armory, grabbed an M4 rifle and several magazines, and asked another BPA if he could ride with him. He called UVA while enroute to get clarification on the school and the location. He loaded both rifles while the other BPA drove. They approached a stop sign near the school, parked in the middle of the road, and ran toward the school with other BPAs.

They entered the building through the west entrance at **11:51:15 AM** and asked law enforcement officers in the hallway if they knew which classroom the assailant was in and if they had cleared the classroom but did not get a response.[188] BPA ▮▮▮▮ told BPA ▮▮▮▮ to get a vest and a long arm. When BPA ▮▮▮▮ returned without a vest, BPA ▮▮▮▮ told him he couldn't be there without a vest.

---

[188] Video footage captured by static camera located in Robb Elementary School, May 24, 2022.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA ▮▮▮▮▮ inquired about clearing the classrooms, but no one answered. After SBPA ▮▮▮▮▮ arrived, the law enforcement officers in the hall discussed using gas. Then a report of a 911 call came through about a girl inside the classroom stating there were multiple injuries and deceased children inside the classroom. At around the same time, they suddenly heard three or four shots. As the law enforcement officers moved toward the classroom, someone from the rear called out and stopped them. The law enforcement officers formed two lines and BPA ▮▮▮▮▮ told SBPA ▮▮▮▮▮ he heard they needed keys to open the doors. An unknown law enforcement officer brought keys that didn't work, so BPA ▮▮▮▮▮ hung them on a doorknob.

When they finally opened the door, BPA ▮▮▮▮▮ lined up second in the line of law enforcement officers that planned to enter Classroom 111. Upon hearing shots, he dropped to the ground with his rifle. Following the breach, BPA ▮▮▮▮▮ entered Classroom 111 but was overcome with emotion and exited the building. Afterward, he met with USBP personnel under a tree and was told to go back to UVA.

Initially, BPA ▮▮▮▮▮ thought the incident was probably related to a bailout and would be quickly resolved. While running toward the school, he realized it was not related to a bailout. BPA ▮▮▮▮▮ informed him it was a barricaded subject situation. BPA ▮▮▮▮▮ believed Constable Field had command and control inside the school. While in the school, BPA ▮▮▮▮▮ did not know about the large presence of law enforcement officers outside the school. He stated it was hard to get information from the local law enforcement officers but was confident in SBPA ▮▮▮▮▮'s ability to take over when SBPA ▮▮▮▮▮ arrived. BPA ▮▮▮▮▮ observed that some information could not get through the radio because of a "hot mic." He understood USBP fell into a support role because they were not the first agency to arrive at Robb Elementary School.

***BPA ▮▮▮▮▮ (UVA), interviewed on March 2, 2023. (Exhibit 120)***

On May 24, 2022, BPA ▮▮▮▮▮ was at UVA assigned to local patrol when radio traffic indicated that other law enforcement agencies were driving through town with their emergency lights and sirens activated. Radio traffic also indicated there was an active shooter at Robb Elementary School. BPA ▮▮▮▮▮ began making his way toward the center of Uvalde. While enroute, he received the address of the school via radio. He parked his GOV on the side of the road near the cafeteria at approximately **12:00:00 PM** and approached the school on foot using other vehicles as cover. He asked a TXDPS trooper what was going on and the trooper stated she had also just arrived and was waiting for additional information. A law enforcement officer near Classroom 13 waved and beckoned BPA ▮▮▮▮▮ and provided information about shots fired at the school.

BPA ▮▮▮▮▮ remained in the vicinity of Classroom 13 until two Sheriff's deputies arrived, then went with them to the southwest corner of Classroom 18. He opened the unlocked door to Classroom 18 and instructed the students and teacher to remain in the classroom. He informed the Sheriff's deputies there were people inside the classroom and provided a quick brief to two USBP SOD agents and other law enforcement officers as they arrived. BPA ▮▮▮▮▮ said the

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



classrooms needed to be evacuated, and he provided cover near the west building until after the breach.

After the breach, he was tasked with finding a blanket to cover a deceased child, then went inside the building and walked to Classrooms 111 and 112 before someone shouted for everyone who was not working on someone to get out of the building. He exited via the south entrance and went to the adjacent open field and set up a perimeter large enough to land two to three helicopters. He received instructions to meet at a tree in front of the school, where the BPAs were instructed to meet at UVA for a debrief and accountability.

While enroute to UVA, he heard about the need for buses to evacuate people. He stopped and spoke with a bus driver and escorted the bus driver to the funeral home adjacent to Robb Elementary School, where police officers told him to leave the area as he no longer needed to be there. He went to UVA, attended the debrief, returned his GOV keys, and was released for the day. He heard a request for assistance at schools regarding as second threat, so he followed USBP units in his POV and reported to the Uvalde Dual Language Academy, where he assisted with the release of students to their parents. Then he drove home and continued listening to the service radio in case additional assistance was needed.

BPA ▮▮▮▮ stated that he never heard anything about a plan of action, and no one appeared to be in charge on the south side entrance of the west building. He observed a lot of people standing around waiting for something and believed the overall agency in command was the Uvalde Police Department, even after other agencies arrived. BPA ▮▮▮▮ observed BPAs on their own actively looking for work and attempting to find ways to help. He believed USBP's role was to eliminate the threat of harm to others due to the active shooter and provide support. He stated he had a responsibility to protect the public once an oath was sworn.

***BPA ▮▮▮▮▮▮ (UVA), interviewed on March 20, 2023. (Exhibit 193)***

On May 24, 2022, BPA ▮▮▮▮ was at UVA on day shift and transport duties when he heard over the UVA radio there was a possible active shooter at Robb Elementary School. He drove to Robb Elementary School using emergency lights and sirens and parked near the Hillcrest Memorial Funeral Home at approximately **12:10:00 PM**. He put on his ballistic vest and walked toward the school. As he neared the school, he told a male in a group of civilians that law enforcement would take care of the situation and that the civilian should not enter the school.

BPA ▮▮▮▮ entered through the west entrance and told a UPD officer he was there to assist in any manner and would go with them if they decided to enter the classroom. The UPD officer told BPA ▮▮▮▮ a BORTAC team would arrive within 30 minutes. Hearing gunfire at **12:21:00 PM**, BPA ▮▮▮▮ recalled seeing a group of law enforcement officers line up and move down the hallway toward Classrooms 111 and 112, but they did not go in. He was not sure why the line of officers stopped. Following the gunfire, BPA ▮▮▮▮ received a set of keys from an unknown individual and used them to open Classrooms 131 and 132, then gave the keys to another officer, who left with them via the west entrance. BPA ▮▮▮▮ stated he saw several members of BORTAC arrive at the school and eventually enter Classroom 111.






**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

After the breach, BPA ▮▮▮ removed children from under desks and passed them to other BPAs in the room. He assisted with providing medical aid at the T-intersection by getting medical supplies for BPA ▮▮▮▮. BPA ▮▮▮ gathered with other BPAs by a tree in front of the school and was instructed to report to UVA. At UVA, he received a clean uniform because his was covered in blood.

BPA ▮▮▮ stated the scene at the school was chaotic and no one was in charge. He was not aware of any children being in any of the school classrooms and thought the assailant killed himself upon hearing three shots fired from the classroom around **12:21:00 PM**. He observed that once BORTAC arrived, they appeared to be in charge of the scene.

### SBPA ▮▮▮ (UVA), interviewed on March 7, 2023. (Exhibit 143)

On May 24, 2022, SBPA ▮ heard radio transmissions regarding a shooting at Robb Elementary School from BPA-I ▮▮▮. SBPA ▮ retrieved a rifle from the UVA armory and drove a GOV to Robb Elementary School, arriving at approximately **12:15:00 PM**. As he was running toward the school, another law enforcement officer told him there was a guy pinned in a room and they were negotiating with him. SBPA ▮ entered the school through the south door between Classrooms 102 and 108 and helped evacuate students. He exited through the south door and went to the grassy area on the east side of the classrooms to make sure no one was there to prevent a crossfire situation during the breach.

Following the breach, he reentered the school after BPA ▮▮▮ exited. SBPA ▮ went toward Classrooms 111 and 112 and helped move three deceased children into Classroom 132. He exited through the east side door and helped other law enforcement officers clear the library, then attended the muster near the tree at the school. He went to UVA and attended the muster there and helped compile a list of all USBP personnel from UVA who were at Robb Elementary School. He left UVA to go home around **8:00:00 PM**.

Upon his initial notification about the incident, SBPA ▮ thought it was only a threat of a shooting, not an actual shooter. Upon arriving at the school, he believed it was a barricaded subject because there were no gunshots and no information about children in classrooms. He did not know who was in charge or in command when he first arrived. After entering the south end of the school, he believed UCISDPD Chief Arredondo was in command because UCISDPD Chief Arredondo was giving directions to fellow law enforcement officers in the south end of the hallway. SBPA ▮ stated USBP's role would be as support if an incident did not have anything to do with drugs or immigration, and he believed USBP would have an obligation to respond because it was a shooting.

### BPA ▮▮▮ (CAR), interviewed on March 7, 2023. (Exhibit 142)

On May 24, 2022, BPA ▮▮▮ was off duty in Uvalde. While on his way home from working out at an Uvalde area track, he saw a TXDPS vehicle with lights and sirens driving fast through town. He followed the TXDPS vehicle, saw a vehicle in a ditch near Robb Elementary School, assumed it was a traffic-related crash, and proceeded home. While enroute, ▮▮▮, who is ▮▮



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



███████████████, received a call to come to work at the hospital immediately due to a shooting.

At home, BPA ████ gathered his duty belt, firearm, and ballistic vest, and self-deployed to the scene of the accident, arriving at approximately **12:20:00 PM**.  He notified an SBPA at CAR that he was on scene at the school, then proceeded to the north side of the school where a police officer informed him that there was a barricaded shooter.  BPA ████ received a call from WC ████, who informed him that BORTAC was on scene and not to get involved.  BPA ████ saw a TXDPS trooper checking Classrooms 15 and 16 and assisted the trooper in evacuating the children and directing them to the east parking lot.

After the breach, BPA ████ moved to the south side of the west building and entered Classroom 112, where he picked up a girl who he then determined was deceased and placed her back on the ground.  He saw a boy sit up and did not observe any injuries on him, so he directed the boy toward the officers down the hallway.  He helped another officer carry a deceased girl out of the classroom, then was requested to assist in clearing the rest of the building (Classrooms 108–110).

He exited through the south door and met with other USBP personnel at a tree on the north side of the building, where they were instructed to report to UVA for a briefing.  At UVA, he was deployed to the hospital to provide security, but upon arrival he observed several other BPAs already there.  After recognizing there were enough personnel at the hospital, he was directed to deploy to the Civic Center.  After his time at the Civic Center, another BPA drove him back to UVA to retrieve his vehicle, then he returned home.

BPA ████ was unable to identify whether anyone was in command and control while he was at Robb Elementary School.  He stated USBP had a responsibility to respond and assist as needed.

### *SOS* ████████ *(UVA), interviewed on March 1, 2023. (Exhibit 110)*

On May 24, 2022, SOS ████ was driving to the USBP Uvalde checkpoint when he heard radio traffic about a vehicle crash, which he assumed was related to a bailout.  He received a call from CBP OPR ASAC ████ asking if the watch commander was on the ground.  SOS ████ called the watch commander and learned there was a shooting at Robb Elementary School.  He then drove to UVA, grabbed a bag with magazines and ammunition, and headed to Robb Elementary School.  He parked on South Grove Street to avoid blocking the road for emergency vehicles and proceeded toward the school on foot at approximately **12:25:00 PM**.  He ran toward the school, where he briefly encountered (A)PAIC ████, but then turned his attention toward someone who was escorting a woman and yelling for a medic.

SOS ████ called for an EMT from the area where EMS were parked.  He guided children running away from the building toward the northwest corner of the school grounds and made his way to the south side of the school building, where he interacted briefly with Constable Zamora.  He entered the building through the south door after hearing gunshots and made his way toward Classrooms 111 and 112.  After the breach, he directed two girls to the triage area and attempted



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



to enter Classroom 112 to help pull children out but heard someone say only medics were allowed in. He returned to the south entrance and received rifles from other BPAs who were bringing out an injured child. All USBP personnel were directed to regroup on the north side of the school, then everyone not actively engaged at the school was directed to report to UVA.

At UVA, SOS ████ worked on logistical matters such as obtaining clean uniforms for agents. He received a call about another possible shooter at the Uvalde High School, so he reported to the high school and assisted with traffic and perimeter security for approximately one hour. He then returned to UVA and went home.

SOS ████ believed Constable Zamora was in charge of the south entrance of the school because Constable Zamora was communicating directly with UCISDPD Chief Arredondo. SOS ████ believed UCISDPD Chief Arredondo had overarching command of the incident because he heard UCISDPD Chief Arredondo attempting to communicate with the assailant. SOS ████ believed the situation was a barricaded subject because that is what Constable Zamora told him and because Chief Arredondo was attempting to communicate with the assailant. SOS ████ did not believe anyone from USBP was in charge or in command at Robb Elementary School and stated that USBP's role was to provide support to local law enforcement agencies. He was not aware of any legal authority to respond to an active shooter situation, but stated an agent responds when assistance is needed, and that law enforcement backs each other up.

***BPA*** ████████████████ ***(CAR), interviewed on March 13, 2023. (Exhibit 172)***

On May 24, 2022, a neighbor, who was a Texas Parks and Wildlife (TPWD) Game Warden, arrived at BPA ████████'s house to request BPA ████████'s wife to watch the Game Warden's children while the warden responded to a shooting at Robb Elementary School. The warden requested BPA ████████ respond with him. BPA ████████ drove to the school in his unmarked USBP K9 truck, following the Game Warden, with lights and sirens activated. He parked some distance away and ran toward the school, arriving at approximately **12:30:00 PM**. He observed people already lined up across from the school and a BPA directing traffic. The TPWD Game Warden led him toward the school where other law enforcement personnel were staged.

BPA ████████ assisted with breaking windows from outside of the west building and pulling children from classrooms. He entered the building via the west entrance and joined the law enforcement officers staged in the north end of the hallway. There was a lot of discussion, a period of time of waiting around, more discussion, and then someone arrived with keys, but they were the wrong ones. The correct keys arrived, but UCISDPD Chief Arredondo and TXDPS Ranger ████████ wanted the group to wait. BPA ████████ heard two separate occasions of gunshots from inside the classroom.

The group of law enforcement officers formed two teams with BPA ████████ on the north side of the classroom doors. The other team entered the classroom and there was a "massive" exchange of gunfire, upwards of 60–80 rounds. The team was instructed to wait to enter, then there was a call for everyone to come into the classroom. BPA ████████ assisted a male teacher



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



from the classroom to the triage area. He yelled at law enforcement officers who were standing in the hallway in a state of shock and instructed them to assist. BPA ▬▬▬▬ assisted with carrying a female teacher outside because the triage area in the hallway was full. He assisted with carrying out a deceased child, then returned to the classroom and was informed everyone had to leave the classroom, so he left.

Next, he was requested to assist with clearing adjacent classrooms and the rest of the building. When the remaining classrooms were clear, he exited the building and was requested to secure the south entrance but was relieved from that after less than a minute. BPA ▬▬▬▬ assisted with comforting a TPWD Game Warden and confirmed that they were both part of the group of law enforcement officers who entered the classrooms. Then BPA ▬▬▬▬ was instructed to report to the front of the school where there was a debrief and the BPAs were instructed to meet at UVA. He met with two BPAs and the Game Warden to make sure they were okay before departing. BPA ▬▬▬▬ went home to change clothes, then reported to UVA, then went home again. He received a call from a Game Warden that there was a threat of another shooter and offered to respond.

BPA ▬▬▬▬ was informed multiple times that the situation was that of a barricaded shooter. He believed USCISDPD Chief Arredondo was in command and control with assistance from TXDPS Ranger ▬▬▬▬. BPA ▬▬▬▬ did not see anything like a traditional incident command set up. He believed USBP had authority and a duty to respond to preserve life and prevent immediate loss of life.

### BPA ▬▬▬▬ (UVA), interviewed on March 14, 2023. (Exhibit 177)

On May 24, 2022, BPA ▬▬▬ was working at the ▬▬▬▬▬▬▬ conducting maintenance on cameras when a call came over the radio requesting all available agents to respond to Robb Elementary School for shots fired. BPA ▬▬▬ departed the ranch and headed toward Uvalde in his GOV. He parked on the west side of the school at approximately **12:30:00 PM**, near a truck that was in a concrete ditch, put on his body armor, and asked another BPA what was going on. He approached the school, where UPD Officer ▬▬▬▬▬ told him they needed to keep people back because ambulances were headed to the school.

BPA ▬▬▬ turned and directed the crowd to stay back and make a path for ambulances. He observed BORTAC arrive on scene and a short time later, people began coming out of the school carrying injured children. BPA ▬▬▬ ran over and asked how he could help. He entered the school, but realized he was in the way and exited. He handed out bottles of water to BPAs and other law enforcement officers. The BPAs then backed off from the scene and rallied around a tree, where they received instruction to report to UVA for further debriefing. BPA ▬▬▬ returned to UVA and observed agents with blood on their uniforms. A call came over the radio that there was a threat made against Uvalde High School, but BPA ▬▬▬ had already turned in his GOV, so he prepared to travel home in a commuter van with other BPAs. BPA ▬▬▬ did not know who had command of the scene at Robb Elementary School.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**





*BPA* ▮▮▮▮▮ *(BRA), interviewed on March 10, 2023. (Exhibit 162)*

On May 24, 2022, BPA ▮▮▮▮ was on duty in a GOV working as a ranch liaison with another BPA when he received a text from ▮▮▮▮ asking if he had heard anything about a shooting at Robb Elementary School. Initially he believed the incident was a failure to yield. The BPAs returned to BRA to determine what had happened. There, SBPA ▮▮▮▮▮▮ said that EMTs were needed at Robb Elementary School. BPA ▮▮▮▮ and the other BPA went to Robb Elementary School. They parked near South Park Street and Geraldine Street and walked to the funeral home across the street from the school, arriving at approximately **12:40:00 PM**. There, they were informed that law enforcement officers were about to enter the classroom.

BPA ▮▮▮▮ entered through the west side of the school and as he entered, he immediately heard gunshots from the breach. He helped evacuate children and move deceased children to clear the area for law enforcement officers to move around in the hallway. He walked down the hallway to determine if ▮▮▮▮ was still in his classroom and was informed that everyone had to leave the building because the area was a crime scene. He exited through the west entrance and began conducting crowd and traffic control outside Robb Elementary School. He attended a muster of all BPAs by the north end of the school, then took ▮▮▮▮ to Walgreens and took another student home. BPA ▮▮▮▮ then drove to UVA before returning to BRA. He indicated he had a responsibility to respond as part of his official duties.

*BPA-I* ▮▮▮▮▮▮▮ *(DRT), interviewed on March 15, 2023. (Exhibit 194)*

On May 24, 2022, BPA-I ▮▮▮▮ was assigned to the midnight shift at DRT. He woke up at home to approximately 20 missed calls and texts from ▮▮▮▮ indicating there had been shots fired at Robb Elementary School. He turned on his service radio and government cell phone and sent a text from his personal cell phone to SBPA ▮▮▮▮▮▮ inquiring about the situation and offering assistance. SBPA ▮▮▮▮▮ responded that BPA-I ▮▮▮▮ could report to the Civic Center to assist. BPA-I ▮▮▮▮ decided to respond to Robb Elementary School. He put on his government-issued body armor and responded in his personal vehicle. He heard a radio report of a 911 call coming from inside a classroom. He arrived near the school at approximately **12:50:00 PM** and proceeded on foot to the funeral home and attempted to assist where he could.

A few minutes later, he observed law enforcement officers flooding out of the west hallway of the school with victims, so he proceeded there to provide assistance. He entered the west hallway and went to help an agent in the triage area, but another medic arrived so he went to assist other law enforcement officers in clearing the rest of the building. He was instructed to exit the building after it had been declared a crime scene, so he exited and went to the large tree on the north side of the school where all BPAs were instructed to meet. There, they were instructed to report to UVA.

After arriving at UVA, BPA-I ▮▮▮▮ heard a report of a possible threat at another school in the area, so he responded to Dalton Elementary School where ▮▮▮▮ was a student. He assisted in providing security there until **6:00:00 PM**, then retrieved ▮▮▮▮ and went home. BPA-I ▮▮▮▮

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



stated the radio traffic was chaos and he was unable to determine who, if anyone, was in command of the incident. He stated it was his responsibility as a federal agent to respond.

### CBP PERSONNEL ON PERIMETER OF ROBB ELEMENTARY SCHOOL PRIOR TO BREACH

Other CBP personnel arrived at Robb Elementary School prior to 12:50:00 PM but remained outside the west building. The following is a summary of the interviews provided by these employees:

### BPA ████████████ (UVA), interviewed on March 6, 2023. (Exhibit 138)

On May 24, 2022, BPA ██████ was assigned to the Uvalde checkpoint and heard over the radio that there was an active shooter at Robb Elementary School. He and his partner immediately grabbed their equipment and headed to their vehicles. BPA ██████ called SBPA ████████████ from his vehicle and informed him that he should probably have his tactical unit respond to the school. BPA ██████ drove to the school and parked near the cafeteria building at approximately **11:50:00 AM**. He asked a civilian in the area if they could find bolt cutters to get through the locked gate at the entrance to the school. The civilian returned with bolt cutters and BPA ████ used them to gain access to the school through the gate.

He went to the southwest corridor of the building with Classrooms 19–23, where he received a call informing him to relocate because the assailant was believed to be in a classroom with windows facing his location. He relocated to Classroom 23 and held up a USBP hat at the classroom window so the students and teachers would know he was law enforcement and open the locked doors. He evacuated students from Classrooms 19–23 and directed them out through the gate where he had entered. After law enforcement officers began exiting the south hallway of the building where the assailant was located, he covered a deceased child with a blanket. A BORSTAR agent asked him to take the BORSTAR agent's M4 rifle so the BORSTAR agent could assist with medical aid. BPA ██████ returned the rifle to other SOD members during the muster near the tree prior to departing the school for UVA.

BPA ██████ stated the response was a mess with a lack of coordination. He did not know who, if anyone, was in command and did not hear any radio traffic indicating who was in command.

### BPA ████████████ (CAR), interviewed on March 7, 2023. (Exhibit 141)

On May 24, 2022, BPA ██████ was off duty at ████████████ when he received text messages from ██████, who was ██████ at Robb Elementary School. BPA ██████ left the barber shop with the barber, who provided BPA ██████ with a personally owned shotgun. They parked in an alley off Geraldine Street at approximately **11:50:00 AM** and ran toward the school. He did not have any assigned work gear or a radio but found a USBP plate carrier with plates on the ground, put the plates in the vest, and put on the vest. He walked toward the west entrance of the school, where he encountered the owner of the vest, so he removed it. He received a text message from ██████ that she was out of the school, so he began to search for ██████. He

AR00153



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



encountered two UPD officers and cleared Classrooms 19–23 with them, finding ▆▆▆▆▆ in Classroom 21. He began clearing Classrooms 13–18 and guided children and teachers toward the sidewalk. He asked another BPA for a ride to his vehicle, then walked to the funeral home to see if anyone needed assistance. He drove the barber to the Civic Center to look for the barber's son, then went back to Robb Elementary School.

BPA ▆▆▆▆▆ stated he did not know who was in command or control. He took direction from UPD officers in helping to clear classrooms. He was not sure of USBP's authority, but stated BPAs always respond to these types of events.

***BPA*** ▆▆▆▆▆ ***(UVA), interviewed on March 21, 2023. (Exhibit 203)***

On May 24, 2022, BPA ▆▆▆ was assigned to the USBP Uvalde Checkpoint and heard BPA-I ▆▆▆▆▆ relay via the service radio that UPD was responding to an individual with a gun near Robb Elementary School. BPA ▆▆▆ self-deployed to Robb Elementary School from the checkpoint, along with other BPAs, arriving at approximately **11:50:00 AM**. He took pictures of a truck in a culvert with a rifle and duffle bag nearby, then stayed with the truck to secure that scene.

He received information from a civilian on the appearance of the assailant and relayed the information via radio. He requested a detective to his location, but no one responded, so he obtained the civilian's information and provided it to TXDPS Rangers. BPA ▆▆▆ remained with the abandoned vehicle for the duration of the incident and fielded questions from civilians until TXDPS relieved him. Once relieved, he received instruction to go to UVA.

While at UVA, he heard of a possible second threat at Uvalde High School. He informed other BPAs of the second threat, then self-deployed to that area. He assisted with setting up a perimeter at the middle school area and instructed parents to stay back until the school district figured out how to release all the children. He cleared the entire area due to a report of a suspicious subject near the soccer field, then returned to the middle school and focused on evacuating children and reuniting them with their families.

BPA ▆▆▆ assumed USBP would be on scene in a support role to help UPD with perimeter security. He assumed UPD would be in charge because it was within the city limits of Uvalde.

***BPA*** ▆▆▆▆▆ ***(UVA), interviewed on March 3, 2023. (Exhibit 132)***

On May 24, 2022, BPA ▆▆▆ was eating lunch when he heard "shots fired" over his radio. He left the café and went to his GOV, where he heard, "shots fired, all agents respond to Robb Elementary School." He responded, arrived, and parked at approximately **11:50:00 AM**. By that time, the school was already surrounded by law enforcement officers and there was no guidance on the radio about where to go. Sheriff Nolasco asked him to help with crowd control.

BPA ▆▆▆ assisted with clearing the street and moving parents back toward the funeral home. He began clearing Classrooms 19–23 with other BPAs, then remained at the corner of Classroom 23 to provide security. After hearing radio transmissions regarding the breach and that the



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



assailant was down, he ran to the south entrance of the school to offer aid. He offered emotional support to law enforcement officers coming out of the school, then went to the tree at the north end of the school to meet with other BPAs, where he was ordered to return to UVA.

BPA ███ was not aware of any CBP leadership guidance while on the scene. He stated that radio transmissions were confusing, flooded with traffic, and there was a "hot mic" situation.

### BPA ████████ (UVA), interviewed on March 2, 2023. (Exhibit 121)

On May 24, 2022, BPA ███ was assigned to use of force training at UVA and was on break from training when he heard over the radio about an incident unfolding at Robb Elementary School involving the words "active shooter." BPA ███ received a rifle and plates from SBPA ███, who instructed him and other BPAs to go to the school to assist. BPA ███ rode as a passenger with other BPAs to Robb Elementary School, where they arrived at approximately **11:50:00 AM**. They parked a block away from the school and he spoke to a Sheriff's deputy to gather information. BPA ███ stayed near BPA ███ because BPA ███ didn't have a radio. He verbally reassured parents that law enforcement was going to take care of the situation and joined a TXDPS trooper in directing children away from the west side of the school. He was then directed to come closer to the school to provide cover for student evacuations.

After that evacuation was complete, he transitioned to the southeast corner of the building near Classroom 109 and assisted with evacuating children and an adult through the window of Classroom 109. BPA ███ and another agent were instructed to watch the windows on the east side of the building. They heard about a breach attempt over the radio, then heard the assailant was down. He attempted to enter the school to assist with the medical response, but someone didn't allow him, saying there were enough people. He agreed, so he went to help elsewhere.

He assisted with guiding an ambulance, then moved to console an unknown BPA. He gathered with other BPAs at a tree on the north side of the building, where they were instructed to go to UVA for a debriefing. He walked back to his vehicle alone and waited for BPA ███, then they drove to UVA. He returned the plates and rifles to the armory and heard talk of an accomplice or second shooter that didn't sound credible, then went home.

BPA ███ did not feel that anyone was in charge of the scene at Robb Elementary School or that anyone was in control of communications. He did not know who was in charge of the medical response, although he noticed a lot of BPAs providing medical assistance. He felt he should help as a law enforcement officer.

### Retired AIA ████████ (AMO Del Rio), interviewed on August 2, 2023. (Exhibit 226)

On May 24, 2022, AIA ███ was working the day shift, flying a CBP helicopter alone in Eagle Pass, Texas, near ████ in support of BORTAC agents apprehending a group of suspected migrants, when he received a call over the DRT radio regarding a possible shooting in Uvalde. Dispatch directed him over the radio to immediately fly toward Uvalde. He communicated to the BORTAC agents that he was departing, not aware of the details and scope of the situation when



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



he departed. AIA ▮▮▮ flew on scene at Robb Elementary School for approximately 20 minutes beginning at approximately **12:00:00 PM**. He communicated the location of the assailant to the TXDPS helicopter, then yielded the scene to TXDPS and took the AMO helicopter to the CBP Air Branch at the Uvalde airport. He remained there for a few hours awaiting instruction before returning to Del Rio.

AIA ▮▮▮ understood that state and local law enforcements on scene should have had command and control over the incident at Robb Elementary School and that CBP's role was to provide them with assistance, backup, and resources. He stated that he responded because it was a violent felony in progress.

***WC*** ▮▮▮▮▮▮▮ ***(UVA), interviewed on March 1, 2023. (Exhibit 111)***

On May 24, 2022, WC ▮▮▮▮▮ was the day shift administrative watch commander at UVA when he heard BPAs come on the radio and ask the operations center at UVA if anything was going on due to a heavy police response in town. Several minutes later, an unknown agent broadcast on the radio that there was a shooter at Robb Elementary School and that local police requested USBP assistance for security and crowd control. WC ▮▮▮▮▮ gathered his equipment while deciding who was going to stay back at the station. He asked SBPA ▮▮▮ to contact BORTAC and make sure they were aware and responding. He went to the armory to get a long gun and found that all M4 rifles and magazines were already issued, so he got a 12-gauge shotgun with 00 buckshot rounds. He gathered equipment and water and rode in WC ▮▮▮'s GOV while attempting to make phone calls and notifications of the situation.

WCs ▮▮▮ and ▮▮▮▮▮ parked two blocks from the school and walked toward the funeral home, arriving at the funeral home at approximately **12:00:00 PM**. From there, they proceeded toward the west door of the west wing of the school. WC ▮▮▮▮▮ ordered a couple of BPAs in the area to go with UPD Officer ▮▮▮ to assist with crowd control at the funeral home, then moved to the front of the school and attempted to break the lock on a gate to facilitate the evacuation of children until someone showed up and unlocked the gate. He moved to a breezeway to provide cover and direct children as they exited, but then was informed they were no longer going to evacuate the children. He proceeded to the east doorway of the west building, where he was waved back. He then moved toward the north side of the building where law enforcement officers were arriving with tactical gear. He asked SBPA ▮▮▮▮ if BORTAC on scene should be put on the Evolving Situation Report and SBPA ▮▮▮▮ said yes.

WC ▮▮▮▮▮ spent time telling people where others were located and answering a variety of questions. He received a call from DPAIC ▮▮▮. During the call, at approximately **12:50:00 PM**, he heard shots fired from within the school, so he hung up and made his way to the west door. He approached BPA ▮▮▮, who was injured, to check on him, then walked BPA ▮▮▮▮ to Geraldine Street, where he requested SBPA ▮▮▮▮ take BPA ▮▮▮ to the hospital. WC ▮▮▮▮▮ gathered water and walked back to a tree with other USBP personnel, where everyone was asked to return to UVA by **2:00:00 PM**. He took over answering incoming calls at UVA from (A)PAIC ▮▮▮ when (A)PAIC ▮▮▮ left.




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

From UVA, WC ████████ responded to Flores Elementary School after hearing of a threat at other schools. He understood the subject at Robb Elementary School was barricaded, isolated, and contained inside the school. He never thought it to be an active shooter based on what he observed and was told upon arrival. He believed the Uvalde County Sheriff's Office was overseeing the scene and observed that communication was very hard at the scene due to patched radio frequencies and difficulty hearing who was talking. WC ████████ understood state and local police were working the situation because UVA did not have any of the equipment he saw. He believed USBP personnel knew that USBP did not have any statutory authority to respond and that they were there in a backup capacity. WC ████████ stated that anything USBP was doing was at the direction of the local police department because it was USBP's responsibility to respond and assist.

***WC*** ████████████ ***(UVA), interviewed on March 2, 2023. (Exhibit 118)***

On May 24, 2022, WC ████ was working the day shift at UVA, performing administrative duties, when he heard a BPA ask over the radio if something was going on because TXDPS was running lights and sirens through the Uvalde area. No one responded, and approximately 10 minutes later, the same BPA transmitted there was an active shooter at Robb Elementary. WC ████ spoke to WC ████████, and they decided to respond to the school. WC ████ went to the UVA armory to get their assigned M4 rifles but discovered there were no M4 magazines available. He checked out two shotguns instead. They traveled together in WC ████'s assigned GOV and parked several blocks away from the school due to heavy traffic in the immediate vicinity. Based on the number of local law enforcement officers on scene at the time of his arrival at approximately **12:00:00 PM**, he assumed the situation was under control.

WC ████ tasked SBPA ████ to create an Evolving Situation Report and provide information to USBP DRT. WC ████ encountered (A)PAIC ████ several times but they did not stay together very long. WC ████ assisted BPA ████, who was wounded, and passed BPA ████ off to BPA ████, instructing BPA ████ to take BPA ████ to the hospital. WC ████ met with all BPAs, then received information about a threat to other schools via social media. He left the school with WC ████ and went to Flores Elementary School to provide security until approximately **7:00:00 PM**, then returned to UVA and went home.

WC ████ believed TXDPS and the Uvalde Police Department were in charge of the incident. He was unaware of the location of the assailant or how many victims were in the school and was under the impression that the assailant was barricaded in a classroom or a closet by himself somewhere in the building that contained Classrooms 111 and 112. Based on the number of local law enforcement officers on scene when he arrived, WC ████ initially assumed the situation was well in hand. He did not believe any member of USBP was in command of the incident and did not see or become aware of the presence of a command post on scene. He observed inaccurate information was transmitted over the radio throughout the incident, which caused confusion, and was aware of law enforcement officers requesting perimeter security from the BPAs on scene. WC ████ stated BPAs have a responsibility to respond to shooter incidents and it is common practice to assist local law enforcement officers.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00157



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**





*BPA ▮▮▮▮▮ (UVA), interviewed on March 14, 2023. (Exhibit 178)*

On May 24, 2022, BPA ▮▮▮ was scheduled to conduct use of force training when it was broadcast over the UVA intercom that there was an active shooter at Robb Elementary School and for BPAs to grab their gear and respond. He grabbed his ballistic vest and M4 rifle and responded to the school in a GOV, arriving between approximately **12:00:00 PM** and **12:10:00 PM**. He parked a few blocks away because the path to the school was blocked by numerous law enforcement vehicles. He proceeded to the school on foot, taking cover behind a telephone pole north of Classroom 129. He moved to the east side of the school, cleared two restrooms, and ended up near the cafeteria. He provided cover while other BPAs cleared and evacuated students from Classrooms 13–18 and 31–34. He returned to the north side of the school after hearing "shooter down" and instructed a TXDPS EMT to assist BPA ▮▮▮▮, who was wounded.

BPA ▮▮▮ gathered with other BPAs near a tree on the north side of the school, then returned to UVA, worked out for an hour to relieve stress, then went home. BPA ▮▮▮ could not identify who, if anyone, was in command of the incident. A UCISDPD officer told BPA ▮▮▮ that the UCISDPD police chief was inside the school with the assailant, which BPA ▮▮▮ understood to mean in the same room at the assailant. BPA ▮▮▮ was under the impression that the incident was an active shooter situation, and he heard the door to the classrooms was locked and a key was needed. He believed he had responsibility as a BPA to respond and assist.

*BPA ▮▮▮▮▮▮ (UVA), interviewed on March 22, 2023. (Exhibit 209)*

On May 24, 2022, BPA ▮▮▮▮ was at UVA attending training. During a training break, he heard radio communications concerning an active shooter and a request that available law enforcement officers respond. BPA ▮▮▮▮▮ retrieved a rifle from the UVA armory, along with other BPAs, and rode to Robb Elementary School with another BPA in a marked USBP vehicle with emergency lights and sirens activated, arriving between approximately **12:00:00 PM** and **12:10:00 PM**. They parked approximately one block away and walked toward the northeast side of the building where the shooting occurred. BPA ▮▮▮▮▮ positioned himself near the classrooms east of that building and relayed information to WC ▮▮▮. He evacuated children from the classrooms east of the building where the assailant was located and evacuated children from Classrooms 7–12. Periodically, he met with law enforcement officers outside the west building to obtain situational updates while continuing to evacuate children.

He moved to the cafeteria, where staff did not want to evacuate, then he was instructed to go to the funeral home to assist with loading children onto buses. He did not know where it was and could not drive anywhere because the roads were blocked with vehicles, so he returned to Robb Elementary School, where he encountered BPA ▮▮▮▮ and drove him to the hospital. BPA ▮▮▮▮ took BPA ▮▮▮▮'s vehicle, firearms, and equipment back to UVA, then turned in his own vehicle keys and returned home.

BPA ▮▮▮ believed the assailant was contained within the school library based on information from a UPD officer. BPA ▮▮▮ did not know who was in charge of the law enforcement

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00158



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



response to the shooting at Robb Elementary School and indicated that USBP responded to the shooting to support other law enforcement officers.

*BPA* ███████ *(UVA), interviewed on March 20, 2023. (Exhibit 198)*

On May 24, 2022, BPA ███████ was working in the unaccompanied minor processing group for UVA. While listening to the UPD radio, he heard dispatch state there was an active shooter at Robb Elementary School. BPA ███████ loaded several cases of water into a marked USBP vehicle and drove with another BPA to Robb Elementary School. They arrived approximately between **12:00:00 PM** and **12:30:00 PM** and parked on the east side of the school. There, he instructed teachers and children leaving the school to run toward waiting school buses.

He was then instructed to bring the water to the funeral home, so he drove there, then walked to the school's west entrance where he offered to help BPA ███████, who was performing chest compressions on an adult female. BPA ███████ attempted to enter the west entrance of the school but was turned away by an unknown law enforcement officer who said there was no one left in the school to help.

BPA ███████ met with other USBP personnel at the front of the school for a short gathering, then drove back to UVA with another BPA. He picked up his children from school and took them home, then went to Dalton Elementary School, where his wife works, to provide security until the end of the day.

Initially, BPA ███████ thought the incident was probably a bailout near a school. The radio traffic he heard at the school was about an active shooter who was barricaded within a school classroom. BPA ███████ stated he responded to the scene in order to help the local law enforcement officers in a secondary capacity.

*(A)PAIC* ███████ *(UVA), interviewed on March 6, 2023. (Exhibit 134)*

On May 24, 2022, (A)PAIC ███████ was returning from ███████ award ceremony at Robb Elementary School when he heard radio traffic about shots being fired near the school. He drove to UVA to retrieve his government-issued Glock 47, handheld radio, and body armor, then drove toward the school, arriving at **12:05:00 PM**.[189] He attempted to contact USBP and other law enforcement agencies by phone but was unable to reach anyone. He had to park a distance away from the school because of a large number of first responders and civilian vehicles parked in the middle of the streets. He approached Sheriff Nolasco for information. Sheriff Nolasco requested USBP provide perimeter security. (A)PAIC ███████ also approached UCSO Chief Deputy ███████ to ask what USBP could do to help. Chief Deputy ███████ informed him it would be a while because law enforcement personnel were trying to negotiate with the subject.

---

[189] OPR interview of XO ███████, March 15, 2023, timestamp 08:41:30; OPR interview of ACPA ███████, March 1, 2023, timestamp 00:36:17; OPR interview of PAIC ███████, March 23, 2023, timestamp 00:58:25; OPR interview of SOS ███████, March 1, 2023, timestamp 12:12:22; OPR interview of WC ███████, March 1, 2023, timestamp between 01:04:10 and 01:13:00; OPR interview of WC ███████, March 2, 2023, timestamp 08:28:00; OPR interview of BPA ███████, March 21, 2023, timestamp 01:07:16.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00159



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



(A)PAIC ███████ called UVA to request water and that the supervisor begin working on the Evolving Situation Report. Sheriff Nolasco requested assistance guiding parents to the funeral home where the children were being evacuated. (A)PAIC ███████ and another BPA directed parents and made and received phone calls with other USBP personnel to update them on the situation.

After the classroom was breached, all law enforcement personnel at the funeral home ran to the school. (A)PAIC ███████ attempted to console other BPAs who were visibly shaken up and encouraged them to remove themselves from the scene. (A)PAIC ███████ went to the Civic Center, where he was reunited with ██████ and ██. He remained at the Civic Center to provide perimeter security. (A)PAIC ██████ believed Sheriff Nolasco was in charge because he was the highest-ranking law enforcement officer in the county. The Sheriff said the assailant was held up in a room, so (A)PAIC ██████ believed the situation was a barricaded subject. (A)PAIC ██████ stated USBP's role was to support other law enforcement agencies for the benefit of public safety and rendering aid. He believed he had a duty to respond to a felony in progress.

***SBPA █████████████ (USBP Erie Station, Pennsylvania), interviewed on February 28, 2023. (Exhibit 109)***

On May 24, 2022, SBPA ██████ was assigned to UVA when he heard a radio transmission on his service radio asking for all available agents to respond to Robb Elementary School. He went to the UVA armory and retrieved his assigned M4 rifle and keys to his assigned GOV, donned a ballistic vest, loaded the rifle, and drove to Robb Elementary School, arriving before **12:15:00 PM**. He blocked off the intersection of Old Carrizo Road and Cargile Street with his GOV and set up security. He instructed a person who was filming the school to move and instructed a person in a car to move. He asked the school security guard what was going on and the guard told him about a possible school shooter near the school's cafeteria. While providing security, he shared the information he knew about the potential shooter with two other law enforcement officers. He called WC ██████ (UVA) at **12:20:00 PM** to seek instructions and was directed to remain at his current location because there were plenty of law enforcement officers at the front of the school. When an unknown BORTAC agent arrived at his location, SBPA ████ provided him with the information he had before the BORTAC agent was called to the front of the school. Prior to the breach at **12:50:00 PM**, EMS personnel arrived at SBPA █████'s position near Old Carrizo Road. Because of the still-active nature of the situation, SBPA █████ escorted them onto the school grounds by the cafeteria building and staged with the EMS personnel near Classroom 18. SBPA ██████ told the EMS personnel not to enter the field of fire from the exterior windows of Classrooms 111 and 112.

Following the breach of Classrooms 111 and 112, he attempted to enter the hallway near the south entrance to assist, but someone yelled for non-EMS people to get out. He then began helping to gather BPAs together at a rally point on campus. After gathering at the rally point, all BPAs were instructed to return to UVA. SBPA █████ drove BPA ███████ there. At UVA, BPAs received information that the assailant's girlfriend threatened to attack another school and several BPAs left the station to respond to area schools. At approximately **3:15:00 PM**, SBPA ██████ was asked to go to the local hospital to deliver the workers compensation paperwork



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



needed for BPA ███. Following his trip to the hospital, SBPA ███ returned to UVA and then went home.

SBPA ███ identified that the radio traffic was problematic. For example, law enforcement officers were interrupting each other's transmissions and misinformation was being broadcasted. SBPA ███ stated that he received information that the incident turned from an active shooter to a hostage situation shortly after arriving on scene at approximately **12:15:00 PM**. Several people asked him if he was in charge and he said no, he was there to assist. He was unaware if anyone was designated in command of all CBP personnel and was under the impression that USBP was on scene at Robb Elementary School in a support role.

***BPA ███████ (UVA), interviewed on February 9, 2023. (Exhibit 49)***

On May 24, 2022, BPA ███ was working an overtime shift driving a marked GOV transport van assisting with a smuggling load that had been detained outside of Uvalde when he heard a radio transmission from UVA indicating there was an active shooter at Robb Elementary School. Upon hearing the radio transmission, BPA ███ activated his lights and sirens and drove to the south side of the school, arriving at approximately **12:15:00 PM**. When he arrived, he spoke with an unknown TXDPS Trooper who told him, "The chief is in the room with the guy."[190] This led BPA ███ to believe the situation was a standoff, so he began conducting traffic control at a nearby intersection because people and vehicles had begun to gather. BPA ███████ assisted other law enforcement personnel with transporting students and teachers to the Civic Center in his GOV, then attended an impromptu muster at the Uvalde Border Patrol Station. He went to Flores Elementary School, where he secured school exits and provided perimeter security around the cafeteria. BPA ███ believed his role was to show up, assist, and do whatever needed to be done.

***BPA ███████ (BRA), interviewed on March 2, 2023. (Exhibit 124)***

On May 24, 2022, BPA ███ was a trainee (BPA-T) at the USBP Brackettville Station working in the BRA area of responsibility with other BPAs. As they were loading migrants into a transport vehicle, the driver asked them if they had heard about the active shooter at Robb Elementary School. BPA ███ told BPA-T ███ to accompany him to the school. BPA ███ drove the GOV with lights and sirens activated and parked two blocks from the school at approximately **12:15:00 PM**. They ran to the funeral home across the street from the school.

BPA-T ███ documented the names of all the BPAs he saw and established a perimeter, creating space between the funeral home and the school. He instructed civilians to move because they were too close to the street. He maintained the perimeter for a couple of hours and directed parents to pick up their children at the Civic Center or Uvalde High School. A woman with a child ran at him from the west side of the funeral home and did not follow his commands to stop, so he absorbed her impact and captured her in an embrace to prevent injury to her.

---

[190] OPR interview of BPA ███████, February 9, 2023, timestamp 00:14:59.

AR00161



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA-T ███ assisted with clearing Classrooms 1–6 at Robb Elementary School and placed a chair in each doorway to indicate it had been cleared. BPA-T ███ departed for UVA and drove BPA ███, who was not in a condition to drive himself, to BRA. BPA-T ███ believed USBP's response was due to their status as first responders and law enforcement officers. He believed if there was an active shooter, it was USBP's responsibility to respond, assist, and stop the threat if needed. He believed Texas Rangers had command and control of the perimeter area.

**BPA** ████████████ *(CAR), interviewed on February 28, 2023. (Exhibit 102)*

On May 24, 2022, BPA ██████ was working at the CAR checkpoint when he received text messages from ████████████ notifying him that there was an active shooter at Robb Elementary School in Uvalde. BPA ██████'s ███ was ██████ in Classroom 110 at Robb Elementary School and was taking ████████ toward the playground when ███ heard gunshots. BPA ██████'s ██████ was a ████████ at Robb Elementary School and ████████████ ██████ attended Uvalde-area schools, including Robb Elementary School.

BPA ████████ told a coworker about the active shooter and said he had to go. BPA ████████ called the on-duty supervisor and advised him of the active shooter in Uvalde and asked if he could take his GOV to the situation. WC ██████ said BPA ████████ should take his POV and go in an off-duty status. BPA ████████ parked near Highway 83 and Old Carrizo Road at approximately **12:30:00 PM** and walked toward the school. He saw law enforcement officers establishing a perimeter, then heard ██████ call his name. BPA ████████ did not join the law enforcement officers on the perimeter because ██████ told him ████████████ was with staff from Robb Elementary School down the street.

He returned to his POV and went to pick up ████████. At his vehicle, BPA ████████ saw BPA ████████████ (CAR), an off-duty BPA, who asked BPA ████████ for a ride back to his vehicle. At the intersection of South Park Street and West Cargile Street, BPA ████████ found ████████████ with school staff and dropped off BPA ████████. After hearing rumors of another active shooter at other schools, BPA ████████ went to other schools to pick his other two children. Unable to pick up ████████ because their schools, Dalton Elementary School and Morales Junior High School, were on lockdown, BPA ████████ went to the Civic Center and decided to secure the back door while waiting for ████████ to arrive.

After his wife arrived at the Civic Center, BPA ████████ ██████, and ████████████ returned to Dalton Elementary School and Morales Junior High School to pick up ████████████. After getting ████████████, BPA ████████ dropped ████████ off at the Civic Center to assist with students. BPA ████████ then took ████████████ home.

**BPA** ████████████ *(BRA), interviewed on March 2, 2023. (Exhibit 116)*

On May 24, 2022, BPA ██████ was off-duty ████████████ in Brackettville, Texas, when he received a text message from the Uvalde School District notifying of an active shooter at Robb Elementary School. He also heard people in the grocery store discussing that there was an active shooter, and ██████ received a text from ████████ teacher. BPA ██████ drove toward the

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00162



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



school and arrived at approximately **12:30:00 PM**.  There, he recognized another BPA and asked him for information.  The other BPA asked for BPA ███████'s assistance with traffic control at the intersection of Geraldine Street and Evans Street.

After the breach and reports that the assailant was killed, BPA ███████ walked toward the Civic Center.  Along the way, another BPA recognized him and drove him there, where he was reunited with ███████████████.  He received a text from ███████, who attended the high school, and had ███████ take him to the high school where he reunited with ███████.  BPA ███████'s ███████ took him and ███████████ home.  He could not identify who was in command and control at any time during the event.  BPA ███████ stated that when an active shooter incident occurs, BPAs are expected to respond with their firearms and body armor.

**BPA ███████████████ (UVA), interviewed on March 2, 2023. (Exhibit 122)**

On May 24, 2022, BPA ███████ was on light duty assigned to the Sensor Program at UVA when an agent called and informed him there was a shooting somewhere.  BPA ███████ decided to self-deploy to Robb Elementary School to take water to the agents who had responded.  He arrived via GOV at approximately **12:30:00 PM** and was requested to assist with crowd control and move people to make room for buses and ambulances in front of the funeral home.  He did that for approximately 10 minutes, then provided emotional support as law enforcement officers began exiting the building.  After agents were informed there was a possible second shooter, he deployed to the Uvalde Dual Language Academy and performed crowd control.

BPA ███████ stated there was no sense of command present at Robb Elementary School.  He received commands from only the Sheriff's department regarding crowd control.  He believed his authority to respond came from being a law enforcement officer and first responder.

**BPA ███████████████ (UVA), interviewed on March 6, 2023. (Exhibit 137)**

On May 24, 2022, BPA ███████ was driving to UVA in a GOV and heard "shooter" and "school" over his radio.  He then began driving toward Uvalde High School because he did not know which school was involved.  He called UVA and was informed it was Robb Elementary School, so he decided to respond there and offer assistance.  Upon arriving at the school at approximately **12:30:00 PM**, BPA ███████ decided to assist with the evacuation of children from the school.  He observed that no one knew what was going on and there was a "hot mic" situation on the radio.  When EMTs arrived at his location, he guided them to the south entrance of the school, then went to his GOV to retrieve a first aid kit to help with what he described as "controlled chaos."  He then met PAIC ███████, who ordered him back to UVA.  At UVA, he heard there was a second shooter at another school, so he deployed to Dalton Elementary School and conducted crowd control and vehicle checks.  He checked pedestrians with backpacks for weapons.

BPA ███████ described the scene at Robb Elementary School as full of first responders and felt that most of the information being transmitted over the radio was unnecessary.  He did not



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



perceive any incident command. BPA ███████ believed that when USBP responds to these types of incidents they are in a supporting role.

***BPA*** ███████ ***(UVA), interviewed on March 21, 2023. (Exhibit 204)***

On May 24, 2022, BPA ██████ was assigned to canine training in Del Rio, Texas. After training ended, he got lunch and heard of an active shooter at Robb Elementary School via service radio. He self-deployed to Robb Elementary School in an unmarked USBP K9 truck with emergency equipment activated. He arrived on scene at approximately **12:30:00 PM** and met an unknown BPA who did not know what was going on. BPA █████ then spoke with a TXDPS trooper who said to stay near the road because they were waiting for a SWAT unit.

BPA █████ asked other USBP personnel where he could help and decided to stay on the perimeter with them. Approximately 20–30 minutes later, he heard gunshots from the breach, then saw people being evacuated. He saw BPA ██████ approached him, and asked if he was all right, then checked BPA ██████'s head and noticed a gash. He told BPA ██████ he would take him to the hospital. As they went to BPA ██████'s vehicle, a different BPA said he would take BPA █████ to the hospital, so BPA ██████ returned to his previous location, then saw other USBP personnel gathering under a tree and joined them. Everyone was instructed to return to UVA for a debrief, so he went there and heard of a possible second threat. He deployed to the Uvalde Classical Academy to provide security during the release of children to their parents. He then deployed to Flores Elementary School and provided security before returning to UVA and going home.

BPA █████ explained that USBP often assists state and local law enforcement agencies as first responders. He did not know who was in charge at Robb Elementary School. He stated the radio was chaotic because all law enforcement agencies were on one channel.

***BPA*** ███████ ***(UVA), interviewed on February 16, 2023. (Exhibit 90)***

On May 24, 2022, BPA █████ was coming back from lunch when he saw USBP vehicles with emergency equipment activated leaving the station. He was instructed to load a couple cases of water into his vehicle and head to Robb Elementary School. He proceeded there in a marked USBP vehicle with three other BPAs, arriving between **12:00:00 PM** and **12:30:00 PM**. He attempted to drive to the funeral home, but the roads were blocked. He dropped off the water, then began helping to evacuate children into buses. Never entering the west building, he joined local law enforcement in trying to prevent the public from advancing toward Robb Elementary School and escorted children from the funeral home to buses that were taking the children to the Civic Center. He stayed with a BPA nicknamed "█████," who was crying and distraught, then resumed helping with crowd control and handing water to first responders. He created a path for the children to the buses, shielding the children from view of the nearby onlookers. Upon learning of a secondary threat, he went to pick up ████████ from Morales Junior High School. He believed USBP's role was to support local law enforcement.



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



***BPA-I*** ██████████ ***(DRT SIU), interviewed on March 10, 2023. (Exhibit 163)***

On May 24, 2022, BPA-I ██████ was on duty in plain clothes at the DRT SIU office when another BPA-I informed him of an incident at Robb Elementary School. Shortly afterward, BPA-I ██████'s supervisor called him looking for BPA-I ██████████ (DRT SIU). Assuming BPA-I ██████ was already at Robb Elementary School, BPA-I ██████ traveled to the school and called BPA-I ██████ several times with no success.

BPA-I ██████ parked his GOV a few blocks away from the school, observed a significant law enforcement presence on scene, and walked to the funeral home across the street from the school, arriving at approximately **12:30:00 PM**. There, he assisted with a loose perimeter to keep parents and civilians away from the school. He asked a local law enforcement officer how he could assist, but the law enforcement officer did not know what to do.

BPA-I ██████ met with other BPAs near the west hallway and was instructed to return to UVA, where they received information indicating there was another threat. BPA-I ██████ responded to the Uvalde High School and stood perimeter for approximately two hours, then returned to DRT to finish his regularly scheduled shift. He went home at **10:00:00 PM**. BPA-I ██████ stated the situation was initially described as a bailout where the subject ran into the school and became a barricaded subject. BPA-I ██████ was never able to identify anyone in command or an established command post. He believed he had a responsibility as a BPA to respond.

***BPA-P*** ██████████ ***(DRT), interviewed on February 9, 2023. (Exhibit 55)***

On May 24, 2022, BPA-P ██████ was the Less-Lethal Coordinating Officer at DRT, conducting observations of DRT's firearms and less-lethal training programs at BRA. He crossed paths with an unknown BPA who advised him that there had been an incident in Uvalde. BPA-P ██████ was not directed to respond, but was with other SBPAs who decided to respond, and they proceeded to Uvalde as fast as they could when there was no traffic. Upon his arrival at Robb Elementary School at approximately **12:30:00 PM**, BPA-P ██████ had to park several hundred yards away on Geraldine Street because the streets were clogged with emergency vehicles that were parked and blocking the way to the school.

BPA-P ██████ attempted to find the drivers of the law enforcement vehicles that were blocking Geraldine Street to clear a path for EMS vehicles. To limit the vehicle congestion near the school, BPA-P ██████ set up traffic control on Geraldine Street and Evans Street, along with a UPD officer and a UCISDPD police officer. After working at the traffic control point on Geraldine Street and Evans Street, BPA-P ██████ traveled with SBPA ██████████ (DRT) to Uvalde Memorial Hospital to assist with crowd control for a short time, then went to UVA to provide Peer Support services for approximately five hours. Based on his observations of the scene around Robb Elementary School, BPA-P ██████ described the incident as chaotic and felt that the law enforcement officers in the area lacked a sense of urgency. He noticed no gunfire, calls for help, or anyone providing directions via megaphone. BPA-P ██████ stated he believed all law enforcement officers, including USBP agents, have an obligation to respond to incidents such as the one at Robb Elementary School with reasonable and necessary force to protect life.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*Assistant Special Agent in Charge (ASAC)* ██████████ *(OPR Del Rio), interviewed on February 28, 2023. (Exhibit 104)*

On May 24, 2022, ASAC ████ was teleworking at home in Uvalde when he received a phone call from SA ██████ advising that BPAs were enroute to an Uvalde school to respond to reports of a man with a firearm. ASAC ████ called Sheriff Nolasco, who advised there was a barricaded subject at Robb Elementary School in Uvalde and that BORTAC was responding. ASAC ████ dressed in CBP tan pants and black polo shirt, gathered his handgun, rifle, and ballistic armor, and went to Robb Elementary School. He arrived at Robb Elementary School between **12:30:00 PM** and **12:35:00 PM**, approximately 15–20 minutes before the classroom was breached and the assailant was shot. He parked at a distance and walked toward the school because the streets were blocked with law enforcement vehicles. He instructed drivers to move out of the way to allow room for an ambulance. He went to the school entrance on the west side, where he spoke to FBI Special Agent ████, who did not know anything about what was going on. ASAC ████ was not able to enter the west building at the school because it was so full of other people. An unknown TXDPS CID SA operating a TXDPS drone reported that the assailant escaped, so ASAC ████ and others began to form a perimeter around the school. Then someone announced the assailant was down.

ASAC ████ attempted to locate the incident command post, then received information concerning another threat. He sent OPR Special Agents to other Uvalde area schools to assist with security and evacuations while he continued working at the funeral home, providing updates to OPR headquarters, coordinating activity, and disseminating information. He remained at the funeral home until early morning the next day and continued working in Uvalde for the next several weeks gathering information and assisting Texas Rangers and other law enforcement agencies. While working at the funeral home following the incident, ASAC ████ learned that UPD attempted to establish an incident command post at the funeral home at the onset of the incident, but other law enforcement agencies responded directly to the school instead, so UPD's efforts were abandoned. Although he was immediately outside the west door of the west building at approximately **12:30:00 PM**, ASAC ████ did not know who was in charge and did not observe any senior law enforcement leaders giving orders to other first responders. ASAC ████ stated USBP had authority to respond to assist other law enforcement agencies.

*AIA* ██████████ *(AMO Del Rio), interviewed on June 1, 2023. (Exhibit 218)*

On May 24, 2022, AIA ██████ was on day shift patrol in the Carrizo Springs area assisting USBP with tracking a group of suspected migrants when he heard a dispatch operator state over the service radio that there was a shootout near a school in Uvalde and assistance from agents was needed. AIA ██████ landed the helicopter so AIA ██████ could board and refueled at CAR before responding to Uvalde. His supervisor informed him to go to Del Rio to pick up AEA ██████, but AIA ██████ advised his supervisor it would take too long to fly to Del Rio, and he was responding straight to Robb Elementary School.

AIA ██████ orbited Robb Elementary School beginning at approximately **12:40:00 PM** at approximately 300 feet while communicating with a TXDPS air unit to coordinate each aircraft's



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



altitude.  He then went to CBP Uvalde Air Branch to free up air space for emergency medical service air units.  After becoming aware of a secondary threat via social media, he refueled and began orbiting schools throughout Uvalde to provide overwatch for deployed agents and officers.

AIA [redacted] stated that initially it sounded like the incident was at or near, but outside, a school, then radio traffic led him to believe it was taking place in the school.  He did not hear if it was classified as active shooter or barricaded subject.  He stated that radio communications were a mess and the patched radio frequency sounded chaotic.  AIA [redacted] stated AMO's role was to assist upon any lawful request for assistance, provide information, conduct overwatch, and assist with locating individuals.  He stated that whichever law enforcement agency was first on scene was in charge, but it did not appear that any law enforcement agency was in charge.

***AEA*** [redacted] ***(AMO Del Rio), interviewed on June 2, 2023. (Exhibit 219)***

On May 24, 2022, AEA [redacted] was on temporary duty to the air unit in Del Rio, Texas.  Another AEA received and relayed a call from DRT communications dispatch regarding a barricaded subject by a school.[191]  As an aircrew rifleman (ACR), AEA [redacted] was trained to shoot from helicopters flown by ACR-qualified pilots.  However, the only ACR-qualified pilot was AIA [redacted], who was flying near Carrizo Springs, Texas.  To save time, AIA [redacted] offered to fly AEA [redacted] to Uvalde to meet up with AIA [redacted] and fly to Robb Elementary School.  He arrived in the air at Robb Elementary School at approximately **12:40:00 PM**.

AEA [redacted] coordinated altitude with a state police helicopter.  He concentrated on an open window with a tree next to it but could not see in because it was dark in the classroom.  He told the pilot and other crew member that something was not right with the situation.  Upon hearing a second threat called out, AMO aircraft ran patterns on multiple schools until notified to return.

AEA [redacted] understood law enforcement was dealing with an active shooter.  He could not determine who was in command and control of the scene because there were so many agencies and communication among them was always an issue.  AEA [redacted] explained that the first person who arrived at an active shooter scene was in command and control and that CBP's role was to respond and help.  He mentioned that sometimes CBP was the closest agency to respond and might be the first agency to arrive.

***AEA*** [redacted] ***(AMO Del Rio), interviewed on May 23, 2023. (Exhibit 216)***

On May 24, 2022, AEA [redacted] was on day shift assigned routine patrol duties in a helicopter assisting USBP agents in the Carrizo Springs area when AIA [redacted] advised him over service radio that he had received a call for assistance regarding shots fired.  AEA [redacted] went to CAR to refuel, then traveled to a big open field in Uvalde and waited to get an AMO Air Crew Rifle program rifleman.  He coordinated with TXDPS aircraft to ensure aircraft deconfliction,

---

[191] OPR interview of AEA [redacted], June 2, 2023, timestamp 00:11:52.

AR00167



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



then arrived in the air at Robb Elementary School at approximately **12:40:00 PM** and started an orbit pattern.

AEA ▮▮▮▮▮ stated USBP's role was to respond as a support agency, and he believed state and local law enforcement would maintain command of a school shooting incident. He did not observe any medical triage or command center for medical aid.

***SBPA ▮▮▮▮▮▮▮▮▮ (UVA), interviewed on February 16, 2023. (Exhibit 84)***

On May 24, 2022, SBPA ▮▮▮▮ was working brush crew at a ranch when he heard an unclear radio transmission to be on the lookout for "a guy carrying a gun." Later, there was a report that someone went to a school with a gun. SBPA ▮▮▮▮ directed all brush crew team members back to their vehicles and they fell in behind TXDPS with lights and sirens heading toward Uvalde. They arrived near Robb Elementary School at approximately **1:00:00 PM** but were unable to get close or out of their vehicles because there were so many other law enforcement personnel and vehicles blocking the streets. SBPA ▮▮▮▮ then deployed his team to the Civic Center, where they arrived as the first law enforcement presence. They blocked driveway entrances with GOVs and established perimeter security. SBPA ▮▮▮▮ kept the road clear for buses, helped escort students into the Civic Center, and directed ▮▮▮▮ to find school officials to help reunite them with their children. His goal was to get students off the buses and safely into the Civic Center. SBPA ▮▮▮▮ stated USBP's general goal in Uvalde was to keep the public safe and assist the Uvalde Police Department. When the situation escalated to an active shooter, SBPA ▮▮▮▮ believed USBP's role was to stop the killing.

***CBP PERSONNEL WHO ARRIVED POST-BREACH OR WERE DIVERTED ELSEWHERE***

Many CBP personnel who responded to Robb Elementary School, some driving distances in excess of 70 miles to respond, either arrived at the school after **12:50:00 PM** or were diverted enroute to other necessary locations, including other Uvalde-area schools, the Civic Center, or the Uvalde Memorial Hospital. The following is a summary of the interviews provided by these employees:

***BPA ▮▮▮▮▮▮▮ (BRA), interviewed on February 7, 2023. (Exhibit 40)***

On May 24, 2022, BPA ▮▮▮▮ was working with the BRA brush crew at a remote location near Spofford, Texas, when the helicopter pilot they were working with announced he was leaving to respond to a school shooting in Uvalde. Approximately 30–45 minutes later, SBPA ▮▮▮▮ ▮▮▮▮ (BRA) notified BPA ▮▮▮▮'s group to respond to the Civic Center. They arrived at the Civic Center at approximately **12:00:00 PM**, and BPA ▮▮▮▮ directed children inside the Civic Center so the school district could account for them. He provided security, directed vehicles arriving at the Civic Center, announced that parents needed to sign out their children inside, and attempted to obtain additional information about a potential second threat. BPA ▮▮▮▮ believed it was his duty to respond and protect the lives of the public.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ███████████████ *(BRA), interviewed on February 7, 2023. (Exhibit 38)*

On May 24, 2022, BPA ███████ serving as a Field Training Officer, was tracking a group of individuals who illegally entered the United States, when he heard about the incident at Robb Elementary School from the helicopter pilot who was providing air support for the tracking operation. BPA ████████'s supervisor contacted him and directed him and his three trainees to respond to the Civic Center. He drove to Uvalde with his emergency lights activated, activating the sirens when he approached traffic. BPA ██████████ arrived at the Civic Center at approximately **12:00:00 PM**. He parked at the Civic Center and assisted with safeguarding children as they entered the building. He provided perimeter security at the Civic Center after hearing that the girlfriend of the assailant was a potential threat. BPA ████████ stated there was no USBP command and control at the Civic Center; rather, USBP was there as a support agency to support the city and the state.

*AIA* ████████████ *(AMO Del Rio), interviewed on May 23, 2023. (Exhibit 217)*

On May 24, 2022, a supervisor informed AIA █████ of a subject who may have shot a police officer and was possibly barricaded in a house. AIA ██████ prepped an AMO helicopter to transport AEA █████████████ (AMO Del Rio) to Uvalde and launched within two minutes. While enroute, AIA ██████ heard via service radio that there was an active shooter at a school. He flew to Uvalde, arrived at the Uvalde Fairgrounds at approximately **12:35:00 PM**, and remained on standby in case AIA ██████████ ran out of fuel.

AIA ██████ stated that USBP's role, pursuant to active shooter training, was to address the assailant as quickly as possible. He believed local law enforcement would have command and control in a multi-agency situation such as this.

*BPA* █████████████ *(BRA), interviewed on February 7, 2023. (Exhibit 36)*

On May 24, 2022, BPA ███████ was at BRA working on a detail near ████████, Texas, around **12:00:00 PM** when he received a message that went to the whole unit directing everyone to report to Uvalde regarding a school shooting. BPA █████████ drove alone in a government-owned vehicle (GOV) using lights and sirens. While enroute, he received information to report directly to the Civic Center. He arrived there at approximately **12:45:00 PM** and explained to parents that their children had to first go inside before being released. He assisted with two to three busloads of teachers and students by creating a lane that allowed a clear pathway for people to walk from the bus to the Civic Center. He helped hand out water bottles to parents. After all the children and parents departed, he repositioned and set up a perimeter to field questions from the public regarding voting at the Civic Center. BPA █████████ stated USBP appeared to have command and control of the area immediately outside the Civic Center because they were the only agency with enough personnel there to assist.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00169



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ▆▆▆▆▆ *(UVA), interviewed on March 13, 2023. (Exhibit 169)*

On May 24, 2022, BPA ▆▆▆▆ was a juvenile coordinator at UVA for the Mission Support Unit when he heard radio or dispatch information about a shooting at Robb Elementary School. BPA ▆▆▆▆ and his team stayed at UVA processing juveniles until all remaining agents were ordered to bring water to the school for the law enforcement officers. Then he traveled to Robb Elementary School, arriving at approximately **12:50:00 PM**, and parked two blocks from the school. He recorded part of the scene with his personal cell phone and provided the recording to OPR.

BPA ▆▆▆▆ approached the west entrance of the school and entered the school wearing gloves to assist, but exited after all non-emergency medical personnel were directed to leave. After a muster at the school, he was ordered to return to UVA for a briefing but told his supervisor he had to go home due to what he had witnessed. BPA ▆▆▆▆ stated that the scene looked like a Hollywood movie with all the lights and chaos. He indicated local law enforcement had control of the streets surrounding the school.

*SBPA* ▆▆▆▆▆▆ *(BRA), interviewed on March 8, 2023. (Exhibit 148)*

On May 24, 2022, SBPA ▆▆▆▆ heard a CBP air unit in the area advise over the radio of a school shooting. SBPA ▆▆▆▆ called the duty SBPA to get more information, then notified WC ▆▆▆▆ at BRA of the situation. SBPA ▆▆▆▆ contacted UVA to ask if they needed BPA EMTs and informed the BPA who answered that BRA would send available EMTs. SBPA ▆▆▆▆ dispatched four BPAs who responded, along with two trainees, then obtained his own gear, including an M4 rifle, and departed for Robb Elementary School in a marked USBP GOV with lights and sirens activated.

He arrived at Robb Elementary School at approximately **12:50:00 PM** and looked for a command post, but no one knew where it was; later he learned it was at the funeral home. As he approached the funeral home, a local law enforcement officer asked him to assist with keeping approximately 30–50 irate parents back from the funeral home. SBPA ▆▆▆▆ instructed the BPA EMTs to assist the EMTs at the school and instructed a BPA trainee to stay and assist in the funeral home area. SBPA ▆▆▆▆ saw BORTAC BPAs running toward the school and heard via service radio that the assailant was down. SBPA ▆▆▆▆ sent a text to PAIC ▆▆▆▆ informing him that the assailant was down, then made a path for children to be taken from the school to a school bus while keeping the parents away.

After getting the children onto the bus, he went to a building on the east side of the school to assist with evacuating children, then checked in with his personnel to make sure they were okay and instructed them to meet at UVA for a briefing. SBPA ▆▆▆▆ learned of a possible second threat, heard conflicting information, and figured out it was incorrect information. He then went to UVA for the briefing and stayed there for about an hour. SBPA ▆▆▆▆ heard someone refer to the assailant as a barricaded subject and stated that if a felony was committed, USBP could act upon it. He stated USBP had a responsibility to respond in a support role.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ▓▓▓▓▓▓ *(USBP Gulfport Station, Mississippi), interviewed on March 22, 2023.*
*(Exhibit 212)*

On May 24, 2022, BPA ▓▓▓ was at DRT conducting firearms qualifications at the DRT range when he learned of the Robb Elementary School incident from SBPA ▓▓▓▓ over the phone. BPA ▓▓▓ responded to Uvalde with other BPAs. While enroute, he heard a radio transmission that the assailant was killed. He arrived near Robb Elementary School at approximately **12:50:00 PM**, parked in a neighborhood, and walked toward the school. There, he assisted with perimeter security for approximately one hour, then reported to UVA for a debriefing.

At UVA, he learned of a second threat made on social media, so he responded to Uvalde High School to assist with perimeter security, then responded to a middle school to assist with the release of students to their parents.

BPA ▓▓▓ believed the incident was a barricaded subject based on hearing that a hostage negotiator had been contacted. He believed TXDPS had control of the scene and did not know of anyone from USBP who was in charge. BPA ▓▓▓ stated that USBP had an obligation to respond as a law enforcement agency.

*PAIC* ▓▓▓▓▓▓▓▓ *(BRA), interviewed on March 2, 2023. (Exhibit 119)*

On May 24, 2022, PAIC ▓▓▓ was driving back to BRA after assisting a BPA with smugglers and undocumented migrants when he heard radio communications on the Uvalde radio channel that someone was shooting through windows. PAIC ▓▓▓ called BRA and inquired about the shooting. (A)Assistant Chief Patrol Agent (ACPA) ▓▓▓ was not aware, so PAIC ▓▓▓ told him to inquire and send necessary resources to Uvalde. Upon receiving later text messages concerning the active shooter in Uvalde and that all required resources were at the location, PAIC ▓▓▓ advised (A)ACPA ▓▓▓ or SBPA ▓▓▓ that BRA BPAs did not need to respond. Later, PAIC ▓▓▓ directed SBPA ▓▓▓ to respond to the incident command post and relay information to BRA and assist.

PAIC ▓▓▓ returned to BRA and retrieved a rifle and other equipment, then self-deployed to Uvalde, driving with emergency equipment activated. He spoke with BPAs at the Uvalde Checkpoint and requested BRA to send BPAs to the Uvalde Checkpoint. While at the checkpoint, he received a text message from SBPA ▓▓▓ stating that the assailant was shot. He followed TXDPS troopers into Uvalde and arrived near Robb Elementary School approximately between **12:50:00 PM** and **1:00:00 PM**. He parked three to four blocks away, gathered his equipment, and went toward the school. He attempted to locate BRA BPAs and determine how he could assist.

He approached the west entrance of Robb Elementary School, where he saw several Brackettville BPAs who were distraught. PAIC ▓▓▓ asked SBPA ▓▓▓ if information that students were still in some of the classrooms in the other buildings had been relayed to anyone, but SBPA ▓▓▓ did not know. PAIC ▓▓▓ then followed a group of law enforcement officers toward the older section of the school, which they discovered had not been cleared. He



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



then entered a classroom with two uniformed officers and escorted a student who was sleeping on the floor to his teacher.  PAIC ▮▮▮ told SBPA ▮▮▮▮▮ to remain at the school and advise any arriving BPAs that they should go to UVA or return to their station.

PAIC ▮▮▮ then returned to his vehicle.  Upon hearing radio communications that shots were fired at Uvalde High School, he went there approximately between **2:15:00 PM** and **2:30:00 PM**.  He parked across the street from the high school and texted USBP management to let them know he was there and would not be at the UVA meeting.  He assisted with moving traffic in and out of the high school so that students could be reunited with their families.  He remained there providing security until all students were released and the faculty departed.

He departed the high school approximately between **6:00:00 PM** and **7:00:00 PM** and went to UVA and ate dinner there.  He then went to the Civic Center looking for BPA ▮▮▮, who had been looking for his ▮▮▮▮▮▮  At the Civic Center, PAIC ▮▮▮ encountered SBPA ▮▮▮, whose family friend was a teacher killed at the school.  PAIC ▮▮▮ spoke with and consoled SBPA ▮▮▮, then returned to BRA and went home.

PAIC ▮▮▮ believed the situation in Uvalde was an active shooter.  He did not know who was in command and did not know who had overarching command.  He identified that USBP is responsible to respond and protect the public along with other law enforcement agencies.

***BPA ▮▮▮▮▮ (EGS), interviewed on February 8, 2023. (Exhibit 42)***

On May 24, 2022, BPA ▮▮ was assisting other BPAs along U.S. Highway 57 when he received a phone call at approximately **12:20:00 PM** from SBPA ▮▮▮▮▮ (EGS) stating to respond to Uvalde because of an active shooter situation.  BPA ▮▮ retrieved his gear from the checkpoint and departed to Uvalde at approximately **12:35:00 PM**.  He drove to the funeral home across the street from Robb Elementary School and arrived approximately between **12:50:00 PM** and **1:45:00 PM**.  There, SBPA ▮▮▮ advised him to go to the Uvalde Border Patrol Station to muster.  After arriving at UVA, he received a message about a possible second shooter and returned to Robb Elementary School, where he was directed to go to Flores Elementary School.  He assisted at Flores Elementary School for approximately two hours by directing traffic and directing parents to the doors where children were located until the school was cleared.  He then returned to the command post at Robb Elementary School, where it was determined that he was no longer needed.  He then drove back to EGS.  BPA ▮▮ stated that as an EMT and first responder, it is his responsibility to assist when needed, with the approval of his supervisor.

***SBPA ▮▮▮▮▮▮ (CAR), interviewed on March 8, 2023. (Exhibit 146)***

On May 24, 2022, SBPA ▮▮▮ was the administrative supervisor over the Field Training Program.  He received information over the service radio that USBP dispatch had requested a CBP helicopter to respond to Uvalde for a shooting at a school.  SBPA ▮▮▮▮ informed PAIC ▮▮▮ and asked for approval to respond to Robb Elementary School.  PAIC ▮▮▮ instructed SBPA ▮▮▮ not to go to Uvalde.

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Approximately 50 minutes after learning of the incident, SBPA ███████ received a phone call instructing EMTs to respond. He gathered his gear and drove with another BPA in his medical vehicle. While enroute, SBPA ██ suggested that SBPA ███████ should proceed to the west side of the school. He arrived at Robb Elementary School at approximately **12:55:00 PM** and parked in front of a house on the corner of Geraldine Street and Nicolas Street, then ran toward the west side of the school with his medical bag. He made contact with the personnel on site to ascertain what was needed, but there was no communication taking place and even the EMS personnel were unsure about the status of the situation. He met with other USBP personnel by a tree near the front of the school, then departed Robb Elementary School and reported to UVA.

From UVA, he went to the Civic Center based on information related to a second threat, then transitioned to assisting at nearby schools. First, he assisted at the Uvalde Dual Language Academy, then Sacred Heart Catholic School, then Uvalde Classical Academy. He assisted with the release of students to their parents for approximately one hour, then went back to the Civic Center, then back to CAR.

SBPA ███████ observed that information over the radio was hard to decipher and was unclear as to what the status of the situation was and if there was still an active shooter. He heard discussion that the assailant was barricaded somewhere. He observed civilians and law enforcement officers everywhere but could not find anyone who knew what was going on or where anything was located. He stated USBP's role was as a law enforcement entity helping in the best interest of the community to stop the killing and save children and people. He believed USBP had authority to respond because it was a significant incident and a felony.

SBPA ███████ did not know who was in command and control of USBP. He heard the funeral home was supposed to be a command center, but when he passed it, it did not look like a command center; it looked like a parking lot. He never saw anything that looked like a command post and never saw anyone who looked or acted like they were in charge. He did not know who was in charge of medical triage and coordination either pre- or post-breach or where they were staged.

***CBPO*** ███████ ***(Del Rio, Texas Port of Entry), interviewed on February 13, 2023.***
***(Exhibit 67)***

On May 24, 2022, CBPO █████ was on a plain clothes assignment to a DEA task force in Del Rio, Texas, working on an operation in Eagle Pass, Texas, when a member of the task force notified her of an active shooter at Robb Elementary School. Other DEA task force members were responding, so CBPO █████ drove to Uvalde in an unmarked GOV with lights activated. While enroute, she heard over her service radio that the assailant was down. She arrived at Robb Elementary School approximately between **12:50:00 PM** and **12:55:00 PM** and stood outside the gate to assist with crowd control and keeping order. She went to the funeral home, where all DEA personnel were directed to respond to provide crowd control assistance for two to three hours. After providing security and crowd control at the hospital, she returned to a street near Robb Elementary School for a briefing with other DEA agents, then drove back to Del Rio. CBPO █████ had no direct knowledge of USBP's role other than as first responders.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ███████ *(DRT), interviewed on March 2, 2023. (Exhibit 117)*

On May 24, 2022, BPA ██████ was driving to lunch when multiple vehicles passed him with their emergency lights activated. He received a text from his sister on his personal phone asking if he had heard about a shooting in Uvalde and another text from her stating that the shooting had occurred at a school. BPA ████ returned to his office and asked if anyone had heard about a school shooting. No one had, so he called ACPA ██████ at DRT to inquire about the shooting. ACPA ██████ had not heard, but a few minutes later came to BPA ██████'s office and told him to grab his stuff and go with him to Uvalde.

They drove to Uvalde with lights and sirens activated while following two TXDPS units. Approximately 10 minutes before they arrived, BPA ██████ received a text stating "they" got the assailant. BPA ████ arrived at Robb Elementary School approximately between **12:55:00 PM** and **1:00:00 PM**, parked about two blocks from the school, and approached the school on foot. BPA ████ comforted a BPA near the school building and brought him to the funeral home.

While at the funeral home, BPA █████ heard TXDPS troopers say there was a threat of another shooter at the middle school or high school, so he relocated to the Uvalde High School. He set up on the east side of the high school in the parking lot in an observation role. He directed traffic and parents where to go for approximately 30 minutes before being informed that a nearby Catholic school needed security, so he relocated there and provided security until all students were released to their parents. He returned to the high school and set up in an observation role in the field behind the high school and stayed there for about 30 minutes until all students were evacuated. He then received a text or email instructing all BPAs to return to UVA, so he went there for about 30 minutes, then returned to DRT.

BPA █████ observed that the scene did not appear chaotic but there was a lot of stuff going on. He did not know who was in command at the scene or who was running the command center. He did not know who was in charge at the high school. He observed everyone was taking positions on their own and relaying their positions on the radio. At the Catholic school, he identified six BPAs and understood that ACPA ██████ was in command; this was the only time he understood who was in command.

*ACPA* █████████ *(DRT), interviewed on February 28, 2023. (Exhibit 98)*

On May 24, 2022, ACPA ██████'s supervisor, Executive Officer (XO) ██████████, told him there was a shooting at Robb Elementary School and that if he wanted to go, he could. ACPA ██████ perceived the statement as an order, so he drove with BPA █████ in an unmarked GOV from DRT to Uvalde. While driving, ACPA █████ called █████ (BPA ██████████) and instructed him to report to UVA while BPA █████████ attempted to gather information via the service radio. Because of communications issues, they only picked up partial information. They received information that the assailant had been stopped and that there were mass casualties. ACPA ██████ followed a TXDPS trooper from Del Rio to Uvalde.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00174



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



When he arrived at Robb Elementary School approximately between **12:55:00 PM** and **1:00:00 PM**, the shooting was already over. He parked approximately four blocks away and proceeded to the school on foot. He walked past the assailant's vehicle that had crashed in the ditch and observed that the school was roped off with police tape. PAIC ███████ informed ACPA ███ that USBP was being instructed to stand by and that USBP agents might be needed at another location.

ACPA ███ observed that most of the radio traffic he heard while enroute to Uvalde was BPAs relaying their positions and asking if assistance was needed. He received information that the assailant's girlfriend had threatened to shoot up another school, so he and BPA ███ went to a middle school to provide security for approximately one hour. He observed it was chaotic at the middle school, but nothing of note happened. While at the middle school, unknown law enforcement personnel asked them to assist with reuniting children with their parents at Robb Elementary School. By the time he arrived, numerous BPAs and TXDPS troopers were already assisting, so he just observed. Another unknown law enforcement officer mentioned that assistance was needed at a local Catholic school, so he went there, but several other LEOs were already there and only two students were left. He left the Catholic school after 20–30 minutes and went to UVA, then departed UVA to drive back to DRT at **6:00:00 PM**.

ACPA ███ stated that by the time he arrived at Robb Elementary School, the shooting had concluded, so he was there in a support role. He did not perceive that anybody was in charge and attempted to find an incident commander with no luck. He observed that everyone on scene looked like they were attempting to help in some way, but there were no directions being given. He perceived the local police were in charge of the scene at Robb Elementary School and believed that BPAs were on scene only to assist local law enforcement officers. He felt it was his duty as a public servant and as a BPA to help where he could but was not aware of any specific authority that mandated BPAs to respond to these types of incidents. He felt he did not play a big part in the response and wished he could have contributed more.

***BPA*** ███████████ ***(DRT), interviewed on February 14, 2023. (Exhibit 72)***

On May 24, 2022, BPA ███ was an acting supervisor ((A)SBPA) at EGS and was working with SBPA ███ when SBPA ███ received a phone call regarding a shooting that had occurred in Uvalde. (A)SBPA ███ rode with SBPA ███ to Uvalde in an unmarked GOV. They drove as close as they could to Robb Elementary School, arriving between **12:55:00 PM** and **1:05:00 PM**, but had to park and walk approximately two blocks because there were so many law enforcement vehicles everywhere. They walked to the funeral home, where an unknown law enforcement officer requested their help forming a perimeter to keep parents back. (A)SBPA ███ directed parents to pick up their children at the Civic Center, then spoke with another BPA before driving to the formal muster at UVA. He then drove to another school (Flores Elementary School or Morales Junior High School) after hearing a radio communication advising of another possible shooting and provided perimeter security for approximately one hour. BPA ███ indicated he responded to provide support and that USBP was there to provide assistance to other agencies.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ███████ *(UVA), interviewed on February 17, 2023. (Exhibit 89)*

On May 24, 2022, BPA ██████ was at UVA assigned to brush duty, working in uniform on a ranch south of Uvalde with several other BPAs, when SBPA ██████ received a phone call regarding the shooting at Robb Elementary School and informed the BPAs, directing them to respond to the school. They traveled in multiple vehicles with emergency lights and sirens activated and arrived at the Civic Center at approximately **1:00:00 PM**. There, they helped unload children from buses and provided security. BPA ██████ cleared a pathway for buses to approach the Civic Center and provided water to parents. He believed the purpose of his response was to provide whatever assistance was necessary.

*BPA* ███████ *(UVA), interviewed on March 22, 2023. (Exhibit 210)*

On May 24, 2022, BPA ██████ was working with the brush crew at ████████ when they heard about the incident at Robb Elementary School via radio communication. The brush crew decided they were going to respond and drove toward Uvalde in a USBP vehicle with lights and sirens activated. While enroute, they received direction to respond to the Civic Center.

They parked in an alley at the back of the Civic Center at approximately **1:00:00 PM**, entered the Civic Center, and provided security near the rear door. After hearing about a potential second threat, BPA ██████ relocated to the exterior of the Civic Center and conducted perimeter security. After being notified to discontinue perimeter security, he drove to UVA, turned in his vehicle and keys, and drove his personal vehicle to Dalton Elementary School where ██████ worked. He remained there until ██████ was cleared to leave the school.

BPA ██████ was unable to identify the person in charge at the Civic Center and did not see anyone giving orders to the law enforcement officers there. He stated USBP's authority to respond was to stop the threat and render aid as soon as possible by nature of their status as first responders and law enforcement officers. He stated USBP would assist other law enforcement agencies.

*DCPA* ████████ *(DRT), interviewed on March 17, 2023. (Exhibit 190)*

On May 24, 2022, DCPA ██████ was the Acting DCPA ((A)DCPA) for DRT when PAIC ████ and SOS ████ informed him there was an active shooter at an elementary school in Uvalde. (A)DCPA ██████ informed CPA Owens of the situation and that he was deploying to the scene. He directed SOS ████ to bring M4 rifles, then drove to Uvalde with three other agents. After receiving reports of 911 calls indicating there could be at least nine victims, he activated the emergency lights and sirens on the vehicle to get to the scene as fast as possible. (A)DCPA ████████ instructed PAIC ████ to order all EMTs within driving distance to deploy to the vicinity of the school. He also instructed the DRT Training and Traumatic Incident Management branch to have Peer Support and Chaplain resources on standby.

DCPA ██████ arrived at Robb Elementary School at approximately **1:00:00 PM**. Around the school, vehicles were blocking the road, so he had to park at the funeral home across from the



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



school.  After a radio transmission announced the subject was down, he proceeded toward the school with his medical bag.  (A)DCPA ████ entered the school through the west entrance and asked how he could assist as a former EMT.  (A)DCPA ████ questioned people who were standing around why they were not helping.  He instructed the BPAs to gather under the tree in front of the school and informed them if anyone was looking for a family member at the school, they should go find them.  After CPA Owens instructed all BPAs to meet at UVA, (A)DCPA ████ requested clean uniforms be gathered at UVA so the BPAs could change clothes.  He assisted with loading children from inside the funeral home onto a school bus, but the situation became increasingly tense with rumors among upset parents.

(A)DCPA ████ and the agents he arrived with departed the area and went to UVA.  TXDPS Rangers arrived at UVA, and DCPA ████ helped them set up to interview BORTAC and BORSTAR members who had been involved.  He returned to DRT to handle reporting, notifications, and other administrative matters.

Because of the distance from DRT to Uvalde, (A)DCPA ████ expected the incident to be over by the time he arrived and believed he would likely assume an incident command role.  He assumed the local police department and TXDPS would have control of the situation and would provide instructions of where to respond, but never confirmed who was in charge.  Although radio communications were inconsistent and there was a "hot mic," the information indicated that they were responding to an active shooter scenario.  Moments later, he began hearing that the assailant was a barricaded subject.  In types of incidents where USBP does not have jurisdiction, DCPA ████ identified that USBP responds in a support role.  He stated USBP should have been taking direction from another agency such as TXDPS or the local police department, and the fact that USBP had to take charge of the situation was not normal.  He observed that "every law enforcement agency was onsite, and it was very chaotic."  He stated that USBP had a duty to act and an obligation to respond when there was a commission of a felony in their presence, especially if it involved loss of life.

***BPA*** ██████████ ***(UVA), interviewed on March 2, 2023. (Exhibit 115)***

On May 24, 2022, BPA ██████ was assigned to the brush crew working at the ████████ with other BPAs when he was informed that there was a shooting at Robb Elementary School and they were ordered to respond.  The BPAs departed toward Robb Elementary School in four different USBP-marked vehicles.  While enroute, they heard radio communications stating that the assailant was down.  They heard a request for assistance at the Civic Center, so they redirected there, arriving at approximately **1:00:00 PM**.  There, they were asked to clear a path for the buses, set up a perimeter, and provide security for children and parents until relieved by the swing shift around **5:00:00 PM**.  BPA ██████ returned to UVA and put his equipment away.  While there, he attempted to console BPA ██████.  BPA ██████ believed that SBPA ██████ was in command and control at the Civic Center as the first SBPA to arrive.

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00177



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*PAIC* ███████ *(COM), interviewed on March 3, 2023. (Exhibit 130)*

On May 24, 2022, PAIC ████ was the Assistant Chief Patrol Agent (ACPA) over the Professional Standards Branch at USBP DRT. He was working in his office when he learned from SOS ████ of an incident at a school in Uvalde. ACPA ████ met with (A)DCPA ████ and ACPA ████ and agreed they should go to Uvalde. He rode in an unmarked GOV and learned via service radio that a significant law enforcement response was occurring. He handled communications for (A)DCPA ████ while (A)DCPA ████ drove with emergency equipment activated. ACPA ████ maintained communications with PAIC ████ and learned that BORSTAR and BORTAC had been sent to the scene.

Approximately 5–10 miles before entering Uvalde, they the heard an announcement that the assailant was down. Upon arriving at Robb Elementary School at approximately **1:00:00 PM**, they parked on the north side of the funeral home. They gathered their medical bags and walked toward the school after being unable to identify any incident command at the funeral home. They entered the school and walked eastbound down the hallway looking for things to do but learned they were not needed for medical assistance or clearing classrooms. They exited through the west door and asked all BPAs not actively engaged in something to meet on the north side of the building near the large tree.

ACPA ████ worked with support staff at DRT to have extra uniforms gathered for BPAs who had blood-stained uniforms. An unknown law enforcement officer asked for his assistance providing security for children who were loading onto buses going to the Civic Center for about 10 minutes. Then he drove to UVA, where he fielded phone calls and emails regarding the situation and helped BPAs exchange bloody uniforms for clean ones. After going home, he received a call from PAIC ████ regarding guidance for the process of asking the eight officer safety questions to involved law enforcement officers following a deadly force incident, in accordance with CBP policy.

ACPA ████ may have given the order that the bloody uniforms could be thrown away a few days later. He stated he could not identify if the situation was ever an active shooter versus a barricaded subject. He did not observe anyone in command and control of the situation at Robb Elementary School. He believed PAIC ████ to be in command with the most information, but upon entering the scene there was no one in command and no incident command post was identified. ACPA ████ stated that BPAs and other law enforcement officers have a mandate to provide public safety and protect the innocent.

*BPA* ███████████ *(CAR), interviewed on February 28, 2023. (Exhibit 95)*

On May 24, 2022, BPA ████ was the Sector Medical Coordinator at DRT coordinating EMT certification classes. He had checked in on the class when another instructor advised him that there was an active shooter in Uvalde. BPA ████ went to the SOD team house to try to get more information and was advised not to respond so as not to flood the scene. Later he received a phone call from SBPA ████ instructing him to head to Uvalde. BPA ████ stopped at the medical supply warehouse and loaded an unmarked GOV with medical supplies. He sent a text



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



from his personal phone to SBPAs ▮▮▮▮ and ▮▮▮▮ informing them that he was enroute with medical supplies, then drove to Uvalde, departing at approximately **12:15:00 PM**. He went directly to the Uvalde Memorial Hospital to provide aid, arriving there at approximately **1:00:00 PM**. BPA ▮▮▮▮ requested the assistance of other law enforcement officers who were standing around at the hospital to unload medical supplies from the GOV into the emergency room and informed the hospital staff to use them, if needed.

BPA ▮▮▮▮ then went to check on the status of an injured BPA but did not find him. He asked hospital personnel where he could help. They said to set up outside the emergency room to conduct initial triage, which he did. There, he overheard law enforcement officers talking about a possible second shooter and decided he would be better utilized at a school, so he left the hospital after confirming with hospital staff that he was not needed.

BPA ▮▮▮▮ went to Dalton Elementary School, entered the grounds, and met with BORSTAR agents. He requested a reporter who was attempting to film the children to move farther away from the school and outside the perimeter, which she did. BPA ▮▮▮▮ decided to meet with the school principal and staff to coordinate the reuniting of students with parents and assisted with the release of students until around **7:00:00 PM**, then went home.

### SBPA ▮▮▮▮ (CBP LESC), interviewed on February 15, 2023. (Exhibit 77)

On May 24, 2022, SBPA ▮▮▮▮ was on detail conducting use of force training assessments at USBP Del Rio Sector for the CBP LESC, observing use of force training at BRA. Around lunchtime, he heard there was an active shooter in Uvalde and decided to respond. SBPA ▮▮▮▮ and other SBPAs drove to Robb Elementary School, arriving at approximately **1:00:00 PM**. They saw that stretchers were being carried into the building and determined that the shooting had ended. SBPA ▮▮▮▮ directed traffic at the street beside the incident command center, then provided security at the hospital. Later, he went to the Uvalde High School and remained there until almost all the children went home, then went to UVA.

### SBPA ▮▮▮▮ (CBP LESC), interviewed on February 10, 2023. (Exhibit 80)

On May 24, 2022, SBPA ▮▮▮ was at USBP Del Rio Sector and USBP Brackettville Station conducting observation and field review of the use of force training for the CBP LESC. While outside after the observation was finished, an unknown BPA informed him that there was an active shooter in Uvalde. SBPA ▮▮▮ decided to respond to Uvalde and left Brackettville in an unmarked patrol vehicle with emergency lights and sirens activated. He drove directly to Robb Elementary School, arriving at approximately **1:00:00 PM**, and parked a couple blocks away from the school. He attempted to clear out vehicles that were blocking EMS vehicles from entering the school but was unsuccessful because the vehicles were locked. He dropped off a BPA at UVA to serve as a Peer Support Member, then went to the Uvalde hospital and helped direct traffic and advise family members where the entrance was. Then he drove to Flores Elementary School to assist with traffic control and security while children were being released to their parents. Next, he responded to Morales Junior High School to assist by standing guard to




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

ensure the safety of the school.  Finally, he returned to UVA to see if any further help was needed, then went back to Del Rio.

*ACPA* ████████████ *(DRT), interviewed on March 3, 2023. (Exhibit 128)*

On May 24, 2022, ACPA ██████ learned from ACPA ██████ of a possible active shooter in Uvalde.  ACPA ██████ obtained M4 rifles and rode with ACPA ██████ and (A)DCPA ██████ to Robb Elementary School.  During the drive, he worked with the others to identify and address priorities.  ACPA ██████ made the appropriate notifications, received and made phone calls, and tried to get the phone number of the incident command post to contact Sheriff Nolasco but received no answer.  ACPA ██████ called and informed the Strategic Communications Branch at DRT of the incident and contacted someone at the training branch and requested to have EMT, Peer Support, and Chaplain personnel respond to Uvalde.

Shortly after arriving at Robb Elementary School at approximately **1:00:00 PM**, they learned the threat had been neutralized.  They locked their rifles in the GOV lockbox and ran with their EMT bags to assist at the school.  They entered the school and saw there was nothing they could do inside to assist, so they exited the building, separated, and began gathering USBP personnel to meet with CPA Owens near a tree on the north side of the school.

There, they were directed to return to UVA.  ACPA ██████ called SOS ██████ at DRT and requested she collect and send clean uniforms to UVA.  They were in the process of leaving Robb Elementary School when a police officer asked them to assist with getting children onto a bus from inside the funeral home.  ACPA ██████ joined a line with other law enforcement personnel to keep the children separated from the large number of nearby parents and ensure they were safely on the bus.  Due to the frustration demonstrated by some parents, they notified a local law enforcement officer that they were leaving and went to UVA.

ACPA ██████ communicated with USBP headquarters in Washington, DC, and composed a list of UVA personnel who responded to Robb Elementary School.  He returned to DRT at approximately **7:00:00 PM**, then went home.  Prior to arriving at Robb Elementary School, ACPA ██████ confirmed there was an active shooter in Uvalde but stated that generally the information he received was incomplete and unclear.  He did not know if the assailant was still shooting, had quit shooting, or was dead.  He was told the incident command post was established at a funeral home in Uvalde and that the agents on scene had the full support of the Chief of the Border Patrol in Washington, DC, to do whatever needed to be done to get the assailant.

ACPA ██████ stated that the scene at the school was chaos, with law enforcement vehicles parked everywhere and streets blocked with law enforcement officers and civilians.  He was not aware if CBP had an active shooter policy.  He stated that it appeared that the BORTAC agent who took tactical control and put a team together was in charge at the school.  ACPA ██████ believed there was a moral obligation to respond because he took an oath to protect America, and believed he also had a personal responsibility to respond to an incident like a school shooting. He did not know what agency was in command and control of the overarching incident but stated



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



it was not USBP. He stated that USBP's role was to support other law enforcement agencies and take joint action, if necessary, because a local or state agency would have had jurisdiction.

*BPA* ███████ *(UVA), interviewed on February 17, 2023. (Exhibit 87)*

On May 24, 2022, BPA ██████ was working with the brush crew when he heard a radio transmission that a shooting had occurred at Robb Elementary School. He rode with other BPAs in a marked patrol vehicle with lights and sirens activated and fell in behind other USBP marked patrol vehicles. BPA ██████ arrived at the Civic Center at approximately **1:00:00 PM** and provided crowd control and cleared a pathway for buses to drive. He was not sure what USBP's role was, but believed it was primarily as support and to help at the scene.

*BPA-P* █████████████ *(DRT), interviewed on February 10, 2023. (Exhibit 62)*

On May 24, 2022, BPA-P ██████ was assigned to the Professional Standards Branch, Management Inquiry Team at DRT, assisting with interviews at the USBP Soft Sided Facility in Eagle Pass, Texas, with SBPAs █████████ (DRT) and █████████ (DRT) when an unknown SBPA received a phone call advising them to respond to Uvalde because of a shooting incident. BPA-P ██████ responded using lights and sirens and drove directly to Robb Elementary School, arriving there a few minutes after **1:00:00 PM**. Due to the large number of law enforcement vehicles at the scene, they had to park approximately one-quarter to one-half of a mile away from the school and walk.

While walking, they encountered an SBPA who told them the situation was over. BPA-P ██████ remained outside the school's fence for a short time, then walked to the funeral home, where he received instructions from an unknown person to go to Dalton Elementary School. He stopped at UVA to pick up body armor and a long arm, then drove to Dalton Elementary School and helped reunite arriving parents with their children. He assisted with traffic control at the entrance to the school, then returned the body armor and long arm to UVA before returning to Del Rio. When asked about his general perception of who was in charge on May 24, 2022, BPA-P ██████ indicated that the incident was complete chaos and it did not appear that anyone was in charge. He stated USBP's role in situations such as this was backup, but if USBP was first on site, the role would be to provide for the safety of the general public.

*BPA* ███████ *(UVA), interviewed on March 10, 2023. (Exhibit 158)*

On May 24, 2022, BPA ██████ was at UVA on light duty due to an ankle injury. He heard some of the USBP mechanics talking about a possible shooter at Robb Elementary School and decided to respond to Robb Elementary School as a BORSTAR agent. He drove a GOV to the school; while enroute, he heard over the radio the "shooter was down." BPA ██████ arrived at Robb Elementary School at approximately **1:00:00 PM** and parked at the funeral home, then walked toward the school. He offered assistance to other BPAs, but they were busy and didn't respond. He then went to the front of the school and met with a group of BPAs for approximately 20 minutes before returning to UVA, where he was instructed to go to local schools and provide



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



security assistance because of reports of a potential new threat. He provided security at Dalton Elementary School, then returned to UVA.

**BPA** ████████ **(DRT), interviewed on March 1, 2023. (Exhibit 107)**

On May 24, 2022, a supervisor called BPA ████ on his personal cell phone and informed him there was a possible shooting in Uvalde and instructed him to head to Uvalde. BPA ████ arrived at Robb Elementary School at approximately **1:00:00 PM** and walked toward the school, where he encountered other BPAs who informed him there were already enough people inside the school to provide support. He went to the funeral home to figure out how he could help and was instructed to relocate to the Civic Center, so he went there and met with other BPAs. He drove some BPAs back to the funeral home, took general pictures of all the law enforcement activity outside the school, then drove the BPAs back to the Civic Center. BPA ████ provided support by giving breaks to the BPAs stationed outside the Civic Center. He stated he did not know what had occurred until he arrived at Robb Elementary School. Prior to arriving at Robb Elementary School, he believed law enforcement officers were chasing a smuggler who bailed out of a vehicle and ran into the school. BPA ████ did not know who or which agency was running the command center when he arrived at the funeral home.

**BPA** ████████████ **(DRT SOD), interviewed on March 1, 2023. (Exhibit 112)**

On May 24, 2022, BPA ████████ was assigned to the Emergency Operations Center at DRT, where a supervisor informed him there was an active shooter in Uvalde. BPA ████████ ████ asked if they were going to respond. The supervisor said yes and BPA ████████ self-deployed. He drove in a GOV and arrived near Robb Elementary School at approximately **1:00:00 PM**. He took his medical bag, weapon, and helmet, and proceeded toward the school. He arrived at the west entrance after the breach and began helping fellow agents who were affected by the events by providing water and emotional help. He met with his team, then went to the side of the building where everyone was mustering and was ordered back to UVA.

Upon being informed of a message about the assailant's girlfriend, he and other agents went to schools around Uvalde. BPA ████████ went to Dalton Elementary School and was stationed at the back door to make sure no one entered the school. He also assisted with directing traffic for parents picking up their children. During his travel to Robb Elementary School, BPA ████████ heard communications that described the event as a barricaded subject. When he arrived at Robb Elementary School at approximately **1:00:00 PM**, he observed people standing around as if nothing was going on. He felt that PAIC ████ and SBPA ████████ were in charge of USBP personnel because SBPA ████ was providing direction and guidance to his BORSTAR team. BPA ████████ believed USBP had authority to respond to an active shooter situation because when lives are being threatened, the threat must be stopped as soon as possible.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



***BPA*** ███████████ ***(UVA), interviewed on March 16, 2023. (Exhibit 187)***

On May 24, 2022, BPA ████ was working brush crew at ████████████ and ████████ south of Uvalde when another BPA in the crew received a text from his spouse asking what was going on at Robb Elementary School.  BPA ████'s supervisor instructed him to respond to the school.  He drove toward the school but was redirected to the Civic Center.  While enroute, he heard sporadic communication over the radio stating "they were going in," and "the subject was down."  He arrived at the Civic Center at approximately **1:00:00 PM** and remained there to provide security and assist with crowd control until all children were safely returned to their parents.  He then returned to UVA and went home.

BPA ████ observed the atmosphere at the Civic Center was chaotic and people were panicking.  He perceived there was no command and control at the Civic Center and observed that law enforcement officers were self-initiating work to control the scene.  Regarding authority to respond, BPA ████ believed all law enforcement officers should respond to these types of incidents.

***BPA*** ███████████ ***(EGT), interviewed on February 8, 2023. (Exhibit 45)***

On May 24, 2022, BPA █████████ was on riverine patrol on the Rio Grande near Eagle Pass, Texas, when BPA █████████ (EGT) told him about the Robb Elementary School incident.  BPA █████████ assisted the vessel commander in getting the boat out of the water so he could exit and respond to Uvalde as an EMT.  He took the M4 rifle from the boat and traveled with another BPA in a USBP ambulance with the lights activated, using the sirens only when traffic approached.  He arrived at the Uvalde Memorial Funeral Home at approximately **1:00:00 PM** and parked as close to the school as possible.

He approached the school carrying his EMT gear but was advised that everyone needing medical treatment had already been treated.  He then proceeded to the funeral home and heard radio traffic indicating the possibility of a second threat.  He went to Dalton Elementary School, where he provided security for five hours.  He communicated with arriving parents to help them understand the process for picking up children.  BPA █████████ recalled receiving instructions only from Watch Commander (WC) █████████ (DRS) and was not aware if anyone else was in charge of the incident.  BPA █████████ understood USBP's role in the response was to fan out and provide security around the school because he believed the school handled most of what occurred.

***BPA*** ███████████ ***(COM), interviewed on March 1, 2023. (Exhibit 113)***

On May 24, 2022, BPA ████ was on duty at the USBP DRT firearms range when another BPA received a phone call regarding an active shooter and possible bailout in Uvalde.  He also heard that a possible load vehicle had shot at the Uvalde Police Department and had something to do with a school.  BPA ████ drove in a GOV with other BPAs to Robb Elementary School and parked in a local resident's driveway with the resident's permission at approximately **1:00:00 PM**.  He helped provide security near a disabled truck in a drainage culvert and assisted with



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



moving vehicles that were blocking the street. He went to the funeral home and was advised to assist with security at the Uvalde Memorial Hospital. Before he could go there, he was instructed to go to UVA for a muster.

From UVA, he traveled with other BPAs to various Uvalde schools to help with security based on information regarding an additional shooter. He provided security for the rest of the day at Uvalde High School, Morales Junior High School, and Flores Elementary School, then traveled back to the DRT firearms range. BPA ████ identified that the command center was in the Hillcrest Memorial Funeral Home. He identified examples of BPA authority to respond such as a felony occurring or a smuggling vehicle incident and stated he was in a backup role during the Robb Elementary School shooting because he arrived after the assailant was stopped.

***SBPA*** ████████ ***(DRT), interviewed on February 10, 2023. (Exhibit 60)***

On May 24, 2022, SBPA ████ was in Eagle Pass, Texas, to assist OPR conducting interviews for a critical incident investigation. During the trip to Eagle Pass, he heard spotty communications on the USBP radio about an incident taking place in Uvalde. During an interview at Eagle Pass, he received a phone call informing everyone that they needed to respond to Uvalde to assist with a critical incident involving CBP employees and a shooting. SBPA ████ drove to Uvalde with his lights and sirens activated when needing to overtake civilian vehicles. He arrived in Uvalde after law enforcement had confronted and killed the assailant. He arrived at the Hillcrest Memorial Funeral Home a few minutes after **1:00:00 PM** and parked approximately two blocks away from Robb Elementary School, then walked toward the school. The incident was already over by that time, so he remained outside the school for about 10 minutes.

Afterward, he went to the command center at the funeral home and met with OPR SA ████ ████ (OPR Del Rio) and Acting Resident Agent in Charge ((A)RAC) ████████ (OPR Del Rio). While at the funeral home, (A)RAC ████ directed him to secure Dalton Elementary School after going to the Uvalde Border Patrol Station to check out hard-plate body armor and M4 rifles. SBPA ████ provided perimeter security at Dalton Elementary School and helped direct traffic with other state and local law enforcement officers. He answered questions and directed people where to go to retrieve their children. He stated that USBP's role in this incident was support and public safety.

***SBPA*** ████████ ***(CAR), interviewed on March 15, 2023. (Exhibit 182)***

On May 24, 2022, SBPA ████ was the duty supervisor at CAR responsible for overseeing daily operations, including scheduling and reviewing files. She heard a radio transmission over the county radio related to a crash, then received a call from a BPA at CAR stating that ████ ████ school was on lockdown because of an active shooter. Next, a BPA came into the office and stated there was an active shooter in Uvalde County and inquired as to which school.

SBPA ████ contacted UVA to obtain information. She stayed in the duty supervisor office with WC ████ and notified PAIC ████ and DPAIC ████ via text. She received a phone call



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



from BPA ███, who informed her that he was responding to the school. She continued to field phone calls from other BPAs. Other BPA EMTs and paramedics asked her if they could deploy; she instructed them to stand by, then received authorization to deploy them. She broadcast over the radio for all available EMTs to respond to Robb Elementary School, then grabbed her EMT bag and departed for Uvalde.

She coordinated with the Crystal City Sheriff's Office to clear the roads to allow EMTs to quickly pass through town. She arrived at Robb Elementary School approximately between **1:00:00 PM** and **1:10:00 PM** and parked in front of a residence because the roads were blocked, then ran toward the school. Another BPA stopped her and told her not to enter the school because there was nothing else they could do. She gathered at a tree with other BPAs and began providing Peer Support, then rode with BPA ███ to UVA and continued Peer Support duties.

She was requested to go to the hospital to support BPA ████ and went there with SBPA ███ but was unable to visit BPA ████ because of a restriction on the number of visitors allowed per patient. She provided her business card to BPA ████'s family in case they required Peer Support services, then remained at the hospital because it was on lockdown due to the threat of a second shooter. During that time, she conversed with a boy who was a victim from inside one of the classrooms and provided her business card to the boy's mother. She left the hospital and went to the Civic Center, where she assisted with security and crowd control.

SBPA ███ stated she could not tell who was in command and control at Robb Elementary School. The only time she perceived anyone in command was when TXDPS Captain ████ gave the order to stand down over the radio, prior to the breach. SBPA ███ stated that the rest of the radio chatter was complete chaos. She believed USBP's role in responding to the school was to stop the threat and provide medical services, although she stated that the primary responsibility to stop the threat was with the first law enforcement agency that arrived on scene. She stated USBP employees are public servants with a responsibility to protect.

***BPA ██████████ (CAR), interviewed on March 10, 2023. (Exhbit 153)***

On May 24, 2022, BPA ████ was working at the permanent tactical checkpoint as an EMT and EMT Coordinator when another BPA asked BPA ████ to handle vehicle primary because the other BPA's wife and son were at a school involved in an active shooter incident. BPA ████ called CAR, and an SBPA advised him not to respond. Later, BPA ████ received a phone call from a radio operator instructing him to respond to Robb Elementary School as an EMT. He drove alone with his emergency equipment activated and parked in the yard of a house, then walked toward the school approximately between **1:00:00 PM** and **1:15:00 PM**. He received instructions to not go inside the school, so he spoke briefly with other BPAs, then traveled to UVA where he heard about a second threat and was instructed to provide security at the hospital, which was then changed to the Civic Center. BPA ████ responded to the Civic Center, provided perimeter security, and advised some people that voting had been stopped because of the need to secure the Civic Center. BPA ████ did not know who was in charge of the response to the active shooter. He believed USBP had a duty to act and respond as a law enforcement organization responsible for protecting the public.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ▆▆▆▆▆▆▆ *(DRT), interviewed on March 3, 2023. (Exhibit 125)*

On May 24, 2022, BPA ▆▆▆▆ was assigned to the DRT Sector Intelligence Unit checking the roads for vehicles that had been breaking down fences. He received a group text from Zavala County Sheriff's Office stating, "school shooting at Robb Elementary," and requesting support. He was not sure whether to respond because he did not feel he would make it in time but left after 20 minutes and drove straight to the school in a GOV and wearing plain clothes, arriving there approximately between **1:00:00 PM** and **1:30:00 PM**. As BPA ▆▆▆▆▆ entered Uvalde, he heard over the radio that entry was made into the classroom. Shortly afterward, he heard the threat was "down."[192]

At the school, he saw a Crystal City Police Department officer he knew and requested information, but the officer was unable to provide any information. BPA ▆▆▆▆ spoke with many law enforcement officers to identify where he could be of assistance, but everyone was either briefing or awaiting instructions. School personnel informed him that there were still children inside the school, so he joined a group of law enforcement officers and began clearing about five classrooms and escorting children and teachers outside before being relieved by the San Antonio Police Department. He left the school and drove back to DRT and briefed his supervisor. BPA ▆▆▆▆ believed USBP's authority in an active shooter event was to neutralize the threat and respond to the people.

*BPA* ▆▆▆▆▆▆▆ *(BRA), interviewed on February 8, 2023. (Exhibit 43)*

On May 24, 2022, BPA ▆▆▆ was responding to sensor activations in the BRA area of responsibility and performing sign cutting with his training unit when a call came out on the service radio for all agents to report to the Civic Center. BPA ▆▆▆▆ traveled to Uvalde with another BPA with lights and sirens activated and reported to the Civic Center approximately between **1:00:00 PM** and **1:30:00 PM**. There, they received orders to funnel the children getting off buses into the building, have parents wait to take the children until all the children were accounted for, keep the area clear, and keep a clear path to the building for the children. He provided perimeter security around the Civic Center upon hearing about another potential threat and answered questions from the public. BPA ▆▆▆▆ stated USBP's role was to provide security.

*BPA* ▆▆▆▆▆▆▆ *(CAR), interviewed on March 9, 2023. (Exhibit 154)*

On May 24, 2022, BPA ▆▆▆▆ was working at the CAR processing center when he heard other BPAs talking about a possible shooting somewhere in Uvalde. He was advised to direct CAR EMTs to Uvalde to assist with medical care and responded as an EMT in his assigned vehicle.

He parked in a neighborhood near the school and walked to the school, arriving approximately between **1:00:00 PM** and **1:30:00 PM**. He then went to the rally point with other BPAs and provided agents with ice packs and water. He joined other law enforcement officers in clearing

---

[192] OPR interview of ▆▆▆▆▆▆, March 3, 2023, timestamp 00:21:58.




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

five or six classrooms, then met with another group of BPAs who were directed to the Civic Center. He provided perimeter security at the Civic Center for approximately three hours, then returned home.

BPA ████ did not know if there was an active shooter or if shots had been fired. He did not believe anyone from USBP oversaw the scene and understood he was directed to Robb Elementary School in a medical capacity. BPA ████ identified that PAIC ████ was the supervisor directing the agents at the rally point and that AEA ████ appeared to be leading the group clearing the classrooms. BPA ████ did not know who was in command at the Civic Center.

**BPA ████████ (BRA), interviewed on March 8, 2023. (Exhbit 145)**

On May 24, 2022, BPA ████ was detailed to USBP DRT as an EMT Coordinator. He was providing EMT training when a trainee (a trooper from TXDPS) notified him that there was an active shooter in Uvalde. ACPA ████ directed BPA ████ to respond to Robb Elementary School. BPA ████ gathered his medical gear and responded with another BPA in an unmarked USBP vehicle. They arrived at Robb Elementary School approximately between **1:00:00 PM** and **1:30:00 PM** and parked a block away from the school, then headed to the funeral home. He signed in on a white board and asked where the medical triage area was located, then walked outside toward the school looking for it. He asked the San Antonio Fire Department Chief how he could be of assistance and was advised he would not be allowed in the school because it had been declared a crime scene.

BPA ████ then signed out of the command post at the funeral home and decided to meet another BPA at the Uvalde Memorial Hospital to assist. While enroute, he heard "shots fired at the high school" over the radio and decided to respond there. He helped search and clear the inside of the high school, then proceeded to Flores Elementary School, an unknown charter school, and Dalton Elementary School to provide perimeter security as each school was evacuated. He drove back to DRT, arriving at approximately **6:00:00 PM**.

BPA ████ stated that the San Antonio Fire Department Chief appeared to be in command and control of the local EMS on site. BPA ████ understood he was responding to a mass casualty event and stated that as an EMT he would provide first aid to anyone in need.

**SA ████████ (OPR Los Angeles), interviewed on July 25, 2023. (Exhibit 225)**

On May 24, 2022, SA ████ was on duty and assigned to OPR Del Rio, where he was driving with SA ████ toward Eagle Pass, Texas. Two BPAs followed behind them in a separate vehicle and one of the BPAs called SA ████ and told him there was a shooting at a school in Uvalde. (A)RAC ████ told SA ████ and SA ████ to proceed to Eagle Pass. Shortly after they arrived, they received a call to respond to Uvalde. They drove in their GOV toward Uvalde with lights and sirens activated and arrived at Robb Elementary School approximately a few minutes after **1:00:00 PM**, where they saw 80–100 law enforcement officers and were not sure whether the situation was still active. They learned of a possible



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



secondary threat against other Uvalde schools and were directed to go to UVA to gather information from TXDPS Rangers. They drove to UVA with lights and sirens activated, and SA ███████ remained there the rest of the evening.

SA ███████ stated that the scene at the school was chaotic and he believed he was required to respond because he is a federal agent. He also stated that any request from state or local law enforcement would require a response.

### SA ███████ *(OPR Del Rio), interviewed on February 10, 2023. (Exhibit 63)*

On May 24, 2022, SA ████ was serving as a BPA on the Management Inquiry/Critical Incident Team at USBP Del Rio Sector, Texas. While driving to a meeting with BPA-P ███████ and SBPA ████ at USBP Eagle Pass South Station, BPA ████ heard over the radio that someone had entered Robb Elementary School with a long arm and shots were fired. BPA ████ called SOS ████ and reported the information from the radio and requested to divert to Uvalde. SOS ███████ instructed BPA ████ to continue to EGS. After BPA ████ arrived at EGS, he conducted the meeting, then received a phone call instructing him and the other agents to respond to Uvalde. They drove to Uvalde in GOVs with emergency equipment activated, arrived at Robb Elementary School a few minutes after **1:00:00 PM**, and parked two blocks away from the school. They entered the funeral home and signed in. There, a TXDPS supervisor told them that there was an active threat to other local schools and instructed them to go to a local school. As they prepared to do so, ACPA ███████ told SA ████ that Chief Patrol Agent (CPA) Owens wanted to address everyone at UVA. They went to UVA to get rifles and body armor, then went to Dalton Elementary School, where they helped the principal release children by instructing parents to drive up to the school and present identification to pick up their children. BPA ██████ assisted with traffic control and brought Gatorade to the funeral home. He indicated that USBP assists local police when circumstances require.

### SA ███████████ *(OPR Del Rio), interviewed on July 19, 2023. (Exhibit 222)*

On May 24, 2022, SA ███████ was driving toward Eagle Pass, Texas, to respond to another matter when he received a call from SBPA ████ about radio communications he heard regarding a possible shooting near a school in Uvalde. SA ███████ called (A)RAC ███████, who initially directed him to proceed with his planned assignment, but then directed him to respond to Uvalde upon learning that BORTAC was responding. SA ███████ drove to Uvalde in his GOV with lights and sirens activated. He arrived at Robb Elementary School approximately a few minutes after **1:00:00 PM** and was advised not to go inside the school.

He went to the funeral home, where he learned of a possible secondary threat against other Uvalde schools and was directed to respond to Morales Junior High School. He sent a text message to OPR SAs that he was responding to the junior high school, where he remained at the perimeter and provided security. A local police officer requested him to accompany her to see the parents and explain the process for student dismissal. After two hours, SA ███████ returned to the incident command center near Robb Elementary School.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He stated that CBP does not have authority to respond to incidents like the one at Robb
Elementary except at the request of state or local law enforcement, who have primary
jurisdiction.

***Supervisory CBP Officer (SCBPO)***      ***(Del Rio Port of Entry), interviewed on***
***February 10, 2023. (Exhibit 59)***

On May 24, 2022, SCBPO ▮▮▮ was at the federal courthouse in Del Rio, Texas, assigned as a
Task Force Officer (TFO) for U.S. Immigration and Customs Enforcement, Homeland Security
Investigations, Del Rio, Texas, when he received a group text message from investigators at
TXDPS regarding a possible active shooter incident at Robb Elementary School. TFO ▮▮▮
decided not to respond because Del Rio is 70 miles away from Uvalde. He concluded his
activities at the courthouse, then received a call from his supervisor instructing him to respond to
the command center in Uvalde. TFO ▮▮▮ picked up another TFO and traveled to Uvalde in
an unmarked vehicle with lights and sirens activated. They arrived at the funeral home at
approximately **1:00:00 PM**. He went to the Uvalde High School after an alleged report of a
threat there, and he assisted officers in trying to calm parents for approximately 30 minutes.
Hethen reported to the command center, where he was instructed to return to the high school and
assist school faculty with children who were going to be released to their parents. He provided
protection for school faculty and escorted children from the lunchroom to their parents' cars
before responding to the fairgrounds for a debrief. TFO ▮▮▮ believed USBP's role was to
assist where needed.

***BPA-P*** ▮▮▮ ***(DRT), interviewed on March 1, 2023. (Exhibit 114)***

On May 24, 2022, BPA-P ▮▮▮ was an SBPA at DRT and someone at the DRT range notified
him that there was an active shooter at Robb Elementary School. He and others gathered their
gear and drove GOVs with lights and sirens to Robb Elementary School, arriving in Uvalde
between approximately **1:05:00 PM** and **1:10:00 PM**. He anticipated the incident would be
resolved by the time they arrived and was not directed to respond but stated that is what they
train to do. Upon arriving, he walked down the street to see how he could help. He overheard
that assistance was needed at the hospital with perimeter security and traffic control, so he and a
BPA-P traveled there. Later, he was contacted to report to UVA to provide Peer Support
assistance. He reported to UVA, then received information about the threat of a possible second
shooter, so he traveled with a BPA-P to Uvalde High School, where they assisted in clearing the
school. He then traveled to Flores Middle School, Morales Junior High School, and Dalton
Elementary School to clear the schools and assist with reuniting students with their parents.
After clearing the schools, he drove back to UVA, then went back to the DRT firearms range.
BPA-P ▮▮▮ observed that incident command was nonexistent. He stated USBP's role was to
assist, do the right thing, and try to save lives because that is what they are paid to do.

***WC*** ▮▮▮ ***(EGS), interviewed on February 14, 2023. (Exhibit 73)***

On May 24, 2022, WC ▮▮▮ received a text message from the Uvalde Consolidated
Independent School District indicating that Robb Elementary School was on lockdown because

---



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



of police activity in the area.  Later, ████ contacted him by phone asking what was going on at the school.  He received a request from an unknown BPA for help and for EMTs and anyone else able to respond.  WC ████ sent BPA ████ to respond to Uvalde and followed BPA ████ with lights and sirens activated.  They arrived at Robb Elementary School between **1:10:00 PM** and **1:15:00 PM**.  WC ████ sent BPA ████ to the funeral home to check in at the command center, while WC ████ checked on injured BPA ████████ at the Uvalde hospital.  WC ████ received information about a possible secondary threat and responded to the Uvalde High School, where he cleared the high school and confirmed there was no shooter and no shots fired.  WC ████ directed two agents to Flores Elementary School and two EMTs to Dalton Elementary School.  He coordinated with BPAs to cover gaps in security perimeters at other Uvalde middle and high schools.  He checked on ████████ at the Civic Center, returned to the command center, then returned to the Uvalde High School and Morales Junior High School to help reunify children with their parents.  He requested assistance from BPAs over the service radio for traffic control.  WC ████ observed that there was not a lot of command and control.  He described the situation as a chaotic mess and stated that it was difficult to get ahold of anyone using service radios.  He believed USBP was there to support and assist and respond to the potential secondary threat.

### WC ████████ (BRA), interviewed on February 9, 2023. (Exhibit 54)

On May 24, 2022, WC ████ heard about the incident from a radio or phone call around lunchtime.  He traveled toward Uvalde in a USBP vehicle but got a flat tire along the way and did not have a spare.  Later, he learned the assailant had been confronted and shot, so he decided to return to BRA.  While at BRA, he learned of a secondary threat, so he continued toward Uvalde with his emergency lights and sirens activated.  He arrived at the Civic Center at approximately **1:15:00 PM** and provided perimeter security.  He spoke with and provided instruction to Brackettville BPAs.  WC ████ observed that the atmosphere at the Civic Center was chaotic and disorganized.  He never learned who had overarching command and control and observed that law enforcement officers were given limited instructions.  He believed he had a duty to provide aid and react to the incident at Robb Elementary School because people were dying.

### BPA ████████ (BRA), interviewed on March 1, 2023. (Exhibit 106)

On March 24, 2022, BPA ████ was attending an EMT course at BRA when two BPA EMT instructors told him there was a shooting and that they were leaving to go to Uvalde and assist.  Acting ACPA ████ asked him to report to Robb Elementary School to assist as a certified Chaplain.  BPA ████ drove toward there in his GOV with emergency equipment activated.  Enroute, he was directed to the Uvalde Border Patrol Station instead of the elementary school.  He arrived at UVA at approximately **1:15:00 PM** and provided support wherever possible for the rest of the day.  He also assisted with distributing clean uniforms.

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**





*BPA ███████████ (BRA), interviewed on February 15, 2023. (Exhibit 79)*

On May 24, 2022, BPA ████ was performing sign-cutting duties in the BRA area of responsibility and heard on the service radio that all available agents in the field needed to respond to Uvalde. He also received a message on his personal cell phone to respond to the Civic Center to assist with releasing children to their parents. He hiked out of the brush, then drove to Uvalde in his K9 vehicle with lights and sirens activated, arriving at the Civic Center at approximately **1:20:00 PM**. He coordinated with school staff at the Civic Center to create a pathway for children arriving on buses to enter the building. He set up a security perimeter around the Civic Center after a second threat was announced over the service radio. BPA ████ felt that the command and control structure was confusing and believed that his responsibility was to provide backup and assistance.

*SBPA ████████████ (CAR), interviewed on March 9, 2023. (Exhibit 152)*

On May 24, 2022, SBPA ████ was assigned to the USBP SOD at DRT. He learned of the Robb Elementary School incident via ATAK cell phone signal chat and text between BORSTAR members. He put on his combat tactical shirt and body armor plates, gathered his agency radio and rifle, and traveled alone to Uvalde. While enroute, SBPA ████ heard mixed messages over the radio about whether the assailant was alive or dead and where the assailant was. He also received a text that said, "shooter is down." Upon arriving at Robb Elementary School at approximately **1:20:00 PM**, he found his way via ATAK cell phone to BORSTAR members gathered near a tree by the entrance of Robb Elementary School. He approached and consoled BPA ██████, then carried BPA ████████'s rifle and escorted him to his GOV, where he helped secure the rifle.

SBPA ████ instructed BORTAC members to report to UVA for a debrief, then drove to UVA. After receiving a message about a second threat, he responded to a middle school (possibly Dalton Middle School, but he does not remember), where he assisted with setting perimeter security and established the perimeter. He stayed at the school for a few hours until all the students were evacuated.

SBPA ████ observed that law enforcement vehicles were unable to access the road into the school and that it was eerily quiet, other than the sound of sirens. He stated that no one seemed to know what was going on and no one appeared to be in command or control of the situation at Robb Elementary School. SBPA ████ believed USBP's role was to respond in a support role and stated that in an active shooter situation, whether USBP has peace officer authority does not matter. He stated there is an implied obligation to respond and stop the assailant, with the priorities being to engage the subject, stop the carnage, and treat the wounded.

*SA ████████████ (OPR Del Rio), interviewed on July 19, 2023. (Exhibit 221)*

On May 24, 2022, SA ██████ received a call from Acting Supervisory SA ((A)SSA) ████████ telling him there was an active shooter situation in Uvalde and to be ready and on standby. SA ████████ received a second call from (A)SSA ████████ to respond to Uvalde. SA ████████





**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



drove his GOV at the speed limit because the vehicle was not equipped with emergency equipment.

When he arrived at Hillcrest Memorial Funeral Home at approximately **1:30:00 PM**, SA ████████ told him everything at the school was secure, but there was the possibility of a second shooter at another school, so SA ████████ went to Uvalde Dual Language Academy to provide security. He worked alongside other BPAs and other law enforcement officers to provide security at that school, which was on lockdown. He left at approximately **4:00:00 PM** and went to UVA, then was sent to the Uvalde Memorial Hospital to serve as liaison between CBP and hospital staff because a BPA had been shot and taken to the emergency room. After the BPA was released, SA ████████ returned to UVA and remained in the muster room until he was released around **12:00:00 AM**.

SA ████████ believed the school principal and administrators and TXDPS troopers were responsible for organizing the dismissal of students and interacting with parents. He stated that a federal law enforcement officer has a responsibility and authority to respond to a threat of this magnitude to provide security and protect the public.

**_WC_** ████████████ **_(UVA), interviewed on February 16, 2023. (Exhibit 91)_**

On May 24, 2022, WC ████████ arrived at the office and heard on the USBP radio that a shooting incident had occurred at Robb Elementary School. WC ████████ ordered his immediate subordinates to remain at UVA to handle matters while he responded to the school. He drove to Robb Elementary School in a marked USBP vehicle with emergency equipment activated, arriving at approximately **1:30:00 PM**, then attended a muster brief at UVA at **2:00:00 PM**. After the brief, he went to the funeral home/incident command center to serve as the USBP point of contact. He offered USBP resources to TXDPS, who requested USBP provide security assistance at all schools and the Civic Center. WC ████████ ordered SBPAs and available USBP personnel to report to different schools to provide security assistance for students being released. He believed USBP had a responsibility to the community and to the United States to respond and assist, especially if innocent people were being injured.

**_BPA_** ████████ **_(CAR), interviewed on March 10, 2023. (Exhibit 161)_**

On May 24, 2022, BPA ████████ was assigned watch duties at Dimmit Regional Hospital in Carrizo Springs when he received a text from another BPA informing him of a shooting at an Uvalde elementary school. BPA ████████ contacted the operations center at CAR to inquire about responding to the school and was initially told to stand by, then 30 minutes later was told someone was coming to relieve him so he could respond to the school.

He traveled to Uvalde in his GOV with lights and sirens activated, arriving at Robb Elementary School at approximately **1:30:00 PM**. He parked and was jogging toward the school with his EMT bag when another BPA approached him and informed him to meet at UVA. He returned to his vehicle and departed for UVA. While at UVA, the Uvalde Memorial Hospital requested security assistance, so he and another BPA departed to go there in BPA ████████'s vehicle.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Upon arrival, they identified there was ample security, so they responded to the Civic Center to provide assistance. He assisted with reunifying several parents with their children, then dropped the other BPA off at his vehicle at UVA and went home. BPA ███████ stated that the Civic Center was a chaotic mess with parents, media, and law enforcement.

***BPA*** ███████████ ***(BRA), interviewed on February 8, 2023. (Exhibit 46)***

On May 24, 2022, BPA ███████ was working in a remote location near Spofford, Texas, when she heard a request over the radio for any available units to report to Uvalde. An unknown supervisor at BRA directed BPA ███████ and three other BPAs to report to the Civic Center. They traveled there with lights and sirens activated, arriving at approximately **1:30:00 PM**. They were directed to stand on the sidewalk to facilitate crowd control. Later, BPA ███████ relocated to provide security along the Civic Center's perimeter, where she informed people they needed to check in at the Civic Center to pick up students. BPA ███████ believed USBP's efforts were to assist school administrators and provide assistance to other agencies, including crowd control and first aid.

***BPA*** ███████████ ***(DRS), interviewed on February 9, 2023. (Exhibit 50)***

On May 24, 2022, BPA ███████ was serving as an instructor for an EMT class at DRT when a fellow EMT instructor, BPA ███████████ (BRA), told him to retrieve his medical kit because they were leaving to go to Uvalde. They traveled in an unmarked GOV with lights activated, but the lights stopped working before leaving Del Rio. At approximately **1:35:00 PM**, BPAs ███████ and ███████ arrived at the Hillcrest Memorial Funeral Home in Uvalde and attempted to follow protocol by finding an on-scene incident commander. Finding none, they spoke with medical personnel at the funeral home and were redirected to Uvalde Memorial Hospital.

While enroute to the hospital, they heard a radio communication regarding a suspected shooter at Uvalde High School, so they decided to redirect to the high school. There, they assisted with clearing classrooms, then went to nearby Morales Junior High School to provide additional perimeter security for one hour before being relieved by someone from the UCSO. Next, they went to Flores Elementary School to provide security and pass along information to parents. When asked about USBP's authority respond to incidents such as the one at Robb Elementary School, BPA ███████ stated he believed, as federal law enforcement officers, it was USBP's role to respond to incidents and provide protection where needed.

***SBPA*** ███████████ ***(CAR), interviewed on February 10, 2023. (Exhibit 64)***

On May 24, 2022, SBPA ███████ learned about the incident at Robb Elementary School because a subordinate contacted him by phone and requested leave to go to the school because the subordinate's ███████ were there. SBPA ███████ approved the request and went to the CAR checkpoint to cover for the subordinate until another BPA arrived. SBPA ███████ monitored the response of other BPAs and EMTs on his Android Team Awareness Kit (ATAK) phone. He then heard that law enforcement officers had breached the classroom where the assailant was. DRT requested SBPA ███████ to respond to UVA and provide Peer Support

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



services.  SBPA ████ notified another Peer Support Member to also report to UVA to provide Peer Support services, then drove alone to UVA in a marked USBP vehicle with emergency equipment activated.  He arrived at UVA at approximately **1:45:00 PM** and provided Peer Support services to affected BPAs.  Upon hearing reports of a secondary threat, he shifted to providing security and went to the Uvalde hospital for less than 10 minutes.  Next, he went to the Civic Center to provide security outside and direct and escort arriving parents to the entrance. SBPA ████ believed the priority was to send EMTs, then ensure the safety of the EMTs due to possible threats.  He responded to the incident as a matter of public safety.

*SA* ████████ *(OPR Del Rio), interviewed on July 19, 2023. (Exhibit 220)*

On May 24, 2022, SA ████ received a call from his supervisor telling him to grab his equipment and respond to Uvalde because there was an incident involving a mass shooting and USBP was involved.  He drove to Uvalde in a GOV at the speed limit and obeying all traffic laws because the vehicle was not equipped with emergency equipment.  He parked near the funeral home at approximately **1:45:00 PM** and spoke with a TXDPS sergeant, trying to find the incident command center.

SA ████ saw another OPR SA and together they found the incident command center in a trailer on the northeast side of the school.  There, they learned about a possible secondary threat at another school, so they left for Uvalde High School.  They spent a few hours at the high school providing security until all the children were released to their parents, then went to UVA and awaited further instruction.  He was directed to go to the Uvalde airport around **7:00:00 PM** and pick up CBP personnel.  He took them back to UVA and was dismissed around **12:00:00 AM**.

SA ████ observed the area surrounding the school was chaos.  He believed it was his duty to act as a law enforcement officer to provide security and safety to the public.

*SBPA* ████████ *(CAR), interviewed on February 14, 2023. (Exhibit 76)*

On May 24, 2022, PAIC ████ informed SBPA ████ about the Robb Elementary School shooting at a meeting they were both attending and instructed SBPA ████ to respond to the Uvalde Station.  SBPA ████ proceeded by himself in an unmarked USBP vehicle without using emergency equipment, arriving in time to attend the **2:00:00 PM** muster.  He went to the Uvalde hospital to check on a wounded BPA there but was unable to visit him.  Next, SBPA ████ went to the Civic Center and provided security for 2.5–3 hours.  He believed his role was to provide support and security for whatever was needed.

*BPA* ████████ *(EGT), interviewed on February 9, 2023. (Exhibit 56)*

On May 24, 2022, BPA ████ was on riverine patrol on the Rio Grande near Eagle Pass, Texas, with BPA ████████ (EGT) when BPA ████ received a phone call directing them to respond to the funeral home in Uvalde because they were both EMTs.  BPA ████ learned about the shooting at Robb Elementary School while enroute by listening to the news on the

AR00194



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



radio.  They traveled in a USBP vehicle with lights and sirens activated and parked several blocks away from the funeral home.  They arrived at the funeral home with their EMT equipment at approximately **2:00:00 PM** and were told that everyone needing medical treatment had already been treated and to report to the Uvalde Border Patrol Station or Del Rio Sector.

As they were driving away from the funeral home, they heard a radio communication about a possible threat to other Uvalde schools, so they followed another USBP vehicle that had its emergency equipment activated and went to Dalton Elementary School, where they provided security until the school's lockdown was lifted.  They then assisted school staff with releasing students to parents and explained the lockdown and release procedures to parents.  BPA ▇▇▇ said he did not know who was in charge at the funeral home and did not observe any instructions being provided to law enforcement officers.  BPA ▇▇▇ explained that based on his training, in a situation like this incident, the first responding law enforcement officer on scene is supposed to take charge of the scene until a more senior law enforcement officer arrives.  He stated that USBP has previously assisted in emergency responses but understood these events to be typically local matters with USBP providing a support role.

**BPA ▇▇▇▇▇▇ (BRA), interviewed on February 8, 2023. (Exhibit 41)**

On May 24, 2022, BPA ▇▇▇▇ was assigned to a detail near Spofford, Texas, when he heard a radio transmission from a helicopter advising that there was a school shooting in Uvalde and a subsequent radio transmission ordering all BRA working agents to report to the Civic Center.  He left immediately for Uvalde with his team using a GOV with emergency lights and sirens activated and arrived at the Civic Center at approximately **2:00:00 PM**.  There, he helped clear a path so students could get inside and kept the area clear for vehicles arriving with students.  He spoke with parents who were asking questions and assisted with creating a perimeter around the Civic Center because of a secondary threat that was being investigated.  He also handed out a few bottles of water.  BPA ▇▇▇▇ observed numerous law enforcement officials from a myriad of agencies at the Civic Center.  He believed that USBP had authority to respond to emergency situations and indicated that USBP has a lot of agents who live or work in the area.

**BPA ▇▇▇▇▇▇▇ (DRT), interviewed on March 14, 2023. (Exhibit 174)**

On May 24, 2022, BPA ▇▇▇▇▇▇ was traveling back from a temporary duty assignment in Carrizo Springs, Texas, when ACPA ▇▇▇ notified him of an active shooter at Robb Elementary School in Uvalde and deployed him to Uvalde.  He arrived at the scene at approximately **2:30:00 PM** and it was no longer active.  He inquired where he could assist and was advised that everyone who needed medical assistance had already been transported to the hospital.  He took photos of the suspect's truck and remained at Robb Elementary School for approximately one hour before hearing a radio transmission indicating a second threat at the Uvalde High School, so he went there.

He was then advised to return to Robb Elementary School for a media briefing, so he proceeded to the funeral home, where he received instructions to respond to the Civic Center to provide



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



security during the media brief. He remained at the Civic Center for approximately two hours. When the media brief ended, he was instructed to return to DRT.

BPA ████ did not know who was in charge of the scene at Robb Elementary School. He stated that it did not appear that anyone was in charge at the Civic Center. He did not know of a specific authority that allowed USBP to respond, but believed USBP had a duty as public servants and law enforcement officers to protect and serve the community.

***WC*** ███████ ***(CAR), interviewed on February 28, 2023. (Exhibit 100)***

On May 24, 2022, WC ████ was scheduled to work the swing shift. He was at home reading emails regarding the incident at Robb Elementary School on his government phone before his shift started. Upon arriving at CAR shortly before his shift started, PAIC ████ told WC ████ to send four agents from his shift to assist with traffic control at the Civic Center. WC ████ directed BPAs to respond to Uvalde and contact the incident commander. He went to Uvalde to support the agents he sent, traveling by unmarked USBP vehicle without emergency equipment activated. He arrived at the Hillcrest Memorial Funeral Home at approximately **3:00:00 PM**, then went to the Civic Center. He then went to UVA to see if they needed assistance and remained there for 1.5 hours, then returned to the Civic Center. He stayed at the Civic Center for a few hours until determining that support was no longer needed, then departed.

WC ████ believed his role at the Civic Center was to provide security and crowd control as needed. He did not know who was in charge at the Civic Center and didn't see anyone giving directions to the officers there. He stated that USBP's authority or role was to support local law enforcement agencies by providing security.

***ACPA*** █████████ ***(DRT), interviewed on February 28, 2023. (Exhibit 101)***

On May 24, 2022, ACPA █████ was working at the DRT Strategic Communications (STRATCOM) Branch when Deputy Chief Patrol Agent (DCPA) ████ called and told him there was a shooting incident in the Uvalde, Texas, area and that perhaps it was an active shooter situation. DCPA ████ instructed ACPA ████ to deploy STRATCOM personnel to Uvalde. ACPA ████ traveled with the DRT Public Affairs Specialist in an unmarked GOV without lights and sirens and ordered two STRATCOM BPAs to report to Robb Elementary School. By the time they arrived in Uvalde, the threat was already neutralized and by the time they arrived at Robb Elementary School (after **3:00:00 PM**), there were no children or buses at the school and the scene had been secured.

While at Robb Elementary School, ACPA ████ attempted to collect information and ensure that USBP personnel were not speaking to the media. He provided support to USBP personnel, then entered the funeral home/incident command post to gather information. He heard a request for assistance at the Civic Center, so he went there and provided security inside the Civic Center. ACPA ████ did not know who was in charge, but because it was a local incident, he assumed local law enforcement was in charge. ACPA ████ identified that as federal law enforcement officers, BPAs had a responsibility to respond to an active shooter situation to save lives.

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*WC* ███████ *(EGT), interviewed on February 14, 2023. (Exhibit 74)*

On May 24, 2022, WC ███████ was the Watch Commander and acting Deputy Patrol Agent in Charge at Eagle Pass South Station (EGS). He was with PAIC ███████, who received a phone call regarding the shooting at Robb Elementary School and told WC ███████ about the incident. Initially WC ███████ decided to stay at EGS to avoid complicating the scene with too many USBP personnel, but after it became prolonged and ongoing, he decided to respond to the command post in Uvalde. WC ███████ traveled alone in an unmarked vehicle with the lights and sirens activated and arrived at the command post at the funeral home near the school at approximately **3:15:00 PM**. He asked TXDPS where he could assist, then proceeded to Flores Elementary School to assist the faculty with releasing children to their parents. He observed that the incident command post was chaotic and it was difficult to determine who was in charge. He stated that he was uncertain of USBP's role but believed there was a responsibility to assist and support other law enforcement agencies.

*BPA* ███████ *(CAR), interviewed on February 7, 2023. (Exhibit 37)*

On May 24, 2022, BPA ███ began his shift at **2:00:00 PM**, attended the daily muster, then departed CAR. He received a call from the duty supervisor to return to CAR because he would be going to Uvalde. After he retrieved a rifle and magazines, BPA ███ rode with another BPA to Uvalde and arrived at the Civic Center at approximately **3:30:00 PM**. There, they were assigned to a parking lot on the Walgreens side of the Civic Center for the purpose of keeping traffic in and out of the lot to a minimum. He directed parents looking for their children toward a door where there were other uniformed officers. BPA ███ characterized the response as "all hands on deck."

*DPAIC* ███████ *(CAR), interviewed on February 10, 2023. (Exhibit 61)*

On May 24, 2022, DPAIC ███ received a text message from SBPA ███████ regarding an active shooter threat at a school in Uvalde. DPAIC ███ informed his supervisor of the active shooter incident and the supervisor stated that there were enough BPAs already responding. Later, there was a need for additional personnel for security at other buildings in Uvalde, so DPAIC ███ drove from Carrizo Springs to Uvalde in his personally owned vehicle (POV) following other agents in patrol vehicles. He arrived in Uvalde approximately between **3:30:00 PM** and **4:00:00 PM** and drove to the Civic Center, where he assisted with establishing additional perimeter security. He directed BPAs to relieve the initial perimeter security personnel, then report to the command center. He talked with some parents he knew personally, then went to UVA at **5:00:00 PM**, then left for home. DPAIC ███ believed USBP's role was to assist, stop any threat, and provide security and assistance.

*PAIC* ███████ *(CAR), interviewed on February 10, 2023. (Exhibit 58)*

On May 24, 2022, PAIC ███ was in a meeting with external stakeholders when someone in the group received a phone call or text message advising of a possible active shooter in Uvalde. PAIC ███ cut the meeting short and sent an email to all CAR supervisors advising them to



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



stand down and await further information.  He attended a ▮▮▮▮▮ muster at CAR, then proceeded with other agents to the Civic Center, arriving there approximately between **3:30:00 PM** and **4:00:00 PM**.  There, he provided relief for BPAs who were already working at the Civic Center.  PAIC ▮▮▮ described the situation at the Civic Center as very disorganized when he arrived.  He stated that USBP's role was only to support in any way possible because he believed USBP had no jurisdiction or authority to respond to the incident.

**BPA** ▮▮▮▮▮▮▮▮ **(CAR), interviewed on February 7, 2023. (Exhibit 39)**

On May 24, 2022, BPA ▮▮▮▮▮ was not yet on duty and was having lunch with ▮▮▮▮ when she informed him that she had discovered through social media that a shooting had occurred at Robb Elementary School.  BPA ▮▮▮▮ reported for swing shift duty at CAR at ▮▮▮▮ and was advised to respond to the incident command center and provide additional security around the perimeter of Robb Elementary School.  He traveled to Uvalde in a USBP patrol vehicle.  While enroute, he was directed to respond to the Civic Center instead and arrived there at approximately **4:00:00 PM**.  At the Civic Center, he directed family members to the main entrance and directed members of the media to a different area.  He returned to CAR after being relieved by officers from the Dilley Police Department.  BPA ▮▮▮▮▮ indicated that USBP's role was to respond to the scene and assist where needed.

**BPA** ▮▮▮▮▮▮▮▮ **(CAR), interviewed on February 9, 2023. (Exhibit 53)**

On May 24, 2022, BPA ▮▮▮▮ heard about the incident at Robb Elementary School from a coworker while driving to work.  He reported to CAR at ▮▮▮▮▮▮ and was told the situation was handled, so he would remain at CAR.  Later, he received instruction to pair up with other BPAs and go to Uvalde to relieve BPAs working security at the Civic Center.  He rode with another BPA with emergency equipment activated, but they were later informed that it was not necessary, so they deactivated it.  BPA ▮▮▮▮ arrived at the Civic Center at approximately **4:00:00 PM** and directed traffic there for two to three hours.  He provided information to civilians on where to go to vote, where to park, and where to get their children.  He advised people not to block the entrances/exits of the Civic Center.  BPA ▮▮▮▮ stated that USBP's role was to support local law enforcement and protect the public from harm.

**BPA** ▮▮▮▮▮▮▮▮▮ **(CAR), interviewed on February 9, 2023. (Exhibit 51)**

On May 24, 2022, BPA ▮▮▮▮▮ had begun work and attended the daily muster when he was called to return to the station's armory with other BPAs.  They were assigned rifles and then traveled to Uvalde.  BPA ▮▮▮▮ was assigned to the Civic Center parking lot for approximately two to three hours beginning at approximately **4:00:00 PM**, after which he returned to CAR.  He stated that law enforcement officers have an obligation to respond to an active shooter situation.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



*ACPA ▮▮▮▮▮ (USBP Tucson Sector, Arizona), interviewed on February 10, 2023. (Exhibit 70)*

On May 24, 2022, ACPA ▮▮▮ was the SOS at USBP Eagle Pass South Station.  SOS ▮▮▮ heard about the incident at Robb Elementary School from another agent at the station.  He took USBP uniforms to UVA, driving in an unmarked GOV with lights and sirens activated.  He arrived at UVA approximately between **4:00:00 PM** and **5:00:00 PM** and dropped off the uniforms at the UVA muster room.  Then he went to Morales Junior High School and assisted school officials with escorting children exiting the school to their parents and providing traffic control.  After that, he went to Uvalde High School, where he assisted a driver who did not look well.  He moved the driver's vehicle to a parking spot and aided the driver until the driver's mother arrived.  ACPA ▮▮▮ observed a large law enforcement presence from many different agencies.  He stated that USBP has authority and responsibility to provide service to the public and other law enforcement officers by assisting with whatever emergency there is.

*BPA ▮▮▮▮▮ (UVA), interviewed on March 16, 2023. (Exhibit 188)*

On May 24, 2022, BPA ▮▮▮ reported for duty after the incident at Robb Elementary School was over.  She did not respond to Robb Elementary School but was informed during the UVA muster that USBP personnel had been involved in a school shooting incident.  After the muster, BPA ▮▮▮ made herself available to provide moral support.  She received information that the girlfriend of the Robb Elementary School assailant was going to "finish the job" and was instructed by an SBPA to respond to Dalton Elementary School.  She traveled to the school in eight minutes and advised a uniformed law enforcement officer that she was there to assist.  The law enforcement officer directed her to park and provide perimeter security and assist with traffic control.  BPA ▮▮▮ stated that it was common for other law enforcement agencies to reach out to USBP for assistance and that USBP usually responds in a secondary role.

*ACPA ▮▮▮▮▮ (DRT), interviewed on March 1, 2023. (Exhibit 105)*

On May 24, 2022, ACPA ▮▮▮ was overseeing the DRT Training and Traumatic Incident Branch, which includes Peer Support, EAP, Chaplains, and canine support, and serving as the acting Deputy Division Chief for DRT's Mission Readiness Operations Division.  While having lunch with other USBP personnel, ACPA ▮▮▮ received either a call or a text message regarding the shooting at Robb Elementary School.  He left the restaurant and returned to DRT, where he remained in Del Rio and did not respond to Uvalde.  His role at DRT was to provide resources to support responding BPAs by overseeing agent support services.  He coordinated the deployment of EMTs and a medical supply trailer; tasked Acting ACPA ▮▮▮ with activating all Peer Support and Chaplain personnel to respond to UVA; coordinated with the watch commander and a BPA to send a message through the emergency notification system to alert personnel of the emergency and for people to reply with their status; requested additional clinicians and agent services respond to Uvalde on a long-term basis; activated a surge team that responded the day after the incident in two-week rotations; and requested funds for replacing equipment and uniforms of BPAs who were hands-on at the scene.  ACPA ▮▮▮ believed that PAIC ▮▮▮ was responsible for supervising the field personnel responding to the incident and that PAIC ▮▮▮ was managing the USBP personnel at UVA.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



### *CBP PERSONNEL WHO SUPPORTED THE RESPONSE*

Some CBP employees did not respond to Robb Elementary School, but instead responded elsewhere or remained where they were to provide support to the law enforcement response. The following is a summary of the interviews provided by these employees:

***BPA ▓▓▓▓ (DRT), interviewed on February 28, 2023. (Exhibit 93)***

On May 24, 2022, BPA ▓▓▓ was assigned to DRT headquarters on a detail as the Peer Support Coordinator. BPA ▓▓▓ was having lunch with other USBP personnel when he learned of the shooting at Robb Elementary School from a post on Facebook. Shortly after that, everyone at the table began receiving notifications on their government cell phones. BPA ▓▓▓ received calls from BPAs in Uvalde notifying him about the shooting and requesting Peer Support help. He retrieved the Peer Support roster and began contacting personnel to report to UVA. He departed Del Rio with another Peer Support Member who drove while BPA ▓▓▓ continued to contact Peer Support personnel. He arrived at UVA at approximately **1:00:00 PM** and began coordinating and assigning tasks to Peer Support personnel. He sent a group of Peer Support BPAs to provide security at the house of a BPA whose ▓▓▓ was one of the deceased children from the shooting. From the time he arrived at the Uvalde Border Patrol Station at approximately **1:00:00 PM**, BPA ▓▓▓ understood that CPA Owens was in command and control at UVA.

***SBPA ▓▓▓▓ (EGT), interviewed on March 3, 2023. (Exhibit 129)***

On May 24, 2022, SBPA ▓▓▓ was on detail as adjutant to CPA Owens at DRT. CPA Owens summoned SBPA ▓▓▓ to his office and told him that there was an active shooter at an Uvalde elementary school. SBPA ▓▓▓ retrieved his ballistic vest and drove with CPA Owens to Uvalde with lights and sirens activated when moving through intersections. They arrived at Robb Elementary School at approximately **1:00:00 PM**, approximately 10 minutes after the classroom was breached and the assailant was shot.

SBPA ▓▓▓ met with other BPAs at a tree on the north side of the school, then returned to his GOV and drove to UVA. He left to pick up food and brought it to UVA, then drove back to EGT. SBPA ▓▓▓ did not know who was in command, but he believed TXDPS was responsible for investigating. He understood that if there is an incident of this type, USBP would respond and stated that USBP is obligated to respond to active shooter events and regularly assists other agencies.

***Chief Border Patrol Agent (CPA) Jason Owens (DRT), interviewed on March 13, 2023. (Exhibit 165)***

On May 24, 2022, a DCPA came into CPA Owens's office in Del Rio, Texas, and informed him that there was a report of an active shooter in Uvalde. CPA Owens rode in an unmarked GOV while SBPA ▓▓▓ drove with lights and sirens activated. While enroute, CPA Owens contacted the TXDPS Regional Commander and apprised him of the situation. He talked to DRT Division Chief (DC) ▓▓▓ to make sure all notifications were going to the chain of



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



command and instructed him to activate the call tree and contact Office of Field Operations (OFO) and AMO to get information on any of their personnel who had responded. CPA Owens told DC ▓▓▓▓ to get as many people to Uvalde as needed to help and to activate Peer Support. He relayed information to DCPA ▓▓▓ to tell BPAs to do what they needed to do and not to wait.

SBPA ▓▓▓▓ and CPA Owens arrived at Robb Elementary School at approximately **1:00:00 PM** and parked one to two blocks away, then walked toward the school. CPA Owens told DCPA ▓▓▓ to make sure all BPAs were accounted for and taken care of. Upon realizing that the school was a crime scene, he directed all USBP personnel to finish helping, then move to UVA. He directed DCPA ▓▓▓ to get fresh uniforms and Peer Support ready at UVA, then instructed DCPA ▓▓▓ to send BPAs wherever they could to help in response to additional threats broadcasted on social media. CPA Owens contacted USBP Headquarters to plan with other USBP sectors to keep operations running in Uvalde. CPA Owens coordinated moving personnel from Laredo and other areas to cover the Uvalde area of responsibility. He spoke with DHS Secretary Mayorkas and CBP Commissioner Magnus and advised them of the situation. CPA Owens gave involved personnel two days of administrative leave to decompress and talk with Peer Support.

CPA Owens stated that radio traffic was difficult to understand, with muffled sound and an open mic at one point. He observed the scene at Robb Elementary School to be very chaotic with vehicles parked everywhere. CPA Owens identified that BORTAC and BORSTAR each have a commander and first-line supervisors for specific elements of each team. For May 24, 2022, these were PAIC ▓▓▓▓, acting DPAIC ▓▓▓▓, and SBPA ▓▓▓▓. CPA Owens stated that when any incident like an active shooter takes place, USBP partners with local law enforcement or a first responder agency in the jurisdiction. He stated the first responder agency takes command and USBP is there in a support role. CPA Owens stated he responded because of the severity of the incident; normally he would stay at DRT.

*PAIC* ▓▓▓▓▓▓▓ *(USBP Laredo South Station, Texas), interviewed on February 13, 2023. (Exhibit 69)*

On May 24, 2022, PAIC ▓▓▓▓ was PAIC at the USBP Del Rio Station (DRS), Texas, and was having lunch when the first message came in reporting an active shooter in Uvalde. Later, he was on his way to Eagle Pass, Texas, when a call came in requesting help in Uvalde. PAIC ▓▓▓▓ changed direction and proceeded toward Uvalde to rendezvous with EMTs. He parked near Robb Elementary School at approximately **1:30:00 PM** and walked to within 50 yards of the school, then heard a radio transmission instructing all USBP personnel to go to UVA for a muster at **2:00:00 PM**. PAIC ▓▓▓▓ observed that the atmosphere at UVA was chaotic and the muster was emotional. He observed there was no real lead agency or command structure at the school and believed that USBP was there in a support role.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*Deputy Patrol Agent in Charge (DPAIC)* ▮▮▮▮ *(DRT SOD), interviewed on March 1, 2023. (Exhibit 108)*

On May 24, 2022, the acting PAIC informed DPAIC ▮▮▮ of an active shooter situation at a school in Uvalde. DPAIC ▮▮▮ went to the conference room and began to write the information being relayed on a display board. He contacted all SOD BPAs on duty and instructed them to report to Robb Elementary School, then began a group text message with BORTAC and BORSTAR members.

DPAIC ▮▮▮ then left DRT to go to the school to offer supervision and assistance but received a call while enroute that BPA ▮▮▮ had been shot and to the hospital. DPAIC ▮▮▮ went to the Uvalde Memorial Hospital to check on BPA ▮▮▮, arriving there at approximately **1:45:00 PM**. He relieved the other BPAs who were assisting BPA ▮▮▮ and filled out the medical paperwork for BPA ▮▮▮. After that, he went to UVA for a debrief and told all SOD BPAs that they were free to take a few days of administrative leave. He encouraged them to participate in the USBP-provided Peer Support services and informed them that participation in interviews by TXDPS and the FBI was voluntary.

Because of DRT's distance from Uvalde and the time it would take for them to arrive at the scene, DPAIC ▮▮▮ thought the deployment of USBP assets to the shooting was more of a gesture of support in response to a request from another law enforcement agency. He thought the assailant would be taken care of quickly, but that BORSTAR medical assets could potentially be of assistance. He stated that USBP only responds to requests from other law enforcement agencies as a secondary or backup role to the requesting agency.

*ACPA* ▮▮▮▮ *(DRT), interviewed on February 28, 2023. (Exhibit 99)*

On May 24, 2022, SOS ▮▮▮ called and informed ACPA ▮▮▮ that Peer Support was needed at Robb Elementary School. ACPA ▮▮▮ deployed to Uvalde in a Peer Support role. While enroute, she received a call to report to UVA instead of the school. She arrived there after **2:00:00 PM** and helped provide clean uniforms to everyone and collect the bloodstained uniforms for evidence. She was then asked to go and pick up food for everyone. She comforted an upset BPA and provided him with a clean uniform and emotional support. She departed UVA at approximately **11:00:00 PM**, returned to DRT to pick up her POV, and went home. ACPA ▮▮▮ did not know who was in charge at Robb Elementary School but heard that USBP SOD was in charge or had taken over.

*Mission Support Specialist (MSS)* ▮▮▮▮ *(DRT), interviewed on March 3, 2023. (Exhibit 126)*

On May 24, 2022, Special Operations Supervisor (SOS) ▮▮▮ and Branch Chief ▮▮▮ approached MSS ▮▮▮ and asked if she would be willing to assist as Peer Support with an active shooter situation with mass casualties. MSS ▮▮▮ drove a GOV with emergency equipment activated toward Robb Elementary School while a BPA passenger gathered information via phone. She went to UVA instead of the school, arriving just in time for the **2:00:00 PM** muster. She assisted where she could without interrupting existing conversation



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



among BPAs. She helped sort piles of uniforms so that agents who responded to the school could change clothes. She also helped organize tables for food and drinks and remained at UVA until approximately **6:30:00 PM**, then returned to DRT and went home.

**BPA** ████████████ **(EGT), interviewed on February 8, 2023. (Exhibit 47)**

On May 24, 2022, BPA ██████ was assigned to the EGT Planning Team and received a phone call from a USBP supervisor asking him to retrieve uniforms from EGT and take them to the Uvalde Border Patrol Station. As part of the Peer Support Program, BPA ██████ took the uniforms to UVA for BPAs who had blood on their uniforms. He drove to UVA in a USBP vehicle with emergency lights and sirens activated, arriving there at approximately **2:20:00 PM**. At UVA, he assisted with organizing the uniforms in the UVA muster room and prepared food for those who responded. BPA ██████ indicated BPAs had a duty to assist in any response to the extent needed to ensure the safety of the public and fellow BPAs and that USBP is responsible for protecting lives.

**BPA** ████████████ **(EGT), interviewed on February 8, 2023. (Exhibit 44)**

On May 24, 2022, BPA █████ was at the USBP Soft Sided Facility in Eagle Pass, Texas, when he received a telephone call from SBPA ██████ informing him that a shooting had occurred at Robb Elementary School and instructing him to respond to EGT to get a USBP vehicle and respond to UVA. BPA ██████ traveled alone in the GOV with the emergency lights activated, behind another BPA in a patrol vehicle. He arrived at UVA at approximately **2:40:00 PM** and helped by getting food and water. He made himself available as a Peer Support Member, then returned to Eagle Pass after another Peer Support Coordinator arrived. BPA ████ believed USBP's role was to respond and help at the incident location.

**SOS** ████████████ **(DRT SIU), interviewed on February 8, 2023. (Exhibit 48)**

On May 24, 2022, SOS ████████ was assigned to the Sector Intelligence Unit (SIU) in Del Rio, Texas, when he received a text message from PAIC ██████ (DRT) about a shooting at a school in Uvalde. Upon receiving the text, SOS ██████ walked from the SIU to the Border Intelligence Center (BIC), where he heard additional information over the radio. Initially SOS ████████ remained at the BIC in Del Rio, assisting law enforcement efforts on the ground in Uvalde by querying license plates via radio and answering phone calls to uncover useful information about the assailant and any possible associates. A BPA at EGS requested SOS ████████ respond to UVA as a Peer Support Member. SOS ██████ traveled there alone in an unmarked USBP vehicle, not using the emergency lights or sirens, and arrived at approximately **3:00:00 PM**. He coordinated with other members of the Peer Support Team at UVA for several hours. SOS ██████ stated it was USBP's responsibility to respond based on a general duty of law enforcement officers to protect lives and make arrests for felonies committed in their presence.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00203



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*BPA* ▮▮▮▮▮▮ *(CAR), interviewed on February 8, 2023. (Exhibit 52)*

On May 24, 2022, BPA ▮▮▮▮ was working as a K9 handler at CAR when a coworker told him the news of the shooting. Shortly after that, he received a phone call from his Peer Support Coordinator, who advised him to respond to Robb Elementary School. BPA ▮▮▮▮ drove to Uvalde in his K9 patrol vehicle. While enroute, he received a phone call to respond to the Uvalde Border Patrol Station, where he arrived at approximately **3:00:00 PM**. There, he identified arriving BPAs who looked distraught and offered to speak with them regarding their experience. BPA ▮▮▮▮ stated that USBP's role was to provide assistance as law enforcement officers wherever needed.

*BPA* ▮▮▮▮▮▮ *(DRS), interviewed on February 13, 2023. (Exhibit 68)*

On May 24, 2022, BPA ▮▮▮ was on his way to work at DRS when he received a phone call from Watch Commander ▮▮▮ asking if he was willing to travel to UVA as a Peer Support Member. BPA ▮▮▮ retrieved his unmarked patrol vehicle from DRS and traveled alone to UVA without lights or siren. He arrived at UVA at approximately **3:15:00 PM** and proceeded to the UVA muster room where he waited for BPAs to approach him for assistance, rather than seeking them out. He believed USBP's role was to respond and provide assistance.

*CBP Officer (CBPO)* ▮▮▮▮▮▮▮▮ *(Del Rio Port of Entry, Del Rio, Texas), interviewed on February 13, 2023. (Exhibit 65)*

On May 24, 2022, CBPO ▮▮▮▮ was on detail to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) as an Analytical Targeting Officer (ATO) when she received text messages on her ATF-issued phone that there was an active shooter. She completed her ▮▮▮▮ ▮▮▮▮▮▮▮▮ shift and went home, where she heard that blood donations were needed and requested permission to respond. CBPO ▮▮▮▮ drove her POV to the Civic Center, arriving there at approximately **4:00:00 PM**, where she was advised that blood was not needed, so she returned home. CBPO ▮▮▮▮ stated that there did not appear to be any agency in charge at the Civic Center.

*BPA* ▮▮▮▮▮▮ *(COM), interviewed on February 16, 2023. (Exhibit 92)*

On May 24, 2022, BPA ▮▮▮▮ was scheduled to work at COM from ▮▮▮▮▮▮▮▮ ▮▮. He attended the COM muster, where he learned what had happened at Robb Elementary School. A supervisor instructed him to get two boxes of USBP uniforms and take them to UVA. He drove in a marked USBP vehicle without activating the emergency equipment and arrived at UVA at approximately **4:00:00 PM**. After delivering the uniforms, he headed back to COM and passed the Civic Center, where he saw other BPAs. He stopped in the parking lot to determine if anyone needed relief. No one did, so he continued to COM. BPA ▮▮▮▮ stated that USBP has a responsibility to respond to active shooter situations because they are usually the first law enforcement agency to arrive on scene. If another agency were already there, USBP would assist in any way possible.

---

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00204



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*PAIC* ████████████ *(EGS), interviewed on February 14, 2023. (Exhibit 71)*

On May 24, 2022, PAIC ██████ learned of the shooting from WC ████████, who had received a message about it from his spouse. PAIC ████████ activated WC ██████ and BPA ████ to provide EMT services and Peer Support. PAIC ████████ patrolled an area near Kennedy Elementary School in Eagle Pass, Texas, and provided security at a middle school to assist with parents picking up children. Later, he traveled to UVA to bring clean uniforms, arriving there between **4:00:00 PM** and **5:00:00 PM**. PAIC ██████ stated that USBP is the largest law enforcement entity in the area and will provide any support when needed.

*SBPA* ████████████ *(USBP Falfurrias Station, Falfurrias, Texas), interviewed on March 22, 2023. (Exhibit 211)*

On May 24, 2022, SBPA ██████ was serving as the administrative supervisor assigned to UVA when he heard a transmission on the radio that there was an armed subject running toward Robb Elementary School. SBPA ████ requested a repeat of the radio transmission to confirm what he heard, then requested the radio channel be cleared of all other traffic. He requested BPAs to respond to Robb Elementary School, while he himself remained at UVA and did not respond to Uvalde.

As the only person left at UVA, he fielded phone calls, maintained accountability of assets, and coordinated various requests. He requested a radio patch via sector communications and handed out rifles from the armory as BPAs were deploying. He maintained a list of personnel who were in the field and coordinated availability of uniforms for BPAs who needed a change of clothes, as well as water to the field and food for BPAs reporting to the station. SBPA ██████ stayed in constant communication with the BIC at DRT and requested the BIC contact other stations to request assistance. He assisted with obtaining information about BPA-I ████████'s involvement with the initial stages of the incident and initiated the Evolving Situation Report.

SBPA ██████ did not know who was in command at Robb Elementary School. He stated that USBP's response and presence was in a support capacity to the local or state law enforcement entities who had peace officer status.

*PAIC* ████████████ *(DRS), interviewed on February 16, 2023. (Exhibit 86)*

On May 24, 2022, PAIC ██████ was acting Division Chief of Operations ((A)DCO) at Del Rio Sector (DRT). (A)DCO ██████ was at lunch when he received several phone calls indicating something was going on in Uvalde related to an active shooter. He did not respond to Uvalde. Rather, he remained in Del Rio, where he established a makeshift emergency operations center between the radio room and, which acted as a conduit for incoming information. He facilitated information flow, notifications, and resource management from outside DRT and with headquarters in Washington, DC. He relayed a request for vital resources to USBP Big Bend Sector and USBP Laredo Sector, including manpower and resiliency teams. At approximately **12:47:00 PM,** he received a message that the Hillcrest Funeral Home was the incident command post and put out a directive for all EMTs to activate and respond to that location.





**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

*SOS* ▮▮▮ *(DRT SOD), interviewed on March 22, 2023. (Exhibit 215)*

On May 24, 2022, SOS ▮ was on duty at the Border Intelligence Center at DRT overseeing the Collections Unit for Intelligence and Confidential Human Sources when he heard radio chatter regarding an active shooter at a school in Uvalde. He then received a call from SBPA ▮▮▮ advising that there was an active shooter at an elementary school in Uvalde. SOS ▮ granted permission for SBPAs to respond to Robb Elementary School while he himself remained in Del Rio and did not respond to Uvalde. He told them to wear their body armor for easy identification. He tasked his team to contact their sources for information regarding the assailant, but the sources did not provide any usable intelligence. SOS ▮ stated that his role was to oversee SBPA ▮▮▮ and ensure the safety of BPA-I ▮▮▮ and USBP's role was to respond and assist other law enforcement agencies.

*WC* ▮▮▮ *(CAR), interviewed on February 15, 2023. (Exhibit 78)*

On May 24, 2022, WC ▮▮▮ heard about the incident over a radio channel that scans the local police channels. He contacted DPAIC ▮▮▮, who instructed WC ▮▮▮ to stand down and not send any personnel. Later, WC ▮▮▮ received a call to deploy personnel, so he deployed three SBPAs while he himself remained in Carrizo Springs and did not respond to Uvalde. He believed the purpose of an active shooter response was to eliminate any threats posed by the active shooter.

*SOS* ▮▮▮ *(DRT), interviewed on February 15, 2023. (Exhibit 82)*

On May 24, 2022, SOS ▮ was the supervisor over the Professional Standards Branch (PSB), Management Inquiry Team at DRT. While on his way to Eagle Pass, Texas, from Del Rio, SOS ▮ received a phone call asking what he knew about an active shooter at Robb Elementary School. He was initially not instructed to go to Uvalde, but then decided to return to DRT when others in his chain of command went. SOS ▮ got rifles for the other agents who went to Uvalde while he himself remained in Del Rio and did not respond to Uvalde. At DRT, he ran the PSB and performed hourly safety checks on his team. SOS ▮ indicated that USBP is always called on to assist local law enforcement because USBP has more assets and better trained personnel. He believed USBP had a duty to respond to an active shooter.

*Executive Officer (XO)* ▮▮▮ *(DRT), interviewed on March 15, 2023. Exhibit 179)*

On May 24, 2022, XO ▮▮▮ was about to have lunch when he received a call from the acting PAIC for SOD at DRT informing him that there was an active shooter at or near a school in Uvalde and that they were deploying to Uvalde. XO ▮▮▮ gave authority to the BORTAC and BORSTAR unit personnel to respond and support local law enforcement. XO ▮▮▮ returned to DRT, where he remained and did not respond to Uvalde. He began trying to coordinate the USBP response and remained in contact with PAIC ▮▮▮, DPAIC ▮▮▮, and (A)PAIC ▮▮, serving as the conduit for information flow to USBP Headquarters in Washington, DC. Either XO ▮▮▮ or PAIC ▮▮▮ authorized the deployment of USBP personnel to other schools to provide support upon receiving information about a second threat.

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00206



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Initially, XO ████ understood the situation to be an active shooter, but it later changed to a barricaded subject. XO ████ believed the command structure on scene was DPAIC ████ serving as incident commander until relieved by PAIC ████ in coordination with local and state law enforcement. XO ████ stated that USBP's role was to provide support to the local law enforcement agencies and USBP's authority to respond to an active shooter was to protect the public and prevent further loss of life, especially if a felony was committed in the presence of a federal law enforcement officer.

***SBPA*** ████████████ ***(USBP Artesia, New Mexico), interviewed on February 15, 2023. (Exhibit 83)***

On May 24, 2022, SBPA ████ was serving as a BPA and Firearms Instructor at the USBP Del Rio Sector (DRT) firearms range, when a visiting firearms instructor notified him of a possible active shooter at a school in Uvalde. While other firearms instructors equipped themselves with rifles and body armor and departed the DRT range for Uvalde, BPA ████ stayed behind to manage the ongoing CBP firearms qualifications at the range. He did not respond to Uvalde.

***WC*** ████ ***(COM), interviewed on March 14, 2023. (Exhibit 173)***

On May 24, 2022, WC ████ was assigned as the Deputy Incident Commander to the DRT Incident Command Post, where he was responsible for managing logistics and assets associated with an ongoing migrant surge. He learned of the shooting at Robb Elementary School from a BPA as he entered the DRT conference room. WC ████ remained in Del Rio and did not respond to Uvalde. He collected and coordinated SOD assets and personnel who would respond to Robb Elementary School with the acting PAIC and DPAIC. He expressed concern regarding USBP overcrowding at the scene, then relocated to the BIC to centralize information gathering. He called all USBP stations within the DRT to collect information on personnel and assets that were deployed to Robb Elementary School. WC ████ did not know if the scene was live or if it was a false call, but he treated it as a potential active shooter situation. He stated that USBP always assists state and local law enforcement when requested but acts in only a secondary capacity. He believed USBP did not have authority to take control of an active shooter situation but had a duty as federal agents to respond and assist. He was not aware of the command structure for USBP at the school.

***SBPA*** ████████████ ***(BRA), interviewed on February 16, 2023. (Exhibit 88)***

On May 24, 2022, SBPA ████ was the duty supervisor at BRA and heard about the incident at Robb Elementary School while listening to radio communications between BPAs and the USBP AMO helicopter pilot flying in the BRA area of responsibility. SBPA ████ called UVA and learned that the incident was a school shooting and inquired if UVA needed anything. He dispatched BRA EMTs and brush crew BPAs to Uvalde, while he himself remained in Brackettville and did not respond to Uvalde. He relayed information he received to the personnel he dispatched. When Robb Elementary School was going to begin moving children out of the school and to the Civic Center, he redirected some of the BPAs to the Civic Center and directed other BPAs to assist with checkpoint duties at the USBP checkpoint near Uvalde. He redirected BPAs and EMTs to wherever WC ████ needed them and made calls



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



and status checks to make sure they were alright.  SBPA ▮▮▮▮▮ did not know who from
USBP may have been in command in Uvalde and stated that he served as the point of contact at
BRA for BPAs.

### PAIC ▮▮▮▮▮ (DRT), interviewed on March 23, 2023. (Exhibit 214)

On May 24, 2022, PAIC ▮▮▮ had oversight of the Border Intelligence Center and Radio Room
920-Communication Center.  He was having lunch with a group when someone in the group
received a call informing them of a possible shooting in Uvalde.  After lunch, he returned to the
BIC radio room to validate the information, assist with any reporting, and allocate resources.  He
ensured staff assigned a scribe, created an accurate timeline, conducted research to identify the
assailant, and identified the area of the incident to provide a map to personnel responding to the
scene.  He ensured that radio communications were monitored and information was disseminated
to the field.  Upon the BIC receiving information that the assailant's girlfriend made a threat at
another location, he worked to identify the girlfriend and provide information to other law
enforcement agencies.

PAIC ▮▮▮ remained in Del Rio and did not respond to Uvalde.  He did not respond to the
school because he knew there would be enough resources deployed.  He stated that the BIC was
the USBP incident command for reporting and communication flow.  During the incident, he was
informed that there was a radio broadcast or discussion regarding individuals at the scene asking
for keys and having difficulty getting through the doors.

PAIC ▮▮▮ stated that USBP protocol is to respond to critical incidents and that it is common for
local law enforcement agencies to request assistance from USBP because of the manpower and
skills USBP has in comparison to small agencies.  PAIC ▮▮▮ stated that the role USBP would
assume was based on the situation.  He believed DPAIC ▮▮▮ was initially in charge at the
scene but had been relieved upon leadership learning that he had a child at Robb Elementary
School.  PAIC ▮▮▮ did not know what agency was in command of the overall law enforcement
response but did know that USBP's role was to provide support and assist local law enforcement
agencies.

### BPA ▮▮▮▮▮ (UVA), interviewed on February 28, 2023. (Exhibit 96)

On May 24, 2022, BPA ▮▮▮ was assigned to the UVA radio room, where he learned that the
Uvalde Police Department was in pursuit of an unknown individual.  Radio communications
indicated that the individual crashed his vehicle near Robb Elementary School.  Then BPA
▮▮▮ began receiving calls from DRT and BRA asking if agents were needed to assist with the
unfolding situation.  BPA ▮▮▮ instructed BRA and DRT not to send agents at that time, then
learned from UPD radio transmissions that shots were being fired at the school.  He observed
other BPAs checking out M4 rifles in preparation to respond and received a call from UPD
requesting USBP assistance at Robb Elementary School at approximately **11:45:00 AM**.

BPA ▮▮▮ remained at UVA and did not respond to Robb Elementary School.  He received
numerous calls from media outlets requesting information about the evolving incident and




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

referred all media inquiries to the DRT Public Information Officer.  He received calls from BRA and DRT and instructed both to send all available assets to Robb Elementary School.  BPA ▇▇▇▇ believed that UPD was handling the situation.  He perceived the radio traffic to be very unorganized and chaotic and observed an open mic for 1–3 minutes.  Based on the radio traffic, it sounded like a barricaded subject at the school.  He understood UPD to be in charge and he stated that USBP's role at the school was to provide assistance to the local police department.

*SOS ▇▇▇▇▇ (CAR), interviewed on February 15, 2023. (Exhibit 81)*

On May 24, 2022, SOS ▇▇▇▇ was attending a meeting with an oil field company and other USBP personnel, two of whom received a text message and phone call about the incident in Uvalde.  PAIC ▇▇▇▇ (CAR) told SOS ▇▇▇▇ that no response was needed, so SOS ▇▇▇▇ remained in Carrizo Springs and did not respond to Uvalde.  SOS ▇▇▇▇ stated that USBP's role was backup because of the time it would take to respond and that their responsibility was to protect the public.

*DPAIC ▇▇▇▇▇▇▇▇ (DRT BIC), interviewed on March 15, 2023. (Exhibit 180)*

On May 24, 2022, DPAIC ▇▇▇▇ was in the prosecutions building when he received a text message from PAIC ▇▇ regarding a possible active shooter at Robb Elementary School.  He received another text a few minutes later confirming the active shooter situation.  DPAIC ▇▇▇▇ remained in Del Rio and did not respond to Uvalde.  He returned to the BIC and went to the radio room.  He knew he was responsible for ensuring that all recordings were captured, that a timeline was initiated and maintained, and that all his staff at the BIC, UVA, and other USBP stations were accounted for.

He alternated between the BIC and the radio room to ensure the timeline was maintained with incoming information from the scene.  He asked (A)PAIC ▇▇ if BORTAC was responding and learned they were 30 minutes away.  DPAIC ▇▇▇▇ assigned Law Enforcement Information System Specialist (LEISS) ▇▇▇▇ as the scribe to record the timeline of events.  He requested to patch the USBP radio communication with the police department and other agencies they could patch with, specifically the UCSO and TXDPS.  He assigned SOS ▇▇▇ and WC ▇▇▇▇ to conduct research on the assailant and obtain information from social media platforms.  DPAIC ▇▇▇▇ questioned who the onsite incident commander was, but no one was able to provide an answer.

He asked the radio room to identify the source of the "hot mic" so the BIC could relay the information to the source.  He asked LEISS ▇▇▇▇ if she could override the "hot mic," but she was unable to.  Later, the BIC identified the source and relayed the information to a BORTAC member to make the person aware.

DPAIC ▇▇▇▇ continuously received information and shared information.  The BIC identified the assailant, created a "lookout" with information and a photograph of him, and disseminated the information to the field and USBP personnel at the scene.  He instructed his staff not to send



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



anyone to Robb Elementary School because resources needed to be managed to address and respond to incoming information.

DPAIC ███████ explained that the BIC became the Sector's incident command center with (A)DC ███████ as the incident commander because he was the highest ranking USBP official present. DPAIC ███████ did not believe anyone was in command of USBP personnel at the school but understood he was part of the command staff in charge of what was being coordinated at the BIC and radio room. He identified that TXDPS requested BORTAC to respond and stated that BORTAC and BORSTAR are always ready to support state and local law enforcement agencies.

DPAIC ███████ stated that it was chaotic managing the information and misinformation received, including conflicting threat and no-threat information from Sheriff's dispatchers. He encountered difficulty with school staff when attempting to corroborate the assailant's biographical and previous enrollment information. DPAIC ███████ identified that DRT has MOUs with other federal law enforcement agencies, but not with any with state or local agencies. He understood USBP's authority and responsibility to respond was in a support role unless told otherwise and stated that no one at the BIC was able to identify a specific person or agency who was in charge at the scene.

*WC* ███████████ *(DRT), interviewed on February 13, 2023. (Exhibit 66)*

On May 24, 2022, WC ██████ was serving in an acting capacity as the Acting Chief of the Training and Traumatic Incident Management Branch. She received multiple phone calls from people regarding the situation in Uvalde and a text message from another agent saying they were enroute to UVA. WC ██████ notified EMT BPAs of the need for them to report to Uvalde, while she stayed at DRT to field incoming calls and communicate activation messages as required. She did not respond to Uvalde. WC ██████ gathered clean uniforms for people who had responded. She activated the Mission Support Specialist and an SBPA for Peer Support assistance. WC ██████ stated that USBP responded to assist other law enforcement agencies in a support capacity and that nothing was reported about who had command or control of the situation.

*SUBJECT MATTER EXPERTS*

OPR interviewed CBP subject matter experts in the fields of NIMS and ICS protocols and active shooter training. The following is a summary of each of OPR's interviews with these CBP personnel:

*ACPA* ███████████████ *(Director, National Firearms and Tactics Branch, LESC),*
*interviewed on August 10, 2023. (Exhibit 228)*

On May 24, 2022, ACPA ███████ was the Director of the LESC Pre-Deployment Branch. He was located in Harpers Ferry, Virginia, and did not respond to Uvalde. ACPA ██████ explained that the Active Shooter Instructor Training Program (ASITP) was developed in 2009 and added

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



to the basic Firearms Instructor Training Program in 2019.  It is a principle-based, scenario-based program that emphasizes the use of cover, positioning, team movements, and clearing rooms, all focused on tactics.  The training was discontinued in 2020 because of a lack of requests, but was restarted in 2021 based on USBP leadership's request.  The content was updated to include clearing "L" and "T" intersections, shoot/no-shoot situations, and safe weapon handling skills.  The training does not teach hostage negotiation tactics or what to do in hostage situations and provides no practical applications or scenarios regarding the differences between active shooter and barricaded subject.  ACPA ▮▮▮▮ stated that the training provides complex subject matter regarding closed and locked doors, as well as threat prioritization focusing first on people, then open doors, then closed doors.  ACPA ▮▮▮▮ explained that the course teaches that a response to an active shooter incident is broken into two parts: a contact team and a rescue team.  The contact team focuses on the primary mission of stopping the threat while the rescue team comes behind the contact team, focusing on the medical triage.  The training lacks any instructional content for breaching locked doors, medical triage, or what responders should do once an active shooter is neutralized.

ACPA ▮▮▮▮ stated that USBP's legal authority to respond to active shooter situations is convoluted.  He explained that LESC and OCC have been working with Congress regarding legislation to provide CBP specific authority, but that most of the existing authority to respond is based on past practices of supporting local and state law enforcement agencies.  Students are instructed that the first person on scene must pick up incident command and take control until someone with more rank or experience arrives and takes over.  ASITP focuses on CBP being first to arrive; it does not discuss what to do if other agencies arrive first or if CBP observes a lack of response from other agencies.

***Branch Chief (BC) ▮▮▮▮▮▮▮▮ (CBP Watch, Incident Management Branch), interviewed
on August 7, 2023. (Exhibit 227)***

BC ▮▮ is located in Washington, DC, and did not respond to Uvalde.  He explained that the National Incident Management System (NIMS) is a doctrinal standard or baseline that allows different agencies responding to incidents to operate in a common, consistent way.  He explained that ICS is a part of NIMS that allows the sharing of information and resources with all responding agencies at all levels.  He identified that CBP offers training on NIMS and ICS protocols through Acadis, CBP's distance learning platform, but more training is needed across CBP in both areas.  BC ▮▮▮ stated that the main principle of ICS is that incidents start and end locally.  The first person on scene is the incident commander until others who are more capable arrive, then the role can be turned over as the situation dictates.  He explained that chaos will result in a situation where no one takes charge or follows ICS protocols.

***PERSONNEL NOT INVOLVED***

In the interest of thoroughness, OPR interviewed all CBP personnel identified during interviews as potentially being a part of the CBP response to the events on May 24, 2022.  The following is a summary of OPR's interviews with people whom OPR determined did not respond to Robb Elementary School or other activities on May 24, 2022:



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



***DPAIC ▮▮▮▮ (UVA), interviewed on February 16, 2023.***

On May 24, 2022, DPAIC ▮▮▮ was on a temporary assignment to Puerto Rico for USBP oral hiring boards and did not respond to Uvalde. While in Puerto Rico, he received a text from ▮▮ ▮▮ about the Robb Elementary School incident. He contacted WC ▮▮▮▮▮▮ (UVA) and learned additional information about the incident, then contacted ▮▮▮▮▮ by phone to help calm her down. He believed the active shooter situation was later determined to be a barricaded subject.

***SA ▮▮▮▮▮▮ (OPR Del Rio), interviewed on July 19, 2023.***

On May 24, 2022, SA ▮▮▮▮ was on leave in San Antonio, Texas, when he saw news on TV at a doctor's office about the incident at Robb Elementary School. After returning to his home in Del Rio, Texas, he called acting Resident Agent in Charge ((A)RAC) ▮▮▮▮ around **5:30:00 PM** and inquired if (A)RAC ▮▮▮ wanted SA ▮▮▮▮ 's assistance. (A)RAC ▮▮▮ said yes, so SA ▮▮▮ retrieved his gear and drove his GOV to Uvalde, arriving at Robb Elementary School and reporting to the incident command center around **8:00:00 PM**. SA ▮▮▮▮ was there for about five to ten minutes before being directed to go to UVA and await further instructions. He departed UVA at **12:30:00 AM**.

***SA ▮▮▮▮▮▮ (OPR Protective Operations Branch), interviewed on July 24, 2023.***

On May 24, 2022, SA ▮▮▮ was assigned to OPR Del Rio and was out of state on approved leave. He did not respond to Uvalde. He learned of the Robb Elementary School incident the following day on the news and checked his government phone for any messages related to the incident but there were none.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



## APPENDIX II:  BORTAC SUMMARY

The following section includes the communications between BORTAC members through text messages and other third-party applications during the incident at Robb Elementary School. Sending a message to the group thread does not necessarily indicate it was received, read, or understood by other members in the thread.  This section also includes the final positions of BORTAC members in and around Robb Elementary School at **12:50:00 PM**, when the entry team breached Classroom 111 and 112.

### *RESPONDING BORTAC MEMBER COMMUNICATIONS 11:44:00 AM – 12:21:00 PM*

| TIME | FROM | TO | DESCRIPTION |
|------|------|-----|-------------|
| 11:44:00 AM | ███████ | BORTAC MANAGEMENT | "Get everyone to Robb school in Uvalde. There's a possible/ shooting guy with AK/AR." |
| 11:45:00 AM | ███████ | BORTAC MANAGEMENT | "Barricaded subject is what their calling it." |
| 11:45:00 AM | ███████ | BORTAC MANAGEMENT | "Robb elementary near Hwy 83." |
| 11:47:00 AM | ███████ | Admin iPhones | "Get everyone to Robb school in Uvalde. There's a possible/ shooting guy with AK/AR." |
| 11:47:00 AM | ███ | BORTAC Field Guys | "Uvalde guys, heard there's a possible school shooting, Robb elementary" |
| 11:47:00 AM | ██████ | BORTAC Field Guys | "Start rolling ███ " |
| 11:48:00 AM | ██████ | Admin iPhones | "They say he's barricade." |
| 11:48:00 AM | ██████ | Admin iPhones | "That's ████ school!" |
| 11:50:00 AM | ██████ | Admin iPhones | "10-13" |
| 11:51:00 AM | ██████ | Admin iPhones | "13" |
| 11:51:00 AM | ██████ | Admin iPhones | "13" |
| 11:55:00 AM | ██████ | Admin iPhones | "Yes" |
| 11:56:00 AM | ██████ | BORTAC MANAGEMENT | "███ should be bringing Bearcat. I'm heading over ther." |
| 11:59:00 AM | ██████ | Admin iPhones | "Scan uva 6. A lot of kids and family's in scene." |
| 11:59:00 AM | ██████ | Del Rio Stash House Op (Whatsapp) | "USMS On the way as well" |
| 12:01:00 PM | ██████ | Admin iPhones | "In route" |
| 12:03:00 PM | ██████ | Admin iPhones | "Rifle with 2 back packs is what they say" |
| 12:04:00 PM | ██████ | Admin iPhones | "███ ████ and I are on 131" |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00213



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| 12:04:00 PM | ███████ | Admin iPhones | "██ ██ let me know when you on blacktop" |
|---|---|---|---|
| 12:07:00 PM | ██████ | Admin iPhones | "I'm in scene trying to figure this out." |
| 12:07:00 PM | ██████ | Admin iPhones | <br>"Subject is on the other side of this building. This is the south side of the school. No one hurt at this time so far. Has been taking pop shots here and there. Come in through w. Cargil street. Other things roads closed." |
| 12:09:00 PM | ██████ | SOD Management | "40mins for most of the BTC element" |
| 12:11:00 PM | ██████ | Admin iPhones | ███████ added ██ to the conversation. |
| 12:14:00 PM | ███████ | Admin iPhones | "██ we are on 90" |
| 12:14:00 PM | ████████ | Admin iPhones | "X4 good deal" |
| 12:15:00 PM | ██████ | Admin iPhones | "Radio put out shooter has 30 magazines loaded" |
| 12:15:00 PM | ██████ | Admin iPhones | Whatsapp thread screenshot: 12:13 PM DPS-███: "T4"12:13 PM +1 ███': They are saying in the SRT chat. Room 411 west building12:13 PM +1 ███': "T4"12:13 PM ███ "HSI SRT en route as well"12:14 PM DPS-███: "Some kids are still inside"+1 ███': "Let's try and get a location that room so units arriving aren't..." |
| 12:20:00 PM | ██████ | Admin iPhones | "Here opposite of you ██" |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00214



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



*RESPONDING BORTAC MEMBER COMMUNICATIONS 12:21:00 PM – 12:50:00 PM*

| TIME | FROM | TO | DESCRIPTION |
|---|---|---|---|
| 12:26:00 PM | ███████ | Admin iPhones | |
| 12:27:00 PM | ███████ | Admin iPhones | "Guy is taking shots at the door. He has multiple children in there. Door is locked." |
| 12:29:00 PM | ███████ | Admin iPhones | "PAs breaching window." |
| 12:29:00 PM | ███████ | Admin iPhones | "1 child shot" |
| 12:31:00 PM | ███████ | Admin iPhones | "We need to dump gas in that window if possible" |
| 12:31:00 PM | ███████ | Admin iPhones | "SO has gas here in the hall way." |
| 12:33:00 PM | ███████ | Admin iPhones | "Gonna gas this kids?" |
| 12:39:00 PM | ███████ | Admin iPhones | "I'm here ███. Looking for ya'll" |
| 12:40:00 PM | ███████ | Admin iPhones | "███ he's on the 7th window from the south side of the building" |

*RESPONDING BORTAC MEMBER COMMUNICATIONS 12:50:00 PM – 2:48:00 PM*

| TIME | FROM | TO | DESCRIPTION |
|---|---|---|---|
| 12:58:00 PM | ███████ | Admin iPhones | "I'm gonna catch a ride to the hospital" |
| 12:59:00 PM | ███████ | Admin iPhones | FaceTime Call Ended |



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| 1:00:00 PM | ███ | Admin iPhones | "Subject dead. Multiple injuries" |
|---|---|---|---|
| 1:25:00 PM | ███ | Admin iPhones | "FYI I am at Uvalde hospital. I am good" |
| 1:46:00 PM | ███ | Admin iPhones | "Everyone that was in the hall way when we made entry, we need front a back pics in full kit. ███ will get urs later." |
| 1:47:00 PM | ███ | Admin iPhones | "Besides ███ and ███, was anyone else around?" |
| 1:49:00 PM | ███ | Admin iPhones | "███ ███ and I on not till they were rushing kids out" |
| 2:13:00 PM | ███ | Admin iPhones | "Head back to school and setup perimeter. Girlfriend said she's going to shoot it up. Setup perimeters" |
| 2:15:00 PM | ███ | Admin iPhones | "If nothing else, DPS wants to talk to us." |
| 2:17:00 PM | ███ | Admin iPhones | "Let's get half at civic center and half at school. If you were involved at the school head that way. If I just hit here got to civic center." |
| 2:19:00 PM | ███ | Admin iPhones | "OK roll to high school ." |
| 2:20:00 PM | ███ | Admin iPhones | "Going to the high school" |
| 2:27:00 PM | ███ | Admin iPhones | [picture of assailant] "Possible I'd" |
| 2:27:00 PM | ███ | Admin iPhones | "That looks like the guy we just handled" |
| 2:29:00 PM | ███ | Admin iPhones | "Ok, came from pd" |
| 2:48:00 PM | ███ | Admin iPhones | "Taking ███ with me to PD. For pics/debrief" |

*FINAL BORTAC POSITIONS UPON BREACH*

1. SBPA ███, BPA ███, and BPA ███ were in the hallway of the west building outside the door of Classroom 111.
2. BPA ███ was near the courtyard east of the west building.
3. BPA ███ was near the southeast corner of the west building.
4. SBPA ███, BPA ███, BPA ███, and BPA ███ were at the Hillcrest Memorial Funeral Home.

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**





Figure 17. Final BORTAC Positions Upon Breach

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00217



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



## EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | U.S. Department of Homeland Security, Management Directive 0810 |
| 2 | Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022 |
| 3 | Advanced Law Enforcement Rapid Response Training (ALERRT) Robb Elementary School Attack Response Assessment and Recommendations, June 2022 |
| 4 | U.S. Department of Justice, Office of Community Oriented Policing Services, Rescue, Response, and Resilience: A critical incident review of the Orlando public safety response to the attack on the Pulse nightclub, 2017 |
| 5 | U.S. Department of Justice, Office of Community Oriented Policing Services, Critical Incident Review: Active Shooter at Robb Elementary School, 2024 |
| 6 | U.S. Census Bureau Data, Uvalde City, TX (2022) |
| 7 | CBP e3 database of G-166 events where bailouts were reported |
| 8 | CBP Standards of Conduct, Directive Number 51735-013B |
| 9 | CBP Use of Force Policy, Publication Number 4500-002A |
| 10 | The Law of Search Manual: The Law of Arrest, Search & Seizure Manual, M-69 |
| 11 | ALERRT & FBI Active Shooter Response – Level 1, Version 7.2 |
| 12 | Active Shooter Instructor Training Program, Instructor Guidebook |
| 13 | CBP Incident Management / Operations Support, CBP LFC Course |
| 14 | Excerpts from Program Syllabus for U.S. Border Patrol Integrated (USBPI) Training Program |
| 15 | Model Uniform Core Criteria (MUCC) for Mass Casualty Incident Triage, National Highway Traffic Safety Administration |
| 16 | 2021 National Emergency Medical Services Education Standards, National Highway Traffic Safety Administration |
| 17 | Legal Differences Between Certification and Licensure, NREMT website |
| 18 | Memorandum from Office of Health Security Director of Emergency Medical Services to U.S. Border Patrol National EMT Program Manager, October 14, 2022 |
| 19 | TXDPS Voluntary Statement from TXDPS Ranger ███████ |
| 20 | TXDPS Voluntary Statement from ZCSO Deputy ██████ |



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 21 | TXDPS Interview Synopsis UCISDPD Lieutenant ███████████, May 25, 2022 |
| 22 | TXDPS Interview Synopsis of ████████, May 27, 2022 |
| 23 | TXDPS Interview Synopsis of ████████, June 11, 2022 |
| 24 | TXDPS Interview Synopsis of ████████, June 3, 2022 |
| 25 | Video Timestamp Offsets |
| 26 | Video of the Static Camera at the T-Intersection of Robb Elementary School |
| 27 | Video of the Static Camera at Hillcrest Memorial Funeral Home |
| 28 | Video of Cell Phone Video Footage from ████████ |
| 29 | Video of Body Worn Camera Footage from Constable Zamora |
| 30 | Video of Body Worn Camera Footage from TPWD Game Warden ████ |
| 31 | Video of Body Worn Camera Footage from UPD Officer ████ |
| 32 | Video of Body Worn Camera Footage from TXDPS Trooper ████ |
| 33 | Video of Body Worn Camera Footage from TXDPS Trooper ████ |
| 34 | Video of Body Worn Camera Footage from UPD Sergeant ████ |
| 35 | Video of Body Worn Camera Footage from UCSO Deputy ████ |
| 36 | IAR regarding interview of BPA ████ |
| 37 | IAR regarding interview of BPA ████ |
| 38 | IAR regarding interview of BPA ████ |
| 39 | IAR regarding interview of BPA ████ |
| 40 | IAR regarding interview of BPA ████ |
| 41 | IAR regarding interview of BPA-T ████ |
| 42 | IAR regarding interview of BPA ████ |
| 43 | IAR regarding interview of BPA-T ████ |
| 44 | IAR regarding interview of BPA ████ |
| 45 | IAR regarding interview of BPA ████ |
| 46 | IAR regarding interview of BPA-T ████ |
| 47 | IAR regarding interview of BPA ████ |
| 48 | IAR regarding interview of SOS ████ |
| 49 | IAR regarding interview of BPA ████ |
| 50 | IAR regarding interview of BPA ████ |
| 51 | IAR regarding interview of BPA ████ |



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 52 | IAR regarding interview of BPA ▇ |
| 53 | IAR regarding interview of BPA ▇ |
| 54 | IAR regarding interview of WC ▇ |
| 55 | IAR regarding interview of BPA-P ▇ |
| 56 | IAR regarding interview of BPA ▇ |
| 57 | IAR regarding interview of BPA ▇ |
| 58 | IAR regarding interview of PAIC ▇ |
| 59 | IAR regarding interview of SCBPO ▇ |
| 60 | IAR regarding interview of SBPA ▇ |
| 61 | IAR regarding interview of WC ▇ |
| 62 | IAR regarding interview of BPA-P ▇ |
| 63 | IAR regarding interview of SA ▇ |
| 64 | IAR regarding interview of SBPA ▇ |
| 65 | IAR regarding interview of CBPO ▇ |
| 66 | IAR regarding interview of WC ▇ |
| 67 | IAR regarding interview of CBPO ▇ |
| 68 | IAR regarding interview of BPA ▇ |
| 69 | IAR regarding interview of PAIC ▇ |
| 70 | IAR regarding interview of ACPA ▇ |
| 71 | IAR regarding interview of (A) PAIC ▇ |
| 72 | IAR regarding interview of BPA-I ▇ |
| 73 | IAR regarding interview of WC ▇ |
| 74 | IAR regarding interview of WC ▇ |
| 75 | IAR regarding interview of SBPA ▇ |
| 76 | IAR regarding interview of SBPA ▇ |
| 77 | IAR regarding interview of SBPA ▇ |
| 78 | IAR regarding interview of WC ▇ |
| 79 | IAR regarding interview of BPA ▇ |
| 80 | IAR regarding interview of SBPA ▇ |
| 81 | IAR regarding interview of SOS ▇ |
| 82 | IAR regarding interview of SOS ▇ |
| 83 | IAR regarding interview of SBPA ▇ |

AR00220




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 84 | IAR regarding interview of SBPA ██████████ |
| 85 | IAR regarding interview of DPAIC ████████ |
| 86 | IAR regarding interview of PAIC ██████ |
| 87 | IAR regarding interview of BPA ████████ |
| 88 | IAR regarding interview of SBPA ████████████ |
| 89 | IAR regarding interview of BPA ████████ |
| 90 | IAR regarding interview of BPA ██████ |
| 91 | IAR regarding interview of WC ██████████ |
| 92 | IAR regarding interview of BPA ████████ |
| 93 | IAR regarding interview of BPA ██████ |
| 94 | IAR regarding interview of BPA ██████████ |
| 95 | IAR regarding interview of BPA █████████ |
| 96 | IAR regarding interview of BPA █████████ |
| 97 | IAR regarding interview of DPAIC ████████ |
| 98 | IAR regarding interview of ACPA ████████ |
| 99 | IAR regarding interview of ACPA ████████ |
| 100 | IAR regarding interview of WC ████████ |
| 101 | IAR regarding interview of ACPA ███████ |
| 102 | IAR regarding interview of BPA ████████ |
| 103 | IAR regarding interview of SBPA ██████ |
| 104 | IAR regarding interview of ASAC ████████ |
| 105 | IAR regarding interview of ACPA █████████ |
| 106 | IAR regarding interview of BPA ████████ |
| 107 | IAR regarding interview of BPA ██████ |
| 108 | IAR regarding interview of DPAIC ████████ |
| 109 | IAR regarding interview of SBPA ███████ |
| 110 | IAR regarding interview of SOS ████████ |
| 111 | IAR regarding interview of WC █████████ |
| 112 | IAR regarding interview of BPA ███████████ |
| 113 | IAR regarding interview of BPA ███████ |
| 114 | IAR regarding interview of BPA-P █████████ |
| 115 | IAR regarding interview of BPA ████████ |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00221



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 116 | IAR regarding interview of BPA |
| 117 | IAR regarding interview of BPA |
| 118 | IAR regarding interview of WC |
| 119 | IAR regarding interview of PAIC |
| 120 | IAR regarding interview of BPA |
| 121 | IAR regarding interview of BPA |
| 122 | IAR regarding interview of BPA |
| 123 | IAR regarding interview of BPA |
| 124 | IAR regarding interview of BPA |
| 125 | IAR regarding interview of BPA-I |
| 126 | IAR regarding interview of MSS |
| 127 | IAR regarding interview of BPA |
| 128 | IAR regarding interview of ACPA |
| 129 | IAR regarding interview of SBPA |
| 130 | IAR regarding interview of PAIC |
| 131 | IAR regarding interview of BPA |
| 132 | IAR regarding interview of BPA |
| 133 | IAR regarding interview of SBPA |
| 134 | IAR regarding interview of DPAIC |
| 135 | IAR regarding interview of BPA |
| 136 | IAR regarding interview of BPA |
| 137 | IAR regarding interview of BPA |
| 138 | IAR regarding interview of BPA |
| 139 | IAR regarding interview of BPA |
| 140 | IAR regarding interview of BPA |
| 141 | IAR regarding interview of BPA |
| 142 | IAR regarding interview of BPA |
| 143 | IAR regarding interview of SBPA |
| 144 | IAR regarding interview of BPA |
| 145 | IAR regarding interview of BPA |
| 146 | IAR regarding interview of SBPA |
| 147 | IAR regarding interview of BPA |

AR00222



**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**



| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 148 | IAR regarding interview of SBPA █████████ |
| 149 | IAR regarding interview of SBPA █████████ |
| 150 | IAR regarding interview of BPA ███████ |
| 151 | IAR regarding interview of SBPA ████████████ |
| 152 | IAR regarding interview of BPA ██████ |
| 153 | IAR regarding interview of BPA ██████ |
| 154 | IAR regarding interview of BPA ██████ |
| 155 | IAR regarding interview of BPA ██████ |
| 156 | IAR regarding interview of BPA ██████ |
| 157 | IAR regarding interview of BPA ████ |
| 158 | IAR regarding interview of BPA ██████ |
| 159 | IAR regarding interview of BPA ████ |
| 160 | IAR regarding interview of AD ████████ |
| 161 | IAR regarding interview of BPA ██████ |
| 162 | IAR regarding interview of BPA ████ |
| 163 | IAR regarding interview of BPA-I █████ |
| 164 | IAR regarding interview of BPA ███ |
| 165 | IAR regarding interview of CPA Jason Owens |
| 166 | IAR regarding interview of PAIC █████ |
| 167 | IAR regarding interview of SBPA █████ |
| 168 | IAR regarding interview of BPA ██████ |
| 169 | IAR regarding interview of BPA ██████ |
| 170 | IAR regarding interview of BPA ████████ |
| 171 | IAR regarding interview of BPA ██████ |
| 172 | IAR regarding interview of BPA ██████ |
| 173 | IAR regarding interview of PAIC █████████ |
| 174 | IAR regarding interview of BPA ████████████ |
| 175 | IAR regarding interview of BPA ███████ |
| 176 | IAR regarding interview of BPA ██████████ |
| 177 | IAR regarding interview of BPA ██████ |
| 178 | IAR regarding interview of BPA █████████ |
| 179 | IAR regarding interview of DPAIC ████████ |

AR00223



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 180 | IAR regarding interview of DPAIC ███████ |
| 181 | IAR regarding interview of SBPA ██████ |
| 182 | IAR regarding interview of SBPA █████████ |
| 183 | IAR regarding interview of SBPA ██████ |
| 184 | IAR regarding interview of BPA-I ███ |
| 185 | IAR regarding interview of BPA ██████ |
| 186 | IAR regarding interview of AEA ███████ |
| 187 | IAR regarding interview of BPA ████████ |
| 188 | IAR regarding interview of BPA ██████ |
| 189 | IAR regarding interview of SBPA ██████ |
| 190 | IAR regarding interview of DCPA ████ |
| 191 | IAR regarding interview of BPA █████████ |
| 192 | IAR regarding interview of BPA ████████ |
| 193 | IAR regarding interview of BPA ██████ |
| 194 | IAR regarding interview of SA (Former BPA-I) ██████ |
| 195 | IAR regarding interview of BPA ██████ |
| 196 | IAR regarding interview of SBPA █████ |
| 197 | IAR regarding interview of BPA ██████ |
| 198 | IAR regarding interview of BPA ██████ |
| 199 | IAR regarding interview of BPA ███████ |
| 200 | IAR regarding interview of BPA ██████ |
| 201 | IAR regarding interview of BPA ███████ |
| 202 | IAR regarding interview of BPA ██████ |
| 203 | IAR regarding interview of BPA █████ |
| 204 | IAR regarding interview of BPA ████ |
| 205 | IAR regarding interview of BPA ███████ |
| 206 | IAR regarding interview of BPA ██████ |
| 207 | IAR regarding interview of BPA █████████ |
| 208 | IAR regarding interview of BPA █████ |
| 209 | IAR regarding interview of BPA ████████ |
| 210 | IAR regarding interview of BPA ██████ |
| 211 | IAR regarding interview of SBPA ███████ |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

AR00224



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 212 | IAR regarding interview of BPA ▮▮▮▮ |
| 213 | IAR regarding interview of BPA ▮▮▮▮ |
| 214 | IAR regarding interview of PAIC ▮▮▮ |
| 215 | IAR regarding interview of SOS ▮▮▮ |
| 216 | IAR regarding interview of AEA ▮▮▮ |
| 217 | IAR regarding interview of AIA ▮▮▮ |
| 218 | IAR regarding interview of AEA ▮▮▮ |
| 219 | IAR regarding interview of AEA ▮▮▮ |
| 220 | IAR regarding interview of SA ▮▮▮ |
| 221 | IAR regarding interview of SA ▮▮▮ |
| 222 | IAR regarding interview of SA ▮▮▮ |
| 223 | IAR regarding interview of SA ▮▮▮ |
| 224 | IAR regarding interview of SA ▮▮▮ |
| 225 | IAR regarding interview of SA ▮▮▮ |
| 226 | IAR regarding interview of AIA ▮▮▮ |
| 227 | IAR regarding interview of BC ▮▮▮ |
| 228 | IAR regarding interview of ACPA ▮▮▮ |



*Office of Professional Responsibility*
**Department of Homeland Security**
1300 Pennsylvania Avenue NW
Washington D.C., 20229

May 10, 2024

**MEMORANDUM**

**Modification of Case Closing Report UF2022586**

The purpose of this memorandum is to memorialize the addition of a disclaimer to the first page of Case Closing Report UF2022586.

Following the final signature on Case Closing Report UF2022586, CBP's Office of Chief Counsel requested the following clarification be inserted on the first page of the report:

> ***DISCLAIMER***
> *This internal report outlines, for CBP leadership, the investigative findings, factual observations and conclusions, and recommendations of CBP OPR. OPR's identification and characterization of legal provisions in this report is offered to provide background and context for findings, observations, conclusions, and recommendations in this report. Nothing in this report constitutes, or should be interpreted as, official legal analysis, legal interpretation, or the legal position of CBP or DHS.*

The Office of Professional Responsibility concurs with the request from CBP's Office of Chief Counsel and is reissuing an updated report with the included language on the first page. No other changes were made.

DANIEL P
ALTMAN

Digitally signed by DANIEL P
ALTMAN
Date: 2024.05.13 13:11:56 -04'00'

Daniel P. Altman
Executive Director
Investigative Operations Division
U.S. Customs and Border Protection
Office of Professional Responsibility

Department of Homeland Security
Management Directive System
MD Number: 0810.1

# THE OFFICE OF
# INSPECTOR GENERAL

## 1.  Purpose

This directive establishes Department of Homeland Security (DHS) policy regarding the Office of Inspector General (OIG).  Any prior Management Directive and any instruction or agreement of any kind issued by or entered into by any DHS official or component that is inconsistent in any respect with this directive is hereby superseded to the extent it is inconsistent with this directive.

## 2.  Scope

This directive applies to all DHS organizational elements (OEs), including all employees, contractors, and grantees.

## 3.  Authorities

A.    The Inspector General Act of 1978, as amended

B.    The Homeland Security Act of 2002, as amended, codified in Title 6, US Code

## 4.  Definitions

OE Offices - As used in this Management Directive, the term OE offices include all Organizational Element offices of internal affairs, inspections, audits or Professional Responsibility.   This term also includes the DHS Office of Security.

DHS Organizational Element – As used in this directive, the term DHS Organizational Element (OE) shall have the meaning given to the term DHS Organizational Element in DHS MD 0010.1, Management Directives System and DHS Announcements.  This includes Elements such as the Bureau of Customs and Border Protection, the United States Coast Guard, the Federal Emergency Management Agency, etc.  It also includes entities that report to DHS Organizational Elements, such as National Laboratories.

MD #: 0810.1

AR00227

## 5.  Responsibilities

A.    _The heads of DHS Organizational Elements_ shall:

    1.    promptly advise the OIG of allegations of misconduct in accordance with the procedures described in Appendix A, and when they become aware of any audit, inspection or investigative work being performed or contemplated within their offices by or on behalf of an OIG from outside DHS, the General Accounting Office, or any other law enforcement authority, unless restricted by law;

    2.    ensure that, upon request, OIG personnel are provided with adequate and appropriate office space, equipment, computer support services, temporary clerical support and other services to effectively accomplish their mission;

    3.    provide prompt access for auditors, inspectors, investigators, and other personnel authorized by the OIG to any files, records, reports, or other information that may be requested either orally or in writing;

    4.    assure the widest possible dissemination of this directive within their OEs. They may issue further instructions as necessary to implement this policy. Any such further instructions shall not conflict with this MD and shall be provided to the OIG immediately upon issuance;

    5.    assist in arranging private interviews by auditors, inspectors, investigators, and other officers authorized by the OIG with staff members and other appropriate persons;

    6.    advise the OIG when providing classified or sensitive information to the OIG to ensure proper handling.

B.    _DHS employees_ shall report suspicions of violations of law or regulation to the DHS Office of Inspector General or the appropriate OE offices, and will likewise:

    1.    cooperate fully by disclosing complete and accurate information pertaining to matters under investigation or review;

    2.    inform the investigating entity of any other areas or activities they believe require special attention;

    3.    not conceal information or obstruct audits, inspections, investigations, or other official inquiries;

MD #: 0810.1

AR00228

4. be subject to criminal prosecution and disciplinary action, up to and including removal, for knowingly and willfully furnishing false or misleading information to investigating officials; and

5. be subject to disciplinary action for refusing to provide documents or information or to answer questions posed by investigating officials or to provide a signed sworn statement if requested by the OIG, unless questioned as the subject of an investigation that can lead to criminal prosecution.

# 6. Policy and Procedures

A. The OIG, while organizationally a component of the DHS, operates independent of the DHS and all offices within it. The OIG reports to the Secretary. Under circumstances specified by statute, the Secretary, upon written notification to the OIG which then must be transmitted to Congress, can circumscribe the OIG's access to certain types of sensitive information and exercise of audit, investigative, or other authority. The DHS Inspector General is the head of the OIG.

The OIG is authorized, among other things, to:

1. administer oaths;

2. initiate, conduct, supervise and coordinate audits, investigations, inspections and other reviews relating to the programs and operations of the DHS;

3. inform the Secretary, Deputy Secretary, and the Congress fully and currently about any problems and deficiencies relating to the administration of any DHS program or operation and the need for, and progress of, corrective action;

4. review and comment on existing and proposed legislation and regulations relating to DHS programs, operations, and personnel;

5. distribute final audit and inspection reports to appropriate authorizing and oversight committees of the Congress, to all headquarters and field officials responsible for taking corrective action on matters covered by the reports and to Secretarial officers, office heads, and other officials who have an official interest in the subject matter of the report;

6. receive and investigate complaints or information from employees, contractors, and other individuals concerning the possible existence of criminal or other misconduct constituting a violation of law, rules, or

AR00229

regulations, a cause for suspension or debarment, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to the public health and safety, and report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law;

7. protect the identity of any complainant or anyone who provides information to the OIG, unless the OIG determines that disclosure of the identity during the course of the investigation is unavoidable.

Further, the OIG shall:

8. follow up on report recommendations to ensure that corrective actions have been completed and are effective;

9. prepare a semiannual report to the Secretary and the Congress, summarizing OIG audit and investigative activities within DHS. Section 5(a) of the Inspector General Act of 1978, as amended, requires this report.

B. Allegations received by the OIG or OE offices shall be retained or referred in accordance with Appendix A of this MD. The only exception to this requirement is that the OIG and the United States Secret Service will adhere to the terms of the Memorandum of Understanding entered into between those two entities on December 8, 2003, and as may be amended from time to time.

C. **_Standards._** Audits shall be conducted consistent with the standards issued by the Comptroller General of the United States. Inspections and investigations shall be conducted consistent with the quality standards issued by the President's Council on Integrity and Efficiency (PCIE).

D. **_Questions or Concerns._** Any questions or concerns regarding this directive should be addressed to the OIG.

J.M. Loy, ADM
Deputy Secretary

Issue date:    JUN 1 0 2004

- 4 -                              MD #: 0810.1

MD 0810.1

## APPENDIX A

The categories of misconduct identified below shall be referred to the OIG. Such referrals shall be transmitted by the OE offices immediately upon receipt of the allegation, and no investigation shall be conducted by the OE offices prior to referral unless failure to do so would pose an imminent threat to human life, health or safety, or result in the irretrievable loss or destruction of critical evidence or witness testimony. In such extraordinary situations, the OIG will be contacted as soon as practical, and all information and evidence collected by the OE office shall then be provided to the OIG as part of the OE referral to the OIG. The OIG will accept and retain all such allegations for investigation subsumed under this exigent circumstance exception.

- All allegations of criminal misconduct against a DHS employee;

- All allegations of misconduct against employees at the GS-15, GM-15 level or higher, or against employees in the OE offices;

- All allegations of serious, noncriminal misconduct against a law enforcement officer. "Serious, noncriminal misconduct" is conduct that, if proved, would constitute perjury or material dishonesty, warrant suspension as discipline for a first offense, or result in loss of law enforcement authority. For purposes of this directive, a "law enforcement officer" is defined as any individual who is authorized to carry a weapon, make arrests, or conduct searches;

- All instances regarding discharge of a firearm that results in death or personal injury or otherwise warrants referral to the Civil Rights Criminal Division of the Department of Justice;

- All allegations of fraud by contractors, grantees or other individuals or entities receiving DHS funds or otherwise engaged in the operation of DHS programs or operations;

- All allegations of visa fraud by DHS employees working in the visa issuance process.

In addition, the OIG will investigate allegations against individuals or entities that do not fit into the categories identified above if the allegations reflect systemic violations, such as abuses of civil rights, civil liberties, or racial and ethnic profiling, serious management problems within the department, or otherwise represent a serious danger to public health and safety.

- 5 -                    MD #: 0810.1

AR00231

With regard to categories not specified above, the OE offices will initiate the investigation upon receipt of the allegation, and shall notify within five business days the OIG's Office of Investigations of such allegations. The OIG shall notify the OE offices if the OIG intends to assume control over or become involved in such an investigation, but absent such notification, the OE office shall maintain full responsibility for these investigations.

Any allegations received by the OIG that do not come within the categories specified above, or that the OIG determines not to investigate, will be referred within five business days of receipt of the allegation by the OIG to the appropriate OE office along with any confidentiality protections deemed necessary by the OIG.

The OE offices shall provide monthly reports to the OIG on all open investigations. In addition, upon request, the OE offices shall provide the OIG with a complete copy of the Report of Investigation, including all exhibits, at the completion of the investigation. Similarly, the OIG shall provide the OE offices, upon request, with a complete copy of any Report of Investigation relating to its OE, including all exhibits, at the completion of the investigation. The OIG shall have the right to request more frequent or detailed reports on any investigations and to reassert at any time exclusive authority or other involvement over any matter within its jurisdiction.

MD #: 0810.1

AR00232

ROBB
ELEMENTARY
SCHOOL

# Texas House of Representatives
## Investigative Committee
*on the* **Robb Elementary Shooting**

**Representative Dustin Burrows,** Chair
**Representative Joe Moody,** Vice Chair
**The Honorable Eva Guzman,** Member



July 17, 2022

AR00233

**HOUSE INVESTIGATIVE COMMITTEE
ON THE ROBB  ELEMENTARY SHOOTING
TEXAS HOUSE OF REPRESENTATIVES
INTERIM REPORT 2022**

**A REPORT TO THE
HOUSE OF REPRESENTATIVES
88TH TEXAS LEGISLATURE**

**DUSTIN BURROWS
CHAIR**

**COMMITTEE CLERK
PAIGE HIGERD**

AR00234



Investigative Committee On
the Robb Elementary Shooting

July 17, 2022

Dustin Burrows                                             P.O. Box 2910
Chair                                            Austin, Texas 78768-2910

The Honorable Dade Phelan
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The Investigative Committee on the Robb Elementary Shooting of the Eighty-seventh Legislature hereby submits its interim report for your consideration.

Respectfully submitted,


Rep. Dustin Burrows


Rep. Joe Moody                                    Justice Eva Guzman


Vice-Chairman: Joe Moody
Members: Justice Eva Guzman

# TABLE OF CONTENTS

Preface ----------------------------------------------------------------------------------------------- 1

Acknowledgments ---------------------------------------------------------------------------------- 1

Dedication ------------------------------------------------------------------------------------------- 1

1 | Introduction & Executive Summary -------------------------------------------------- 5

The School --------------------------------------------------------------------------------------- 5

The Responders --------------------------------------------------------------------------------- 7

2 | Background & History of Investigation -------------------------------------------- 10

3 | Robb Elementary School Security & Facilities Overview ----------------------- 13

Uvalde CISD Police Department ------------------------------------------------------------- 13

Active Shooter Plan ---------------------------------------------------------------------------- 14

ALERRT Standard for Active Shooter Training ------------------------------------------- 17

Rise of "Bailout" Security Incidents -------------------------------------------------------- 22

Raptor Alert System --------------------------------------------------------------------------- 23

Uvalde CISD Facilities & Maintenance ----------------------------------------------------- 24

Robb Elementary Facilities & Management ------------------------------------------------ 24

Policies for Locking Doors -------------------------------------------------------------------- 25

Maintenance of Doors & Keys ---------------------------------------------------------------- 27

4 | The Attacker ---------------------------------------------------------------------------- 29

Family & Early Life ----------------------------------------------------------------------------- 29

School --------------------------------------------------------------------------------------------- 30

The Year Before --------------------------------------------------------------------------------- 32

The Last Days ------------------------------------------------------------------------------------ 34

5 | May 24 Incident & Law Enforcement Response --------------------------------- 39

Coach Silva Alerts the School ---------------------------------------------------------------- 41

Law Enforcement Responds to Robb Elementary ----------------------------------------- 41

Robb Elementary School Locks Down ------------------------------------------------------- 44

The Attacker Enters the West Building ----------------------------------------------------- 46

The Attacker Enters Rooms 111 & 112 ----------------------------------------------------- 46

First Law Enforcement Approaches & Enters ---------------------------------------------- 48

What Happened for the Next 73 Minutes? ------------------------------------------------- 52

On the South … ---------------------------------------------------------------------------------- 52

On the North … ---------------------------------------------------------------------------------- 58

On the Outside … -------------------------------------------------------------------------------- 62

What Didn't Happen in Those 73 Minutes? ------------------------------------------------ 62

Law Enforcement Responder Headcount ---------------------------------------------------- 64

6 | Information Flow ----------------------------------------------------------------------- 66

The First Reports ------------------------------------------------------------------------------- 66

ALERRT Report ---------------------------------------------------------------------------------- 67

Video Evidence ---------------------------------------------------------------------------------- 68

Compromised Trust ----------------------------------------------------------------------------- 69

7 | Factual Conclusions ------------------------------------------------------------------- 70

# Preface

This is the interim report of the Investigative Committee on the Robb Elementary Shooting of the Texas House of Representatives.

Conscious of the desire of the Uvalde community and the public at large to receive an accurate account of the tragedy at Robb Elementary School, the Committee has worked diligently and with care to issue this interim report of its factual findings. The Committee's work is not complete. We do not have access to all material witnesses. Medical examiners have not yet issued any reports about their findings, and multiple other investigations remain ongoing. The Committee believes this interim report constitutes the most complete telling to date of the events of and leading to the May 24, 2022, tragedy.

This Committee has prioritized factual accuracy, as will be evident from our attention to conducting our own interviews and documenting our sources of information. Still, based on the experiences of past mass-shooting events, we understand some aspects of these interim findings may be disputed or disproven in the future.

The Committee issues this interim report now, believing the victims, their families, and the entire Uvalde community have already waited too long for answers and transparency.

# Acknowledgments

The Committee gratefully acknowledges the assistance of all who helped with its investigation and the preparation of this interim report, including Clement Abbondandolo, Margo Cardwell, Courtney Chaplin, Matthew Crow, Casey Garrett, Harrison Garrett, Paige Higerd, Ted Liggett, Michael Massengale, Kolton McDougald, and Ellic Sahualla.

# Dedication

The Committee submits this report with great humility and the deepest respect for the victims and their families. It is the Committee's sincere hope that this brings some clarity for them as to the facts that happened. This report is meant to honor them.

You will notice the name of the attacker is not mentioned. We also will not use his image, so as not to glorify him.

AR00237

### Nevaeh Alyssa Bravo

Nevaeh is remembered as a playful girl who put a smile on the faces of everyone around her. Her family meant the world to her, and she often helped her father around the house. Nevaeh loved the colors pink and purple and enjoyed playing softball and riding her bike.

### Jacklyn "Jackie" Jaylen Cazares

Jackie is remembered as a caring girl who enjoyed singing and making TikTok videos. Jackie loved animals (especially her four dogs) and wanted to become a veterinarian; she also dreamt of visiting Paris. Jackie was known as someone who would go out of her way to help anyone.

### Makenna Lee Elrod

Makenna is remembered as the light in the lives of those who knew her. She loved the color purple, softball and gymnastics, and spending time with her family—especially time on the ranch with her dad. Her smile lit up rooms, and she liked to leave hidden notes for her family to find.

### Jose Manuel Flores, Jr.

Jose is remembered as loving and kind. He was an honor roll student who wanted to be a police officer when he grew up to help protect other people. Jose was an amazing big brother who looked out for his siblings, and his parents called him "a helper" because he was always pitching in at home.

### Eliahna "Ellie" Amyah Garcia

Ellie is remembered as a gentle, kindhearted girl who loved spending time with her family and was very close with her grandparents. She enjoyed playing basketball and wanted to be a cheerleader one day. Ellie adored the colors pink and purple and loved a nice bowl of ramen noodles. She was a long-term planner who was already picking dresses and dances for her quinceañera five years away.

### Irma Garcia

Irma is remembered as courageous and selfless—a wife and mother of four who was always willing to lend a helping hand to anyone who needed one. She was a 23-year teacher. Irma died protecting her students, and her heroism will be remembered forever.

### Uziyah Sergio Garcia

Uziyah is remembered as an outgoing boy who loved his family as well as his "cousins and brothers from another mother." He was always fair and full of life, and he enjoyed running, swimming, football, and playing his Nintendo Switch and Oculus.

AR00238

# Amerie Jo Garza

Amerie is remembered as considerate and fun-loving. She was protective of her three-year-old brother and would kiss him every morning before she went to school. Amerie loved swimming, drawing, and vanilla bean frappés from Starbucks. She dreamt of becoming an art teacher one day.

# Xavier James Lopez

Xavier is remembered as an active boy who loved swimming and playing little league baseball for his team, the Blue Jays. He was lively, energetic, and always eager to dance, especially the cumbia with his grandmother. Xavier was known for wearing stylish clothes and had a smile that could cheer anyone up.

# Jayce Carmelo Luevanos

Jayce is remembered as a happy, thoughtful boy with many friends who always seemed to be running around his yard with him. He made his grandparents a pot of coffee every morning and would leave notes saying that he loved them. Dinosaurs were one of his favorite things.

# Tess Marie Mata

Tess is remembered as a natural athlete who enjoyed softball, soccer, and gymnastics—she especially loved doing backbends in gymnastics. Tess was a fan of the Houston Astros and even played the same position as her favorite player, José Altuve, in softball. She was saving up money for a family vacation to Disney World.

# Maranda Gail Mathis

Maranda is remembered as smart and nice, a shy tomboy who loved the color purple, especially when it was on unicorns and mermaids. Maranda also enjoyed spending time outdoors and had an incredible imagination.

# Eva Mireles

Eva is remembered as dedicated and vibrant. She enjoyed CrossFit, hiking, spending time with her dog, Kane, and being with her family. Her smile was bright and her commitment to her students was still unwavering after 17 years as an educator. She was a hero who never gave up throughout an impossible ordeal.

# Alithia Haven Ramirez

Alithia is remembered as talented and bighearted. She was a gifted artist who wanted to go to art school in Paris one day. She was also a mature role model to her siblings and was always thoughtful about helping those in need.

AR00239

## Annabell Guadalupe Rodriguez

Annabell is remembered as empathetic and loyal. She enjoyed spending time with her sisters and watching TikToks. Her favorite color was blue—especially blue found on butterflies. Annabell was on the honor roll and known for being a sharp student.

## Maite Yuleana Rodriguez

Maite is remembered as sweet and competitive. She loved learning about animals and the ocean, especially dolphins, whales, and dogs. She was an honor student who dreamt of attending Texas A&M to become a marine biologist. Her favorite color was green, and she enjoyed a #13 from Whataburger—always with a side of sliced jalapenos.

## Alexandria "Lexi" Aniyah Rubio

Lexi is remembered as intelligent and driven. She had a contagious smile and enjoyed playing softball and basketball, which she excelled at. Lexi was an all-A student who wanted to become a lawyer one day, and she was interested in social and political issues because she wanted to make a difference.

## Layla Marie Salazar

Layla is remembered as witty and lively. She loved singing with her parents while coming to and from school and going with her grandparents for tacos. She was also an avid swimmer, dancer, and runner who'd won six races at a recent field day.

## Jailah Nicole Silguero

Jailah is remembered as a joy to be around, a pure delight who enjoyed making TikToks to show off to her family and friends. Jailah was always dancing and liked to spend time outdoors as well.

## Eliahna Torres

Eliahna is remembered as loving and compassionate. She enjoyed making other people laugh and was a "master of jests." She was also an amazing softball player up for a spot on the city's all-star team. Eliahna was a natural leader who was also known for her warmth and selflessness.

## Rojelio Fernandez Torres

Rojelio is remembered as a clever, positive boy who enjoyed being outdoors in his free time as well as playing football and videogames like Pokémon. Rojelio was always eager to help others and had a real love for life.

AR00240

# 1 | Introduction & Executive Summary

There is nothing we can do to heal the wounds suffered by the Uvalde community, nothing that can redress the loss of 21 souls stolen from their families and friends. We must critically examine the contributing factors to the horrific massacre at Robb Elementary School to try to provide answers and prevent similar tragedies in the future. A safer environment for all Texas children is one of the ways we can honor the memory of the students and teachers murdered in Uvalde.

Across our state, men and women who work in the fields of education and law enforcement exemplify both service and sacrifice. Teachers dedicate themselves to the betterment of society through the promise of a new generation. Police officers see danger and run to meet it, knowing the cost and stepping forward to pay it. In pursuing these high callings, teachers and police officers live in the public square—nurturing, encouraging, protecting, preserving. They render this service on behalf of us all, but especially for children, who are the most innocent and vulnerable among us. Like the rest of us, educators and law enforcement officers sometimes fail at crucial moments. When they do, that does not diminish the good work and sacrificial service of their professions as a whole.

Of necessity, this report will describe shortcomings and failures of the Uvalde Consolidated Independent School District and of various agencies and officers of law enforcement. At the outset, we acknowledge that those same shortcomings could be found throughout the State of Texas. We must not delude ourselves into a false sense of security by believing that "this would not happen where we live." The people of Uvalde undoubtedly felt the same way. We must all take seriously the threats to security in our schools and the need to be properly prepared to confront active shooter scenarios.

Other than the attacker, the Committee did not find any "villains" in the course of its investigation. There is no one to whom we can attribute malice or ill motives. Instead, we found systemic failures and egregiously poor decision making. We recognize that the impact of this tragedy is felt most profoundly by the people of Uvalde in ways we cannot fully comprehend.

## The School

With hindsight we can say that Robb Elementary did not adequately prepare for the risk of an armed intruder on campus.

The school's five-foot tall exterior fence was inadequate to meaningfully impede an intruder. While the school had adopted security policies to lock exterior doors and internal classroom

AR00241

doors, there was a regrettable culture of noncompliance by school personnel who frequently propped doors open and deliberately circumvented locks. At a minimum, school administrators and school district police tacitly condoned this behavior as they were aware of these unsafe practices and did not treat them as serious infractions requiring immediate correction. In fact, the school actually suggested circumventing the locks as a solution for the convenience of substitute teachers and others who lacked their own keys.

The school district did not treat the maintenance of doors and locks with appropriate urgency. In particular, staff and students widely knew the door to one of the victimized classrooms, Room 111, was ordinarily unsecured and accessible. Room 111 could be locked, but an extra effort was required to make sure the latch engaged. Many knew Room 111's door had a faulty lock, and school district police had specifically warned the teacher about it. The problem with locking the door had been reported to school administration, yet no one placed a written work order for a repair.

Another factor contributing to relaxed vigilance on campus was the frequency of security alerts and campus lockdowns resulting from a recent rise of "bailouts"—the term used in border communities for the increasingly frequent occurrence of human traffickers trying to outrun the police, usually ending with the smuggler crashing the vehicle and the passengers fleeing in all directions. The frequency of these "bailout"-related alarms—around 50 of them between February and May of 2022—contributed to a diminished sense of vigilance about responding to security alerts.

Other factors delayed the reporting of the threat to the campus and to law enforcement. Low-quality internet service, poor mobile phone coverage, and varying habits of mobile phone usage at the school all led to inconsistent receipt of the lockdown notice by teachers. If the alert had reached more teachers sooner, it is likely that more could have been done to protect them and their students.

In violation of school policy, no one had locked any of the three exterior doors to the west building of Robb Elementary. As a result, the attacker had unimpeded access to enter. Once inside, the attacker continued into the adjoining Rooms 111 and 112, probably through the door to Room 111, and apparently completely unimpeded. Locking the exterior and interior doors ultimately may not have been enough to stop the attacker from entering the building and classrooms. But had school personnel locked the doors as the school's policy required, that could have slowed his progress for a few precious minutes—long enough to receive alerts, hide children, and lock doors; and long enough to give police more opportunity to engage and stop the attacker before he could massacre 19 students and two teachers.

AR00242

Because of these failures of facilities maintenance and advance preparation, the attacker fired most of his shots and likely murdered most of his innocent victims before any responder set foot in the building. Of the approximately 142 rounds the attacker fired inside the building, it is almost certain that he rapidly fired over 100 of those rounds before any officer entered.

### The Responders

Since the 1999 Columbine tragedy, the law enforcement community has recognized the critical importance of implementing active shooter training for all officers, regardless of specialty. Also, all officers must now acknowledge that stopping the killing of innocent lives is the highest priority in active shooter response, and all officers must be willing to risk their lives without hesitation.

At Robb Elementary, law enforcement responders failed to adhere to their active shooter training, and they failed to prioritize saving the lives of innocent victims over their own safety.

The first wave of responders to arrive included the chief of the school district police and the commander of the Uvalde Police Department SWAT team. Despite the immediate presence of local law enforcement leaders, there was an unacceptably long period of time before officers breached the classroom, neutralized the attacker, and began rescue efforts. We do not know at this time whether responders could have saved more lives by shortening that delay. Regardless, law enforcement committed numerous mistakes in violation of current active shooter training, and there are important lessons to be learned from each faulty assumption and poor decision made that day.

The Uvalde CISD's written active shooter plan directed its police chief to assume command and control of the response to an active shooter. The chief of police was one of the first responders on the scene. But as events unfolded, he failed to perform or to transfer to another person the role of incident commander. This was an essential duty he had assigned to himself in the plan mentioned above, yet it was not effectively performed by anyone. The void of leadership could have contributed to the loss of life as injured victims waited over an hour for help, and the attacker continued to sporadically fire his weapon.

A command post could have transformed chaos into order, including the deliberate assignment of tasks and the flow of the information necessary to inform critical decision making. Notably, nobody ensured that responders making key decisions inside the building received information that students and teachers had survived the initial burst of gunfire, were trapped in Rooms 111 and 112, and had called out for help. Some responders outside and inside the building knew that information through radio communications. But nobody in

AR00243

command analyzed this information to recognize that the attacker was preventing critically injured victims from obtaining medical care. Instead of continuing to act as if they were addressing a barricaded subject scenario in which responders had time on their side, they should have reassessed the scenario as one involving an active shooter. Correcting this error should have sparked greater urgency to immediately breach the classroom by any possible means, to subdue the attacker, and to deliver immediate aid to surviving victims. Recognition of an active shooter scenario also should have prompted responders to prioritize the rescue of innocent victims over the precious time wasted in a search for door keys and shields to enhance the safety of law enforcement responders.

An effective incident commander located away from the drama unfolding inside the building would have realized that radios were mostly ineffective, and that responders needed other lines of communication to communicate important information like the victims' phone calls from inside the classrooms. An offsite overall incident commander likely could have located a master key more quickly—several people on campus had one. An offsite overall incident commander may have suggested checking to see if officers could open the door without a key—in hindsight, they probably could have. An offsite overall incident commander who properly categorized the crisis as an active shooter scenario should have urged using other secondary means to breach the classroom, such as using a sledgehammer as suggested in active shooter training or entering through the exterior windows.

Uvalde CISD and its police department failed to implement their active shooter plan and failed to exercise command and control of law enforcement responding to the tragedy. But these local officials were not the only ones expected to supply the leadership needed during this tragedy.

Hundreds of responders from numerous law enforcement agencies—many of whom were better trained and better equipped than the school district police—quickly arrived on the scene. Those other responders, who also had received training on active shooter response and the interrelation of law enforcement agencies, could have helped to address the unfolding chaos.

Yet in this crisis, no responder seized the initiative to establish an incident command post. Despite an obvious atmosphere of chaos, the ranking officers of other responding agencies did not approach the Uvalde CISD chief of police or anyone else perceived to be in command to point out the lack of and need for a command post, or to offer that specific assistance. Several will suggest they were misled by false or misleading information they received as they arrived; however, the "chaos" described by almost all of them demonstrates that at a

AR00244

minimum, responders should have asked more questions. This suggests a training deficiency, in that responding officers failed to adequately question the absence of command. Other responders failed to be sufficiently assertive by identifying the incident commander and offering their assistance or guidance, or by assuming command in the absence of any other responder having expressly done so. In this sense, the entirety of law enforcement and its training, preparation, and response shares systemic responsibility for many missed opportunities on that tragic day.

AR00245

## 2 | BACKGROUND & HISTORY OF INVESTIGATION

On June 3, 2022, Speaker of the Texas House of Representatives Dade Phelan created by proclamation the Investigative Committee on the Robb Elementary Shooting, pursuant to Rule 1, Section 17, and Rule 4, Sections 57 and 58, of the Rules of the House of Representatives. Three members were appointed to the Committee: Representative Dustin Burrows, Chair; Representative Joe Moody, Vice-Chair; and the Honorable Eva Guzman, Public Member. The Speaker gave the Committee the same authority and duties conferred on standing committees under the rules, and the Committee is set to expire on the date the 88th Legislature convenes.

Speaker Phelan charged the Committee with the duty to "conduct all inquiries into the actions of any State or local officer, employee, department, agency, institution, or instrumentality and any political subdivision needed to make a complete and thorough examination of the facts and circumstances of the events relating to the violent acts, shootings, and murders at Robb Elementary School in Uvalde." In the conduct of its investigation, the Speaker charged the Committee to "examine the evidence developed by all law enforcement authorities" and to "acquire and analyze additional evidence as needed to make comprehensive findings." The Committee has the additional duty of providing assistance to the Select Committee on Youth Health and Safety and the Committee on Homeland Security and Public Safety in the consideration of their joint charges on mass violence prevention and community safety. This Committee "shall submit a final report in the same manner as an interim study committee under Rule 4, Section 61, Rules of the House of Representatives."

Put more simply, this is a fact-finding committee. The Speaker has tasked other legislative committees with the difficult but critical responsibility of proposing policy in response to the tragedy at Robb Elementary School.

The Committee held its first meeting on June 9, 2022, in Austin, Texas. In an extensive briefing in executive session, Col. Steven C. McCraw, Director of the Texas Department of Public Safety, provided the Committee an overview of the status of the ongoing DPS investigation, including the attacker's background, the incident timeline, and the response by law enforcement. The Committee reviewed a composite video recording of the attacker's approach to the school and law enforcement's response. The meeting concluded with DPS agreeing to provide its evidence to the Committee.

The Committee then heard three days of testimony on June 16th, 17th, and 20th in Uvalde, Texas. Testifying witnesses included employees of the Uvalde CISD (including Robb

AR00246

Elementary School staff), the Uvalde CISD Police Department, the Uvalde Police Department, the Department of Public Safety, and members of the attacker's family. On June 17th, all three members of the Committee visited the Robb Elementary School campus accompanied by Uvalde CISD Superintendent Dr. Hal Harrell, and the Committee paid its respects to the victims and to the community by laying a floral wreath at the school memorial.

Uvalde CISD Police Chief Pete Arredondo testified before the Committee in Austin, Texas, on June 21st followed by Sgt. Thomas Calabro with the Houston Police Department, who provided information about training and standard practices for law enforcement responses to active shooter scenarios and for the command and coordination of multiple responding law enforcement agencies.

The Committee returned to Uvalde on June 29th and 30th. On June 29th, the Committee interviewed Uvalde Mayor Don McLaughlin, four Robb Elementary School fourth grade teachers, and five employees of the Uvalde Police Department, including a dispatcher. The next day, June 30th, the Committee interviewed Uvalde CISD employee Becky Reinhardt, Uvalde County Precinct One Constable Johnny Field (by videoconference), and two peace officers who responded to the incident from the Department of Public Safety (a special agent and a lieutenant). That day, the Committee's investigators also interviewed Robb Elementary School teacher Arnulfo Reyes, the teacher in Room 111 who is still recovering from his injuries. The Committee received a report and an audio recording of the interview of Mr. Reyes.

On July 11th, the Committee reconvened in Austin to interview ALERRT Assistant Director John Curnutt and Uvalde County Sheriff Ruben Nolasco, both by videoconference. The Committee also conducted a follow-up interview of DPS Director McCraw.

The Committee interviewed all 35 witnesses in executive session, meaning that the sessions were closed to the public. Despite public expressions of frustration and even criticism that these meetings were conducted behind closed doors, the Committee is confident that its method served the goal of an objective fact-finding process. The Committee was able to engage witnesses in candid discussions that may not have been possible in public hearings or other settings.

In addition to the witnesses who appeared before the Committee in executive session, the Committee's investigators conducted at least 39 independent informal interviews, The Committee and its investigators have reviewed hundreds of crime-scene photos and dozens of audio and video recordings from the incident, including surveillance camera footage, mobile-phone video, 911 calls, radio transmissions, and body-worn camera footage. They reviewed recordings and summaries of witness interviews conducted and recorded by law

AR00247

enforcement agencies. Documentation received from the Department of Public Safety and reviewed by the Committee included an enormous trove of digital evidence, including data from mobile phones, cloud storage, and social media messages. The Committee received and reviewed thousands of pages of documents received from numerous agencies including ALERRT, ATF, Texas DPS, FBI, Texas School Safety Center, and Uvalde CISD. These documents included school audits and safety plans, school disciplinary records, employment records, criminal-history reports, dispatch logs, ballistics reports, firearms traces, gun store records, information about the victims, and various diagrams, sketches, and timelines.The Committee also invited and received suggestions from witnesses about how to improve policies relating to school safety, firearm safety, law enforcement training and resources, and active shooter response. The Committee genuinely appreciates the input from all witnesses, and it will be shared with the House committees formed to evaluate and propose policies to address mass violence prevention and community safety.

AR00248

# 3 | ROBB ELEMENTARY SCHOOL SECURITY & FACILITIES OVERVIEW

The Committee has great respect for teachers and all who dedicate their lives to the education of children.

As of the fall of 2020, there were 5,371,586 students in Texas schools. There are 1,204 school systems, most of which are independent school districts. The largest independent school district in Texas is in Houston, with 196,943 students enrolled for the 2020–21 school year. The smallest district is San Vicente ISD, which had five students for 2020–21.[1]

Most school districts have multiple campuses with multiple buildings. It is estimated that there could be as many as 80,000 buildings in the State of Texas that house children at various times during the school year. These are important facts to remember in the context of discussing policy related to school-hardening measures.

Uvalde CISD serves a rural community of 15,217 citizens.[2] The district's schools include Uvalde High School, Morales Junior High, Anthon, Flores, Robb, and Dalton elementary schools, and several alternative education programs.[3] The campus buildings range from over 100 years in age to the newest school, Uvalde High School, which was opened nearly four decades ago in 1983.[4] Uvalde CISD constructed many of those older buildings during times when the potential threats to students were much different than those faced today.[5] While no school could ever be built to prevent every conceivable threat, they can be built and operated in ways to better mitigate risk and impede potential threats from outside attackers.

## Uvalde CISD Police Department

Until recently, the Uvalde Police Department was responsible for security in the Uvalde public schools. In 2018, Uvalde CISD established its own police department, headquartered at Uvalde High School. With nine different schools and a budget for six police officers, Uvalde CISD oversees more campuses than it has officers, and it has assigned no officer specifically to Robb Elementary. Instead, officers would regularly visit the Robb campus for a walk-through several

---

[1] Source: Texas Education Agency.

[2] 2020 Census, https://data.census.gov/cedsci/all?q=Uvalde%20city,%20Texas.

[3] *See generally* www.ucisd.net.

[4] Committee testimony of Rodney Harrison, UCISD Maintenance and Operations Director (June 16, 2022).

[5] Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

AR00249

times per week, usually lasting from 15–45 minutes.[6] Uvalde CISD Police Chief Pete Arredondo and his second-in-command, Lt. Mike Hernandez, also testified that they visited campuses and walked halls to "rattle doors" to confirm they were locked.[7]

Uvalde CISD police officers commonly carried two radios: one for the school district, and another "police radio" which transmitted communications from various local law enforcement agencies. While the school district radios tended to work reliably, the police radios worked more intermittently depending on where they were used.[8]

### A c t i v e   S h o o t e r   P l a n

As directed by state legislation enacted in 2019,[9] Uvalde CISD adopted a policy for responding to an active shooter emergency. And Uvalde CISD deserves credit for having done so—they are one of the few Texas school districts recognized by the School Safety Center as having submitted a viable active shooter policy.[10]

Uvalde CISD Police Chief Arredondo and Director of Student Services Kenneth Mueller prepared a document titled "Annex 1 Active Shooter" and adopted it on April 15, 2020.[11] The document identified its purpose as seeking to "outline the local organization, operational concepts, responsibilities, and procedures to accomplish coordinated Administration,

---

[6] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022) (couple times per week, approximately 15 minutes per visit); *see also* Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022) (usually took 30-45 minutes to walk Robb Elementary); Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022) (about once per day, usually for less than an hour unless dealing with a problem); Committee testimony of Kenneth Mueller (June 16, 2022) (officers would float, visiting all elementary-school campuses). Uvalde CISD police officer Ruby Gonzalez described how she and her colleagues would rotate shifts based at the high school. The 7:00 a.m.–4:00 p.m. shift would begin with traffic control and watching the courtyard at the high school, followed by rounds to check in at other campuses, walk halls, and check doors. Similarly, the officer working the 9:00 a.m.–6:00 p.m. shift would visit various campuses in the afternoon. Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[7] Testimony of Pete Arredondo, USCID police chief (June 21, 2022); Testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022).

[8] Committee testimony of Adrian Gonzalez, UCISD police officer (June 20, 2022).

[9] Tex. H.B. 2195, § 1, 86th Leg., R.S. (2019) ("A school district shall include in its multihazard emergency operations plan a policy for responding to an active shooter emergency. The school district may use any available community resources in developing the policy described by this subsection."), codified as Tex. Educ. Code § 37.108.

[10] *Cf.* Texas School Safety Center, 2017-2020 DAR Report: Findings on Safety and Security in Texas School Districts, *available* at https://txssc.txstate.edu/research/technical-reports/dar-2020/ ("[T]he EOP review indicated that of the 1,022 districts reviewed, only 200 had a viable active shooter policy. Of the remaining 822 districts, 626 districts did not have a policy in place and 196 districts had an insufficient policy.").

[11] *See* Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ I ("The Uvalde CISD police department along with the Director of Student Services makes recommendations and creates plans to develop a safe environment and to lead the District to Mitigate, Prevent, Prepare, Respond, and Recover from potential active shooter situations.").

AR00250

Teachers, District police officers, local law enforcement and first responders to Prevent, Prepare, Respond, and Recover from the possibility of an active shooter entering any of the District campuses."[12]

The plan called for utilization of "the National Incident Management System (NIMS) during an emergency to coordinate response efforts."[13] It further stated that "[t]he District's police officers, administrators, and teachers and support staff, along with the students have the daily responsibility to mitigate and prevent an active shooter situation," and that "[a]ll staff members and student[s] will know the proper procedures to follow if a suspected shooter is on the campus."[14]

With respect to securing doors, the active shooter policy stated:

> Staff will conduct inspections of classrooms to make sure doors and windows can be secured … .Doors to all classrooms will remain locked during instruction and the campuses will have one main entry point to the school. *Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.*[15]

The active shooter policy outlined a series of preventative safety measures that served as the "primary preventative strategy" to address "problems of violence, vandalism, disruptions and fear."[16] As applicable to Robb Elementary, these preventative measures included:

> POLICE OFFICERS – The district employs 4 officers. This includes a Chief, a detective, and two officers.[17]
>
> PARTNERSHIPS WITH LOCAL LAW ENFORCEMENT. Local law enforcement agencies are invited to come to any of our campuses while they are on patrol. UCISD provides free breakfast or lunch to any law enforcement personnel visiting our campuses.[18]
>
> THREAT ASSESSMENT TEAMS – Every campus employs an interdisciplinary team of trained professionals that convene to identify, evaluate, classify and address threats or potential threats to school security. Following assessment, this team determines

---

[12] *Id.* ¶ II.

[13] *Id.* ¶ IV.A.1; *see also id.* ¶ V.B ("All personnel assigned responsibilities in this plan are trained on NIMS concepts, procedures and protocols."). Regarding NIMS, the, training that defines operational systems that guide how personnel work together to prevent, protect against, mitigate, respond to and recover from incidents see generally https://training.fema.gov/nims/.

[14] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.A.2.

[15] *Id.* ¶ IV.B.1.b (emphasis supplied).

[16] *Id.* ¶ IV.B.2.a.

[17] *Id.* ¶ IV.B.2.b. Uvalde CISD later hired two additional officers to bring its total force to six, though at the time of the attack on Robb Elementary there were only five officers employed.

[18] *Id.* ¶ IV.B.2.c.

AR00251

appropriate response and intervention. This includes notification and involvement of parents, a suicide risk assessment, and the development of a written safety plan.[19]

SOCIAL MEDIA THREATS – UCISD utilizes Social Sentinel to monitor all social media with a connection to Uvalde as a measure to identify any possible threats that might be made against students and or staff within the school district.[20]

PERIMETER FENCING – Dalton, Anthon, and Robb have fencing that encloses the campus is designed to limit [*sic*] and/or restrict access to individuals without a need to be on the campus.[21]

RADIOS – Key staff have been provided radios to support campus communication processes.[22]

LOCKED CLASSROOM DOOR POLICY – Teachers are instructed to keep their classroom doors closed and locked at all times. Barriers are not to be used. Substitutes shall follow the same policy, with campuses ensuring they have access to the classrooms they need throughout the day. The Standard Response Protocol procedures are on the back of all of our badges issued to substitute teachers.[23]

STAFF TRAINING – All staff members are trained annually in emergency protocols for the campus. Key campus personnel are CPI-trained.[24]

STUDENT TRAINING & DRILLS – Students receive training on the Standard Response Protocol for lockout, lockdown, evacuate, shelter, and hold. In addition, drills are held for each of these emergency actions on a regular basis … .[25]

THREAT REPORTING SYSTEM – Students, parents, staff, and community members are encouraged to share information with us that is deemed troubling, so that we may take appropriate action. This includes information about weapons, threats, fights, drugs, self-harm, suicide or disclosures made that are concerning. Reports may be made online at ucisd.net, by contacting any campus administrator, district administrator or UCISD Police Officers.[26]

In the event of an active shooter incident, the policy expressly provided that upon verification of an active shooter, "the District police department Chief will become the person in control of the efforts of all law enforcement and first responders that arrive at the scene."[27] The response was to include, if possible, "secur[ing] the administration office as a command post

---

[19] *Id.* ¶ IV.B.2.g.

[20] *Id.* ¶ IV.B.2.g.

[21] *Id.* ¶ IV.B.2.l. The Uvalde CISD director of maintenance and operations, Rodney Harrison, confirmed for the Committee that the fence around Robb Elementary was five feet high.

[22] *Id.* ¶ IV.B.2.p.

[23] *Id.* ¶ IV.B.2.r.

[24] *Id.* ¶ IV.B.2.s. "CPI" refers to the Crisis Prevention Institute, an international training organization that specializes in the safe management of disruptive and assaultive behavior. *See* https://www.crisisprevention.com/About-Us.

[25] *Id.* ¶ IV.B.2.t.

[26] *Id.* ¶ IV.B.2.v.

[27] *Id.* ¶ IV.B.4.b.

AR00252

and retriev[ing] the critical information and data about the school's emergency systems, including communications, staff and student's locations, detailed floor plans and other important information, documents, items, and supplies that are prepared and readily available for use during the incident."[28]

The active shooter policy recognized that "[t]he district has primary responsibility for the health and safety of students, staff, substitute teachers, and visitors while on district property," and that "[d]uring an emergency *the district should coordinate law enforcement, health and medical services with other local first responders*."[29] The school district's police department was assigned the responsibility for "the Incident Command Center" and for being "first on scene to prevent or stop an active shooter,"[30] while the policy assigned to other "[l]ocal law enforcement and first responders" the function and responsibility to "follow the direction of the ICS leader to ensure proper procedures are followed" and to "[a]ccept assigned roles of ICS leader."[31]

Under a section titled "Direction and Control," the policy laid out a specific "line of succession":

> 1. Uvalde CISD police department – Chief Pete Arredondo
>
> 2. Uvalde CISD police department – Lt. Mike Hernandez
>
> 3. Director of Student Services – Kenneth Mueller[32]

The policy calls for the district to conduct a "post incident review … to analyze the process and make any corrective action as determined."[33]

### ALERRT Standard for Active Shooter Training

Before joining the Uvalde CISD Police Department, Chief Arredondo received active shooter training from the ALERRT Center,[34] which the FBI has recognized as "the National Standard

---

[28] *Id.* ¶ IV.B.4.f.

[29] *Id.* ¶ V.A.1 (emphasis supplied).

[30] *Id.* ¶ V.B.

[31] *Id.* ¶ V.B. "ICS" is not defined in Uvalde CISD's active shooter plan, but it refers to "Incident Command System." *See, e.g.*, Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 2-27 (v. 7.2, 2020) (noting that "[a] list of incident command courses can be found on the FEMA training web page at https://training.fema.gov/emiweb/is/icsresource/trainingmaterials.htm").

[32] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ VI.C.

[33] *Id.* ¶ VIII.C.

[34] Committee testimony of Pete Arredondo, UCISD Chief of Police (June 21, 2022). Chief Arredondo received the ALERRT training while working for the Laredo ISD police department, between his retirement from the Webb County Sheriff's Office in 2017 and his hiring as chief of the Uvalde CISD police in March 2020. *See id.* Uvalde Police Sgt. Daniel Coronado, who responded to Robb Elementary as well, also acknowledged receiving ALERRT training. Committee testimony of Sgt. Daniel Coronado, Uvalde Police Department (June 20, 2022).

AR00253

in Active Shooter Response Training."[35] Every school district peace officer in Texas must be trained on how to respond in active shooter scenarios.[36] Not all of them get ALERRT training, but Chief Arredondo and other responders at Robb Elementary did.

ALERRT's training program identifies the challenge for law enforcement responders of possibly having to work "with a small ad hoc team of individuals they may have never trained with before," such that "the only way to swing the tactical advantage back in favor of the [law enforcement] responder is through the use of effective teamwork and tactics."[37] The training identifies lessons to be learned from past active shooter incidents. From the Columbine tragedy in 1999, one lesson was that responders must have tools and training to immediately make entry and neutralize an active shooter threat.[38] Another Columbine lesson was the "Priority of Life Scale": innocent civilians come before law enforcement and other responders.[39] After Columbine, "[w]hile protecting the lives of officers remained a high priority, Stopping the Killing of innocent civilians took first priority. From that moment forward, every law enforcement officer was expected to be willing to risk his or her life without hesitation."[40] "Law enforcement officers were expected to distract, isolate, and neutralize the threat, even in tactically complex situations and when they lacked special training."[41]

A lesson from the Navy Yard Building 197 incident in 2013 was that "[t]he earlier an Incident Command structure can be established, the better," and this tragedy prompted an "Initial Incident Command" block to be added to the ALERRT Level 1 course.[42] The Pulse Nightclub

---

But not all law enforcement officers receive this training, and several other law enforcement officers interviewed by the Committee stated they had not received ALERRT training. *E.g.*, Testimony of Sgt. Eduardo Canales, Uvalde Police Department (June 29, 2022) (none of UPD SWAT team has received ALERRT training); Committee testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022).

[35] *See generally* https://alerrt.org/about ("The ALERRT Center at Texas State University was created in 2002 as a partnership between Texas State University, the San Marcos, Texas Police Department and the Hays County, Texas Sheriff's Office to address the need for active shooter response training for first responders.").

[36] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.

[37] Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 1-9 (version 7.2, 2020).

[38] *Id.* at STU 2-6.

[39] *Id.*

[40] *Id.* at STU 2-7.

[41] *Id.*

[42] *Id.* at STU 2-10; *see also id.* at STU 2-13 (Rt. 91 Harvest Music Festival incident in 2017 taught lesson of establishing unified command early on). The Incident Command module teaches: "Ideally, Incident Command will be established as the first [law enforcement] responder arrives on-scene, provides dispatch with a brief LCAN [i.e. Location, Condition, Actions, and Needs] size-up report, and assumes command." *Id.* at STU 7-6. The

incident from 2016 taught the importance of awareness of the distinction between hostage/barricade and active shooter scenarios.[43] The Marjory Stoneman Douglas High School incident in 2018 taught the importance of incident command structure for appropriate management of resources and that law enforcement responders must be prepared to use word-of-mouth communication when radio communications are overloaded.[44]

On the subject of communicating effectively, the ALERRT course teaches that effective communication is necessary for successful teamwork.[45] "Regional law enforcement agencies should continually train together to establish radio protocols for use during multi-agency active shooter response."[46] "Law Enforcement responders should be familiar with their regional communications plan but also be prepared to respond effectively without reliable radio communications."[47] "After giving a message, [law enforcement] responders should look for confirmation that the intended party received and understood the message."[48] "If radio communications are unreliable, it may be necessary to use runners to deliver messages."[49]

With respect to establishing incident command, law enforcement responders are encouraged to complete Incident Command System (ICS) and National Incident Management System (NIMS) courses as early as possible in their careers.[50] The ALERRT training advises that "[t]he initial [law enforcement] responder to arrive at an active shooter scene becomes the Initial Incident Commander by default…."[51] Further, "[a]s soon as [a law enforcement] responder notices that there appears to be sufficient officers hunting for the attacker, that responder

---

training acknowledges that "sometimes this is difficult because the first [law enforcement] responder to arrive on-scene may find him or herself immediately involved in a gunfight," and "[s]urviving and winning the gunfight should always take priority over considering Incident Command matters." *Id.* But "[a]s soon as immediate threats have been neutralized," law enforcement responders need to ensure that they communicate critical information to dispatch, including the assumption of command. *Id.*

[43] *Id.* at STU 2-12.

[44] *Id.* at STU 2-14.

[45] *Id.* at STU 2-23.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at STU 2-27.

[51] *Id.* at STU 2-28.

AR00255

should find a secure location, take out their Active Shooter Response Card, assume Initial Incident Command, and begin completing tasks listed on the card."[52]



**Slide 2-32. Active Shooter Response Card**

*Excerpt from ALERRT, Active Shooter Response—Level 1.*

A later, more in-depth module on incident command describes the ICS process:

**Take Command**

The first step in the ICS process is for the first [law enforcement] responder who arrives on the scene … to simply take command. Command is passed up the chain as the scene or situation grows larger. As more officers arrive on-scene, command is passed on and assumed by higher levels, building the ICS tree. All active shooter Incident Command structures will grow. This is a fact, and they will continue to grow for the next several days after the shooter is down.

Taking command is as simple as saying "I have command." … This allows all oncoming resources to receive information and report to one person. Taking command is important because it will help stop freelancing and possible blue-on-blue scenarios.

**Provide an LCAN Report**

Next, the first [law enforcement] responder in should give a size-up report, or LCAN report. This is simply a Location, Condition, Actions, and Needs report telling follow-up units where the officer is at, what he or she sees on arrival, what he or she is doing or plans on doing, and what he or she needs to complete the mission … .LCAN reports

---

[52] *Id.* ALERRT training teaches that every law enforcement responder, "even those recently hired, should carry the Active Shooter Response Card with them at all times," and "[t]hey should be prepared to assume command and start completing the tasks listed on the card within the first few minutes." *Id.* at STU 7-7; *see also id.* at STU 8-2 – 8-4(module 8.1, Incident Command System Instructor Walk-Throughs).

should be updated as more actions are needed to give follow-on responders updated information as they are coming in. This will help with overconvergence and allow the ICS system to begin to set up … .The LCAN report should continue to be updated as the situation changes.

**Assume Command**

As more [law enforcement] responders arrive on the scene, someone should assume command of the outside of the building. This person could be a higher-ranking officer or any responder who sees enough personnel are inside and realizes that things need to be taken care of on the outside of the building (e.g., perimeter control, ambulance exchange areas, staging for all to set up, more contact teams).

Command will be passed from the interior commander … to the command person outside who can begin getting control of the chaos of the emergency. Eventually, this person will be relieved of his or her position and an overall commander will take charge of the situation during the next several stages of the event. As the incident stabilizes, command will downsize and the situation will move into an investigative phase. Units will be released to service and cut loose.

The main points to remember about ICS are that the first [law enforcement] responder must take command. This [law enforcement] responder must also give an LCAN report for oncoming units. Someone else on the outside of the building must then assume command from the first [law enforcement] responder and begin to help gain control of the chaos.[53]

The ALERRT training includes a module on "Entering Locked Buildings Quickly, Discreetly, and Safely," advising that "[r]esponders should be creative and make use of improvised tools to get inside the building however they can."[54] With respect to using keys, ALERRT teaches that "[o]ften, the quickest, most discreet, and safest method of entering a locked building is to locate a key—as long as keys can be located immediately," but "if a key cannot be located quickly, [law enforcement] responders should use another technique to enter the area without delay."[55] The training also suggests sledgehammers and pry tools as reliable, practical, and affordable breaching tools,[56] and a separate module anticipates the challenge of breaching closed and locked outward-opening interior doors, noting that "[m]any public buildings are required by law to have outward-opening doors with self-closing mechanisms for all high-occupancy rooms," and that law enforcement responders "should be prepared to encounter this type of door during an active response."[57]

---

[53] *Id.* at STU 8-2 – 8-3 (emphasis in original).

[54] *Id.* at STU 3-8.

[55] *Id.* at STU 3-9.

[56] *Id.* at STU 3-11 – 3-12.

[57] *Id.* at STU 4-22.

R i s e   o f   " B a i l o u t "   S e c u r i t y   I n c i d e n t s

Uvalde CISD police officers visit school campuses in the event of lockdowns, which occurred relatively frequently at Robb Elementary due to its proximity to the intersection of Highway 83 and Highway 90. Chief Arredondo described a rise in bailouts: to avoid being stopped by law enforcement, vehicles loaded with undocumented immigrants traveling along highways leading from the border towns of Del Rio and Eagle Pass lead officers on high-speed chases that often end by crashing the vehicle and allowing the occupants to scatter.[58]



*Uvalde, at the intersection of Hwy. 83 & Hwy. 90.*          *Robb Elementary, near intersection of Hwy. 83 & Hwy. 90.*

Numerous witnesses testified to the Committee that there has been an increase in bailout activity over the past 18 months.[59] Uvalde CISD Director of Student Services Kenneth Mueller testified that since February 2021, high-speed chases have been a daily event in the Uvalde area, causing Uvalde CISD schools to be secured or locked down frequently, with 47 "secure" or "lockdown" events happening since late February 2022, and approximately 90% of those

---

[58] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 29-30 (June 21, 2022).

[59] *See, e.g.*, Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* Committee testimony of Lt. Mike Hernandez, Uvalde CISD Police(June 17, 2022) (confirming the frequency of bailouts in the neighborhood surrounding Robb Elementary). Regarding the impacts of bailouts on the Uvalde community, *see, e.g.*, Carine Hajjar, National Review, *Human-Smuggler 'Bailouts' Are Endangering Border Communities* (Apr. 12, 2022), available at https://www.nationalreview.com/corner/human-smuggler-bailouts-are-endangering-border-communities/ (featuring pre-tragedy interview of Uvalde Mayor Don McLaughlin, specifically identifying the risk to school-age residents of Uvalde).

AR00258

being attributed to bailouts.[60] Uvalde CISD parents became so concerned about the number of bailouts occurring near the elementary-school campuses that they offered to hire off-duty police to supplement the Uvalde CISD police presence.[61]

### Raptor Alert System

School district witnesses also testified to another effect of the rising prevalence of bailouts. The alert system does not differentiate its signals between bailouts and other kinds of alerts, such as an active shooter situation. The series of bailout-related alerts led teachers and administrators to respond to all alerts with less urgency—when they heard the sound of an alert, many assumed that it was another bailout.



*Raptor Alert application.*

Raptor Technologies supplied the alert system Uvalde CISD used. Uvalde CISD had used Raptor's software to screen campus visitors for approximately 10 years. In the fall of 2021, Mueller viewed a presentation on Raptor's emergency management alert system, and he gathered the Uvalde CISD principals, who agreed that they needed it. Uvalde CISD purchased the software in October 2021, and the first Raptor alert occurred on February 8, 2022.[62]

By March 2022, as Uvalde CISD was implementing the Raptor alert system, there was a high volume of alerts. By utilizing the Raptor mobile phone application,[63] any Uvalde CISD employee could activate an alert. Staff at a school campus typically would first learn about a bailout from an external source. Then they would decide, depending on the proximity of the threat to the school, whether to initiate a "secure" or a "lockdown" alert.[64]

---

[60] Committee testimony of Kenneth Mueller (June 16, 2022); *see also* Committee testimony of Lynn Deming, Robb Elementary fourth-grade teacher (June 29, 2022) (describing how most Raptor alerts have been for bailouts, and one happened on the Robb Elementary campus near the bus lane).

[61] Committee testimony of Kenneth Mueller (June 16, 2022).

[62] *Id*; *see* https://raptortech.com/raptor-alert/.

[63] Raptor Emergency Management Brochure, available at https://raptortech.com/wp-content/uploads/2021/09/Raptor-EmergencyManagement-Brochure.pdf?emergency-management-software-for-schools.

[64] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

AR00259

Chief Arredondo explained it was important to notify schools in the vicinity of the highways about bailouts because the passengers would scatter everywhere, and the school district police did not want them coming on campus. While there have been no incidents of bailout-related violence on Uvalde CISD school grounds, there have been examples of high-speed driving that sometimes crossed school parking lots and reports of some bailout incidents involving firearms in the surrounding neighborhoods.[65]

The Committee received evidence that Uvalde CISD employees did not always reliably receive the Raptor alerts. Reasons included poor wi-fi coverage, phones that were turned off or not always carried,[66] and employees who had to log-in on a computer to receive a message.

### Uvalde CISD Facilities & Maintenance

Uvalde CISD has a Maintenance & Operations Department overseen by director Rodney Harrison, who testified before the Committee. Harrison expressed his view that Uvalde CISD's buildings are in fairly good shape. To facilitate taking care of each campus, the Maintenance & Operations Department employs 14 full-time employees supplemented by six students employed to help move furniture. Harrison stated that it is difficult to keep his department staffed, and he has recently lost employees to two retirements during the COVID pandemic, one death, and another employee moving away.[67]

### Robb Elementary Facilities & Management

Robb Elementary School was built in 1955. Most recently, it served as the primary Uvalde CISD school for students in second through fourth grades.[68] "New" buildings were constructed at the elementary schools, including the west building at Robb, 22 years ago.[69]

Robb Elementary had a new principal beginning with the 2021–22 school year. Principal Mandy Gutierrez has worked for Uvalde CISD for over two decades, starting as a fourth grade

---

[65] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 30 (June 21, 2022); Committee testimony of Kenneth Mueller (June 16, 2022).

[66] Committee testimony of Kenneth Mueller (June 16, 2022).

[67] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[68] The only other option for second to fourth grades is the Uvalde Dual Language Academy. Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Uvalde CISD informed the Investigatory Committee that it intends to turn the former Robb Elementary School campus into a park dedicated to the memory of the students and teachers killed in the shooting tragedy. Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

[69] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022); Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

teacher at Robb in 2008. In 2018, she became assistant principal, and she served in that position until becoming the principal in 2021.[70]

Uvalde CISD had assigned two full-time custodians to Robb Elementary.[71] The lead custodian was Jaime Perez.

In 2019, Uvalde CISD received a state-funded grant to upgrade school security. The school district used its funds to add video cameras to various campuses, build a fence surrounding Flores Elementary School, and install magnetic entryways at some campuses.[72]

### Policies for Locking Doors

Robb Elementary's principal testified that the school's west building has three exterior doors, two of which policy required to remain locked. Each classroom in the west building had a door to a hallway, which policy required to remain locked at all times.[73] The interior classroom doors also were required to remain closed and locked at all times.[74] The interior doors were solid metal with a small pane of glass and could only be locked from the outside using a key.[75]

The school district's police officers conducted walk-throughs, during which they would check for locked doors.[76] When they found doors unlocked the officers would remind teachers to keep the doors locked, and in the event of repeat offenders, they would document the violations.[77]

Multiple witnesses reported to the Committee that people at Robb Elementary commonly left doors unlocked—as did people at all the other Uvalde CISD schools as well.[78] Teachers would use rocks to prop open exterior doors,[79] and they used door stops, wedges, and magnets to

---

[70] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[71] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[72] *Id.*

[73] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* Committee testimony of Pete Arredondo, Chief of Uvalde CISD Police Department (June 21, 2022) (assumed Rooms 111 and 112 were locked because the policy was for them to be locked at all times, particularly during a lockdown).

[74] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times.").

[75] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[76] *Id.*; Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[77] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[78] *E.g.*, Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[79] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

AR00261

prevent interior door locks from latching.[80] Due to a key shortage, Robb Elementary School substitute teachers often were instructed to use the "magnet system" to circumvent the locks in violation of school district policy.[81]

Uvalde CISD Police Officer Adrian Gonzalez testified that when an officer was walking the floors and checking doors, the teachers would notify each other, and they would lock their doors.[82] The officers would speak to the teachers and to their supervisors, and they tried to discourage the use of magnets.[83] Common responses from teachers would include that they did not have a key (particularly in the case of substitute teachers) and that it was just temporary while a child was using the restroom.[84] For some teachers, the inconveniences of keeping up with a key outweighed their perception of the risk of leaving doors unlocked. Other teachers were "rule followers," always locking their doors.

At the time of the incident, all the doors in the building had been recently painted.[85] In March 2022, around spring break, school administrators received a report from the teacher in Room 111 that his classroom door was not always locking.[86] According to numerous witnesses who testified before the Committee, the door to Room 111 could lock, although it took some extra effort, and if the door closed softly it might not lock. But the head custodian at Robb Elementary testified that he never heard about any problems with the doors for Rooms 111 or 112, and if he had, he would have created a work order.[87] Robb Elementary maintenance records confirm the lack of any written work order to repair the door for Rooms 111 or 112 during the 2021–22 school year. Although Uvalde CISD policy required each staff member to

---

[80] Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022); Testimony of Rodney Harrison, Uvalde CISD Maintenance and Operations Director (June 16, 2022). Assistant principal Shawna Wolbert, who was not present on campus during the incident, told the Department of Public Safety that there was a "magnet system" with magnets provided to substitutes to keep doors from locking. DPS interview of Robb Elementary Assistant Principal Shawna Wolbert (May 28, 2022). Principal Gutierrez said the same thing in her statement to DPS. DPS interview of Robb Elementary Principal Mandy Gutierrez (May 28, 2022).

[81] *See* DPS interviews of Robb Elementary administrators (May 28, 2022); *see also* Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times. *Barriers are not to be used. Substitutes shall follow the same policy*, with campuses ensuring they have access to the classrooms they need throughout the day." (emphasis supplied)).

[82] Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022).

[83] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022); Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[84] Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[85] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* DPS interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[86] *See, e.g.*, Committee investigators' interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[87] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

know the procedures to follow to request repairs for a door that would not lock,[88] Robb Elementary teachers testified to the Committee that instead of requesting a work order themselves, they would call school administrators who were responsible for making the requests.

### Maintenance of Doors & Keys

Considering the district's policies about keeping doors locked, it was important that doors and locks be properly maintained. The manufacturer discontinued production of the door locks used at Robb Elementary. While the school district had acquired a supply of key blanks at the time the locks were purchased, that supply was gone by May 2022.[89]

The director of maintenance and operations, Mr. Harrison, testified that people frequently lose, forget, or simply do not want to carry school keys. As a result, the custodians spend a lot of time opening doors. The maintenance and operations department has one employee who specializes in door repairs, but it relies on YouTube instruction videos, online diagrams, and the help of a local locksmith to work on locks. Harrison testified that unless there is a work order notifying his department of a problem, his employees do not regularly check doors.[90]

There were numerous different master keys that worked with different sets of locks at the Robb Elementary School campus. People who had master keys included Harrison, Principal Gutierrez, Assistant Principal Shawna Wolbert, Robb Instructional Coach Rebecca Guzman, Principal Gutierrez's secretary, Janette Martinez, and lead custodian Jaime Perez.[91] Both Uvalde CISD Police Chief Arredondo and Lt. Mike Hernandez possessed a large number of keys to Uvalde CISD buildings. Chief Arredondo kept a number of keys in his car, but he was not sure whether he had master keys for Robb Elementary. He knew he did not have a key to every building, though he testified that he had requested a complete set for himself.[92] Of the over 50 keys that he carried with him, Lt. Hernandez testified that he had a Robb Elementary master

---

[88] Uvalde CISD, *Annex 1: Active Shooter* ¶ IV.B.1.b ("Doors to all classrooms will remain locked during instruction … . Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.").

[89] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[90] *Id.*

[91] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022); Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[92] Committee testimony of Pete Arredondo, USCID police chief (June 21, 2022).

AR00263

key that had worked, although sometimes he had to jiggle keys to make them work. Additionally, sometimes staff would change locks without notice to him.[93]

Arnulfo Reyes, the fourth grade teacher in Room 111 stated in an interview that teachers and students in his building widely knew that the door to his classroom frequently did not lock, and he had gotten in "trouble" several times when Uvalde CISD police officers found the door unlocked. He stated that, on multiple occasions, he reported the malfunctioning lock to school administrators, who stated that the request had been turned in. As was the apparent practice among Robb Elementary teachers, Reyes never submitted a work order to repair the door lock for Room 111 himself.[94] Principal Gutierrez, in her testimony, confirmed that school administration knew about the issues with that door, stating that it was reported around spring break of 2022.[95]

---

[93] Committee testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022). Lt. Hernandez's keys were sent into the west building in response to the request for a master key during the May 24, 2022, incident, but officers inside the building were unable to identify the correct key from among the dozens of keys on his key rings.

[94] DPS interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[95] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

AR00264

# 4 | THE ATTACKER

One motive that drove the man behind the massacre at Robb Elementary School was a desire for notoriety and fame. The Committee refuses to perpetuate his memory in that way; our focus is to ensure that Texas never forgets the children and beloved teachers who have been lost and the lessons this tragedy can teach. So, instead of naming him, we call him by a generic term used in active shooter training: "the attacker." In consultation with the local community in Uvalde, the Committee arranged to show victims' families, in advance of public release, a prudently edited version of Robb Elementary's hallway surveillance video that did not include images of him.[96] We regret that others, under cover of anonymity and for their own motives, have sensationalized evidence of this horrible tragedy at the risk of glorifying a monster.[97]

## Family & Early Life

The attacker was born in Fargo, North Dakota on May 16, 2004, the second child born to the mother, Uvalde native A.R., and her then-boyfriend, S.R. The couple split shortly after the attacker's birth, and A.R. returned to Uvalde with the two children. The father had limited and inconsistent involvement in his children's lives from that point onward.[98]

Mother A.R. was known to several witnesses who testified before the Committee from her work as a server at local Uvalde restaurants. A.R. was involved in the attacker's early life, but over time, her relationship with both her children became strained.[99] A.R. struggled with a long history of drug use and other personal issues, though her only criminal history was a 2005 misdemeanor theft that ended in probation and a dismissed 2007 charge of misdemeanor family-violence assault.[100] The FBI interviewed a former girlfriend of the attacker who

---

[96] The Committee incorporates into its report, by reference, the edited videorecording of the May 24, 2022, law enforcement response at Robb Elementary uploaded at https://www.youtube.com/watch?v=vYjDc5sDZyU. This video is considered part of this report.

[97] Tragically, there is evidence that national media coverage of mass shootings has played a role in increasing their frequency. *See generally* https://www.dontnamethem.org/.

[98] The evidence shared by other law enforcement agencies includes the attacker's birth certificate and school records as well as notes from interviews of both of his parents.

[99] In addition to various interviews of family members conducted by law enforcement agencies in the wake of the Robb Elementary tragedy, the Committee heard testimony from an aunt and a cousin of the attacker. Also, the Committee learned many details in this section from a review of the attacker's mobile phones and cloud-based data storage, which were imaged by law enforcement and provided to the Committee.

[100] Records of the mother's criminal history were provided to the Committee.

AR00265

believed one of A.R.'s boyfriends sexually assaulted him at an early age, but that A.R. didn't believe his outcry.[101]

The attacker and his family had some support from extended family, most notably A.R.'s mother, C.G. Testimony before the Committee portrayed C.G. as well-known and well-regarded in the Uvalde community, particularly within the local school district, from which she retired after twenty-seven years. C.G. took on the role of a maternal figure in the lives of both the attacker and his sister, especially as they grew older.

Relatives described the attacker as shy and quiet. The Committee heard testimony that he was reluctant to interact with peers because of a speech impediment. Poverty is not an unfamiliar circumstance in Uvalde—86% of the children in the school district may be economically disadvantaged.[102] The attacker often wore the same clothing day after day.

### School

Records from the attacker's early school years reveal varied accounts of his character and school performance. His pre-K teacher's report described him as "a pleasure to have … a wonderful student … always ready to learn," and it praised his "hard work and positive attitude in the classroom." Yet early assessments showed he was behind other students academically, and by third grade, school officials already had identified him as "at-risk" due to consistently poor test results. School records reveal that someone may have requested speech therapy for the attacker, and his later internet searches show he himself sought information on dyslexia. Ultimately, he received no special education services.[103]

The attacker's fourth grade year at Robb Elementary School was significant to him. The shooting took place in his former fourth grade classroom, and he discussed bad memories of fourth grade with an acquaintance just weeks beforehand. In testimony before the Committee, two different narratives have emerged.

The attacker's fourth grade teacher testified before the Committee. Not only did she know the attacker from having been his teacher, but she was also in Robb Elementary's fourth grade building, in a different classroom, at the time of the attack. This teacher told the Committee she knew the attacker needed extra help in her class because he claimed to be a victim of bullying. She testified that she met with the attacker's mother, A.R., over the mother's concerns about bullying, and that she had promised A.R. that her son would have a good fourth grade

---

[101] FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP).

[102] Committee testimony of Dr. Becky Reinhardt, Uvalde CISD (June 30, 2022).

[103] *Id.*

year. According to the teacher, it was a good year for the attacker. She said she believed her classroom was a safe place for him and that he made friends there.

Members of the attacker's family, however, reported to the Committee their belief that other students still bullied the attacker throughout his fourth grade school year over his stutter, clothing, and short haircut. A cousin of the attacker said she was in the same fourth grade class with him, and she corroborated this version of his experience that year. She reported an incident in which another girl in the class tied the attacker's shoelaces together, resulting in him falling over and injuring his face. The family also reported their belief that some teachers also picked on the attacker and his cousin.

Despite the accounts that suggest bullying of the attacker had become a concern by the fourth grade, in notes found on his phone, he described them as beginning in middle school. It is not known to the Committee whether the attacker ever shared these notes with anybody.

Records show the attacker had declining attendance, with more than one hundred absences annually beginning in 2018, along with failing grades and increasingly dismal performance on standardized and end-of-course exams. While Uvalde CISD "school success officers" do try to bring truant children back to school, many Uvalde students have spotty attendance, and the local judicial system reportedly does not consistently enforce truancy rules.[104] It is unclear whether any school resource officers ever visited the home of the attacker.

Despite his absences, or perhaps because of them, the attacker had almost no disciplinary history at school. The single infraction on his school record is for "mutual combat" with another student in a hallway in late 2018, resulting in a three-day suspension.

By 2021, at age seventeen, the attacker had only completed the ninth grade. On October 28, 2021, Uvalde High School involuntarily withdrew him, citing poor academic performance and lack of attendance.[105]

---

[104] *Id.*

[105] There has been some public reference to a Uvalde High School teacher, identified in FBI investigative reports as Rhiannon Bates, who was identified by yet another teacher as having purportedly stated in the past that the attacker was the one student of whom she was afraid, and that "if any student was going to become a school shooter, it would be him." FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP). The Committee's investigators interviewed Ms. Bates, and she categorically denies this account, specifically denying any knowledge about the attacker. In her testimony to the Committee, Uvalde CISD administrator Dr. Becky Reinhardt confirmed that the attacker had not been one of Bates's students, and there is no indication that she ever had any interaction with him. Committee testimony of Dr. Becky Reinhardt, Uvalde CISD (June 30, 2022).

AR00267

The Year Before

In a year distinguished by the general school-age population's return to school in Uvalde and elsewhere after the COVID pandemic, the attacker dropped out of school and turned down a dark path. While in earlier years, notes in his phone reflect that he unsuccessfully sought to fit in (including a fixation with weight and fitness that resulted in an eating disorder), in 2021 he appears to have increasingly withdrew and isolated himself.

An ex-boyfriend of his mother A.R. described the attacker to an investigating Texas Ranger as a loner who punched holes in the walls of his room after arguments with her. By this time the attacker's sister already had graduated and left home, and his best (perhaps only) friend was living in San Antonio. The attacker had no driver's license or vehicle. Family members told the Committee and other investigators that a group of the attacker's former friends "jumped" him early in the year. The attacker began trying to teach himself boxing and mixed martial arts with a punching bag in his room at home.

In mid-2021, his relationship with the girlfriend later interviewed by the FBI ended. She described the attacker as lonely and depressed, constantly teased by friends who called him a "school shooter." She said he told her repeatedly that he wouldn't live past eighteen, either because he would commit suicide or simply because he "wouldn't live long."[106] The attacker responded to the breakup by harassing the girl and her friends.

The attacker began wearing black clothes, combat boots, and long, unkempt hair. He was active on several social media platforms, including TikTok, Instagram, YouTube, and the French livestreaming platform Yubo. He networked with local peers in ongoing group chats on Snapchat, and he played a range of videogames, including the Call of Duty and Grand Theft Auto series. Most of his usernames and even his email address reflected themes of confrontation and revenge.

The attacker began to demonstrate interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online. Those with whom he played videogames reported that he became enraged when he lost. He made over-the-top threats, especially towards female players, whom he would terrorize with graphic descriptions of violence and rape.

His online interactions grew more manipulative and controlling as the year wore on, and he presented a more commanding personality online than he did in person. He pretended to a

---

[106] FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP).

greater level of maturity than he had, searching the internet for information on sexual practices mentioned by others in conversation. The attacker wrote about his difficulty connecting to other people or feeling empathy for them; he said he was "not human," and he called others "humans," apparently intending it as an insult. Later internet usage suggests he may have wondered if he was a sociopath and sought out information on the condition. His internet research resulted in him receiving an email about obtaining psychological treatment for sociopathy.

The attacker became focused on achieving notoriety. He believed his TikTok and YouTube channels would be successful. The small number of views he received led him to tell those with whom he interacted that he was "famous," that they were mere "randoms" by comparison, and that they were lucky to interact with him.

On Yubo, the attacker spoke enviously of publicity given to a murderer and animal abuser whose story became widely known after a Netflix documentary. In late 2021, he shared a video online that showed him driving around with "someone he met on the internet" holding a clear plastic bag that contained a dead cat, which he discarded in the street and spit on while his driver laughed. The video then showed the attacker wearing a tactical plate carrier, went on to show him dryfiring BB guns at people, and ended with footage of emergency services responding to a serious car accident, which he claimed his driver had caused.

The attacker got a job in late 2021. He first worked at Whataburger, where a friend's grandmother saw him. She snapped a picture and sent it to her grandson, warning that it was "an example of what your life will be if you quit school"—a sentiment some of his peers expressed to him directly. His employer fired him after a month for threatening a female coworker, and he fared similarly at his next job at Wendy's. A coworker there described him as "not a good person" and "troubled," someone who "put himself in a box and would not talk or associate with anyone he worked with." An exception to that approach was when he tried discussing guns with another employee. When the other employee received the discussion negatively, the attacker challenged him to a fight. The attacker also occasionally worked with his grandfather, who had an air conditioning business and paid him in cash.

Living at home, the attacker had no real expenses and hoarded money, telling acquaintances that he was "saving for something big" and that they would all see him in the news one day. Family members believed he was saving money for his own apartment or car, but clues to his real plans surfaced near the end of 2021. That is when he ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn in both the video he shared and on the day of the Robb Elementary massacre. Still seventeen at the time, the attacker asked at

least two different people to buy guns for him,[107] which they both refused to do. Interviews conducted by other investigators indicate that family members and friends were aware of his efforts to buy guns before he was legally permitted to do so.

Finally, the attacker developed a fascination with school shootings, of which he made no secret. His comments about them coupled with his wild threats of violence and rape earned him the nickname "Yubo's school shooter" on that platform. Those with whom he played games taunted him with a similar nickname so often that it became a running joke. Even those he personally knew in his local chat group began calling him "the school shooter" after he shared pictures of himself wearing the plate carrier he'd bought and posing with a BB gun he tried to convince them was real. None of his online behavior was ever reported to law enforcement, and if it was reported by other users to any social media platform, it does not appear that actions were taken to restrict his access or to report him to authorities as a threat.

## The Last Days

While a vague idea for a school shooting appears to have been in the attacker's mind as early as late 2021, he began to pursue his evil plan in early 2022 after a falling-out with his mother. A blowout argument between them was livestreamed on Instagram, and several members of their family viewed it. Although sheriff's deputies responded to a call, they made no arrests. Soon afterwards, the attacker left home and moved in with his grandmother, just blocks away from Robb Elementary School.

His relationship with his mother never improved. He retained similar antipathy toward his father, who last saw him about a month before the shooting. The father felt his son had no love left for him. He noticed that the attacker had cuts on his own face that appeared to be self-inflicted (something other witnesses had observed on prior occasions), and he claimed he was "doing something" soon.

The attacker had moved into his grandmother's small home, where he had no room of his own and slept on the living-room floor. A few days before the shooting, he confided in an older cousin who was also staying there, telling her that he did not want to live anymore. After

---

[107] The straw purchase of a firearm as proposed by the attacker would violate federal law. *See* 18 U.S.C. § 922(a)(6) ("It shall be unlawful— for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a … licensed manufacturer, [or] licensed dealer … knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such … manufacturer, [or] dealer … with respect to any fact material to the lawfulness of the sale … under the provisions of this chapter"). Additionally, Texas law provides that "A person commits an offense if the person … intentionally or knowingly sells, rents, leases, or gives or offers to sell, rent, lease, or give to any child younger than 18 years of age any firearm … ." Tex. Pen. Code § 46.06(a)(2).

AR00270

a lengthy heart-to-heart, the cousin believed she'd gotten through to him. The attacker's uncle also recalled having similar discussions with him.

Meanwhile, the attacker's planning and preparation became more focused. The Committee received extensive documentation compiled and created by the Bureau of Alcohol, Tobacco, Firearms and Explosives in the course of its investigation of the attacker's purchases. He began buying more firearms accessories beginning in February 2022, including 60 30-round magazines, a holographic weapon sight, and a Hellfire Gen 2 snap-on trigger system.

On March 23, 2022, a suspicious person dressed in all black with a backpack was seen canvasing Robb Elementary, but no one ever identified the person.

As soon as the attacker turned eighteen on May 16, 2022—just one week before the shooting on May 24, 2022—he was finally able to purchase guns and ammunition. An online retailer shipped 1,740 rounds of 5.56mm 75-grain boat tail hollow point to his doorstep, at a cost of $1,761.50. He ordered a Daniel Defense DDM4 V7 (an AR-15-style rifle) for shipment to a gun store in Uvalde, at a cost of $2,054.28 (including tax and transfer fee). On May 17, 2022, he bought a Smith and Wesson M&P15 (also an AR-15-style rifle) at the same store in Uvalde, at a cost of $1,081.42. He returned the next day for 375 rounds of M193, a 5.56mm 55-grain round with a full metal jacket, which has a soft core surrounded by a harder metal. He returned again to pick up his other rifle when it arrived on May 20, 2022, and he had store staff install the holographic sight on it after the transfer was completed.[108]



*The attacker's rifles; the leftmost was used at Robb.*

The owner of the gun store described the attacker as an "average customer with no 'red flags' or suspicious conditions"—just that he was always alone and quiet. The owner of the store remembered asking how an 18-year-old could afford such purchases (the rifles alone were over $3,000), and the attacker simply said he had saved up. Patrons of the store who saw him told

---

[108] The exact cost of all magazines, sights, and other accessories in addition to the amounts listed above likely ranged from $1,500–2,000 based on market value and the amounts the attacker reported to those he told about the purchases.

AR00271

a different story in FBI interviews, saying after the tragedy that the attacker was "very nervous looking" and that he "appeared odd and looked like one of those school shooters"; another described his all-black clothing as simply giving off "bad vibes."

A background check was conducted, and the attacker qualified for the purchases. While multiple gun sales within such a short period are and were reported to the ATF, the law only requires purchases of handguns to be reported to the local sheriff. Here, the information about the attacker's gun purchases remained in federal hands.

The attacker's uncle drove him to the gun store twice. He said he did not know they were going to pick up a rifle the first time; the store is connected to a popular restaurant, and the attacker said he was hungry. When he returned with a long box and no food, it was obvious he had purchased a rifle. The Committee has not learned who took the attacker to the gun store on May 18th, but the uncle drove him back on May 20th after the attacker falsely told him he needed to pick up ammunition purchased online. The uncle said he did not see what was in the attacker's package, and he was too unfamiliar with firearms to know what might have been inside. It is now known that the package contained the second, more expensive rifle used in the shooting.

The attacker's grandmother and cousin both told him he could not have a gun in the home, so the uncle agreed to store the first rifle at his house. He believes the attacker snuck it out after staying the night a few days later. The attacker apparently hid the second rifle outside his grandmother's house until he brought it in the night before the shooting, as he related to an acquaintance by text messages.

The attacker had no experience with firearms, and based on other investigators' interviews of friends and family, the shooting was likely the first time he fired one. The uncle recalled the attacker attempting to seat a magazine in the rifle and the magazine repeatedly falling out onto the floor. Internet search history shows the attacker sought out ranges but was unable to get to one that allowed long guns before the shooting. He also searched the internet for basic information such as what kind of ammunition an AR-15 fires and whether a magazine can be reused after being emptied, and he looked for information on how to buy "juggernaut armor," a fictional armor system depicted in videogames.

Online interactions involving the attacker continued to foreshadow a tragedy. In March 2022, in an Instagram group conversation, a student told him that "people at school talk [expletive] about you and call you school shooter." Later, the attacker began referencing a timeline. On April 2nd, he asked in a direct message on Instagram, "Are you still gonna remember me in 50 something days ?" After the answer, "probably not 😭," he retorted with, "Hmm alright

AR00272

we'll see in may 👍." The attacker often connected those dates with doing something that would make him famous and put him "all over the news," and many of those with whom he chatted suspected his cryptic deadlines meant violence. For example, in a May 14th conversation he simply wrote "10 more days," leading to immediate speculation that he meant he'd "shoot up a school or something" or commit "mass murder" on that date. On May 17th, a friend told him that an acquaintance of theirs was "telling everyone u shooting up the school."

The attacker also began sharing photos of his rifles, including with total strangers. Those in his Snapchat group claimed they believed the guns were fake (despite the attacker posting the receipt) because he had tried to pass off a BB gun as real the year before. For those with no reason for doubts, the context often made the shared images disturbing, such in late April when a friend proposed visiting the attacker in Uvalde:



After the attacker sent a picture of the rifle he intended to buy—to great approval—their discussion continued just after his birthday when he made his first gun and ammo purchases:

AR00273





In the last days before the shooting, the attacker saved news stories and other information about the mass shooting in a Buffalo, N.Y. supermarket on May 19, 2022. He also spent time with his cousin's son, who attended Robb Elementary. After playing the children's videogame Roblox, the attacker elicited from him details about his schedule and how lunch periods worked at the school.

On the eve of the shooting, the attacker began contacting numerous people with vague but ominous messages about doing something the next day. In one Snapchat exchange with a German teenager he had befriended, he commented: "I got a lil secret 😯 😊." When she became curious, he told her it was "impossible for today" because he was still waiting for something "being delivered Monday 23 by 7 pm." His order of 1,740 hollow points arrived later that day.

Prior to the shooting, the attacker had no criminal history and had never been arrested. He is not known to have espoused any ideology or political views of any kind. Private individuals alone knew the many warning signals.

AR00274

## 5 | MAY 24 INCIDENT & LAW ENFORCEMENT RESPONSE

May 24, 2022, marked the beginning of the end of the 2022 school year at Robb Elementary School. Parents, teachers, and students came to school that day ready to celebrate the students' accomplishments and awards and to look forward to another peaceful Uvalde summer. The students had completed all their tests and school instruction was over for the year. It was awards day, and parents were coming to school to see their children's ceremonies. Many students anticipated going home early or remaining with their classmates to watch a movie.

In a nearby neighborhood, a former Robb Elementary student and Uvalde High School dropout had made other grim plans for that now-fateful day. In private messages, the Robb Elementary School attacker had indicated to acquaintances that he had chosen this date in advance for a significant event. Some in the Uvalde community have speculated that the attacker intended to choose the date when, carrying out a local tradition, the Class of 2022 seniors would return to Robb Elementary to walk the halls at lunchtime. If the attacker's former classmates were his intended targets, they were spared because the seniors' visit occurred on May 23, 2022, the day before the tragic attack.

The attacker was at home with his grandparents on the morning of May 24th when he sent eerie online messages, including to an Instagram model he'd never met whom he had tagged in pictures of his guns the week before. "I'll text you in an hour," he wrote, "But you HAVE TO RESPOND. I got a lil secret. I wanna tell u 😊."

Evidence shows that the attacker had been getting in increasing conflicts with his grandmother, and she had threatened to remove him from her mobile phone plan. On the morning of May 24th, she called customer service to do just that. After a nearly hour-long FaceTime conversation with his online acquaintance in Germany, the attacker began texting her live updates:



While these text messages have been circulated in media reports, those reports do not include a message deleted by the attacker's correspondent before the screenshot was taken. Just twenty-eight seconds after the attacker informed her that he

AR00275

had shot his grandmother and intended to "shoot up" an elementary school, the German teenager replied with a single word: "Cool."[109]

The attacker actually did shoot his grandmother in her face. Despite not having a driver's license, he then proceeded to steal her truck, abandoning her to seek help from a neighbor as he set out to complete his plan.

Driving toward Robb Elementary on South Grove Street, the attacker apparently lost control of the truck while approaching Geraldine Street, crashing the vehicle into a ditch.



*Truck crashed by attacker near Robb Elementary.*

Surveillance cameras at the nearby Hillcrest Memorial Funeral Home captured the crash on video at approximately 11:28 a.m. Two men saw the crash and began to walk from the funeral home, across Geraldine Street, to the location of the truck. The attacker emerged from the wreckage and began shooting toward the two men, who turned and fled back toward the funeral home. Immediately, a report was made to 911 about a man at that location shooting a gun.

---

[109] The above depiction of the text messages is one that has been posted by news outlets—an image of the teenager's phone taken after the shooting. The Committee reviewed data from the attacker's phones, which contained an additional message that appears to have been deleted in the image shared by the teenager.

AR00276



*Robb elementary and surroundings.*

The attacker proceeded to advance toward Robb Elementary School. There was a five-foot fence around the perimeter of the school property. The attacker tossed a backpack over the fence, then he climbed over it, as documented on the funeral home's surveillance camera.

### Coach Silva Alerts the School

Robb Elementary Coach Yvette Silva was outdoors at that time with a group of third graders, and she spotted the backpack being tossed over the fence followed by a person dressed in black climbing over it. She then saw the person raise a gun and begin to shoot. Coach Silva thought the attacker was shooting at her, and she ran from the field toward her classroom. She used her school radio to report: "Coach Silva to office, somebody just jumped over the fence and he's shooting." She ran toward a group of third graders on the school playground to tell them to lock down. She expected to then hear an announcement of a lockdown, but she did not hear one right away.[110] Meanwhile, the attacker proceeded to the fourth grade teachers' parking lot, continuing to fire his gun.

### Law Enforcement Responds to Robb Elementary

While this was unfolding, Uvalde Police Department dispatch communicated to local law enforcement the initial 911 report from the funeral home about the vehicle crash. Numerous officers immediately began to respond in the direction of Robb Elementary School.

---

[110] Committee testimony of Coach Yvette Silva, Robb Elementary (June 16, 2022).

AR00277

Uvalde Police SSgt. Eduardo Canales, commander of the SWAT team, had been at Robb Elementary just an hour before for his son's end-of-year school ceremonies. While working at his office, other officers ran down the hallway and said there had been a vehicle accident with shots fired. He followed Lt. Mariano Pargas, the acting chief of the Uvalde Police. (Uvalde Police Chief Daniel Rodriguez was out of town that day, and on this occasion, Lt. Pargas had been designated as acting chief.) On arrival at the school, SSgt. Canales saw cars stopped and a man shooting a gun. He grabbed his rifle, put a magazine into it, and grabbed an extra magazine. He saw people at the funeral home pointing in the direction of the school, and he heard somebody say the attacker was in or near the building. SSgt. Canales entered an open gate where he met Lt. Javier Martinez, also of the Uvalde Police.[111]

Lt. Martinez also heard the report of a vehicle accident with shots fired. He drove toward the intersection of Geraldine and South Grove, and as he arrived, he saw a man on the side of the road pointing. He jumped out of his car, popped the trunk to get his vest, then proceeded toward the west side of the school's west building.[112]

At around the same time, another Uvalde Police officer, Sgt. Daniel Coronado, also arrived on the scene. He wore his uniform and a vest, but he had no rifle plates for protection. Sgt. Coronado first stopped his patrol vehicle at the south end of South Grove Street where it dead-ends into Geraldine Street. He saw two Uvalde Police officers at the intersection who had arrived before him. Sgt. Coronado exited his vehicle, heard gunfire, and asked where the shooting was occurring. At first, the other officers said they did not know, and they could not see the attacker.[113]

One of those officers testified to the Committee that, based on the sound of echoes, he believed the shooter had fired in their direction.[114] That officer saw children dressed in bright colors in the playground, all running away. Then, at a distance exceeding 100 yards, he saw a person dressed in black, also running away. Thinking that the person dressed in black was the attacker, he raised his rifle and asked Sgt. Coronado for permission to shoot.[115]

---

[111] Committee testimony of SSgt. Eduardo Canales, Uvalde Police (June 29, 2022).

[112] Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022).

[113] Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[114] The Committee is unaware of any public reporting about this episode that has identified the police officer by name. The officer testified before the Committee. In light of the Committee's determination that the description of this episode by ALERRT—then widely reported by the media—is likely incorrect, we likewise decline to identify him by name for purposes of this report.

[115] *See, e.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

AR00278

Sgt. Coronado testified he heard the request, and he hesitated. He knew there were children present. He considered the risk of shooting a child, and he quickly recalled his training that officers are responsible for every round that goes downrange.[116]

According to the officer who made the request, there was no opportunity for Sgt. Coronado to respond before they heard on the radio that the attacker was running toward the school. The officers testified to the Committee that it turned out that the person they had seen dressed in black was not the attacker, but instead it was Robb Elementary Coach Abraham Gonzales.[117] Coach Gonzales had been on his way to the parking lot to leave the school after his lunch duty when he heard a gunshot and then Coach Garcia's report about the attacker over the radio. He told the children around him to run away.[118] Robb Elementary fourth grade teachers Lynn

---

[116] *Id.*

[117] Part 1 of the ALERRT report, included the following narrative in its timeline:

> Prior to the suspect's entry into the building at 11:33:00, according to statements, a Uvalde Police Officer on scene at the crash site observed the suspect carrying a rifle outside the west hall entry. The officer, armed with a rifle, asked his supervisor for permission to shoot the suspect. However, the supervisor either did not hear or responded too late. The officer turned to get confirmation from his supervisor and when he turned back to address the suspect, he had entered the west hallway unabated. (OS per investigating officer interview).

ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations*, at 4 (July 6, 2022). The ALERRT report appears to rely on an interview conducted by Texas Ranger Michael Schraub, who interviewed the officer in question on May 27, 2022. That report stated:

> While in route to the scene Officer [A] advised Officer [B] located the shooter. However, the shooter was located a couple blocks away from the dispatch location. Officer [A] advised upon arrival, the shooter was shooting at Officer [B]. Officer [A] advised he positioned his patrol vehicle while ducking down and grabbing his rifle between the shooter and Officer [B]. Officer [A] advised the purpose was to protect Officer [B] while he exited his patrol vehicle. Officer [A] advised his vehicle was not struck by any projectiles.

> Officer [A] advised upon exiting his patrol vehicle he observed the shooter in the distance. When he observed the shooter, Officer [A] advised there were kids in the background. Therefore, Officer [A] advised he hesitated shooting at the suspect. Officer [A] advised he requested permission to shoot, looked back very briefly at Sergeant Coronado, but never received a response. Upon looking back the direction of the shooter Officer [A] advised the shooter was gone.

DPS interview (May 27, 2022). In a subsequent DPS interview, the officer in question described the person he saw not as "the shooter" but as "a person in black toward the back of the school, but kids were behind that individual." DPS interview (June 13, 2022). These DPS interview reports do not include or support the detail suggested in the ALERRT report that a Uvalde police officer "observed the suspect carrying a rifle *outside the west hall entry.*" Based on its review of evidence to date, this Committee concludes that it is more likely that the officer saw Coach Gonzales dressed in black near a group of schoolchildren than that there was an actual opportunity to shoot the attacker from over 100 yards away, as assumed by ALERRT's partial report.

[118] DPS interview of Coach Abraham Gonzales (May 28, 2022).

AR00279

Deming and Sasha Martinez each testified that Coach Gonzales yelled at their children to lock down as the attacker approached.[119]

Sgt. Coronado saw people at the funeral home also indicating the attacker was running toward the school. He returned to his car and drove east down Geraldine Street to attempt to flank and engage the attacker. He parked his car on the northeast corner of the campus and saw Uvalde CISD Police Chief Pete Arredondo arrive.[120]

Just minutes before, Chief Arredondo had been in his office at Uvalde High School when he heard "shots fired" on the radio. He rushed out, heard something about Robb Elementary School, and drove toward the school. He arrived with his radios, but as he exited his vehicle, he was fumbling with them and they bothered him, so he dropped them by the school fence knowing that Sgt. Coronado, the sergeant on patrol, was there and "fully uniformed" with his radio.[121]

### Robb Elementary School Locks Down

As the attacker approached the school and as law enforcement responders were arriving, staff at Robb Elementary were beginning to lock down, based mostly on word-of-mouth reports of an armed man on campus.

Principal Mandy Gutierrez had just finished an awards ceremony and was in her office when she heard Coach Silva's report over the radio. She attempted to initiate a lockdown on the Raptor application, but she had difficulty making the alert because of a bad wi-fi signal.[122] She did not attempt to communicate the lockdown alert over the school's intercom. By phone, she called and spoke with Chief Arredondo, who told her, "shut it down Mandy, shut it down."[123] She told head custodian Jaime Perez to ensure that all the doors were locked. She initially locked down in her own office, but she later moved to the cafeteria.[124]

---

[119] Committee testimony of Lynn Deming, Robb Elementary teacher (June 29, 2022); Committee testimony of Sasha Martinez, Robb Elementary teacher (June 29, 2022).

[120] Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[121] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[122] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).

[123] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161 (June 21, 2022).

[124] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

AR00280

Perez was in the cafeteria when he also heard Coach Silva's report on the radio. He immediately started to implement a lockdown, starting to lock doors from the outside. He heard shots and returned to the cafeteria where he remained for the duration of the incident.[125]

In the west building, the fourth grade teachers in and around the building also started to initiate lockdown procedures upon hearing about the approaching attacker. Sasha Martinez taught a fourth grade class in Room 110. She and her class had left their classroom ahead of schedule for recess. They were on their way to the playground when they heard a coach yelling, pointing at the roof, and telling them to run. Martinez started to hear gunshots, and her students started running, some toward the cafeteria, others joining her toward the direction of their classroom in the west building. She then decided to take them to another open classroom in another building instead.[126]

Lynn Deming in Room 104 was getting her class ready to go early to recess. She was standing at the south door of the west building waiting for a child to get a water bottle when her students heading out the south door reported that a coach was yelling at them. She heard "pow pow" and told her kids to get back into the classroom.[127]

Elsa Avila taught fourth grade in Room 109. She had lined-up her students at 11:30 a.m. to go to recess. Some of the children reported to her that students from Deming's classroom were returning screaming and crying. She opened the door and did not see anybody, but she heard a female voice saying, "get in your rooms." She returned to her classroom and slammed the door shut, because otherwise the lock would not latch. She turned off the lights and closed the door. Her students knew what to do—they positioned themselves away from the windows and the doors.[128]

Nicole Ogburn, the fourth grade teacher in Room 102 at the southwest corner of the west building, heard a sound like metal on brick from the outside. She looked out her window and saw a man in dark clothes with a gun and a bag walking up the sidewalk. She told her students to get down. She heard shots coming from the outside into the window, and she hid underneath a curtain in the room.[129]

---

[125] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

[126] Committee testimony of Sasha Martinez, Robb Elementary teacher (June 29, 2022). Martinez commented that she thought a lot of time passed between hearing gunshots and then later receiving the Raptor alert. *Id.*

[127] Committee testimony of Lynn Deming, Robb Elementary teacher (June 29, 2022).

[128] Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[129] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022).

AR00281

In Room 105, fourth grade teacher Jennieka Rodriguez received a Raptor alert of a lockdown at 11:32 a.m. Her students knew what to do and where to hide. She stepped outside and checked her classroom door to ensure it was locked. As she did so, she looked across the hall and locked eyes with another fourth grade teacher, Ms. Garcia, who was locking the door to her classroom, Room 112.[130]

### The Attacker Enters the West Building

After walking north along the west side of the west building, as observed by Ms. Ogburn,[131] the attacker entered the unlocked west door of the west building.[132] The exterior doors on the east and south sides of the building also were unlocked, such that even if the west door had been locked, the attacker still would have had the ability to enter the building, but his progress likely would have been slowed.

After passing through the west door, the attacker walked east into the building, then turned to his right, south into a hallway. He proceeded down to the vestibule for Rooms 111 and 112 and turned left to face those classroom doors.

### The Attacker Enters Rooms 111 & 112

The surveillance video in the hallway shows that the attacker fired his gun toward Rooms 111 and 112 at approximately 11:33 a.m. He walked forward toward the doors and could be seen stepping back into the hallway before proceeding again into one of the classrooms.

We cannot be certain which of the doors the attacker entered. But, based on the evidence available to the Committee, it is most likely that the attacker found the door to Room 111 unlocked or unsecured and entered through that door.[133] There is no evidence that the attacker

---

[130] Committee testimony of Jennieka Rodriguez, Robb Elementary teacher (June 29, 2022).

[131] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022).

[132] The Committee received some evidence that this door was usually kept locked, as it was supposed to be. Committee investigator interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022). The Committee also heard some evidence that staff often propped open the door with a rock so that teachers could run out and come back in. *See, e.g.,* Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022). The surveillance camera inside the west building recorded that someone had propped open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the attacker arrived, the door was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the building. *Id.*

[133] As discussed later in this report, responding officers assumed, but did not verify, that the doors to Rooms 111 and 112 were locked because of school policies and door designs intended to ensure locked classroom doors. Acting on that assumption, officers spent a great amount of time seeking a master key that could open a door they presumed to be locked. Other information described in this report casts doubt on the suggestion the door

made a forced entry through either door. As noted previously, there is evidence that Ms. Garcia, a teacher in Room 112, locked her classroom door as witnessed by the teacher in Room 105 across the hall, Ms. Rodriguez.[134]

As for Room 111, there was substantial evidence that door did not secure properly, The teacher in Room 111, Arnulfo Reyes, knew this, and on several occasions reported the condition of the door to the school.[135] There was also evidence that teachers and students throughout the fourth grade knew the condition of Room 111's door, as they regularly would enter the door to access the printer in that room.[136] Reyes has no recollection of ever receiving a lockdown alert[137] or any memory that he undertook the special effort needed to get his classroom door to lock before the arrival of the attacker.[138]

According to an analysis provided to the Committee, after entering the attacker spent about 2½ minutes rapidly firing over 100 rounds between the two rooms,[139] ultimately killing many innocent victims.[140] Law enforcement discovered a Hellfire trigger system in the room with the attacker, but based on the evidence provided to date, the Committee is unable to determine whether it was used to increase the weapon's rate of firing. The Department of Public Safety

---

was actually locked. The Committee has been advised that none of the Border Patrol agents who used a key and ultimately opened the door were wearing body cameras which might have shed additional light on this question.

[134] Committee testimony of Jennieka Rodriguez, Robb Elementary teacher (June 29, 2022). One of the surviving students in Room 112 also reported that she saw Ms. Garcia lock the door. DPS interview of Khloie Torres (June 2, 2022).

[135] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[136] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022); *see also* interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[137] DPS (Elizondo) interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[138] *E.g.*, DPS (Williamson/Benitez) interview of Arnulfo Reyes, Robb Elementary teacher (May 27, 2022). Reyes told the Committee's investigators that he believes the attacker entered through Room 112 and from there shot through the wall into Room 111. Interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022). The Committee finds that suggestion to be unlikely for the reasons previously explained about why Room 112 likely was locked and Room 111 likely was unlocked. It is more likely, and otherwise consistent with his account, that Reyes heard bullets fired by the attacker from outside in the hallway, through the doors, and into Room 111.

[139] *Cf.* Texas Department of Public Safety (@TexasDPS), https://twitter.com/TxDPS/status/1539256179234332673 (June 21, 2022) (reference materials for testimony before Texas Senate Special Committee to Protect All Texans).

[140] *See also* Committee interview of DPS Director Col. Steven C. McCraw (June 9, 2022) (incident timeline). The analysis provided to the Committee strongly suggests that of approximately 142 total rounds fired by the attacker in the building, approximately 21 of those rounds can be identified as being fired after officers entered the building. The first 11 officers to enter the building did so over the course of approximately 6 seconds. It thus appears to be virtually certain that over 100 rounds were fired before the arrival of the first responders.

AR00283

Case 2:25-cv-00033-AM    Document 10-2    Filed 12/08/25    Page 284 of 499

has advised the Committee there is no indication that the Hellfire device was used by the attacker. It is also possible that it was used.[141]

Terrified teachers and students throughout the west building heard this extended burst of gunfire, as did law enforcement officers who were arriving on the campus and closing in on the west building.[142] Responders heard the tail end of this gunfire as they entered the building through the south and west doors.[143] During those two and a half minutes of gunfire, it is likely that one of the bullets passed through the walls and struck Ms. Avila, the teacher in Room 109.[144]

Also during this time, at approximately 11:36 a.m., Uvalde Police Department dispatch received a call reporting a woman "shot in the head on Diaz Street."[145]

First Law Enforcement Approaches & Enters

After the attacker already had fired over 100 shots in Robb Elementary's west building, two separate groups of officers converged on the building at the same time from different directions. From the time of their initial entry and over the course of the next five minutes, the attacker fired approximately 16 additional rounds.

On the south side of the building, Chief Arredondo and Officer Adrian Gonzalez of the Uvalde CISD Police and Uvalde Police Officer Page and Sgt. Coronado approached. Officers Page and Gonzalez were the first to enter,[146] followed by Chief Arredondo, then by Sgt.

---

[141] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Report of Investigation #13 (June 2, 2022).

[142] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[143] *E.g.*, Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022); *see also* Robb Elementary surveillance video.

[144] *See* Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[145] Uvalde County Sheriff Ruben Nolasco testified to the Committee that while he was on his way to respond to the report of shots fired in the vicinity of Robb Elementary, he learned about the shooting of a woman on Diaz Street (who turned out to be the attacker's grandmother) from a man in a vehicle who flagged him down in the street. *See* Uvalde Police Department Call Sheet Report (May 24, 2022); Committee testimony of Uvalde County Sheriff Ruben Nolasco (July 11, 2022). Other information provided to the Committee has suggested that Sheriff Nolasco learned about the shooting on Diaz Street by other means, and perhaps earlier than he has acknowledged. In a desire to put this issue to rest, and to foreclose the suggestion that earlier reporting of the attacker's assault on his grandmother could have led to an earlier law enforcement intervention, the Committee has requested records from Sheriff Nolasco's mobile phones to confirm that he was not contacted directly for assistance on Diaz Street. The Committee has not yet received these records. The issue is important if a more timely report of the Diaz Street shooting could have prompted an earlier call from dispatch for law enforcement response to the area or an earlier Raptor alert at the school.

[146] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); DPS interview of Officer Donald Page, Uvalde Police (May 25, 2022).

Robb Cmte Rpt  •  48 of 77

AR00284

Coronado. Officers Page and Gonzales both heard rounds as they were approaching.[147] So did Sgt. Coronado, who yelled "shots fired."[148]

Meanwhile, on the north side of the building, Lt. Martinez and Ssgt. Canales of the Uvalde Police entered the building first, followed by Uvalde Police Officer Louis Landry.[149] Lt. Martinez told a DPS investigator that he heard gunfire from inside the building, then he entered.[150] He testified to the Committee that he suspected the attacker was inside shooting,



*West Building, Robb Elementary.*

---

[147] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); DPS interview of Officer Donald Page, Uvalde Police (May 25, 2022).

[148] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022); *see also* Sgt. Coronado's body-worn camera footage (11:36).

[149] DPS interview of Officer Louis Landry, Uvalde Police (May 26, 2022); *see also* Robb Elementary surveillance video.

[150] DPS interview of Lt. Javier Martinez, Uvalde Police(May 25, 2022); *see also* Robb Elementary surveillance video.

AR00285

but that as he entered the building it was definitely quiet, with no screaming or crying. He said that on arrival inside the building, he heard "a few muffled shots."[151]

The evidence establishes that as they arrived at the west building, the initial responders knew there had been gunfire inside the building. They heard it as they were approaching. When they entered, they could see a cloud of debris in the hallway from drywall, as well as bullet holes in the walls and spent rifle casings on the floor. Yet the testimony received by the Committee also indicated that none of these initial responders recalled hearing screams or having any contemporaneous understanding, as they arrived in the building, that teachers and students just then had been shot inside the classrooms.



*Uvalde Police officers enter from north end of hallway.*

---

[151] *E.g.*, Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022); *see also* Robb Elementary surveillance video.

AR00286

After entering the west building, the two separate groups of officers converged on Rooms 111 and 112. Coming from the south, Officer Page saw smoke and fog and observed that both classrooms were dark. Officer Gonzales remembers smelling gunpowder, saying that it looked smoky or cloudy, like someone set off a fire extinguisher.[152] Chief Arredondo made similar observations of smoke, and he also saw spent casings on the ground.[153] As Sgt. Coronado followed this group and Chief Arredondo from the south, he heard no more active gunfire as recorded on his body camera. It was quiet, and he could see bullet holes through the sheetrock.[154] On Sgt. Coronado's body camera footage, another officer can be heard saying, "it's an AR."[155] Upon entering the building, the officers tried but were unable to communicate on their radios. Officer Page stopped near Rooms 111 and 112,[156] and the school surveillance video suggests that the officers coming north from the south door were the first to reach the near vicinity of Rooms 111 and 112.

Simultaneously, Lt. Martinez followed by SSgt. Canales entered the hallway and approached Rooms 111 and 112, with Lt. Martinez approaching along the east wall and SSgt. Canales following along the west wall, as recorded on SSgt. Canales's body camera and the school surveillance video. Immediately behind them, four additional officers entered the building and remained in the north hallway.

At approximately 11:37 a.m., the officers converged from both sides of the hallway on Rooms 111 and 112. Coming from the north, Lt. Martinez peered into the vestibule for Rooms 111 and 112, and he faced gunfire, getting grazed by fragments of building material on the top of his head.[157] He immediately retreated to the north end of the hallway.[158] On the opposite side

---

[152] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022).

[153] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 87 (June 21, 2022). Chief Arredondo testified that he recalled seeing "the locking mechanism" for the door to Room 111, or what he calls "a thumb, the locking mechanism that goes in the throw." He explained, "there's a small gap in between the door and the frame, and you could see, you know, a fraction of an inch. I have an image in my head of seeing that—that throw." *Id.* at 97. For the reasons explained above, the Committee finds it is most likely that the door to Room 111 was not properly or effectively locked.

[154] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[155] Sgt. Coronado's body-worn camera footage (11:36).

[156] DPS interview of Uvalde Police Department Officer Donald Page (May 25, 2022).

[157] ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* (July 6, 2022) (stating that Lt. Martinez and Ssgt. Canales were hit by "building material fragments caused by the suspect's rounds passing through the walls," citing "Investigating Officer Interview" and "Internal School Surveillance").

[158] *See* Robb Elementary surveillance video (11:36). The recent ALERRT report states that "[o]nce the officers retreated, they should have quickly made a plan to stop the attacker and gain access to the wounded," noting "[t]here were several possible plans that could have been implemented." "Perhaps the simplest plan," according to ALERRT, "would have been to push the team back down the hallway and attempt to control the classrooms

AR00287

of the hall, fragments also hit SSgt. Canales on his ear. He likewise retreated and exited the building on the west side. No shots were fired at that time toward the attacker by the law enforcement responders.

## What Happened for the Next 73 Minutes?

Like the initial approach into the west building, the remainder of law enforcement actions at Robb Elementary School until the ultimate breach of the classroom and neutralization of the attacker was a tale of two separate responses on the north and south sides of the hallway.

## On the South …

After the attacker fired on the responders, Chief Arredondo noticed the light on in Room 110—the room immediately south of Room 111 which was used by Ms. Martinez, who had taken her class out of the building early for recess. Chief Arredondo wondered if there could be a threat in Room 110. The door was either open or unlocked. He entered to clear the room, and he saw holes in the wall. The room was vacant. He told the Committee he thought, "There's no babies in here. It's awards day."[159] He testified that he prayed that if Room 110 was empty, the children might be gone from the rooms occupied by the attacker as well.

Although the encounter had begun as an "active shooter" scenario, Chief Arredondo testified that he immediately began to think of the attacker as being "cornered" and the situation as being one of a "barricaded subject" where his priority was to protect people in the other classrooms from being victimized by the attacker.[160]

With the benefit of hindsight, we now know this was a terrible, tragic mistake.

Testifying before the Committee, Chief Arredondo explained his thinking on this subject at the time as follows:

> We have this guy cornered. We have a group of officers on … the north side, a group of officers on the south side, and we have children now that we know in these other rooms. My thought was: We're a barrier; get these kids out -- not the hallway, because the bullets

---

from the windows in the doors." The report explains the purported simplicity of the plan by noting: "Any officer wearing rifle-rated body armor (e.g., plates) would have assumed the lead as they had an additional level of protection." ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* (July 6, 2022). A problem with ALERRT's depiction of its "simplest plan" is that no officer present was wearing "rifle-rated body armor (e.g., plates)." The Committee agrees the officers should have attempted to breach the classrooms even without armor, but it is inflammatory and misleading to release to the public a report describing "plans that could have been implemented" that assume the presence of protective equipment that the officers did not have.

[159] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[160] *Id.*

are flying through the walls, but get them out the wall – out the windows, because I know, on the outside, it's brick.

*** 

[T]o me … once he's … in a room, you know, to me, he's barricaded in a room. Our thought was: "If he comes out, you know, you eliminate the threat," correct? And just the thought of other children being in other classrooms, my thought was: "We can't let him come back out. If he comes back out, we take him out, or we eliminate the threat. Let's get these children out."

It goes back to the categorizing. … I couldn't tell you when -- if there was any different kind of categorizing. I just knew that he was cornered. And my thought was: " … We're a wall for these kids." That's the way I looked at it. "We're a wall for these kids. We're not going to let him get to these kids in these classrooms" where … we saw the children.[161]

Chief Arredondo's testimony about his immediate perception of the circumstances is consistent with that of the other responders to the extent they uniformly testified that they were unaware of what was taking place behind the doors of Rooms 111 and 112. They obviously were in a school building, during school hours, and the attacker had fired a large number of rounds from inside those rooms. But the responders testified that they heard no screams or cries from within the rooms, and they did not know whether anyone was trapped inside needing rescue or medical attention. Not seeing any injured students during their initial foray into the hallway, Sgt. Coronado testified that he thought that it was probably a "bailout" situation.[162]

Chief Arredondo and other officers contended they were justified in treating the attacker as a "barricaded subject" rather than an "active shooter" because of lack of visual confirmation of injuries or other information. Chief Arredondo explained his reasoning for not continuing an active shooter-style response, telling the Committee:

[W]hen there's a threat … you have to visibly be able to see the threat. You have to have a target before you engage your firearm. That was just something that's gone through my head a million times … .[G]etting fired at through the wall … coming from a blind wall, I had no idea what was on the other side of that wall. But … you eliminate the threat when you could see it. … I never saw a threat. I never got to … physically see the threat or the shooter.[163]

This "barricaded subject" approach never changed over the course of the incident despite evidence that Chief Arredondo's perspective evolved to a later understanding that fatalities

---

[161] *Id.* at 122, 125-25.

[162] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022). Chief Arredondo also testified that the possibility of a bailout "came over my mind at some point … because they happen so often, and there's been a few that were armed." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 49 (June 21, 2022).

[163] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

and injuries within the classrooms were a very strong probability.[164] He effectively conceded his error when asked what he would have done differently had he known injured victims were in the classroom. Chief Arredondo responded to the Committee: "I guess, if I knew there was somebody in there, I would have—we probably would have rallied a little more, to say, 'Okay, someone is in there.'"[165]

Chief Arredondo went to Room 109, found it locked and dark, saw a child's head, and realized there were students in that room.[166] Officer Gonzales asked Chief Arredondo if he wanted to activate the SWAT team, which he confirmed, so Gonzales then stepped out and made the call.[167] As mentioned earlier, however, the head of the Uvalde Police SWAT team already was in the building.

Chief Arredondo then used his mobile phone to call the Uvalde Police. The Department of Public Safety supplied the following transcription of that call:

> Hey..hey it's Arredondo..it's Arredondo can you hear me? No I have to tell you where we're at..it's an emergency right now. I'm inside the building, I'm
>
> *dispatcher can be heard talking in the background asking what room number*
>
> Is the teacher with him? Is the teacher with him? Is the teacher with him? Is she in the same room as him? Can you hear me? Ma'am?
>
> *dispatcher: I'm right here*
>
> Ma'am, is the teacher with him? In his classroom?
>
> *dispatcher: She's in another classroom she's in room 102. Another person possible shot across from her.*
>
> Okay, we have him in the room. he's got an AR15, he's shot a lot. He's in the room, he hasn't come out yet. We're surrounded, but I don't have a radio
>
> *dispatcher confirms SWAT location*
>
> Yes and they need to be outside of this building prepared. Because we don't have enough fire power right now it's all pistol and he has an AR15. If you
>
> *dispatcher asked if you can stay on the phone with me as long as you can*
>
> I am but I'm gonna drop it when he comes out of that door. Alright.
>
> *dispatcher advises over the radio that 401 has the shooter in 111 or 112. He's going to be armed with a rifle. He's requesting SWAT by the funeral home.*

---

[164] For example, later in the incident, Sgt. Coronado's body-worn camera footage recorded that somebody asked, at 12:34 p.m., "we don't know if he has anyone in the room with him, do we?" Chief Arredondo responded, "I think he does. There's probably some casualties." Sgt. Coronado agreed, saying "yeah, he does … casualties." Then at 12:41 p.m.: "Just so you understand, we think there are some injuries in there."

[165] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[166] *Id.*

[167] Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

AR00290

So. So I need you to bring a radio for me, and give me my radio for me. I need to get one
rifle. Hold on. I'm trying to set him, I'm trying to set him up.

By 11:42 a.m., Constable Johnny Field had arrived on the north end of the hallway.[168]
Constable Field saw Chief Arredondo on the other end and held up his phone. Chief
Arredondo called and began communicating with him by phone as his primary contact on the
north end.[169] They discussed the need to evacuate children from the building,[170] and Chief
Arredondo decided to accomplish that by breaking windows.[171] Officers Gonzales and Page
proceeded to start breaking classroom windows and helping to evacuate students from
classrooms.[172] Chief Arredondo found another unlocked classroom on the east side of the
hallway with a teacher and students locked down inside, and he told them to stay down.[173]

Meanwhile, Sgt. Coronado had exited the building through the south door and made his own
report by radio.[174] He requested shields and flashbangs from the police department, and he
asked for helicopter support and ballistic shields from the Department of Public Safety.
Agreeing with Chief Arredondo's assessment, he reported the shooter was "contained" inside
the building and "barricaded in one of the offices." Dispatch asked Sgt. Coronado if the
classroom door was locked. He responded he was not sure, but that they had a Halligan tool
to break it. Radio traffic indicated the attacker was in Ms. Mireles's classroom (Room 112) and
asked whether her students were inside. In response, Sgt. Coronado requested a mirror to look
around corners. A voice on the radio stated that "the class should be in session."[175]

After the initial responders took fire from the attacker, Sgt. Coronado remained outside the
building on the south and west sides for a total of approximately 30 minutes,[176] regularly

---

[168] *See* Robb Elementary surveillance video.

[169] Testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022); Testimony of Chief Pete
Arredondo, Uvalde CISD Police (June 21, 2022).

[170] Testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022).

[171] Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[172] Testimony of Officer Adrian Gonzalez, UCISD Police (June 20, 2022) (stating that after calling for SWAT, he
began to help evacuating children on his own initiative and received no further orders from Chief Arredondo).

[173] Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[174] Sgt. Coronado's body-worn camera footage (11:38).

[175] Sgt. Coronado's body-worn camera footage (11:43).

[176] Sgt. Coronado's body-worn camera documented his activity. At 11:44 a.m., a responder asked by radio where
he was needed, and received direction to head to the south side of the school. The responder then stated that a
lot of people were pulling up by the funeral home. Sgt. Coronado responded to have some officers available to
keep everybody back. At 11:48 am he suggested locking down the high school and all the other schools. At 11:49
a.m., a little more than 10 minutes after their initial encounter with the attacker, Sgt. Coronado warned arriving
officers about a doorway and a "fatal funnel." He asked them to prop open the south door.

advising other officers to be careful about potential crossfire or a "fatal funnel" in the hallway and assisting the evacuation of students and teachers through windows on the west side of the building. When some newly arrived responders appeared to suggest that the officers should clear out of the south side of the hallway because United States Border Patrol Tactical Unit (BORTAC) responders were operating on the opposite end, Sgt. Coronado responded, "Chief is in there, Chief is in charge right now,"[177] suggesting both that Chief Arredondo was in control and in communication with the other side of the building.

While Sgt. Coronado was outside, his body camera recorded several people commenting on the need to find a master key to the classrooms. Once Sgt. Coronado returned inside the south side of the hallway, he found Chief Arredondo on his phone also asking for a key, which was a primary focus of his attention for the next 40 minutes. Chief Arredondo personally tried all of one large set of keys brought to him,[178] and when Sgt. Coronado cautioned him to stay clear of the hallway and the "fatal funnel," Chief Arredondo responded, "just tell them to f***ing wait."[179]

Much of this time was spent by Chief Arredondo on the phone with Constable Field. He issued a series of additional requests for equipment and support, including snipers,[180] a master key,[181] and breaching tools,[182] repeatedly referencing the need for a key and breaching tools before they could attempt to enter the classrooms with the attacker. While waiting, he also periodically attempted to communicate with the attacker in English and Spanish, including immediately after four shots were fired inside the classroom at 12:21 p.m.

Despite all of the discussion of breaching tools, Chief Arredondo testified no one made him aware when one arrived at the building.[183]

Chief Arredondo prioritized making certain all other classrooms in the building were cleared of teachers and students, including the evacuation of Room 109, where the attacker had shot Ms. Avila through the walls.[184] In the context of this evacuation, Chief Arredondo commented

---

[177] Sgt. Coronado's body-worn camera footage.

[178] Sgt. Coronado's body-worn camera footage (12:17 p.m.).

[179] *Id.* (12:17 p.m.).

[180] *Id.* (12:14 p.m.).

[181] *Id.* (12:16 p.m.).

[182] *Id.* (12:21 p.m.); *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[183] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[184] *See* Sgt. Coronado's body-worn camera footage (12:26 p.m.).

that "people are going to ask why we're taking so long," and, in an apparent reference to the ongoing evacuations, that they were trying to care of "the rest of the lives first."[185]

In addition to seeking keys and a breaching tool, the other predominant theme on the south side of the building was waiting for BORTAC to breach the classrooms. Chief Arredondo discussed with Constable Field various means of assisting the breach, such as by using a sniper or flashbangs to kill or distract the attacker.[186]

Beginning around 12:30 p.m., various officers entered through the south door and walked by Chief Arredondo and Sgt. Coronado, stacking up south of Rooms 111 and 112 and on the west side of the hallway, anticipating a move to breach the classrooms.[187]



*Responders stack in hallway south of Rooms 111 & 112.*

At 12:45 p.m., somebody commented that a Ranger had a set of keys that was being tested. And finally, at 12:50 p.m., a team of officers made entry into the classrooms and killed the attacker, with officers stationed in the south part of the hallway quickly falling in behind them and entering Rooms 111 and 112.

---

[185] Other public reports about this particular quote appear to be inaccurate.

[186] Sgt. Coronado's body-worn camera footage (12:17 p.m.).

[187] Sgt. Coronado's body-worn camera footage; *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022); Committee testimony of Trooper Joshua Bordovsky, Tex. Dep't of Public Safety (June 20, 2022).

AR00293

Chief Arredondo testified that the only direction he gave to the north side of the building, through Constable Field, was for them to evacuate the kids and to test the keys before trying to go into the room with the attacker. He said he did not make any decision for BORTAC to breach the classrooms.[188]

On the North …

Rewinding the clock to the point at which the attacker shot at the initial responders in the building, there were three Uvalde Police officers who led the way down the hallway from the north side of the building: Lt. Martinez, followed by SSgt. Canales, followed by Officer Landry. Building fragments hit Lt. Martinez and SSgt. Canales as the attacker shot into the hallway, and all three officers retreated to the north end.

As Ssgt. Canales ran out, his body camera documented the presence of multiple officers in the north hallway and a Department of Public Safety trooper stationed at the door as he exited to the west. Ssgt. Canales stated "we got to get in there," and he made a phone call requesting more help.[189] Uvalde Police Officer Landry, who had been third in line on the north side behind Lt. Martinez and Ssgt. Canales, also exited the building on the west side, then moved to the south side of the building where he began helping to clear classrooms and waiting for specialized teams to arrive.[190] After the initial shock of taking gunfire, Lt. Martinez returned south back down the hallway. Following active shooter training, he began to advance again toward Rooms 111 and 112 in an evident desire to maintain momentum and to "stop the killing," but this time no other officers followed him. Several law enforcement officers suggested to the Committee that if others had followed him as backup, Lt. Martinez might have made it back to the classroom doors and engaged. Later, he helped to evacuate children from classrooms and moved to the south side of the building, and ultimately he was part of the stack of officers on that side of the hallway when BORTAC finally breached the classrooms.

The school surveillance camera installed where the north-south hallway intersects the east-west hallway at the north end of the building captured the movement and activity of law enforcement officers on the north side of the building. From that perspective, the period from 11:37 a.m., when Lt. Martinez, Ssgt. Canales, and Officer Landry made their retreat from the attacker's gunfire, to 12:50 p.m., when a BORTAC-led stack finally made entry into the

---

[188] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[189] *See* Ssgt. Canales's body-worn camera footage.

[190] DPS interview of Uvalde Police Department Officer Louis Landry (May 26, 2022).

classrooms, saw the movement of dozens of officers from a variety of law enforcement agencies in and out of the north hallway, positioning and preparing themselves for the eventual breaching effort.

At first, responders from the Uvalde Police Department, including the acting chief of police on that day, Lt. Mariano Pargas, dominated the north end of the building. Lt. Pargas, who was one of the earliest responders, testified that he was never in communication with Chief Arredondo, and that he was unaware of any communication with law enforcement officers on the south side of the building. He told the Committee he figured that Chief Arredondo had jurisdiction over the incident and that he must have been coordinating the law enforcement response—and that the Uvalde Police were there to assist. He did not coordinate with any of the other agencies that responded, such as the Uvalde Sheriff's Office and the Department of Public Safety. Lt. Pargas did receive a phone call from the chief of the Uvalde Police, who was out of town on vacation, who called to tell him to set up a command post right away. Lt. Pargas testified that he went to the back of the funeral home to start a command post, that the funeral home provided an office, and that then he went back outside to try to keep up with what was going on.[191] This did not result in the establishment of an effective command post.

Lt. Pargas was present when a Uvalde CISD officer, Ruben Ruiz, entered through the west door and stated, "she says she is shot." Officer Ruiz was referring to his wife, Ms. Mireles, who was one of the teachers in Room 112. Officer Ruiz was escorted away from the building. Lt. Pargas also testified he heard on the radio about 911 calls that had come from inside the classrooms, and he told the Committee that it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the attacker. According to Lt. Pargas, while nobody said it, the officers on the north side of the building were waiting for other personnel to arrive from Department of Public Safety or BORTAC, with better equipment like rifle-rated shields.[192]

As responders continued to arrive on the scene, officers stationed outside the building directed them to assist on the perimeter. Special Agent Luke Williams of the Department of Public Safety testified that upon his arrival he disregarded a request that he assist at the perimeter, and instead he proceeded into the east door on the north side of the building. He began to clear rooms along the north hallway, and he found a student hiding in the boys' restroom. The student had his legs up so as not to be seen, and as he had been trained to do, he demanded

---

[191] Committee testimony of Lt. Mariano Pargas, Jr., Uvalde Police (June 29, 2022).

[192] *Id.*

that Special Agent Williams confirm he was with law enforcement, which he did by showing his badge under the stall.

As Special Agent Williams then approached the intersection of the hallways from the east where a group of officers was positioned at the west side of the intersection with weapons pointed south, he heard somebody ask, "y'all don't know if there's kids in there?" Special Agent Williams interjected, "if there's kids in there we need to go in there."



An officer who had been positioned in the hallway responded to Special Agent Williams that whoever was in charge would figure that out. Another officer pointed out to him that his position on the east side of the intersection was creating a crossfire situation relative to the group of officers pointing their weapons toward Rooms 111 and 112 from the south. Special Agent Williams departed to continue clearing other classrooms.[193]

*Responders positioned in north end of hallway (Special Agent Williams's body camera).*

Between 11:52 a.m. and 12:21 p.m., the surveillance video shows four different ballistic shields arriving in the building. Importantly, however, only the last shield, furnished by the U.S. Marshals, was rifle-rated. The Committee heard evidence that the rifle-rated shield was the only one that would have provided meaningful protection to officers against the attacker's AR-15 rifle. The Committee received no evidence that anyone told Chief Arredondo or anyone else on the south side of the building about the arrival of the rifle-rated shield.

Just before 12:30 p.m., there was a burst of activity on the north side. A group of officers moved past the position previously established at the north hallway intersection, and they began to establish a stack close to the north side of Rooms 111 and 112. Viewed from the south, Sgt. Coronado announced the arrival of BORTAC.[194] Another group of officers began to stage medical triage equipment in the east side of the north hallway. This indicates that BORTAC likely assumed tactical command of the incident at this time.

---

[193] *See* Special Agent Williams's body-worn camera footage.

[194] Sgt. Coronado's body-worn camera footage (12:29 p.m.).

AR00296

BORTAC Acting Commander Paul Guerrero came to the north side of the building upon his arrival at Robb Elementary. In a post-incident statement, he said he was advised "that the subject had possibly shot multiple children and was still in the classroom." He requested surveillance through the back windows of Rooms 111 and 112 to possibly deploy gas as they made entry. He then went to retrieve a Halligan tool from his car.[195] The school's surveillance camera shows the arrival of a Halligan breaching tool at 12:35 p.m..[196] The Committee received no evidence that the arrival of the breaching tool ever was communicated to Chief Arredondo or anyone else on the south side of the building.

According to his statement, Cdr. Guerrero attempted to pry open a door in the hallway to see if the Halligan tool would work. He determined it would take too long and dangerously expose an officer to gunfire coming from inside the classroom. He observed that the classroom doorway had multiple holes consistent with bullet holes, and he did not want to expose or jeopardize the safety and lives of any officers by trying to pry the door open.[197]

Cdr. Guerrero then obtained a master key from an officer at the scene. As he made his way to the classroom door, an officer advised him to try it on another door first. He attempted to open another door along the hallway, and it did not work. He saw a few Border Patrol agents and advised them to start setting up for a triage situation of mass casualties. He then received a second master key, which he successfully used to open another door.[198]

Working with the BORTAC team, Cdr. Guerrero had another agent use the rifle-rated ballistic shield to give him cover as he opened the classroom door. Cdr. Guerrero placed the key in the door to Room 111 and opened the door. (Cdr. Guerrero's contemporaneous report stated that he unlocked the door,[199] but as explained above, there is reason to question whether the door was actually locked.)

---

[195] Statement of Agent Paul Guerrero (undated, taken by Ranger Ricardo Guajardo).

[196] *See* Special Agent Williams's body-worn camera footage.

[197] *Id.*

[198] *Id.*

[199] In his statement, Commander Guerrero said "I placed the key into the keyhole. The key worked and I was able to unlock and open the door." *Id.*; *see also* Statement of Agent Warren John Becker (undated, taken by Ranger Tyler Williamson) ("The door was locked, and I utilized the shield to provide cover for Acting BORTAC Commander Guerrero as he opened the door with the master key.").

The attacker was standing in front of a closet in the corner of Room 111, and he fired his rifle at the stack of officers coming through the classroom door. The officers fired on the attacker, killing him.[200]

The Committee has been advised that none of the Border Patrol agents involved in opening the door were wearing activated body cameras.

## On the Outside …

As mentioned in the narratives above, there were important events happening outside the north and south ends of the west building. In part due to the difficulty of maintaining radio communications within the building, not everybody inside the building received all of this information.

A police radio communication of unknown origin stated at 11:56 a.m.: "[I]t is critical for everybody to let PD take point on this."[201] None of the witnesses interviewed by the Committee indicated any knowledge of this communication or what it meant by "PD" taking "point on this." The general consensus of witnesses interviewed by the Committee was that officers on the scene either assumed that Chief Arredondo was in charge, or that they could not tell that anybody was in charge of a scene described by several witnesses as "chaos" or a "cluster."

There was a series of phone calls with a student inside Room 112, initiated by the student calling 911 at 12:03 p.m.. Radio traffic communicated to those officers who could hear it the fact that a student had called from within the classroom. Several witnesses indicated that they were aware of this, but not Chief Arredondo. The Committee has received no evidence that any officer who did learn about phone calls coming from inside Rooms 111 and 112 acted on it to advocate shifting to an active shooter-style response or otherwise acting more urgently to breach the classrooms.

## What Didn't Happen in Those 73 Minutes?

A major error in the law enforcement response at Robb Elementary School was the failure of any officers to assume and exercise effective incident command. Uvalde Police officers responding to a vehicle wreck and shots fired appear to have arrived first on the scene, which would make one of them the initial incident commander. Uvalde CISD Police Chief Arredondo quickly arrived as the incident moved to school property and the law enforcement

---

[200] Statement of Agent Paul Guerrero (undated, taken by Ranger Ricardo Guajardo).

[201] Source: DPS timeline.

response evolved. This made him a natural person to assume command over an incident as it developed. But Chief Arredondo does not consider himself to have assumed incident command. He explained to the Committee:

> [W]hile you're in there, you don't title yourself … .I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as … I'm talking about the command part … the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.

> ***

> you can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[202]

Other people could have assumed command, including the next people in Uvalde CISD's preassigned line of command for active shooter response or others on the scene with more experience or training. ALERRT training teaches that any law enforcement officer can assume command, that somebody must assume command, and that an incident commander can transfer responsibility as an incident develops. That did not happen at Robb Elementary, and the lack of effective incident command is a major factor that caused other vital measures to be left undone. Also, the misinformation reported to officers on the outside likely prevented some of them from taking a more assertive role. For example, many officers were told to stay out of the building because Chief Arredondo was inside a room with the attacker actively negotiating.

Responders did not remain focused on the task of "stopping the killing" as instructed by active shooter training.[203] They never attempted to breach the classroom before BORTAC accomplished entry. Chief Arredondo explained:

> I knew those doors … .Those doors opened outward. … They're thick, heavy doors with a metal frame. Most people are used -- as police officers, used to going to a residence and you kick in doors. That's just such a common thing in our business. You didn't have that option here. I knew a ramrod, which I call a buddy, which is … a heavy pipe with two handles, that wasn't going to work … and that's why I called for that extraction tool and keys.[204]

---

[202] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[203] *E.g.*, *id.*

[204] *Id.*

AR00299

But nobody ever checked the doors of Rooms 111 or 112 to confirm they were actually locked or secured.[205] Room 111 probably was not. Chief Arredondo's search for a key consumed his attention and wasted precious time, delaying the breach of the classrooms.[206]

Nobody called Principal Gutierrez to ask about the location of a master key.[207] She had a key, and the head custodian had a key. Yet despite all the effort to find a key, nobody called her.

Although discussed on both the south and north sides of the building, nobody ever created a diversion on the east side of the building, where Rooms 111 and 112 had windows.[208]

And although it should not have proved necessary had responders remained focused on "stopping the killing" as soon as possible, as the incident dragged on, nobody tasked any law enforcement responder to establish reliable communications between the south and north sides of the building and with resources outside the building. Radio communication was ineffective, so something else was needed for decisionmakers to receive critical information, such as the fact that victims had called from inside the rooms with the attacker.[209] To the extent there was confusion among officers about whether the scenario was an "active shooter" or "barricaded subject," information that there were wounded victims in the rooms would have clarified the existence of an active shooter scenario.

Law Enforcement Responder Headcount

In total, 376 law enforcement officers responded to the tragedy at Robb Elementary School.

---

[205] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[206] ALERRT has noted the failure to check the lock in its criticisms. *See* ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* at 18-19 (July 6, 2022). A representative of ALERRT testified before the Committee that the "first rule of breaching" is to check the lock. *See* Testimony of John Curnutt, ALERRT (July 11, 2022). Unfortunately, ALERRT apparently has neglected to include that "first rule of breaching" in its active-shooter training materials, which includes modules entitled "Closed and Locked Interior Doors" and "Entering Locked Buildings Quickly, Discreetly, and Safely." *See* Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 3-8 – 3-10, 4-20 – 4-25.

[207] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022) (no recollection of communicating with Principal Gutierrez).

[208] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[209] *See* Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022) (did not recall tasking anyone, commented "it would be fantastic" to have the most up-to-date information and that his "priority was to get into that classroom," and "I didn't have communication with … what was going on outside. My big thing was getting through that door.").

AR00300

The breakdown of responders, by agency, is as follows:[210]

| | |
|---|---|
| 149 | United States Border Patrol |
| 91 | Texas Department of Public Safety |
| 25 | Uvalde Police Department |
| 16 | San Antonio Police Department (SWAT) |
| 16 | Uvalde County Sheriff's Office |
| 14 | Department of Homeland Security – HIS |
| 13 | United States Marshals |
| 8 | Drug Enforcement Agency |
| 7 | Frio County Sheriff's Office |
| 5 | Kinney County Sheriff's Office |
| 5 | Uvalde Consolidated Independent School District |
| 4 | Dilley Police Department |
| 4 | Zavala County Sheriff's Office |
| 3 | Medina County Sheriff's Office |
| 3 | Sabinal Police Department |
| 2 | City of Uvalde Fire Marshals |
| 2 | Pearsall Police Department |
| 2 | Texas Parks and Wildlife |
| 2 | Uvalde County Constables |
| 2 | Val Verde County Sheriff's Office |
| 1 | Frio County Constables |
| 1 | Southwest Texas Junior College |
| 1 | Zavala County Constables |

---

[210] Source: Texas Department of Public Safety.

AR00301

# 6 | INFORMATION FLOW

This Committee's chief goal from the very beginning has been to provide accurate information from dependable sources. The public's need for accurate information only has intensified as we have investigated the facts surrounding the tragedy. Problems with the flow of information have plagued government, media, and public discussion about what happened at Robb Elementary from the outset—damaging public trust, inflicting a very real toll on the people of Uvalde, and creating an imperative to provide a reliable set of facts.

## The First Reports

Shortly after the shooting, authorities first reported to the public that the shooter killed fourteen students and one teacher, and the attacker was reported dead at that time.[211]

The next day, state leaders looked to law enforcement for more information in preparation for a broader press conference. The briefing was planned to be led by a Uvalde police lieutenant who had been at the scene, but that officer literally passed out while waiting in the hallway beforehand. In his place, the DPS Regional Director for South Texas, Victor Escalon, agreed to conduct the briefing.[212] Director Escalon, who is not based in Uvalde, had arrived on the scene shortly before the attacker was killed. He did not personally witness the bulk of the day's events, leaving him to depend on secondhand knowledge acquired from other law enforcement officers who had been part of the response.[213]

That briefing was the basis for the press conference the day after the shooting, in which Governor Abbott and other leaders relied on the information law enforcement gave them. After correcting the death toll to nineteen students and two teachers, they made statements based upon Director Escalon's briefing (which itself was based entirely on secondhand knowledge). These statements repeated a false narrative that the entire incident lasted as little as forty minutes thanks to officers who rapidly devised a plan, stacked up, and neutralized the attacker. The general sentiments shared that day were that law enforcement responders were courageous in keeping the attacker pinned down while children were evacuated.

---

[211] All press conferences referenced in this report were recorded.

[212] Committee testimony of DPS Director Col. Steven C. McCraw (July 11, 2022).

[213] Uvalde CISD Police Chief Pete Arredondo said he approached Regional Director Escalon after the briefing because he was surprised and frustrated after hearing his comments that a school district officer had engaged the attacker. "Y'all haven't even gotten our statements yet," he told Escalon. "We were all the first ones there." Chief Arredondo testified: "he corrected that. But during the press conference, it still came out that way." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 180-81 (June 21, 2022).

AR00302

Another press conference was held the next day outside of Robb Elementary School, and new details emerged. One was: "The back door was propped open. It wasn't supposed to be … a teacher … propped it open [and] that was an access point that the subject used." The idea that the door was propped open led to public outcry, and even a teacher who was not implicated was devastated as she wondered whether she had accidentally left a door open.[214] The truth—confirmed by video—is that while a teacher had propped open the west exterior door, she actually saw the attacker approaching and slammed that door shut as she called 911 for help. The door was closed; it simply was either already unlocked or the lock failed to engage, which she could not have known because the doors lock from the outside.[215] On May 31, it was confirmed that her account was correct.[216]

The media repeated the communication failures of relevant authorities, supplemented by leaks released uncritically. The Committee certainly does not question the role or value of reporting by the press, but it is unfortunate that caution and context have been so uncommon. Various people commenting publicly perpetually have taken information at face value, presenting it as definitive when provided as tentative, and they rarely have characterized it as one small part of a vastly larger body of evidence. (To their credit, some outlets did produce original investigative pieces questioning many of the inconsistencies documented earlier.)

The Committee recognizes the natural tension between providing the public with immediate information and the need for accuracy. A complete and thorough investigation can take months or even years to confirm every detail, especially when this many law enforcement officers are involved. However, one would expect law enforcement during a briefing would be very careful to state what facts are verifiable, and which ones are not.

While this is by no means an exhaustive list, the Committee draws attention to two instances to make its broader points.

### ALERRT Report

The first instance is based upon the report, and subsequent media coverage, of the report released by the Advanced Law Enforcement Rapid Response Training (ALERRT) Center. The report was "based on an incident briefing held for select ALERRT staff . . . for approximately

---

[214] One teacher emotionally testified to the Committee that she had spent several distraught days thinking it was her fault the attacker had entered the building, and she had gone as far as apologizing to people.

[215] Like virtually all schools, Robb Elementary made use of "Columbine" doors that can only be locked from the outside; from the inside, exterior doors are opened with a push bar.

[216] Travis Considine, chief communications officer for DPS, confirmed this for the Associated Press as one of their reporters explored the story.

AR00303

1 hour" along with some unspecified "additional information" staff later received from DPS.[217] ALERRT conducted no investigation of its own and spoke to no witnesses, relying instead on a snapshot of an evolving investigation. One of its conclusions was a bombshell: a "UPD officer was armed with a rifle and sighted in to shoot the attacker; however, he asked his supervisor for permission to shoot."[218] He failed to get a response, and the attacker quickly slipped into the school.

During testimony before the Committee, an ALERRT representative admitted he had learned that DPS had received an additional statement from the officer, stating he no longer believed he had seen the attacker when he sought permission to shoot. In fact, and as the Committee has concluded, that officer saw a coach ushering kids inside—something the Texas Rangers, under the purview of DPS, had discussed with the officer during a later interview. Uvalde Mayor McLaughlin issued a statement explaining as much, and ALERRT quickly caveated its findings, saying it did not know "the officer gave a third statement to investigators that was different from the first two statements."

Video Evidence

The Committee fought hard to make sure the public could see the hallway video (although, as previously stated, the Committee would not have shown the images of the attacker and would have let the families of the victims see it first). Our justification was that we could tell people all day long what we saw, but everyone needed to see it for themselves.

After the leak of part of a composite video prepared by the FBI, images began circulating condemning some shown on it. "Cellphone cop" was said to be standing around checking his phone, indifferent. What those sharing it did not know was that it was an image of Eva Mireles's husband. She had been in contact with him already, and when he moved off camera later, she told him she was dying. After receiving this call, he was naturally devastated and was not permitted to return by other law enforcement officers. While this report has cited numerous failures by law enforcement, the actions of this man were not among them.

The problem, of course, is the power, speed, and unaccountable nature of social media. While it allows the truth to spread, it has done far more to amplify incorrect or incomplete information. This is an example of how a picture without context can lead to an incomplete or false impression that is repeated even by respected news organizations. Mark Twain said it best: "A lie can travel halfway around the world before the truth puts on its shoes."

---

[217] *See* ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* at 3 (July 6, 2022).

[218] *Id.* at 15.

AR00304

Compromised Trust

This report has addressed many of the discrepancies and loose threads related to the Robb Elementary shooting, and the Committee focused on research and documentation to support its findings, in part because we expected to be met with rightful skepticism after everything that has happened. The results of the information issues surrounding the shooting are wide ranging and will be felt for a long time to come.

An uncertain narrative also opens the door much wider for conspiracy theories, many of which have been harmful. The fear of a coverup is palpable here, and while most see it as simply part of an intragovernmental "blame game," others have made wild accusations that authorities are sweeping some major scandal under the rug.[219] Comments on social media have repeated and shared specific false allegations about the attacker's identity and associations. And predictably, some have promoted the disgusting Sandy Hook-style claim that Robb Elementary was home to a hoax or "false flag" operation.[220] While this and similar claims might seem obviously beneath our dignifying with a response, it does become harder to proclaim the truth when it is so opaque.

Most fundamentally, there has been a loss of trust in government. As peace officers' union CLEAT said in a recent release, the "great deal of false and misleading information" means that sources "Texans once saw as iron-clad and completely reliable have now been proven false."[221] The Committee certainly has felt the distrust and doubt about its work from those who have cynically but justifiably worried about the way we conducted our investigation.

We tried at every turn to elevate and respect the needs of Uvalde, because nowhere has unreliable information more impacted a community. We saw wounds continuously ripped open and agonizing disillusionment grow there among the people who most deserve swift, sure answers about the tragedy that shook their community. Uvalde itself has paid a terrible price as it has waited for the truth and waded through the shaky narrative given instead.

---

[219] In fact, #uvaldecoverup is a popular hashtag for tweets related to the Robb Elementary School shooting, and those are the kinds of claims regularly associated with it.

[220] Some coverage can be found at the *Houston Chronicle* (https://www.houstonchronicle.com/politics/texas/politifact/article/fact-check-uvalde-false-flag-17214816.php), among other outlets.

[221] CLEAT's release is at https://www.cleat.org/cleat-response-to-uvalde-mass-shooting/.

AR00305

# 7 | Factual Conclusions

Based on the foregoing information developed through its investigation, the Committee has drawn the following preliminary conclusions:

1.  **Uvalde CISD and Robb Elementary**

    a.  *Communications and lockdown alerts*:

        i.  Poor wi-fi connectivity in Robb Elementary likely delayed the lockdown alert through the Raptor application.

        ii.  Once the alert was sent, not all teachers received it immediately for a variety of reasons including wi-fi coverage, whether the teacher used the Raptor phone application (as opposed to logging in through a web browser), and whether the teacher was carrying a phone at the time.

        iii.  No one used the school intercom as another means to communicate the lockdown.

        iv.  As a result, not all teachers received timely notice of the lockdown, including the teacher in Room 111.

    b.  *Effect of bailouts*:

        i.  The frequency of less-serious bailout-related alerts in Uvalde diluted the significance of alerts and dampened everyone's readiness to act on alerts.

        ii.  In response to the May 24, 2022, lockdown alert at Robb Elementary, the initial reaction of many administrators, teachers, and law enforcement responders was that it likely was a less-dangerous bailout.

    c.  *Doors and locks*:

        i.  Robb Elementary had recurring problems with maintaining its doors and locks.

        ii.  In particular, the locking mechanism to Room 111 was widely known to be faulty, yet it was not repaired.

            1.  The Robb Elementary principal, her assistant responsible for entering maintenance work orders, the teacher in Room 111, other teachers in the fourth grade building, and even many fourth grade students widely knew of the problem with the lock to Room 111.

AR00306

2. Nevertheless, no one placed a work order to repair the lock—not the principal, her secretary, the teacher to Room 111, or anyone else.

iii. Robb Elementary had a culture of noncompliance with safety policies requiring doors to be kept locked, which turned out to be fatal.

1. Exterior doors.

a. Teachers at Robb Elementary often used rocks to prop open exterior doors.

b. The west door to the west building was supposed to be continuously locked. When the attacker approached on May 24, 2022, it was unlocked, and he was able to enter the building there.

c. If the door had been locked as policy required, the attacker likely would have been slowed for some period of time as he either circumvented the lock or moved to another point of entry into the building.

2. Interior classroom doors.

a. Teachers at Robb Elementary commonly left interior doors unlocked for convenience, and they also used magnets and other methods to circumvent door locks.

b. The doors to Rooms 111 and 112 were required to be locked at all times, and in a lockdown, the teachers were supposed to check that they were locked.

i. A teacher in Room 112 was seen locking her classroom door after the lockdown alert.

ii. The door to Room 111 probably was not locked. The teacher in Room 111 does not recall hearing the lockdown alert. The door required special effort to lock it, and the teacher has no memory of having done so. The attacker apparently did not have to take any actions to overcome a locked door before entering the classrooms.

c. If the door to Room 111 had been locked, the attacker likely would have been slowed for some time as he either circumvented the lock or took some other alternative course of action.

AR00307

2. **Information that was known or knowable about the attacker**

    a. *Home and family*:

        i. The attacker had an unstable home life with no father figure and a mother struggling with *a* substance abuse disorder.

        ii. The attacker's family moved often and lived in relative poverty.

        iii. The attacker developed sociopathic and violent tendencies, but he received no mental health assistance

        iv. Various members of the attacker's family were aware during the time leading up to the attacker's 18th birthday that he was estranged from his mother and that he had asked for help in buying guns through straw purchases that would have been illegal. Family members uniformly refused to buy guns for him.

        v. During the week between his 18th birthday and the events of May 24, 2022, the attacker expressed suicidal ideation to a cousin, who talked to him and did not believe he was an imminent suicide risk.

        vi. During the week between his 18th birthday and the events of May 24, 2022, the attacker's grandparents and other family members became aware that the attacker had bought guns. The grandparents demanded that the guns be removed from their home.

    b. *School*:

        i. The attacker struggled academically throughout his time in school.

        ii. The school made no meaningful intervention with the attacker before he was involuntarily withdrawn for poor academic performance and excessive absences.

        iii. The attacker had few disciplinary issues at school, but he was suspended once for a fight.

        iv. Due to his excessive absences, there apparently was no information actually known to the school district that should have identified this attacker as a threat to any school campus.

    c. *Law enforcement*: There apparently was no information actually known to local Uvalde law enforcement that should have identified this attacker as a threat to any school campus before May 24, 2022.

    d. *Friends and acquaintances*: Some of attacker's social media contacts received messages from the attacker related to guns, suggesting that he was going to do

something they would hear about in the news, and even referring to attacking a school.

e. *Social media*:

    i. Reports suggest that some social-media users may have reported the attacker's threatening behavior to the relevant social media platforms. The social media platforms appear to have not done anything in response to restrict the attacker's social media access or report his behavior to law enforcement authorities.

    ii. The services used by Uvalde CISD to monitor social media for threats did not provide any alert of threatening behavior by the attacker.

f. *Firearms and ammunition sellers*: There was no legal impediment to the attacker buying two AR-15-style rifles, 60 magazines, and over 2,000 rounds of ammunition when he turned 18. The ATF was not required to notify the local sheriff of the multiple purchases.

## 3. Law enforcement response on May 24, 2022

a. There was no law enforcement officer on the Robb Elementary campus when the attacker came over the fence and toward the school.

b. Citizens at the scene quickly alerted local law enforcement about a vehicle accident, a man with a gun, and shots fired near the Robb Elementary campus.

c. As initially reported by Uvalde Police dispatch and as understood by most initial responders, the incident began off-campus and as one that would have been in the jurisdiction of the Uvalde Police Department. Uvalde Police officers were among the first, if not the first, law enforcement responders on the scene as a man firing a gun moved toward Robb Elementary School.

d. As the situation developed and responders received more information, it became apparent that the threat moved on to the school campus and within the jurisdiction of the Uvalde CISD Police Department.

e. Multiple law enforcement officers arrived at Robb Elementary within a few minutes of the attacker coming over the fence.

f. A Uvalde Police Department officer saw a person dressed in black and thought it might have been the attacker. From a distance of over 100 yards, that officer requested permission to shoot. Subsequent analysis suggests that the person in black was a school coach, and the officer did not have an opportunity to stop the attacker by shooting him before he entered the west building.

g. Robb Elementary School Coach Yvette Silva acted heroically and almost certainly saved lives by alerting the school to the attacker's advance. Most fourth grade classes successfully locked down as a result of her quick response.

AR00309

h. After entering through the unlocked west door, the attacker had about three minutes in the west building before first responders arrived at the building, including approximately two and a half minutes during which the attacker is estimated to have fired over 100 rounds.

i. The initial responders to the west building heard gunfire and encountered a hallway with a fog of drywall debris, bullet holes, and empty rifle casings. They converged on Rooms 111 and 112, which they identified as the location of the attacker. They acted appropriately by attempting to breach the classrooms and stop the attacker. The attacker immediately repelled them with a burst of rifle fire from inside the classrooms.

j. The responders immediately began to assess options to breach the classroom, but they lost critical momentum by treating the scenario as a "barricaded subject" instead of with the greater urgency attached to an "active shooter" scenario.

k. It actually was an "active shooter" scenario because the attacker was preventing critically injured victims from getting medical attention.

   i. An active shooter scenario differs from a barricaded-subject scenario in that law enforcement officers responding to an active shooter are trained to prioritize the safety of innocent victims over the safety of law enforcement responders.

   ii. At first, the first responders did not have "reliable evidence" about whether there were injured victims inside Rooms 111 and 112, although circumstantial evidence strongly suggested that possibility, including the fact that the attacker had fired many rounds inside classrooms at a time when students were in attendance.

   iii. The ALERRT training "reliable evidence" standard does not align with the "reasonable officer" standard applied by ALERRT in its preliminary and partial report.

l. Uvalde CISD's active shooter policy called for Uvalde CISD Police Chief Arredondo to be the incident commander in any active shooter response.

   i. Chief Arredondo was one of the first responders to arrive at the west building.

   ii. In the initial response to the incident, Chief Arredondo was actively engaged in the effort to "stop the killing" up to the point when the attacker was located in Rooms 111 and 112, and the attacker fired on responding officers.

   iii. By this time, there were dozens of officers on the scene, but Chief Arredondo did not assume his preassigned responsibility of incident command, which would have entailed informing other officers that he

was in command and also leaving the building to exercise command, beginning with establishing an incident command post.

    iv. Instead, he remained in the hallway where he lacked reliable communication with other elements of law enforcement, and he was unable to effectively implement staging or command and control of the situation.

m. Over the course of the next hour, hundreds of law enforcement officers arrived at the scene.

    i. The scene was chaotic, without any person obviously in charge or directing the law enforcement response.

    ii. To the extent any officers considered Chief Arredondo to be the overall incident commander, they also should have recognized that was inconsistent with him remaining inside the building.

    iii. There was an overall lackadaisical approach by law enforcement at the scene. For many, that was because they were given and relied upon inaccurate information. For others, they had enough information to know better.

n. Despite obvious deficiencies in command and control at the scene which should have been recognized by other law enforcement responders, none approached Chief Arredondo or any of the officers around him or subordinate to him to affirmatively offer assistance with incident command.

o. Chief Arredondo and the officers around him at the south end of the building were focused on gaining access to the classrooms (through use of a breaching tool, a key, or other means) and protective equipment for officers (through rifle-rated ballistic shields, flashbangs, etc.).

p. Meanwhile, dozens of law enforcement officers were assembling in the hallway on the north side of the building, stacking up for an assault on the classrooms, and mostly waiting for further instructions pending the arrival of protective gear and breaching equipment.

q. While 911 received communications from victims inside Rooms 111 and 112, Chief Arredondo did not learn about it because of his failure to establish a reliable method of receiving critical information from outside the building.

r. Eventually, Chief Arredondo came to understand there probably were casualties inside Rooms 111 and 112. Even if he had received information of surviving injured victims in the classrooms, it is unclear that he would have done anything differently to act "more urgently."

s. U.S. Marshals provided a rifle-rated shield and it arrived around 12:20 p.m., approximately 30 minutes before the classroom was finally breached.

t. While officers acted on the assumption that the doors to Rooms 111 and 112 were locked, as they were designed to be, nobody tested that assumption.

u. Room 111's door probably was not effectively locked shut.

v. Chief Arredondo did not actually exercise tactical incident command over the BORTAC team, nor did the BORTAC team seek instruction from Chief Arredondo.

w. By the time the BORTAC team breached the classrooms, the tactical command inside the building had been de facto assumed by BORTAC.

x. Acting on effectively the same information available to Chief Arredondo, including an assumption of injured victims in the room, the BORTAC commander on scene waited until arranging a rifle-rated shield and obtaining a working master key before attempting to breach the classrooms.

y. The Committee has not received medical evidence that would inform a judgment about whether breaching the classroom sooner than the approximately 73 minutes that passed between the first responders' initial arrival at the west building and their eventual breach of the classrooms could have been saved lives or mitigated injuries.

    i. As described above, it is likely that most of the deceased victims perished immediately during the attacker's initial barrage of gunfire.

    ii. However, given the information known about victims who survived through the time of the breach and who later died on the way to the hospital, it is plausible that some victims could have survived if they had not had to wait 73 additional minutes for rescue.

AR00312

I N   M E M O R Y   O F

Nevaeh Bravo

Jacklyn Cazares

Makenna Elrod

Jose Flores, Jr.

Eliahna Garcia

Irma Garcia

Uziyah Garcia

Amerie Jo Garza

Xavier Lopez

Jayce Luevanos

Tess Mata

Maranda Mathis

Eva Mireles

Alithia Ramirez

Annabell Rodriguez

Maite Rodriguez

Alexandria Rubio

Layla Salazar

Jailah Silguero

Eliahna Torres

Rojelio Torres

AR00313

AR00314

# Robb Elementary School Attack Response Assessment and Recommendations





ALERRT
TEXAS STATE UNIVERSITY

# Table of Contents

Introduction ................................................................................................................ 1

Detailed Timeline ........................................................................................................ 3

Physical Assessment ................................................................................................... 10

Tactical Assessment .................................................................................................... 13

    Circumstance Before Suspect Entry ..................................................................... 13

    Initial Response Within Building ......................................................................... 14

    Changing Circumstances Prior to Assault ............................................................ 17

Supplement: Breaching Assessment and Opportunities ............................................. 21

References .................................................................................................................... 24

The following abbreviations are used throughout the report.

ISS – Internal School Surveillance
FH – Funeral Home video footage
OS – Officer Statement
IOI – Investigating Officer Interview
BWC – Body Worn Camera
UPD CS – Uvalde Police Department Call Sheet
RL – Radio Logs
UCISD PD – Uvalde Consolidated Independent School District Police Department
UPD – Uvalde Police Department
DPS – Texas Department of Public Safety
BP – Border Patrol
BORTAC – Border Patrol Tactical Teams

*This report was created using school video, third party video exterior of school, body cameras, radio logs, verbal testimony of officers on scene, and verbal statements from investigators. This report should not be considered a definitive or final report as all investigatory options have not been exhausted at this point. This report should be considered a living document. It is subject to changes as new or further evidence becomes available. This report is being compiled for the explicit purpose of identifying training gaps to be addressed by police officers across the state of Texas. The authors of this report are subject matter experts in their field of active attack incidents, patrol, and tactical operations with over 150 years of combined experience. These are the expert opinions based on experience, research, and studies of other incidents and not a formal accusation of the responders on this incident.*

## Introduction

Robb Elementary School in Uvalde, Texas was attacked on May 24, 2022. The attack resulted in 21 fatalities (19 students and 2 teachers) and 17 injuries. The Texas Department of Public Safety contacted the Advanced Law Enforcement Rapid Response Training (ALERRT) Center soon after the attack to assess the law enforcement response. The ALERRT Center was selected for this task for a variety of reasons. First and foremost, ALERRT is nationally recognized as the preeminent active shooter / attack response training provider in the nation. ALERRT was recognized as the national standard in active shooter response training by the FBI in 2013. ALERRT's excellence in training was recognized in 2016 with a Congressional Achievement Award.

More than 200,000 state, local, and tribal first responders (over 140,000 law enforcement) from all 50 states, the District of Columbia, and U.S. territories have received ALERRT training over the last 20 years. The ALERRT course catalog includes several courses designed to prepare first responders to 1) isolate, distract, and neutralize an active shooter, 2) approach and breach a crisis site using traditional and non-traditional methods, 3) incorporate effective command to manage a rapidly evolving active situation, and 4) manage traumatically injured patients to improve survivability. ALERRT's curriculum is developed and maintained by a team of subject matter experts with over 150 years combined law enforcement, fire, and tactical experience.

ALERRT training is research based. The ALERRT research team not only evaluates the efficacy of specific response tactics (Blair & Martaindale, 2014; Blair & Martaindale, 2017; Blair, Martaindale, & Nichols, 2014; Blair, Martaindale, & Sandel, 2019; Blair, Nichols, Burns, & Curnutt, 2013;) but also has a long, established history of evaluating the outcomes of active shooter events to inform training (Martaindale, 2015; Martaindale & Blair, 2017; Martaindale, Sandel, & Blair, 2017). Specifically, ALERRT has utilized case studies of active shooter events to develop improved curriculum to better prepare first responders to respond to similar situations (Martaindale & Blair, 2019).

For these reasons, ALERRT staff will draw on 20 years of experience training first responders and researching best practices to fulfill the Texas DPS request and objectively evaluate the law enforcement response to the May 24, 2022, attack at Robb Elementary School. This initial report will be focused on the portion of the response up until the suspect was neutralized.

The information presented in this report is based on a incident briefing held for select ALERRT staff on June 1, 2022. The briefing, which was held for approximately 1 hour, was led by an investigating officer with knowledge of the event and investigative details. Briefing materials included surveillance footage from the school, Google Maps, a brief cell phone video, and verbal questions and answers between ALERRT staff and the investigator. We were first oriented to the location of this incident by the investigator via Google Maps. We were then given a chronological timeline of events and actions by the investigator as we reviewed the cell phone and school surveillance video. All times presented in this report are based on timelines provided by investigators. Additionally, we have received additional information as the investigation is still ongoing. The timeline presented here is based on the most current information as of 6/30/2022.

LAW ENFORCEMENT RESPONSE ASSESSMENT                                              2

The report will begin by presenting a thorough timeline of events as evidenced through video footage and details garnered from the ongoing investigation. Each entry cites the data source (refer to abbreviations presented on the Table of Contents). Following the timeline, we will comment on tactics utilized by responding officers. Information related to breaching options will be presented as a supplemental attachment at the end of the report. The tactical discussion is the opinion of ALERRT, and it is based on years of extensive training, research, and an ever-evolving understanding of active shooter response. The concepts discussed are foundational to ALERRT's nationwide training curriculum. While the discussion will be frank and objective, it is not meant to demean the actions taken by law enforcement during this incident. Rather, the discussion is intended to improve future response. For this reason, attention will be drawn to actions that worked well and actions that did not.

## Detailed Timeline



**Figure 1. Overhead View**

At 11:27:14, a female teacher (Female 1) exits the exterior door in the west hall propping the door open with a rock to prevent it from closing behind her (see Figure 2 for suspect entry point). (ISS)

At 11:28:25, the suspect becomes involved in a motor vehicle crash in a dry canal near the elementary school. Two people from a nearby business approached the crash scene at 11:29:02. The suspect engaged them both with a rifle. The two people were able to flee back to the business unharmed and called 9-1-1. (FH)

At 11:29:40, Female 1 returns through the west entry deliberately kicking the rock from the door jamb. Female 1 pulls the door shut and continues to look out of the exterior door as she is frantically speaking on her cell phone. Female 1 attempts to enter a door on the south side of the west hallway only to find it locked. Female 1 knocked on the door, and it was eventually answered by another female (Female 2). Female 1 appears to advise Female 2 of the emergency whereupon Female 2 re-enters her room and secures the door. Female 1 moves into a room closest to the exit on the north side of the west hallway. Female 1 re-enters the hallway numerous times yelling down the hall for students to get into their classrooms. (ISS)

At 11:30:14, the suspect, wearing dark clothing and carrying a bag, left the crash scene and climbed a chain-link fence onto the elementary school property. The suspect walked deliberately across the open grounds between the fence and the teachers' parking lot. The suspect moved towards the school buildings on the westmost side of the campus. Although a defect that might have been caused by a bullet was located on a building south of the affected structure, it could not be

LAW ENFORCEMENT RESPONSE ASSESSMENT                                    4

substantiated at this time that any rounds were fired at a teacher and children on the playground at the time of the crash. (FH)

At 11:31:36, the suspect is captured on video between the cars shooting, and a Uvalde Patrol unit is captured arriving at the crash site. (FH)

At 11:31:43, a Uvalde Consolidated Independent School District Police officer drives through the west gate near the crash site and across the field to the south side of the affect building, at a high rate of speed. (FH)

At 11:32:08, the suspect reached the west teachers' parking lot adjacent to the affected building and fired through windows into the westmost rooms prior to entering the building. (FH and audio file from ISS)



**Figure 2. Suspect Entry Point**

Prior to the suspect's entry into the building at 11:33:00, according to statements, a Uvalde Police Officer on scene at the crash site observed the suspect carrying a rifle outside the west hall entry. The officer, armed with a rifle, asked his supervisor for permission to shoot the suspect. However, the supervisor either did not hear or responded too late. The officer turned to get confirmation from his supervisor and when he turned back to address the suspect, he had entered the west hallway unabated. (OS per investigating officer interview).

LAW ENFORCEMENT RESPONSE ASSESSMENT                                            5

**Note:** *The internal school surveillance (ISS) video consisted of a ceiling-mounted camera that was situated at the intersection of three intersecting hallways (as indicated by the yellow star in Figure 3) This camera captured 1) the suspect's entry point, which was the short (West) hallway leading to an exterior door; 2) a second long hallway (South) with multiple classrooms on either side of the hall and an exterior door at the southmost end of the hall; and 3) a third hallway (East) that leads to other classrooms, restrooms, a teachers' lounge, a library, and an exterior door at the eastmost end of the hallway.*



**Figure 3. West Building Layout**

At 11:33:00, the suspect enters the school from the exterior door in the west hall while holding a rifle. The suspect looked around the hallway and then continued to walk down the west hallway before turning right (down the south hallway). The suspect walked past a series of rooms with closed doors and a firewall "break." before making his way to room 111 and 112. (ISS)

At 11:33:24, upon reaching rooms 111 and 112, the suspect fired a series of rounds from the hallway in the direction of classrooms 111 and 112. (ISS)

AR00321

LAW ENFORCEMENT RESPONSE ASSESSMENT                                    6

At 11:33:32, the suspect made entry into what appears to be classroom 111. Immediately, children's screams could be heard along with numerous gunshots in the classrooms. The rate of fire was initially very rapid then slowed, lasting only a few seconds. (ISS)

At 11:33:37, the suspect backed out of what appears to be classroom 111 into the south hallway. The suspect made a slight turn to what appears to be his left and fires a series of rounds from the hallway into classroom 112. The suspect then re-enters what appears to be classroom 111 and continues to fire what is estimated to be over 100 rounds by 11:36:04 (according to audio analysis). During the shooting the sounds of children screaming, and crying, could be heard (according to audio analysis). (ISS)



**Figure 4. Officers Initial Entry into West Building**

After the suspect made entry into the west building, three Uvalde Police Department (UPD) officers gathered on Geraldine Street (behind police vehicles) in front of the school drop-off / pick-up area. Then the officers, using a bounding overwatch tactic, move quickly (one at a time) to the west door.

At 11:35:55, all three Uvalde Police Department (UPD) officers entered the structure through the west door into the west hallway. These officers were equipped with the following: one with external armor and two with concealable body armor, two rifles, and three pistols. At 11:36:00, four officers entered the south hallway through the south door closest to the suspect. It is not clear what equipment these officers had with them. Four more officers entered the west hallway through the west door at 11:36:03. Three of these officers were from the UPD and one was from the Uvalde Consolidated Independent School District Police Department (UCISD PD). They were equipped with three external body armor carriers and one with concealable body armor and pistols. (ISS)

It did not appear that any of the officers were in possession of breaching tools, medical equipment, ballistic shields, or "go-bags." (ISS)

**NOTE:** *A "go-bag" is typically a bag or backpack that is widely used in the law enforcement community to respond to critical incidents. The "go-bag" commonly consists of spare ammunition, medical equipment, and breaching tools. The purpose of the "go-bag" is to carry equipment needed for a specialized response, when carrying that equipment on a regular basis is not feasible. Taking a "go-bag" into a crisis site facilitates the availability and implementation of these tools in a patrol response where tactical assets and teams are not readily available.*

At 11:36:04, the last shots from the initial barrage from the suspect were fired. There were seven officers in the west hallway and four officers in the south hallway. (ISS)

At 11:36:10, officers from the west and south hallway advanced to rooms 111 and 112. As the officers entered the threshold of rooms 111 and 112, they were fired upon by the suspect, who was in room 111. The gunfire at 11:37:00 and 11:37:10 drove the officers away from the threshold of room 111 and 112 and back to the west and south hallways prior to either team making contact with either room 111 or 112 classroom doors. (ISS)

At 11:38:38, the suspect concludes firing, according to audio estimates 11 rounds are fired. (ISS)

Investigators advised that two officers were injured by building material fragments caused by the suspect's rounds passing through the walls. (IOI and ISS)

Officers generally remained at the intersection of the west and south hallway and in the south hallway near the south entrance until the final assault. (IOI and ISS)

At 11:38:11, officers on scene, but outside of the hallway, call for additional assistance to include a tactical team with specialized capabilities. (BWC and UPD CS)

At 11:38:37, an officer outside of the hallway advises the suspect "is contained." (BWC)

At 11:40:58, the suspect fires 1 round according to audio estimates. (ISS)

At 11:41:30, dispatch asked via radio if the door was locked, a UPD officer responds, "I am not sure, but we have a hooligan to break it." (BWC)

At 11:44:00, the suspect fires one more round according to audio estimates. (ISS)

LAW ENFORCEMENT RESPONSE ASSESSMENT                                    8

At 11:48:18, a UCISD PD officer enters through the west hallway door and states, "She says she is shot," referring to his wife. He is escorted outside of the building. (BWC)

By 11:51:20, law enforcement from various agencies (including UPD, UCISD PD, Uvalde Sheriff's Office (USO), Fire Marshals, Constable Deputies, Southwest Texas Junior College Police Department (SWTJC PD), and the United States Border Patrol (BP) had arrived at the scene and were moving inside and out to evaluate the situation. (ISS, UPD CS, RL)

At 11:52:08, the first ballistic shield entered the west hallway. (ISS)

At 11:53:10, a Texas Department of Public Safety (DPS) special agent arrived at the perimeter and was advised to man the perimeter. Another officer makes a comment about there being kids still in the building, the DPS special agent advised, "if there is then they just need to go in."

At 11:56:49, the DPS special agent states "there's still kids over here. So, I'm getting the kids out!" (BWC)

At 12:03:51, a second ballistic shield arrives, and at 12:04:16 a third shield arrives on scene in the west hallway. (ISS)

At 12:06:16, UPD RL notes that no Command Post is set up, advised bodies needed to keep parents out. (RL)

At 12:10:17, officers in the west hallway begin passing out and donning gas masks. (ISS)

At 12:14:10, CS gas cannisters and launcher deliverable varieties are brought in. (ISS)

By 12:13:00, dispatchers had received numerous 9-1-1 calls from a child explaining that there were several children and one of her teachers deceased and another teacher hurt in room 112. (UPD 9-1-1)

At 12:15:27, it appears tactical team members of United States Border Patrol Tactical Teams (BORTAC) arrive and assist with fortifying the law enforcement position at the intersection with ballistic shields. (ISS)

At 12:20:46, a fourth ballistic shield arrives in the west hallway. (ISS)

At 12:21:08, four shots are fired by the suspect from within one of the two classrooms. (ISS)

At 12:21:22, BORTAC members move to a set of double doors within 36' of rooms 111 and 112 bringing two ballistic shields. However, no assault on the rooms was conducted. (ISS)

LAW ENFORCEMENT RESPONSE ASSESSMENT                                              9

At 12:23:35, BP medical team members began setting up medical triage in the east hallway in front of the restrooms. They had numerous backboards, medical kits, a defibrillator as well as bleeding control supplies. (ISS)

From 12:21:16 until 12:34:38, a continuous conversation takes place in the south hallway, involving UCISD PD Chief Arredondo and a UPD officer discussing tactical options and considerations including snipers, windows, and how to get into the classroom.  They also discussed who has the keys, testing keys, the probability of the door being locked, and if kids and teachers are dying or dead. (BWC)

At 12:35:39, BP agents arrive in the west hallway with the first observed breaching tool, a Halligan tool. (ISS)

From 12:37:45 until 12:47:25, UCISD PD Chief Arredondo attempts to negotiate with the suspect, speaking in English and Spanish. The Chief also calls someone to try to look into the windows from outside, he then begins asking for more keys. At 12:46:18, he exclaims, "If y'all are ready to do it, you do it. But you should distract him out that window." At 12:47:25, Chief Arredondo states, "He's going in! He's going in! Tell those guys on the west that they're going in! Let 'em know!" (BWC)

At 12:47:57, a USO deputy arrives in the west hallway with a sledgehammer. (ISS)

At 12:50:03, an ad Hoc team assaults room 111, neutralizing the suspect. The suspect had concealed himself in a book closet, he then emerged when the team made entry. Footage showed officers frantically carrying the dead and injured to the casualty collection point (CCP) in the east hallway. Some law enforcement officers rushed casualties directly through the exterior door at the end of the west hallway. It is unknown if medical personnel (EMS) were staged nearby for direct patient handoff. (ISS)

The result of this incident was 19 children and two adults killed with an additional 17 reported injuries. Additionally, the suspect was neutralized through gunfire in the assault.

## Physical Site Assessment

The investigator escorted ALERRT staff to the crime scene for a site walkthrough. As expected, there was a large quantity of dry blood on the floors in all three hallways. There were noticeable penetrating ballistic defects throughout various walls in the south hall.

The classroom doors were inset just over 36" into a 90-degree inset from the hallway to accommodate the swing of the outward opening classroom doors towards the hall. Each inset had two separate doors, side-by-side, leading into a separate classroom. The door on the left-hand side of the inset opened outward from right to left, and the door on the right-hand side of the inset opened outward from left to right as seen in Figure 5.



**Figure 5. Classroom Layout**

The classroom doors were class 2 steel doors. The classroom doors had safety glass with security wire mesh imbedded (see Figure 6). The hardware consisted of a single metal door handle locking latch, three exterior metal hinges, and a door closure device mounted to the top inside portion of the door. The door jambs were composed of steel and set in a metal stud and sheetrock wall.



**Figure 6. Class 2 Steel Door**

The door to room 111 had been removed for evidentiary purposes and collection. Once the evidence had been removed the door was left on the floor of the room. The door for room 112 was intact and in place. There was a noticeable concentration of exiting bullet defects in the area of the inset. There were noticeable bullet defects on the door jamb of classroom 111, approximately 5' from floor level. Both rooms 111 and 112 possessed an extraordinary amount of dry blood concentrated on the floor.

The exterior walls of each classroom had two 3' x 4' windows near the opposing corners of each classroom (see Figure 3). The bottom of each window was approximately 3' from interior floor level, and they were equipped with mini blinds. From the exterior, the windows were approximately 4' from ground level. The windows were composed of a heavy aluminum frame with three lateral cross beams that held four (4) 1'x3' panes of tempered glass, as seen in Figure 7.



**Figure 7. Exterior Classroom Window**

An exterior window on the right-hand side as you enter room 111 had a clear bullet defect. Based on the fragmented spiderweb pattern it was evident that the window was composed of safety glass, which fragments into small pieces when it is struck with enough force to break.

It appears the investigative teams cut out sections of sheetrock in the south hall to collect evidence. The interior walls were constructed with vertical metal studs every 16". Pink fiberglass insulation was installed between each vertical metal stud and was encapsulated between sheetrock material to form walls that separated each "paired" set of classrooms.

An assessment of the classroom closet, on the exterior wall, which is directly opposite of the classroom door, revealed that the exterior wall was cinder block on the inner portions and decorative brick on the exterior (as seen in Figure 7).

## Tactical Assessment

While the previous section detailed the timeline, the following discussion will assess different tactical issues present in the response. We will use the most recent version of our Level I manual (v.7.2) as our primary reference (ALERRT & FBI, 2020). We are breaking this discussion into three parts: 1) circumstances outside the building prior to suspect entering building, 2) initial officer response, and 3) changing environment leading to the eventual assault on room 111.

### Circumstances Before the Suspect Entered the Building

We identified three key issues that occurred prior to the suspect gaining entry to the building. First, a teacher propped open the exterior door at 11:27:14. ALERRT staff noted rocks (some of which were painted) were placed at most external doors of the building. Based on this observation, it appears that propping doors open is common practice at this school. While the teacher did kick the rock and close the door prior to the suspect making entry, and the propping open of the door did not affect what happened in this situation, circumventing access control procedures can create a situation that results in danger to students. After the teacher closed the door, she did not check to see if the door was locked. Perhaps this was because the door is usually locked. However, on this day the door was not locked, and because it was not locked, the attacker was able to immediately access the building. This again highlights the importance of not circumventing access control procedures. Even if the teacher had checked to see if the door was locked, it appears that she did not have the proper key or tool to engage the locking mechanism on the door. Finally, we note that the door was a steel frame with a large glass inlay. This glass was not ballistic glass, nor was there film on the glass to maintain the integrity of the door if the suspect shot the glass. This suggests that the suspect would have been able to gain access to the building even if the door was locked.

Second, one of the first responding officers (UCISD PD) drove through the parking lot on the west side of the building at a high rate of speed. The suspect was in the parking lot at this time, but the officer did not see him. If the officer had driven more slowly or had parked his car at the edge of the school property and approached on foot, he might have seen the suspect and been able to engage him before the suspect entered the building (ALERRT & FBI, 2020, p. 3-4.)

Third, a Uvalde PD officer reported that he was at the crash site and observed the suspect carrying a rifle prior to the suspect entering the west hall exterior door. The UPD officer was armed with a rifle and sighted in to shoot the attacker; however, he asked his supervisor for permission to shoot. The UPD officer did not hear a response and turned to get confirmation from his supervisor. When he turned back to address the suspect, the suspect had already entered the west hall exterior door at 11:33:00. The officer was justified in using deadly force to stop the attacker. Texas Penal Code § 9.32, DEADLY FORCE IN DEFENSE OF PERSON states, an individual is justified in using deadly force when the individual reasonably believes the deadly force is immediately necessary to prevent the commission of murder (amongst other crimes). In this instance, the UPD officer would have heard gunshots and/or reports of gunshots and observed an individual approaching the school building armed with a rifle. A reasonable officer would conclude in this case, based upon the totality of the circumstances, that use of deadly force was warranted. Furthermore, the UPD officer was approximately 148 yards from the west hall exterior door. One-hundred and forty-eight yards

is well within the effective range of an AR-15 platform. The officer did comment that he was concerned that if he missed his shot, the rounds could have penetrated the school and injured students. We also note that current State of Texas standards for patrol rifle qualifications do not require officers to fire their rifles from more than 100 yards away from the target. It is, therefore, possible that the officer had never fired his rifle at a target that was that far away. Ultimately, the decision to use deadly force always lies with the officer who will use the force. If the officer was not confident that he could both hit his target and of his backdrop if he missed, he should not have fired.

If any of these three key issues had worked out differently, they could have stopped the tragedy that followed. First, had the exterior door been secured, the suspect may have never gained access to the building. At the very least, the suspect would have been delayed and responding officers would have had more time to find and stop the shooter before he entered the building. The UCISD PD officer might have seen the suspect had the officer not been driving as fast or if he had approached on foot. Lastly, had the UPD officer engaged the suspect with his rifle, he may have been able to neutralize, or at least distract, the suspect preventing him from entering the building.

**Initial Response Within Building**

We identified three key issues that occurred before the suspect entered rooms 111 and 112 for the last time. First, Uvalde ISD had protocols in place requiring doors to remain locked at all times, and the school was currently on an active lockdown prior to the suspect gaining entry to the school. The suspect was still able to gain access to room 111. We received information from the investigating officer that the lock on room 111 had been reported as damaged multiple times; however, this has not been confirmed through work orders at this time. Regardless, the suspect is seen entering the room, exiting the room, and then reentering the room again prior to officers entering the building at 11:35:55. The only way to engage the lock is to insert a key from the hallway side of the door. At no point is the suspect observed entering the hallway and engaging the locking mechanism. Based upon this, we believe that the lock to room 111 was never engaged.

The second issue involves having teams of officers at both ends of the south hallway. ALERRT teaches that a single team should be in a single area of building at a time (ALERRT & FBI, 2020, pp. 2-20 to 2-26 & 7-4). Having multiple teams or splitting an existing team can create a crossfire situation. If the suspect had emerged from the classrooms, officers from both teams presumably would have opened fire resulting in a high likelihood of officers at either end of the hallway shooting officers at the other end. The teams should have quickly communicated, and officers at one end of the hallway should have backed out and redeployed to another position. Additionally, ALERRT teaches that teams consist of up to 4 members (ALERRT and FBI, 2020, pp. 4-1 to 4-27). Teams larger than 4 tend to create congestion and interfere with the ability of the team to operate quickly and effectively. Therefore, once 4 officers were in the south hallway area of the building, no additional officers were needed in that area. Additional officers should have been assigned other tasks.

The third issue revolves around losing momentum. The first three responding UPD officers enter the west hall exterior door at 11:35:55 and an additional four officers entered the south hall at

11:36:00. Audio recordings indicate the suspect was actively firing his weapon until 11:36:04. The first responding officers correctly moved toward the active gunfire, which was acting as their driving force (ALERRT & FBI, 2020, pp. 2-15 to 2-16, 2-26, 2-33). The seven officers converged on rooms 111 and 112 at 11:37:00. As the officers approached the doors, the suspect began firing. This gunfire caused both teams of officers to retreat from the doors. We note that the officers **did not** make contact with the doors (i.e., they never touched any part of the doors). The team approaching from the north fell back to the T-intersection of the west and south hallways. This position is approximately 67 feet from the doors of rooms 111 and 112. The team approaching from the south fell back to the south end of the south hallway. The team in the south hallway were not visible on camera, so their distance from the affected classrooms is unknown.

ALERRT teaches that first responders' main priority in an active shooter situation is to first **Stop the Killing** and then **Stop the Dying** (ALERRT & FBI, 2020, pp. 2-9, 2-15 to 2-16). Inherent in both stopping the killing and dying is the priority of life scale (ALERRT & FBI, 2020, pp. 2-6 & 2-34). At the top of this scale, the first priority is to preserve the lives of victims/potential victims. Second, is the safety of the officers, and last is the suspect. This ordering means that we expect officers to assume risk to save innocent lives. Responding to an active shooter is a dangerous task (Blair & Duron, 2022). There is a chance that officers will be shot, injured, or even killed while responding. This is something that every officer should be acutely aware of when they become a law enforcement officer.

To adhere to the priority of life, the first responding officers' actions should be determined based on the current driving force. In this instance, there is a suspect actively shooting inside an occupied elementary school. The active gunfire is the driving force, and the officers correctly responded to this driving force by moving toward the rooms that were being attacked.

Ideally, the officers would have placed accurate return fire on the attacker when the attacker began shooting at them. ALERRT trains the widely-used ABCs of cover – **A**ccurate return fire, **B**ody armor, and **C**over (ALERRT & FBI, 2020. p. 2-21; Blair et al., 2013). The ABCs give the first responder a tiered approach to achieving cover while maintaining control of the situation. Further, the ABCs are presented in order of preference (A first, B second, C third). As noted in Figure 6, there was a window in the center of each classroom door. Officers could have utilized the window to send accurate return fire back at the suspect. Even though the room was darker than the hallway, the suspect would have been backlit by the exterior windows and muzzle flashes would have been present. Obviously, this return fire must be consistent with the fundamental firearms safety rules (e.g., the officers must ensure that students will not be hit by the officers' return fire). Any officer with body armor should have squared their body armor to the threat to improve protection. In this situation, we don't believe the last course of action (moving to cover) was a viable option because the interior construction of the school would not stop bullets, and therefore, was not cover. Maintaining position or even pushing forward to a better spot to deliver accurate return fire would have undoubtedly been dangerous, and there would have been a high probability that some of the officers would have been shot or even killed. However, the officers also would likely have been able to stop the attacker and then focus on getting immediate medical care to the wounded.

It is not surprising that officers who had never been shot at before would be overwhelmed by the directed gunfire. This is especially the case if they had not been consistently training to deal with this type of threat. However, even after retreating, the officers were still presented with a clear driving force. The suspect was actively firing his weapon when the officers entered the building, and a reasonable officer would assume that there were injured people in the classrooms. The officers also knew the suspect was still alive and preventing them from accessing the wounded in the classrooms. These injured people are a driving force (ALERRT & FBI, 2020, p. 2-17) Once the officers retreated, they should have quickly made a plan to stop the attacker and gain access to the wounded. There were several possible plans that could have been implemented. We list a few here:

A. Perhaps the simplest plan would have been to push the team back down the hallway and attempt to control the classrooms from the windows in the doors. Any officer wearing rifle-rated body armor (e.g., plates) would have assumed the lead as they had an additional level of protection. A team of 4 officers could have utilized the windows in the doors to control a large portion of the classroom from the hallway. Two officers would have taken angular positions on each window. This would have allowed them to cover a large portion of each classroom and the officers would have been likely to see and engage the attacker. Again, this would have been dangerous, but the priority of life scale dictates that the officers assume risk to save innocent lives. It is also worth noting, the officers had weapons (including rifles), body armor (which may or may not have been rated to stop rifle rounds), training, and backup. The victims in the classrooms had none of these things. If the classroom doors were locked, some of the officers on the door windows would have been able to provide cover while the other officers breached the doors.

B. If the officers believed that they could not establish control through the doors, they should have found another way to stop the killing and dying. One option would have been to breach the exterior windows of the classrooms. Ideally, this would have involved breaking more than one window simultaneously and then raking the blinds out of the window. It is likely that the suspect would have fired at the officers, but the exterior construction of the building would have provided them with good cover. After the windows were broken (i.e., ported), the officers could have planned to simultaneously stand up in the windows to confront the attacker (i.e., cover). The room would have been substantially darker than the bright exterior conditions at the time. However, breaking the windows and raking the blinds would have increased lighting in the room. Hand-held or weapon-mounted lights could also have been used to increase visibility (see Supplementary information regarding an assessment of breaching options).

C. Both options a and b could have been done simultaneously. The window breaks could have been used to signal the start of the assault and draw the suspect's attention from the doors. The window officers would stay behind the cover of the exterior wall while the door officers had priority of fire. Then the window officers could stand and cover the rest of the room.

D. Other options (such as breaching the sheetrock walls or having an officer run past the rooms to draw fire while other officers moved up to cover the interior windows) could also have

been utilized. Each of these alternatives would have had various strengths and weaknesses but would have regained momentum for the officers.

None of these actions were taken. While it would have taken a few minutes to coordinate and execute any of these actions once the officers retreated from the rooms, taking 2, 3, 5 or even 10 minutes to do so would have been preferable to the more than an hour it took to ultimately assault the room.

We commend the officers for quickly entering the building and moving toward the sounds of gunfire. However, when the officers were fired at, momentum was lost. The officers fell back, and it took more than an hour to regain momentum and gain access to critically injured people.

**Changing Circumstances Prior to Assault**

As discussed, the situation became static at 11:38:37. Prior to this, at 11:38:11, the UCISD PD Chief called for additional assistance (tactical teams and equipment). The responding officers began treating the situation as a hostage/barricade rather than an active shooter event. The timeline shows that the shooter was killed at 12:50:03. This section will describe the escalating circumstances that unraveled over the one hour, eleven minutes, and twenty-six seconds between officers taking static positions and the moment the suspect was killed. We will detail key moments where officers' capabilities increased due to arriving equipment and personnel as well as moments where the exigency of the situation increased due to either suspect actions (e.g., firing his weapon) or additional information (e.g., injured people) being communicated to the officers inside the building.

A reasonable officer would have considered this an active situation and devised a plan to address the suspect. Even if the suspect was no longer firing his weapon, his presence and prior actions were preventing officers from accessing victims in the classroom to render medical aid (ALERRT & FBI, 2020, p. 2-17).

For the sake of argument, we will assume that officers believed the active shooter situation had transformed into a hostage barricade starting at 11:38:37. We'll also assume that officers needed additional equipment and/or trained tacticians to perform the room assault. In a hostage/barricade, officers are taught to utilize the 5 Cs (Contain, Control, Communicate, Call SWAT, Create a Plan; ALERRT & FBI, 2020, pp. 2-17 to 2-19). In this instance, the suspect was contained in rooms 111 and 112. The officers established control in that they slowed down the assault. However, the officers did not establish communication with the suspect. The UCISD PD Chief did request SWAT/tactical teams. SWAT was called, but it takes time for the operators to arrive on scene. In the meantime, it is imperative that an immediate action plan is created. This plan is used if active violence occurs. It appears that the officers did not create an immediate action plan.

**Factors Increasing Exigency**

We identified two factors that we believe increased the exigency of the situation and should have prompted officers to execute an immediate action plan. These factors were ongoing gunfire and the presence of injured people.

*Gunfire.* At 11:40:58, the suspect fired one shot. At 11:44:00, the suspect fired another shot, and finally, at 12:21:08, the suspect fired 4 more shots. During each of these instances, the situation had gone active, and the immediate action plan should have been triggered because it was reasonable to believe that people were being killed.

*Injured People.* While it is unclear whether the information from 9-1-1 about injured people in the classrooms was being communicated to officers on the inside of the school, at 11:48:18, a UCISD PD officer enters through the west hallway door and states, "She says she is shot," referring to his wife. The officer was looking at his phone when he relayed the information to the other officers in the hallway. Based on statements, he had received a call from his wife in the room. This statement illustrates officers on scene were aware of at least one injured person in need of assistance.

**Factors Increasing Capability**

In addition to information that should have increased the exigency of the situation, a variety of factors increased the capabilities of the officers while dealing with these threats. These included breaching tools, shields, tactical operators, and CS gas. Please refer to Figure 8 on page 20 for a detailed timeline of the factors that increased both exigency and officer capability.

*Breaching Tools.* A UPD officer stated that they had a Halligan at 11:41:30 when asked by dispatch if the doors were locked. This tool was not seen on camera, and if he was referring to the tool being on scene or at the UPD is unclear. A Halligan tool was captured on camera at 12:35:39. A USO deputy arrives on scene with a sledgehammer at 12:47:57. This completed the toolset needed to breach an outward opening door.

*Ballistic Shields.* The first ballistic shield arrives on scene at 11:52:08. A second ballistic shield arrived at 12:03:51, a third ballistic shield arrived at 12:04:16, and a fourth ballistic shield arrived at 12:20:46. Each ballistic shield afforded first responders additional protection from potential gunfire. We do not have information about the ballistic rating of each shield at this point.

*Tactical Operators.* While many officers flowed through the scene, the first known tactical operators (i.e., BORTAC) arrived at 12:15:27. BORTAC operators receive extensive training and equipment to respond to barricaded suspects. Additionally, it is common for tactical operations to be turned over to tactical operators upon their arrival; however, it appears that control of tactical operations was not given to the tactical operators on scene.

*CS Gas.* Between 12:10:17 and 12:14:10, gas masks were passed out and CS gas cannisters and launchers were on scene.

The assault team entered the room at 12:50:03, 1 hour, 11 minutes, and 26 seconds after the first responding officers took static positions. The assault team had keys that could unlock the door. It

does not appear that any officer ever tested the doors to see if they were locked. As we described earlier, we do not believe the door to room 111 was locked.

As this section illustrates, there were multiple points in time where the driving force increased through additional gunfire; however, officers did not act on these increases in driving force. Additionally, officers on scene continually received additional equipment and tactical components that increased their capabilities to address the suspect. Ultimately it is unclear why the officers decided to assault the room at 12:50:03. There was no apparent change in driving force or response capability at this point.

While we do not have definitive information at this point, it is possible that some of the people who died during this event could have been saved if they had received more rapid medical care. In the next part of this AAR, we intend to address that Stop the Dying portion of the response that occurred following the killing of the suspect.

Additionally, we have noted in this report that it does not appear that effective incident command was established during this event. The lack of effective command likely impaired both the Stop the Killing and Stop the Dying parts of the response. The final part of this AAR will address incident command issues.

LAW ENFORCEMENT RESPONSE ASSESSMENT                    20



**Figure 8. Exigency vs Capability Timeline**

## Supplemental Materials

## Breaching Assessment and Opportunities

The initial wave of officers in this incident worked to locate and identify the location of the suspect. However, in doing so, they were met with a difficult challenge posed by the suspect; they were being fired at while attempting to enter the classroom where the suspect, victims, and casualties were located. Furthermore, the officers did not have any breaching tools. For the purposes of this report, breaching tools refer to common tools that are expected to be carried and utilized during active shooter / active attack events. The responding officers making the initial approach did not have immediate access to ballistic shields. The officer's overall level of training is unknown at this point.

ALERRT staff conducted a series of tests at Robb Elementary School incorporating critical thinking and breaching techniques to determine possibilities that may have changed the incident outcome. ALERRT staff used non-traditional tools that can be purchased at most any hardware store or obtained from a firetruck. The tools used were a 10LB sledgehammer, a Stanley Fat Maxx, and a Halligan tool (see Figure 9).



Stanley Fat Maxx               10 Pound Sledgehammer                    Halligan Tool

**Figure 9. Breaching Tools**

### Keyed Entry

After much discussion and observation, it was clear that an unshielded officer faced imminent serious bodily injury or death if they were to attempt to unlock the door. This was proven during the initial responding officers first attempt to open the door. The breach point and inset locations in the south hall received heavy gunfire, and this breach method, <u>alone</u>, was untenable.

### Pry

ALERRT staff performed a "pry" on the door using a Stanley Fat Maxx and a sledgehammer. The breaching technique was recorded and performed relatively quickly (the door was opened in 3-4

seconds). Although the breach was conducted quickly, and a positive breach was established, there was still a substantial risk of serious bodily injury or death to officers if this breach were to be performed without a ballistic shield.

**Pry with a Distraction**

The purpose of implementing a distraction during the breach is to redirect the suspect's focus away from the breach point while the breach is performed. In this case, banging on a wall in the south hallway was used as a distraction. The distraction was initiated, and a positive breach was established relatively quickly (i.e., 3-4 seconds). When the door was opened the ALERRT staff member that was placed in the room as a suspect was focused on the wall where the distraction was performed. The distraction afforded the breachers time to perform the breach while lowering the risk of serious bodily injury or death.

**Breaching an outward opening door with a sledgehammer**

Typically, outward opening doors are breached using a pry technique. There are techniques that can be used to breach outward opening doors using a sledgehammer or ramming technique. This technique was attempted and proven to not be a viable option due to the construction of the metal door. A positive breach was not established, and performing this technique took a long time. Unshielded, the probability of serious bodily injury or death would be high.

**Wall Breaching**

Utilizing the walls in an adjoining classroom, a series of wall breaches were conducted. The purpose for a wall breach is to create a distraction prior to conducting a pry breach. Additionally, a wall breach can create a port hole allowing officers to engage the suspect through the opening.

Using a sledgehammer with the strike face toward the wall, a distraction was created by striking the wall multiple times. The strikes resulted in limited penetration to the interior wall in the adjacent classroom.

Using a sledgehammer with the strike face turned sideways, a port was created with 2-3 strikes to the wall. Any remaining insulation materials were removed by hand to clear out the opening.

Using the Stanley Fat Maxx, a distraction was performed by penetrating the sheetrock into the adjacent room with a single puncture through the wall.

It was evident that the suspect in this attack fired numerous rounds from a rifle that penetrated the sheetrock walls. These distractions/ports offer a breaching option but still come with a risk for unshielded officers.

**Pry with a window distraction**

This breaching method incorporated an exterior window breach as a distraction while simultaneously prying the classroom door. The windows were breached with a Halligan tool while the interior door was breached with a Stanley Fat Maxx and sledgehammer. The window breach added to the tactical advantage by causing the subject in the room to direct attention to the windows while the interior breach team was able to breach, enter, and address the subject.

It was found that "port and cover" on the window was challenging due to miniblinds obstructing view and unequal lighting conditions.

- Port and cover refers to breaching a window and addressing threats from that opening.
- Miniblinds or obstructions would need to be cleared with a breaching tool for a view into the room,
- The classroom was significantly darkened without artificial lighting while the exterior was relatively sunny and bright. When the exterior window was breached, the unequal lighting conditions resulted in the exterior members having diminished capabilities to see into the dark classroom to acquire a target. Raking the blinds out would increase the lighting in the room, and hand-held or weapon mounted lights could further improve lighting conditions.

**Additional Breaching Options**

**Vehicle Breaching.** The use of a motor vehicle to breach fortified locations should always be considered as a breaching option in matters of exigent circumstances and loss of life. However, in this incident, vehicle breaching was not a viable option due to the construction and layout of the school. Vehicle breaching was also not feasible because the officers were unsure where innocent children and teachers were located in the room.

**Ballistic Breaching.** The use of a 12-gauge shotgun and 00 buck is another viable breaching method that could have or may have been used with the proper equipment and training.

# References

ALERRT & FBI (2020). *Active Shooter Response – Level 1*. Version 7.2.

Blair, J. P. & Duron, A. (2022). How police officers are shot and killed during active shooter events: Implications for response and training. *The Police Journal*. DOI: 10.1177/0032258X221087827

Blair, J. P., & Martaindale, M. H. (2014). *Evaluating police tactics: An empirical assessment of room entry techniques*. Routledge.

Blair, J. P., & Martaindale, M. H. (2017). Throwing a chair could save officers' lives during room entries. *International Journal of Police Science and Management. 19*(2). DOI: 10.1177/1461355717711452

Blair, J. P., Martaindale, M. H., & Nichols, T. (2014). Active shooter events from 2000 to 2012. *Law Enforcement Bulletin*, Retrieved from http://leb.fbi.gov/2014/january/active-shooter-events-from-2000-to-2012

Blair, J. P., Martaindale, M. H., & Sandel, W. L. (2019). Peek or push: An examination of two types of room clearing tactics for active shooter event response. *Journal of Police Emergency Response. 9*(3)*. DOI: 10.1177/2158244019871052

Blair, J. P., Nichols, T., Burns, D., & Curnutt, J. R. (2013). *Active shooter events and response*. CRC Press.

Martaindale, M. H. (2015). Police considerations in active shooter events. *Royal Canadian Mounted Police Gazette. (77)*1.

Martaindale, M. H., & Blair, J. P. (Spring, 2017). Active Shooter Events in Schools. *The Journal of School Safety*. Hoover, AL: National Association of School Resource Officers.

Martaindale, M. H., & Blair, J. P. (2019). The evolution of active shooter response training protocols since Columbine: Lessons from the Advanced Law Enforcement Rapid Response Training Center. *Journal of Contemporary Criminal Justice. 35*(3), 342-356.

Martaindale, M. H., Sandel, W. L., & Blair, J. P. (2017). Active shooter events in the workplace: Findings and policy implications. *Journal of Business Continuity and Emergency Planning*. *11*(1).

# RESCUE, RESPONSE, AND RESILIENCE

A critical incident review of the Orlando public safety response
to the attack on the Pulse nightclub

Frank Straub, Jack Cambria, Jane Castor, Ben Gorban, Brett Meade, David Waltemeyer, and Jennifer Zeunik





Community Oriented Policing Services
U.S. Department of Justice



POLICE

This project was supported, in whole or in part, by cooperative agreement number 2016-CK-WX-K021 awarded by the US Department of Justice, Office of Community Oriented Policing Services. The opinions contained herein are those of the author(s) or contributor(s) and do not necessarily represent the official position or policies of the US Department of Justice. References to specific individuals, agencies, companies, products, or services should not be considered an endorsement by the author(s) or the US Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

The internet references cited in this publication were valid as of the date of publication. Given that URLs and websites are in constant flux, neither the author(s) nor the COPS Office can vouch for their current validity.

Recommended citation:
Straub, Frank, Jack Cambria, Jane Castor, Ben Gorban, Brett Meade, David Waltemeyer, and Jennifer Zeunik. 2017. *Rescue, Response, and Resilience: A Critical Incident Review of the Orlando Public Safety Response to the Attack on the Pulse Nightclub*. Critical Response Initiative. Washington, DC: Office of Community Oriented Policing Services.

Published 2017

AR00342

# Contents

Letter from the Director of the COPS Office ................................................................... v

Letter from the President of the Police Foundation .......................................................... vii

Executive Summary .......................................................................................................... x

Introduction ...................................................................................................................... 1

    COPS Office Critical Response Technical Assistance ................................................... 2

    Scope and goals of the review ..................................................................................... 3

    National and international implications ......................................................................... 4

    Methodology ................................................................................................................ 5

    Limitations of this report ............................................................................................. 5

    Report organization ..................................................................................................... 6

Timeline of Events— Sunday, June 12, 2016 .................................................................... 7

1. Incident Description ...................................................................................................... 13

    Inside Pulse moments before the attack ...................................................................... 13

    Phase I. Active shooter (2:00–2:15 a.m.) .................................................................... 14

    Phase II. Barricaded suspect with hostages (2:15–2:35 a.m.) ...................................... 22

    Phase III. Terrorism in Orlando (2:35–4:45 a.m.) ........................................................ 23

    Phase IV. The incident comes to an end (4:45–5:15 a.m.) ........................................... 29

    Phase V. Recovery and investigation ........................................................................... 31

    The aftermath ............................................................................................................. 32

2. Leadership and Relationships ........................................................................................ 34

    Decision-making ......................................................................................................... 34

    Pre-existing relationships ............................................................................................ 35

    Trust and understanding .............................................................................................. 38

    Information sharing ..................................................................................................... 39

    Unity of message ........................................................................................................ 39

Organizational awareness.................................................................................................40

Critical incident debriefs and organizational learning ....................................................42

Leadership and relationships observations and lessons learned ...................................43

3. Tactical Response and Command and Control ....................................................................47

Incident command and command posts .........................................................................47

Tactical response ............................................................................................................48

Self-deployment..............................................................................................................50

Securing victims, witnesses, and staging areas ............................................................52

The decision to negotiate or assault...............................................................................53

The final breach ..............................................................................................................57

Tactical response and command and control observations and lessons learned ..........58

4. Equipment and Training.......................................................................................................61

Equipment.......................................................................................................................61

Communications..............................................................................................................64

Training ...........................................................................................................................65

Equipment and training observations and lessons learned............................................70

5. Emergency Medical Care ....................................................................................................75

Emergency medical care observations and lessons learned .........................................78

6. Officer Safety and Post-Event Responder Wellness ..........................................................80

Officer safety...................................................................................................................80

Post-event responder wellness.......................................................................................81

Mental health incident commander .................................................................................82

Officer safety and post-event responder wellness observations and lessons learned ...83

7. Post-Event Victim Welfare ..................................................................................................86

Activation of the emergency operations center ..............................................................86

Family reunification center ..............................................................................................87

Family assistance center ................................................................................................89

Orlando united assistance center ...................................................................................91

Post-event victim welfare observations and lessons learned .........................................92

AR00344

8. Investigations ........................................................................................................................ 96

    Promising practices ........................................................................................................... 96

    Survivors and witnesses ................................................................................................... 97

    Investigations observations and lessons learned ............................................................ 98

9. Media and Public Information ........................................................................................... 100

    Media and public relations ............................................................................................. 100

    During the attack ............................................................................................................ 101

    After the attack ............................................................................................................... 102

    The following days .......................................................................................................... 104

    Elected officials .............................................................................................................. 105

    Media and public relations observations and lessons learned ..................................... 106

10. Community Engagement and Relationships .................................................................... 111

    Community-police relationships in Orlando ................................................................... 111

    Community support post-Pulse ...................................................................................... 113

    Police protection following the incident ........................................................................ 115

    Getting business back on track after the incident ......................................................... 116

    Community resilience and moving forward .................................................................... 118

    Community engagement, relationships, and resilience observations and lessons learned ........ 119

Conclusion ............................................................................................................................. 121

Appendix A. Observations and Lessons Learned ......................................................................... 122

Appendix B. Email from Chief John W. Mina to Orlando Police Department Staff .................................. 145

Appendix C. Orlando Police Department Pulse Award Ceremony Recipients........................................... 146

Appendix D. Orlando-Area First Responder Training Exercises .................................................. 154

Appendix E. Methodology........................................................................................................ 158

Appendix F. Orlando Background Information and Responding Agency Profiles .................................... 162

Abbreviations, Acronyms, and Initialisms..................................................................................... 175

About the Authors ................................................................................................................ 178

About the Police Foundation ................................................................................................... 181

About the COPS Office ......................................................................................................... 182

AR00346

# Letter from the Director of the COPS Office

Colleagues:

I don't think any of us will forget the horror of the Pulse Nightclub attack in June of 2016. This horrific act claimed the lives of 49 innocent people and injured 58 others, making it at the time the worst attack in our country since September 11, 2001. Nor should we forget the bravery, strength, and professionalism of the Orlando Police Department (OPD) and the other first responders who responded to the incident. They performed with great heroism and skill in the midst of chaos and carnage.

The OPD's response, which was appropriate and consistent with national guidelines and best practices, saved lives. And the department also learned important lessons from this event, which can be of great value to other law enforcement and public safety organizations. To share them and identify best practices for effective response to similar attacks and mass casualty events, OPD Chief John W. Mina asked the COPS Office to conduct a critical incident review.

This report, which details aspects of the event and its aftermath, underscores the need for a national conversation about law enforcement policies, practices, and training for handling acts of mass public violence and terrorism. This discussion is especially important now, in an era when we face coordinated events, multisite attacks, explosive devices, and other unforeseen threats.

The report also stresses the fact that developing partnerships before an event occurs is critical to a successful response. In addition, it notes the vital role that communication to the public plays and highlights the importance of meeting the mental health needs of officers who have been involved in mass casualty incidents.

I applaud Chief Mina for requesting this comprehensive review and thank the Police Foundation and its technical team for developing the report. Its findings and recommendations will not only benefit the OPD but can also help other agencies prepare for similar situations.

As threats of terrorism persist and our law enforcement officers and first responders continue to put themselves in harm's way to protect us, efforts such as this can help save many lives.

Sincerely,

Russ Washington
Acting Director
Office of Community Oriented Policing Services

# Letter from the President of the Police Foundation

As I write this letter on October 2, 2017, the country is learning of yet another deadly shooting that occurred last night in Las Vegas, Nevada. It now has the dubious distinction of the worst mass murder on American soil since 9/11. At this moment, Las Vegas first responders are responding to a scene where at least 58 people were killed and hundreds wounded by a gunman who fired on a large crowd at a concert.

It is unfathomable to me how frequently our first responders are confronted with responding to horrific incidents such as this one and the one that occurred at Pulse on June 12, 2016. In recent years, there have been countless domestic and international mass casualty and terrorist attacks that highlight both the worst of humanity and the best—such as the bravery and resilience demonstrated by communities like Orlando.

Like many across the nation on June 12, 2016, my heart broke as I watched the news that Sunday morning. As the sun rose, it became apparent that Orlando was at that time the site of the deadliest terrorist attack on American soil since September 11, 2001. More than 100 innocent people were shot—leaving 49 dead and 53 with gunshot wounds, as well as five people with other injuries—as part of a vicious and senseless attack at the Pulse nightclub.

The challenges confronting the principal public safety agencies responding to this incident included: transitions in the operational and tactical strategies from active shooter to barricaded suspect with hostages to terrorism; the dark and difficult layout of the nightclub; the safety and well-being of countless hostages and officers; multiple local, state, and federal agencies arriving with sometimes overlapping roles and responsibilities; and agencies with differing policies and practices using different communications systems and protocols. In addition, the constant threat of secondary attacks and explosions required decisive action with little conclusive information under extremely grisly and difficult circumstances.

While our assessment team confirmed that the Orlando Police Department's (OPD) tactical response was consistent with its policies, procedures, and training as well as recognized promising practices, the current and evolving threat environment demands that our nation's public safety agencies better prepare command personnel and first responders to prevent and respond to the next attack. It is imperative that our national homeland security, law enforcement, and public safety communities coordinate, debate, and create guidelines on the police response to acts of mass public violence and terrorism that meet this increasing and evolving threat.

Bringing new advances to policing lies at the core of the Police Foundation's mission. Central to our research and work with law enforcement agencies is the idea that it is imperative to honestly examine, analyze, and study police-involved incidents to identify "lessons learned" to continually advance the profession. The increased frequency of these incidents and the continual evolution of the challenges faced mandate that public safety agencies must continue to evolve and adapt their training and responses to meet these challenges. Certainly, that is true of this incident.

Those who responded to the Pulse that night are some of the bravest and most dedicated of public servants. Undoubtedly, their well-trained and decisive actions saved lives. It is because of the efforts of all involved in the response on June 12 that the suspect was neutralized before he could inflict more damage and devastation. This assessment—and the lessons learned—are not designed to "Monday morning quarterback." Rather, they are intended to provide a basis for careful study of the tactics used by the terrorist and the actions taken by Orlando-area public safety agencies that day. It is an effort to enhance the safety of first responders and the public at large and further aide in preparing for, responding to, and recovering from mass casualty and terrorist incidents like the one that occurred last night.

I am grateful to Orlando Police Chief John W. Mina and the OPD for their cooperation with our review. Not only were they willing to answer our questions, provide us access to their department and vital information, and provide us unwavering support but they also invited our team and our examination of the response to this attack in an effort to help advance policing response to terrorist attacks. Deputy Chief Robert Anzueto provided our team with exceptional access and support throughout the project. In addition, I am grateful to the hundreds of interviewees who generously gave us their time. They answered questions candidly, and we are forever thankful for their willingness to tell us the story of their experiences and rehash traumatizing moments. It was only through their eyes that we were able to gain a true understanding of the complexities involved. It is extremely important to acknowledge the dedication and professionalism of the many law enforcement and first responder agencies involved in this incident. In addition to the Orlando Police Department, the individuals from 26 additional agencies that responded all performed their duties valiantly. They are listed in appendix F.

I would like to express my gratitude for the hard work of our assessment team: Chief Frank Straub (ret.), PhD; Jack Cambria; Chief Jane Castor (ret.); Ben Gorban; Dr. Brett Meade; David Waltemeyer, and Jennifer Zeunik. In addition, I would like to thank our Police Foundation staff, including Blake Norton, James Burch, Rebecca Benson, Joyce Iwashita, and Siobhan Scott for their hard work and support throughout the review.

Finally, we offer this work as a tribute to the memory of the victims and survivors of the attack on Pulse, and to the resiliency of the City Beautiful. May we remember them and honor them by diligently applying the lessons learned.

Sincerely,

Chief Jim Bueermann (ret.)
President
Police Foundation

# Executive Summary

On June 12, 2016, what began as an active shooter incident when a lone gunman entered the Pulse nightclub in Orlando, Florida, and began shooting innocent club goers transitioned into a barricaded suspect with hostages incident and ended as the deadliest terrorist attack[1] on American soil since September 11, 2001. By the time the incident was over, at least one of every three people in Pulse was either wounded or killed.[2] One hundred two innocent people had been shot: 53 injured and 49 killed. The destruction that occurred on June 12 was the direct result of the shooter's actions. The decisions made and actions taken by the men and women of the Orlando Police Department (OPD) and Orlando's other law enforcement agencies embody the bravery, strength, and professionalism of our nation's law enforcement and public safety first responders as well as the strength of the Orlando community.

As demonstrated by many other events—the Boston Marathon terrorist bombings in 2013; the coordinated terrorist attacks in Paris and in San Bernardino, California, in 2015; in Brussels in 2016; in Charleston, South Carolina, in 2016 and Newtown, Connecticut, in 2012 and throughout Europe in June 2017—persons and groups motivated by violent ideological, political, or individual factors continue to commit acts of mass public violence and terrorism. Instances of mass shootings increased in both frequency and lethality during the period from 2000 to 2013, and it is undeniable that communities across the United States will continue to be the targets of these events.[3] According to a Washington Post article, there were154 mass shootings in the first half of 2017, including the June 14, 2017, attack on Republican members of Congress.[4] Still, our law enforcement officers and their public safety partners continue to put themselves in harm's way to protect the communities they serve.

---

[1] The FBI labeled the Pulse attack an act of terrorism according to 18 U.S.C. § 2331 (2009), https://www.gpo.gov/fdsys/pkg/USCODE-2009-title18/pdf/USCODE-2009-title18-partI-chap113B-sec2331.pdf.

[2] Marc Santora, "Last Call at Pulse Nightclub, and Then Shots Rang Out," *The New York Times*, June 12, 2016, https://www.nytimes.com/2016/06/13/us/last-call-at-orlando-club-and-then-the-shots-rang-out.html?_r=0; chief executives of responding agencies, interviews with assessment team members, December 15–16, 2016; witness statements to Florida Department of Law Enforcement, provided to assessment team December 15, 2016.

[3] J. Pete Blair and Katherine W. Schweit, A Study of Active Shooter Incidents, 2000–2013 (Washington, DC: Federal Bureau of Investigation, 2014), https://www.fbi.gov/file-repository/active-shooter-study-2000-2013-1.pdf/view.

[4] Christopher Ingraham, "By One Definition the GOP Baseball Shooting is the 154th Mass Shooting This Year," *The Washington Post*, June 14, 2017, https://www.washingtonpost.com/news/wonk/wp/2017/06/14/the-gop-baseball-shooting-is-the-154th-mass-shooting-this-year/?utm_term=.2447413407f8.

OPD Chief John W. Mina asked the US Department of Justice, Office of Community Oriented Policing Services (COPS Office) to conduct an independent critical incident review of the OPD's response to the attack to identify best practices and lessons learned to improve the department's planning, training, policies, procedures, and practices regarding events of this nature and magnitude. This review also provides lessons for law enforcement and public safety agencies across the nation as they prepare to face increasing acts of mass public violence and the growing threat of terrorism.

Major themes of the report include the following:

- The OPD and their law enforcement partners responded to the Pulse terrorist attack in a manner consistent with recognized promising practices under extremely volatile and difficult circumstances, saving the lives of innocent people.

- Recognizing that the threat of mass casualty and terrorist attacks represents a continuing—if not growing—threat, law enforcement must continue to evaluate and adapt training, policies, and strategies. The national homeland security, law enforcement, and public safety communities should coordinate, debate, and create guidelines on policies, procedures, practices, and training related to the police response to acts of mass public violence and terrorism. While the tactical response by the OPD was consistent with the department's policies, procedures, and training as well as recognized promising practices, the current and evolving threat environment demands that our nation's public safety agencies better prepare command personnel and first responders to prevent and respond to the next attack. Decision makers including law enforcement, fire, and emergency management leaders; local, state, and federal elected officials; and community leaders should create guidance that will help prepare first responders to operate in environments where the suspect(s) are committed to killing large numbers of innocent people, where improvised explosive devices (IED) are present, where first responders may be the target of secondary attacks, and where simultaneous multisite attacks are a reality (chapters 3 and 4).

- Collaboration, pre-existing relationships, and partnerships are a critical part of a successful, unified response to critical incidents. The OPD successfully leveraged existing relationships with federal, state, and local public safety agencies in their response to the Pulse nightclub terrorist attack (chapter 2).

- Understanding and applying the National Incident Management System (NIMS) and incident command system (ICS) is crucial to ensure that all public safety and other resources are coordinated and brought to bear in response to critical incidents (chapter 3).

- Ensure officers are trained and equipped to respond to acts of mass public violence and terrorism including being able to provide emergency medical care for people with catastrophic injuries (chapters 4 and 5).

- Control the narrative; do not let unofficial social media control information regarding the incident or the department. The OPD's communications team in close partnership with the City of Orlando's communications team used social media to inform the community, to refute false information, and to provide a message of resilience and hope (chapter 9).

- Pay attention to the needs—particularly the mental health needs—of all personnel involved in a critical incident. Resilient agencies and communities must focus on healing of all personnel engaged in the mass casualty response as well as on the healing of the community (chapters 6, 7, and 10).

The critical analysis of the response by the OPD and regional public safety agencies to the Pulse nightclub terrorist attack is intended to provide objective feedback to the OPD—not in judgement but in careful study. It is also intended to add to the growing body of literature that national and international law enforcement, public safety agencies, and the communities they serve can draw on to prepare for future acts of mass public violence and terrorism.[5]

---

[5] Access many of these reports at "Critical Incident Reviews," Police Foundation, accessed June 27, 2017, http://www.incidentreviews.org.

# Introduction

The City of Orlando, Florida, is home to approximately 270,934 people, and is the seat of Orange County, which has a population of approximately 1,288,126.[6] In addition to those who call Orlando home, many more visit and spend time enjoying the amenities the city offers. For example, Orlando has one of the largest convention centers in the nation, attracting millions of people to visit the city each year. In addition, seven of the top 25 amusement and theme parks in the world[7] are located no more than 20 miles away—including Walt Disney World, Universal Studios Florida, and SeaWorld—making Orlando one of the most popular travel destinations in the United States.[8] The University of Central Florida, one of the largest universities in the nation (based on student enrollment of more than 64,000 students) also resides in Orlando.[9] All of these features, along with the city's location in the "sun belt"[10] make Orlando's nicknames—"Theme Park Capital of the World" and "the City Beautiful"—all the more appropriate.[11]

The Orlando Police Department (OPD) protects the city with 743 sworn officers across four bureaus. According to 2016 data, that year OPD officers responded to 389,505 calls for service and made 13,092 arrests.[12] The OPD is a nationally recognized police department focused on the safety of its community. According to its website, "Our job is to protect the citizens of Orlando and we intend to accomplish that mission, even at risk to our own lives."[13] The department demonstrated this commitment on June 12, 2016.

At approximately 2:00 a.m. on June 12, a gunman entered the Pulse nightclub in downtown Orlando and began shooting innocent staff and clubgoers. The attack that began as an active shooter incident transitioned into a barricaded suspect with hostages incident and ended as the deadliest terrorist attack in the United States since September 11, 2001. By the time the incident was over, at least one out every

---

[6] "Quick Facts: Orange County and Orlando City, Florida," United States Census Bureau, accessed June 4, 2017, https://www.census.gov/quickfacts/table/PST045215/12095,1253000.

[7] Judith Rubin, *TEA/AECOM 2015 Theme Index and Museum Index: The Global Attractions Attendance Report* (Burbank, CA: Themed Entertainment Association, 2016), http://www.teaconnect.org/images/files/TEA_160_611852_160525.pdf.

[8] Jennifer Polland, "The 25 Most Popular Travel Destinations in the US," Business Insider, April 1, 2015, http://www.businessinsider.com/the-25-most-popular-travel-destinations-in-the-us-2015-3?op=1/#-portland-oregon-7.

[9] "We Are UCF," University of Central Florida, accessed June 16, 2017, https://www.ucf.edu/.

[10] Dictionary of American History, "Sun Belt," Encyclopedia.com, accessed June 2, 2017, http://www.encyclopedia.com/places/united-states-and-canada/miscellaneous-us-geography/sun-belt.

[11] "Welcome to Orlando, Florida," Visit Orlando, accessed June 4, 2017, http://www.visitorlando.com/.

[12] Orlando Police Department, *Courage. Pride. Commitment: Orlando Police Department 2016 Annual Report* (Orlando, FL: Orlando Police Department, 2017), http://fliphtml5.com/gydm/xifo.

[13] "Police Department," City of Orlando, accessed June 4, 2017, http://www.cityoforlando.net/police/.

AR00355

three people in the Pulse nightclub was either wounded or killed.[14] One hundred two innocent people had been shot: 49 people were killed and 53 injured, and another five people had non–gunshot related injuries. An OPD detective who was working an extra duty detail at Pulse that night reacted quickly to the attack, engaging the shooter and calling for assistance. OPD officers, including members of the special weapons and tactics (SWAT) team, were on scene in less than three minutes and initiated a response to the active shooter. By sunrise, 27 public safety agencies from across the region had participated in a coordinated response to extricate critically wounded patrons, rescue the hostages, and neutralize the suspect.

This report details the multiple phases of the OPD response to the incident and describes the public safety response more generally to provide context. The report examines the decisions that were made by the OPD's leadership, the actions taken to resolve the incident, and the concerted effort by the entire community to recover from the terrorist attack. It also provides observations and lessons learned from the response, identified through an independent, objective, and comprehensive analysis. The report is designed to benefit the OPD and the Orlando community as well as to provide law enforcement and public safety agencies across the nation with critical guidance and recommendations to inform the response to an increasingly complex and violent threat environment.

## COPS Office Critical Response Technical Assistance

The Office of Community Oriented Policing Services (COPS Office) established the Critical Response Technical Assistance program in 2013 to provide "targeted technical assistance to law enforcement agencies dealing with high-profile events, major incidents, or sensitive issues of varying need."[15]

The purpose of this COPS Office Critical Incident Review is to conduct a comprehensive after-action assessment of the OPD's preparation for and response to the terrorist attack that occurred on June 12, 2016, as well as the strategies and processes implemented following the event.[16]

---

[14] Santora, "Last Call" (see note 2); chief executives of responding agencies, interviews (see note 2); witness statements to Florida Department of Law Enforcement (see note 2).

[15] "Critical Response," Office of Community Oriented Policing Services, accessed June 28, 2017, https://cops.usdoj.gov/Default.asp?Item=2806. For more information about the COPS Office in general, see page 182.

[16] COPS Office, "Department of Justice to Conduct After-Action Review of Police Response to Orlando Nightclub Mass Shooting," press release, July 15, 2016, https://cops.usdoj.gov/Default.asp?Item=2878.

AR00356

## Scope and goals of the review

> "This process allows for open feedback in a constructive way and enables law enforcement officials to speak with total candor in an open forum. It allows partner agencies to give honest feedback, which leads us all closer to the ultimate goal of developing best practices for dealing with high-risk incidents in our changing world."
>
> — *John W. Mina, Chief of Police, Orlando Police Department*

This report focuses primarily on the OPD's response to the terrorist attack. However, to be thorough and complete, the report includes the broader response of the numerous local, state, and federal law enforcement agencies; other public safety organizations; the City of Orlando; and the community. Reviewing every aspect of the incident, the response, and its aftermath allows for a robust discussion of how the decisions made and actions taken by the OPD and their law enforcement partners affected the response to the terrorist attack. The review identifies observations and lessons learned for the OPD, law enforcement agencies, public safety organizations, elected officials, and the communities they serve to consider in an era of increasing acts of mass public violence and a growing terrorist threat.

In reviewing the entirety of the public safety response to this incident, the report examines current active shooter and hostage negotiation protocols within the context of a terrorist event. The review further examines leadership and interagency relationships, tactical response protocols, command and control challenges, equipment and training, emergency medical care, officer safety and post-event responder wellness, post-event victim and survivor welfare, post-incident investigations, media and public information practices, and community engagement.

The observations and lessons learned are intended to be catalysts for strengthening the OPD's policies, procedures, tactics, and operations. While the tactical response by the OPD was executed according to the department's policies, procedures, and training as well as recognized promising practices and protocols, the Pulse nightclub terrorist attack presented unconventional tactical issues that challenged decision makers to respond to a quickly developing, complex, and highly volatile incident marked by overwhelming devastation and human suffering. The response required, in some cases, that untested strategies and tactics be implemented to save the lives of seriously wounded victims and hostages and neutralize the threat.

# National and international implications

The terrorist attack on the Pulse nightclub was the deadliest attack on US soil since September 11, 2001. It is imperative that our nation learn lessons from this event that transcend political and cultural issues and focus on strengthening the security and safety of our communities. As demonstrated by events such as the Boston Marathon bombings in 2013;[17] the terrorist attacks in Paris[18] and in San Bernardino, California, in 2015[19] and in Brussels, Belgium, in 2016;[20] mass shootings in Newtown, Connecticut, in 2012 and Charleston, South Carolina, in 2016; and the terrorist attacks in early summer 2017 in Manchester and London, England[21]—persons and groups motivated by a variety of ideological, political, or individual factors represent a growing threat to our and other nations' security. Police officers will continue to be the first responders to these increasingly deadly and frequent incidents. We must ensure they have the information, equipment, and training necessary to meet the challenges ahead. This critical analysis of the OPD and other law enforcement and public safety agencies' response to the Pulse nightclub attack adds to the growing body of literature that national and international public safety agencies and communities can use to prepare for future acts of terrorism and mass public violence.

The OPD and their law enforcement partners responded to the Pulse terrorist attack in a manner consistent with recognized promising practices under extremely volatile and difficult circumstances, saving the lives of innocent people. Recognizing that the threat of mass casualty and terrorist attacks represents a continuing—if not growing—threat, law enforcement must continue to evaluate and adapt training, policies, and strategies.

---

[17] Edward F. Davis III, Alejandro A. Alves, and David Alan Sklansky, *Social Media and Police Leadership: Lessons from Boston*, New Perspectives in Policing Bulletin (Washington, DC: National Institute of Justice, 2014), https://www.ncjrs.gov/pdffiles1/nij/244760.pdf; *After Action Report for the Response to the 2013 Boston Marathon Bombings* (Boston: Massachusetts State Police, 2014), http://www.mass.gov/eopss/docs/mema/after-action-report-for-the-response-to-the-2013-boston-marathon-bombings.pdf.

[18] Global Terrorism Database, "Incident Summary: 11/13/2015," National Consortium for the Study of Terrorism and Responses to Terrorism, accessed June 3, 2017, http://www.start.umd.edu/gtd/search/IncidentSummary.aspx?gtdid=201511130008.

[19] Rick Braziel et al., *Bringing Calm to Chaos: A Critical Incident Review of the San Bernardino Public Safety Response to the December 2, 2015, Terrorist Shooting Incident at the Inland Regional Center*, Critical Response Initiative (Washington, DC: Office of Community Oriented Policing Services, 2016), https://ric-zai-inc.com/ric.php?page=detail&id=COPS-W0808; Frank Straub, Jennifer Zeunik, and Ben Gorban, "Lessons Learned from the Police Response to the San Bernardino and Orlando Terrorist Attacks," *CTC Sentinel* 10, no. 5 (May 2017), https://www.ctc.usma.edu/v2/wp-content/uploads/2017/05/CTC-Sentinel_Vol10Iss515.pdf.

[20] Pieter Van Ostaeyen, "Belgian Radical Networks and the Road to the Brussels Attacks," *CTC Sentinel* 9, no. 6 (June 2016), https://ctc.usma.edu/v2/wp-content/uploads/2016/06/CTC-SENTINEL_Vol9Iss613.pdf.

[21] Greg Myre, "Manchester Bombing Is Europe's 13th Terrorist Attack Since 2015," NPR, May 23, 2017, http://www.npr.org/sections/parallels/2017/05/23/529645904/manchester-bombing-is-europes-12th-terrorist-attack-since-2015.

## Methodology

To conduct this review, the Police Foundation in consultation with the COPS Office assembled a team of subject matter experts with extensive experience in law enforcement leadership, operations, decision-making, tactical and critical incident response, and hostage negotiations.[22] From January through April 2017, the team conducted interviews and focus groups; reviewed materials including 911 call logs, policies, procedures, and official after action reports; reviewed incident data; examined open source media related to the OPD and the incident; researched national and international promising practices and model policies; and studied after action reports from previous terrorist attacks and mass casualty incidents. Based on the analysis of this comprehensive body of information, the assessment team developed the observations and lessons learned contained in this report. A full detailed methodology can be found in appendix E on page 158.

## Limitations of this report

The OPD and supporting agencies provided the assessment team exceptional access and assistance in gathering information for this review. The OPD command staff should be commended for requesting this review and for their assistance throughout the process. Their consistent support with scheduling interviews and focus groups with relevant personnel, providing resources and images for the report, and communication and insight were invaluable to the team.

Because of ongoing criminal investigations, however, the assessment team did face restrictions regarding some of the important details regarding the June 12, 2016, terrorist attack and response. The team did not review FBI reports, intelligence, ballistics reports, evidence, crime scene documentation, or classified information related to the suspect or potential law enforcement friendly fire during the incident. These parameters were put in place to ensure that the investigations were not compromised in any way by the team's review and to maintain the integrity and focus of this report.

In addition, while the assessment team did attempt to reach out to survivors of the Pulse incident through representative advocacy groups, the OPD, victims' advocates and city liaisons, direct social media contact, family members, and other approaches, only one survivor was willing to talk with us directly. The assessment team was sensitive to the raw and fresh trauma that these individuals have suffered because of the actions of the suspect. Because of this, the assessment team did not aggressively pursue direct contact with survivors without their express consent and interest in talking with the team. The assessment team did, however, have access to and reviewed 10 witness statements provided directly to law enforcement as part of their investigations and countless media articles that included statements, video, and quotes from survivors and witnesses.

---

[22] Full bios of assessment team members can be found beginning on page 178.

## Report organization

The report begins with a full timeline of incident events; chapter 1 then provides a detailed chronology of the attack on the Pulse nightclub and the public safety response in the form of a narrative description broken up into phases that describe how the incident evolved. Phase I describes the response to the active shooter part of the incident. Phase II shows the response to a barricaded suspect with hostages. Phase III depicts the realization that this incident was an act of terrorism. Phase IV describes the final entry and neutralization of the suspect. Finally, phase V outlines the subsequent investigation and the recovery process.

Chapters 2 through 10 focus on issues that impacted the response, including leadership and interagency relationships, tactical response and command and control, equipment and training, emergency medical care, officer safety and post-event responder wellness, post-incident investigations, media and public information, and community engagement. Each of these chapters provides information on the identified topic or topics as well as important observations and lessons learned as they relate to the OPD's response to the Pulse nightclub terrorist attack. The conclusion summarizes the key themes and identifies topics that require further study.

# Timeline of Events— Sunday, June 12, 2016

The assessment team created the following timeline of the Pulse nightclub terrorist attack based on information and documents provided by the Orlando Police Department (OPD), the Orange County Sheriff's Office (OCSO), the Florida Department of Law Enforcement (FDLE), news media accounts, and other sources.[23] Unless otherwise indicated, the times and descriptions are based on the OPD timeline that has been released to the public.[24] All times are Eastern Daylight Time.

While the timeline is intended to provide a chronology of events, a more detailed description can be found in the narrative that follows it.

| | |
|---|---|
| Just before 2:00 a.m. | The suspect parked a rented car in the parking lot of the neighboring car shop, Pro Tint & Detailing, and walked south toward the Pulse nightclub. |
| 2:02 a.m. | The suspect, armed with a Sig Sauer MCX semiautomatic .223 caliber rifle (military-style rifle) and a Glock 17 (9mm) handgun, entered the Pulse nightclub through the south door. He immediately shot a patron who was standing inside the front parlor. |
| 2:02:17 a.m. | An OPD detective working extra duty at the club reported on the Patrol East radio channel: "Shots fired, shots fired, shots fired!" The police dispatcher immediately broadcast a signal 43 (officer needs immediate assistance). At this point, the OPD detective's exact location is unknown to the dispatcher and responding units. |
| 2:02:35 a.m. | The OPD detective reports "Shots fired 1912 S. Orange Ave. Shots fired, multiple down!" Over the next one minute and nine seconds, the OPD detective made three more radio transmissions, reporting that shots were being fired inside the club. |
| 2:02 a.m. | Dozens of the patrons inside Pulse ran out of the club through exits on the south side of the club, through the main entrance, through a patio on the east side, and into a fenced alleyway on the north side. One of the Pulse security officers kicked a hole in the fence, which allowed approximately 20 patrons to escape into the parking lot of a neighboring business to the north. |

---

[23] A full detailed methodology of the documents and materials reviewed, interviews and focus groups conducted, and research conducted can be found in appendix B on page 145.

[24] Orlando Police Department timeline provided by email to assessment team May 11, 2017.

AR00361

| | |
|---|---|
| 2:02 a.m. | While taking protective cover behind a vehicle in the south parking lot, the OPD detective fired several rounds at the suspect, who was standing just inside a set of double doors and continued to fire multiple shots inside the club. |
| 2:03 a.m. | According to the OPD, less than one minute and 20 seconds after the signal 43 was broadcast, the first backup officer arrived on scene. A second backup officer arrived about a minute later. |
| 2:05 a.m. | Over the radio, the OPD detective advised that the suspect had an assault rifle. The OPD detective fired three shots at the suspect as the sound of rapid fire gunshots were heard inside the club. |
| | *The gunfire inside the club stopped.* |
| 2:06 a.m. | The OPD detective assembled a contact team with three other officers and they began to approach the club from the east patio area. |
| 2:07 a.m. | The OPD special weapons and tactics (SWAT) commander—a lieutenant who was also the on-duty watch commander—arrived on scene. |
| 2:08 a.m. | A sergeant took the OPD detective's place on the initial contact team on the east side of the club. A second contact team, located on the south side of the club, was organized by the SWAT commander. The second team consisted of the SWAT commander and five officers. |
| 2:09 a.m. | The contact team on the east patio directed a patron from the main dance floor area out of the club through the patio, to South Orange Avenue. |
| | *(Total individuals rescued by law enforcement to this point: 1)* |
| 2:10 a.m. | An officer from the contact team assisted a bartender who had been hiding behind the patio bar since the shooting started. The bartender, who was not injured, was directed out of the club to South Orange Avenue. |
| | At least five additional shots fired by the suspect were heard further inside the club. The SWAT commander's team entered the club through a large window they had broken. They moved toward the sound of the gunshots. The officers believed the suspect had barricaded himself in one of two restrooms at the end of a small hallway on the west side of the club. The team positioned itself behind a bar at the end of the hallway, keeping the suspect contained in the restroom. |

One individual inside the north restroom called 911 advising that he was hiding in the handicapped-accessible stall with at least 10 other people and that the suspect was "in the bathroom. He's in the bathroom."[25] At this point, the nature of the incident transitioned to a barricaded suspect with hostages.

*No more gunshots were heard being fired by the suspect until the final breach.*

*(Total individuals rescued by law enforcement to this point: 2)*

| | |
|---|---|
| 2:14 a.m. | On the other side of the club, two officers from the initial contact team located a group of 22 patrons hiding in a restroom at the southeast corner of the main dance floor. One officer provided cover while the other officer escorted the patrons out through the east patio to awaiting officers. |

*(Total individuals rescued by law enforcement to this point: 24)*

2:15 a.m.    Officers found a person hiding behind a bar on the east patio and quickly helped him out toward South Orange Avenue.

*(Total individuals rescued by law enforcement to this point: 25)*

2:15 a.m.    At least seven people[26] in the main dance floor area were quickly extracted through the main entrance on the south side of the club or through the east patio to waiting officers and deputies.

*(Total individuals rescued by law enforcement to this point: at least 32)*

2:17 a.m.    The SWAT commander and sergeant in the west bar area fired shots at the suspect. The SWAT commander was heard yelling "Let me see your hands now!" just prior to firing his weapon.[27]

2:18 a.m.    The SWAT commander asked dispatch to initiate a "full SWAT callout."

2:18–2:28 a.m.    During this time, officers and deputies moved through the main dance floor area checking injured persons and looking for survivors. They helped at least 14 incapacitated individuals out of the club through the east patio or main entrance.

*(Total individuals rescued by law enforcement to this point: at least 46)*

---

[25] "911 transcripts (pages 1–68) from 6-12-16 (PDF)," City of Orlando, accessed June 4, 2017, http://www.cityoforlando.net/cityclerk/pulse-tragedy-public-records/.

[26] According to the OPD, it was difficult to accurately document exactly how many individuals were rescued, especially in times when there were larger groups rescued at once. Therefore, the OPD timeline uses the phrase "at least" from this point onward, and this usage is repeated in this timeline.

[27] "Pulse Police Body Camera Videos Release: June 1, 2017," City of Orlando, accessed June 2, 2017, http://www.cityoforlando.net/cityclerk/pulse-tragedy-public-records/.

| | |
|---|---|
| 2:21 a.m. | A person who had been shot was able to escape from one of the west restrooms and crawl out to the west bar, where he was helped out of the club by officers and moved into the south parking lot area. |

*(Total individuals rescued by law enforcement to this point: at least 47)*

| | |
|---|---|
| 2:25 a.m. | Three officers extracted a person hiding inside a fenced-in storage area just outside the double doors located on the south side of the club. |

*(Total individuals rescued by law enforcement to this point: at least 48)*

| | |
|---|---|
| 2:30 a.m. | An unidentified man, believed to be the suspect by the OPD,[28] called 911, spoke in a unknown language, and quickly hung up. |

| | |
|---|---|
| 2:32 a.m. | A sergeant assisted by other officers rescued five people who were hiding in the kitchenette behind the main bar. Two of the five were injured and had to be carried out; the other three, who could walk, were escorted out of the club to the east patio and were handed off to officers and deputies. |

*(Total individuals rescued by law enforcement to this point: at least 53)*

| | |
|---|---|
| 2:35 a.m. | A sergeant and assisting officers rescued six people who were hiding in an upstairs office area above the main dance floor. They were escorted across the dance floor and out the east patio to awaiting officers and deputies.[29] |

*(Total individuals rescued by law enforcement to this point: at least 59)*

| | |
|---|---|
| 2:35 a.m.[30] | The suspect called 911 and told the call-taker that he "did the shooting in Orlando." The call lasted 50 seconds. |

| | |
|---|---|
| 2:48 a.m. | The crisis negotiation team (CNT) sergeant called the suspect back. The call lasted six minutes. During the conversation, the suspect suggested he was wearing an explosive vest and claimed there was a vehicle in the parking lot with explosives inside. |

| | |
|---|---|
| 3:06 a.m. | A person who had been shot and who had been hiding in one of the west restrooms was able to crawl out to the west bar, where members of the SWAT team rescued him and brought him to officers in the south parking lot. |

*(Total individuals rescued by law enforcement to this point: at least 60)*

---

[28] After further investigation by the FBI following the incident, it was determined that this call was not made by the suspect.

[29] "Communication/911 Calls for June 12, 2016," City of Orlando, accessed June 28, 2017, http://www.cityoforlando.net/cityclerk/pulse-tragedy-public-records/.

[30] "Transcripts of Calls with Suspect 6-12-16," City of Orlando, accessed June 1, 2017, http://www.cityoforlando.net/cityclerk/pulse-tragedy-public-records/. According to the FBI, the call occurred at 2:39 a.m., but the inconsistency could be the result of the time indicated on the suspect's phone.

3:12 a.m.                Additional members of the SWAT team arrived on scene and began relieving officers and deputies inside the club.

3:13 a.m.                OPD public information officers arrived on scene and began sharing information on Twitter.

3:20 a.m.                An OPD Avatar III Tactical Robot was sent into the club to provide images of the urinal and south restroom, but it could only partially enter the restroom because of obstructions. The OPD used the public address system on the robot to advise the hostages that the police were working on a rescue.[31]

3:25 a.m.[32]            After a report indicated that gunfire was heard in the lobby of Orlando Regional Medical Center (ORMC) the hospital was locked down for approximately one hour and implemented its "code silver" active shooter plan.

3:42 a.m.                SWAT members rescued four club workers who were hiding in the north dressing room.

                         *(Total individuals rescued by law enforcement to this point: at least 64)*

4:03 a.m.                The OCSO hazardous device team (HDT) arrived on scene. A K-9 from the Greater Orlando Aviation Authority arrived on scene and alerted on the suspect's vehicle.

4:29 a.m.                A person who was held hostage inside the club sent a text message to her brother. She told her brother the suspect was going to attach four bomb vests to hostages.

Approx. 4:30 a.m.        SWAT team officers rescued a group of eight patrons hiding in a dressing room on the west side of the club, just north of the restrooms. They jarred an air conditioning unit that was protruding from the exterior wall loose and directed the people inside the dressing room to pull in the unit while SWAT team officers pushed it through the opening. Once the unit was removed, SWAT team officers pulled eight people out of the dressing room through the hole in the wall.

                         *(Total individuals rescued by law enforcement to this point: at least 72)*

---

[31] Robert Anzueto, deputy chief, Orlando Police Department, in email to assessment team members, May 31, 2017.

[32] Michael L. Cheatham, et al., "Orlando Regional Medical Center Responds to Pulse Nightclub Shooting," Bulletin of the American College of Surgeons, November 1, 2016, http://bulletin.facs.org/2016/11/orlando-regional-medical-center-responds-to-pulse-nightclub-shooting/.

| | |
|---|---|
| 4:59 a.m. | The OSCO HDT made final preparations for an explosive breach to the west wall. |
| 5:02 a.m. | The explosive charge was detonated; the wall was partially breached. |
| 5:08 a.m. | A SWAT team BEARCAT[33] began to breach the west wall. |
| 5:09 a.m. | A SWAT team officer was heard on a loudspeaker telling people inside the club to move away from the wall. |
| 5:10–5:13 a.m. | SWAT team members rescued people from the southwest restroom. |
| | *(Total individuals rescued by law enforcement to this point: at least 85)* |
| 5:14 a.m. | As another SWAT officer was widening the hole in the south restroom wall, the suspect began firing in the north restroom. The SWAT team deployed two flash-bangs (stun grenades) near the wall where the SWAT team was positioned. |
| 5:15 a.m. | SWAT team officers exchanged gunfire with the suspect, firing numerous rounds. An OPD SWAT team officer was hit in his helmet by a round fired by the suspect. The OPD reported the suspect was down after the exchange of gunfire. |
| 5:17–5:26 a.m. | People continued to be extricated from the club. An estimated total of 18 individuals were rescued from the restrooms by members of the SWAT team: approximately 13 rescued from the south restroom before the suspect was killed and approximately five rescued from the north restroom after he was killed. |
| 5:27 a.m. | All remaining individuals were extricated from the club and all of the hostages who survived were rescued. Officers withdrew from the club because of the threat of explosives. |
| | *(Total individuals rescued by law enforcement to this point: at least 90)* |
| 11:15 a.m. | The OPD SWAT, OCSO HDT, and Federal Bureau of Investigation SWAT team officially determined the Pulse nightclub and the suspect's vehicle were safe.[34] |

---

[33] "BEARCAT" is an acronym for *ballistic engineered armored response counter attack truck*, a military-style truck. Bryant Jordan, "This Armored Vehicle Punched Hole in Wall to Save Orlando Club Patrons," DefenseTech, last modified June 13, 2016, https://www.defensetech.org/2016/06/13/bearcat-made-a-lifesaving-hole-in-the-wall-for-orlando-club-patrons/.

[34] Robert Anzueto, deputy chief, Orlando Police Department, in phone call with assessment team member, October 2, 2017.

# 1. Incident Description

This chapter provides a description and renderings of the Pulse nightclub on June 12, 2016; a detailed chronology of the attack and the public safety response to serve as contextual background for the report.

## Inside Pulse moments before the attack

As the time approached 2:00 a.m., approximately 300 people—many from the Orlando-area LGBTQ and Hispanic communities—were still packed into the 4,500–square foot Pulse nightclub, enjoying the last 30 minutes of the Latin Night event.[35] As Pulse was one of the few bars in the area open to those as young as 18 (rather than requiring patrons to be 21), its 300 patrons that night were an amalgam of diverse backgrounds and ages. Some were frequent patrons of the club; others were in town from neighboring cities for the Latin Night event; and still others were in Orlando on vacation.[36]

At each of the club's three bars, patrons lined up to get their last drinks of the night as bartenders had just announced last call; some were finishing their last bites of food. Others were dancing in the three sections of the club—the main dance floor located to the right of the front entrance, known as the "Jewel Box;" the smaller "Adonis Room," located directly behind the main entrance; and the fenced-in outdoor patio area located just off the Jewel Box (see figure 1 on page 14 for the layout of the Pulse nightclub). Live entertainment was taking place on stages in the Jewel Box and the Adonis Room. The club was relatively dark, except for the rotating strobe lights. Music was blaring, a different type of music coming from each DJ in the club.[37]

---

[35] Katie Mettler, "Orlando's Club Pulse Owes its Name and Spirit to 'Loving Brother' Who Died from AIDS," *The Washington Post*, June 13, 2016, https://www.washingtonpost.com/news/morning-mix/wp/2016/06/13/more-than-just-another-gay-club-pulse-was-founded-in-her-brothers-memory-and-named-for-his-beating-heart/?utm_term=.5584125ac7e2.

[36] Witness statements to Florida Department of Law Enforcement (see note 2).

[37] Santora, "Last Call" (see note 2).

**Figure 1. Layout of Pulse nightclub**



A – South entrance/reception area

B – "Jewel Box"

C – "Adonis Room"

D – Emergency exit

E – Patio

F – North dressing rooms

G – South Restroom

H – Restroom where suspect barricaded

I – Wall that was breached

## Phase I. Active shooter (2:00–2:15 a.m.)

At approximately 2:00 a.m., just beyond the black fence of the club's patio and outdoor area, the suspect parked a rented car in the parking lot of the neighboring car shop, Pro Tint & Detailing.[38] The suspect—an almost six-foot-tall man wearing a green, blue, and white plaid dress shirt; a white T-shirt underneath; and tan cargo pants[39]—exited the vehicle and walked south through the parking lot of Pulse along the fence line (see figure 2 on page 15). It was a club he had previously cased.[40]

---

[38] Orlando Police Department timeline (see note 24).

[39] *Report of Autopsy of Omar Mir Seddique Mateen* (Orange County, FL: Office of the Medical Examiner District Nine, June 13, 2016).

[40] Federal Bureau of Investigation notes to COPS Office, provided to assessment team September 5, 2017.

AR00368

**Figure 2. Suspect's path into nightclub**



A – Suspect parked his vehicle at the neighboring Pro Tint & Detailing car shop.

B – Route suspect took from vehicle to Pulse entrance, ensuring he avoided being seen.

C – Extra duty OPD detective working security detail and his vehicle.

Photo courtesy of Orlando Police Department

At 2:02 a.m., the suspect entered the club and immediately began firing a Sig Sauer MCX semiautomatic .223 caliber rifle and a Glock 17 9mm (shown on page 16) as fast as he could pull the triggers. Some rounds struck the first victims at close range; other rounds ricocheted off the cinderblock and stucco walls, the reception desk, and the chandelier, pockmarking the walls and hitting victims.

Deeper inside the club, some patrons were not immediately startled by the shots. The staccato sound did not sound like shots being fired; some believed the sound was part of the music or a special sound effect employed by a DJ; to others it sounded like a BB gun.[41] Even some employees thought the sounds

---

[41] Michael Sallah et al., "What Happened between 2 and 5 a.m.? The Orlando Massacre, Minute by Minute," *Miami Herald*, June 15, 2016, http://www.miamiherald.com/news/state/florida/article84076637.html.



**Sig Sauer MCX rifle (L) and Glock 17 handgun (R) similar to those used by the assailant at Pulse.**

Photo of Sig Sauer MCX courtesy of Police Foundation; photo of Glock 17 courtesy of Bureau of Alcohol, Tobacco, Firearms, and Explosives

were something other than gun shots. One of the bartenders in the Adonis Room thought that there was a problem with the wiring of the speakers, and the DJ outside believed someone had set off a string of firecrackers.[42] Some in the club continued what they were doing, paying little attention to the sound.

At 2:02 a.m., still within the first minute of the attack, one of the three DJs in the club turned his music down and listened closer. With the volume lower and the sounds no longer matching the beat of the music, it was clear that it was not a special effect but something much more real.[43] The DJ turned the music off and yelled, "Run! Get out! There's a guy with a gun!"[44]

Outside, in the Pulse parking lot, an Orlando Police Department (OPD) detective who was working extra duty at the club—to provide outside security and to provide assistance to security personnel inside the club if needed—heard the shots that were being fired; at 2:02:17 a.m., he broadcast over the radio, "Shots fired, shots fired, shots fired," and requested additional officers to respond.[45] The detective told the assessment team that he immediately recognized that his Sig Sauer P226[46] 9mm handgun (shown on page 17) was no match for the .223 caliber rifle being fired inside the club and moved to a position that afforded him more cover in the parking lot. Two patrons attempted to flee through an emergency exit on the south side of the club. When the detective saw the suspect shoot them, he fired at the suspect.[47]

---

[42] Santora, "Last Call" (see note 2).

[43] Witness statements to Florida Department of Law Enforcement (see note 2).

[44] Gal Tziperman Lotan et al., "Orlando Nightclub Shooting Timeline: Four Hours of Terror Unfold," *Orlando Sentinel*, May 31, 2017, http://www.orlandosentinel.com/news/pulse-orlando-nightclub-shooting/os-orlando-pulse-nightclub-shooting-timeline-htmlstory.html.

[45] Orlando Police Department timeline (see note 24).

[46] Florida Department of Law Enforcement Investigative Report, provided by Danny Banks, special agent in charge, Florida Department of Law Enforcement, to assessment team, December 15, 2016.

[47] Detective, Orlando Police Department, interview with assessment team, January 26, 2017.



**OPD detective's Sig Sauer P226 handgun**

Photo courtesy of Orlando Police Department

Around the time the shots began, the first 911 calls began to come in. The first calls indicated the confusion and chaos inside the club regarding what was happening and the number of shooters.[48] For instance, one caller said, "They are just shooting, they are spraying bullets right now. They are spraying bullets," and questioned the cause of the shooting, saying, "It's not like a shooting it's not, like, you know what I mean."[49] Other survivors also believed that initially the shooting was a "club shooting" associated with criminal activity or specifically targeting one or more individuals, and they were confused when the shooting did not stop.[50] Call takers and dispatchers could hear the shots being fired and the chaos inside Pulse as they answered calls or held open lines with people who had been shot. A 911 operator indicated, "I still have active shooting going on in my call. You can hear the shots in the background."[51]

---

[48] Video surveillance footage from inside the club showed there was only one shooter during the entire incident.

[49] "911 transcripts (pages 1–68)" (see note 25).

[50] Heather Leigh et al., "3 Describe Chaos inside Pulse Nightclub," News4Jax, last modified June 14, 2016, http://www.news4jax.com/news/florida/3-survivors-share-stories-from-inside-pulse-nightclub; witness statements to Florida Department of Law Enforcement (see note 2).

[51] "911 transcripts (pages 1–68)" (see note 25).

As soon as OPD dispatchers heard the shots fired call, at approximately 2:02 a.m., they broadcast a signal 43 (officer needs immediate assistance) over the police radio, which is not unusual in Orlando.[52] The previous night, there had been a high-profile shooting, and many of the officers that responded to the Pulse nightclub had also responded to that incident. Many of the officers expected that similar to that call, by the time they arrived at Pulse the shooting would be over.[53] Meanwhile, call takers and dispatchers at the OPD Communications Center tried to gather information from callers inside Pulse and relayed the information to responding officers while attempting to calm the callers.[54]

Once clubgoers recognized the sound as gunfire, the club became chaotic. Still within the first minute, an employee kicked a hole through an eight-foot fence on the north side of the patio, which allowed 22 patrons to escape.[55] Patrons ran for exits (see figure 3 on page 19); hid in dressing rooms, closets, and restrooms; or ducked behind the bars. Many of them were already wounded. During this time, crammed into these hiding places, people hugged one another; screamed and yelled for help; and made calls to 911, friends, and family.

After the detective fired at the suspect, the suspect doubled back into the club and walked deeper into the Jewel Box section. He made his way through the main dance area, indiscriminately firing his weapons (a rifle and handgun). As the suspect traversed the club, at 2:05 a.m., the OPD detective engaged him again, firing from the parking lot into the club.[56] Patrons continued to escape or find a place to hide. Others fell to the ground, took cover, pretended to be dead, or had been shot. According to survivors, as the suspect moved through the Jewel Box at this time, he stood over the individuals lying on the floor and fired additional rounds into them at point-blank range without regard for whether they were alive or already dead.[57]

The suspect then continued to make his way toward the patio, moving between the main dance floor and the west bar area. He continuously fired his weapons as he moved. According to OPD estimates, calculated by listening to all of the 911 recordings, the suspect fired approximately 200 rounds in less than five minutes, stopping only to reload.[58]

---

[52] There were 14 signal 43 calls in 2015 and 21 signal 43 calls in 2016, according to Orlando Police Department computer-aided dispatch.

[53] Orlando Police Department SWAT team members, focus group with assessment team, January 24, 2017.

[54] Orlando Police Department 911 call takers and dispatchers, focus group with assessment team, February 21, 2017.

[55] Orlando Police Department timeline (see note 24).

[56] Orlando Police Department timeline (see note 24).

[57] Leigh et al., "3 Describe Chaos" (see note 50).

[58] Robert Anzueto, deputy chief, Orlando Police Department, interview with assessment team, January 25, 2017.

AR00372

**Figure 3. Location of Pulse nightclub exits**



Three additional officers arrived on scene at approximately 2:06 a.m. and formed a contact team with the detective.[59] The team staged outside the club when the shooting paused to determine the status and location of the suspect.

Approximately two minutes later, at 2:08 a.m., officers from various agencies—including members of the OPD SWAT team, the Orange County Sheriff's Office (OCSO), and the Belle Isle Police Department—arrived on scene and formed a second contact team. Also at 2:08 a.m., the initial contact team, now led by an OPD sergeant, entered the club through the patio. At just more than six minutes after the shooting began, the contact team immediately began rescuing people. They were followed approximately one minute later by the second contact team, which was led by the SWAT commander—a lieutenant who was also the on-duty watch commander. The second contact team entered through a large window in the reception area, which they broke, and headed toward the Jewel Box area to locate the suspect and assist in the rescue efforts.[60]

---

[59] Orlando Police Department timeline (see note 24).

[60] Orlando Police Department timeline (see note 24).

According to officers who entered the building, what they saw in the largest room of the club was a scene unlike any they had ever seen before. Bodies were piled up on the stage and across the dance floor; individuals with devastating wounds and deceased victims were everywhere.[61] A disco ball and colored lights were the only source of light in the otherwise dark room.[62] There was an "eerie quiet"[63]—broken only by occasional gunfire, cries for help, and ringing cell phones strewn across the floor or in the pockets of victims as friends and family tried to reach those inside the club.[64]

While they were tending to individuals in the Jewel Box, at 2:10 a.m., the contact team led by the OPD SWAT commander responded to gunshots in the Adonis Room. Upon entering the Adonis Room, they determined the shots were coming from a narrow and dimly lit hallway. Just as quickly as the shooting began, it stopped.[65] The OPD SWAT commander recalled that at this time, he believed they had contained the suspect in one of the two restrooms located at the end of the narrow hallway.[66] The SWAT commander directed the team to take up positions to cover the hallway and prevent the suspect from advancing down the hallway. The contact team also rescued two patrons who had hidden behind the bar some of the officers were using as cover.[67]

At approximately 2:10 a.m., one of the injured hostages inside the north restroom called 911. During the call, he advised that he was hiding in the handicapped-accessible stall with at least 10 other people, that he was shot in the leg and the knee, and that there were several other people who had been shot multiple times. The injured hostage was also able to provide the operator with a key piece of information referring to the suspect: "He's in the bathroom. He's in the bathroom." As the OPD operator and the Orlando Fire Department (OFD) call taker tried to keep the injured hostage calm and gather more information regarding which restroom the suspect was in, the injured hostage expressed confusion regarding who the shooter was, what was going on outside, and which restroom they were in, admitting at one point, "I don't need to hang up. I just don't know what to do." The caller was only able to say further, "It's the restroom in the nightclub, they are unisex," but was otherwise unable to identify where they were. The injured hostage stayed on the line but could not provide any additional information.[68] Information provided by the caller helped confirm that the suspect was in one of the two restrooms down the hallway where the officers had taken containment positions.

---

[61] The 49 victims who died had an average of 4.5 entry and exit wounds apiece. Orange County Medical Examiner's Office, interview with assessment team, January 27, 2017; Orlando Police Department SWAT team members, focus group (see note 53).

[62] Statement by Orlando Police Department officer, July 19, 2016, provided to assessment team by Orlando Police Department December 15, 2016.

[63] Orlando Police Department first responders, focus group with assessment team, February 23, 2017.

[64] Orlando Police Department SWAT team members, focus group (see note 53).

[65] Orlando Police Department timeline (see note 24).

[66] Orlando Police Department SWAT team members, focus group (see note 53).

[67] Orlando Police Department SWAT team members, focus group (see note 53).

[68] "911 transcripts (pages 1–68)" (see note 25).

**"Mindset is Key"**

Throughout the interviews conducted by the assessment team, Orlando Police Department (OPD) officers, Orange County Sheriff's Office deputies, other officers, and executives requested that the report describe the chaos, devastation, and horrific circumstances under which they operated during the Pulse response.

One first responder who had served three tours in the US military (Somalia, Afghanistan, and Iraq) described his experience: "I was a platoon sergeant again. I stepped out of being a cop and back into being a platoon sergeant. We were in a war zone."

From the extra duty OPD detective's initial radio call until the suspect was neutralized, OPD officers and their public safety partners operated in an overwhelming scene of human carnage and suffering. Within this environment, first responders assembled contact teams, moved toward the shooting, rescued people, and contained the suspect in a restroom at the end of a narrow and dimly lit hallway. Other officers directed severely injured survivors to exit the club if they could walk or crawl to safety. Officers outside the club, blood-soaked, assisted survivors to triage areas or transported them in their vehicles to the nearby trauma center, while others tried to explain to bystanders what was happening as more and more first responders arrived on scene. Command personnel made tactical decisions within a rapidly evolving, complex, and novel environment that presented circumstances that emergency and crisis planning had not fully anticipated.

The chaos and horror of the terrorist attack extended well beyond the nightclub. Dispatchers reported having to occasionally mute their phones to compose themselves before they continued talking with panic-stricken and sometimes critically wounded callers inside the club. The dispatchers relied on their training to keep callers calm so they could obtain critical information regarding the suspect, the location of persons hiding in the club, or the bomb vests the shooter claimed to have and provide that information to officers and command personnel at the scene.

Many of the law enforcement, fire, emergency medical services, and medical personnel interviewed by the assessment team stressed that the "mindset [of first responders] is key" to their ability to operate in overwhelming and unimaginable environments. They repeated over and over again that command personnel and officers needed to train and practice decision-making and tactics in environments that simulate, as much as possible, the realities of uncertain, devastating, and overwhelming operating environments.

_____

Source: Orlando Police Department first responders, focus group (see note 63).

At 2:14 a.m., while the second contact team remained in the Adonis Room containing the suspect, the other contact team—joined by additional officers and deputies—began clearing the patio, the Jewel

Box, and any of the other areas they could access. As one team provided security, the other triaged the injured and started rescuing those with the most critical injuries. More than 20 patrons were rescued from a restroom in the southeast corner of the Jewel Box section of the nightclub.

## Phase II. Barricaded suspect with hostages (2:15–2:35 a.m.)

At 2:18 a.m., the OPD SWAT commander initiated a full SWAT call-out as the suspect was contained in the restroom with hostages. The SWAT commander also requested that a triage team be formed to remove injured people from the club.[69]

As the triage team—consisting of officers from agencies including the Apopka, Belle Isle, Eatonville, Maitland, Winter Garden, and Winter Park Police Departments, the OCSO, and the Seminole County Sheriff's Office[70]—rescued the injured survivors, others pulled on the legs of officers and begged for help. One officer, responding to the number of severely wounded or deceased victims, told survivors, "If you're alive, raise your hand,"[71] as he continued to rescue survivors. Many of the survivors were too severely injured or in shock and unable to move by themselves, so officers and deputies carried them to the makeshift triage center, located behind the Einstein Bros. Bagels store approximately 200 feet from the club. Between 2:18 a.m. and 2:28 a.m., despite being physically exhausted from carrying severely injured individuals to the triage area,[72] officers continued, rescuing 14 people from inside the club.[73]

When the triage area became too crowded to handle the number of critically injured persons and responders administering first aid, officers and deputies loaded injured individuals into their vehicles and transported them to Orlando Regional Medical Center (ORMC), the Level 1 Trauma Center less than half a mile away. Between 20 and 25 gunshot victims were transported by law enforcement to ORMC in their vehicles.[74]

---

[69] Orlando Police Department timeline (see note 24).

[70] For a complete list of responding agencies, see appendix C on page 162.

[71] *Pulse Presentation*, Orlando Police Department, provided to assessment team December 15, 2016.

[72] Orlando Police Department and Orange County Sheriff's Office first responders, focus group with assessment team, February 22, 2017.

[73] Orlando Police Department and Orange County Sheriff's Office first responders, focus group (see note 72).

[74] Orlando Police Department Homicide Unit Supplement Report, provided by Orlando Police Department to assessment team December 15, 2016.

**The Importance of the Golden Hour**

During the response to any incident in which numerous individuals are critically injured, triage and transportation to the appropriate medical facility is of premier importance. In the medical field, it is widely believed that if paramedics transport the wounded within less than 60 minutes—known as the "golden hour"—their likelihood of survival greatly improves. First responders at Pulse were aware of this and made it a priority to extricate as many of the injured as possible from the nightclub and move them to ORMC. Within 40 minutes, all of the critically injured individuals except the hostages in the restrooms were removed. Of the 69 critically injured individuals who were removed from the club, 58 survived their injuries, a testament to the importance of the "golden hour" and a key lesson learned to preserve life.

_____

Source: Charlie Eisele, "The Golden Hour," *Journal of Emergency Medical Services*, August 31, 2008, http://www.jems.com/articles/2008/08/golden-hour.html.

At 2:20 a.m., as the club was being secured and people were being rescued, another individual—this time from inside the restroom with the suspect—called 911. The hostage advised the call taker that the suspect was reloading his weapons and that although he was no longer firing, there were injured hostages who needed medical attention.[75] One minute later, a hostage escaped from one of the restrooms down the hallway.[76]

At 2:30 a.m., 11 more persons—five who had been hiding in the drink preparation and kitchenette room behind the main bar in the Jewel Box and six who had been hiding in an upstairs office area above the main dance floor—were rescued by an OPD sergeant and a team of officers.[77] By approximately 2:35 a.m., all the critically injured individuals in the club except the hostages and the survivors in the Adonis Room area, the restrooms, and the dressing rooms—had been rescued.

At 2:35 a.m., another 911 call was answered in the Communications Center: a call that would change the nature of the incident from a barricaded suspect with hostages to a terrorist event.[78]

## Phase III. Terrorism in Orlando (2:35–4:45 a.m.)

When the 911 operator answered the call at 2:35 a.m., it was difficult for her to hear because of the noise and commotion in the Communications Center. Initially, the suspect spoke in Arabic; however, he soon switched to English and clearly stated, "I'm in Orlando and I did the shooting." When the 911 operator asked for the individual's name, he replied, "My name is, 'I pledge allegiance to Abu Bakr Al-

_____

[75] "911 transcripts (pages 1–68)" (see note 25).

[76] Orlando Police Department timeline (see note 24).

[77] Orlando Police Department timeline (see note 24).

[78] John W. Mina, chief, Orlando Police Department, and Ron Hopper, assistant special agent in charge, Federal Bureau of Investigation, emails to assessment team, December 15–16, 2016.

Baghdadi of the Islamic State'."[79] He repeated his allegiance to the leader of the Islamic State of Iraq and the Levant (ISIL) and the organization when asked for his name again. As soon as the call taker realized she was talking to someone who was claiming responsibility for the shooting, she notified her supervisors.[80] Less than one minute after the call was answered, it ended.

After hanging up, the suspect also called a local cable channel to publicly profess that he was the shooter. At approximately 2:45 a.m., the suspect told a producer, "I'm the shooter. It's me," and reaffirmed that "I did it for ISIS"—the Islamic State in Iraq and Syria[81]—before hanging up.[82]

Using geospatial triangulation capabilities within the communications center, OPD personnel verified that the cell phone call came from inside or from a location very close to the Pulse nightclub. Based on the caller's statement that he was the shooter, the location of the phone from which the call was received, and the suspect's pledge of allegiance to the Islamic State, OPD and FDLE officials began tracking down information on the cell phone's owner.[83] At 2:47 a.m., an OPD dispatcher radioed that the cell phone was listed to Omar Mir Seddique Mateen.[84]

At 2:48 a.m., an OPD crisis negotiation team (CNT) sergeant called the number, and the suspect answered. Instead of providing his name, the suspect advised the negotiator, "You're speaking to the person who pledged allegiance to the Islamic State." The suspect told the negotiator, "What's going on is that I feel the pain of the people getting killed in Syria and Iraq," and he said that he was following the example set by the Boston Marathon bombers.[85] He then told the negotiator, "There is some vehicles outside that have some bombs" and that "they can take out a whole city block almost."[86] In addition to those vehicle-borne improvised explosive devices (VBIED), the suspect told the negotiator that he had a vest similar to the ones used in Paris (alluding to the explosive vests used during the coordinated attacks at the Stade de France, Bataclan concert hall, and bars and cafes on November 13, 2015).[87] After nine minutes, the suspect ended the call. Having made two calls to 911, the suspect then used his phone to search the internet for news of the shooting.[88]

---

[79] "Transcripts of Calls with Suspect 6-12-16" (see note 30).

[80] Orlando Police Department 911 call takers and dispatchers, focus group (see note 54).

[81] The Islamic State, the Islamic State of Iraq and the Levant (ISIL), and the Islamic State of Iraq and Syria (ISIS) all refer to the same terrorist organization led by Abu Bakr Al-Baghdadi.

[82] Michael E. Miller, "'I'm the Shooter. It's Me': Gunman Called Local TV Station during Attack, Station Says," *The Washington Post*, June 15, 2016, https://www.washingtonpost.com/news/morning-mix/wp/2016/06/15/im-the-shooter-its-me-gunman-called-local-tv-station-during-attack-station-says/?utm_term=.d2c83581b594.

[83] Orlando Police Department CNT sergeant, interview with assessment team, January 25, 2017.

[84] Orlando Police Department timeline (see note 24).

[85] "Transcripts of Calls with Suspect 6-12-16" (see note 30).

[86] "Transcripts of Calls with Suspect 6-12-16" (see note 30).

[87] "Transcripts of Calls with Suspect 6-12-16" (see note 30).

[88] Orlando Police Department Homicide Unit Supplement Report (see note 74).

Given the potential of VBIEDs and other explosives, at 2:57 a.m., three K-9s were requested: one from the OPD, one from the University of Central Florida Police Department (UCFPD), and one from the Seminole County Sheriff's Office.[89] The UCFPD K-9 swept the triage area and the nearby OFD station and the area around it and moved north towards the ORMC. Meanwhile, the OPD K-9 searched the parking lot. The OPD K-9 handler advised that his dog was distracted by officers holding perimeter positions in and around the club and he was unable to determine if his dog had also alerted to the vehicle. Because of the uncertainty, an OPD sergeant requested another K-9, this one from the Greater Orlando Aviation Authority.[90] The Seminole County Sheriff's Office K-9 was used to sweep the 7-Eleven and other locations near Pulse and the Arnold Palmer Hospital.

After trying to reconnect with the suspect multiple times, at approximately 3:03 a.m., the suspect answered another call from the CNT sergeant. The suspect continued to talk about air strikes and said, "In the next few days you're going to see more of this type of action going on." Though this call lasted 16 minutes, other than the beginning of the call, the suspect and negotiator went back and forth with little substantive information exchanged as the suspect repeatedly expressed frustration about the bombings in Syria and Afghanistan, questioned the CNT sergeant, and refused to answer any questions before he hung up.[91] Each time the suspect hung up, the CNT sergeant attempted to call him back and get him on the phone, reasoning that if he was talking he wasn't shooting. At the same time that the CNT sergeant was trying to reconnect with the suspect, another member of the CNT relayed information from the calls to the command center.

At approximately 3:18 a.m., the OPD mobile command center (MCC) and CNT vehicle arrived at the scene and became operational. Both vehicles were parked in an open lot on South Orange Avenue just north of the OFD fire station and across the street from Pro Tint & Detailing and Pulse. The initial staging area was selected because it was behind OFD station 5 and near the 7-Eleven where arriving officers were checking in and the triage area in the Einstein Bros. Bagels store's parking lot. As OPD SWAT officers arrived on scene, they were directed into the club to relieve officers and deputies who had been holding their positions for more than an hour.

At approximately 3:20 a.m., the OPD sent its Avatar III Tactical Robot (shown on page 26) into Pulse to provide images of the urinal and the south restroom. The robot was able to fully enter the area with the urinal and determine that the area was clear, but because of obstructions, it could only partially enter the south restroom. The robot was equipped with two-way audio, which allowed OPD command staff to hear inside the club and to advise the hostages via a public address system that it was the police and that they were working on a rescue.[92]

---

[89] Orlando Police Department Computer Aided Dispatch Report, June 12, 2017, provided to assessment team December 15, 2016.

[90] Orlando Police Department Homicide Unit Supplement Report (see note 74).

[91] "Transcripts of Calls with Suspect 6-12-16" (see note 30).

[92] Anzueto, deputy chief, Orlando Police Department, email (see note 31).



**Avatar III tactical robot.**

Photo courtesy of RoboteX

At approximately 3:24 a.m., the suspect answered the final call that he would take from the CNT sergeant. The suspect indicated that he was annoyed with all the phone calls, recapped all his previous statements, and hung up.[93] That call lasted about three minutes.

At approximately 4:03 a.m., the K-9 from the Greater Orlando Aviation Authority arrived on scene.[94] As this was happening, the OCSO HDT arrived on scene and was notified about the K-9 alerts.[95] A member of the OCSO HDT recommended that a 1,000-foot perimeter[96] (see figure 4 on page 27) be established around the car to ensure the safety of all first responders and injured who were being triaged.[97] However, this recommendation was ignored as officers and deputies held their positions and did not back away.

---

[93] In total, the suspect spoke with authorities four times for a total of 29 minutes.

[94] The Orlando International Airport—where the Greater Orlando Aviation Authority is located—is approximately a 20–minute drive from Pulse.

[95] The OCSO HDT is primarily a part-time service and many of the members were performing their regular duties or working extra duty details at other venues throughout the county. Once they received the callout, many of them had to retrieve their equipment—including the explosives that would be used to breach the wall—and meet on scene. For more about the OCSO HDT, see the sidebar on page 49.

[96] *The IED and VBIED Threat (Improvised Explosives Device) (Vehicular Borne IED)*, CJTF-7 OIF Smart Card 4 (Camp Victory, Baghdad, Iraq: Combined Joint Task Force 7 Operation Iraqi Freedom, 2004), https://fas.org/irp/doddir/army/ied-smartcard.pdf.

[97] Orlando Police Department Homicide Unit Supplement Report (see note 74).

AR00380

**Figure 4. Perimeter recommended by OCSO HDT**



Copyright © 1995–2017 Esri. All rights reserved. Published in the United States of America.

At 4:29 a.m., a text message was sent by one of the hostages who was in the restroom with the suspect to the hostage's brother. According to the brother, the text message indicated that the suspect claimed he had four additional explosive vests that he intended to place on hostages and detonate.[98]

At approximately 4:30 a.m., OPD SWAT team members rescued a group of eight patrons hiding in a restroom on the west side of the nightclub, directly behind the restroom where the suspect was barricaded. SWAT team officers talked to the patrons in the dressing room via an employee's cell phone and told them the only safe way out was to remove the air conditioning unit from the wall and climb through the opening. The SWAT team officers and eight uninjured survivors devised a coordinated effort to loosen the unit and push it into the dressing room, where the survivors would slowly and quietly lower it to the floor in an effort not to alert the suspect. A SWAT team officer told the person on the line to ensure that all the patrons were out before he exited the room. SWAT team officers jarred the air conditioner loose, and the survivors pulled the unit into the dressing room while the SWAT team pushed

---

[98] Orlando Police Department timeline (see note 24).

it in to them. Once the unit was removed, SWAT team members assisted the eight people through the opening to safety. The last one to exit was indeed the person who had been on the phone with the OPD SWAT officer.

At approximately 4:33 a.m., based on the text message and other information received from 911 callers and survivors who had been rescued from other rooms inside Pulse regarding the possibility of IEDs and based on the K-9 alerts on the suspect's vehicle, the MCC and the CNT vehicles were moved from their initial location to an intersection further south (see figure 5 on page 29).[99] In addition, inside the MCC, the OPD command staff, fearing the imminent loss of life, changed their strategy from negotiation to taking immediate action to free the hostages and neutralize the suspect.

---

[99] Orlando Police Department Homicide Unit Supplement Report (see note 74).

AR00382

**Figure 5. Location of Orlando command post**



A – Original location of command vehicles

B – Relocated OPD command post

C—Final location of command vehicles

Copyright © 1995–2017 Esri. All rights reserved. Published in the United States of America.

## Phase IV. The incident comes to an end (4:45–5:15 a.m.)

At 4:59 a.m., the OCSO HDT squad prepared an explosive charge to breach the exterior western wall of the nightclub. Command personnel determined that an exterior breach offered a safer option than a direct assault down the narrow hallway to rescue the hostages. The HDT team detonated the charge at 5:02 a.m. Because of the wall's structure, the detonation only partially breached the wall and did not create a hole large enough for the OPD SWAT team to enter.[100] An OPD BEARCAT equipped with a ram

---

[100] Orange County Sheriff's Office hazardous device team members, focus group with assessment team, January 25, 2017.

**Figure 6. Breaches of Pulse nightclub exterior wall**



Photo courtesy of Orlando Police Department

completed the hole at 5:08 a.m.[101] The first hole was made in the hallway wall between the two restrooms. Recognizing that they had not breached the wall in the south restroom where some of the hostages were hiding, the armored vehicle was repositioned and breached a hole large enough for the OPD SWAT members to rescue the survivors (all breaches are numerically ordered in figure 6).

A SWAT team member was widening the hole in the south restroom wall, and as he was doing so the suspect started shooting from within the north restroom.[102] The SWAT team deployed two flash-bangs—one right after the other—into the hole where the hallway was located, and the SWAT commander immediately sent the BEARCAT to breach the north restroom wall.

---

[101] Orlando Police Department timeline (see note 24); Jordan, "This Armored Vehicle" (see note 33).

[102] Orlando Police Department timeline (see note 24); Jordan, "This Armored Vehicle" (see note 33). This information was also verified by a 911 caller who stated that shots were being fired in the restroom and by a Pulse nightclub survivor in an interview with the assessment team, May 3, 2017.



**OPD SWAT team officer's gunshot-damaged helmet.**

Photo courtesy of Orlando Police Department

As the first breach occurred in the north restroom wall, the suspect emerged at approximately 5:15 a.m. and engaged officers and deputies in a shootout. During the shootout, one OPD SWAT team officer was struck in his ballistic helmet by a shot fired by the suspect (the damaged helmet is shown here). The officer fell to the ground; while lying on his side, he returned fire, emptying his magazine. The SWAT officer then returned to his feet and ran approximately 10 yards to the south and reloaded his weapon. At this time, a second SWAT officer realized that his partner had been shot and had other SWAT team members remove him from the scene. Once the threat was neutralized, the SWAT officer's injury was quickly assessed, and he was transported to ORMC via an OPD pickup truck.

At 5:15 a.m., the suspect was killed.

## Phase V. Recovery and investigation

After the suspect was killed, SWAT team officers extricated hostages from the north restroom, and officers and deputies carried or assisted them to triage areas, working quickly due to the continued threat of explosives. OPD SWAT team officers and OCSO HDT personnel and the OPD Avatar III tactical robot entered the club and began searching for additional victims and any potential explosive devices. Between 5:17 a.m. and 5:26 a.m., five individuals were rescued from the north restroom and 13 from

the south restroom. At 5:27 a.m. an announcement was made over the radio that all injured and uninjured survivors—approximately 90 people—had been removed from Pulse and that officers and deputies were to back away because of the continuing possibility of IEDs.[103]

Because of the number of patrons' bags and electronic devices, the possibility of secondary devices, and the limitations on the number of personnel that were allowed inside the club, clearing Pulse was an intense and dangerous undertaking as officers and FBI agents methodically searched each victim, bag, and electronic device in the club for IEDs.[104] At 11:15 a.m. on Sunday, June 12, OPD SWAT, the OCSO HDT, and FBI SWAT team officially determined the Pulse nightclub and the suspect's vehicle safe.[105]

## The aftermath

With all survivors rescued from inside the club and receiving medical treatment at one of four area hospitals—ORMC, Florida Hospital, Dr. Phillips Hospital, and Winter Park Hospital[106]—the overall focus shifted to finding and identifying the injured and deceased and notifying their families. Because all the critically injured survivors had been transported to ORMC, and because of its proximity to Pulse, concerned family members and friends flooded the ORMC waiting room. Officers securing the perimeter also directed family and friends to ORMC (discussed further in chapter 7 beginning on page 86).

After being notified of the incident by law enforcement personnel, victim advocates from the UCFPD victim services unit responded to the four hospitals that received injured survivors. The victim advocates worked to console individuals and groups in the hospital lobbies as they waited for information and updates about loved ones. Victim advocates also collected contact information from representatives of each group as well as the names of the individuals they were waiting to hear from so that they could pass along the information they received. The director of the UCFPD victim services unit, who is also a member of the Florida Crisis Assistance Response Team, immediately initiated a statewide callout of victim advocates.[107] As a result, an additional 80 victim advocates—specially trained law enforcement officers and Spanish-speaking personnel—responded to assist the survivors and the families and friends of survivors and victims.[108]

---

[103] Orlando Police Department timeline (see note 24).

[104] Orange County Sheriff's Office hazardous device team, focus group (see note 100).

[105] Use of Force Investigation (see note 34).

[106] Individuals from the Pulse shooting received medical attention at area hospitals as follows: 35 at ORMC, 20 at Florida Hospital, two at Dr. Phillips Hospital, and one at Winter Park Hospital.

[107] University of Central Florida Police Department victim advocates, interview with assessment team, January 26, 2017.

[108] The FBI also dispatched dozens of victim advocates to assist families and victims at the Family Assistance Center at Beardall Center, Camping World Stadium, and the LGBT Center of Central Florida. They also dispatched Spanish-speaking advocates, who were essential because some family members spoke only Spanish.

As more information became available, including the names of the victims, the FDLE took the lead in making death notifications with assistance from the UCFPD victim advocates. This task was taken on by the FDLE as a way to support the response and allow the OPD to focus on duties and responsibilities at Pulse. Notifications began to be made in an unused meeting room just outside the lobby in ORMC. FDLE officials and UCFPD victim advocates soon determined that ORMC was not the appropriate place to make death notifications as distraught families and friends had to make their way back through the crowded ORMC lobby, passing other families awaiting information about their own loved ones, after they were told their loved ones had died.[109]

During planning for a mass casualty event, ORMC had previously arranged with the Hampton Inn & Suites, located less than a quarter of a mile north of the hospital, that in the event of a critical incident, hotel meeting space would be available to support a family reunification center (FRC).[110] The FDLE and the victim advocates moved to the Hampton Inn & Suites, which provided more space and a more private location in which to make the notifications.

The FDLE made as many of the notifications to victims' families in person as possible. While there were complications in doing so, because some next-of-kin were international or because of strained family relationships, 48 of the 49 notifications were made by Monday, June 13.[111]

With a city and a nation in shock, the Orlando community began the healing process in the days and weeks following the attack. Vigils and prayer services were held and volunteers donated food, blood, and time to helping survivors and families of those who lost their lives. The OPD—along with the OCSO and Florida Highway Patrol—continued to support these activities by providing security, managing parking and traffic, and ensuring temporary memorials were protected. The FRC transitioned to a family assistance center where services were provided to survivors, families, and friends. Community leaders—particularly Mayor Buddy Dyer and Police Chief John W. Mina—continued to assert, "We will not be defined by the act of a hateful murderer," and "We will be defined by how we respond and how we are responding: with love, with compassion, with unity among our city."[112]

---

[109] University of Central Florida Police Department victim advocates, interview (see note 107).

[110] Orlando Regional Medical Center emergency preparedness manager, interview with assessment team, January 26, 2017.

[111] Orange County medical examiner, interview with assessment team, January 27, 2017.

[112] Jeff Weiner, "Mayor Buddy Dyer: 'I Don't Think We Change A Bit'," *Orlando Sentinel*, June 13, 2016, http://www.orlandosentinel.com/news/pulse-orlando-nightclub-shooting/os-orlando-mass-shooting-buddy-dyer-20160613-story.html.

# 2. Leadership and Relationships

The terrorist attack at Pulse—which included threats of suicide bombers and of bomb vests being placed on hostages and possibly secreted in vehicles—unfolded in one of the most popular travel destinations in the country,[113] once again demonstrating that acts of mass public violence and terrorism can happen anywhere at any time. Leadership—both internal and public-facing—is imperative to develop and implement a cogent response to reduce chaos and save lives during a critical incident such as the Pulse nightclub terrorist attack. Leadership requires bringing a sense of composure, an awareness of individual and agency capabilities and needs, decision-making based on limited and constantly evolving information and circumstances, and calm to a highly charged, dynamic, and volatile situation.

Examples of leadership, regardless of title, can be seen throughout the response and during the days and weeks that followed the attack. During the assessment team's review, the team identified decision-making, pre-existing relationships, information sharing, trust and understanding, unity of message, self and organizational awareness, and learning from previous after action reports as key factors during the response to the attack at the Pulse nightclub.

## Decision-making

While decision-making ability is a key characteristic of any organizational leader, strength of that character is tested during critical incidents. During the terrorist attack at the Pulse nightclub, the Orlando Police Department (OPD) and partner agency leaders were forced to make decisions in an urgent, high-stakes, and unpredictable environment. Creative and decisive actions were required to resolve situations that arose as the incident played out.[114] OPD command personnel and individual first responders were required to make split-second tactical and operational decisions, often weighing bad options against worse, putting victims' safety ahead of their own.

Recent body-worn camera footage captured the intensity of the response at Pulse and the critical and difficult decisions facing officers and commanders alike. During one exchange with a bystander outside the club, one officer explained one of the many challenges of the response:

> Bystander: "Y'all is gonna shoot his [expletive]?"
>
> Officer: "We can't, ma'am."
>
> Bystander: "What do you mean, you can't?"

---

[113] Polland, "The 25 Most Popular Travel Destinations" (see note 8).

[114] Chief executives of responding agencies, interviews (see note 2).

Officer: "We can't; there's more victims in there. If we started to shoot, we might shoot other people."

Bystander: "[Expletive] go in there and shoot his [expletive], man."[115]

Orlando Police Chief John W. Mina and other command personnel made effective decisions in response to the myriad challenges that arose during the incident. As the incident progressed from an active shooter situation to a suspect barricaded with hostages to a terrorist holding hostages, the decisions became more complex and more difficult. Variables included the number of hostages; the location of the hostages in a restroom at the end of a narrow hallway; the large number and location of survivors, some critically injured, inside the club; the possibility of secondary devices inside the club and in vehicles outside; the possibility that hostages would be sent out of the restroom wearing bomb vests; the safety of his officers as they rescued individuals and prepared to rescue the hostages and engage the suspect; and the reliability of the information being provided.

As demonstrated in the Pulse response, leaders—and for that matter all personnel—must be prepared to take quick, decisive, and creative action with little to no reliable information.[116] They will often be required to choose between two or more undesirable options, and the consequences of those decisions will be significant as the lives of victims and first responders may be at stake. In addition, agency leaders must prepare their officers—at every level—to make effective decisions in uncertain and dynamic environments. "Agencies cannot wait for a complex or novel critical incident before they engage in conversations regarding decision-making and tactics. Rather, they must invest in training opportunities that create highly complex scenarios to build situational awareness, decision-making, and complex creative problem solving skills."[117]

## Pre-existing relationships

Jurisdictional and operational decisions can be contentious during routine incidents. When incidents such as the attack at the Pulse nightclub occur, a decision on who should lead the response and which agencies should play a supporting role can become particularly antagonistic. Any delay due to indecision, leadership debates, or political posturing can compound the challenges faced during a critical incident. However, jurisdictional decisions can be made expeditiously if leaders have established solid personal and professional relationships before a critical incident takes place as demonstrated during the response to the terrorist attack at Pulse.[118]

---

[115] "Pulse Police Body Camera Videos Release: June 1, 2017" (see note 27).

[116] David H. Freedman, "A Few Good Principles," Forbes.com, last modified May 29, 2000, https://www.forbes.com/asap/2000/0529/201.html.

[117] Rick Braziel, Devon Bell, and George Watson, *A Heist Gone Bad: A Police Foundation Critical Incident Review of the Stockton Police Response to the Bank of the West Robbery and Hostage Taking* (Washington, DC: Police Foundation, 2015), https://www.policefoundation.org/publication/a-heist-gone-bad/.

[118] *Police Under Attack: Southern California Law Enforcement Response to the Attacks by Christopher Dorner* (Washington, DC: Police Foundation, 2013), http://www.policefoundation.org/critical-incident-review-library/police-foundation-regional-review-of-police-response-to-the-attacks-by-christopher-dorner/.

In fact, leadership during the terrorist attack at the Pulse nightclub was similar in many ways to leadership demonstrated during the 2013 Boston Marathon bombing and the 2015 San Bernardino terrorist attack. While the OPD's Chief Mina was the incident commander, the leaders from the federal, state, and local agencies who assembled in the command center agreed that the overarching mission was to save lives, and they rallied around doing so—providing whatever resources they could to accomplish the goal. While individual law enforcement and elected officials took charge of specific aspects of the response—tactical operations and investigations; media relations and public information; setting up a centralized donation site; and providing services to the victims and their families—no single individual claimed responsibility or credit for the response.

To some degree, the OPD response was informed by the after action report that followed the Boston Marathon bombing, including the principles of swarm intelligence:

> "1. An overriding object that forges unity of mission and connectivity of action . . .
>
> 2. A spirit of generosity that rallies groups and individuals to assist one another and overcome constraints of resources, know-how, or tools to achieve the paramount mission . . .
>
> 3. Respect for the responsibilities of others, described as 'staying in one's lane' while assisting others to succeed in their lane to accomplish mission critical duties and tasks . . .
>
> 4. Neither taking undue credit nor pointing blame among key players, oftentimes portrayed as 'checking your ego at the door' . . .
>
> 5. Genuine interpersonal trust and respect developed well before the event so that existing and dependable leadership relationships, integrity and camaraderie can be leveraged during the event, often described as 'don't wait for an emergency to exchange business cards.'"[119]

The local, state, and federal law enforcement leaders involved in the response to the terrorist attack at the Pulse nightclub told the assessment team that as they faced the most challenging set of circumstances in their careers,[120] the concept of swarm intelligence—specifically the pre-existing trusting professional and personal relationships—contributed immensely to the success of the response. Every public safety leader interviewed by the assessment team reported that the biggest advantage they had while managing the response was the relationships they had developed over many years of working together and supporting one another, in whatever way needed, regardless of their title or agency affiliation. These pre-existing relationships led to the open and honest sharing of information, open discussions between federal officials and their local counterparts regarding the terrorist designation of the attack, decisions regarding who would lead the response and the terrorism investigation, what roles

---

[119] Leonard J. Marcus et al., *Crisis Meta-Leadership Lessons from the Boston Marathon Bombing Response: The Ingenuity of Swarm Intelligence* (Cambridge, MA: Harvard School of Public Health, 2014), https://cdn2.sph.harvard.edu/wp-content/uploads/sites/8/2013/04/Crisis-Leadership-Lessons_Boston-Marathon.pdf.

[120] Chief executives of responding agencies, interviews (see note 2).

and responsibilities different agencies would play, the order in which they would speak during press conferences, and how information would be provided to the media and the community. Although this was the OPD's incident to manage, some agencies self-deployed, their personnel finding jobs to do during and after the incident with little or no direction from the OPD or other command personnel. Paraphrasing the words of one command officer, first responders found a job and did it.[121]

OPD Chief Mina and Orange County Sheriff Jerry Demings have been friends and professional colleagues for many years. Prior to being elected to lead the Orange County Sheriff's Office (OCSO) in 2008, Demings served as the OPD's chief from 1998 to 2002 and as the Orange County Public Safety Director from 2002 to 2008. During Demings' tenure as chief of the OPD, Mina served as a commander under him. In 2014, Mina was appointed to lead the OPD and the positive and effective working relationship continued. The two frequently saw each other at events in the city and county, and their agencies routinely partner with one another during day to day operations. Their relationship and the operational experiences that Mina and Demings had shared during their careers facilitated decision-making and operations during the Pulse response.

As a former OCSO deputy sheriff, the special agent in charge (SAC) of the Florida Department of Law Enforcement's (FDLE) Orlando field office, Danny Banks, was also accustomed to working with Chief Mina and Sheriff Demings. After being notified about the incident, Banks arrived at the unified command center and offered assistance. In addition to deploying more than 70 agents and analysts to assist in gathering intelligence during the incident, the FDLE also assisted in victim identification and led the next-of-kin notifications. The FDLE also followed up on intelligence and investigative leads throughout the state and assisted in the location, identification, and return of victims' vehicles. The OPD and the FDLE have in place an active memorandum of understanding indicating that the FDLE will investigate all OPD officer–involved shootings.

Sheriff Don Eslinger of Seminole County responded to the UCC to offer his deputies' assistance. Eslinger, who had been sheriff for 26 years, also provided support and advice in the UCC.

At the federal level, the Federal Bureau of Investigation's (FBI) assistant special agent in charge (ASAC) of the Tampa field office—whose responsibility extended to Orlando—had long-standing, trusting relationships with both Chief Mina and Sheriff Demings. The ASAC, Ron Hopper, had worked with the two local leaders for many years prior to the attack on Pulse, including supporting both agencies during operations and facilitating antiterrorism training for both the OPD and the OCSO. The relationship between Hopper, Mina, Demings, and SAC Banks proved to be critical during the early stages of the attack at Pulse and during the weeks that followed as information was openly exchanged between the leaders and their agencies worked cooperatively.

Because of the magnitude of the attack, numerous tasks and responsibilities needed to be undertaken, and agencies were asked to assume nontraditional roles and responsibilities. For example, the Drug Enforcement Administration (DEA) took on the responsibility of assisting victims' family members and

---

[121] Chief executives of responding agencies, interviews (see note 2).

next of kin in dealing with a host of medical, insurance, financial, and other issues.[122] Over the course of 10 days, DEA agents, with assistance from the FDLE, cataloged, searched, and facilitated the release of 130 vehicles to their owners or to the next of kin of the deceased. This was done while other DEA agents assisted the FBI with witness interviews and performed other investigative responsibilities.

## Trust and understanding

Trusting and sustained relationships are not built by simply networking at a local event or exchanging pleasantries a few times a year during awards banquets or other ceremonies.[123] Rather, they are established through frequent and genuine personal contacts over time. The interpersonal relationships within the Orlando law enforcement community and between Mayor Buddy Dyer and Chief Mina were built over many years and through sustained efforts to do so. Dyer trusted and empowered Mina to lead the law enforcement response and provided assistance if and when it was needed by the law enforcement team. When the mayor was interviewed by the assessment team and asked what lessons he wanted to share he said one of the most important was "Stay out of the way of the chief – let him or her do their job."[124] Mina also discussed the importance of his relationships with other city department heads and their ability to work together to respond to the incident.[125]

In addition to developing relationships among agency heads, law enforcement leaders should encourage their personnel to develop similar relationships among their colleagues, particularly among mutual aid partners.[126] Pre-existing relationships are instrumental to ensuring that upon arriving at a scene, supervisors and commanders from different agencies can work together to address issues. Likewise, operational personnel from patrol to special operations components need to have relationships among their peers, because they will undoubtedly be the first responders on scene. As demonstrated during the initial stages of the Pulse nightclub response, officers from at least six different agencies formed entry teams and went in to the nightclub together to address the suspect, worked together to treat and rescue victims, and shared resources.[127] The seamless response was accomplished as supervisors and commanders met regularly to discuss critical incident planning and had come together after previous incidents to critically evaluate their overall performance.[128] These types of regular planning meetings, along with honest and open assessments, broke down barriers to communication and collaboration—all of which were critical to the Pulse response.

---

[122] Danny Banks, special agent in charge, Florida Department of Law Enforcement, interview with assessment team, February 21, 2017.

[123] Ron Hopper, assistant special agent in charge, Federal Bureau of Investigation, interview with assessment team, December 15, 2016.

[124] Buddy Dyer, mayor, Orlando, Florida, interview with assessment team, December 16, 2016.

[125] John W. Mina, chief, Orlando Police Department, interview with assessment team, December 16, 2016.

[126] *Police Under Attack* (see note 118).

[127] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[128] *Police Under Attack* (see note 118).

**State and Local Law Enforcement Executives and Elected Officials Security Clearance Initiative**

In response to the terrorist attack on September 11, 2001, the FBI established the State and Local Law Enforcement Executives and Elected Officials Security Clearance Initiative to provide these stakeholders with the security clearances necessary to be able to share classified information that "would or could affect their area of jurisdiction." For more information about the initiative, visit "Security Clearances for Law Enforcement," Federal Bureau of Investigation, accessed June 29, 2017, https://www.fbi.gov/resources/law-enforcement/security-clearances-for-law-enforcement.

## Information sharing

The personal and professional relationships between the leaders of the local, state, and federal law enforcement agencies that responded to the Pulse attack facilitated the seamless, immediate, and consistent flow of information throughout the incident. This was further aided by the fact that prior to this event, local and state law enforcement officials had obtained federal security clearances that allowed them to receive classified briefings from the FBI and other federal law enforcement agencies.

After the suspect called 911 and pledged his allegiance to the leader of the Islamic State of Iraq and the Levant (ISIL) and indicated that he had explosives similar to those used in other recent terrorist attacks, officials recognized that the Pulse nightclub suspect could be a terrorist. These suspicions were confirmed after he was identified and prior contacts with the FBI were confirmed. Much of the FBI's information regarding the suspect was classified; however, because local and state law enforcement leaders had obtained the appropriate federal security clearances, the FBI could share information with them regarding the suspect. This information was critical to informing many of the tactical decisions made during the incident. The law enforcement leadership group decided without hesitation that the OPD would lead the response and that, based on the determination that the incident was a terrorist attack, the FBI would take over the scene once the suspect was in custody or neutralized. During the days following the attack, the FBI held daily classified briefings, during which they updated local and state law enforcement leaders on the progress of their investigation.

## Unity of message

During and immediately following a critical incident, leadership must set the tone for the days, weeks, and months to follow.[129] Through early statements, consistent messaging, and demeanor, Mayor Dyer, Chief Mina, Sheriff Demings, and FBI ASAC Hopper set the tone of the response, which was one of calm determination, resiliency, and unity. Executives from other city and county agencies aligned in support

---

[129] Braziel, Bell, and Watson, *A Heist Gone Bad* (see note 117).

of this message and ensured that their agencies were available to provide any required resources.[130] Other political officials, including the governor, were also supportive of the unified message and response and allowed responding public safety agencies to perform their responsibilities without interfering in the decision-making and tactical processes. Demonstrating unity and cooperation between public safety leadership and political officials was essential in gaining the confidence of the community.[131]

All of the city and county leaders interviewed by the assessment team said they recognized early on that they had to come together and present a unified front to show consistency in their messaging. Yet again, pre-existing relationships proved beneficial when deciding who would conduct media briefings and what information should be conveyed to the media and the public. Before each media briefing, the speakers and their respective staffs—including Chief Mina and the OPD public information officers (PIO)—collaborated to determine the order in which participants would speak and what information would be shared. All participants understood their roles and remained on message. Effective and consistent messaging by the leadership team created confidence in the Orlando community and the nation as they wrestled with this tragic event (more about the public information and media relations in chapter 9 beginning on page 100).

## Organizational awareness

The days, weeks, and months following a high-profile critical incident can be overwhelming for city and public safety leaders. Many additional political and community-related obligations and responsibilities follow a critical incident, often pulling agency leaders further away from their organizations. The OPD and other public safety officials were also asked to attend numerous community and political events in recognition of their leadership and their department's performance during the incident. As a result, leaders must recognize the need to balance the attention they give to external responsibilities with the time they spend within their agency communicating with and caring for their personnel.[132]

Managing time between external events and internal agency activities can be accomplished by identifying opportunities—such as roll calls and other events—to personally recognize agency personnel for their efforts, answer questions, and check on their well-being regardless of the role they played. Beginning on the night of June 12, 2016, Chief Mina emailed the entire OPD staff to express his gratitude for all of their work.[133] Mina and the command staff also met personally with dozens of officers and civilians both formally and informally in the days and weeks afterward, including at the beginning of the Critical Incident Stress Management debriefings and before then FBI Director James Comey spoke with hundreds of officers. Mina also made several visits to the OPD Communications Center and personally thanked the 911 call takers and dispatchers on each visit. Beginning in July 2016, Mina also met with

---

[130] Orlando Police Department, Orlando Fire Department, and City of Orlando public information officers and communications personnel, focus group with assessment team, February 23, 2017.

[131] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[132] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[133] See appendix B for the full text of Chief Mina's email to the staff.

groups of 40 to 50 officers at a time as part of his regularly scheduled Chief's Message portion of in-service training, in which he dedicated the majority of the time to thanking and praising everyone for the role they played in the response to the Pulse terrorist attack—even if they were not on the scene—and stressed the importance of letting the command staff know of heroism or other extraordinary acts that were deserving of recognition. He was aware that often not everyone is recognized after large critical incidents.

Chief Mina continued to seek ways to acknowledge and support OPD personnel involved in the Pulse response when he requested the US Department of Justice, Office of Community Oriented Policing Services (COPS Office) provide peer-to-peer technical assistance to discuss recognition opportunites and officer mental health with leaders of other agencies who had been through similar large-scale mass casualty incidents. Many tactical team members were honored for their response and teamwork, and some individual officers were given city and community awards for bravery. It should be noted, however, that during assessment team interviews conducted before May 2017, some OPD personnel expressed concern that not everyone felt they had been properly thanked or recognized for their actions during or after the incident.[134] On May 5, 2017, more than 300 individual and team awards were given at the OPD Pulse Award Ceremony.[135] This agency recognition and employee engagement facilitated the healing process and fostered esprit de corps. Agency leaders should be aware that while they must work to acknowledge all contributions to the response, some individuals may still feel as if they were not acknowledged in a way that they felt they deserved.

Another aspect of organizational awareness involves law enforcement leaders assessing and testing the strengths and needs of their agencies as well as those of their their mutual aid partners to build a regional response capability. During a critical incident, the number of tasks that need to be accomplished and the amount of resources required to manage the incident can grow quickly as the incident evolves and in the days, weeks, and months that follow. Few agencies have all of the resources to manage a major critical incident and its aftermath. Therefore, agencies should train and plan with their mutual aid partners to identify the resources they may need to call on in response to a critical incident.[136]

It is critical that interagency planning and training consider resources beyond those found in the law enforcement community. The disconnect between OPD leadership and the leadership of the Orlando Fire Department (OFD), for example, affected the overall response. Because of miscommunication within the fire department chain of command, the chief of the OFD was not notified about the ongoing incident, and he did not arrive on scene until well after the suspect was neutralized. In addition, the OPD

---

[134] On May 5, 2017, the OPD formally recognized the personnel and agencies that contributed to the Pulse response.

[135] This event had originally been scheduled for January 2017, but because an officer was killed in the line of duty it had to be postponed. See appendix C for the full list of OPD Pulse Award Ceremony awards and recipients.

[136] Frank Straub et al., *Managing the Response to a Mobile Mass Shooting: A Critical Incident Review of the Kalamazoo, Michigan, Public Safety Response to the February 20, 2016, Mass Shooting Incident* (Washington, DC: Police Foundation, 2017), https://www.policefoundation.org/publication/managing-the-response-to-a-mobile-mass-shooting/.

and OFD maintained separate command posts for several hours, which exacerbated the lack of coordination between police, fire, and emergency medical services (EMS) command personnel and first responders during the incident.

## Critical incident debriefs and organizational learning

The attack on the Pulse nightclub challenged Orlando public safety leaders and their personnel as they confronted threats and other issues they had not previously encountered. However, many members of the command staff, mid-level leaders, members of specialized teams, and patrol officers advised the assessment team that they had studied critical incident debriefs and reports from similar incidents and believe that, as a result, they were better prepared for some of the challenges that emerged during the incident.[137] In fact, some of the OPD command staff and special weapons and tactics (SWAT) team members indicated that they had read the assessment of the San Bernardino terrorist attack published by the COPS Office and the Police Foundation[138] as well as other after action reports going back as far as the Columbine High School attack in Colorado in 1999. SWAT personnel and some patrol officers said they responded instinctively during the incident because they had participated in training scenarios drawn from the after action reports.[139] The OPD, for example, had conducted in-service training—in some cases ad hoc training—for patrol officers responding to active shooter events with high levels of environmental stimulation—darkness, alarms, people screaming and asking for help, simulated devastating injuries, etc. In addition, members of the command staff had reviewed the movie theater shooting in Aurora, Colorado, in 2012 and noted the need to transport critically injured victims to a trauma center if it was close to the incident scene, rather than staging, which led to officers quickly transporting critically injured victims to the trauma center in lieu of delaying treatment while waiting for EMS resources to arrive on scene. Likewise, in their review of the San Bernardino terrorist attack, OPD personnel noted the importance of keeping ingress and egress open for ambulances, fire apparatus, and specialized response vehicles.[140]

After the terrorist attack at Pulse, some of the agencies involved conducted independent after action reviews of their agency's performance. In particular, OPD Chief Mina—who acknowledged learning from critical incident reviews of previous mass casualty and terrorist attacks—requested this COPS Office independent and comprehensive after action assessment of his agency's response. He also acknowledged that a lesson learned from this incident was that a multiagency after action review (AAR) would be a powerful organizational learning tool for all involved. He suggested that the AAR include all

---

[137] Access more after action and critical incident assessment reports at "Critical Incident Reviews," Police Foundation, accessed June 27, 2017, http://www.incidentreviews.org.

[138] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[139] OPD SWAT team members and OPD watch commanders, anonymous focus groups with assessment team, January 24, 2017.

[140] OPD SWAT team members, anonymous focus group (see note 139).

responding organizations and stakeholders to enable each organization to view the incident response from others' perspectives.[141] Critically assessing the response to a major incident is commendable and essential to learning and improving individual agency, regional, and national response capabilities.

## Leadership and relationships observations and lessons learned

**Observation 2.1. OPD responders, and leaders in particular, took creative and decisive action under dire, complex, and dynamic circumstances with little to no reliable information.**

*Lesson learned 2.1.1. Responders and their leaders will be required to quickly make creative decisions with little to no reliable information under constantly changing and sometimes horrifying circumstances. These decisions could mean life or death for victims, department personnel, and bystanders.*

*Lesson learned 2.1.2. Leaders should prepare and empower their command staff and responders—at every level of the organization—to make decisions under difficult circumstances through training and practices that focus on critical thinking, situational awareness, and collaboration.*

**Observation 2.2. OPD leadership used the tenets of "swarm intelligence"—particularly pre-existing professional relationships with Orlando-area federal, state, and local leaders—to respond to the terrorist attack at Pulse nightclub.**

No agency or leader claimed the spotlight or special recognition for their role. Leaders agreed that the overarching mission was to save lives, and they rallied around doing so—providing whatever resources they could to accomplish the goal.

*Lesson learned 2.2.1. Response to and management of critical incidents are greatly enhanced when pre-existing relationships exist between leaders and supervisors from all potential first responder agencies.[142] Each leader involved in the response indicated that pre-existing relationships and trust amongst leaders enhanced decision-making, identifying steps that needed to be taken, allocation of resources, and delineation of roles and responsibilities for each agency.*

*Lesson learned 2.2.2. Mutual trust and respect between agency leaders and command personnel within and across agencies, along with trust among line-level personnel working toward a unified goal, are overarching components for reducing competing interests and ensuring a collaborative response.[143]*

---

[141] John W. Mina, chief, Orlando Police Department, interview with assessment team, December 16, 2016.

[142] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[143] *Police Under Attack* (see note 118).

**Observation 2.3. Sharing classified information and intelligence during the response to the Pulse terrorist attack informed tactical operations and led to the seamless transition of on-scene leadership from the OPD to the FBI once the incident was resolved.**

*Lesson learned 2.3.1. Ensuring that public safety leaders possess the necessary security clearances prior to a critical incident facilitates information sharing before, during, and after a terrorist incident. Incidents involving terrorism and federal law enforcement will require leaders to possess security clearances to participate in classified briefings.*

**Observation 2.4. Through early and consistent unified messaging, Orlando Mayor Dyer and OPD Chief Mina set the tone for the response from their agencies, the Orlando community, and the nation.**

Orlando leaders set the tone of calm determination, resiliency, and unity in the face of the tragic event. Responding agency executives from the city and the county aligned in support, as did community leaders. In addition, other political officials, including the governor, were supportive and allowed responding agencies to perform their responsibilities without interfering in the decision-making and tactical processes.

*Lesson learned 2.4.1. Leadership and unity of message before, during, and immediately following a critical incident set the tone for the days, weeks, and months to follow.[144]*

*Lesson learned 2.4.2. Demonstrating unity and cooperation between public safety leadership and political officials is essential to gaining the confidence of the community.*

**Observation 2.5. In the hours during the Pulse attack as well as in the days and months following it, OPD command staff have been faced with enormous demands on their time, energy, and focus.**

In addition to their regular duties, OPD leaders have attended hundreds of Pulse-related events, traveled around the world to make presentations to law enforcement and security professionals about the response to the attack, and addressed many additional requests. This requires a delicate balance of organizational awareness, continuing to run a large agency, helping their employees recover, and being responsive to their own personal and family commitments.

*Lesson learned 2.5.1. Leaders must recognize the need to balance the attention they give to external responsibilities with the time they spend within their agency, communicating with and caring for their personnel, their community, and themselves.*

The hours during and days, weeks, and months following a high-profile incident can be overwhelming, requiring leaders to balance the increased demands on their time, focus, and energy as well as that of their organization.[145]

---

[144] Braziel, Bell, and Watson, *A Heist Gone Bad* (see note 117).

[145] NAMI (National Alliance on Mental Illness), *Preparing for the Unimaginable: How Chiefs Can Safeguard Officer Mental Health Before and After Mass Casualty Events* (Washington, DC: Office of Community Oriented Policing Services, 2016), https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P347.

*Lesson learned 2.5.2. Some OPD personnel expressed concern for the limited attention and recognition command staff gave to those who responded to the Pulse attack.*

Command staff should take extra steps to personally acknowledge the efforts of all individuals who played a role in the response.[146]

**Observation 2.6. OPD leaders were aware of their internal resources and capabilities and used them effectively to address many of the challenges that arose during the response to the Pulse attack, but they acknowledged that awareness could be improved in other areas.**

For example, OPD leaders relied on the OCSO hazardous device team (HDT) to conduct the explosive breach, but they admitted that they had not trained on a regular basis with the HDT. This led to some confusion and lack of coordination during the final assault. On the other hand, some agencies sent duplicative resources that went unused while other resources were needed—particularly by public information officers—but were unavailable. The number of tasks that needed to be accomplished and the amount of resources required grew within—and especially between—the phases of the response, requiring greater familiarity, collaboration, and interagency training in preparation for critical incidents.

*Lesson learned 2.6.1. Assessing and testing the strengths and needs of your own agency and surrounding first responder agencies in preparation for a critical incident can expedite mutual aid, facilitate interagency coordination, streamline operations, and identify deficits in regional resources.*

For example, both OPD SWAT and the OCSO HDT acknowledged the need for regular training between their teams to improve joint operations during routine and crisis events.

*Lesson learned 2.6.2. Conducting executive level, multiagency tabletop exercises—including elected and appointed officials as well as department heads from other government agencies—in preparation for a critical incident can help define roles and responsibilities, identify available resources, and have an agreed-upon incident command system in place.[147]*

Regional planning exercises helped Orlando public safety leaders strengthen relationships and operations and identify resources as well as the roles various agencies would play in a multiagency response to a critical incident.

*Lesson learned 2.6.3. Interagency planning and training should consider access to resources beyond those found in the law enforcement community.*

For several hours, the chief of the OFD was not notified about the ongoing incident, and the OFD established a separate incident command post, which exacerbated lack of coordination between police, fire, and EMS leaders and command staff. Greater emphasis must be placed on ensuring that unified command includes agencies outside of law enforcement, including fire, EMS, and other critical agencies, to ensure a multidisciplined response and the use of all public safety assets and capabilities as soon as practical during a critical incident.

---

[146] Braziel, Bell, and Watson, *A Heist Gone Bad* (see note 117).

[147] Braziel et al., *Bringing Calm to Chaos* (see note 19).

**Observation 2.7. The OPD prioritized studying and learning from AARs and debriefs and crafted training and exercises based on them to prepare for critical incidents.**

The OPD began conducting tabletop and reality-based training for patrol officers on active shooter events following the Columbine High School shooting in 1999. In more recent exercises, the OPD focused on responding to such incidents with high levels of environmental stimulation—darkness, alarms, people screaming for help, and simulated devastating injuries. Members of the OPD command staff reviewed the Aurora movie theater shooting and the San Bernardino terrorist attack and implemented many of the lessons learned from those reports in this response. Chief Mina also asked for this incident review to be conducted in an effort to continue to learn from the Pulse tragedy and so that he could share those lessons with his peers nationwide.

> *Lesson learned 2.7.1. Identify and implement promising practices and lessons learned from other relevant incident reviews and AARs, both internal and external to your jurisdiction.[148]*

> *Lesson learned 2.7.2. Conduct AARs and incident reviews, particularly those that include all stakeholder groups, on large-scale incidents to provide lessons internally and among regional partners to build organizations that are constantly learning and improving operations and tactics.*

In the field of emergency preparedness, the lessons learned approach stands on the assumption that learning from experience, whether it be our own experience or others' and whether it be from real events or simulations, improves practice and minimizes avoidable deaths and negative economic and social consequences of disasters. Thus, the appeal of learning from experience to avoid duplicating mistakes is widely appreciated in the emergency preparedness arena, and many organizations have adopted formal procedures for identifying, documenting, and disseminating lessons learned from prior response to emergency situations and simulations.[149]

---

[148] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[149] Elena Savio, Foluso Agboola, and Paul D. Biddinger, "Use of After Action Reports (AARs) to Promote Organizational & Systems Learning in Emergency Preparedness," *International Journal of Environmental Research and Public Health* 9, no. 8 (August 2012), 2949–2963, doi:10.3390/ijerph9082949.

# 3. Tactical Response and Command and Control

A comprehensive tactical response strategy that is directed by a coordinated and collaborative unified command and control structure is critical to responding to and resolving complex events involving multiple phases and multiple jurisdictions. Because the Orlando Police Department (OPD) has had a longstanding policy,[150] a set of checklists, and trainings related to the department's response to man-made and natural major incidents, many of the tactics employed in the response to the terrorist attack on the Pulse nightclub were second nature to the first responders.[151] However, as the incident became more complex, the multiagency response was at times uncoordinated and confused, demonstrating the importance of multiagency coordination systems and the need to quickly establish unified command and control.[152] The goal of this chapter is to discuss command and control, tactics, and strategies employed during the OPD's response to the terrorist attack on the Pulse nightclub.

## Incident command and command posts

During the initial response to the shots fired call, an OPD SWAT commander, who was also the on-duty watch commander, established incident command when he began providing tactical instructions over the radio. As soon as he arrived on scene, he immediately formed a contact team with the other officers who had responded and entered the club. He remained the forward tactical lead inside the club and during the final assault.

While the SWAT commander led the response inside the club, during the first hour of the incident there was no one who assumed command outside the club to manage the overall operation as well as the staging and deployment of personnel and resources as they arrived on the scene. Once the unified command center (UCC) was established, decision-making, strategies, and assignments were generally well coordinated and effective.

As the incident progressed, some agencies such as the Orlando Fire Department (OFD) established their own incident command posts, which negatively impacted information and resource sharing, coordination, and overall situational awareness. For example, firefighters assigned to station 5, located within a block of the incident, remained locked down, under the command of the on-duty battalion chief. According to the OFD, firefighters were waiting for the OPD to give them a "safe to enter"

---

[150] Orlando Police Department Policy and Procedure, Policy 1308.3 – Major Incidents, provided to assessment team March 30, 2017.

[151] Orlando Police Department Policy and Procedure, Policy 1308.3 (see note 150).

[152] *National Incident Management System* (Washington, DC: US Department of Homeland Security, 2008), https://www.fema.gov/pdf/emergency/nims/NIMS_core.pdf.

notification before they responded to the scene.[153] Other OFD responders, operating under the direction of the independent OFD command post, began designating roles and responsibilities for themselves within the OFD incident command system blocks away from the law enforcement command center. It should be noted that once the OFD received notification that it was safe to operate outside the club, they assisted in the triage area as well as in the transportation of numerous victims to area hospitals and the trauma center.[154]

## Tactical response

Upon hearing the first shots fired by the suspect, the OPD detective who was working his extra duty security detail at Pulse determined that rapid intervention was necessary and quickly positioned himself to engage the suspect.[155] As he was doing so, he immediately radioed and confirmed with OPD dispatch that shots had been fired inside the club and that there were multiple injuries. He requested additional units and the establishment of a secure perimeter.

Within two minutes of the initial broadcast of shots fired, the OPD SWAT commander, who is a lieutenant and was the on-duty watch commander, was en route to the scene and encouraged the detective to stay off the radio—a tactic employed to prevent the suspect from overhearing approaching officers or following the police response on a scanner—and directed the detective to engage the suspect.[156] When the detective saw the suspect temporarily emerge from the emergency exit doors, he engaged the suspect; and when he saw the suspect traversing the dance floor he engaged the suspect for a second time, forcing him to retreat back into the club. Once three additional officers arrived, they followed tactics learned in their active shooter and casualty rescue training. They created an initial contact team and planned to enter the club.[157]

---

[153] Roderick Williams, chief, Orlando Fire Department, presentation given to the assessment team and to chief executives of other responding agencies during interviews with assessment team, December 15–16, 2016.

[154] Williams, presentation (see note 153).

[155] According to the International Association of Chiefs of Police Active Shooter Model Policy, "rapid intervention" is defined as "Immediate response by one or more officers to an active shooting based on a reasonable belief that failure to take action pending the arrival of additional officers would result in death or serious bodily injury." *Active Shooter Model Policy*, (Alexandria, VA: International Association of Chiefs of Police, 2014), 1, http://www.theiacp.org/Portals/0/documents/pdfs/MembersOnly/ActiveShooterPolicy.pdf.

[156] SWAT commander, Orlando Police Department, interview with assessment team, January 24, 2017; Use of Force Investigation (see note 34).

[157] Orlando Police Department "Response to Active Killing Incident," lesson plan outline, provided to assessment team May 12, 2017.

**Specialized Orlando Police Department and Orange County Sheriff's Office Responding Units**

The Orlando Police Department (OPD) special weapons and tactics (SWAT) team is a part-time volunteer group staffed by approximately 50 sworn members from various units and divisions of the OPD. The SWAT team maintains two groups directed by a team supervisor, and is commanded by and receives orders from a SWAT team commander, deputy team commander, or ranking SWAT team supervisor at a scene. The SWAT team trains twice per month and is issued special equipment and firearms. The SWAT team may be activated by any OPD employee of the rank of lieutenant or higher or any acting watch commander.

The Orange County Sheriff's Office (OCSO) SWAT team is a part-time volunteer group staffed by approximately 30 sworn members from various units and divisions of the OCSO plus four tactical medics and is overseen by four full-time SWAT team members—a captain, a lieutenant, a training sergeant, and a deputy quartermaster. The SWAT team trains every other Tuesday in the use of advanced tactics and specialized weapons and equipment to allow them to effectively handle difficult and dynamic situations including hostage rescue, armed barricaded subjects, high-risk search warrants, and violent fugitive apprehensions.

The OCSO hazardous device team (HDT) is a part-time volunteer group staffed by approximately 12 sworn members from various units and divisions of the OCSO and is commanded by a full-time lieutenant. The HDT trains at least twice per month in all aspects of hazardous device management including the detection, identification, and safe disposal of explosive devices.

When a second group of officers arrived—including the OPD SWAT commander, four other members of the OPD SWAT team, and officers from other agencies—a second contact team was formed. The two contact teams coordinated their entries into the club to maximize their ability to identify and engage the suspect(s) (as at the time it was not yet clear that there was just one assailant) and prevent being caught in one another's crossfire. The first team entered through the patio, and the second team broke a large window near the main entrance and moved to the main dance floor in the Jewel Box area (see figure 1 on page 14). Once inside, the contact teams planned to stop the active threat. As soon as the suspect barricaded himself in a restroom and stopped shooting, SWAT team officers took tactical positions behind a bar located at the end of the hallway that led to the restroom, containing the suspect. With the suspect contained, officers in the main areas of the club began triaging and rescuing victims.

The initial tactical response was consistent with the OPD's active shooter training and recognized promising practices. However, as the incident became more complex and prolonged, transitioning from a barricaded suspect with hostages to an act of terrorism, the OPD's operational tactics and strategies were challenged by the increasing threat posed by the suspect's claim of improvised explosive devices inside the club and in vehicles surrounding the club.

## Self-deployment

Because the attack took place early Sunday morning, the number of OPD officers immediately available to respond to Pulse was increased because of extra duty assignments at nearby bars and clubs in downtown Orlando. In addition, many of the officers who were working extra duty assignments were also on the SWAT team, which brought highly trained and well equipped personnel very quickly to the scene. Officers from several other agencies also responded to the "shots fired" and "an officer needs assistance" call.

The number of law enforcement personnel who responded to the Pulse nightclub was appropriate given the urgency and gravity of the radio broadcasts, conflicting information about the number of suspects, the number of victims, and the number of injured persons and the severity of their injuries. Although the majority of the first responders were not formally dispatched to the scene, their response was consistent with OPD and regional mutual aid policies, procedures, and protocols. Their immediate response, the formation of contact teams, and those teams' entry into the club saved innocent lives by stopping the killing and containing the suspect. In addition, many officers who responded in the second wave—again, many of whom were not formally dispatched—played an integral role in triaging injured persons and rescuing them from the club. During the initial response, other officers took it upon themselves to ensure that South Orange Avenue remained open to ambulances and other emergency vehicles.

However, as the number of officers on scene grew, self-deployment negatively impacted an already chaotic situation. Within the first three hours, approximately 300 local law enforcement officers were on scene.[158] Instead of responding to the UCC or other staging areas to check in and receive assignments, many officers armed with patrol rifles self-deployed into the club or took positions along the perimeter. Others stood by and waited for direction. According to OPD officers and Orange County Sheriff's Office (OCSO) deputies inside the club and on the inner perimeter, they had never seen so many guns pointed at them and they questioned the necessity of having so many heavily armed officers in unnecessary positions when they could have been performing other critical functions.[159] Likewise, other first responders who had carried injured victims from the club said that when they got outside, they struggled to identify officers to whom they could pass the victims to bring them to the triage area, which suggests that officers may have been more effectively assigned to particular duties.

---

[158] OPD Pulse Presentation, Orlando Police Department, provided to assessment team December 15, 2016.

[159] Orlando Police Department and Orange County Sheriff's Office first responders, focus group (see note 72).

It is critical in large scale events that unified command be established as quickly as possible, a scene safety officer designated, and staging areas designated and secured to coordinate the arrival and assignment of law enforcement and other public safety resources.

Uncontrolled self-deployment depletes resources that may be necessary to respond to ongoing calls for service unrelated to the event. For example, two OPD dispatchers remarked that at one point during the Pulse response there were no available units to respond to calls for service in the city or the county.[160] "Besides causing a chaotic situation, self-deployment . . . also deplete(s) the pool of available officers who might be needed to respond to different venues where multiple active shooting assaults are occurring. While it is a natural human propensity to rush in to help, an uncoordinated response instead results in chaos and ineffectual deployment."[161]

In November 2008, terrorists conducted sequential and highly mobile attacks in Mumbai, India. Multiple teams attacked several locations at once—combining armed assaults, carjackings, drive-by shootings, improvised explosive devices (IED), targeted killings, and building takeovers, as well as barricade and hostage situations that quickly overwhelmed local police and military assets.[162] Similarly, in November 2015 terrorists engaged in multisite attacks in Paris, targeting the Stade de France, restaurants in the 10th and 11th arrondissements, and the Bataclan concert hall. In a little over three hours, the nine Paris attackers killed 130 and wounded 368 people.[163] Although US law enforcement has not been challenged by a simultaneous multisite attack as experienced overseas, there is legitimate potential for such an event to occur. According to Mark Lomax, then executive director of the National Tactical Officers Association, "You might not want to send all your assets to a scenario until you get further intelligence" and get a global view of what is happening as quickly as possible.[164] In Orlando, because approximately 300 officers and deputies from 27 agencies—including many of their chief executives—responded to the scene, a secondary attack in the region could have proved difficult to respond to and manage.

---

[160] Orlando Police Department 911 dispatchers, forum with assessment team, February 20, 2017.

[161] Joel M. Justice, *Active Shooters: Is Law Enforcement Ready for a Mumbai Style Attack?* (Monterey, CA: Naval Postgraduate School, 2013), 69, http://calhoun.nps.edu/handle/10945/37645.

[162] Angel Rabasa et al., *Lessons of Mumbai* (Santa Monica, CA: Rand Corporation, 2009), 5, https://www.rand.org/content/dam/rand/pubs/occasional_papers/2009/RAND_OP249.pdf.

[163] QuinnWilliams, LLC, *The Attacks on Paris: Lessons Learned* (Los Angeles: Homeland Security Advisory Council, 2016), 3, https://static1.squarespace.com/static/5782ad8f9de4bb114784a8fe/t/5783fec9d482e95d4e0b79bf/1468268235955/HSAC-Paris_LessonsLearned_WhitePaper.pdf.

[164] Martin Kaste, "American Police Learn Conflicting Lessons of Terrorist Attacks," NPR, last modified November 16, 2015, http://www.npr.org/sections/the two-way/2015/11/16/456269321/american-police-learn-conflicting-lessons-of-terrorist-attacks.

Another area of concern is the use of secondary devices to target first responders, as seen in the San Bernardino terrorist attack in December 2015 as well as in numerous attacks in Europe and the Middle East. The potential presence of secondary devices suggests the importance of officers being directed to secure staging areas, keeping lanes of ingress and egress open for emergency medical and specialized response vehicles, carefully considering the location of command posts, and establishing triage sites.[165]

## Securing victims, witnesses, and staging areas

As OPD officers and other law enforcement personnel arrived on scene they were overwhelmed by hundreds of panicked patrons fleeing the club through multiple exits, some of whom were gravely wounded. In addition, they received conflicting information regarding the number of shooters and the circumstances inside the club. In their efforts to quickly move the patrons from danger and render aid to injured victims, many officers and deputies did not identify patrons or search them for weapons or IEDs. In addition, the triage area and perimeter were established without searching the areas for IEDs. The confusion among arriving law enforcement officers reinforces the importance of establishing a scene safety officer as soon as practical to manage dispatched and self-deploying officers and resources as well as to ensure that appropriate security measures are put in place to protect victims and first responders from secondary devices or attacks.

In their efforts to rapidly transport critically injured victims to the Orlando Regional Medical Center (ORMC), officers and deputies did not search victims for weapons or other dangerous articles. This security gap complicated reports of an active shooter inside the hospital as officers and security personnel were unsure if they had transported a suspect to the hospital. In part, this uncertainty contributed to the hospital being locked down for approximately an hour as OPD officers and hospital security cleared the building.[166]

The OCSO's after action report noted that the area in which the command post was initially staged was never swept for secondary devices, even after the Greater Orlando Aviation Authority K-9 successfully alerted to the suspect's vehicle.[167] In an interview with the assessment team, an OPD deputy chief acknowledged the security issues and recognized that they were important lessons learned.[168]

---

[165] "FBI Again Warns of Secondary Explosive Devices, Cautions Officers to Watch Surroundings," PoliceOne.com, last modified May 16, 2004, https://www.policeone.com/terrorism/articles/86852-FBI-Again-Warns-of-Secondary-Explosive-Devices-Cautions-Officers-To-Watch-Surroundings/; Office of Justice Programs, "A Guide for Investigating Bomb and Explosion Scenes: Arriving at the Bomb and/or Explosion Scene," National Institute of Justice, last modified June 1, 2009, https://www.nij.gov/topics/law-enforcement/investigations/crime-scene/guides/explosion-bombing/pages/arrive.aspx; Robert Mueck, "Revisiting the Staging Area Manager," Domestic Preparedness, last modified July 23, 2014, https://www.domesticpreparedness.com/preparedness/revisiting-the-staging-area-manager/.

[166] Cheatham et al., *Orlando Regional Medical Center Responds* (see note 32).

[167] *Orange County Sheriff's Office After Action Report: Pulse Nightclub June 12, 2016–July 12, 2016* (Orange County, FL: Orange County Sheriff's Office, 2016).

[168] Anzueto, deputy chief, Orlando Police Department, interview (see note 58).

AR00406

In another example, regarding the threat posed by IEDs and secondary devices, an OCSO hazardous device team (HDT) lieutenant recommended that a 1,000-foot perimeter be established around Pulse and the suspect's vehicle after the suspect claimed to have left a device in it and K-9s alerted on the vehicle. However, despite the potential threat, officers and deputies maintained their positions to contain the suspect and to protect officers and deputies who continued to rescue wounded patrons. During the final assault, one OPD SWAT team officer remarked that he considered that he might lose his legs if the suspect detonated a device, but he hoped that because he was behind an armored personnel carrier he would survive the explosion.[169]

Even though the UCC and command vehicles were moved, they remained within the 1,000-foot perimeter. A member of the OPD command staff admitted more attention should have been given to the location and security of the UCC to ensure continuity of operations had IEDs been present or detonated.

## The decision to negotiate or assault

There has been some debate in the media as to whether the OPD should have engaged the suspect in the restroom sooner, especially after he called 911 and pledged his allegiance to the Islamic State of Iraq and the Levant (ISIL). Regardless of ideology, the priority in active shooter response is to push forward, to confront the threat, and to stop the killing as soon as possible. From the moment that the OPD detective became aware of the attack, he engaged the suspect. As soon as additional officers arrived, they formed contact teams, entered the club, and drove the suspect into the restroom, containing him and suppressing further violence. Once the suspect was contained, officers and deputies searched for and rescued barricaded patrons and extricated the injured persons from the club. The officers held their positions despite the threat of secondary explosive devices as command personnel assessed their options to rescue hostages, and arrest or neutralize the suspect.

With the suspect contained—and the fact that no shots were being fired by the suspect, the uncertainty as to the number of hostages, and the exact location of the suspect and hostages still undetermined—the initial contact team, made up of responding SWAT officers, also took into account the layout of the Adonis Room and the poor visibility as they weighed whether they should hold their containment positions or conduct a direct assault down the hallway to rescue the hostages. The Adonis Room is more than 60 feet long and more than 30 feet wide, with three restrooms, two dressing rooms, a pair of thin and narrow hallways, and no windows (see figure 7 on page 56).

---

[169] Orlando Police Department SWAT team members, focus group (see note 53).

When the initial contact team entered the Adonis Room the only sources of light were the exit signs and television screens around the bar, the reflections of their flashlights in the mirrors, and the open emergency exit doors.[170] In focus groups with the assessment team, numerous officers said they could see neither down the long narrow hallway leading to the two dressing rooms and the emergency exit at the far end of the room nor down the hallway leading to the restroom where the suspect was contained with hostages.[171]

Without clear visuals and with incomplete information regarding the exact location of the suspect and hostages, SWAT officers determined it was too risky to conduct a direct assault and maintained their positions behind and around the bar, approximately 15 feet away from the entrance to the restroom where the suspect was contained. In addition, the lack of gunfire led officers to determine that the situation had transitioned from an active shooter to an armed barricaded suspect with hostages. While the suspect was contained, officers searched and secured the remainder of the Adonis Room, leading several patrons to safety.

While terrorists may be willing to die for their cause, and their "calling card is to start killing people straight away,"[172] there is ample evidence to suggest that they are just as ready to embrace a resolution that provides them with some sense of accomplishment or victory.[173] Negotiations can create meaningful dialogue, exchange of information, and opportunities to resolve the event without risking further injury to hostages, law enforcement personnel, or the suspect. In addition to buying time and gaining important intelligence, the negotiation process provides much-needed time to assemble tactical teams and prepare them for an assault if it does not succeed in securing a peaceful surrender.[174]

In several instances, suspects have given up voluntarily to police responding to acts of mass public violence or terrorist incident. For instance, Naveed Haq killed one person and injured five during an attack with two semiautomatic pistols at the Seattle Jewish Federation office in July 2006. After negotiating with the police, Haq surrendered. In June 2009, Carlos Bledsoe carried out a drive-by shooting at a military recruiting base in Little Rock, Arkansas. The attack resulted in the death of a US soldier and the injury of another. After being stopped by the police, he exited his car and surrendered without incident. On July 20, 2012, James Holmes was arrested without incident outside the Aurora Theater in which he killed 12 and wounded 58.[175] In the aftermath of the Boston Marathon bombing in April 2013, in which three people were killed and more than 260 injured, suspect Dzhokhar Tsarnaev, one of the two brothers who committed the bombings, surrendered after being shot by police while

---

[170] Use of Force Investigation (see note 46)

[171] OPD SWAT team members and OPD watch commanders, anonymous focus group (see note 139).

[172] Mark White, "Police to Confront Terrorists in New Tactic," Sky News, last modified December 1, 2015, http://news.sky.com/story/police-to-confront-terrorists-in-new-tactic-10337529.

[173] Adam Dolink and Keith M. Fitzgerald, *Negotiating Hostage Crisis with the New Terrorists* (Westport, CT: Praeger Security International, 2007), 2.

[174] Dolink and Fitzgerald, *Negotiating Hostage Crisis* (see note 173).

[175] Gary Strauss, "Aurora Officers Describe Arresting James Holmes," *USA Today*, January 8, 2013, https://www.usatoday.com/story/news/nation/2013/01/08/james-holmes-aurora-hearing/1816875/.

hiding in a boat in Watertown, Massachusetts. In January 2017, Esteban Santiago shot and killed five people and wounded six others in the Ft. Lauderdale airport. After emptying magazines full of ammunition, Santiago dropped his pistol, lay on the ground, and waited for the police to arrest him.[176]

As demonstrated in the attack on the Seattle Jewish Federation and a 2004 attack on Beslan school in North Ossetia, Russia,[177] established crisis and hostage negotiation protocols can be effective in resolving horrific incidents of mass public violence and terrorism. However, recognizing that extremist terrorism represents a continuing if not a growing threat, the OPD and other law enforcement agencies should develop specific negotiation protocols recognizing that an immediate and overwhelming tactical assault may be the safest and most effective response to resolve a hostage incident during a terrorist attack.[178]

The OPD crisis negotiation team (CNT) followed OPD Policy and Procedure 1505.4 (Crisis Negotiation Team) and Policy and Procedure 1306.0 (Guide for Hostage, Suicidal, and Barricaded Person Situations) in response to the Pulse attack. In accordance with policy, the CNT was activated because the suspect was both "a contained person who [was] holding others against their will and [was] threatening the lives or safety of others" and "a sniper or terrorist."[179] The CNT sergeant deployed to the OPD communications center and followed one of the central philosophies of the OPD's Guide for Hostage, Suicidal, and Barricaded Person Situations: "Once a situation has been contained in a specific location, time is on your side. Stop and think before you act" and "utilize all resources available to them to reduce the risk of injury or death."[180]

---

[176] Dean C. Alexander, "Combating Terror Threats Against Police," Homeland Security Today, last modified May 3, 2017, http://www.hstoday.us/singel-article/exclusive-combating-terror-threats-against-police/93e5c68de46091572aebec571a5bfdf4.html.

[177] Neil Shortland, "Crisis Negotiation Techniques in Terrorist Incidents: It's Been 10 years Since Beslan—What Have We Learned?" Center for Terrorism and Security Studies at UMass Lowell, last modified August 12, 2014, https://blogs.uml.edu/ctss/2014/08/12/crisis-negotiation-techniques-in-terrorist-incidents-its-been-10-years-since-beslan-what-have-we-learned/.

[178] Paul Cruickshank, "A View from the CT Foxhole: James A. Gagliano, Former FBI Hostage Rescue Team Counterterrorist Operator," CTC Sentinel 10, no. 5 (May 2017), https://ctc.usma.edu/v2/wp-content/uploads/2017/05/CTC-Sentinel_Vol10Iss516.pdf.

[179] Orlando Police Department Policy and Procedure 1505.4 – Crisis Negotiation Team, provided to assessment team March 30, 2017.

[180] Orlando Police Department Policy and Procedure 1306.1 – Guide for Hostage, Suicidal, and Barricaded Person Situations, provided to assessment team March 30, 2017.

**Figure 7. Layout of Adonis Room**



The dimensions of the Adonis Room were provided by Robert Anzueto, deputy chief, Orlando Police Department, in discussion with Jennifer Zeunik, director of programs, Police Foundation, May 22, 2017, and in Federal Bureau of Investigation notes to the COPS Office, provided to the assessment team September 5, 2017.

As soon as the CNT sergeant established contact with the suspect, the sergeant listened and asked questions to extract more information about the ongoing incident, keeping the suspect from engaging in additional violence. Even when the suspect hung up multiple times and refused to speak with the negotiator, the CNT sergeant called back 76 times over the course of the incident, left multiple voicemails, and texted the phone number. After each call with the suspect, the CNT sergeant had a liaison and a dispatcher pass information to command personnel and officers on scene.[181] The efforts of the CNT team developed critical intelligence information regarding the suspect, his allegiance to ISIL, and the potential presence of IEDs as well as suicide vests that informed many of the tactical decisions made and implemented during the event.

The crisis negotiations, supported by SWAT team operations that kept the suspect contained in the restroom, allowed law enforcement personnel to successfully search for, locate, and rescue patrons and staff—many of whom were critically injured—from the club. Negotiations gathered critical information concerning the suspect, his thinking, and his intentions, informing the decision to move to a tactical assault.

---

[181] Orlando Police Department CNT sergeant, interview (see note 83).

## The final breach

The final assault on the club to rescue hostages and arrest or neutralize the suspect using an explosive breach was an appropriate tactical decision.

While OCSO HDT deputies prepared and placed the charge on the west wall of the club, the OPD SWAT team provided cover. However, though the two teams worked together to determine where they should place the charge to gain access into and rescue hostages from the south restroom, they placed it in a location that they thought was the south restroom; the location was in fact against the hallway. When the charge was detonated, it was a partial breach to the point where a small linear section of the drywall was visible—but the team was unable to see what was on the other side of the wall. Therefore, the SWAT commander ordered the OPD BEARCAT operator to ram the wall with the extended ram. Once the hole was big enough to see through to the other side, the SWAT commander realized it was the hallway and ordered the BEARCAT operator to move further south along the wall and ram that section. When that hole was large enough, SWAT officers rescued hostages from the south restroom.

As the last hostage was being pulled through the hole in the south restroom wall and while team members were widening the hole with the hand-held ram, the suspect fired shots from inside the north restroom. The SWAT team immediately deployed two flash-bangs, one right after the other, and sent the BEARCAT to breach the north restroom wall. When the BEARCAT operator rammed the north restroom wall, the suspect emerged from behind the door and engaged in a firefight with the SWAT team. During the shootout, a SWAT team officer was struck in his ballistic helmet, and the suspect was shot and killed.

OCSO HDT and OPD SWAT have trained together numerous times since 2007, which was demonstrated by the teams' familiarity with one another's tactics during the Pulse response.[182] However, with the increasing threat of mass casualty and terrorist attacks, the OCSO HDT and OPD SWAT will now focus more on breaching techniques and rapid response tactics to combat situations similar to Pulse.

The command center did not advise personnel outside of the assault team that a breach was about to occur, leading to confusion among officers, deputies, and other first responders when the charge was detonated. Many perimeter officers were caught off guard and were unprepared to assist injured survivors rescued by SWAT team officers as the assault was made. Although the suspect was quickly neutralized by law enforcement, he surprised the assault team when he emerged from the restroom and began shooting at the officers, some of whom had neither cover nor concealment.

---

[182] See appendix D for full list of training exercises for the OPD, OFD, and Orlando-area first responders.

## Tactical response and command and control observations and lessons learned

**Observation 3.1. The OPD followed their tactical and hostage negotiation policies and protocols as well as recognized promising practices as they pertain to active shooter and barricaded hostage situations.**

However, OPD policies and protocols and recognized practices and training need to be re-examined in light of the increasing threat of mass public violence and terrorist attacks.

> *Lesson learned 3.1.1. The law enforcement community should consider the need to modify the application of current active shooter and barricaded hostage response protocols to terrorist incidents, and a review should be held by the law enforcement community.*

> "While a debate can be had about whether such protocols should change in the case of standoffs with Islamist terrorists seeking to kill and be killed, it is worth emphasizing that current best practices are designed to avoid the death of hostages and putting police officers in unreasonable danger. Recognizing that the threat of such extremist terrorism represents a continuing—if not growing—threat, it may be appropriate to develop specific protocols for hostage events during terrorist attacks."[183]

**Observation 3.2. OPD officers and other responders formed two contact teams and entered the nightclub approximately six minutes after the attack began with a clear plan to engage, contain, apprehend, or neutralize the suspect.**

As soon as they could determine where the suspect was, the contact team, led by the OPD SWAT commander, engaged the suspect and forced him to retreat into the restroom while the other contact team triaged and rescued victims.

> *Lesson learned 3.2.1. The first officers on scene of an active shooting incident should organize contact teams to engage, contain, apprehend, or neutralize the gunman and rescue victims.*

**Observation 3.3. While OPD SWAT and OCSO HDT played coordinated roles throughout the Pulse incident, members of both teams reported that the response during and immediately following the initial breach became disorganized and uncoordinated. Specialty units—particularly interagency units—must train together to avoid confusion and disorganization during joint tactical operations.**

> *Lesson learned 3.3.1. Incorporate special units—such as SWAT or HDT—in regular planning and training exercises so they are familiar with one another's command and control and tactical protocols.*

> *Lesson learned 3.3.2. Command-level personnel should ensure appropriate interagency communications, planning, and execution to ensure the safety of law enforcement personnel during tactical operations.*

---

[183] Straub, Zeunik, and Gorban, "Lessons Learned" (see note 19).

**Observation 3.4. The self-deployment of approximately 300 Orlando area law enforcement personnel needed greater coordination at the scene and citywide.**

Uncoordinated self-deployment placed some officers in danger inside Pulse as well as outside from improvised explosive devices. In addition, as evidenced by the multisite attacks in Paris and Mumbai as well as attacks in the United Kingdom in the summer of 2017,[184] police departments must be prepared to deploy and respond to multiple locations and coordinated attacks.

> *Lesson learned 3.4.1. Law enforcement supervisors must anticipate and train to prevent uncoordinated and inefficient self-deployment.*

> *Lesson learned 3.4.2. After adequate personnel are on scene, additional personnel should be directed to staging areas for assignment of duties and should be directed to return to the staging area prior to their dismissal, or return to their regular assignment after being relieved.*

Uncoordinated self-deployment, particularly in instances of mass public violence and or a terrorist attack, presents officer safety challenges and depletes resources that may be needed to respond to secondary attacks or regular calls for service.

> *Lesson learned 3.4.3. As soon as practical a supervisor should be designated as the scene safety officer to direct personnel and resources to staging areas, coordinate assignments, and ensure that adequate ingress and egress are maintained.*

**Observation 3.5. Unified law enforcement command was established at the Pulse attack scene within the first hour. However, Orlando Fire Department and emergency medical services (EMS) officials were not included in the unified command center and were unaware of the discussions occurring and the decisions being made as a result.**

> *Lesson learned 3.5.1. As soon as possible and practical during an incident, establish a unified command of all primary first responders—including fire and EMS—to facilitate communication, situational awareness, operational coordination, allocation of resources, and delivery of services.*

> *Lesson learned 3.5.2. Engender buy-in of traditional incident command system (ICS) training for law enforcement, which continues to present challenges.*

For example, first responders from both the OPD and the OCSO reported that paying attention during ICS training is difficult as it does not connect the structure to "real" incidents.[185] Law enforcement leaders and researchers should endeavor to re-examine ICS and build a model that will be accepted and implemented in response to critical incidents.

> *Lesson learned 3.5.3. ICS planning, training, and implementation must involve all public safety first responders and medical facilities to ensure situational awareness across specialties and the effective coordination and use of resources.*

---

[184] Faith Karimi, Hilary Whiteman, and Kara Fox, "How the London Terror Attack Unfolded," CNN, last modified June 4, 2017, http://www.cnn.com/2017/06/04/europe/london-how-the-attack-unfolded/index.html.

[185] Orlando Police Department and Orange County Sheriff's Office first responders, focus group (see note 72).

**Observation 3.6. The OPD could have better identified, established, and communicated the location of staging and assembly areas for arriving law enforcement officers, fire, and EMS to ensure that the area was safe and secure.**

OPD personnel did not establish a secure staging area during the Pulse response, nor did they initially consider the safety of the location of the command post. They did, however, ensure that ingress and egress routes were secure.

*Lesson learned 3.6.1. Be mindful of secondary explosive devices and potential secondary attacks. Have arriving explosive ordinance disposal units sweep staging, assembly, and command post areas to guard against secondary devices.*

*Lesson learned 3.6.2. Responders and supervisors should constantly evaluate security risks of command post, victim and witness triage, and personnel locations and make appropriate adjustments as required.*

*Lesson learned 3.6.3. Responders and responding agencies should continually plan and evaluate ingress and egress routes during critical incidents to ensure that routes are clear for ambulances and other emergency vehicles.*

The OPD did keep South Orange Avenue open for emergency medical and specialized response vehicles.

# 4. Equipment and Training

The goal of this section is to discuss what equipment and prior training was effective in responding to the terrorist attack and what equipment needs and additional training may assist the Orlando Police Department (OPD) and other agencies faced with an incident of this magnitude.

## Equipment

From the initial response to the Pulse active shooter call until its conclusion, the OPD and its law enforcement partners leveraged specialized equipment to provide tactical advantages and to protect victims, law enforcement and public safety first responders, and the community.

### Weapons and personal protective equipment

Individual officers and deputies who responded to Pulse were equipped differently based on their individual agency policies and procedures, budgets, and operating philosophies. OPD officers were trained on and equipped with 9mm handguns, and those who responded in their department vehicles had patrol rifles. Some OPD officers were also issued shotguns.

The OPD mandates that all first responders wear protective body armor when assigned to a uniformed function and "while engaged in field activities to include on-duty and extra duty employment."[186] The OPD SWAT team members and other responding officers did have their protective vests on, but they did not don the advanced hit gear that they normally would prior to an operation. However, it is important to note that the department-issued vests are level I (with the option for the officer to pay for an upgrade to level II), meaning that they are tested to stop ammunition fired from short barrel handguns but are not designed to protect against rifle ammunition, especially the type used by the suspect during the Pulse attack.[187] Several officers told the assessment team that they had purchased and used their own personal protective equipment (PPE), particularly upgraded vests with ballistic inserts to provide greater protection from high caliber bullets.[188] OPD special weapons and tactics (SWAT) team members have customized rifles, ballistic vests, and helmets issued to them because of their tactical duties.

Orange County Sheriff's Office (OCSO) deputies are issued Glock 45-caliber handguns, shotguns, and some patrol rifles.

---

[186] Orlando Police Department Policy and Procedure 1624.14 – Uniforms, provided to assessment team March 30, 2017. (Of the initial responding agencies, most but not all have similar policies regarding issued equipment.)

[187] For more information about different types of body armor; performance standards; and how to select, purchase, wear, and care for body armor, visit "Body Armor," National Institute of Justice, last modified July 12, 2013, https://www.nij.gov/topics/technology/body-armor/Pages/welcome.aspx.

[188] Orlando Police Department first responders, focus group with assessment team, February 22, 2017.

It should be noted that initially, some of the OPD SWAT team officers and tactical officers from other agencies entered Pulse without donning their specialized protective equipment. It is essential that officers take the additional seconds to equip themselves to meet the threat posed by individuals determined to kill as many persons as they can so that they can safely and effectively engage the threat.

## Decontamination equipment

Many officers and deputies lacked the necessary equipment to protect themselves from the blood-borne pathogens they came in contact with while rescuing critically injured victims from the club and transporting them to the hospital. During interviews, officers and deputies noted that they did not have rubber gloves to put on before assisting with the extrication and transportation of victims. In fact, some officers and deputies described being "soaked" in blood, to the point that they had to wring blood from their clothing, socks, and shoes and that they had family members meet them outside of their homes with garbage bags so that they could immediately remove everything they were wearing and dispose of it.[189] One officer described having to buy industrial-strength cleaner to decontaminate the bed of his truck because of the blood and body matter that was left after transporting victims from the triage area to the hospital.

While OPD Policy and Procedure 1301.8 (Significant Exposure and Control Plan) was followed, it was not written with an attack of this magnitude in mind. The policy does not include large-scale decontamination policies, procedures, or protocols for officers before they are relieved of duty from a mass casualty incident. The supervision of officer decontamination could also be a duty and responsibility of a scene safety officer or supervisor as previously discussed.

## Robots

After the suspect said he had an explosive vest and hostages told law enforcement officers they had overheard the suspect saying he was going to place bomb vests on four of the hostages and detonate them, the OPD deployed a tactical robot into the club to gather intelligence. The OPD Avatar III tactical robot (shown on page 26) entered the nightclub at 3:20 a.m. to provide images of the interior and additional situational awareness for SWAT team commanders and the high-risk incident commander on scene outside Pulse. Of particular concern were the length and dimensions of the hallway in the Adonis Room that led to the restrooms and obtaining any additional information about the position of the suspect to determine if a direct assault on the restroom was possible.

The robot was able to fully enter the urinal area and determine that the area was clear, but because of the number of deceased victims it was only partially able to enter the south restroom. In addition, the robot was unable to fully explore the hallway or the restrooms in which hostages and the suspect were contained.[190] However, the images provided by the robot helped command personnel determine that an

---

[189] Orlando Police Department first responders, focus group with assessment team, January 24, 2017.

[190] Anzueto, deputy chief, Orlando Police Department, email (see note 31).

assault down the hallway to rescue hostages from the restrooms and to neutralize the suspect would be extremely dangerous for the hostages and officers engaged in the assault. Shortly thereafter, the OCSO hazardous device team (HDT) prepared to conduct the explosive breach of the exterior wall of the restroom to rescue the hostages and apprehend or neutralize the suspect.[191]

The Orlando Fire Department's bomb squad also deployed its Remotec Andros F6B robot to search the suspect's vehicle for explosive devices.[192]

After the exterior wall was breached and the suspect was neutralized, the OCSO deployed two robots into Pulse—a Remotec Andros F6B and a Remotec Wolverine—to assist in searching the suspect and the club for improvised explosive devices (IED).[193]

## Armored personnel carriers

The OPD deployed two armored personnel carriers (APC) to the nightclub to assist with the response. These APCs were instrumental in protecting the officers who would have otherwise been directly in the suspect's line of fire following the breach of the wall.[194] In addition, a ram affixed to the OPD's BEARCAT was used to breach the wall after the partial breach by the explosive charge. It should be noted that the City of Orlando had purchased the BEARCAT with its own funds to better protect the community and to enhance the OPD's ability to respond to violent incidents.[195] The other OPD BEARCAT, which was deployed as cover for SWAT officers at the south double door exit, was purchased using Urban Areas Security Initiative (UASI) Program funds. The OCSO's APC, which was deployed but not used, was also purchased using UASI Program funds as a regional asset.[196]

---

[191] Orange County Sheriff's Office hazardous device team, focus group with assessment team, January 25, 2017.

[192] Orlando Fire Department, phone call with assessment team, June 20, 2017.

[193] Orlando Police Department SWAT team members, focus group (see note 53).

[194] Orlando Police Department SWAT team members, focus group (see note 53).

[195] Dyer, interview (see note 124).

[196] Orange County Sheriff's Office hazardous device team member, phone call with assessment team, June 20, 2017.



**The OPD's BEARCAT with ram.**

Photo courtesy of Orlando Police Department

## Communications

A primary communication challenge during the OPD's response to Pulse stemmed from the numerous radio channels that were used during the incident. While call takers and dispatchers in the communications center can patch all OPD radio stations together, patch the OPD and OCSO SWAT channels together, or patch other agency channels together, some individuals and groups declined to be patched during the response to the Pulse incident to preserve operational integrity and safeguard tactics. Some officers said they were concerned that shifting between channels as they were operational would have diverted their focus and potentially jeopardized their safety, so they remained on their normal operating radio channel throughout the incident. In other cases, specialized units or groups did not open their channel(s) to prevent unnecessary radio traffic from interfering with their tactical operations. The lack of a common radio channel and a tactical dispatcher became problematic when the OCSO HDT announced the impending detonation of the explosive device they had placed to breach the west wall, and several officers and deputies were unaware that the breach was about to occur.

As the volume of 911 calls and law enforcement activity increased, so did the load on the computer-aided dispatch system and on the call takers and dispatchers. The communications center was fortunate in that there were four dispatch supervisors in the communications center that Saturday night and

AR00418

Sunday morning as the calls began coming in instead of the usual two.[197] Supervisors were able to provide additional direction when needed and also had long-standing relationships with some of the first responders, which facilitated emergency communications.[198] But even though the Orlando Fire Department (OFD) communications center is co-located with the OPD communications center and the two agencies transferred calls back and forth, the OFD was unable to assist in dispatching law enforcement personnel or resources because the agencies operate on separate radio systems.

Communication challenges also arose from an outdated paging system. While the OFD communications supervisor sent out an initial page in the early hours of the incident, there were no follow up pages sent or protocols to ensure that the pages were received. As a result, the chief of the OFD was not notified of the incident until approximately 5:00 a.m., and there was no OFD representation in the UCC until after the suspect had been neutralized.[199]

## Training

The OPD detective working extra duty at the Pulse nightclub on June 12 said that tactical firearms training provided by the department was instrumental in how he reacted during his initial response to the shooting. He praised and credited OPD departmental firearms instructors and training staff and said the reason he was able to engage and survive is because of the quality of training he had received. He also said he did not have a conscious thought the entire time; his actions were instinctive.[200] The sentiment that training took over and informed many of the actions taken and decisions made that night was echoed by all of the OPD and OCSO officers and deputies and civilian support staff interviewed by the assessment team. The importance of appropriate equipment and training cannot be overstated.

### Active shooter training

Since the Columbine High School mass shooting in Colorado in 1999, law enforcement agencies in central Florida began modifying their response to active shooter incidents.[201] While the previous strategy had been to hold the perimeter and call SWAT, following that school shooting law enforcement modified their response to actively find the shooter or shooters and stop the threat—either in a group formation or if necessary through the actions of a single officer. OPD officers' and OCSO deputies' actions at Pulse were consistent and in accordance with these updated active shooter trainings nationwide. According to Advanced Law Enforcement Rapid Response Training, the priorities in an active

---

[197] Orlando Police Department 911 call takers and dispatchers, focus group (see note 54).

[198] Orlando Police Department 911 call takers and dispatchers, focus group (see note 54).

[199] Williams, presentation (see note 153).

[200] Detective, Orlando Police Department, interview (see note 47).

[201] Orlando Police Department SWAT team members, focus group (see note 53).

shooter situation are first to stop the killing and second to stop the dying.[202] During the response, OPD officers and other law enforcement personnel were able to contain the suspect, establish an inner and outer perimeter, rescue victims, and rapidly evacuate all injured victims from inside and outside Pulse.

In 2015, the OPD conducted agency-wide active shooter training and incorporated the OFD rescue task force to serve as a casualty rescue component of an entry team. It should be noted that despite this joint training, the rescue task force did not play a role in the response to the shooting. It should also be noted, however, that it was at least 20 minutes before the scene went from a "hot zone" to a "warm zone." It would have been too dangerous for fire or EMS personnel to enter the area during those first 20 minutes—but after 20 minutes, it would have been reasonable for fire or EMS to enter with a law enforcement cover to assist. A similar situation occurred in the San Bernardino terrorist attack when members of the Rancho Cucamonga Fire Department's rescue task force responded but were not deployed to assist in the removal of victims from the warm zone.[203] It is incumbent on public safety leaders to create similar teams and to integrate the teams during training exercises and use these resources during "real" critical incidents. To accomplish the deployment of fire-based rescue task forces, memoranda of agreement or similar documents should be executed. Deployment protocols and responsibilities should be clearly defined, and the fire service should be represented in the UCC to coordinate deployment with law enforcement tactical units.

## Incident command system training

All OPD officers are also required to complete Federal Emergency Management Agency (FEMA) independent study (IS) training module IS-700 (National Incident Management System 'NIMS': An Introduction). Meanwhile, all OPD supervisors are required to attend IS-800 (National Response Framework: An Introduction), IS-200 (Incident Command System 'ICS' for Single Resources and Initial Action Incidents), and IS-100 (Introduction to Incident Command System).[204] All OPD general and command staff (lieutenants, captains, deputy chiefs, and chief of police) received G-300 (Intermediate ICS for Expanding Incidents) and G-400 (Advanced ICS) training. While these trainings provide critical knowledge regarding management of large-scale critical incidents, few law enforcement agencies nationwide include ICS in routine operations. As previously noted, greater effort should be made to develop and implement an ICS protocol that more closely aligns with the law enforcement response to routine emergencies and crisis events.

---

[202] "Advanced Law Enforcement Rapid Response Training at Texas State University," Texas State University, accessed May 2, 2017, https://alerrt.org/.

[203] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[204] The entire FEMA IS Course List, course overviews, prerequisites, continuing education units (CEUs), and course lengths are available online at FEMA Emergency Management Institute, "Course List," Federal Emergency Management Agency, last modified December 4, 2014, https://training.fema.gov/is/crslist.aspx?all=true.

**Safety Zones and Perimeters Defined**

**Hot zone.** The area where a direct and immediate threat exists. A direct and immediate threat is dynamic and is determined by the complexity and circumstances of the incident. Examples of direct and immediate threats are an active shooter, a barricaded suspect, a hostage situation, a high-risk warrant service, and possible terrorist acts. This could also be classified as the "inner perimeter" by law enforcement, an area within the range of active gunfire or secondary devices posing immediate danger to life and health (IDLH). Law enforcement should also consider the area to be IDLH if they can visualize the shooter or determine a threat.

**Warm zone.** The area where a potential threat exists but the threat is not direct or immediate. An example of a threat that is not direct or immediate is an unknown location of suspects in a given area already cleared. Fire department resources may be requested to enter warm zones, but this should only be done with force protection, with cover and concealment, or in accordance with local fire department policies. These instances could be used for rapid extraction of multiple victims or officers down who need immediate assistance. Prior to entering a warm zone, a risk-versus-gain analysis should be completed. Law enforcement could also refer to the warm zone as part of the inner perimeter.

**Cold zone.** The area where no significant danger or threat can be reasonably anticipated. This designation could be achieved by distance, geographic location, or inaccessible areas from the incident. The cold zone is the location for staging of resources, the incident command post, and treatment and transportation of patients. This area could also be classified "outer perimeter" by law enforcement.

_____

Source: FIRESCOPE, *Emergency Response to Tactical Law Enforcement Incidents* (Sacramento, CA: Firefighting Resources of California Organized for Potential Emergencies, 2015,)
http://www.firescope.org/meetings/bod/2015/bod_meeting3/documents/ics%20701.pdf.

## Regional multidiscipline and scenario-based training exercises

Regional tabletop exercises and larger-scale, scenario-based training exercises should be used to enhance and deepen interagency relationships. These types of training exercises should not only prepare agencies and their personnel for critical incidents but they should also facilitate interpersonal interactions and team building between allied agency personnel. If this dynamic does not exist, the effectiveness of the entire incident response may be compromised as may the sustainability of operations required after a critical incident.

In conducting tabletop and other practical exercises, agencies must build upon the lessons learned from previous events and after action reviews. It is also becoming increasingly evident that there is a nexus between terrorist attacks in Europe and other areas of the world and US attacks. For example, the suspect in the Pulse attack referenced the Paris attacks and the use of suicide vests, suggesting that he was wearing a similar device. Going forward, US law enforcement and other public safety officials must recognize the potential for suicide bombings, secondary devices and attacks, and multisite attacks in planning and training exercises.

## Reality-based training

Despite their training, almost all of the first responders who made entry to contact and isolate the suspect, participated in protecting the inner perimeter, or evacuated injured survivors still inside the nightclub stated that the sight of victims "piled up like matchsticks," the sound of constantly ringing cell phones for those trying to contact victims, and hearing victims pleading for help or feeling victims grabbing their ankles as they were moving through the club will be with them forever.[205] Even seasoned SWAT team members and officers who have been through military deployments to Afghanistan and Iraq were initially shocked and had difficulty processing what was occurring.[206] An OPD lieutenant said that his agency has never faced or trained for a situation of this magnitude and that at least initially, "checklists went out the window." During a focus group with the assessment team, he asked, "How do you train and prepare for a situation like this?"[207] Many of the officers and deputies stressed the need for realistic physically and mentally challenging training, because "your body can't go where your mind has never been."[208] In many ways, because officers and deputies relied on their training and trusted their peers who responded with them, they were able to overcome their hesitation and shock and successfully respond to the Pulse nightclub attack.[209]

According to research conducted at the Federal Law Enforcement Training Center, "a critical component of officer safety and survival is the ability to make effective decisions under stress. This capacity is most critical in those situations that rapidly escalate to the point at which an immediate and appropriate response is necessary for survival. . . . Cognitive processing and preparation are critical skills that must . . . be a part of law enforcement training."[210]

---

[205] Orlando Police Department and Orange County Sheriff's Office first responders, focus group (see note 72).

[206] Orlando Police Department and Orange County Sheriff's Office first responders, focus group (see note 72).

[207] Orlando Police Department watch commanders, focus group with assessment team, January 24, 2017.

[208] Orlando Police Department SWAT team members, focus group (see note 53).

[209] Orlando Police Department SWAT team members, focus group (see note 53); Orange County Sheriff's Office hazardous device team members, focus group (see note 100).

[210] James L. Meyerhoff, *Stress and Decision-making* (Washington, DC: Federal Law Enforcement Training Center, 2011), 1–14, https://www.fletc.gov/sites/default/files/imported_files/reference/research-papers/Stress-and-Decision-Making-04-06-12--Approved---Pulic-Release--508-Accessible.pdf.

As demonstrated in Orlando, San Bernardino, and other cities that have experienced acts of public mass violence or terrorism, patrol officers are increasingly the first law enforcement personnel to arrive on scene. While significant emphasis has been placed on training tactical units to respond to these novel, complex, and rapidly evolving events, these recent incidents have demonstrated that the actions taken by patrol and other nontactical unit officers greatly impacts the outcome of the incident. The presence of or potential for IEDs, suicide bombers, or hostages suggests that greater emphasis must be placed on providing training for patrol officers arriving on the scene of a terrorist attack. In addition to tactics, training must include decision-making and critical thinking components to strengthen the patrol officer's ability to conduct a situational assessment and develop and execute an appropriate course of action in overwhelming operational environments.[211]

OPD patrol officers told the assessment team that the in-service firearms, active shooter, and ad hoc training they had received prepared them to respond to the Pulse terrorist attack. However, all acknowledged the need for increased agency-based and multiagency training consistent with the evolving threat environment to continuously build individual and department-wide skills, tactics, and protocols.

## Training for all personnel

The importance of training for critical incidents also extends to civilian and support personnel, particularly communications staff. The OPD communications center is jointly housed with the OFD, and OPD and OFD dispatchers and communications supervisors are co-located in a room that serves as the City of Orlando Emergency Operations Center. As emergency calls came in—and the realization that this was a significant mass casualty event became more apparent—the communications center supervisors, dispatchers, and 911 call takers said their training kicked in and they were "in the zone," even as the communications center was being overwhelmed with calls. Prior active shooter training for communications personnel was invaluable because it prepared them to mute their lines if they became emotional, focus on keeping victims calm, obtain crucial information from them to relay to those on scene, and prepare survivors for rescue by telling them to do exactly what the officers told them to do.[212]

---

[211] Straub, Zeunik, and Gorban, "Lessons Learned" (see note 19).

[212] Orlando Police Department 911 call takers and dispatchers, focus group (see note 54).

**Relying on Training When It Matters Most**

In the early morning hours of June 12, 2016, an Orlando Police Department communications center employee was returning from her break, heard the commotion, and realized something big was happening. Several dispatchers and communications supervisors said initially they did not think the calls were real, but she did. She returned to her duty station and began taking 911 calls from victims. As she was speaking to one victim, the employee heard gunshots and realized the victim had just been killed as she was talking with her. She then received a call from another victim. Relying on her extensive training, she was able to keep the victim calm on the phone and was instrumental in his eventual rescue. On several occasions, she relied on what she had learned—that during emotional times it is important to mute the phone, regain composure, and return to the task at hand—and muted the phone so the victim could not hear her becoming emotional before quickly reopening the line and returning to help him.

Several employees were distraught and the emotional toll was apparent, but because of their training, they were all able to provide a calming presence to the victims and relay important information to officers on scene. Supervisors immediately requested department chaplains respond to assist call takers and dispatchers dealing with emotional trauma. One dispatcher summed up the mood, stating, "We did not do enough."

_____

Source: Orlando Police Department 911 call takers and dispatchers, focus group (see note 54).

## Equipment and training observations and lessons learned

**Observation 4.1. The OPD and the OCSO gained tactical advantages and maintained officer safety because of their access to specialized equipment.**

Prior to the suspect being neutralized, the OPD Avatar III tactical robot was deployed and provided images from parts of the Adonis Room that contributed to the determination that an assault down the hallway would be too dangerous and the results too unpredictable. After the suspect was neutralized, the OCSO and the Orlando Fire Department (OFD) were able to use their robots as well to aid in the clearing of the nightclub and the suspect's vehicle.

> *Lesson learned 4.1.1. Departments should consider the purchase of tactical robots on an individual basis or as a regional asset to increase their ability to gain intelligence to inform tactical decisions in highly volatile operating environments.*

**Observation 4.2. Many of the law enforcement first responders were ill-equipped to protect themselves from the threat posed by the suspect.**

Specifically, the body armor issued to patrol officers and others who were not assigned to specialized units did not provide sufficient protection against the .223 caliber rounds fired by the suspect. Some of the other officers who had been issued higher level ballistic vests and helmets nevertheless failed to don the equipment before entering the Pulse nightclub during the initial assault.

*Lesson learned 4.2.1. Agencies should ensure that adequate personal protective equipment (PPE) is issued to and used by first responders.*

PPE should include active shooter armor kits (ballistic helmets and ballistic vests with ceramic plates) that afford greater protection from semi- and fully automatic weapons and .223 caliber and other ammunition.

*Lesson learned 4.2.2. The balance between "militarizing" the police and ensuring they have the necessary equipment such as armored personnel carriers to protect themselves and the community during incidents of mass public violence and terrorism needs continued discussion and analysis.*

**Observation 4.3. The ability of the OPD communications center staff to patch the radio channels from all four of OPD's geographic sectors facilitated information sharing amongst all OPD personnel.**

*Lesson learned 4.3.1. Interoperability and the ability to patch together responding agency radios facilitated the sharing of information which greatly enhances response coordination when necessary.*

**Observation 4.4. Because of the medical equipment in the Orlando Regional Medical Center (ORMC) and some signal dead zones, OPD officers responsible for clearing the hospital during the report of an active shooter in the facility experienced challenges in communicating with command staff.**

Although the hospital was cleared in approximately one hour, OPD had to have an officer stand outside the ORMC and relay information to and from the command center to ensure they stayed informed about the presence of a secondary attack or additional suspects.

*Lesson learned 4.4.1. Agencies should identify facilities within their communities that pose radio and cell phone transmission and reception difficulties. These facilities can be used to train personnel and identify ways to mitigate poor communication.*

**Observation 4.5. The OFD chief was not notified about the Pulse attack in a timely manner because the fire department's outdated paging system failed.**

*Lesson learned 4.5.1. Agencies should build redundancy into command notification protocols to ensure all appropriate notifications of a critical incident occur in an organized and timely manner.*

*Lesson learned 4.5.2. Public safety communication centers should be designed to create situational awareness among dispatchers so that even if police, fire, and emergency medical services (EMS) operate on different systems—radio or paging—all public safety agencies are aware of activities in other disciplines and can act to support those activities if needed.*

**Observation 4.6. Almost all OPD officers, OCSO deputies, and civilian support staff interviewed by the assessment team agreed that training in their respective areas of responsibility took over and informed the decisions they made and actions they took in response to the Pulse attack.**

*Lesson learned 4.6.1. The OPD and other law enforcement agencies should continue to develop and implement reality-based training that develops situational awareness, critical thinking, and the ability to execute tactics under high levels of stress.*

*Lesson learned 4.6.2. Agencies should continue to regularly plan, train, and exercise using tabletop and practical exercises that incorporate recognized practices and lessons learned from critical incident reviews and after action reports.*

Needs evaluations, planning, training, and practical exercises should be ongoing activities.

**Observation 4.7. Law enforcement counterterrorism training must recognize the evolution of the tactics used during terrorist attacks in the United States or abroad and be updated accordingly.**

Federal, state, and local training must recognize the changing threat environment and prepare law enforcement personnel, especially those who are not assigned to specialized units, to respond to incidents where high capacity weapons, IEDs, and other devices may be employed by well-trained and -equipped assailants.[213]

*Lesson learned 4.7.1. Improved counterterrorism training is necessary to strengthen both community and officer safety.*

In general, counterterrorism training for law enforcement personnel, especially those who are not assigned to specialized units, has not progressed significantly since 9/11.

*Lesson learned 4.7.2. Increased attention should be paid to policies, procedures, and training regarding the law enforcement response to suicide bombers, secondary devices, and multisite attacks.*

---

[213] Dan Atkinson, "BPD to Use Mideast Conflict as Training to Fight US Terror," *Boston Herald*, March 30, 2017, http://www.bostonherald.com/news/local_coverage/2017/03/bpd_to_use_mideast_conflicts_as_training_to_fight_us_terror.

**Observation 4.8. Training should prepare responders, particularly patrol officers, for situations they may experience when responding to terrorist attacks.**

OPD active shooter training prior to the Pulse attack included sensory deprivation and stimuli that officers experienced during the incident. Going forward, OPD and national training must recognize and prepare law enforcement personnel to make decisions in overwhelming, novel, complex, and rapidly evolving environments.

*Lesson learned 4.8.1. Training should consider transitions, phases, and additional risks posed by terrorists including those that extend beyond the arrest or neutralization of the suspect(s).*

Training should include transitioning from a dynamic active shooter situation (a situation that is evolving very rapidly consistent with the suspect's actions) to a static situation (a situation that is not evolving or in motion because the suspect is contained, has escaped, or is incapacitated) and potentially back to dynamic or mass casualty situations, requiring transitions back and forth over the course of the response. It is important to account for all the challenges, considerations, and roles and responsibilities that arose in this response.

*Lesson learned 4.8.2. Training should attempt to create as much sensory deprivation or stimuli as possible to simulate real-world scenarios. The ability to understand and apply response strategies in a high stress environment improves performance.*

First responders entering the nightclub encountered a barrage of sensory stimuli: They saw deceased victims and injured persons, heard screaming and moaning from victims, smelled the odor of gunpowder, felt water and blood, experienced movement as injured and uninjured victims ran from the building, the club was relatively dark except for the rotating strobe lights, and experienced a heightened level of fear because of the potential presence of IEDs. This level of chaos can cause a high stress situation that affects officers' abilities to apply response strategies learned during training. Therefore, this level of chaos should be considered and even simulated during training.

**Observation 4.9. Many of the OPD civilian staff, other city personnel, and volunteers who provided support in the emergency operations center, the family reunification center, and the family assistance center had not been trained to handle high stress situations such as mass casualty incidents.**

Although City staff members regularly attend FEMA-related training to work as volunteers at the emergency operations center, the family assistance center, and other post-disaster centers, this training is traditionally focused on weather-related catastrophes. Some of the people who answered hotline calls, Spanish-speaking City employees, and City finance personnel were not prepared for some of the things they heard and saw, but their support was integral to the success of the overall response. By the second and third day, properly trained personnel from the Red Cross, United Way, and other victim-oriented organizations were in place answering hotline calls.

*Lesson learned 4.9.1. Provide mass casualty and emergency response training to those in nontraditional roles who may be needed in an emergency situation to ensure they are prepared to deal with difficult and emotional calls and information.*

*Lesson learned 4.9.2. Post-event responder welfare should be included in agency planning, training, and exercises so responders are better prepared to operate in high stress environments.*

**Observation 4.10. OCSO HDT and OPD SWAT have trained together numerous times since 2007, which was demonstrated by the two teams' familiarity with one another's tactics during the Pulse response. However, with the increasing threat of mass casualty and terrorist attacks, the OCSO HDT and OPD SWAT will focus more on breaching techniques and rapid response tactics to combat situations similar to Pulse. Similarly, fire, EMS, and other government stakeholder agencies have participated in crisis response training with OPD.**

Previous training events and Orlando-area joint operations built a level of familiarity between the teams' overall tactics, demonstrated throughout the Pulse response. However, challenges followed the partial breach.

*Lesson learned 4.10.1. Specialized law enforcement units should regularly train together to ensure familiarity with each unit's policies, procedures, and tactics.*

*Lesson learned 4.10.2. Law enforcement agencies should engage regional first responder agencies—including other law enforcement, fire, EMS, emergency management, and government and nongovernment stakeholders—in crisis response training.*

*Lesson learned 4.10.3. Training exercises should continue past the point where the threat no longer exists and extend to the coordination of the medical response, the notification of victims' families, establishing reunification and assistance center(s), and providing resources to vigils and funerals and prolonged impact on the immediate community.*

Too often, training events stop after the shooters are located and the threat eliminated. This leaves first responders with a lack of knowledge and appreciation for how the entire response system functions and how their actions influence other steps of the process. In this instance, the OPD had not fully accounted for family reunification and notification, survivor and witness interviews, and staging areas that provided privacy from the media and were able to hold the number of people expected.

# 5. Emergency Medical Care

Recent improvised explosive device (IED) and active shooter incidents have led first responders to adapt and adopt emergency-based tactics and strategies that focus on reducing the time it takes to safely get to victims and provide emergency medical care.[214] Especially with the increasing severity of injuries caused by expanding bullets fired from high capacity semiautomatic rifles similar to the one used in the Pulse attack, prioritizing emergency medical care is imperative. "Once [expanding bullets] enter the body, they fragment and explode, pulverizing bones, tearing blood vessels, and liquefying organs."[215] Therefore, emerging alternatives to the traditional policy suggest that law enforcement agencies adapt the basic tenets of tactical combat casualty care and collaborate to allow emergency medical services (EMS) personnel with appropriate protective equipment to quickly enter the scene of a critical incident with law enforcement officers to stabilize patients and minimize fatalities.[216] This chapter will discuss the emergency medical care the Orlando Police Department (OPD) and partner agencies provided during the response to the terrorist attack at Pulse.

An increasing number of law enforcement agencies nationwide are providing basic trauma care and equipment for their officers. The International Association of Chiefs of Police adopted a resolution recommending the following:

> "that every law enforcement officer should receive tactical emergency medical training including critical core skills of early, life-threatening hemorrhage control and rapid evacuation of mass casualty victims to a casualty collection point. Tactical emergency medical skills are critical life-saving interventions in the officer-down situation, whether as officer applied self-aid or given to a fellow officer, or to victims of a mass casualty situation such as an active shooter or bombing event."[217]

While the primary goal of tactical emergency medical training is to assist wounded officers, the benefits of such training and equipment to save the lives of critically injured civilians has been demonstrated repeatedly in critical situations. For example, on February 20, 2016, several people were shot during a mobile active shooter incident in Kalamazoo, Michigan. Lives were undoubtedly saved because

---

[214] Straub et al., *Managing the Response* (see note 136).

[215] Leana Wen, "What Bullets Do to Bodies," *The New York Times*, June 15, 2017, https://www.nytimes.com/2017/06/15/opinion/virginia-baseball-shooting-gun-shot-wounds.html.

[216] Office of Health Affairs, *First Responder Guide for Improving Survivability in Improvised Explosive Device and/or Active Shooter Incidents* (Washington, DC: US Department of Homeland Security, 2015), https://www.dhs.gov/sites/default/files/publications/First%20Responder%20Guidance%20June%202015%20FINAL%202.pdf.

[217] Police Physicians Section, "Tactical Emergency Medical Training for Law Enforcement Personnel: Adopted at the 120th Annual Conference, Philadelphia, Pennsylvania, October 23, 2013," International Association of Chiefs of Police, last modified October 23, 2013, http://www.theiacp.org/ViewResult?SearchID=2310.

responding officers from the Kalamazoo Department of Public Safety and the Kalamazoo County Sheriff's Office had tactical emergency medical kits and training, which they used to treat some of the gunshot wounds. A similar situation occurred in Tucson, Arizona, in January 2011, when Pima County Sheriff's Department deputies saved the lives of then Congresswoman Gabrielle Giffords and several others.[218] In fact, "based on the immediacy of the threat and the geographic location of victims, law enforcement officers providing casualty care may offer the best chance for victim survival."[219]

In 2013, a group of public safety personnel representing fire, law enforcement, pre-hospital care, trauma care, and the military convened in Hartford, Connecticut, to develop consensus regarding strategies to increase survivability of in mass public shootings. Applying lessons learned from injuries experienced on military battlefields, the group of experts developed the acronym THREAT to address casualty management during high-threat tactical and rescue operations:

- **T**hreat suppression

- **H**emorrhage control

- **R**apid **E**xtrication to safety

- **A**ssessment by medical providers

- **T**ransport to definitive care[220]

Recognizing that IED, active shooter, and other mass casualty incidents represent an increasing threat of devastating injuries to civilians and public safety personnel, all first responders should be trained and equipped to provide basic lifesaving measures in response to explosive injuries and gunshot wounds.

In Orlando, many of the first officers who responded to the terrorist attack were among the 772 officers that the OPD had trained in individual first aid kit (IFAK) tactical medical solutions.[221] While the initial contact team maintained their cover positions and kept the suspect contained, other OPD officers and Orange County Sheriff's Office (OCSO) deputies entered Pulse and immediately began triaging victims.

Once they were extricated from the club and brought to the triage area—located behind the Einstein Bros. Bagels store approximately 250 feet from Pulse—law enforcement officers, following the example of officers who responded to the Aurora, Colorado, movie theater shooting, transported critical patients to the hospital in police vehicles.[222] Because the level one trauma center Orlando Regional Medical

---

[218] Straub et al., *Managing the Response* (see note 136).

[219] Office of Health Affairs, *First Responder Guide* (see note 216).

[220] Joint Committee to Create a National Policy to Enhance Survivability from Intentional Mass Casualty Shooting Events, "Improving Survival from Active Shooter Events: The Hartford Consensus," American College of Surgeons, last modified June 1, 2013, http://bulletin.facs.org/2013/06/improving-survival-from-active-shooter-events/.

[221] "IFAK Training Users—Current," TacMed Medical Solutions, provided to assessment team March 30, 2017.

[222] *Aurora Century 16 Theater Shooting: After Action Report for the City of Aurora* (Arlington, VA: TriData Division, 2014), https://www.courts.state.co.us/Media/Opinion_Docs/14CV31595%20After%20Action%20Review%20Report%20Redacted.pdf).

Center (ORMC) was less than half a mile from the club, officers and deputies placed injured victims in the beds of their trucks and back seats of their cars and drove them to the hospital, quickly returning to Pulse to transport more critically wounded victims. However, because this process was so rapid, the alert system had not even notified emergency room staff at ORMC that there was a mass casualty incident when victims started arriving.[223]

Of the 102 people shot and five others injured at Pulse, 69 were alive when first responders arrived. Because of the emergency medical care provided by first responders, the overwhelming majority of those 69—58 people, or 84 percent—survived. In addition, because of the emergency medical care provided by first responders and the timeliness with which patients were transferred to local hospitals, all of the 35 people who had been shot and reached operating rooms alive—even with the most critical of injuries—survived.[224]

**Rapid Victim Transportation**

On July 12, 2012, the city of Aurora, Colorado, experienced a mass shooting at Century 16 Theater movie complex when a lone gunman shot 70 people while 12 other people suffered injuries from fleeing the scene. As the number of police, fire, and emergency medical services responders increased, the theater quickly became a site of chaos and confusion, with no coordinated response. An unintended consequence was that police vehicles blocked ambulances from triage and treatment locations to pick up victims and transport them to local hospitals. In a creative improvisation, police officers decided to transport victims in their own vehicles, which was unprecedented and unplanned but saved lives. Of the 82 people injured, 60 were successfully transported to hospitals and survived, and police vehicles were responsible for transporting more victims than ambulances. Police were commended for thinking outside the box and preventing increased loss of life.

_____

Source: *Aurora Century 16 Theater Shooting* (see note 222).

---

[223] Orlando Regional Medical Center emergency preparedness manager, interview (see note 110).

[224] Nadeen Yanes, "Orlando Officials Share Lessons Learned from Pulse Shooting," Click Orlando, last modified April 26, 2017, http://www.clickorlando.com/news/pulse-orlando-shooting/orlando-officials-share-lessons-learned-from-pulse-shooting.

## Emergency medical care observations and lessons learned

**Observation 5.1. Because of the emergency medical care provided by Orlando first responders, the overwhelming majority of the injured extricated from Pulse survived.**

The OPD and supporting agencies responding to Pulse made victim rescue a priority. Within 40 minutes, all critically injured victims except the hostages in the restrooms were rescued. Officers and deputies used patrol and other vehicles to transport the most critically injured victims to the nearby trauma center. Because of this quick action on the part of law enforcement in addition to the Orlando Fire Department (OFD) transporting patients from the triage area, 58 injured survivors (53 who had been shot and five with other injuries) were treated at local hospitals and survived. Only 11 individuals who were shot inside of the club and extricated alive did not survive.[225] This is a testament to the importance of the "golden hour" and a key lesson learned to preserve life.[226]

> *Lesson learned 5.1.1. Law enforcement agencies should equip and train officers in the use of personal tactical emergency medical kits that include tourniquets, "quick clot" occlusive dressings, and Israeli bandages.*
>
> The OPD trained all officers in IFAK tactical medical solutions, which proved essential to saving a significant number of critically injured victims, particularly from the Jewel Box and patio areas of the Pulse nightclub.
>
> *Lesson learned 5.1.2. Law enforcement personnel should be prepared to improvise to save critically injured persons.*
>
> For example, the OPD and partner organizations used police vehicles to transport critically injured victims to the level one trauma center close to the incident location, saving numerous lives.

**Observation 5.2. The OPD should continue to build relationships, train, and develop protocols with medical personnel from area hospitals, especially the regional level 1 trauma center, to improve the law enforcement response to mass casualty incidents.**

Most of the injured victims from Pulse were brought to ORMC even before the hospital received notification from its alert system. While ORMC acknowledged that the OPD saved numerous lives by rapidly transporting victims to the trauma center, the emergency room was quickly overwhelmed. In addition, ORMC personnel said that had they been aware of the need for a decontamination facility for officers and deputies, they would have made outdoor showers at the hospital available.

> *Lesson learned 5.2.1. Create relationships with and include hospital and medical personnel in regional mass casualty or terrorist training.*

---

[225] Orlando Police Department timeline (see note 24).

[226] Charlie Eisele, "The Golden Hour," *Journal of Emergency Medical Services*, August 31, 2008, http://www.jems.com/articles/2008/08/golden-hour.html.

*Lesson learned 5.2.2. Identify medical protocols and practices that can be adapted and administered in life-threatening situations.*

While emergency medical care and tactical medical training can be cost-prohibitive for some agencies, partnering with hospitals and local medical professionals can provide law enforcement with practical training and can foster or enhance partnerships with critical stakeholders. In Orlando, ORMC staff commended officers and deputies for rescuing and saving the lives of so many victims and offered to engage in planning and training exercises to enhance the public safety and hospital response to mass casualty events.

*Lesson learned 5.2.3. Law enforcement personnel should be assigned to medical facilities receiving patients from critical incidents to provide security and assist medical staff with situational awareness and communication.*

During the Pulse incident response, emergency room staff members were not aware of why the hospital was locked down for approximately one hour. An OPD officer informed them so that they could safely continue their life-saving work. At the same time, emergency room staff members were able to provide OPD officers with information about the severity—and types—of the victims' injuries.

**Observation 5.3. Prior to the Pulse attack, the OPD incorporated the OFD rescue task force to serve as a casualty rescue component in the "warm zone." [227]**

The intent in establishing the rescue task force was to provide faster access to life-saving emergency medical care for victims by integrating fire department and EMS personnel into contact teams. While in this incident the OFD personnel of the rescue task force did not enter the club with the OPD, this approach to tactical medical response is one example of possible collaborative options.

*Lesson learned 5.3.1. Public safety agencies should consider, train, and exercise how they will deploy emergency medical responders in active shooter or other hostile events to ensure victim extraction, triage, and treatment.*

Law enforcement agencies must ensure they are prepared for incidents that require medical responses like the ones required in San Bernardino and the Pulse terrorist attacks. They should determine whether to incorporate fire department or EMS personnel, have a tactical medic trained, train all personnel in emergency medicine, or implement a combination of these options.

**Observation 5.4. The OPD had trained more than 700 officers in IFAK tactical medical solutions at the time of the shooting.**

*Lesson learned 5.4.1. To reduce the amount of time necessary for victims to receive emergency trauma care, law enforcement officers should be trained in IFAK or similar emergency medical care methods.*

---

[227] For more information about safety zones and perimeters, see the sidebar "Safety Zones and Perimeters Defined" on page 67.

# 6. Officer Safety and Post-Event Responder Wellness

Protecting the safety and wellness of officers during and in the aftermath of the response to a major incident is crucial. This chapter will review the strategies and equipment used by the Orlando Police Department (OPD) to protect their officers during and following the response to the Pulse attack.

## Officer safety

Terrorists and other individuals intent on causing harm—particularly to law enforcement officers—study law enforcement protocols and responses to critical incidents and adapt their tactics accordingly.[228] The use of high-caliber and high-capacity weapons and the use of secondary devices are becoming increasingly common in attacks in the United States. The primary intent of secondary devices is to kill or injure first responders during the response and the subsequent investigation at the location of the attack and at other areas pertinent to the response including the command post and the triage area.[229]

In Orlando, the suspect made multiple statements indicating that he was following this trend. He told the OPD crisis negotiation team (CNT) sergeant that there were cars with bombs outside the club that could detonate an entire city block and that he had an explosive vest.[230] In addition, hostages rescued from inside the club relayed to OPD officers that they overheard the suspect say he had four additional explosive vests that he intended to put on hostages and detonate to kill and injure first responders. Although some law enforcement officers discounted the suspect's ability to enter the club with multiple suicide bomb vests while firing and reloading two weapons, the OPD operated under the assumption that the suspect was equipped with one or more devices.

As soon as this information was relayed to the unified command center (UCC), the Orange County Sheriff's Office (OCSO) hazardous device team (HDT) lieutenant was asked to provide his analysis and recommendations to the sheriff. The HDT lieutenant repeatedly said that if the suspect had the IEDs that he claimed he had, there would need to be a 1,000-foot perimeter established around the club and the car to provide safety. Despite this lieutenant's input, many officers were either unaware of this determination or actively chose to ignore it because of their commitment to rescuing victims and apprehending the suspect.

---

[228] Braziel et al., *Bringing Calm to Chaos* (see note 127).

[229] *Managing the Emergency Consequences of Terrorist Incidents: Interim Planning Guide for State and Local Governments* (Washington, DC: Federal Emergency Management Agency, 2002), https://www.fema.gov/pdf/plan/managingemerconseq.pdf.

[230] "Transcripts of Calls with Suspect 6-12-16" (see note 30).

## Post-event responder wellness

Terrorist attacks and other hostile events take an emotional toll on all involved as well as on those watching it play out from around the nation and the world. However, law enforcement officers, firefighters, and emergency medical services personnel are often expected to be "tough" and "resilient" and able to bounce back from trauma without much if any mental health treatment or professional attention. The culture of public safety—similar to the military's in this way—has historically not embraced the need to attend to the mental health of its personnel.[231]

The law enforcement profession has begun to recognize that "most police officers may be able to tolerate a more vivid exposure to death or violence than the general public, but there are situations, such as mass casualty events, where the traumatic stress simply exceeds an officer's ability to cope without support."[232] In addition, law enforcement personnel—including call takers and dispatchers, investigators, other officers, and support staff—who are not at the scene of a critical incident but respond in other ways can also be affected.[233] Therefore, it is important that agencies acknowledge and provide mental health support to all personnel. In recognition of the fact that there is no one-size-fits-all wellness strategy that accommodates the needs of every individual involved in the response to a critical incident, it is imperative to ensure that an array of mental health and wellness resources are available immediately as well as in the days, weeks, and months following.[234]

In accordance with Policy and Procedure 1502.0 (Critical Incident Stress Management Team), the OPD critical incident stress management (CISM) team held a mandatory formal debriefing for all employees involved in the response to Pulse on Tuesday, June 14—less than 72 hours after the attack.[235] The OPD also invited employees and responders of the 26 other agencies that supported the response at Pulse to participate in the debriefing; many of these responders were also required by their agencies to attend.

The session was held at a high school and began with all of the attendees being provided a general overview of the symptoms of post-traumatic stress and stress management information, assessments of the overall well-being of personnel, and a recap of all of the mental health and wellness resources available to officers. Attendees were then randomly divided into smaller groups and were led by individual CISM and peer support personnel in facilitated discussions of their role in the response and their personal reactions to the event. This was followed up by a second formal debrief in November

---

[231] NAMI, *Preparing for the Unimaginable* (see note 145).

[232] NAMI, *Preparing for the Unimaginable* (see note 145).

[233] IACP National Law Enforcement Policy Center, *Critical Incident Stress Management: Concepts and Issues Paper* (Alexandria, VA: International Association of Chiefs of Police, 2011), 1, http://www.theiacp.org/Portals/0/documents/pdfs/MembersOnly/CriticalIncidentStressPaper.pdf.

[234] John Nicoletti, Sara Garrido, and Mark J. Kirschner, "Supporting the Psychological Recovery of First Responders Following a Mass Casualty Event," *The Police Chief* 83, no. 6 (June 2016), 40–45, http://www.policechiefmagazine.org/supporting-the-psychological-recovery/.

[235] Orlando Police Department Policies and Procedures 1502.0 – Critical Incident Stress Management Team, provided to assessment team May 11, 2017.

2016. The second debriefing was another opportunity to have mental health experts describe the longer-term symptoms of post-traumatic stress and facilitate discussions about the emotional toll of the Pulse response on the attendees.[236]

In addition, OPD personnel were encouraged to use and in some cases were referred to a bevy of city and outside resources to ensure their mental and emotional well-being. The employee assistance program (EAP) available to all City employees was leveraged by both sworn and civilian personnel. The EAP provided a pool of mental health experts for individual counseling sessions to personally address the traumatic experiences that resulted from participating in the response to the Pulse attack. Some OPD officers and employees were also permitted to use mental health and well-being resources, including residential treatment programs, at other Florida law enforcement agencies.

It is important for leadership to set the tone for openly confronting and honestly discussing the mental health needs of an entire agency, particularly in times of crisis. "In a critical incident, it is easy for the department to single out personnel it believes are impacted and provide support to them. It is hard to make such a judgment when the personnel involved in the critical incident may not even know they need help."[237] This trauma, if left untreated, can lead to work performance and officer safety issues, particularly in law enforcement agencies. OPD Chief John W. Mina epitomized leadership's setting the tone for an agency in the aftermath of a critical incident. In addition to openly acknowledging the importance of health and well-being for all personnel, Mina requested a peer-to-peer meeting with law enforcement mental health experts and chiefs who had led their agencies through a mass casualty incident, which the COPS Office facilitated in 2016.[238]

## Mental health incident commander

In the aftermath of a terrorist attack or other mass casualty event, agencies should designate a mental health incident commander as soon as possible and practical. The primary role of the mental health incident commander is to monitor agency personnel in the aftermath of the event, to coordinate debriefings, to connect individuals to peer support or mental health professionals, to connect families of those involved in the incident response to support services if needed, and to ensure a continuum of care in the aftermath of the event. This position is also necessary to advise agency leadership regarding operational decisions that impact personnel mental health (including work and shift assignments) and vets and manages self-deployed mental health providers.

---

[236] Orlando Police Department and Orange County Sheriff's Office first responders, focus group (see note 72).

[237] IACP National Law Enforcement Policy Center, *Critical Incident Stress Management*, 2 (see note 233).

[238] As part of this Critical Incident Review, the COPS Office granted Chief Mina's request and provided a meeting with two law enforcement mental health experts and a retired chief who had recently been through a mass casualty response.

AR00436

Ideally, the mental health incident commander should be a person who has

- familiarity with the agency and public safety culture;

- credibility with agency personnel;

- mental health training;

- connections with the local mental health community;

- an understanding of the impact of trauma and familiarity with Psychological First Aid.[239]

In the aftermath of the Pulse terrorist attack, the OPD assigned a captain, who is the CISM commander, to serve as the mental health incident commander.

## Officer safety and post-event responder wellness observations and lessons learned

**Observation 6.1. The OPD did not assign an incident safety officer on scene during the response.**

Many officers and deputies responded to the signal 43 by self-deploying, rushing into and around Pulse nightclub.[240] Without an incident safety officer, special weapons and tactics (SWAT) team members rushed into the club before donning the entirety of their ballistic equipment, the 1,000-foot hazardous device team (HDT) perimeter was not communicated to all responders, and there was no decontamination process for responders as they were relieved of duty.

> *Lesson learned 6.1.1. An incident safety officer should be designated as quickly as possible during response to a mass casualty or emergency incident, especially a terrorist incident.*

> This officer is responsible for identifying, communicating, and mitigating (to the extent possible) all responder safety risks including adhering to perimeters when explosive devices are mentioned or found and there is the possibility of secondary devices and HDT perimeters.

> *Lesson learned 6.1.2. The incident safety officer should oversee decontamination protocols for decontamination of all responding personnel and their vehicles.*

**Observation 6.2. The OPD does not have decontamination protocols in place for first responding officers following large-scale critical incidents.**

OPD Policy and Procedure 1301.8 (Significant Exposure and Control Plan) includes officer safety and wellness evaluations, testing, and follow-up procedures for individuals and vehicles, and OPD Policy and Procedure 1308.3 (Major Incidents) includes checklists for various major incidents. Neither of these

---

[239] NAMI, *Preparing for the Unimaginable* (see note 145).

[240] Signal 43 is the signal code for "officer needs immediate assistance."

policies and procedures addresses officer and vehicle decontamination processes for large-scale critical incidents. For many of the first responders, the individual decontamination that officers and deputies had to do themselves was one of the more traumatizing parts of the response.

*Lesson learned 6.2.1. Decontamination protocols should be established before a critical incident occurs.*

**Observation 6.3. OPD leadership prioritized the mental health of all OPD personnel following the response to Pulse.**

All OPD personnel and OCSO deputies the assessment team interviewed said that they were offered—and in some cases required to use—a variety of mental health resources. From the mandatory CISM debriefs less than 72 hours after the incident and six months later to the availability of EAP sessions to the willingness of Chief Mina to allow employees to use external resources, the OPD ensured that mental well-being was a primary focus following the response to Pulse.

*Lesson learned 6.3.1. Organizational leadership should ensure that all involved in the response feel valued and are provided access to the physical and mental health resources they may need after a critical incident.*

*Lesson learned 6.3.2. Agencies should create a post-event wellness strategy that accommodates everyone, including on-scene responders, support personnel, and other agency employees.*

As much as possible, create a responder mental health strategy that accommodates employees who respond better to immediate debriefs and counseling, those who prefer time before debriefs and counseling, and those who prefer a combination, and determine what level of participation will be compelled versus suggested and who will be included. During assessment team interviews and focus groups with OPD and OCSO personnel, some individuals expressed appreciation for the immediate CISM debrief because it helped them put their emotions in perspective, provided opportunities to hear some positive outcomes of the response, and almost immediately addressed some issues and concerns they had. Other employees remarked that the mandatory debrief immediately after the incident was unhelpful because they had not recuperated from the physical stimulation caused by the response, much less fully processed their own emotions. In addition, while some individuals appreciated being randomly assigned to the facilitated discussion groups, others felt the debriefs would have been more useful and comfortable with members of their own team. Likewise, some felt that being compelled to talk was beneficial while others said it was hard to identify emotions that soon after the attack. However, everyone interviewed agreed that they were provided a significant number of resources and opportunities to ensure their mental health and well-being.

**Observation 6.4. While the OPD did provide various opportunities for healing following the incident, including debriefs and counseling through EAP, some employees felt that given the extraordinary circumstances of a critical incident the EAP system did not meet their personal needs.**

*Lesson learned 6.4.1. Jurisdictions and individual agencies should consider whether their traditional EAP and mental health structure will suffice in the aftermath of a critical incident or if adjustments should be made for employees in need of other outside services.*

**Observation 6.5. The OPD assigned a designated mental health incident commander.**

The primary role of the mental health incident commander is to monitor agency personnel in the aftermath of the event, to coordinate debriefings, to connect individuals to peer support or mental health professionals, to connect families of those involved in the incident response to support services if needed, and to ensure a continuum of care in the aftermath of the event. This position is also necessary to advise agency leadership regarding operational decisions that impact personnel mental health (including work and shift assignments) and to vet and manage self-deployed mental health providers.

*Lesson learned 6.5.1. To further focus and prioritize the mental health in the aftermath of the Pulse incident, OPD and other law enforcement agencies should assign a mental health incident commander.*

The OPD assigned a captain of the CISM team as a mental health incident commander. The captain's role was to monitor agency personnel, coordinate the CISM debriefs, and provide and guide employees to special services.

# 7. Post-Event Victim Welfare

"[Pulse] showed us that we were the community we thought we were."

— *Executive Director, Orlando Chamber of Commerce*

For law enforcement agencies and emergency operations centers, response to critical incidents does not end once the threat is neutralized and injured victims are transported for medical care. Emergency operations require a phased approach, handled by assigned city and community organizations in collaboration with police departments, to address the long-term needs of a community after a crisis. Family and friends of victims have questions about the well-being of loved ones, victims need assistance identifying continued support, and the community needs to know ways in which they can help. Fortunately for Orlando, training and experience over the years—from active shooter incidents to hurricanes—have prepared all stakeholders and partners to respond to these needs. The City of Orlando's Disaster Operations Center, the Police Emergency Operations Center, and the City Emergency Operations Center all consolidated into one emergency operations center (EOC) that included all relevant stakeholders to support the overall mission of the Orlando Police Department (OPD) and City of Orlando response to the Pulse attack. The purpose of this chapter is to review the processes and systems Orlando used to provide services to victims in the aftermath of the Pulse incident.

## Activation of the emergency operations center

During the Pulse incident, Orlando activated its level 1 EOC in the OPD communications center on the morning of June 12, 2016, and continued operating nonstop through June 22, 2016. During that time, their mission was to provide operational coordination and support for the following:

- OPD command post and on-scene operations during the incident
- The emergency information center (EIC) and help line
- Dignitary visits, funerals, memorial services, and vigils
- Family reunification center
- Family assistance center
- Orlando united assistance center
- OneOrlando Fund[241]

---

[241] City of Orlando Emergency Management, *Emergency Management Response to the Pulse Nightclub Shooting*, presentation to assessment team February 23, 2017.

The mayor's declaration of a state of emergency and activation of the EOC allowed the City to allocate additional resources to support the emergency operations of the OPD during response to the Pulse incident, provide services for victims and their families in the aftermath of the incident, and provide additional funding opportunities for the OPD and the City to support the response.[242]

The EIC and help line were established to provide information to victims' families and friends. The EIC also served as the victim information center for staff members from the Florida Emergency Mortuary Operations Response System (FEMORS).[243] It was staffed by community service officers, City staff, local volunteers, and American Red Cross volunteers. The EIC started with a bank of 12 phones but quickly expanded to 23 phones and answered approximately 6,800 calls. The overwhelming number of calls taken and the broad range of information requested during those calls solidified the EOC's need for ample resources including staff members who were trained and prepared for the emotional impact taking crisis calls can have on volunteers. This help line relieved the pressure on the OPD to answer questions and attend to the needs of the community in the aftermath of the incident.

## Family reunification center

In the moments and hours during and immediately following the incident, Pulse victims were taken or sent to Orlando Regional Medical Center (ORMC). In addition, "Anytime the media, the FBI [Federal Bureau of Investigation], or the OPD encountered a family member—particularly in the first few hours— they told them to come to ORMC."[244] This caused challenges as the ORMC notification system did not fully prepare hospital staff to receive so many people. By 11:00 a.m. on June 12, the ORMC was completely overwhelmed. Family and friends of Pulse-related victims had extended past the emergency room (ER) and hallways, were then moved to a hotel across the street, and still needed more space. ORMC contacted the city Office of Emergency Management (OEM) to ask for assistance in setting up the family reunification center (FRC). Within hours of the incident, the OEM established the FRC at the Beardall Senior Center near the Pulse site and the ORMC for next-of-kin notifications and victim

---

[242] Florida Governor Rick Scott also called a statewide state of emergency on June 13, 2016. Buddy Dyer, "City of Orlando Update 10:20 a.m.," City of Orlando, June 12, 2016, http://www.cityoforlando.net/mayor/2016/06/city-of-orlando-update-1020-a-m/.

[243] The Florida Emergency Mortuary Operations Response System (FEMORS) is made up of about 187 volunteers from across the state of Florida who assist in mass fatality situations when local resources are exhausted. The group is comprised of autopsy assistants, forensic scientists, dentists, and others who can assist with tasks that include identifying victims in these incidents. About 40 members of FEMORS rushed to Orlando the morning after the Pulse shooting to help quickly identify the bodies of the 49 victims shot and killed at Pulse. According to the FEMORS director, the physical aspect of identifying bodies takes less of a toll than the emotional on the volunteers. "'It isn't the presence of human remains that may be difficult for them; this is what they deal in their normal day,' he said. 'It's the scale of the event, the impact on your community. That is a difficult thing to try to train for.'" Katelyn Newberg, "UF Employees among Emergency Responders in Orlando Shooting Response," *Gainesville Sun*, last modified June 21, 2016, http://www.gainesville.com/news/20160616/uf-employees-among-emergency-responders-in-orlando-shooting.

[244] John Hick, "Lessons Learned from the Pulse Nightclub Shooting:  An Interview with Staff from the Orlando Regional Medical Center," *The Exchange* 1, no. 3 (2016), https://asprtracie.hhs.gov/documents/aspr-tracie-newsletter-the-exchange-issue-3.pdf.

identification. The center had the space and the capacity to more comfortably accommodate victims' loved ones as they waited to receive information. It was close to the hospital and also provided parking. The FRC operated from June 12 to June 14 to provide notification and support to families of victims regarding the status of their loved ones who had been at Pulse that night. The FBI crisis team, the FEMORS staffers, and members of the Florida Department of Law Enforcement (FDLE) were there to provide the necessary and often difficult information on victims of the shooting. The establishment of the FRC allowed the OPD to delegate the reunification of survivors and loved ones and conduct next-of-kin notifications for victims killed during the attack.

The after action report of the Washington, D.C., Navy Yard shooting in 2013 emphasized the importance of planning and communicating the process and location for both the FRC and a family assistance center (FAC) in the aftermath of a critical incident.[245] The nexus of raw emotion and logistical challenges makes this process difficult under any circumstances and particularly in the case of mass violence. In Orlando, the questions of where to do the notifications, who should be involved in the process, and who should be notified were all areas of consideration. It was deemed too difficult to conduct the notifications at ORMC because responders quickly noted that the families being led back were going to the "room of doom," where they heard the worst possible news about their family member. Because of where the notification rooms were located, family members who had just been told their loved one had been killed then had to walk back through a labyrinth of other family members and friends waiting to hear about the fate of their own loved ones. Victim advocates were also challenged because they were responsible for ushering the families to and from the room but were required not to say anything to the families about what to expect because the FDLE was the only agency authorized to handle notifications. Some families were frustrated at the victim advocates for not telling them and making them wait through the formal process. In some cases, the victim advocates were unprepared for the vitriol directed at them. Finally, some of the victims' complicated family situations—including being disowned or otherwise not having relationships with their next of kin and some families not knowing, wanting to believe, or understanding why their decedent was at a gay nightclub—and some family members not speaking English added extra levels of challenge to the already difficult notification process.[246]

The establishment and operation of the FRC was an important step toward healing for the community and showed important partnerships within the city of Orlando. While the EOC, the FDLE, and the victim advocates undertook this difficult work, the OPD was able to focus on assisting with the investigation, preparing for press conferences, taking on public relations and media work, and receiving information from the FBI and the FDLE—not to mention getting back to the work of responding to other calls for service in Orlando.

---

[245] *After Action Report Washington Navy Yard September 16, 2013: Internal Review of the Metropolitan Police Department Washington, D.C.* (Washington, DC: Metropolitan Police Department, 2014), http://www.policefoundation.org/wp-content/uploads/2015/05/Washington-Navy-Yard-After-Action-Report.pdf.

[246] University of Central Florida Police Department victim advocates, focus group with assessment team, January 26, 2017.

While the Beardall Center offered the space needed to make family notifications, City and OPD officials did not originally account for the media response to the FRC. Members of the media, particularly those from outside the local market, were able to find and access victims' family members as they walked from their cars into the Beardall Center. Information-hungry reporters shoved cameras and microphones in their faces with little consideration for their need for privacy or state of grief at the time. A similar situation occurred after the San Bernardino terrorist shooting; there, officers eventually created a human perimeter to protect victims and witnesses from reporters as they walked to a bus that would transport them from one family reunification location to another.[247]

## Family assistance center

Once the next-of-kin notifications were completed, the EOC closed the FRC and the FAC was opened to support the immediate needs of families, friends, and victims. The FAC was opened at Camping World Stadium on June 15 and remained open until June 22. The location was chosen based on its accommodations; its secure parking area; its parking, security, and logistical staff already in place; and the fact that it had a designated media area. The facility was large enough to handle the more than 900 individuals and 255 families served by the FAC as well as the 50 to 60 government, community, and business organizations that sent representatives to provide support. It also provided the logistical and technological capacity necessary for the City information technology (IT) department to set up a phone bank and computer support. Those who were there described the FAC as being set up somewhat like a job fair where victims or their families could come and stop by the booth of any of the represented organizations for assistance. Once established, the FAC provided a myriad of services and information to victims and their families. Airlines provided support (and donations) to support getting family to and from funerals. LGBTQ community groups provided information and support to those in the LGBTQ community who needed various services. Children's and pet services were also offered. The organizations represented at the FAC are as follows:[248]

- African-American Chamber of Commerce
- American Airlines
- American Red Cross
- Aspire Health
- Catholic Charities
- Caribbean American Chamber of Commerce
- Children's Home Society
- Colombian consulate

- Delta Airlines
- FBI
- Florida Attorney General's Office
- Florida Crisis Response Team
- Florida Department of Children and Family
- Florida Department of Vital Statistics
- Florida Morticians Association
- Government of Puerto Rico

---

[247] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[248] April Taylor and Kathy DeVault, *Emergency Management Response to the Pulse Nightclub Shooting* (Orlando, FL: City of Orlando Emergency Management, 2017), http://ema.ohio.gov/Documents/DirectorsConference/ 2017_Spring/Emergency%20Management%20Response%20to%20the%20Pulse%20Nightclub%20Shooting.pdf.

- Greater Orlando Aviation Authority
- Heart of Florida United Way
- Hispanic Chamber of Commerce
- Howard Phillips Center for Children and Families
- JetBlue
- Legal Aid Society
- LGBT Chamber of Commerce
- LGBT Community Center
- Lynx
- Medical Examiner's Office
- Mexican consulate
- Orange County Sheriff's Office victim advocate
- Orlando Utility Commission
- Osceola County
- Pet Alliance
- Salvation Army
- Senior Resource Alliance
- Social Security Administration
- Southwest Airlines
- Tax Collector
- Therapy Dogs International
- United Airlines
- US Department of Veterans Affairs
- Zebra Coalition

The FAC was publicized via a flier that was posted on websites and social media and distributed in print throughout Orlando.

The after action report of the 2013 Boston Marathon bombing recommended that a plan for a family assistance center be established prior to a mass casualty incident so that jurisdictions can quickly establish necessary services for victims and their families in the aftermath of a large scale event.[249] Likewise, the San Bernardino terrorist shooting incident review recommended identifying a location for the FAC where amenities such as food, water, and charging stations were provided for victims while they waited to receive information and access services.[250] The Orlando OEM reviewed these case studies and learned from them, preparing their plan for an FAC.[251]

The OEM practiced their plan, collaborating with and bringing in businesses, community organizations, and other nongovernmental organizations in addition to nontraditional government organizations to meet face to face, explain their roles in the event of an emergency, and begin to build relationships. Camping World Stadium was selected based on its readiness to host large numbers of people. When the need for an FAC did come, the location and partners were primed and ready to respond.

---

[249] *After Action Report for the Response to the 2013 Boston Marathon Bombings*, 105 (see note 17).

[250] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[251] Manuel Soto, City of Orlando emergency manager, interview with assessment team, February 23, 2017.

At the direction of OPD commanders, the OPD and the OCSO provided security at the Hampton Inn & Suites and at the Beardall Center to ensure that victims and their families and friends were safe and not hounded by the media. However, as in San Bernardino, there was still a "gauntlet" of media that the families and friends had to go through to get in. Part of the reason Camping World Stadium was selected as the location of the FAC was because security staff was already in place and the OPD was familiar with the security of the stadium.

## Orlando united assistance center

Through a partnership between the City of Orlando, the Orange County government, and the United Way, the Orlando united assistance center (OUAC) opened on June 23, 2016, and is still open at the time of publication one year later. The OUAC serves as a navigation point to assess the needs and provide information, support, and resources to those directly affected by the Pulse incident. It provides long-term family services and mental health and counseling services.

The Orlando OEM established the FRC at the Beardall Center first, then transitioned to address immediate victim services at the FAC at Camping World Stadium, then transitioned again to the OUAC. They had planned, prepared, coordinated, and practiced their plan to address victims' needs before the Pulse event ever took place. This planning and use of resources helped provide much-needed services to the victims of the terrorist attack, served as support to the OPD's overall response, and relieved the OPD of needing to provide these services to the victims so that they could focus on other aspects of the response.[252]

---

### Helping Victims of Mass Violence and Terrorism Toolkit

The Office of Victims of Crime—in coordination with the Federal Bureau of Investigation, the Office for Victim Assistance, and the Office of Justice for Victims of Overseas Terrorism—developed a toolkit to assist communities in preparing for and responding to victims of mass violence and terrorism in an efficient, effective, and compassionate manner. The toolkit reviews the steps involved in identifying partners and creating and maintaining partnerships; addresses resource gaps; and includes response and recovery tools that review how first responders and service providers can use appropriate victim assistance protocols in the aftermath of an incident as well as checklists, guides, and templates.

_____

Source: OVC, *Helping Victims of Mass Violence & Terrorism* (see note 252).

---

[252] OVC (Office for Victims of Crime), *Helping Victims of Mass Violence & Terrorism: Planning, Response, Recovery, and Resources*, Office of Justice Programs, last modified August 2015, https://www.ovc.gov/pubs/mvt-toolkit/.

## Post-event victim welfare observations and lessons learned

**Observation 7.1. Activating the EOC and declaring a state of emergency allowed the City of Orlando to create a central location from which to direct and allocate resources both to support the OPD response to the Pulse incident and to provide critical information, resources, and services to victims and the community.**

> *Lesson learned 7.1.1. Activating the EOC and declaring a state of emergency early in the process can help secure additional resources, relieving pressure and responsibility on the police department so that they can focus on other important law enforcement aspects of the response.*

**Observation 7.2. The OPD and the City of Orlando had a pre-existing plan for reunifying families in the aftermath of a critical incident.**

Because of multiple large-scale critical incident exercises, the emergency preparedness manager for the Orlando Regional Medical Center (ORMC) knew the waiting room of the hospital would quickly be overwhelmed and determined that the Hampton Inn & Suites would have more room and resources to accommodate family notifications and reunification. The hospital and the hotel had a pre-existing understanding, and as soon as the waiting room became overcrowded with family members and friends of Pulse victims, the transition was made smoothly to the FRC. The City of Orlando, the OPD, and Orlando Health did have plans in place for reunification, but those plans were not designed to respond to incidents of this magnitude. The City and Orlando Health implemented changes on the move to scale up and work within their existing plans.

> *Lesson learned 7.2.1. Identify the location for an FRC near primary hospitals prior to a critical incident. The FRC should be a scalable, safe, stable, and comfortable facility that provides access to amenities such as restrooms and outlets to charge cell phones.*

> *Lesson learned 7.2.2. In mass casualty events, the next-of-kin notification process should account for logistical issues, and notifications should be made in a timely manner to lessen the stress on family members and significant others as they wait to hear about loved ones involved in the incident.*

Whenever possible, notifications should be made in person. The Orange County Medical Examiner's Office, the FDLE, and the FBI identified 48 of the 49 decedents in less than 24 hours, and most of the next-of-kin notifications were made as soon as the decedents were identified. This kept families from having to wait to get closure and begin the process of moving forward.

> *Lesson learned 7.2.3. Police departments challenged by the need to identify and interview large numbers of victims and witnesses should consider staffing to expedite the interview process and request assistance from other agencies, if appropriate.*

AR00446

Some of the victims and witnesses of the Pulse terrorist attack expressed frustration about having to wait to be interviewed before they were released and not having the ability to contact their loved ones.[253]

## Observation 7.3. The OPD provided safe, comfortable provisions for victim and witness care while they awaited interview and notification.

OPD command staff said they learned from the after action report of the San Bernardino attack, which highlighted that "victims expressed concern regarding the amount of time spent on the golf course (approximately three hours)," and "victims expressed concern and frustration with the inability to contact family members, lack of counseling services, and the lengthy interview and photographing process."[254] Having the FRC at a hotel allowed for victims to have access to restrooms and electricity. Similarly, uninjured witnesses who were placed on buses and transported to OPD headquarters were afforded the opportunity to wait inside with water and facilities available and electricity to charge their devices, as well as phones for those who had left theirs in the club.

*Lesson learned 7.3.1. Consider provisions for victim and witness care while they are awaiting interviews and being notified.*

These may include making cell phone charging stations and other forms of communication available, providing food and beverages, and providing access to counselors and clergy.[255]

*Lesson learned 7.3.2. Designate a special area where clergy and counselors can assemble within the FRC and be made available to those who request them.*

Some OPD chaplains and additional self-deployed religious leaders from throughout the Orlando community arrived at the FRC to offer their assistance to victims and families. However, the clergy did not have a room in which to provide counseling, so they had to do it in the middle of the room with other victims and family members nearby. This created situations where individuals who needed counseling were unable to receive it in a timely or private manner and chaplains were mistakenly included with victims in some instances.

## Observation 7.4. Victims, witnesses, and their families could have been provided better cover from media access as they entered the FRC.

The scale of this incident resulted in an overwhelming amount of media on the scene, near the hospitals, and throughout the Orlando area. Victims, witnesses, and their families expressed frustration to OPD officers and University of Central Florida Police Department (UCFPD) victim advocates about having to walk through a media gauntlet on the way in and out of the FRC. Once the aggression of the national

---

[253] Anzueto, deputy chief, Orlando Police Department, interview (see note 58); University of Central Florida Police Department victim advocates, focus group (see note 246).

[254] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[255] Braziel et al., *Bringing Calm to Chaos* (see note 19).

media was observed, additional security was put in place and attempts by PIOs to control the media were implemented. OPD officers began acting as valet parkers so that the families could go straight into the hotel, avoiding exposure to the media. Local media were cooperative.

*Lesson learned 7.4.1. Ensure security and privacy for families of victims going to and from the FRC as members of the media or other unscrupulous individuals may go to great lengths to access or harass them.*

*Lesson learned 7.4.2. Designate one or more areas near but not immediately surrounding or adjacent to the FRC where the public and the media can gather without interfering.*

**Observation 7.5. The scale of this incident far exceeded the natural disasters that most EOCs and their respective hotlines traditionally deal with, and the EOC was not fully prepared for the level and type of calls that came in to the hotline. However, within 36 hours, trained call takers were in place.**

Beginning with the first press conference, Mayor Buddy Dyer provided the phone number for the public hotline that the EOC had established to provide information about the FAC. Originally, the hotline was linked to 12 phones, but it quickly expanded to 23 phones and answered approximately 6,800 calls. With the phone bank quickly growing, support staff members were untrained and unprepared for the emotional impact of the calls they were required to answer, which contributed to mental health and wellness concerns after the EOC was deactivated.

*Lesson learned 7.5.1. When establishing any type of public hotline to provide information on a critical incident, the infrastructure, staffing, and ability of the staff to handle the calls, including call takers trained in crisis response, should be in place prior to public announcement being made.*

**Observation 7.6. The Orlando FAC provided immense support and assistance to the survivors and families of victims of the Pulse nightclub terrorist attack.**

Whether the responsibility of the police department, the City, or the EOC, this resource was extremely helpful to the Orlando community.

*Lesson learned 7.6.1. Establish an FAC that provides a one-stop location for victims and their families to access any products and services necessary in the aftermath of the incident. Publicize the availability of victim services at all press conferences, through fliers, and on social media.*

The FAC was opened at Camping World Stadium based on the stadium's ability to accommodate the 956 individuals and 298 families that ended up coming, in addition to the 50 to 60 government, community, and business organizations that sent representatives to provide support. The location also provided the logistical and technological capacity necessary for the City IT department to set up a phone bank and computer support; many of the logistical details—including parking, food vendors, security staff, offices, etc.—were already established; and public safety personnel were familiar with the layout, which allowed for additional security measures and protection of individuals and families from the media.

*Lesson learned 7.6.2. Partner with nontraditional jurisdiction agencies and stakeholders—including IT, public transportation, financial services, airlines and hotels, etc.—when creating an FAC to expedite the setup process and ensure the availability of various resources.*

OEM had learned from previous critical incident reports that the FAC should provide a myriad of services and information to victims' families. Through practice and other exercises, OEM fostered partnerships with private and public businesses, associations, and other stakeholders so that when needed, their resources would be available. As soon as the FAC was established, OEM was able to rely on airlines, LGBTQ and Hispanic community groups, the Hispanic Chamber of Commerce, the Muslim population, and other organizations to provide a host of services to families of decedents and survivors.

# 8. Investigations

The Federal Bureau of Investigation (FBI) began its investigation once it was determined that the suspect was a terrorist, but as previously noted, the Orlando Police Department (OPD) remained the incident commander until the suspect was neutralized. The FBI led the Pulse crime scene investigation and was assisted by the OPD and other federal, state, and local agencies.

The OPD and the Orange County Sheriff's Office (OCSO) requested that the Florida Department of Law Enforcement (FDLE) conduct an investigation into the use of force by all law enforcement officers who engaged the suspect during the Pulse response. Concurrently, the State's Attorney Office for the Ninth Judicial Circuit conducted a separate investigation of the OPD officers who fired their weapons during the incident.

This chapter reviews the investigative process that followed the incident.

## Promising practices

Throughout the investigative process, the leaders of the federal, state, and local law enforcement agencies involved in the Pulse response coordinated decision-making and operations through the unified command center (UCC).

Before the incident was officially declared an act of terrorism, the assistant special agent in charge of the FBI field office in Orlando mobilized the Joint Terrorism Task Force, the Crisis Management Coordinator, the special weapons and tactics (SWAT) team, hostage negotiators, the evidence response team (ERT) and the various squads under his command. The FBI also dispatched its mobile command post to the scene. Once the determination was made that the shooting was an act of terrorism, the FBI assumed primary jurisdiction over the investigation, the crime scene, and evidence.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Administration (DEA), the FDLE, and local agencies—primarily the OPD and the OCSO—supported the FBI in various capacities. For example, FDLE aided the FBI by conducting intelligence scans and gathering information regarding the suspect and the incident, investigating leads throughout Florida, and searching for information about possible other shooters or related incidents in the Orlando area. The DEA also took the lead in searching and clearing each of the vehicles within the outer perimeter prior to releasing them to survivors and family members in the days following the incident. OPD detectives were attached to the FBI to assist with information sharing between law enforcement and the US attorney in the command post.

The crime scene investigation began slowly as FBI SWAT agents and bomb technicians—along with OCSO hazardous device team (HDT) members—methodically searched the Pulse for improvised explosive devices. Following the assault, the suspect was found lying on the ground with a battery pack lying between his legs with wires coming out of it.

**Florida's Open Record Laws**

Florida is known for its progressive and all-inclusive open records laws, commonly known as the "government in the sunshine" or "sunshine" laws. According to Title X, Chapter 119, Section 119.01, "It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person. Providing access to public records is a duty of each agency." Given the broad applicability of the law to many of the records that were generated during and after the attack at Pulse nightclub—any documents, photographs, sound recordings, and other materials—there were significant implications for the investigations. Because the primary agencies conducting or assisting in concurrent investigations—including OPD, OCSO, the State's Attorney Office for the Ninth Circuit, and FDLE—are subject to this law, the investigators coordinated with federal investigators to ensure that any evidence that was photographed or taken by local or state agencies would not jeopardize any potential federal investigations or prosecutions. The City of Orlando also proactively created a page on the City website, http://www.cityoforlando.net/cityclerk/pulse-tragedy-public-records/, for all public records.

_____

Source: Public Officers, Employees, and Records, Fla. Stat. tit. X, ch. 119 (2016), http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&Search_String=&URL=0100-0199/0119/Sections/0119.011.html.

Initially, OPD SWAT and OCSO HDT believed the box might have been the explosive the suspect claimed he had. Investigation revealed that it was actually an emergency lighting box that had fallen on the suspect during the shootout.

By the time the interior of the club was determined to be free of explosives, the FBI's ERT from headquarters was on scene and took the lead in collecting the evidence. The ERT worked with the OPD and the Orange County Medical Examiner's office to remove and identify all of the victims and the suspect, who were then transported to the Orange County Morgue for identification and autopsies. Next, investigators from the FDLE and the State's Attorney's Office for the Ninth Judicial Circuit worked in conjunction with the ERT to determine what evidence they would need to inform their use of force and officer involved shooting investigations. The state's attorney and the FDLE were aware that because of Florida's public information laws—known as "sunshine laws"—agencies would eventually be required to make all evidence and information that they collected public, so they coordinated with the FBI to ensure the federal investigation was not compromised.

## Survivors and witnesses

The logistics associated with the identification and interviewing of survivors and witnesses were immense. Given the chaos created by hundreds of people running from the nightclub, law enforcement investigators, including the OPD, struggled to identify all the patrons who were at Pulse that night. To obtain statements from the survivors and to reunify injured survivors with their families and friends, the

OPD ran concurrent processes. Individuals who were uninjured were transported to OPD headquarters on city buses to be interviewed. By using the department's headquarters, the OPD ensured that the survivors could provide their statements in a comfortable and secure environment where they had access to water, coffee, telephones, and restrooms while they waited.[256] Meanwhile, the family reunification center (FRC), initially established at the Hampton Inn & Suites less than a quarter of a mile north of Orlando Regional Medical Center (ORMC), was used to reunite injured survivors and their families as well as to connect them to services.

The complexity and challenge of identifying and interviewing witnesses and collecting evidence in a large-scale mass casualty event like the terrorist attack on Pulse cannot be overstated. Collaborative relationships facilitated the smooth transition of responsibility, identification of roles, and sharing of resources.

## Investigations observations and lessons learned

**Observation 8.1. Local, state, and federal agencies responding to the Pulse incident, including the OPD, delineated roles and responsibilities, coordinated efforts, shared information and evidence, and collaborated throughout the incident and its aftermath.**

Rapid and effective decision-making, clear division of work and responsibilities, frequent sharing of information and resources, pre-existing relationships among the executives of the agencies, and constant collaboration in the UCC—led by the OPD—allowed multiple investigations to progress simultaneously.

> *Lesson learned 8.1.1. The ability to immediately determine specific agency investigative roles and responsibilities is crucial to effective incident and investigation management.*

> Orlando area federal, state, and local responding agencies were quickly able to determine investigative roles.

> *Lesson learned 8.1.2. Critical incident training and exercises should continue through all aspects of survivor and witness identification, interviewing, and reunification.*

> The OPD did not initially have victim advocates or a strategy for handling identification, interviewing, and reunification of the number of victims and witnesses who were affected at the Pulse nightclub. OPD command staff acknowledged the difficulties in interviewing all of the patrons at the club on June 12, because many patrons fled when the shooting began and did not return to the area or go to OPD headquarters. The OPD had not developed protocols for interviewing large numbers of witnesses and victims during a mass casualty event.

---

[256] The OPD was not involved in the transfer of uninjured survivors to the FRC. Once they were released from OPD headquarters, the uninjured survivors were free to go.

**Taking on Nontraditional and Nonpublicized Tasks for the Greater Good**

During the investigative process, DEA agents displayed tremendous professionalism and compassion for those effected by the attack. Agents took money out of their own pockets to pay for taxis that would arrive with survivors and loved ones coming to pick up vehicles. Many individuals had no money because their purses or wallets were either in their vehicles or still in the club. Agents were also seen taking food provided for first responders to survivors and loved ones there to pick up vehicles because they had not eaten in hours and did not have money to purchase food. These acts of compassion and professionalism displayed by the DEA defined the public safety response to the Pulse nightclub attack and emphasized the need to adjust to the demands of a critical incident and remain focused on the overall mission.

Later, the DEA and the FDLE partnered to identify vehicles and their owners inside the FBI perimeter near Pulse to return survivors' vehicles to their owners. This job, although outside the scope of what either agency may traditionally be responsible for, provided unpublicized services to those affected by the incident.

_____

Source: Danny Banks, special agent in charge, Florida Department of Law Enforcement, interview with assessment team, February 20, 2017.

# 9. Media and Public Information

In critical incidents, law enforcement agencies face a delicate balance between informing the public about what is taking place as it is occurring, protecting victims and officers, and ensuring the integrity of the response.

Law enforcement leaders should anticipate that some people experience added fear as an event unfolds, particularly one that is part of a coordinated set of terrorist acts—as experienced, for example, on September 11, 2001, domestically and more recently in Mumbai, Paris, Brussels, and the United Kingdom internationally. Especially in a city with multiple large venues for concerts and sporting events, hundreds of bars and nightclubs, and one of the largest tourist attractions in the world, a coordinated set of attacks is a legitimate possibility.

In addition to the fear that unfolds in the community, the news media's desire for breaking news 24 hours a day, seven days a week and the constant stream of content available online can complicate law enforcement's ability to manage the delivery and release of information to viewers and followers—these outlets sometimes report inaccurate information. Furthermore, online outlets—particularly unaffiliated individuals posting on social media—can often operate without scrutiny and rigor leading to rumors that spread quickly. The speed at which these rumors spread, as well as the public's associated reactions, can hamper the ability of law enforcement agencies to ensure the safety of first responders' efforts and the investigation of an event as they are forced to divert resources to rumor control.

When multiple federal, state, county, and local agencies are involved in the response to an event, there is increased potential for conflict and confusion regarding public information with each agency operating under different media guidelines. With 27 agencies from diverse jurisdictions involved in the response to the terrorist attack at the Pulse nightclub, the potential for discrepancies in what information was released, by whom, and when was magnified. However, with a coordinated public information strategy that encompassed news media, nontraditional media, and social media, the numerous individuals and agencies involved were able to successfully keep the public informed. This chapter will explore the City of Orlando and Orlando Police Department's (OPD) coordinated public information strategy and discuss lessons learned from its public information officers (PIO).

## Media and public relations

One of the hallmarks of Orlando's response to the Pulse nightclub attack was the citywide structured, coordinated, and disciplined handling of media and public relations. Prior to this incident, city officials conducted annual emergency management tabletop exercises in which communications was a key function. While most of the previous exercises had focused on natural disasters and weather-related emergencies like hurricanes, following the unrest in Ferguson, Missouri, and in Baltimore, city officials determined that they needed to be prepared for similar situations.

The city conducted a tabletop exercise focused on the law enforcement and broader government response to civil disobedience. Through the exercise, the city established a process for communicating about different types of events, including which entity would take the lead to avoid some of the initial confusing and contradictory social media messaging that occurred during similar responses, including the Boston Marathon bombings.[257] Because of this strategy, it was predetermined that the OPD media relations office, which consists of two PIOs—one civilian and one sergeant—and a handful of support staff, would lead media and public relations, and the City would use its social media accounts to complement and share the messages being posted by police.[258]

## During the attack

The PIOs were notified of the ongoing active shooter and hostage situation with multiple casualties at approximately 3:13 a.m. They knew that the murder of Christina Grimmie—a contestant on "The Voice" who had just given a performance at the Plaza Live theater—the night before[259] meant that the public was already on edge and that nontraditional media outlets in addition to the regular litany of media would be associated with an event of this magnitude. They also knew that social media was already overflowing with posts from people inside and outside the Pulse nightclub. All of this information led the PIOs to predict that the scene was only going to become more chaotic. In accordance with OPD Policy and Procedure 1308.3 (Major Incidents), the PIOs immediately deployed to the scene to establish a media briefing area and begin disseminating information.[260]

Once they arrived on scene, the PIOs received a quick overview of the events from OPD command staff and used the department's Twitter feed to establish their presence and provide credible information about the ongoing incident, especially about the victims, as quickly as possible. While the OPD hosted a number of social media accounts—including Facebook, YouTube, Instagram, Snapchat, Nextdoor, Pinterest, and Flickr—the decision was made to use Twitter almost exclusively to provide the public and the media with updates. This would allow information to be shared in a timely and efficient manner without having to individually respond to the rising volume of press inquiries. The other social media

[257] Sharon Burke, Alyssa Sims, and David Sterman, *War and Tweets: Terrorism in America in the Digital Age* (Washington, DC: New America, 2016), https://na-production.s3.amazonaws.com/documents/War-And-Tweets10.27.pdf.

[258] Burke, Syms, and Sterman, *War and Tweets* (see note 257).

[259] Jillian Sederholm et al., "Gunman Who Killed 'The Voice' Singer Christina Grimmie Had Two Weapons, Ammo, Knife: Police," NBC News, last modified June 11, 2016, http://www.nbcnews.com/news/us-news/voice-singer-christina-grimmie-shot-after-florida-concert-n590161.

[260] Orlando Police Department Policy and Procedure 1308.3 – Major Incidents, provided to assessment team March 30, 2017.

channels were used to point people to the OPD Twitter feed. The first two tweets, timestamped at 3:58 a.m., alerted the public of police activity and multiple injuries at Pulse[261] and noted that all official updates would come from the OPD Twitter account.[262]

Over the course of the next several hours, as the event progressed, the OPD continued to use Twitter to inform the public and the media about new developments and to remind them that the situation was fluid. It also used Twitter to provide updates from Orlando Regional Medical Center (ORMC) and the family reunification center (FRC), to share information about—and from—press briefings, and to confirm certain information and correct misinformation that had gone viral. Particularly after witnesses and media outlets reported hearing a loud explosion and linked it to the suspect's earlier claim that he had explosive devices, the OPD quickly corrected the false reports and explained that the sound was the Orange County Sheriff's Office's (OCSO) planned detonation of a controlled explosion to breach the exterior wall of the club.[263]

Even after the incident was officially designated a terrorist attack, the OPD remained the lead agency on disseminating information related to the tactical response both because that response was still being led and coordinated in the UCC by the OPD and because the OPD had the following of the local community and the local media as well as the national and international outlets that joined over the previous hours to receive updates.

According to local reporters, "the police department did a decent job of releasing information through [their Twitter account] in a timely manner."[264] Because of its established presence, OPD's Twitter account was the first to confirm that the suspect had been neutralized.[265]

## After the attack

After the suspect was neutralized and all remaining threats were resolved, the importance of the unity of message and coordination of who would focus on different aspects of the response remained, even as the media and public information strategy shifted to calming public fears and leading the charge of

---

[261] Orlando Police Department (@OrlandoPolice), "Shooting at Pulse Nightclub on S Orange. Multiple injuries. Stay away from area," Twitter post, June 12, 2016, 3:58 a.m. [Twitter archive: 12:58 a.m. PDT], https://twitter.com/orlandopolice/status/741902485070045184.

[262] Orlando Police Department (@OrlandoPolice), "Official updates will come from this Twitter account. No email or phone calls please," Twitter post, June 12, 2016, 3:58 a.m. [Twitter archive: 12:58 a.m. PDT], https://twitter.com/orlandopolice/status/741902588589707264.

[263] Orlando Police Department (@OrlandoPolice), "That sound was a controlled explosion by law enforcement. Please avoid reporting inaccuracies at this time," Twitter post, June 12, 2016, 5:05 a.m. [Twitter archive: 2:05 a.m. PDT], https://twitter.com/orlandopolice/status/741919251678826496.

[264] Burke, Sims, and Sterman, *War and Tweets* (see note 257).

[265] Orlando Police Department (@OrlandoPolice), "Pulse Shooting: The shooter inside the club is dead," Twitter post, June 12, 2016, 5:53 a.m. [Twitter archive: 2:53 a.m. PDT], https://twitter.com/orlandopolice/status/741931400392249344.

unity and resilience. Chief executives from the mayor's office, the OPD and the OCSO, and the Federal Bureau of Investigation (FBI) and other federal agencies worked together and met regularly to prepare for press conferences and determine the information that would be released at each.

In a separate mobile command vehicle at the scene—provided by the OCSO media relations office—as well as at the emergency operations center (EOC), which had been activated at approximately 8:00 a.m. just after the first press conference, public affairs staff and PIOs from the same agencies coordinated how information would be released, the appropriate format for the press conferences, and the importance of ensuring unity of message. The OPD decided that they would not release anything on social media until the information was first mentioned by Chief John W. Mina or Mayor Buddy Dyer during a press conference, and the other public affairs staff and PIOs followed suit. In addition, while the original plan for the initial press conference was to have Mina provide an update with available details, leaders determined that it was more important for Dyer to begin the first press conference to present the message that the overall response was and would continue to be a local community-driven response focused on trust and unity, not a law enforcement response focused on an investigation and terrorism. This same format was repeated for the second news conference, especially given the gravity of the information that was about to be released. Dyer took the podium and began by stating that since the first press conference, investigators had gotten better access to the nightclub and determined that the number of casualties was not the 20 that had been previously reported, but 50 (including the suspect). Dyer used that information to reiterate the initial message that Orlando "won't be defined by hate, but by how we respond, with love, compassion, and unity" and that this attack was not a referendum on the LGBTQ, Hispanic, or Muslim communities. He also invited the president of the Islamic Society of Florida to address the press.[266]

During the times before and between press conferences, Chief Mina would handwrite his statements and send pictures to the OPD PIOs. This allowed the PIOs to simultaneously tweet important pieces of information as he was addressing the press and the City was live-streaming the press conference, allowing for multiplatform delivery of information to the public. The OPD also used Twitter later in the day to portray the heroism of the responders by tweeting a picture of the Kevlar helmet worn by the OPD officer who was hit during the final exchange of gunfire.[267]

---

[266] Burke, Sims, and Sterman, *War and Tweets* (see note 257).

[267] Orlando Police Department (@OrlandoPolice), "Pulse shooting: In hail of gunfire in which suspect was killed, OPD officer was hit. Kevlar helmet saved his life," Twitter post, June 12, 2016, 11:05 a.m. [Twitter archive: 8:05 a.m. PDT], https://twitter.com/orlandopolice/status/742009920808210432.

Over the course of the first 24 hours, the City received innumerable press requests, particularly for one-on-one interviews with the chief or the mayor. In order to process these requests, the OPD PIOs created an automatic reply for all incoming email requests, which read as follows:

> The Orlando Police Department Media Relations Department and Public Information Officers are working hard to provide updates on the Pulse nightclub shooting. In order to do that, we are *not responding* to individual emails or phone calls until further notice.

> All official updates will come from either the live media briefings, which are happening roughly every three hours on scene, or through the OPD Twitter account @orlandopolice on Twitter. Do not contact the communications center or ask for a watch commander. All information is coming through us, via Twitter only. Any media releases will be placed on the City of Orlando website and linked to from Twitter.

> The FBI is the lead federal agency on the Pulse nightclub shooting. Its main national press office can be reached at 202-324-3691.

> Thanks for letting us do our jobs, so we can help you do yours.

They also changed their voicemail greeting message to relate that they would not be responding to individual emails or phone calls until further notice and that all official updates would come via their live briefings or Twitter. This allowed the PIOs to dedicate their attention to the chief and the meetings at the joint information center (JIC) instead of attempting to answer the flood of calls and emails, vet and prepare officers before speaking to the media, and restrict potential leaks and release of unverified information. Nevertheless, the contact information of the requestors and the contents of their requests were entered into a running spreadsheet, which was used to respond and track responses after the initial chaos subsided and the OPD could begin granting individual interviews. Even then, interviews were restricted to the mayor, the chief, and a Spanish-speaking deputy chief.

## The following days

In the days following the attack, as the initial chaos subsided and evolved, the media and public relations aspects of the response continued to evolve as well. Because of their increased Twitter following, the PIOs continued to use the account to provide updates about the heroism of the responders, to mourn victims, and to thank—and grieve with—the community. The OPD also worked with the Florida Department of Law Enforcement (FDLE) staff to ensure that next-of-kin notifications were made and the information was verified so that the OPD could honor the deceased via social media. Pictures and messages of gratitude for the donations they received, messages of support from around the globe, and pictures from the vigils throughout the city were also tweeted and retweeted by the OPD, further demonstrating their commitment to embracing the community.

In addition, while the majority of the response focused on the services provided to the next-of-kin of the decedents and the survivors—and thus transitioned to being handled by the City—a handful of media outlets changed course. As soon as the names of the officers involved in the shooting were made public,

some media outlets began aggressively tracking down the officers and their families (presumably seeking comments and additional information), in some cases even knocking on their doors and dispatching affiliates in other states to do the same with officers' family members nearby.

Others attempted to generate contention between survivors and responding agencies by asking leading questions surrounding whether or not officers waited too long to neutralize the suspect, asking business owners who were not allowed within the perimeter how they felt, and looking for an exclusive story of some sort.[268] In response to questions about the tactical response, an OPD special weapons and tactics (SWAT) team commander was briefed on what information could and could not be released, and he proceeded to walk down the line of media and address their concerns. The PIOs also created a timeline identifying how many hostages were safely and successfully rescued, where they were in the club, and when they were rescued to counter the emerging contentious narrative.[269]

In response to the aggression of the national and international media and in deference to the local media, when the OPD began conducting exclusive interviews, the first ones were provided to the local outlets.[270]

OPD PIOs are equipped with laptop computers with internal wifi that enable them to conduct all police department business remotely. However, on the morning of June 12, they relied solely on cell phones because they were working from the street. Despite only having department-issued smart phones with them as they worked from the scene, the PIOs successfully worked from a handful of different locations during the response, generated 203 more tweets in June 2016 than they had generated in May, helped to design and disseminate fliers about the FRC and the family assistance center (FAC), and helped to coordinate and provide information about the vigils and ceremonies throughout the area. The City of Orlando has a mechanism by which all social media posts on all the City's accounts and platforms are archived.

## Elected officials

Members of the press were not the only group to descend upon the scene in large numbers in the aftermath of the attack. The President and Vice President of the United States traveled to Orlando to visit the scene, pay their respects, and offer their support and gratitude to the responders. The Director of the FBI also visited first responders and investigators at the nightclub. In addition, with the Republican and Democratic National Conventions both less than two months later, candidates vying for their party's nominations arrived in Orlando. State officials made their way to Orlando as well. In some cases, these officials merely wanted to offer their condolences to the victims and survivors and show their support for first responders; others sought more in-depth information on the tactical

---

[268] Public information officers (PIO), Orlando Police Department, Orlando Fire Department, and City of Orlando, focus group with assessment team, February 23, 2017.

[269] PIOs, focus group (see note 268).

[270] OPD PIOs noted that local media outlets appreciated the opportunity to get exclusive interviews prior to national outlets. PIOs, focus group (see note 268).

response and the suspect. In response, personnel were allocated from both the OPD and the mayor's office to assist the elected officials arriving in Orlando without impacting or impeding the ongoing investigation at the scene.

Local elected officials limited their involvement to supporting law enforcement officers and uniting and grieving with the community. In the early morning hours of June 12, as soon as Mayor Dyer was notified of the ongoing incident, he went to the unified command center (UCC). He did not involve himself in the tactical and operational decisions being made and did not seek to inject politics or optics into the decision-making process. Instead, Dyer deferred to Chief Mina, simply offering the full resources of the City to the OPD and doing whatever he could to support the first responders and the overall response. He did contribute to the response by using his leadership and position as a trusted local official to shape how the public viewed the response, including clear and comforting language in all of his press conference statements, acknowledging the LGBTQ and Hispanic communities and the Muslim population, assuaging the community's fears, and continuing the unity of response that had been started by law enforcement.[271]

## Media and public relations observations and lessons learned

**Observation 9.1. Prior to the attack at the Pulse nightclub, the PIOs of all Orlando city agencies established a process for communication during events of varying types. The process included protocols regarding which entity would take the lead, what the other agencies would do, and what the overall tone of the messages would be.**

*Lesson learned 9.1.1. A media and public relations strategy that ensures the coordination of all jurisdiction-department public information officers (PIOs) and all information being released through various platforms and accounts is integral to effectively handling the media during a critical incident.*

For each phase of the response in Orlando, a thoughtful and coordinated media and public relations strategy that included traditional and social media was developed. During the incident, the OPD relied primarily on its Twitter account to provide breaking news and images from the scene and used its other social media channels to point interested followers to Twitter. As the response shifted, the City's Facebook page was used for messages about the city response and city messages, and Periscope was used for live-streaming press conferences.

*Lesson learned 9.1.2. The depth of the department's media and public relations team and strategy is extremely important to consider before a critical incident.*

Major incidents place a significant amount of strain on media and public relations teams and PIOs throughout the jurisdiction, and it is imperative that communications teams have the depth to handle the workload. Ensure that the team is able to communicate with significant segments of the community, including non-English speakers. Personnel should also be available to address media

---

[271] Burke, Sims, and Sterman, *War and Tweets* (see note 257).

outlets in different time zones and countries. Be aware that after a critical incident, business as usual will continue for the rest of the jurisdiction, but the public information needs related to the incident will continue for weeks, months, and years.

**Observation 9.2. With the OPD's coordinated media and public information strategy, the numerous individuals and agencies involved successfully kept the public informed.**

With 27 agencies involved in the response to the terrorist attack at the Pulse nightclub, discrepancies could have existed in what information was released, by whom, and when. However, with a coordinated public information strategy, the numerous individuals and agencies involved were able to successfully keep the public informed. Deferring to the OPD and having all city and county social media accounts, email addresses, and phone messages direct news media to the OPD ensured that all media and public relations were handled consistently.

*Lesson learned 9.2.1. Unity of message and communications that focus on resilience are imperative to the overall success of the response.*

**Observation 9.3. The OPD leveraged resources such as their pre-existing social media followings and held press conferences to control their story.**

Despite the chaos caused by intensive media coverage, OPD PIOs put standardized voicemail greeting messages on their desk phones and cell phones and an automatic reply on their general email address directing everyone to the OPD Twitter account and instructed them to leave their information and interview requests in a message. This allowed for department personnel to focus on managing the initial flood of questions and requests and the tasks at hand during the event. Essentially, through its PIOs, the OPD became its own news agency, using social media to correct rumors, share information and images, and frame the narrative. To help sort through the many hundreds of emails, the communications group at Orlando City Hall tracked all media requests and added them to a single Excel spreadsheet. This was accomplished by directing all emails to the dedicated PIO email address.

*Lesson learned 9.3.1. Police departments should leverage pre-existing social media followings to act as a single primary source of information and communication with the public during a critical incident.*

Agencies that regularly use social media to communicate with the public will have an established audience for distribution of information in a critical incident. However, during a critical incident is not the time to attempt to establish a social media following.

**Observation 9.4. In some instances, OPD PIOs did not have access to the resources they needed to the keep the public informed but instead adapted work-arounds.**

OPD PIOs were deployed on scene and were responsible for keeping the public informed about the safety of area around Pulse, incident outcomes and status, available resources for victims, locations for vigils, and other important information. At times, however, they did not have the resources available to them to facilitate that work. For example, there was no room in the UCC for the PIOs to sit in on

briefings. Instead, PIOs received updates from Chief Mina and senior staff via text or in person right after the briefings in the UCC. In addition, they often did not have the equipment they needed to work on scene.

*Lesson learned 9.4.1. PIOs should be involved and included in the UCC to directly participate in and observe decisions made related to press conferences and social media posts. Receiving information secondhand can eliminate important context behind statements.*

Because there was no room in the UCC for the PIOs, they received information following briefings. This was especially challenging for the PIOs prior to press conferences, when Chief Mina had to handwrite his statements and send images of them by text message to the PIOs so that they could prepare to post them as he made his statements during the press conferences.

*Lesson learned 9.4.2. PIOs should be provided with mobile resources necessary to undertake their duties over a long period of time and in any location (laptops with necessary software and smart phones).*

**Observation 9.5. OPD PIOs acknowledged that—particularly with the limited characters of social media—it is important to be thoughtful and cautious in communications so that they are sensitive to decedents' family members, victims, witnesses, and the larger community.**

*Lesson learned 9.5.1. Ensure that public statements—including during press conferences and interviews and on social media—properly balance law enforcement terminology with the perceptions and impacts on victims, their families, survivors, and the larger community.*

**Observation 9.6. The decision to have Mayor Dyer and Chief Mina speak at the first press conference before federal officials was made strategically to set the tone that the response would be driven by the community, not by federal investigators.**

Furthermore, having Mayor Dyer speak before Chief Mina allowed the mayor to shape how the public viewed the response, including using clear and comforting language in his press conference statements, acknowledging the LGBTQ and Hispanic communities and the Muslim population, and assuaging the community's fears instead of focusing on investigating a crime.

*Lesson learned 9.6.1. Having a recognizable local leader speak first at first press conferences portrayed a sense that the response was and would continue to be a local community-driven response led by trust and unity, not a federal response driven by terrorism.*

**Observation 9.7. To enhance relationships with local media outlets, the OPD provided them exclusive interviews before the national and international media.**

Local media outlets do not have the resources to be as aggressive and persistent as national and international outlets, but they will be the outlets that remain when the major incident and the initial response are over and the national and international media leave. The OPD recognized the importance of maintaining its positive relationships with their local media outlets by offering exclusive interviews and stories before going to the national and international channels.

*Lesson learned 9.7.1. Prioritize the needs and requests of the local media before that of national and international media outlets.*

The OPD purposefully responded to and provided local media outlets with exclusive interviews and information first as a way to build trust and relationships with them. According to the OPD PIO, "They [local media outlets] are going to be here long after the national media has gone home."[272]

*Lesson learned 9.7.2. Establish a JIC or other location where PIOs or other personnel from stakeholder agencies can coordinate the incident media response and can monitor media and social media to keep abreast of erroneous information being reported and quell rumors.*

The JIC was established as part of the EOC, but prior to the establishment of the EOC, the PIOs from the responding law enforcement agencies and the City worked out of the OCSO PIO truck that came to provide support. OPD PIOs acknowledged that it would have helped to have the ability to follow media reporting so that they could quickly correct erroneous information and be more proactive in addressing rumors as they did following the posts of a potential bomb that was really the explosive breach.

*Lesson learned 9.7.3. Prepare for negative questions and shifts in the news cycle from being on your side to looking for an exclusive story and trying to generate contention.*

OPD PIOs acknowledged that one of the biggest lessons they learned was to balance between transparency and the implications on the officers and family members. Prior to releasing the names and information of officers involved in this incident, they should have better considered the implications of media outlets becoming aggressive in tracking down officers, calling and showing up at their houses, and potentially tracking down relatives.

---

[272] PIOs, focus group (see note 268).

**Observation 9.8. Because Mayor Dyer and representatives from his office had been involved in critical incident response exercises, he was aware that his role was to focus on unifying the community and setting the tone for the city.**

As soon as Mayor Dyer was made aware of the ongoing incident, he responded to the UCC. When he arrived, instead of interjecting himself and politics into the decision-making process, he focused on collecting information and determining the tone and message of the response he would provide to his community. Other local elected officials followed suit and focused on calming and unifying the community as well as demonstrating resiliency instead of getting involved in the investigation and tactical response.

*Lesson learned 9.8.1. Include elected officials' roles and responsibilities in planning and managing critical incidents, and include them in training and exercises. After a critical incident, be prepared to handle elected officials of all levels and political affiliations, providing them with constructive roles when possible.*

Personnel from both the OPD and the mayor's office were allocated to assist the local, state, and federal officials who traveled to Orlando to visit the scene, pay their respects, and offer their support and gratitude to the responders. Some officials wanted to offer their condolences to the victims and survivors and show their support for first responders, while others wanted to be more involved. In addition, with the Republican and Democratic National Conventions both less than two months later, candidates vying for their party's nominations arrived in Orlando. In some cases, the officials were not received warmly by the community and their visits caused additional strain for already taxed agencies.

# 10. Community Engagement and Relationships

---

*"Hate may have visited our community . . . but hate will not define us. And hate will not defeat us. Because we are one Orlando."*

*— Buddy Dyer, Mayor of Orlando*

---

Community resilience is "a measure of the sustained ability of a community to utilize available resources to respond to, withstand, and recover from adverse situations."[273] While there are many things that contribute to community resilience, some foundational aspects include community cohesion and collaboration and a shared responsibility and vision.[274] For this reason, it is important to look at the Orlando Police Department (OPD) and larger public safety response to the Pulse shooting within the context of the strength of the Orlando community and its relationships. While the City of Orlando government did an outstanding job of considering and addressing the needs of Pulse victims, the true character of the city was also shown in the response by the community—individuals and organizations. In this way, the Pulse tragedy galvanized much of the community's support for one another, their support for the police and the City's support for its community; it galvanized the community's resilience. This chapter will explore how the work done by the OPD to strengthen and sustain relationships with the Orlando community prior to the incident impacted the response to the Pulse terrorist attack and to the resilience of the city after the attack.

## Community-police relationships in Orlando

The OPD is no stranger to working to build community trust and police legitimacy through engagement and transparency. Its efforts prior to the Pulse incident set the foundation on which community support during and after the Pulse incident was built. Indeed, the police department's 2016 annual report positions community engagement as one of the top three priorities for the department and highlights that "[t]he Community Relations Unit also participated in more than 575 community events, meetings, surveys, and trainings in 2016."[275] Through activities such as Coffee with a Cop, Orlando Speaks, and the many other activities of the OPD community relations unit, officers regularly engage with diverse

---

[273] "Community Resilience," RAND Corporation, accessed June 4, 2017, http://www.rand.org/topics/community-resilience.html.

[274] Deborah Spence, ed., *Improving Law Enforcement Resilience: Lessons and Recommendations,* Officer Safety and Wellness Group Meeting Summary (Washington, DC: Office of Community Oriented Policing Services, 2017), https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P362.

[275] Orlando Police Department, *Courage. Pride. Commitment* (see note 12).

segments of the Orlando community. In addition, the OPD is member of the Police Data Initiative, and its open data portal provides raw policing and crime data as well as maps and visualizations to the public for open transparency and accountability.[276]

The OPD also uses targeted engagement to engender trust with specific communities as well. The Orlando LGBTQ community has enjoyed a solid relationship with the OPD for some time, and that relationship continues to be cultivated today through efforts by both the OPD and the LGBTQ community. As part of the OPD's community policing and engagement effort to build relationships with the community, Chief John W. Mina appointed OPD's first LGBTQ liaison. The liaison began frequent contact and a focused engagement strategy with the LGBTQ community to ensure that the OPD understands the issues facing the LGBTQ community and that the community feels protected. According to the executive director of the Lesbian, Gay, Bisexual, Transgender Community Center of Central Florida (The Center Orlando), an LGBTQ community group, the OPD liaison officer and other OPD officers made a weekly habit of stopping in to The Center Orlando on a regular basis just to check in and to chat long before the Pulse incident occurred. "I have officers' personal cell phone numbers," he said.[277] The foundation built by OPD and LGBTQ community leaders prior to the Pulse shooting established a relationship that bolstered the response during the incident and is now even stronger than before.[278]

Similarly, the OPD has enjoyed great relationships with Orlando's African-American and Hispanic communities and continually engages in many forms of outreach. As one example, the annual Hispanic Citizens' Police Academy—which is conducted entirely in Spanish by OPD officers and personnel—has a greater attendance each year than the Citizens' Police Academy conducted in English. The OPD also sponsors community barbecues and other get-togethers in communities throughout the city to enable residents to interact with officers in social settings and not just when they call for help. In addition, in the aftermath of Pulse, the City of Orlando assembled a team of Spanish-speaking communicators to translate all materials for a Spanish-language version of the City's website. They also translated many of the critical messages being sent out on social media. Even in the aftermath of the Pulse incident, recognizing that the majority of the victims in the attack were Hispanic, the OPD stressed the importance of its relationship with the Hispanic community. OPD command staff reached out to the Hispanic community daily to make sure all their needs were met and continue to do so to this day. This has continued the strong relationship with the Hispanic community that was built on a foundation of trust, dedication, and service to all.

---

[276] "Welcome to Orlando's Open Data Website," City of Orlando, accessed June 4, 2017, https://data.cityoforlando.net.

[277] Executive director, Lesbian, Gay, Bisexual, Transgender Community Center of Central Florida, interview with assessment team, April 18, 2017.

[278] Executive director, Lesbian, Gay, Bisexual, Transgender Community Center of Central Florida, interview (see note 277).

AR00466

## Community support post-Pulse

A remarkable characteristic of the response to the Pulse nightclub shooting was not only the response from Orlando public safety agencies and the City of Orlando but also the response from the Orlando community at large. Almost universally, the assessment team heard from individuals interviewed who said that many segments of the Orlando community came together to support and to find ways to help in any way they could.

Immediately upon hearing of the incident, community leaders reported to the scene to stand in solidarity with victims and with city leaders, the OPD, and the other first responders. Some stayed at the site for days to address community needs, attend press conferences, and coordinate volunteer activities and products. Others, like the executive director of The Center Orlando, went to the hospital in the immediate aftermath so victims could see a familiar and friendly face. Counselors donated time to those in need, and many others donated food, water, office supplies, toys for children in victims' families, and other items. While the donations were appreciated and seen as an outpouring of love, the City had to establish systems for intake and distribution to ensure that they were used appropriately and went to the proper recipients. This is where organizations like the American Red Cross and The Center Orlando became critically important. They deployed volunteers to establish systems to intake and distribute resources such as food and water in necessary locations around the city. More than anything, the community came together to support one another and to show their appreciation for the city that supported them.

This support did not come from just one segment of the community; it can be seen through the many acts of kindness and generosity displayed by people of every culture and background in the year since the incident. The LGBTQ community held fundraisers and other events to raise money and to thank first responders. Local nonprofit organizations made and donated items to victims, families, and first responders of the Pulse incident throughout the year, like the group that donated Pulse themed quilts to the OPD and others.[279] The Florida State Conference of the NAACP showed support following the incident with the following statement:

> The Florida State Conference of the National Association for the Advancement of Colored People sends our prayers, condolences, and thoughts to the victims and their family members of the senseless act of violence and hatred that occurred at Pulse Night Club in Orlando, FL. We commend the efforts of Local, State, and Federal Officials as well as Law Enforcement for their

---

[279] "#QuiltsforPulse Charity Drive with the Orlando MQG," Modern Quilt Guild, last modified June 14, 2016, https://themodernquiltguild.wordpress.com/2016/06/14/quiltsforpulse-charity-drive-with-the-orlando-mqg/.

diligent efforts in securing and protecting the residents of the Orange County/Orlando, FL community. We also offer our support to local healthcare facilities who are working around the clock to treat and save the lives of all who have been negatively impacted. At this time, we pray for unity and strength as a State and Nation to combat the forces of intolerance and hatred.[280]

According to the executive director of the Orlando Chamber of Commerce, "The entire community rallied, not just the LGBT community."[281]

### Leveraging Established Relationships

In the aftermath of the incident, one activist group took the opportunity to politicize their beliefs about the LGBTQ community by protesting events commemorating the victims of the Pulse shooting. The LGBTQ community was also out in force to remember the victims and to come together as a community. With OPD resources already stretched thin as they worked to protect a seemingly continual stream of dignitary visits and other Pulse-related events, this situation had the potential to turn disruptive and violent and could have further taxed those resources. However, building on the already established relationship with the LGBTQ community and community leaders, OPD officers leveraged strong lines of communication and trust to give direction, calm the crowd, and de-escalate the situation during the protests. They established a point of contact with one of the LGBTQ community leaders, who relayed messages to the counterprotesting crowd about when they were getting too loud or moving outside of their secure area. The officer kept the group informed of what was going on around them and how to best react in the tenuous situation to keep it under control. This mutual understanding and respect made the communication smooth and facilitated a peaceful ending to the event and contributed to everyone going home safely.

Similarly, the OPD has a historically strong relationship with the Hispanic community. This relationship has been built on a foundation of trust, dedication, and service to all. Because the majority of victims in this attack were Hispanic, the OPD leveraged and built on those relationships during the response to the attack on Pulse. The OPD reached out to the Hispanic community daily to make sure all of their needs were met and continue to do so to this day.

_____

Source: Robert Anzueto, deputy chief, Orlando Police Department, in email to Police Foundation assessment team, September 28, 2017; executive director, Lesbian, Gay, Bisexual, Transgender Community Center of Central Florida, interview (see note 277).

---

[280] "FL NAACP Responds to Shooting in Orlando, Florida," press release, accessed July 5, 2017, http://www.flnaacp.com/naacp/23012/.

[281] Executive director, Orlando Chamber of Commerce, interview with assessment team, April 18, 2017.

## Police protection following the incident

In the hours and days following the shooting at Pulse, many in the LGBTQ community felt particularly threatened. They experienced feelings of intense fear because they had been targeted; some even felt unsafe leaving their homes. LGBTQ community leaders reached out to the OPD through established lines of communication to ensure that when community members were out holding vigils or marches or otherwise commemorating Pulse victims, they had police presence to keep them protected. Even as law enforcement dealt with the initial response to the attack at the nightclub, personnel were deployed across the city to provide security and protection to other LGBTQ commercial establishments. For example, K-9 units were dispatched to LGBTQ bars and clubs in the city and county to conduct external and internal building K-9 sweeps. In addition, in the days and weeks following the attack, law enforcement provided security at numerous LGBTQ community gatherings and vigils.

In the aftermath of a critical incident such as the attack on Pulse, it is incumbent on law enforcement to take additional steps to protect specific communities negatively affected by the incident.[282] The positive and trusting relationship the OPD had with the LGBTQ community in Orlando resulted in each supporting the other after the attack. The community came to law enforcement's defense when they faced criticism for their response to the attack. In turn, law enforcement maintained their support for the LGBTQ community and took additional steps to ensure their safety after they suffered such a terrible loss of life and sense of safety.

In addition to taking additional steps to protect a community directly impacted by the incident, the OPD and the Orange County Sheriff's Office (OCSO) took additional steps to remain connected to and protect specific communities from potential retribution. The attack on Pulse was identified as a terrorist attack, and the shooter who claimed to be Muslim and inspired by the Islamic State of Iraq and the Levant (ISIL). As a result, law enforcement responded to the Muslim community to show its support and to provide them with added protection. Specifically, the assessment team heard from a Council on American-Islamic Relations Florida leader that she reached out to Sheriff Jerry Demings, and together they were able to address security concerns in the immediate aftermath of the Pulse incident.[283] Similarly, after the terrorist attacks in San Bernardino, California, law enforcement took steps to ensure that Muslim community members felt protected from retribution for the attack and stood with them to condemn the attacks publicly.[284] These steps are important as a way to continue to engender trust with these communities to reduce crime and prevent terrorism.[285] Building trusting relationships based on

---

[282] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[283] Muslim community group leaders, interview with assessment team, May 26, 2017.

[284] Braziel et al., *Bringing Calm to Chaos* (see note 19).

[285] Robert Wasserman, *Guidance for Building Communities of Trust* (Washington, DC: Office of Community Oriented Policing Services, 2010), https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P194.

interaction and collaboration may lead to increased reporting of suspicious activity as well as sharing of information, target hardening, and improved coordination as communities attempt to prevent and respond to terrorist acts of violence.[286]

One of the ways the OPD demonstrated its positive relationship with Orlando's Muslim community was to invite and have a local imam stand side by side with law enforcement leaders during one of the early press briefings outside the nightclub.[287] This demonstrated that the entire Muslim community was not and should not be held responsible for this horrific act of violence. It also demonstrated that law enforcement was committed to supporting and protecting the Muslim community as they were doing for the LGBTQ community. This display by law enforcement also brought the LGBTQ and Muslim communities together so they could support one another and ensure this tragedy did not tear them or their city apart.[288] This was demonstrated when 68 local and national LGBTQ, Hispanic, and Muslim groups joined together days after the attack to sign a pledge to stand together against violence and hate.[289] This, in conjunction with Mayor Dyer and Chief Mina's unified message of peace and unity, furthered the resilience of the Orlando community.

Providing additional security to certain locations such as mosques after terrorist incidents is an essential step for law enforcement. Ignoring this responsibility or not responding properly can have dramatic results not only physically but also on the emotional resilience of the community.[290] For example, shortly after the attack on Pulse, a Ft. Pierce, Florida, mosque occasionally attended by the suspect was burned by an individual who opposed the teaching of Islam.[291]

## Getting business back on track after the incident

The area surrounding the Pulse nightclub (dubbed SoDo or "South Downtown" by some) boasts several small businesses as well as chain restaurants and other shops that had been the focus of economic development efforts prior to the Pulse incident. Dry cleaners, barber shops, a bike shop, doctors and dentists' offices, and other businesses on or near South Orange Avenue relied on foot and vehicle traffic for staff and customers to access the business. However, the Pulse incident required the Federal Bureau

---

[286] International Association of Chiefs of Police, *Using Community Policing to Counter Violent Extremism: Five Key Principles for Law Enforcement* (Washington, DC: Office of Community Oriented Policing Services, 2014), https://ric-zai-inc.com/ric.php?page=detail&id=COPS-P299.

[287] Jessica Durando, "After Orlando Shooting, Muslim Americans Show Support for Victims," *USA Today*, June 13, 2016, https://www.usatoday.com/story/news/nation/2016/06/12/orlando-nightclub-muslim-reaction/85790320/.

[288] Selima Hussain, "South Florida Muslim and LGBT Communities Unite for Rally after Orlando Shooting," [Broward and Palm Beach, FL] *Sun Sentinel*, June 15, 2016, http://www.sun-sentinel.com/news/sfl-south-florida-muslim-and-lgbt-communities-band-together-after-orlando-shooting-20160615-story.html.

[289] Antonia Blumberg, "Outpouring Of LGBT, Muslim Groups Sign Statement Against Bigotry," Huffington Post, last modified June 22, 2016, http://www.huffingtonpost.com/entry/outpouring-of-lgbt-muslim-groups-sign-statement-against-bigotry_us_576aeb49e4b0c0252e7827f9.

[290] NAMI, *Preparing for the Unimaginable* (see note 145).

[291] Kimiko de Freytas-Tamura, "30-Year Sentence for Man Who Burned Florida Mosque Attended by Omar Mateen," *The New York Times*, February 7, 2017, https://www.nytimes.com/2017/02/07/us/mosque-fire-florida.html?_r=1.

AR00470

of Investigation (FBI) to keep the area surrounding the club closed for approximately 10 days to ensure the area's safety and to process it for evidence. Approximately 60 businesses were affected by the lack of access due to the street closure during this time.

While business owners understood the public safety need for the street closure, many of them were frustrated by the lack of communication and information coming from the City, the FBI, and the OPD on the plan for reopening the street. The City of Orlando leveraged the following:

- **Numerous partnerships and liaision programs.** The City of Orlando funds and manages multiple City-business programs—including the SoDo area's Main Street Program, which worked to maintain connections with business owners, and the Downtown South Partnerships coordinator, who met with affected businesses daily—and assigned multiple contacts from the City of Orlando Economic Development Department to remain in personal contact with affected businesses. The joint work of these methods and individuals advocating on behalf of the businesses resulted in accelerating the opening of the affected areas.

- **Direct visits, daily newsletters, and social media updates.** These communication methods were used regularly to communicate with affected businesses.

- **The Small Business Administration.** The Small Business Administration established a temporary office in the area and worked in conjunction with the City to assist the local businesses.[292]

However, some of the businesses lost at least 10 days of revenue as well as some customers, causing long-term impact.

To the extent possible, cities should provide consistent communication to businesses affected by long-term closures in the aftermath of large-scale critical incidents. A similar situation occurred on a larger scale in the aftermath of the Boston Marathon bombing. "On the morning of April 17, the mayor assigned the responsibility for planning the reopening of Boylston Street to [the Office of Emergency Management] and tasked all other City departments to support this critical mission."[293] The Office of Emergency Management (OEM) in Boston laid out a detailed plan to reopen the businesses and to communicate that plan with the businesses and the public.

---

[292] OPD command staff, in phone conversation with assessment team member, October 3, 2017.

[293] *After Action Report for the Response to the 2013 Boston Marathon Bombings* (see note 17).

## Community resilience and moving forward

Since the Pulse incident, the City of Orlando and the Orlando community have worked together to provide opportunities for individuals and groups to mourn and commemorate the victims of the tragedy. From preserving the temporary monuments left to the victims on the Pulse site to the City Hall Christmas tree decorated with ornaments designed as a tribute to the signs in the windows of businesses all over the city supporting the survivors, the community continues to support the survivors and the victims' families. In a time when some survivors still suffer from physical pain from injuries that are inextricably tied to the trauma that occurred on that day, they have chosen to move forward and continue to heal. This shared experience of trauma has provided a place from which to build resilience and resolve.

On the one-year anniversary of the attacks, the City of Orlando and the Orange County Government, in collaboration with the owners of the Pulse nightclub, commemorated the victims and showed continued compassion and support to survivors, victims' families and friends, and others affected in the community with "Orlando United Day – A Day of Love and Kindness."[294] The day was described as "an opportunity to join with others in acts of love and kindness to continue the unity that followed the tragedy."[295] The day began with Orange County Mayor Teresa Jacobs and Orlando Mayor Buddy Dyer presenting the Orlando United Day proclamation with Orlando District 4 Commissioner Patty Sheehan and Pulse nightclub owner Barbara Poma at the Orange County Administration Building. Those in attendance at the presentation were also able to donate blood and attach rainbow ribbons with messages of love onto area trees.[296] Over the course of the day, the City of Orlando, Orange County, and countless community and business organizations participated in a myriad of events, vigils, community service and volunteer opportunities, and reflections occurring all over the city to continue to demonstrate the resilience of the city and support for the victims and survivors.[297] The day included two ceremonies held at the nightclub:[298] a community gathering and remembrance and a concluding ceremony that evening where the names of the 49 victims were read and 49 wreaths were displayed as speakers and musicians led gatherers in reflective prayers and focused on hope and healing.[299]

---

[294] "Acts of Love & Kindness," OneOrlando Alliance, accessed June 22, 2017, https://oneorlandoalliance.org/acts-of-love-and-kindness/.

[295] "Orlando United Day," Orange County, Florida, accessed June 22, 2017, http://www.orlandounitedday.com.

[296] "Orlando United Day Tributes Remember the 49," Orange County Government, last modified June 13, 2017, https://newsroom.ocfl.net/2017/06/orlando-united-day-tributes-remember-the-49/.

[297] "Orlando United Day" (see note 295).

[298] "Orlando United Day: Event Schedule, Road Closures and Transportation Options," WESH2, last modified June 12, 2017, http://www.wesh.com/article/orlando-united-day-event-schedule-road-closures-and-transportation-options/10008431.

[299] "Orlando United Day" (see note 295).

AR00472

# Community engagement, relationships, and resilience observations and lessons learned

**Observation 10.1. Pre-existing Orlando police-community relationships, fostered and sustained over time, enhanced the resilience of the community in the aftermath of the Pulse terrorist incident.**

The OPD and other Orlando officials were able to leverage the strong relationships that had been fostered and sustained prior to the attack at Pulse nightclub to enhance the resilience of the Orlando community during and in the aftermath of the incident. Community members and organization representatives, law enforcement personnel, and City and County officials interviewed by the assessment team and providing information through the media said that the strength of the pre-existing community-police relationships significantly enhanced the resilience of the community and the ability to quickly come together and support one another.

*Lesson learned 10.1.1. Building strong community-police relationships can assist in the response and resilience of a community following a terrorist or mass casualty incident.*

**Observation 10.2. The OPD, the OCSO, and other Orlando-area public safety agencies were sensitive to the needs of particular groups most affected by the incident, including the LGBTQ, Hispanic, and Muslim communities.**

Even as the OPD and its supporting agencies were still engaged in the initial response at Pulse nightclub, law enforcement personnel were deployed across the city and the county to provide security and protection to other LGBTQ commercial establishments and to mosques and Muslim institutions. The OPD dispatched K-9 units to LGBTQ bars and clubs in the city and county to conduct external and internal building sweeps, provided security at numerous LGBTQ and Hispanic community gatherings and vigils, and heightened security for the Muslim community and showed their support at mosques. In the hours and days following the incident, the OPD continued to be sensitive to the special needs of affected groups and provided protection during vigils and other commemorative events while also having an imam stand with city officials during press conferences.

*Lesson learned 10.2.1. In the aftermath of a terrorist attack or other mass casualty incident, it is important for law enforcement to be sensitive to the needs of the particular group(s) most affected by the attack, including those victimized and those likely to face retribution.*

**Observation 10.3. The OPD and the City of Orlando have continued to support the victims of the attack and the community as a whole and have come together to support opportunities for individuals and groups to mourn and commemorate the victims of the Pulse tragedy.**

While the days and weeks immediately following a critical incident are generally when the most attention is paid and the most support is raised for various charities and organizations, it is imperative to also prepare for anniversaries and other important times beyond the short term. Months before the first anniversary, the OPD and the City of Orlando began planning for it, declaring it "Orlando United Day" and preparing for vigils and remembrance ceremonies. It is also important to be prepared to address the event when similar incidents occur.

*Lesson learned 10.3.1. Prepare for the long haul.*

Both for the purposes of providing security and to support the community, the OPD continues to provide resources and to support events remembering the incident and commemorating the victims.

**Observation 10.4. The City of Orlando, the state of Florida, and federal responding partners could have better coordinated and communicated with businesses near Pulse to address their needs and long-term impact of the response and investigation.**

The City of Orlando leveraged direct visits, daily newsletters, and social media updates; numerous partnerships and liaison programs; and a temporary Small Business Administration office to communicate with business owners in the area. However, according to a liaison of the business community around the Pulse nightclub, approximately 60 businesses were financially impacted by the investigative perimeter. The liaison was not a City employee and had no direct City points-of-contact, which made it difficult to relay information regarding the reopening of the area to local business owners and likewise to share the concerns of the business owners with the City. This issue also arose when funding was being distributed to victims and local business owners did not qualify or have someone to advocate on their behalf. While federal partners report providing services to assist impacted businesses, many of the businesses were not aware of the services or were not able to leverage them.

*Lesson learned 10.4.1. Consider the needs of local businesses and have a city or law enforcement liaison who can provide information to and advocate for impacted local businesses during a critical incident that requires them to be closed.*

# Conclusion

The Orlando Police Department (OPD), assisted by federal, state, and local law enforcement and public safety agencies, responded to the deadliest terrorist attack on US soil since the 9/11 World Trade Center and Pentagon attacks in a manner consistent with recognized promising practices under extremely volatile and difficult circumstances, saving the lives of innocent people. In doing so, the women and men of the OPD and their partner agencies demonstrated the professionalism, bravery, skill, and determination of our nation's law enforcement officers to protect the communities they serve—putting themselves in harm's way to save innocent lives.

Since 2001, individuals motivated by a range of ideological beliefs and individual factors have engaged in horrific acts of mass violence targeting innocent civilians in communities across the United States. According to a report by the Congressional Research Service in 2015, since 2010 these attacks have increased in frequency as well as lethality.[300] The individuals who perpetrate these acts of mass public violence and terrorism are becoming more unpredictable and deadly in the strategies and tactics they employ, challenging the law enforcement community not only to use recognized promising practices but also to develop and implement next practices that anticipate the evolving threat environment.

Local law enforcement officers, particularly those assigned to patrol work, are the most important resource for identifying, preventing, and responding to threats. Routine patrol work places officers in neighborhoods where terrorists hide, plan, and attack, giving those officers the opportunity to gather critical intelligence as well as to identify potential threats. In addition to their role in preventing terrorist attacks, patrol and other officers working in non-tactical units must be properly trained and equipped to identify the threat, immediately engage the perpetrator(s), extricate and render aid to victims, assume incident command, and request appropriate public safety resources. Well established community-police relationships are vital to preventing and responding to incidents of mass public violence and terrorism as well as to building resiliency within the community.

On June 12, 2016, Orlando police officers and their counterparts entered an overwhelming scene of human suffering, and with laser-like focus they stopped the killing and saved the lives of innocent victims in Pulse. Well-defined, well-developed, and practiced protocols equipped responding officers to perform effectively during this tragic event. This critical incident review highlights the response and identifies lessons learned regarding the law enforcement response to acts of mass public violence and terrorism. In doing so, the review honors the victims of the Pulse nightclub attack and the bravery of the Orlando law enforcement community and serves as a call to action for our nation's elected officials and law enforcement and public safety leaders.

---

[300] William J. Krouse and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013* (Washington, DC: Congressional Research Service, 2015), 15, https://fas.org/sgp/crs/misc/R44126.pdf.

# Appendix A. Observations and Lessons Learned

**Observation 2.1. OPD responders, and leaders in particular, took creative and decisive action under dire, complex, and dynamic circumstances with little to no reliable information.**

*Lesson learned 2.1.1. Responders and their leaders will be required to quickly make creative decisions with little to no reliable information under constantly changing and sometimes horrifying circumstances. These decisions could mean life or death for victims, department personnel, and bystanders.*

*Lesson learned 2.1.2. Leaders should prepare and empower their command staff and responders—at every level of the organization—to make decisions under difficult circumstances through training and practices that focus on critical thinking, situational awareness, and collaboration.*

**Observation 2.2. OPD leadership used the tenets of "swarm intelligence"—particularly pre-existing professional relationships with Orlando-area federal, state, and local leaders—to respond to the terrorist attack at Pulse nightclub.**

No agency or leader claimed the spotlight or special recognition for their role. Leaders agreed that the overarching mission was to save lives, and they rallied around doing so—providing whatever resources they could to accomplish the goal.

*Lesson learned 2.2.1. Response to and management of critical incidents are greatly enhanced when pre-existing relationships exist between leaders and supervisors from all potential first responder agencies. Each leader involved in the response indicated that pre-existing relationships and trust amongst leaders enhanced decision-making, identifying steps that needed to be taken, allocation of resources, and delineation of roles and responsibilities for each agency.*

*Lesson learned 2.2.2. Mutual trust and respect between agency leaders and command personnel within and across agencies, along with trust among line-level personnel working toward a unified goal, are overarching components for reducing competing interests and ensuring a collaborative response.*

**Observation 2.3. Sharing classified information and intelligence during the response to the Pulse terrorist attack informed tactical operations and led to the seamless transition of on-scene leadership from the OPD to the FBI once the incident was resolved.**

*Lesson learned 2.3.1. Ensuring that public safety leaders possess the necessary security clearances prior to a critical incident facilitates information sharing before, during, and after a terrorist incident. Incidents involving terrorism and federal law enforcement will require leaders to possess security clearances to participate in classified briefings.*

**Observation 2.4. Through early and consistent unified messaging, Orlando Mayor Dyer and OPD Chief Mina set the tone for the response from their agencies, the Orlando community, and the nation.**

Orlando leaders set the tone of calm determination, resiliency, and unity in the face of the tragic event. Responding agency executives from the city and the county aligned in support, as did community leaders. In addition, other political officials, including the governor, were supportive and allowed responding agencies to perform their responsibilities without interfering in the decision-making and tactical processes.

*Lesson learned 2.4.1. Leadership and unity of message before, during, and immediately following a critical incident set the tone for the days, weeks, and months to follow.*

*Lesson learned 2.4.2. Demonstrating unity and cooperation between public safety leadership and political officials is essential to gaining the confidence of the community.*

**Observation 2.5. In the hours during the Pulse attack as well as in the days and months following it, OPD command staff have been faced with enormous demands on their time, energy, and focus.**

In addition to their regular duties, OPD leaders have attended hundreds of Pulse-related events, traveled around the world to make presentations to law enforcement and security professionals about the response to the attack, and addressed many additional requests. This requires a delicate balance of organizational awareness, continuing to run a large agency, helping their employees recover, and being responsive to their own personal and family commitments.

*Lesson learned 2.5.1. Leaders must recognize the need to balance the attention they give to external responsibilities with the time they spend within their agency, communicating with and caring for their personnel, their community, and themselves.*

The hours during and days, weeks, and months following a high-profile incident can be overwhelming, requiring leaders to balance the increased demands on their time, focus, and energy as well as that of their organization.

*Lesson learned 2.5.2. Some OPD personnel expressed concern for the limited attention and recognition command staff gave to those who responded to the Pulse attack.*

Command staff should take extra steps to personally acknowledge the efforts of all individuals who played a role in the response.

**Observation 2.6. OPD leaders were aware of their internal resources and capabilities and used them effectively to address many of the challenges that arose during the response to the Pulse attack, but they acknowledged that awareness could be improved in other areas.**

For example, OPD leaders relied on the OCSO hazardous device team (HDT) to conduct the explosive breach, but they admitted that they had not trained on a regular basis with the HDT. This led to some confusion and lack of coordination during the final assault. On the other hand, some agencies sent duplicative resources that went unused while other resources were needed—particularly by public information officers—but were unavailable. The number of tasks

that needed to be accomplished and the amount of resources required grew within—and especially between—the phases of the response, requiring greater familiarity, collaboration, and interagency training in preparation for critical incidents.

*Lesson learned 2.6.1. Assessing and testing the strengths and needs of your own agency and surrounding first responder agencies in preparation for a critical incident can expedite mutual aid, facilitate interagency coordination, streamline operations, and identify deficits in regional resources.*

For example, both OPD SWAT and the OCSO HDT acknowledged the need for regular training between their teams to improve joint operations during routine and crisis events.

*Lesson learned 2.6.2. Conducting executive level, multiagency tabletop exercises—including elected and appointed officials as well as department heads from other government agencies—in preparation for a critical incident can help define roles and responsibilities, identify available resources, and have an agreed-upon incident command system in place.*

Regional planning exercises helped Orlando public safety leaders strengthen relationships and operations and identify resources as well as the roles various agencies would play in a multiagency response to a critical incident.

*Lesson learned 2.6.3. Interagency planning and training should consider access to resources beyond those found in the law enforcement community.*

For several hours, the chief of the OFD was not notified about the ongoing incident, and the OFD established a separate incident command post, which exacerbated lack of coordination between police, fire, and EMS leaders and command staff. Greater emphasis must be placed on ensuring that unified command includes agencies outside of law enforcement, including fire, EMS, and other critical agencies, to ensure a multidisciplined response and the use of all public safety assets and capabilities as soon as practical during a critical incident.

**Observation 2.7. The OPD prioritized studying and learning from AARs and debriefs and crafted training and exercises based on them to prepare for critical incidents.**

The OPD began conducting tabletop and reality-based training for patrol officers on active shooter events following the Columbine High School shooting in 1999. In more recent exercises, the OPD focused on responding to such incidents with high levels of environmental stimulation—darkness, alarms, people screaming for help, and simulated devastating injuries. Members of the OPD command staff reviewed the Aurora movie theater shooting and the San Bernardino terrorist attack and implemented many of the lessons learned from those reports in this response. Chief Mina also asked for this incident review to be conducted in an effort to continue to learn from the Pulse tragedy and so that he could share those lessons with his peers nationwide.

*Lesson learned 2.7.1. Identify and implement promising practices and lessons learned from other relevant incident reviews and AARs, both internal and external to your jurisdiction.*

*Lesson learned 2.7.2. Conduct AARs and incident reviews, particularly those that include all stakeholder groups, on large-scale incidents to provide lessons internally and among regional partners to build organizations that are constantly learning and improving operations and tactics.*

In the field of emergency preparedness, the lessons learned approach stands on the assumption that learning from experience, whether it be our own experience or others' and whether it be from real events or simulations, improves practice and minimizes avoidable deaths and negative economic and social consequences of disasters. Thus, the appeal of learning from experience to avoid duplicating mistakes is widely appreciated in the emergency preparedness arena, and many organizations have adopted formal procedures for identifying, documenting, and disseminating lessons learned from prior response to emergency situations and simulations.

**Observation 3.1. The OPD followed their tactical and hostage negotiation policies and protocols as well as recognized promising practices as they pertain to active shooter and barricaded hostage situations.**

However, OPD policies and protocols and recognized practices and training need to be re-examined in light of the increasing threat of mass public violence and terrorist attacks.

*Lesson learned 3.1.1. The law enforcement community should consider the need to modify the application of current active shooter and barricaded hostage response protocols to terrorist incidents, and a review should be held by the law enforcement community.*

"While a debate can be had about whether such protocols should change in the case of standoffs with Islamist terrorists seeking to kill and be killed, it is worth emphasizing that current best practices are designed to avoid the death of hostages and putting police officers in unreasonable danger. Recognizing that the threat of such extremist terrorism represents a continuing—if not growing—threat, it may be appropriate to develop specific protocols for hostage events during terrorist attacks."[301]

**Observation 3.2. OPD officers and other responders formed two contact teams and entered the nightclub approximately six minutes after the attack began with a clear plan to engage, contain, apprehend, or neutralize the suspect.**

As soon as they could determine where the suspect was, the contact team, led by the OPD SWAT commander, engaged the suspect and forced him to retreat into the restroom while the other contact team triaged and rescued victims.

*Lesson learned 3.2.1. The first officers on scene of an active shooting incident should organize contact teams to engage, contain, apprehend, or neutralize the gunman and rescue victims.*

---

[301] Straub, Zeunik, and Gorban, "Lesson Learned" (see note 19).

**Observation 3.3. While OPD SWAT and OCSO HDT played coordinated roles throughout the Pulse incident, members of both teams reported that the response during and immediately following the initial breach became disorganized and uncoordinated. Specialty units—particularly interagency units—must train together to avoid confusion and disorganization during joint tactical operations.**

*Lesson learned 3.3.1. Incorporate special units—such as SWAT or HDT—in regular planning and training exercises so they are familiar with one another's command and control and tactical protocols.*

*Lesson learned 3.3.2. Command-level personnel should ensure appropriate interagency communications, planning, and execution to ensure the safety of law enforcement personnel during tactical operations.*

**Observation 3.4. The self-deployment of approximately 300 Orlando area law enforcement personnel needed greater coordination at the scene and citywide.**

Uncoordinated self-deployment placed some officers in danger inside Pulse as well as outside from improvised explosive devices. In addition, as evidenced by the multisite attacks in Paris and Mumbai as well as attacks in the United Kingdom in the summer of 2017, police departments must be prepared to deploy and respond to multiple locations and coordinated attacks.

*Lesson learned 3.4.1. Law enforcement supervisors must anticipate and train to prevent uncoordinated and inefficient self-deployment.*

*Lesson learned 3.4.2. After adequate personnel are on scene, additional personnel should be directed to staging areas for assignment of duties and should be directed to return to the staging area prior to their dismissal, or return to their regular assignment after being relieved.*

Uncoordinated self-deployment, particularly in instances of mass public violence and or a terrorist attack, presents officer safety challenges and depletes resources that may be needed to respond to secondary attacks or regular calls for service.

*Lesson learned 3.4.3. As soon as practical a supervisor should be designated as the scene safety officer to direct personnel and resources to staging areas, coordinate assignments, and ensure that adequate ingress and egress are maintained.*

**Observation 3.5. Unified law enforcement command was established at the Pulse attack scene within the first hour. However, Orlando Fire Department and emergency medical services (EMS) officials were not included in the unified command center and were unaware of the discussions occurring and the decisions being made as a result.**

*Lesson learned 3.5.1. As soon as possible and practical during an incident, establish a unified command of all primary first responders—including fire and EMS—to facilitate communication, situational awareness, operational coordination, allocation of resources, and delivery of services.*

*Lesson learned 3.5.2. Engender buy-in of traditional incident command system (ICS) training for law enforcement, which continues to present challenges.*

For example, first responders from both the OPD and the OCSO reported that paying attention during ICS training is difficult as it does not connect the structure to "real" incidents. Law enforcement leaders and researchers should endeavor to re-examine ICS and build a model that will be accepted and implemented in response to critical incidents.

*Lesson learned 3.5.3. ICS planning, training, and implementation must involve all public safety first responders and medical facilities to ensure situational awareness across specialties and the effective coordination and use of resources.*

**Observation 3.6. The OPD could have better identified, established, and communicated the location of staging and assembly areas for arriving law enforcement officers, fire, and EMS to ensure that the area was safe and secure.**

OPD personnel did not establish a secure staging area during the Pulse response, nor did they initially consider the safety of the location of the command post. They did, however, ensure that ingress and egress routes were secure.

*Lesson learned 3.6.1. Be mindful of secondary explosive devices and potential secondary attacks. Have arriving explosive ordinance disposal units sweep staging, assembly, and command post areas to guard against secondary devices.*

*Lesson learned 3.6.2. Responders and supervisors should constantly evaluate security risks of command post, victim and witness triage, and personnel locations and make appropriate adjustments as required.*

*Lesson learned 3.6.3. Responders and responding agencies should continually plan and evaluate ingress and egress routes during critical incidents to ensure that routes are clear for ambulances and other emergency vehicles.*

The OPD did keep South Orange Avenue open for emergency medical and specialized response vehicles.

**Observation 4.1. The OPD and the OCSO gained tactical advantages and maintained officer safety because of their access to specialized equipment.**

Prior to the suspect being neutralized, the OPD Avatar III tactical robot was deployed and provided images from parts of the Adonis Room that contributed to the determination that an assault down the hallway would be too dangerous and the results too unpredictable. After the suspect was neutralized, the OCSO and the Orlando Fire Department (OFD) were able to use their robots as well to aid in the clearing of the nightclub and the suspect's vehicle.

*Lesson learned 4.1.1. Departments should consider the purchase of tactical robots on an individual basis or as a regional asset to increase their ability to gain intelligence to inform tactical decisions in highly volatile operating environments.*

**Observation 4.2. Many of the law enforcement first responders were ill-equipped to protect themselves from the threat posed by the suspect.**

Specifically, the body armor issued to patrol officers and others who were not assigned to specialized units did not provide sufficient protection against the .223 caliber rounds fired by the suspect. Some of the other officers who had been issued higher level ballistic vests and helmets nevertheless failed to don the equipment before entering the Pulse nightclub during the initial assault.

*Lesson learned 4.2.1. Agencies should ensure that adequate personal protective equipment (PPE) is issued to and used by first responders.*

PPE should include active shooter armor kits (ballistic helmets and ballistic vests with ceramic plates) that afford greater protection from semi- and fully automatic weapons and .223 caliber and other ammunition.

*Lesson learned 4.2.2. The balance between "militarizing" the police and ensuring they have the necessary equipment such as armored personnel carriers to protect themselves and the community during incidents of mass public violence and terrorism needs continued discussion and analysis.*

**Observation 4.3. The ability of the OPD communications center staff to patch the radio channels from all four of OPD's geographic sectors facilitated information sharing amongst all OPD personnel.**

*Lesson learned 4.3.1. Interoperability and the ability to patch together responding agency radios facilitated the sharing of information which greatly enhances response coordination when necessary.*

**Observation 4.4. Because of the medical equipment in the Orlando Regional Medical Center (ORMC) and some signal dead zones, OPD officers responsible for clearing the hospital during the report of an active shooter in the facility experienced challenges in communicating with command staff.**

Although the hospital was cleared in approximately one hour, OPD had to have an officer stand outside the ORMC and relay information to and from the command center to ensure they stayed informed about the presence of a secondary attack or additional suspects.

*Lesson learned 4.4.1. Agencies should identify facilities within their communities that pose radio and cell phone transmission and reception difficulties. These facilities can be used to train personnel and identify ways to mitigate poor communication.*

**Observation 4.5. The OFD chief was not notified about the Pulse attack in a timely manner because the fire department's outdated paging system failed.**

*Lesson learned 4.5.1. Agencies should build redundancy into command notification protocols to ensure all appropriate notifications of a critical incident occur in an organized and timely manner.*

*Lesson learned 4.5.2. Public safety communication centers should be designed to create situational awareness among dispatchers so that even if police, fire, and emergency medical services (EMS) operate on different systems—radio or paging—all public safety agencies are aware of activities in other disciplines and can act to support those activities if needed.*

**Observation 4.6. Almost all OPD officers, OCSO deputies, and civilian support staff interviewed by the assessment team agreed that training in their respective areas of responsibility took over and informed the decisions they made and actions they took in response to the Pulse attack.**

*Lesson learned 4.6.1. The OPD and other law enforcement agencies should continue to develop and implement reality-based training that develops situational awareness, critical thinking, and the ability to execute tactics under high levels of stress.*

*Lesson learned 4.6.2. Agencies should continue to regularly plan, train, and exercise using tabletop and practical exercises that incorporate recognized practices and lessons learned from critical incident reviews and after action reports.*

Needs evaluations, planning, training, and practical exercises should be ongoing activities.

**Observation 4.7. Law enforcement counterterrorism training must recognize the evolution of the tactics used during terrorist attacks in the United States or abroad and be updated accordingly.**

Federal, state, and local training must recognize the changing threat environment and prepare law enforcement personnel, especially those who are not assigned to specialized units, to respond to incidents where high capacity weapons, IEDs, and other devices may be employed by well-trained and -equipped assailants.

*Lesson learned 4.7.1. Improved counterterrorism training is necessary to strengthen both community and officer safety.*

In general, counterterrorism training for law enforcement personnel, especially those who are not assigned to specialized units, has not progressed significantly since 9/11.

*Lesson learned 4.7.2. Increased attention should be paid to policies, procedures, and training regarding the law enforcement response to suicide bombers, secondary devices, and multisite attacks.*

**Observation 4.8. Training should prepare responders, particularly patrol officers, for situations they may experience when responding to terrorist attacks.**

OPD active shooter training prior to the Pulse attack included sensory deprivation and stimuli that officers experienced during the incident. Going forward, OPD and national training must recognize and prepare law enforcement personnel to make decisions in overwhelming, novel, complex, and rapidly evolving environments.

*Lesson learned 4.8.1. Training should consider transitions, phases, and additional risks posed by terrorists including those that extend beyond the arrest or neutralization of the suspect(s).*

Training should include transitioning from a dynamic active shooter situation (a situation that is evolving very rapidly consistent with the suspect's actions) to a static situation (a situation that is not evolving or in motion because the suspect is contained, has escaped, or is incapacitated) and potentially back to dynamic or mass casualty situations, requiring transitions back and forth over the course of the response. It is important to account for all the challenges, considerations, and roles and responsibilities that arose in this response.

*Lesson learned 4.8.2. Training should attempt to create as much sensory deprivation or stimuli as possible to simulate real-world scenarios. The ability to understand and apply response strategies in a high stress environment improves performance.*

First responders entering the nightclub encountered a barrage of sensory stimuli: They saw deceased victims and injured persons, heard screaming and moaning from victims, smelled the odor of gunpowder, felt water and blood, experienced movement as injured and uninjured victims ran from the building, the club was relatively dark except for the rotating strobe lights, and experienced a heightened level of fear because of the potential presence of IEDs. This level of chaos can cause a high stress situation that affects officers' abilities to apply response strategies learned during training. Therefore, this level of chaos should be considered and even simulated during training.

**Observation 4.9. Many of the OPD civilian staff, other city personnel, and volunteers who provided support in the emergency operations center, the family reunification center, and the family assistance center had not been trained to handle high stress situations such as mass casualty incidents.**

Although City staff members regularly attend FEMA-related training to work as volunteers at the emergency operations center, the family assistance center, and other post-disaster centers, this training is traditionally focused on weather-related catastrophes. Some of the people who answered hotline calls, Spanish-speaking City employees, and City finance personnel were not prepared for some of the things they heard and saw, but their support was integral to the success of the overall response. By the second and third day, properly trained personnel from the Red Cross, United Way, and other victim-oriented organizations were in place answering hotline calls.

*Lesson learned 4.9.1. Provide mass casualty and emergency response training to those in nontraditional roles who may be needed in an emergency situation to ensure they are prepared to deal with difficult and emotional calls and information.*

*Lesson learned 4.9.2. Post-event responder welfare should be included in agency planning, training, and exercises so responders are better prepared to operate in high stress environments.*

**Observation 4.10. OCSO HDT and OPD SWAT have trained together numerous times since 2007, which was demonstrated by the two teams' familiarity with one another's tactics during the Pulse response. However, with the increasing threat of mass casualty and terrorist attacks, the OCSO HDT and OPD SWAT will focus more on breaching techniques and rapid response tactics to combat situations similar to Pulse. Similarly, fire, EMS, and other government stakeholder agencies have participated in crisis response training with OPD.**

Previous training events and Orlando-area joint operations built a level of familiarity between the teams' overall tactics, demonstrated throughout the Pulse response. However, challenges followed the partial breach.

*Lesson learned 4.10.1. Specialized law enforcement units should regularly train together to ensure familiarity with each unit's policies, procedures, and tactics.*

*Lesson learned 4.10.2. Law enforcement agencies should engage regional first responder agencies—including other law enforcement, fire, EMS, emergency management, and government and nongovernment stakeholders—in crisis response training.*

*Lesson learned 4.10.3. Training exercises should continue past the point where the threat no longer exists and extend to the coordination of the medical response, the notification of victims' families, establishing reunification and assistance center(s), and providing resources to vigils and funerals and prolonged impact on the immediate community.*

Too often, training events stop after the shooters are located and the threat eliminated. This leaves first responders with a lack of knowledge and appreciation for how the entire response system functions and how their actions influence other steps of the process. In this instance, the OPD had not fully accounted for family reunification and notification, survivor and witness interviews, and staging areas that provided privacy from the media and were able to hold the number of people expected.

**Observation 5.1. Because of the emergency medical care provided by Orlando first responders, the overwhelming majority of the injured extricated from Pulse survived.**

The OPD and supporting agencies responding to Pulse made victim rescue a priority. Within 40 minutes, all critically injured victims except the hostages in the restrooms were rescued. Officers and deputies used patrol and other vehicles to transport the most critically injured victims to the nearby trauma center. Because of this quick action on the part of law enforcement in addition to the Orlando Fire Department (OFD) transporting patients from the triage area, 58 injured survivors (53 who had been shot and five with other injuries) were treated at local hospitals and survived. Only 11 individuals who were shot inside of the club and extricated alive did not survive. This is a testament to the importance of the "golden hour" and a key lesson learned to preserve life.

*Lesson learned 5.1.1. Law enforcement agencies should equip and train officers in the use of personal tactical emergency medical kits that include tourniquets, "quick clot" occlusive dressings, and Israeli bandages.*

The OPD trained all officers in IFAK tactical medical solutions, which proved essential to saving a significant number of critically injured victims, particularly from the Jewel Box and patio areas of the Pulse nightclub.

*Lesson learned 5.1.2. Law enforcement personnel should be prepared to improvise to save critically injured persons.*

For example, the OPD and partner organizations used police vehicles to transport critically injured victims to the level one trauma center close to the incident location, saving numerous lives.

**Observation 5.2. The OPD should continue to build relationships, train, and develop protocols with medical personnel from area hospitals, especially the regional level 1 trauma center, to improve the law enforcement response to mass casualty incidents.**

Most of the injured victims from Pulse were brought to ORMC even before the hospital received notification from its alert system. While ORMC acknowledged that the OPD saved numerous lives by rapidly transporting victims to the trauma center, the emergency room was quickly overwhelmed. In addition, ORMC personnel said that had they been aware of the need for a decontamination facility for officers and deputies, they would have made outdoor showers at the hospital available.

*Lesson learned 5.2.1. Create relationships with and include hospital and medical personnel in regional mass casualty or terrorist training.*

*Lesson learned 5.2.2. Identify medical protocols and practices that can be adapted and administered in life-threatening situations.*

While emergency medical care and tactical medical training can be cost-prohibitive for some agencies, partnering with hospitals and local medical professionals can provide law enforcement with practical training and can foster or enhance partnerships with critical stakeholders. In Orlando, ORMC staff commended officers and deputies for rescuing and saving the lives of so many victims and offered to engage in planning and training exercises to enhance the public safety and hospital response to mass casualty events.

*Lesson learned 5.2.3. Law enforcement personnel should be assigned to medical facilities receiving patients from critical incidents to provide security and assist medical staff with situational awareness and communication.*

During the Pulse incident response, emergency room staff members were not aware of why the hospital was locked down for approximately one hour. An OPD officer informed them so that they could safely continue their life-saving work. At the same time, emergency room staff members were able to provide OPD officers with information about the severity—and types—of the victims' injuries.

**Observation 5.3. Prior to the Pulse attack, the OPD incorporated the OFD rescue task force to serve as a casualty rescue component in the "warm zone."**

The intent in establishing the rescue task force was to provide faster access to life-saving emergency medical care for victims by integrating fire department and EMS personnel into contact teams. While in this incident the OFD personnel of the rescue task force did not enter the club with the OPD, this approach to tactical medical response is one example of possible collaborative options.

*Lesson learned 5.3.1. Public safety agencies should consider, train, and exercise how they will deploy emergency medical responders in active shooter or other hostile events to ensure victim extraction, triage, and treatment.*

Law enforcement agencies must ensure they are prepared for incidents that require medical responses like the ones required in San Bernardino and the Pulse terrorist attacks. They should determine whether to incorporate fire department or EMS personnel, have a tactical medic trained, train all personnel in emergency medicine, or implement a combination of these options.

**Observation 5.4. The OPD had trained more than 700 officers in IFAK tactical medical solutions at the time of the shooting.**

*Lesson learned 5.4.1. To reduce the amount of time necessary for victims to receive emergency trauma care, law enforcement officers should be trained in IFAK or similar emergency medical care methods.*

**Observation 6.1. The OPD did not assign an incident safety officer on scene during the response.**

Many officers and deputies responded to the signal 43 by self-deploying, rushing into and around Pulse nightclub. Without an incident safety officer, special weapons and tactics (SWAT) team members rushed into the club before donning the entirety of their ballistic equipment, the 1,000-foot hazardous device team (HDT) perimeter was not communicated to all responders, and there was no decontamination process for responders as they were relieved of duty.

*Lesson learned 6.1.1. An incident safety officer should be designated as quickly as possible during response to a mass casualty or emergency incident, especially a terrorist incident.*

This officer is responsible for identifying, communicating, and mitigating (to the extent possible) all responder safety risks including adhering to perimeters when explosive devices are mentioned or found and there is the possibility of secondary devices and HDT perimeters.

*Lesson learned 6.1.2. The incident safety officer should oversee decontamination protocols for decontamination of all responding personnel and their vehicles.*

**Observation 6.2. The OPD does not have decontamination protocols in place for first responding officers following large-scale critical incidents.**

OPD Policy and Procedure 1301.8 (Significant Exposure and Control Plan) includes officer safety and wellness evaluations, testing, and follow-up procedures for individuals and vehicles, and OPD Policy and Procedure 1308.3 (Major Incidents) includes checklists for various major incidents. Neither of these

policies and procedures addresses officer and vehicle decontamination processes for large-scale critical incidents. For many of the first responders, the individual decontamination that officers and deputies had to do themselves was one of the more traumatizing parts of the response.

*Lesson learned 6.2.1. Decontamination protocols should be established before a critical incident occurs.*

**Observation 6.3. OPD leadership prioritized the mental health of all OPD personnel following the response to Pulse.**

All OPD personnel and OCSO deputies the assessment team interviewed said that they were offered—and in some cases required to use—a variety of mental health resources. From the mandatory CISM debriefs less than 72 hours after the incident and six months later to the availability of EAP sessions to the willingness of Chief Mina to allow employees to use external resources, the OPD ensured that mental well-being was a primary focus following the response to Pulse.

*Lesson learned 6.3.1. Organizational leadership should ensure that all involved in the response feel valued and are provided access to the physical and mental health resources they may need after a critical incident.*

*Lesson learned 6.3.2. Agencies should create a post-event wellness strategy that accommodates everyone, including on-scene responders, support personnel, and other agency employees.*

As much as possible, create a responder mental health strategy that accommodates employees who respond better to immediate debriefs and counseling, those who prefer time before debriefs and counseling, and those who prefer a combination, and determine what level of participation will be compelled versus suggested and who will be included. During assessment team interviews and focus groups with OPD and OCSO personnel, some individuals expressed appreciation for the immediate CISM debrief because it helped them put their emotions in perspective, provided opportunities to hear some positive outcomes of the response, and almost immediately addressed some issues and concerns they had. Other employees remarked that the mandatory debrief immediately after the incident was unhelpful because they had not recuperated from the physical stimulation caused by the response, much less fully processed their own emotions. In addition, while some individuals appreciated being randomly assigned to the facilitated discussion groups, others felt the debriefs would have been more useful and comfortable with members of their own team. Likewise, some felt that being compelled to talk was beneficial while others said it was hard

to identify emotions that soon after the attack. However, everyone interviewed agreed that they were provided a significant number of resources and opportunities to ensure their mental health and well-being.

**Observation 6.4. While the OPD did provide various opportunities for healing following the incident, including debriefs and counseling through EAP, some employees felt that given the extraordinary circumstances of a critical incident the EAP system did not meet their personal needs.**

*Lesson learned 6.4.1. Jurisdictions and individual agencies should consider whether their traditional EAP and mental health structure will suffice in the aftermath of a critical incident or if adjustments should be made for employees in need of other outside services.*

**Observation 6.5. The OPD assigned a designated mental health incident commander.**

The primary role of the mental health incident commander is to monitor agency personnel in the aftermath of the event, to coordinate debriefings, to connect individuals to peer support or mental health professionals, to connect families of those involved in the incident response to support services if needed, and to ensure a continuum of care in the aftermath of the event. This position is also necessary to advise agency leadership regarding operational decisions that impact personnel mental health (including work and shift assignments) and to vet and manage self-deployed mental health providers.

*Lesson learned 6.5.1. To further focus and prioritize the mental health in the aftermath of the Pulse incident, OPD and other law enforcement agencies should assign a mental health incident commander.*

The OPD assigned a captain of the CISM team as a mental health incident commander. The captain's role was to monitor agency personnel, coordinate the CISM debriefs, and provide and guide employees to special services.

**Observation 7.1. Activating the EOC and declaring a state of emergency allowed the City of Orlando to create a central location from which to direct and allocate resources both to support the OPD response to the Pulse incident and to provide critical information, resources, and services to victims and the community.**

*Lesson learned 7.1.1. Activating the EOC and declaring a state of emergency early in the process can help secure additional resources, relieving pressure and responsibility on the police department so that they can focus on other important law enforcement aspects of the response.*

**Observation 7.2. The OPD and the City of Orlando had a pre-existing plan for reunifying families in the aftermath of a critical incident.**

Because of multiple large-scale critical incident exercises, the emergency preparedness manager for the Orlando Regional Medical Center (ORMC) knew the waiting room of the hospital would quickly be overwhelmed and determined that the Hampton Inn & Suites would have more room and resources to accommodate family notifications and reunification. The hospital and the hotel had a pre-existing understanding, and as soon as the waiting room became overcrowded with

family members and friends of Pulse victims, the transition was made smoothly to the FRC. The City of Orlando, the OPD, and Orlando Health did have plans in place for reunification, but those plans were not designed to respond to incidents of this magnitude. The City and Orlando Health implemented changes on the move to scale up and work within their existing plans.

*Lesson learned 7.2.1. Identify the location for an FRC near primary hospitals prior to a critical incident. The FRC should be a scalable, safe, stable, and comfortable facility that provides access to amenities such as restrooms and outlets to charge cell phones.*

*Lesson learned 7.2.2. In mass casualty events, the next-of-kin notification process should account for logistical issues, and notifications should be made in a timely manner to lessen the stress on family members and significant others as they wait to hear about loved ones involved in the incident.*

Whenever possible, notifications should be made in person. The Orange County Medical Examiner's Office, the FDLE, and the FBI identified 48 of the 49 decedents in less than 24 hours, and most of the next-of-kin notifications were made as soon as the decedents were identified. This kept families from having to wait to get closure and begin the process of moving forward.

*Lesson learned 7.2.3. Police departments challenged by the need to identify and interview large numbers of victims and witnesses should consider staffing to expedite the interview process and request assistance from other agencies, if appropriate.*

Some of the victims and witnesses of the Pulse terrorist attack expressed frustration about having to wait to be interviewed before they were released and not having the ability to contact their loved ones.

**Observation 7.3. The OPD provided safe, comfortable provisions for victim and witness care while they awaited interview and notification.**

OPD command staff said they learned from the after action report of the San Bernardino attack, which highlighted that "victims expressed concern regarding the amount of time spent on the golf course (approximately three hours)," and "victims expressed concern and frustration with the inability to contact family members, lack of counseling services, and the lengthy interview and photographing process." Having the FRC at a hotel allowed for victims to have access to restrooms and electricity. Similarly, uninjured witnesses who were placed on buses and transported to OPD headquarters were afforded the opportunity to wait inside with water and facilities available and electricity to charge their devices, as well as phones for those who had left theirs in the club.

*Lesson learned 7.3.1. Consider provisions for victim and witness care while they are awaiting interviews and being notified.*

These may include making cell phone charging stations and other forms of communication available, providing food and beverages, and providing access to counselors and clergy.

*Lesson learned 7.3.2. Designate a special area where clergy and counselors can assemble within the FRC and be made available to those who request them.*

Some OPD chaplains and additional self-deployed religious leaders from throughout the Orlando community arrived at the FRC to offer their assistance to victims and families. However, the clergy did not have a room in which to provide counseling, so they had to do it in the middle of the room with other victims and family members nearby. This created situations where individuals who needed counseling were unable to receive it in a timely or private manner and chaplains were mistakenly included with victims in some instances.

**Observation 7.4. Victims, witnesses, and their families could have been provided better cover from media access as they entered the FRC.**

The scale of this incident resulted in an overwhelming amount of media on the scene, near the hospitals, and throughout the Orlando area. Victims, witnesses, and their families expressed frustration to OPD officers and University of Central Florida Police Department (UCFPD) victim advocates about having to walk through a media gauntlet on the way in and out of the FRC. Once the aggression of the national media was observed, additional security was put in place and attempts by PIOs to control the media were implemented. OPD officers began acting as valet parkers so that the families could go straight into the hotel, avoiding exposure to the media. Local media were cooperative.

*Lesson learned 7.4.1. Ensure security and privacy for families of victims going to and from the FRC as members of the media or other unscrupulous individuals may go to great lengths to access or harass them.*

*Lesson learned 7.4.2. Designate one or more areas near but not immediately surrounding or adjacent to the FRC where the public and the media can gather without interfering.*

**Observation 7.5. The scale of this incident far exceeded the natural disasters that most EOCs and their respective hotlines traditionally deal with, and the EOC was not fully prepared for the level and type of calls that came in to the hotline. However, within 36 hours, trained call takers were in place.**

Beginning with the first press conference, Mayor Buddy Dyer provided the phone number for the public hotline that the EOC had established to provide information about the FAC. Originally, the hotline was linked to 12 phones, but it quickly expanded to 23 phones and answered approximately 6,800 calls. With the phone bank quickly growing, support staff members were untrained and unprepared for the emotional impact of the calls they were required to answer, which contributed to mental health and wellness concerns after the EOC was deactivated.

*Lesson learned 7.5.1. When establishing any type of public hotline to provide information on a critical incident, the infrastructure, staffing, and ability of the staff to handle the calls, including call takers trained in crisis response, should be in place prior to public announcement being made.*

**Observation 7.6. The Orlando FAC provided immense support and assistance to the survivors and families of victims of the Pulse nightclub terrorist attack.**

Whether the responsibility of the police department, the City, or the EOC, this resource was extremely helpful to the Orlando community.

*Lesson learned 7.6.1. Establish an FAC that provides a one-stop location for victims and their families to access any products and services necessary in the aftermath of the incident. Publicize the availability of victim services at all press conferences, through fliers, and on social media.*

The FAC was opened at Camping World Stadium based on the stadium's ability to accommodate the 956 individuals and 298 families that ended up coming, in addition to the 50 to 60 government, community, and business organizations that sent representatives to provide support. The location also provided the logistical and technological capacity necessary for the City IT department to set up a phone bank and computer support; many of the logistical details—including parking, food vendors, security staff, offices, etc.—were already established; and public safety personnel were familiar with the layout, which allowed for additional security measures and protection of individuals and families from the media.

*Lesson learned 7.6.2. Partner with nontraditional jurisdiction agencies and stakeholders— including IT, public transportation, financial services, airlines and hotels, etc.—when creating an FAC to expedite the setup process and ensure the availability of various resources.*

OEM had learned from previous critical incident reports that the FAC should provide a myriad of services and information to victims' families. Through practice and other exercises, OEM fostered partnerships with private and public businesses, associations, and other stakeholders so that when needed, their resources would be available. As soon as the FAC was established, OEM was able to rely on airlines, LGBTQ and Hispanic community groups, the Hispanic Chamber of Commerce, the Muslim population, and other organizations to provide a host of services to families of decedents and survivors.

**Observation 8.1. Local, state, and federal agencies responding to the Pulse incident, including the OPD, delineated roles and responsibilities, coordinated efforts, shared information and evidence, and collaborated throughout the incident and its aftermath.**

Rapid and effective decision-making, clear division of work and responsibilities, frequent sharing of information and resources, pre-existing relationships among the executives of the agencies, and constant collaboration in the UCC—led by the OPD—allowed multiple investigations to progress simultaneously.

*Lesson learned 8.1.1. The ability to immediately determine specific agency investigative roles and responsibilities is crucial to effective incident and investigation management.*

Orlando area federal, state, and local responding agencies were quickly able to determine investigative roles.

*Lesson learned 8.1.2. Critical incident training and exercises should continue through all aspects of survivor and witness identification, interviewing, and reunification.*

The OPD did not initially have victim advocates or a strategy for handling identification, interviewing, and reunification of the number of victims and witnesses who were affected at the Pulse nightclub. OPD command staff acknowledged the difficulties in interviewing all of the patrons at the club on June 12, because many patrons fled when the shooting began and did not return to the area or go to OPD headquarters. The OPD had not developed protocols for interviewing large numbers of witnesses and victims during a mass casualty event.

**Observation 9.1. Prior to the attack at the Pulse nightclub, the PIOs of all Orlando city agencies established a process for communication during events of varying types. The process included protocols regarding which entity would take the lead, what the other agencies would do, and what the overall tone of the messages would be.**

*Lesson learned 9.1.1. A media and public relations strategy that ensures the coordination of all jurisdiction-department public information officers (PIOs) and all information being released through various platforms and accounts is integral to effectively handling the media during a critical incident.*

For each phase of the response in Orlando, a thoughtful and coordinated media and public relations strategy that included traditional and social media was developed. During the incident, the OPD relied primarily on its Twitter account to provide breaking news and images from the scene and used its other social media channels to point interested followers to Twitter. As the response shifted, the City's Facebook page was used for messages about the city response and city messages, and Periscope was used for live-streaming press conferences.

*Lesson learned 9.1.2. The depth of the department's media and public relations team and strategy is extremely important to consider before a critical incident.*

Major incidents place a significant amount of strain on media and public relations teams and PIOs throughout the jurisdiction, and it is imperative that communications teams have the depth to handle the workload. Ensure that the team is able to communicate with significant segments of the community, including non-English speakers. Personnel should also be available to address media

outlets in different time zones and countries. Be aware that after a critical incident, business as usual will continue for the rest of the jurisdiction, but the public information needs related to the incident will continue for weeks, months, and years.

**Observation 9.2. With the OPD's coordinated media and public information strategy, the numerous individuals and agencies involved successfully kept the public informed.**

With 27 agencies involved in the response to the terrorist attack at the Pulse nightclub, discrepancies could have existed in what information was released, by whom, and when. However, with a coordinated public information strategy, the numerous individuals and

agencies involved were able to successfully keep the public informed. Deferring to the OPD and having all city and county social media accounts, email addresses, and phone messages direct news media to the OPD ensured that all media and public relations were handled consistently.

*Lesson learned 9.2.1. Unity of message and communications that focus on resilience are imperative to the overall success of the response.*

**Observation 9.3. The OPD leveraged resources such as their pre-existing social media followings and held press conferences to control their story.**

Despite the chaos caused by intensive media coverage, OPD PIOs put standardized voicemail greeting messages on their desk phones and cell phones and an automatic reply on their general email address directing everyone to the OPD Twitter account and instructed them to leave their information and interview requests in a message. This allowed for department personnel to focus on managing the initial flood of questions and requests and the tasks at hand during the event. Essentially, through its PIOs, the OPD became its own news agency, using social media to correct rumors, share information and images, and frame the narrative. To help sort through the many hundreds of emails, the communications group at Orlando City Hall tracked all media requests and added them to a single Excel spreadsheet. This was accomplished by directing all emails to the dedicated PIO email address.

*Lesson learned 9.3.1. Police departments should leverage pre-existing social media followings to act as a single primary source of information and communication with the public during a critical incident.*

Agencies that regularly use social media to communicate with the public will have an established audience for distribution of information in a critical incident. However, during a critical incident is not the time to attempt to establish a social media following.

**Observation 9.4. In some instances, OPD PIOs did not have access to the resources they needed to the keep the public informed but instead adapted work-arounds.**

OPD PIOs were deployed on scene and were responsible for keeping the public informed about the safety of area around Pulse, incident outcomes and status, available resources for victims, locations for vigils, and other important information. At times, however, they did not have the resources available to them to facilitate that work. For example, there was no room in the UCC for the PIOs to sit in on briefings. Instead, PIOs received updates from Chief Mina and senior staff via text or in person right after the briefings in the UCC. In addition, they often did not have the equipment they needed to work on scene.

*Lesson learned 9.4.1. PIOs should be involved and included in the UCC to directly participate in and observe decisions made related to press conferences and social media posts. Receiving information secondhand can eliminate important context behind statements.*

Because there was no room in the UCC for the PIOs, they received information following briefings. This was especially challenging for the PIOs prior to press conferences, when Chief Mina had to handwrite his statements and send images of them by text message to the PIOs so that they could prepare to post them as he made his statements during the press conferences.

*Lesson learned 9.4.2. PIOs should be provided with mobile resources necessary to undertake their duties over a long period of time and in any location (laptops with necessary software and smart phones).*

**Observation 9.5. OPD PIOs acknowledged that—particularly with the limited characters of social media—it is important to be thoughtful and cautious in communications so that they are sensitive to decedents' family members, victims, witnesses, and the larger community.**

*Lesson learned 9.5.1. Ensure that public statements—including during press conferences and interviews and on social media—properly balance law enforcement terminology with the perceptions and impacts on victims, their families, survivors, and the larger community.*

**Observation 9.6. The decision to have Mayor Dyer and Chief Mina speak at the first press conference before federal officials was made strategically to set the tone that the response would be driven by the community, not by federal investigators.**

Furthermore, having Mayor Dyer speak before Chief Mina allowed the mayor to shape how the public viewed the response, including using clear and comforting language in his press conference statements, acknowledging the LGBTQ and Hispanic communities and the Muslim population, and assuaging the community's fears instead of focusing on investigating a crime.

*Lesson learned 9.6.1. Having a recognizable local leader speak first at first press conferences portrayed a sense that the response was and would continue to be a local community-driven response led by trust and unity, not a federal response driven by terrorism.*

**Observation 9.7. To enhance relationships with local media outlets, the OPD provided them exclusive interviews before the national and international media.**

Local media outlets do not have the resources to be as aggressive and persistent as national and international outlets, but they will be the outlets that remain when the major incident and the initial response are over and the national and international media leave. The OPD recognized the importance of maintaining its positive relationships with their local media outlets by offering exclusive interviews and stories before going to the national and international channels.

*Lesson learned 9.7.1. Prioritize the needs and requests of the local media before that of national and international media outlets.*

The OPD purposefully responded to and provided local media outlets with exclusive interviews and information first as a way to build trust and relationships with them. According to the OPD PIO, "They [local media outlets] are going to be here long after the national media has gone home."

*Lesson learned 9.7.2. Establish a JIC or other location where PIOs or other personnel from stakeholder agencies can coordinate the incident media response and can monitor media and social media to keep abreast of erroneous information being reported and quell rumors.*

The JIC was established as part of the EOC, but prior to the establishment of the EOC, the PIOs from the responding law enforcement agencies and the City worked out of the OCSO PIO truck that came to provide support. OPD PIOs acknowledged that it would have helped

to have the ability to follow media reporting so that they could quickly correct erroneous information and be more proactive in addressing rumors as they did following the posts of a potential bomb that was really the explosive breach.

*Lesson learned 9.7.3. Prepare for negative questions and shifts in the news cycle from being on your side to looking for an exclusive story and trying to generate contention.*

OPD PIOs acknowledged that one of the biggest lessons they learned was to balance between transparency and the implications on the officers and family members. Prior to releasing the names and information of officers involved in this incident, they should have better considered the implications of media outlets becoming aggressive in tracking down officers, calling and showing up at their houses, and potentially tracking down relatives.

**Observation 9.8. Because Mayor Dyer and representatives from his office had been involved in critical incident response exercises, he was aware that his role was to focus on unifying the community and setting the tone for the city.**

As soon as Mayor Dyer was made aware of the ongoing incident, he responded to the UCC. When he arrived, instead of interjecting himself and politics into the decision-making process, he focused on collecting information and determining the tone and message of the response he would provide to his community. Other local elected officials followed suit and focused on calming and unifying the community as well as demonstrating resiliency instead of getting involved in the investigation and tactical response.

*Lesson learned 9.8.1. Include elected officials' roles and responsibilities in planning and managing critical incidents, and include them in training and exercises. After a critical incident, be prepared to handle elected officials of all levels and political affiliations, providing them with constructive roles when possible.*

Personnel from both the OPD and the mayor's office were allocated to assist the local, state, and federal officials who traveled to Orlando to visit the scene, pay their respects, and offer their support and gratitude to the responders. Some officials wanted to offer their condolences to the victims and survivors and show their support for first responders, while others wanted to be more involved. In addition, with the Republican and Democratic National Conventions both less than two months later, candidates vying for their party's nominations arrived in Orlando. In some cases, the officials were not received warmly by the community and their visits caused additional strain for already taxed agencies.

**Observation 10.1. Pre-existing Orlando police-community relationships, fostered and sustained over time, enhanced the resilience of the community in the aftermath of the Pulse terrorist incident.**

The OPD and other Orlando officials were able to leverage the strong relationships that had been fostered and sustained prior to the attack at Pulse nightclub to enhance the resilience of the Orlando community during and in the aftermath of the incident. Community members and organization representatives, law enforcement personnel, and City and County officials

interviewed by the assessment team and providing information through the media said that the strength of the pre-existing community-police relationships significantly enhanced the resilience of the community and the ability to quickly come together and support one another.

*Lesson learned 10.1.1. Building strong community-police relationships can assist in the response and resilience of a community following a terrorist or mass casualty incident.*

**Observation 10.2. The OPD, the OCSO, and other Orlando-area public safety agencies were sensitive to the needs of particular groups most affected by the incident, including the LGBTQ, Hispanic, and Muslim communities.**

Even as the OPD and its supporting agencies were still engaged in the initial response at Pulse nightclub, law enforcement personnel were deployed across the city and the county to provide security and protection to other LGBTQ commercial establishments and to mosques and Muslim institutions. The OPD dispatched K-9 units to LGBTQ bars and clubs in the city and county to conduct external and internal building sweeps, provided security at numerous LGBTQ and Hispanic community gatherings and vigils, and heightened security for the Muslim community and showed their support at mosques. In the hours and days following the incident, the OPD continued to be sensitive to the special needs of affected groups and provided protection during vigils and other commemorative events while also having an imam stand with city officials during press conferences.

*Lesson learned 10.2.1. In the aftermath of a terrorist attack or other mass casualty incident, it is important for law enforcement to be sensitive to the needs of the particular group(s) most affected by the attack, including those victimized and those likely to face retribution.*

**Observation 10.3. The OPD and the City of Orlando have continued to support the victims of the attack and the community as a whole and have come together to support opportunities for individuals and groups to mourn and commemorate the victims of the Pulse tragedy.**

While the days and weeks immediately following a critical incident are generally when the most attention is paid and the most support is raised for various charities and organizations, it is imperative to also prepare for anniversaries and other important times beyond the short term. Months before the first anniversary, the OPD and the City of Orlando began planning for it, declaring it "Orlando United Day" and preparing for vigils and remembrance ceremonies. It is also important to be prepared to address the event when similar incidents occur.

*Lesson learned 10.3.1. Prepare for the long haul.*

Both for the purposes of providing security and to support the community, the OPD continues to provide resources and to support events remembering the incident and commemorating the victims.

**Observation 10.4. The City of Orlando, the state of Florida, and federal responding partners could have better coordinated and communicated with businesses near Pulse to address their needs and long-term impact of the response and investigation.**

The City of Orlando leveraged direct visits, daily newsletters, and social media updates; numerous partnerships and liaison programs; and a temporary Small Business Administration office to communicate with business owners in the area. However, according to a liaison of the

business community around the Pulse nightclub, approximately 60 businesses were financially impacted by the investigative perimeter. The liaison was not a City employee and had no direct City points-of-contact, which made it difficult to relay information regarding the reopening of the area to local business owners and likewise to share the concerns of the business owners with the City. This issue also arose when funding was being distributed to victims and local business owners did not qualify or have someone to advocate on their behalf. While federal partners report providing services to assist impacted businesses, many of the businesses were not aware of the services or were not able to leverage them.

*Lesson learned 10.4.1. Consider the needs of local businesses and have a city or law enforcement liaison who can provide information to and advocate for impacted local businesses during a critical incident that requires them to be closed.*

# Appendix B. Email from Chief John W. Mina to Orlando Police Department Staff

Sun 6/12/2016, 7:00 p.m.

OPD Dept

On the darkest day of my 25 years at the Orlando Police Department, I wanted to take a moment to tell all of you how proud I am of the work you have done today and will do over the next days and weeks.

We have trained again and again for this type of situation. It's unfortunate that we had to put those skills to use today. But because of that training and your professionalism, we saved dozens of lives this morning.

Even before the first patrol units arrived on the scene, an OPD officer working extra duty at the club engaged the gunman as he opened fire. Our first responders and SWAT team faced a hail of gunfire as they rescued the hostages, and we are blessed beyond words that none of them were gravely injured or killed.

We've received an enormous amount of tactical Law Enforcement support from local, state and Federal agencies. The outpouring we have received from our Central Florida community and Law Enforcement across the nation and the world, has overwhelmed me with gratitude.

I know that you have all been affected today by the tragic actions of a lone terrorist who cut short the lives of so many. Our community, our City, and our Department will be grieving in the days, weeks and months to come.

But on a day like today—and every day—I couldn't be more proud to be your chief.

Please hug your families tonight. And be safe out there.

John W. Mina, Chief of Police
Orlando Police Department

AR00499